

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Fernanda Garber, Marc Lerner, Derek
Rasmussen, and Robert Silver,
representing themselves and all others
similarly situated,

        Plaintiffs,

        v.

Office of the Commissioner of Baseball,
Major League Baseball Enterprises Inc.,
MLB Advanced Media L.P., Directv LLC,
Directv Sports Networks LLC, Root
Sports Pittsburgh, Root Sports Rocky
Mountain, Root Sports Northwest,
Comcast Corp., Comcast Sportsnet
Philly, L.P., Comcast Sportsnet Bay
Area, L.P., Comcast Sportsnet Chicago,
L.P., Yankees Entertainment and Sports
Networks, LLC, Athletics Investment
Group, LLC, The Baseball Club of
Seattle, L.P., Chicago National League
Ball Club, LLC, Chicago White Sox, Ltd.,
Colorado Rockies Baseball Club, Ltd.,
New York Yankees Partnership, The
Phillies, L.P., Pittsburgh Baseball, Inc.,
and San Francisco Baseball Associates,
L.P.,

        Defendants.

Civil Action No.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

      Plaintiffs Fernanda Garber, Marc Lerner, Derek Rasmussen, and Robert

Silver, by and through their attorneys, file this Complaint against Defendants and

allege as follows:

**I.**
## NATURE OF THE ACTION

1.     Major League Baseball ("MLB" or "League") is comprised of thirty separately owned and operated major league men's baseball clubs in the United States and Canada. The MLB clubs, like other sports leagues, have structured their governance to permit major decisions regarding on-field sporting competition and off-field business competition to be made by the club owners themselves. In so doing, the owners act in their own economic self-interest, including entering into a series of agreements that eliminate, restrict, and prevent off-field competition. These anti-competitive agreements go far beyond any cooperation reasonably necessary to provide major league men's professional baseball contests that increase fan appeal or respond to consumer preferences.

2.     This action challenges—and seeks to remedy—the defendants' use of the illegal cartel that results from these agreements to eliminate competition in the distribution of games over the Internet and television. Defendants have accomplished this by agreeing to divide the live-game video presentation market into exclusive territories, which are protected by anticompetitive blackouts. Not only are such agreements not necessary to producing baseball contests, they are directed at reducing competition in the live-game video presentation market, involving and protecting third parties who operate only in that separate market.

3.     In a 1998 complaint against the League and other clubs, the New York Yankees conceded that the League is a cartel that has exceeded the boundaries of necessary cooperation. (*New York Yankees Partnership and Adidas America, Inc. v.*

2

*Major League Baseball Enterprises, Inc., et al.*, Case No. 98-civ-0129 (S.D.N.Y.).)
The Yankees sued when the League interfered with the Yankees' individual
licensing agreement with Adidas. As the Yankees stated in their complaint:
"Defendants operate a horizontal cartel, through which the Major League Clubs
have agreed not to compete with each other and thereby to fix prices and to reduce
output below competitive levels in the (i) professional baseball retail licensing
markets; and (ii) the professional baseball sponsorship markets." *Id.* at ¶153. The
restraints articulated in the present complaint are no less anticompetitive or
justified as the restraints set forth in the Yankees' case against the league. (The
Yankees and the League reached a confidential agreement before any briefing on
the merits of the Yankees' suit.)

      4.    Clubs in other sports leagues have also sued their respective leagues
on antitrust grounds, including challenges to the regional blackout system at issue
here. In 2007, Madison Square Garden, L.P., which owns the New York Rangers
Club, sued the National Hockey League to eliminate anticompetitive restraints that
are similar to those alleged in this complaint. The Rangers' complaint flatly
conceded that the NHL was a "cartel" and acknowledged that the League's
televising and streaming restrictions were anti-competitive and unlawful. (*Madison
Square Garden, L.P. v. National Hockey League, et al.*, Case No. 07-8455 (S.D.N.Y.),
Amended Complaint ("MSG Complaint"), ¶ 6). After the Rangers defeated the
League's motion to dismiss the complaint, the League and the Rangers settled the
lawsuit.

5.     In an action brought by the Phoenix Coyotes hockey club against the NHL, the Coyotes stated, "The NHL and its members have conspired to create exclusive television and radio broadcast rights within designated territories through contracts with individual NHL members, thereby maintaining monopoly power within each team's 'home territory' by preventing others from broadcasting events within those territories." Second Amended Complaint, *Coyotes Hockey LLC v. NHL*, Adv. No. 09-494 (Bankr. D. Ariz. June 5, 2009). That action was ultimately resolved when the League obtained ownership of the Phoenix Coyotes through the club's bankruptcy.

6.     Similarly, the Chicago Bulls sued the National Basketball Association, "characterizing the NBA as a cartel that has slapped a limit on the output of broadcast games, something that is illegal under the antitrust laws." *Chicago Professional Sports Ltd. Partnership v. National Basketball Ass'n*, 961 F.2d 667, 669 (7th Cir. 1992). That case settled after the League agreed to allow the Bulls to televise a greater number of games outside of its local territory.

7.     In *American Needle, Inc. v. National Football League*, 130 S. Ct. 2201 (2010), the United States Supreme Court unanimously rejected the NFL's claim that an agreement regarding the joint marketing of club-owned intellectual property was the decision of a "single entity"—the league—not subject to section 1 of the Sherman Act. The Court reaffirmed lower court decisions that sports leagues are subject to the antitrust laws and that league owners must refrain from agreements that unreasonably restrain trade. The Court also reaffirmed its own

4

decision in *NCAA v. Board of Regents*, 468 U.S. 85 (1984), which held that the hallmark of an unreasonable restraint is one that raises price, lowers output, or renders output unresponsive to consumer preference. The Court's decision extended a long line of precedents that recognize that sports leagues are subject to the antitrust laws. Indeed, the United States District Court for the Eastern District of Pennsylvania found over a half-century ago that television blackout agreements of the very kind at issue in this case amount to "an unreasonable and illegal restraint of trade." *United States v. Nat'l Football League*, 116 F. Supp. 319, 327 (E.D. Pa. 1953).

8. The distribution of video presentations of baseball games is subject to the antitrust laws. *See Henderson Broadcasting Corp. v. Houston Sports Ass'n, Inc.*, 541 F. Supp. 263 (D.C. Tex. 1982). Agreements with third parties to restrain competition in the television and internet industry are well outside the narrow exemption to the antitrust laws recognized in *Flood v. Kuhn*, 407 U.S. 258 (1972). Nothing about these agreements reflect anything unique to baseball; they are essentially identical to those in other major sports, and baseball itself has long understood that broadcasting does not fall within the exemption, as has Congress.

9. Despite these clear precedents, MLB's member clubs continue to agree to divide the live-game video presentation market by assigning an exclusive territory to each team and its television partners. In exchange for being granted anticompetitive protections in its own home market, the team and its partners expressly agree not to compete in the other teams' exclusive territories. The stated

purpose of these policies is to create regional monopolies that protect the partners from competition in their respective local areas.

10.     The only way consumers can watch video presentations of other teams is through one of two exclusive "out-of-market" packages: "MLB.TV," which is available through the Internet, or "MLB Extra Innings," a product similar to MLB.TV, which the League offers through cable and satellite providers. For both packages, the "in-market" games are blacked out to protect the local television partner. Thus, a New York Mets fan living in New York cannot watch the Mets play through the internet or television package. The fan must own a television and subscribe to a cable package that includes the channels that carry Mets' games.

11.     In addition, the Defendants have colluded to sell the "out of market" packages only through the League. The League Defendants are then able to exploit their illegal monopoly by charging supra-competitive prices. As a result of this monopoly, moreover, the League is able to require purchasers of MLB.TV or MLB Extra Innings to buy all "out-of-market" games of all the League's teams even if the fan is only interested in a particular team or a particular game. Thus, a Detroit Tigers fan living in New York cannot watch the Tigers play, except occasional games on network television, unless he purchases the entire package of League games from the MLB's exclusive MLB.TV or MLB Extra Innings products.

12.     As one set of commentators has put it, "Absent the exclusive territorial arrangements agreed to by league owners, individual teams would . . . arrange for their own games to be available out-of-market. . . . Fans wishing to see only their

6

favorite team now pay for more games than they want, so sports leagues are currently using their monopoly power to effectuate a huge wealth transfer. Another significant group of less fanatic consumers would be willing to pay a more modest sum for their favorite teams' games only. As to these fans, the current scheme reduces output." Stephen F. Ross & Stefan Szymanski, *Fans of the World Unite!* (Stanford Univ. 2008).

13.    As MSG/New York Rangers stated in its antitrust complaint against the NHL: "There are no legitimate, procompetitive justifications for these 'exclusive' agreements and other competitive restraints, which have harmed consumers in various ways ...." (MSG Complaint, ¶ 46). In particular, as MSG stated, these restraints result in "reduced output, diminished product quality, diminished choice and suppressed price competition." (*Id.* at ¶45).

14.    These restraints are not reasonably necessary to maintain a level of competitive balance within the League that fans prefer, or to maintain the viability of franchises. To the extent that competition among teams for internet or television rights would result in revenue disparities that preclude a fan-optimal level of competitive balance, agreements that require revenue sharing, if set at levels that do not restrict output, is an obvious and well-recognized less restrictive alternative, and one that baseball already employs.

15.    Plaintiffs are individuals who were, and continue to be, harmed by the Defendants' anti-competitive agreements. They have either (1) purchased a cable package that includes a network that is protected from competition and therefore is

7

overpriced or (2) purchased an "out-of-market" package (either online or through

their television provider) that is overpriced because of these unlawful agreements.

The Plaintiffs seek to restore off-field competition among and between the clubs and

their partners by ending the Defendants' collusive distribution agreements.

## II.
## PARTIES

### A.   The Plaintiffs

16.    Plaintiff Fernanda Garber now lives in Burlingame, California. From

2009 through March 2011, she subscribed to Comcast cable service in Oakland,

California. Her service included Comcast Sportsnet California and Comcast

Sportsnet Bay Area. She was charged supra-competitive prices for her service due

to Defendants' conduct.

17.    Plaintiff Marc Lerner lives in Oxford, Mississippi. Mr. Lerner

subscribed to the MLB.tv Internet streaming package in July 2011 for the 2011

season. His favorite team is the New York Yankees. He would prefer not to be

required to purchase a full "out-of-market" package to get New York Yankees

games, and would prefer not to have to subscribe to pay television to be able to

watch New York Yankees games involving the St. Louis Cardinals, Cincinnati Reds,

and Atlanta Braves, all of which are blacked out on MLB.tv in Oxford, Mississippi.

He was charged supra-competitive prices for his service due to Defendants' conduct.

18.    Plaintiff Derek Rasmussen lives in Fort Wayne, Indiana. He

subscribed to the MLB.tv Internet streaming package during the 2011 season. His

favorite team is the Milwaukee Brewers. He would prefer not to be required to

8

purchase a full "out-of-market" package to get Milwaukee Brewers games. Milwaukee Brewers games are blacked out in Fort Wayne when they play the Detroit Tigers, Chicago Cubs, Chicago White Sox, and Cincinnati Reds. He was charged supra-competitive prices for his service due to Defendants' conduct.

19.     Plaintiff Robert Silver lives in Philadelphia, Pennsylvania. Until 2010, he subscribed to Directv satellite service and received channels carrying live professional baseball games not available on a sponsored telecast. He was charged supra-competitive prices for his service due to Defendants' conduct.

### B.     The League Defendants

20.     The Office of the Commissioner of Baseball is an unincorporated association also doing business as Major League Baseball ("MLB" or "the League") and has as its members the Major League Baseball Clubs. MLB's principal place of business at 245 Park Ave, New York, New York. It is the most significant provider of major league men's professional baseball games in the world.

21.     Each team, or club, that is a member of the MLB is a separate and independent business with a separate and independent owner and significant autonomy in its business operations. The teams cooperate to schedule and produce baseball games and facilitate competition on the field, but the clubs compete off the field in their businesses. The clubs compete with each other for the acquisition of players, coaches, and management personal. They set their own prices for the sale of tickets for attending games in person. The clubs also compete in the developing, licensing, and marketing of their respective marks for various purposes.

22.     Defendant Major League Baseball Enterprises, Inc. ("MLB Enterprises") is a New York corporation with its principal place of business in New York, New York.

23.     Defendants MLB Advanced Media, L.P., a Delaware limited partnership, and MLB Advanced Media, Inc., a Delaware corporation, have their principal place of business at 75 Ninth Avenue, New York, New York ("MLB Advanced Media"). MLB Advanced Media is ultimately owned and controlled by MLB and the MLB member clubs.

24.     MLB, MLB Enterprises, and MLB Advanced Media are collectively referred to herein as "the MLB Defendants" or "the League."

### C.     The MLB Club Defendants

25.     The member clubs of the MLB that are named as defendants are:

a.     Athletics Investment Group, LLC, is a California limited partnership and owns and operates the Oakland Athletics.

b.     The Baseball Club of Seattle, L.P., is a Washington limited partnership and owns and operates the Seattle Mariners.

c.     Chicago National League Ball Club, LLC, is a Delaware corporation and owns and operates the Chicago Cubs.

d.     Chicago White Sox, Ltd., is an Illinois limited partnership and owns and operates the Chicago White Sox.

e.     Colorado Rockies Baseball Club, Ltd., is a Colorado limited partnership and owns and operates the Colorado Rockies.

10

f.    New York Yankees Partnership is an Ohio limited partnership and owns and operates the New York Yankees.

g.    The Phillies, L.P., is a Pennsylvania limited partnership and owns and operates the Philadelphia Phillies.

h.    Pittsburgh Baseball, Inc. is a Pennsylvania corporation and owns and operates the Pittsburgh Pirates. Pittsburgh Baseball, Inc. is a subsidiary of Pittsburgh Baseball Holdings, Inc.

i.    San Francisco Baseball Associates, L.P. is a California limited partnership and owns and operates the San Francisco Giants.

26.    The defendants identified in the preceding paragraph are collectively referred to as "the Clubs" or "MLB Club Defendants."

D.    **Other MLB Clubs**

a.    Angels Baseball, L.P., is a California corporation and owns and operates the Los Angeles Angels.

b.    Arizona Diamondbacks is a Delaware limited partnership and owns and operates the Arizona Diamondbacks.

c.    Atlanta National League Baseball Club, Inc., is a Georgia Corporation and own and operates the Atlanta Braves. The Atlanta National League Baseball Club is a subsidiary of Liberty Media LLC, which in turn is a subsidiary of Liberty Media Corporation.

d.    Baltimore Orioles, L.P., is a Maryland partnership and owns and operates the Baltimore Orioles,

11

e.      Boston Red Sox Baseball Club, L. P., is a Massachusetts limited partnership and owns and operates the Boston Red Sox.

f.      Cleveland Indians Baseball Company, Inc., is an Ohio corporation and owns and operates the Cleveland Indians.

g.      Detroit Tigers, Inc., is a Michigan corporation and owns and operates the Detroit Tigers.

h.      Florida Marlins, L.P., is a Florida limited partnership and owns and operates the Florida Marlins.

i.      Houston McLane Company, Inc. is a Texas corporation and owns and operates the Houston Astros.

j.      Kansas City Royals Baseball Corporation is a Missouri corporation and owns and operates the Kansas City Royals.

k.      Los Angeles Dodgers, Inc., is a Delaware corporation and owns and operates the Los Angeles Dodgers. On or about May 1, 2012, it was purchased by Guggenheim Baseball Management, L.P., a Delaware limited partnership.

l.      Milwaukee Brewers Baseball Club, Inc., is a Wisconsin corporation and owns and operates the Milwaukee Brewers.

m.      Minnesota Twins, LLC, is a Minnesota corporation and owns and operates the Minnesota Twins.

n.      Padres, L.P., is a Delaware limited partnership and owns and operates the San Diego Padres.

o.    Rangers Baseball Express LLC is a Delaware corporation and owns and operates the Texas Rangers.

p.    Reds Baseball Partners, LLC, is an Ohio corporation and owns and operates the Cincinnati Reds.

q.    St. Louis Cardinals, L.P., is a Missouri corporation and owns and operates the St. Louis Cardinals.

r.    Sterling Mets, L.P., is a Delaware corporation and owns and operates the New York Mets. Sterling Mets, L.P. is a subsidiary of Sterling Equities, Inc.

s.    Tampa Bay Devil Rays, Ltd., is a Florida limited partnership and owns and operates the Tampa Bay Rays.

t.    Toronto Blue Jays Baseball Club is a subsidiary of Rogers Communications Inc., a Canadian corporation, and is located at 1 Blue Jays Way, Rogers Centre, Toronto, Ontario.

u.    Washington Nationals, L.P., is a Delaware partnership and owns and operates the Washington Nationals.

### E.    The Television Defendants

27.    Defendant Directv, LLC, is a Delaware corporation whose principal place of business is 2230 East Imperial Highway, El Segundo, California. Directv and its subsidiaries provide satellite television service ("DBS") throughout the United States.

13

28. Defendant Directv Sports Networks LLC, a wholly owned subsidiary controlled by Directv, is a Delaware limited liability company, whose principal place of business is 2230 East Imperial Highway, El Segundo, California.

29. Defendant Root Sports Pittsburgh, a/k/a "Directv Sports Net Pittsburgh LLC," Defendant Root Sports Rocky Mountain, a/k/a "Directv Sports Net Rocky Mountain LLC," and Defendant Root Sports Northwest a/k/a "Directv Sports Net Northwest LLC," are Delaware limited liability companies whose principal place of business is 2230 East Imperial Highway, El Segundo, California. Root Sports Pittsburgh, Root Sports Rocky Mountain, and Root Sports Northwest are wholly-owned subsidiaries of, and are controlled by, Directv and/or Directv Sports Networks LLC. Root Sports Pittsburgh is a regional sports network that produces and distributes video presentations for the Pittsburgh Pirates. Root Sports Rocky Mountain produces and distributes video presentations for the Colorado Rockies. Root Sports Northwest produces and distributes video presentations for the Seattle Mariners.

30. Defendant Comcast Corporation ("Comcast") is a Pennsylvania corporation whose principal place of business is 1701 John F. Kennedy Boulevard, Philadelphia, Pennsylvania. Comcast owns and operates cable systems throughout the United States.

31. Comcast owns and controls Comcast Sportsnet Defendants, which include:

14

a.      Comcast Sportsnet Philly, L.P, located at 3601 South Broad Street, Philadelphia, Pennsylvania, a Regional Sports Network ("RSN"), which produces and distributes video presentations for the Philadelphia Phillies;

b.      Comcast Sportsnet Bay Area, L.P., located at 370 3rd Street, 2nd Floor, San Francisco, California, which produces and distributes video presentations for San Francisco Giants and Oakland Athletics through Comcast Sportsnet Bay Area and Comcast Sportsnet California;

c.      Comcast Sportsnet Chicago, L.P., located at 350 N. Orleans Street, Suite S1-100, Chicago, Illinois, which produces and distributes video presentations for the Chicago Cubs and Chicago White Sox.

32.    Defendant Yankees Entertainment and Sports Networks, LLC ("YES") is located at 405 Lexington Ave, 36th Floor, New York, New York. YES produces and presents New York Yankees games.

F.     **Other Relevant Entities**

33.    Fox Sports Net, Inc., a subsidiary of News Corporation, owns and controls a number of regional sports networks engaged in producing and presenting Major League Baseball games and which are part of the conspiracy to divide the live baseball video market:

a.      Fox Sports West and Prime Ticket are RSNs that carry Los Angeles Angels and Los Angeles Dodgers games.

b.      Fox Sports Ohio carries Cincinnati Reds games.

c.      Fox Sports Southwest carries Texas Rangers games.

d.      Fox Sports South and SportSouth carry Atlanta Braves games.

15

     e.     Fox Sports Houston carries Houston Astros games.

     f.     Fox Sports Detroit carries Detroit Tigers games.

     g.     Fox Sports Florida carries Florida Marlins games.

     h.     Fox Sports North carries Minnesota Twins games.

     i.     Fox Sports Arizona carries Phoenix Diamondbacks games.

     j.     Fox Sports Kansas City carries Kansas City Royals games.

     k.     Fox Sports Midwest carries St. Louis Cardinals games.

     l.     Fox Sports Wisconsin carries Milwaukee Brewers games.

     m.     Sun Sports carries Tampa Bay Rays games.

     n.     Fox Sports San Diego carries San Diego Padres games beginning in 2012 (previously Channel 4 San Diego carried these games).

34.     Other RSNs carrying professional baseball games in the United States include:

     a.     New England Sports Network ("NESN"); which carries Boston Red Sox games;

     b.     Mid-Atlantic Sports Network ("MASN"), which carries Baltimore Orioles and Washington Nationals games;

     c.     Sportsnet New York, which carries New York Mets games;

     d.     Sportstime Ohio, which carries Cleveland Indians games.

35.     A few games of some teams are carried by local, over-the-air channels. One of these is WGN-TV, a local Chicago television station that carries a minority of both Chicago White Sox and Chicago Cubs games. These games are carried

16

nationwide on the WGN "superstation." WGN is the last of the superstations—local channels distributed nationwide through cable and satellite—to carry Major League Baseball games. Major League Baseball demands payment of a fee to the league, which is distributed to the other teams, to compensate them for facing this limited competition. WGN presentations are typically blacked out in the local market of the other (non-Chicago) team.

36.     Turner Broadcast System ("TBS") is a nationwide cable and satellite television channel that carries Major League Baseball games nationwide. In the regular season, those presentations are typically blacked out in the local markets of the teams involved in the game being presented.

37.     ESPN is a nationwide cable and satellite television channel that carries Major League Baseball games nationwide. Certain of its video presentations are exclusive for a given period of time, during which other networks may not show any other game, regardless of location. Other games are not exclusive, with blackout rules governed by Defendants' agreements designed to limit competition in the market.

38.     Fox Broadcasting Company is an over-the-air television network that carries Major League Baseball games nationwide. Most of these games are subject to a nationwide exclusivity for a given period of time, which prevents the presentation of any non-Fox games in any market.

## III.
## CLASS ACTION ALLEGATIONS

39.     Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons in the United States (excluding Defendants, their present and former parents, subsidiaries, affiliates, and Co-Conspirators, the named Plaintiffs, and government entities) who fall within the following classes:

a.     Television Class: All individuals who purchased television service from Directv and/or Comcast, or their subsidiaries, at any time within four years prior to the filing of this complaint and until the effects of the anti-competitive conduct end, that included channels carrying video presentations of live major league baseball games that were not available through a sponsored telecast (as that term is used by the Sports Broadcasting Act, 15 U.S.C. § 1291, *et seq.*).

b.     Internet Class: All individuals who purchased MLB.tv in the United States directly from any of the League Defendants or their subsidiaries at any time within four years prior to the filing of this complaint and until the effects of the anti-competitive conduct end.

40.     Due to the nature of the trade and commerce involved, Plaintiffs believe that each class consists of at least many thousands of members, the exact number and their identities being known to Defendants and their co-conspirators.

41.     The Classes are so numerous and geographically dispersed that joinder of all members is impracticable.

42. There are questions of law and fact common to the Class, including:

a. Whether MLB Defendants and their Co-Conspirators engaged in a contract, combination, or conspiracy among themselves to fix, raise, maintain or stabilize prices of video presentations of live MLB games by blacking out potentially competing presentations of MLB games;

b. Whether Defendants and their co-conspirators engaged in a contract, combination, or conspiracy among themselves to fix, raise, maintain or stabilize prices of MLB Extra Innings by preventing any competitor from offering competing products;

c. Whether Defendants and their co-conspirators engaged in a contract, combination, or conspiracy among themselves to fix, raise, maintain or stabilize prices of presentations of MLB.tv by preventing any competitor from offering competing products;

d. The effect of Defendants' conspiracy on the prices of MLB.tv and MLB Extra Innings in the United States during the class period;

e. The effect of Defendants' conspiracy on the prices pay television packages that include MLB games that are not available on a sponsored telecast;

f. The identity of the participants of the conspiracy;

g. The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

h. Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

19

i.      Whether the alleged conspiracy violated Section 2 of the Sherman Act, 15 U.S.C. § 2;

j.      Whether the conduct of Defendants and their co-conspirators, as alleged in this complaint, caused injury to the Plaintiffs and the other members of the Classes;

k.      The appropriate class-wide measure of damages.

43.     Plaintiff Fernanda Garber was, during the class period, a subscriber to pay television service provided by Comcast, which included channels carrying MLB games that are not available on a sponsored telecast. Her claims are typical of the claims of the Television Class members, and Ms. Garber will fairly and adequately protect the interests of that Class.

44.     Plaintiff Robert Silver was a subscriber to pay television service provided by Directv, which included channels carrying MLB games that are not available on a sponsored telecast. His claims are typical of the claims of the Television Class members, and Mr. Silver will fairly and adequately protect the interests of the Television Class.

45.     Plaintiffs Marc Lerner and Derek Rasmussen are direct purchasers of MLB.TV. Their claims are typical of the claims of the Internet Class members, and they will fairly and adequately protect the interests of the Class.

46.     Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

47.     Given the high cost of establishing that the Defendants' agreements violated the antitrust laws (including, but not limited to, substantial expert witness costs and attorneys' fees), a class action is the only economically feasible means for any plaintiffs to enforce his or her statutory rights.

48.     The prosecution of separate actions by individual members of the Classes would also create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

49.     The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

50.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Classes are readily definable and is one for which records should exist. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. This class action presents no difficulties in management that would preclude maintenance as a class action.

## IV.
## JURISDICTION AND VENUE

51.     Plaintiffs bring this action pursuant to Section 16 of the Clayton Act (15 U.S.C. §26), for a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. This

21

Court has subject matter jurisdiction over that claim pursuant to 28 U.S.C. §§ 1331 and 1337.

52.     Venue is proper pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22. The Defendants transact business in this district, and are subject to personal jurisdiction in this district.

53.     Class members were injured in this district.

## V.
## TRADE AND COMMERCE

54.     Major league men's professional baseball has attributes that are attractive to sports fans that set it apart from other sports or leisure activities. Close substitutes do not exist. Watching (or participating as a fan in) major league baseball cannot be reasonably interchanged with watching (or participating as a fan in) other sports or other leisure activities.

55.     The provision of major league baseball contests in North America is a relevant product/service market. This market is characterized by high barriers to entry. Major League Baseball has market power as it is the only and dominant, provider of this product/service. MLB, acting through and in combination with the separate and independent clubs, also exercises market power through the exclusive license agreements and the other unnecessary and unjustified restraints on each club's competitive activities that are the subject of this complaint.

56.     Most importantly for this action, there is a relevant market for live video presentations of major league baseball games over media such as cable and satellite television and the Internet. MLB's dominance in the production of major

league baseball games in the United States gives it the ability, together with its television partners, to exercise market power in the market for live video presentations of MLB games.

57.     The relevant geographic market consists of North America, including the United States. Various geographic submarkets also may exist.

58.     Defendants' conduct complained of herein has taken place in and affected, and directly, substantially, and foreseeably restrained, the interstate and foreign trade and commerce of the United States, by, inter alia, the interstate and foreign distribution of video of MLB games.

## VI.
## FACTS RELEVANT TO PLAINTIFFS' CLAIMS

### A.     The Anticompetitive Exclusive License Agreements.

59.     It has been long recognized that MLB clubs, like the member clubs of all professional sports leagues, must cooperate to define, schedule, and produce league contests. That limited cooperation is fully consistent with the antitrust laws. But the member clubs continue to exist as separate businesses with separate owners that retain significant degrees of autonomy in their operations. In these operations, the clubs compete in business matters that are separate and distinct from the facilitation of baseball games.

60.     Pursuant to a series of agreements between and among Defendants, the League has obtained centralized control over distribution of live video programming of MLB games. As described more fully below, as a result of these

agreements, the clubs have agreed not to compete in business matters related to the video presentation of live major-league professional baseball games.

61.    The majority of MLB games are televised pursuant to contracts entered into by the individual clubs with separate entities, primarily RSNs, including Root Sports, various regional Comcast Sportsnets, and others.

62.    A smaller number of presentations are produced pursuant to national agreements between the League and a national entity, including ESPN and TBS, which require a subscription to a pay-television service, and Fox Broadcasting, an over-the-air network. The League also owns its own channel, the MLB Network, which televises nationally through certain cable and satellite providers.

### 1.    Regional Blackout System

63.    At the core of Defendants' restraint of competition in the video programming market are the regional blackout agreements. The purpose and effect of these agreements is to divide the market geographically, permitting only the video presentations of a local team's television partner to be shown in that team's "exclusive territory." The member clubs, through the League, have agreed that they will not permit their television partners to compete with other member clubs' partners. Each team's partner has a monopoly in its exclusive territory, except in those cities where two teams are located. Only in one the four such locations—New York City—are there two independent RSNs carrying major league baseball games.

64.    The purpose of these restrictions is to restrain competition by protecting the local television telecasters of each MLB game in the local markets of

the teams. "Blackouts protect the local rights holders ...."

http://support.directv.com/app/answers/detail/a_id/17231723.

65.     Defendants Comcast and Directv have joined the conspiracy by

agreeing to enforce and maintain these anticompetitive restrictions.

66.     The result of these agreements is a classic, horizontal, geographical

market division. In the absence of a separate out-of-market package or a national

telecast (both are discussed below), a consumer of video presentations of live major

league baseball is required to purchase the video presentation provided by the

consumers' local team.

67.     In the absence of these restrictions, fans would have access to live

video from teams throughout the United States and Canada. The availability of

multiple sources of major-league professional baseball programming would result in

competition among the Defendants, which would lower prices and increase choice

for consumers.

### 2.    Implementation of the Blackout System through Agreements Restraining Competition Among Sports Networks

68.     The clubs implement their system of exclusive territories through a

system of agreements with regional networks. These agreements require the

networks to agree not to compete with other regional networks in the presentation

of televised MLB games.

69.     The networks (and their corporate parents) agree to these

requirements knowing that other networks must agree not to compete in their

25

territories. The result is a horizontal division of the market that is enforced by the horizontal agreement between the Defendants.

70.    In each case, the local television network (and the entity that controls that network) agrees with the League and member clubs that it will not permit its presentations of the games to be shown in areas outside of its exclusive territory, knowing that other networks will likewise agree not to compete in their exclusive home territory. The League and the network also agree that the network will not carry games of other teams outside their territory.

71.    The Regional Sports Networks (RSNs) enter agreements with multichannel video programming distributers (MVPDs), like defendants Comcast and Directv, to implement the blackouts. But-for these agreements, the MPVDs would facilitate "foreign" RSN entry and other forms of competition.

72.    The result is that each local network has a monopoly on live televised baseball games in its exclusive territory. (This is true even in Chicago, Los Angeles, and the Bay Area, each of which has two teams that are carried by the RSNs with the same owners. Only New York is not a pure monopoly, as RSNs carrying the New York Yankees and New York Mets operate as a duopoly in that market). In certain cases, the outer areas of a team's territory may overlap with another team's or teams' territories, permitting a viewer to watch either team's games, if they are available, and subjecting the viewer to local blackouts of all such teams games.

73.    These express restrictions on competition have made local sports networks extremely valuable. The Federal Communications Commission has

repeatedly described RSNs as the clearest example of "must-have" channels because of their exclusive control of sports programming. *See, e.g.,* *In re AT&T Servs., Inc.,* FCC 11-168, 2011 WL 5534853, *3 (Nov. 10, 2011). In upholding FCC rules designed to ensure that RSNs are not used to unfairly harm competition in the MVPD market, the Court of Appeals for the District of Columbia Circuit agreed that this control of sports programming made RSNs "'must have' and nonreplicable." *Cablevision Sys. Corp. v. FCC,* 649 F.3d 695, 702 (D.C. Cir. 2011).

74.     These restrictions have the purpose and effect of creating a series of regional monopolies in order to increase the price that can be charged by the teams, the television networks, and television distributers like Comcast and Directv. Plaintiffs and all purchasers of video programming that include these networks consequently pay higher prices for television services that include presentations of major league professional baseball games.

### B.     "Out-of Market" Packages

75.     With very limited exceptions, for a consumer to obtain out-of-market games, there are only two options, both of which, as a consequence of agreements by and among the member clubs, are controlled by the League: MLB.TV, which is streamed over the Internet and is available only through the league; and MLB Extra Innings, which is a similar service available only through cable and other television distributors, including Directv.

76.     The League defines these products as "out-of-market" packages, and games from outside of a protected territory as "out-of-market" games. "In-market"

27

and "out-of-market" are terms defined by reference to the anticompetitive geographical restrictions imposed by Defendants and their co-conspirators.

77. The League provides MLB.TV over the Internet directly to the consumer. For 2011, the cost for MLB.TV was $99.99 for the season ($19.99 on a monthly basis), or $119.99 for a premium subscription ($24.99 monthly), which allows fans to obtain both home and away broadcasts.

78. For most games, MLB.TV offers both the "home" and "away" feeds—a feature the League actively markets—but the other team's feed is never available in a game involving a local team. These "in-market" games are blacked out. Nationally televised games are blacked out in the United States as a whole, and viewers located in a team's exclusive territory are blacked out from all presentations of a game involving the local team or teams.

79. As the League explains on its website: "All live games on MLB.TV and available through MLB.com Gameday Audio are subject to local blackouts. Such live games will be blacked out in each applicable Club's home television territory, regardless of whether that Club is playing at home or away. If a game is blacked out in an area, it is not available for live game viewing." http://mlb.mlb.com/mlb/help/faq_subscriptions.jsp#q10

80. The League offers MLB.TV as all-or-nothing. Purchasers of MLB.TV must buy all out-of-market games for all teams even if they are only interested in watching the games of a particular team. They must choose to purchase at least one month's games at a time.

28

81.     The clubs' horizontal elimination of competition for online streaming of baseball games raises prices and reduces consumer welfare.

82.     Because of these restrictions on competition, there is no way for a consumer to obtain live, internet-streaming of games involving a team from within the exclusive territory of that team, with only very limited exceptions. No one in New York, for example, has access to any live presentation of a contest involving the Mets over the Internet, despite the fact that Mets' contests are routinely streamed over the Internet to consumers elsewhere, and no additional cost would be incurred by permitting Mets' games to be viewed by New York baseball fans. The sole reason for this restriction is to interfere with competition.

83.     By agreement of the clubs, MLB.TV is the exclusive distributer of nearly all live and recorded MLB games in the United States.

84.     ESPN has streamed certain games over its own Internet service, but only where it already had the exclusive right to distribute that game, preventing such streaming from competing with any other provider.

85.     Teams are prohibited from streaming their own games, even within their own exclusive territories, unless they enter into a separate agreement with the league that prevents any potential competition with other providers.

86.     The New York Yankees, through its television partner, the YES Network, provide in-market streams, but only to consumers who already subscribe to the YES Network through their television provider, and consumers are required

to pay an additional fee for this service. These restrictions serve to prevent any competitive effects.

87.     Because the League is the only source of such programming, it is able to charge monopoly pricing and limit the choices available to consumers. The inevitable consequence is higher pricing, lower quality, less choice to consumers, and lower output.

88.     MLB Extra Innings is similar to MLB.TV, but is available by satellite through Directv and Dish Network, as well as through most cable companies through In Demand, whose majority owner is Comcast. The price for the service for the 2011 season was approximately $200.

89.     As with MLB.TV, all MLB Extra Innings games involving a team whose exclusive territory encompasses the viewer's location are blacked out from Extra Innings, regardless of whether the game is being held locally, and regardless of whether the game is available to the viewer through a different network. The sole purpose of these restrictions is to protect the local network from competition.

90.     As the parent company of the New York Rangers stated in objecting, on antitrust grounds, to analogous packages for the National Hockey League, "the clubs' horizontal elimination of competition against that package—given the distinct market for professional ice hockey broadcasts—produces higher prices and reduced consumer welfare." Pl. Mem. Opp. Mot. Dismiss at 30, *Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 07-8455 (S.D.N.Y.). The same is true of baseball.

91.     Defendants have restrained and threatened to restrain competition in the carrying of games, seeking to control the delivery of content through all media platforms in ways that go beyond what is reasonably necessary to the production of baseball contests or to the success of Major League Baseball.

### C.     The Agreements Have Restrained Horizontal Competition and Have Had Anticompetitive Effects and Led To Consumer Harm.

92.     The above-described agreements have restrained horizontal competition between and among the MLB clubs and the MLB, including in the commercial exploitation of video presentations of live games where the member clubs could and would compete with each other. In particular, in the absence of the exclusive licenses and other competitive restraints, MLB clubs would compete with each other in the presentation of their teams' games to a much greater extent than the limited opportunities that are now available.

93.     The above-described agreements have adversely affected and substantially lessened competition in the relevant markets. Output of presentations of live MLB games, as well as output of game highlights and footage, is lower, and prices are higher, than they would be in the absence of the agreements to restrict competition. Moreover, output is unresponsive to consumer preference to view live MLB games, including local games, through both Internet and television media.

94.     Competition by individual clubs independently acting to exploit the distribution of their teams' games would produce consumer benefits, such as an increase in the availability of live video presentations over a wider range of media, including cable, the internet and wireless devices.

31

95.    The above-described agreements do not concern matters of league structure and do not concern any unique characteristic or need of baseball exhibitions. These anticompetitive restraints are not necessary to the exhibition of baseball and are not integral to the sport itself.

96.    Teams in Major League Baseball, like teams in other major sports leagues, have made attempts to compete in the live video market outside of their prescribed territories. As noted, the Chicago Cubs and Chicago White Sox continue to carry a number of games on the WGN superstation. The League has waged a campaign to limit the availability of games carried on a superstation, and has been largely successful; at one time, at least four other teams' games were available outside of their home markets on superstations. Now, the league levies a substantial "tax" on superstations to ensure that other teams and their television partners are compensated for the "harm" they suffer due to facing marketplace competition.

97.    In the NHL, the parent company of the New York Rangers went so far as to sue the league to challenge these limitations, acknowledging that in absence of such restrictions, "[t]he teams would compete with each other in the broadcasting" of NHL hockey games. (MSG Complaint, ¶ 42).

98.    The Chicago Bulls sued the National Basketball Association challenging its rules limiting superstation presentations of live games. That case ultimately settled when the parties agreed to permit the Bulls to carry a greater, but still limited, number of games outside of the Chicago area.

32

99.    There are no legitimate, pro-competitive justifications for these exclusive license agreements and other competitive restraints, which have harmed consumers in various ways, including in the above-described ways.

### D.    Plaintiffs' Have Suffered Antitrust Injury.

100.    Plaintiffs have been overcharged for the video presentation of live MLB games.

101.    Subscribers to pay-television service with standard channel packages have been forced and will continue to be forced to overpay for their television service because of the inclusion of sports networks that commands supra-competitive pricing. Subscribers suffer this overpayment even if they do not watch sports programming. *See, e.g.,* Brian Stetler and Amy Chozick, *Paying a 'Sports Tax,' Even if You Don't Watch*, N.Y. TIMES, Dec. 15, 2011, available at http://www.nytimes.com /2011/12/16/business/media/for-pay-tv-clients-a-steady-diet-of-sports.html.

102.    Subscribers to MLB Extra Innings have been forced and will continue to be forced to overpay for "out-of-market" games because of the lack of competition created by the geographical exclusivity system.

103.    Subscribers to MLB.TV have been forced and will continue to be forced to overpay for Internet-delivered games and have been and will continue to be forced to purchase Internet-delivered games in a bundle of all such games (other than those blacked out), despite the fact that, in the absence of collusive agreements, individual games and individual teams' games would be available at substantially lower prices.

104.   Plaintiffs have been and will continue to be prevented from obtaining Internet-delivered videos of the games involving local teams.

105.   Plaintiffs have been and will continue to be prevented from obtaining games involving a local team from any source other than the team's RSN partner, which typically requires the purchase of a full pay-television subscription, including tens or hundreds of other channels Plaintiffs may not want.

106.   Individual teams and their media partners are restrained from distributing their games through cable, satellite, Internet and otherwise in ways that they may determine are best suited to reaching their respective and potential fan bases throughout the country and abroad.

## VII.
## CLAIMS FOR RELIEF

### COUNT ONE
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### On Behalf of the Television Class

107.   Plaintiffs Garber and Silver, on behalf of themselves and the Television Class, incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

108.   Beginning at a time presently unknown to Plaintiffs, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, combination or conspiracy in restraint of trade with the purpose, intent, and effect of restraining horizontal competition among the MLB member clubs and their television partners, and between the clubs and the MLB, with the purpose, intent, and effect of

34

restraining trade and commerce in the distribution of major league professional baseball games, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

109.   The contract, combination or conspiracy has resulted in an agreement, understanding, or concerted action between and among the Defendants and their co-conspirators that regular season games will only be carried within a team's protected geographical territory ("in-market games"). The agreement forbids the carrying or online streaming of any MLB game in any geographic market except those licensed by the MLB team in that geographical market.

110.   The contract, combination, or conspiracy has restrained competition between and among the Defendants in violation of Section 1 of the Sherman Act. It has led to anticompetitive effects in the relevant markets, as alleged above, and caused injury to consumers and competition in those relevant markets and elsewhere.

111.   The Defendants' contract, combination, agreement, understanding or concerted action with the co-conspirators occurred in or affected interstate commerce. The Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between and among the Defendants and other unnamed co-conspirators. These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

112.   Defendants' anticompetitive conduct has directly and proximately caused antitrust injury, in the form of higher prices and reduced choice, as set forth

above. Plaintiffs and other consumers will continue to suffer antitrust injury and other damage unless Defendants are enjoined from continuing to engage in the foregoing violations of law.

## COUNT TWO
## VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### On Behalf of the Television Class

113.   Plaintiffs Garber and Silver, on behalf of themselves and the Television Class, incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

114.   Beginning at a time presently unknown to Plaintiffs, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, combination or conspiracy in restraint of trade with the purpose, intent, and effect of restraining horizontal competition among the MLB member clubs and their television partners, and between the clubs and the MLB, with the purpose, intent, and effect of restraining trade and commerce in the distribution of major league professional baseball games, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

115.   The contract, combination or conspiracy has resulted in an agreement, understanding, or concerted action between and among the Defendants and their co-conspirators that the League will be the exclusive provider of live "out-of-market" games distributed through television providers. The Defendants and their co-conspirators have agreed that no club or television partner will offer a competing

product, or make their programming available within another team's exclusive territory.

116.     The contract, combination, or conspiracy has restrained competition between and among the Defendants in violation of Section 1 of the Sherman Act. It has led to anticompetitive effects in the relevant markets, as alleged above, and caused injury to consumers and competition in those relevant markets and elsewhere.

117.     The Defendants' contract, combination, agreement, understanding or concerted action with the co-conspirators occurred in or affected interstate commerce. The Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between and among the Defendants and other unnamed co-conspirators. These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

118.     Defendants' anticompetitive conduct has directly and proximately caused antitrust injury, in the form of higher prices and reduced choice, as set forth above. Plaintiffs and other consumers will continue to suffer antitrust injury and other damage unless Defendants are enjoined from continuing to engage in the foregoing violations of law.

## COUNT THREE
## VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### On Behalf of the Internet Class

119. Plaintiffs Lerner and Rasmussen, on behalf of themselves and the Internet Class, incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

120. Beginning at a time presently unknown to Plaintiffs, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, combination or conspiracy in restraint of trade with the purpose, intent, and effect of restraining horizontal competition among the MLB member clubs and their television partners, and between the clubs and the MLB, with the purpose, intent, and effect of restraining trade and commerce in the distribution of major league professional baseball games, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

121. The contract, combination or conspiracy has resulted in an agreement, understanding, or concerted action between and among the Defendants and their co-conspirators that the League will be the exclusive provider of live "out-of-market" games over the Internet. The Defendants and their co-conspirators have agreed that no club or television partner will offer a competing product, or make their presentation of games over the internet available within another team's exclusive territory.

122. The contract, combination, or conspiracy has restrained competition between and among the Defendants in violation of Section 1 of the Sherman Act. It

has led to anticompetitive effects in the relevant markets, as alleged above, and caused injury to consumers and competition in those relevant markets and elsewhere.

123.    The Defendants' contract, combination, agreement, understanding or concerted action with the co-conspirators occurred in or affected interstate commerce. The Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between and among the Defendants and other unnamed co-conspirators. These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

124.    Defendants' anticompetitive conduct has directly and proximately caused antitrust injury, in the form of higher prices and reduced choice, as set forth above. Plaintiffs and other consumers will continue to suffer antitrust injury and other damage unless Defendants are enjoined from continuing to engage in the foregoing violations of law.

## COUNT FOUR
### VIOLATION OF SECTION 2 OF THE SHERMAN ACT
### On Behalf of All Classes

125.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

126.    Defendants and their co-conspirators, by the above-mentioned conduct, possess monopoly power over the market for video presentations of major league baseball games and Internet streaming of same and have used that power for

the purposes of unreasonably excluding and/or limiting competition, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. These activities have gone beyond those which could be considered as "legitimate business activities," and are an abuse of market position.

127.    Through the anti-competitive conduct described herein, Defendants and their co-conspirators have willfully acquired and maintained, and unless restrained by the Court, will continue to willfully maintain, that monopoly power by anti-competitive and unreasonably exclusionary conduct. Defendants and their co-conspirators have acted with an intent to illegally acquire and maintain that monopoly power in the relevant product market, and their illegal conduct has enabled them to do so, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

128.    Defendants' anticompetitive conduct has directly and proximately caused antitrust injury, as set forth above. Plaintiffs and other consumers will continue to suffer antitrust injury and other damage unless defendants are enjoined from continuing to engage in the foregoing violations of law.

## VIII.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray as follows:

A.    That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and that Plaintiffs be named representatives of their respective classes.

B.     That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this complaint, be adjudged to have been a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

C.     That the Defendants and their co-conspirators actions to illegally acquire and maintain monopoly power in the relevant product market, be adjudged to have been in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

D.     That judgment be entered for Plaintiffs and members of the Class against Defendants for three times the amount of damages sustained by Plaintiffs and the members of the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

E.     That Plaintiffs and the Class be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

F.     That Defendants and their co-conspirators be enjoined from further violations of the antitrust laws; and,

41

G.     That Plaintiffs and members of the Class have such other, further or different relief, as the case may require and the Court may deem just and proper under the circumstances.

Dated:   May 9, 2012

POMERANTZ HAUDEK
GROSSMAN & GROSS LLP

By: _____
Michael M. Buchman

100 Park Avenue, 26th Floor
New York, NY 10017
Telephone: (212) 661-1100
Facsimile:  (212) 661-8665

Edward Diver
Howard Langer
Peter Leckman
LANGER, GROGAN & DIVER, P.C.
1717 Arch Street, Suite 4130
Philadelphia, PA 19103
Telephone: (215) 320-5660
Facsimile:  (215) 320-5703

*Attorneys for Plaintiffs Fernanda*
*Garber, Marc Lerner, Derek*
*Rasmussen, and Robert Silver*