**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____
                                                          )
THOMAS LAUMANN, FERNANDA GARBER,    )
ROBERT SILVER, and PETER HERMAN,             )
representing themselves and all others similarly    )
situated,                                                         )          12-cv-1817 (SAS)
                                                          )
                            Plaintiffs,                        )
                                                          )
            v.                                                    )
                                                          )
NATIONAL HOCKEY LEAGUE et al.,                 )
                                                          )
                            Defendants.                     )
_____)
                                                          )
FERNANDA GARBER, MARC LERNER,            )
DEREK RASMUSSEN, and ROBERT SILVER,  )
representing themselves and all others similarly    )
situated,                                                         )          12-cv-3704 (SAS)
                                                          )
                            Plaintiffs,                        )
                                                          )
            v.                                                    )          ECF Cases
                                                          )
OFFICE OF THE COMMISSIONER OF              )
BASEBALL, et al.,                                           )          Electronically Filed
                                                          )
                            Defendants.                     )
_____)


**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS THE COMPLAINTS**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

SUMMARY OF COMPLAINTS ..........................................................................................6

I.      THE PARTIES............................................................................................................6

        A.      The NHL and MLB Defendants ..........................................................6

        B.      The RSN and Distributor Defendants .................................................7

                1.      The RSN Defendants ...............................................................7

                2.      The Distributor Defendants......................................................9

        C.      The Plaintiffs .....................................................................................10

II.     THE ALLEGED MARKETS AND PRODUCTS ........................................10

III.    THE ALLEGED UNLAWFUL AGREEMENTS .......................................13

IV.     SUMMARY OF CLAIMS ...............................................................................14

ARGUMENT ..........................................................................................................................15

I.      PLAINTIFFS HAVE FAILED TO ALLEGE HARM TO COMPETITION..................15

        A.      Plaintiffs' Allegations Contradict Any Plausible Theory of Reduced
                Output.................................................................................................16

        B.      Plaintiffs' Conclusory Allegations Of High Prices Do Not State Injury To
                Competition .......................................................................................20

        C.      Plaintiffs' Allegations About Lack Of "Consumer Choice" State No Claim .......21

II.     TV PLAINTIFFS LACK STANDING TO BRING THEIR CLAIMS...........................24

        A.      TV Plaintiffs' Claims For Damages Are Barred Under *Illinois Brick*.................26

                1.      TV Plaintiffs Are Indirect Purchasers And Thus Lack Standing To
                        Sue For Damages.....................................................................27

                2.      No Purported "Co-Conspirator" Exception To *Illinois Brick*
                        Applies.....................................................................................29

                3.      No Other Exception To *Illinois Brick* Is Available ..................33

i

B.     TV Plaintiffs Lack Standing Under *Associated General Contractors* Because The Claimed Injuries Are Too Remote From The Alleged Wrongful Conduct ..................................................................35

C.     Count Two In *Garber* Should Be Dismissed For Lack Of Standing, And TV Plaintiffs And Internet Plaintiffs Lerner And Rasmussen Lack Article III Standing To Seek Injunctive Relief ..................................39

III.    THE COMPLAINTS DO NOT STATE AN ANTITRUST CLAIM AGAINST COMCAST, DIRECTV, OR THE RSN DEFENDANTS ..............................................40

A.     Comcast, DIRECTV, And The RSN Defendants Cannot Horizontally Conspire With The NHL Or MLB Defendants, As A Matter Of Law ................41

B.     The Vertical Distribution Activities Of Comcast, DIRECTV, And The RSN Defendants Do Not Harm Competition ......................................43

1.     Comcast's And DIRECTV's Vertical Distribution Activities Are Lawful.............................................................................43

2.     The RSN Defendants' Vertical Distribution Activities Are Equally Lawful.............................................................................44

C.     The Complaint Fails To Allege Other Necessary Elements Of Any Purported Claim Against Comcast, DIRECTV, Or The RSN Defendants ..........46

IV.    THE COMPLAINTS DO NOT STATE AN ANTITRUST CLAIM AGAINST THE NHL AND MLB DEFENDANTS..................................................................47

A.     Plaintiffs Are Challenging The NHL And MLB Defendants' "Core" Venture Activities That Are Reasonable As A Matter of Law............................48

B.     The Supreme Court Has Made Clear That Necessary Venture Activities May Be Viewed As Reasonable As A Matter of Law .........................................49

C.     The NHL And MLB Clubs Lack The Capacity To Conspire With Respect To Rights They Do Not Own Or Control............................................................52

V.     PLAINTIFFS HAVE FAILED TO PLAUSIBLY ALLEGE A LEGALLY COGNIZABLE RELEVANT MARKET ........................................................................54

VI.    THE COMPLAINTS DO NOT STATE A CLAIM UNDER SECTION 2 OF THE SHERMAN ACT ...............................................................................................57

A.     Plaintiffs Have Not Pled Harm To Competition In A Relevant Market...............57

B.     Plaintiffs Fail To Plead Monopoly Power.........................................................58

CONCLUSION...............................................................................................................60

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*In re ATM Fee Antitrust Litigation*,
  No. 10-17354, 2012 WL 2855813 (9th Cir. July 12, 2012) ................................... 29, 32

*Agnew v. National Collegiate Athletic Association*,
  683 F.3d 328 (7th Cir. 2012) ........................................................................................ 50

*American Needle, Inc. v. National Football League*,
  130 S. Ct. 2201 (2010) ...................................................................................... 5, 49, 50

*In re Antibiotic Antitrust Actions*,
  333 F. Supp. 310 (S.D.N.Y. 1971) ............................................................................... 38

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................... 15, 21, 30, 41

*Associated General Contractors of California., Inc. v. California State Council of Carpenters*,
  459 U.S. 519 (1983) ...................................................................... 4, 25, 36, 37, 39

*Association of Independent Television Stations, Inc. v. College Football Association*,
  637 F. Supp. 1289 (W.D. Okla. 1986) .......................................................................... 51

*B.V. Optische Industrie de Oude Delft v. Hologic, Inc.*,
  909 F. Supp. 162 (S.D.N.Y. 1995) ............................................................................... 56

*Balaklaw v. Lovell*,
  14 F.3d 793 (2d Cir. 1994) ........................................................................................... 24

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................ 15, 30, 45

*Bill Beasley Farms, Inc. v. Hubbard Farms*,
  695 F.2d 1341 (11th Cir. 1983) .................................................................................... 55

*Brantley v. NBC Universal, Inc.*,
  675 F.3d 1192 (9th Cir. 2012) ....................................................................... 21, 22, 23, 24

*Broadcast Music, Inc.v. Columbia Broadcasting System, Inc.*,
  441 U.S. 1 (1979) .................................................................................................... 48, 51

*Business Electronics Corp. v. Sharp Electronics Corp.*,
  485 U.S. 717 (1988) ..................................................................................................... 42

iii

*Car Carriers, Inc. v. Ford Motor Co.*,
  745 F.2d 1101 (7th Cir. 1984) ........................................................................24

*Carell v. Shubert Organization, Inc.*,
  104 F. Supp. 2d 236 (S.D.N.Y. 2000) ...........................................................16

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
  479 U.S. 104 (1986) .......................................................................................24

*Chicago Professional Sports Ltd. Partnership v. National Basketball Association*,
  95 F.3d 593 (7th Cir. 1996).............................................................. 17, 21, 49, 52

*Chicago Professional Sports Ltd. Partnership v. National Basketball Association*,
  961 F.2d 667 (7th Cir. 1992)......................................................................17, 45

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ...................................................................................39, 40

*Consolidated Terminal Systems, Inc. v. ITT World Communications, Inc.*,
  535 F. Supp. 225 (S.D.N.Y. 1982) .................................................................59

*In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*,
  No. MDL 150(AWT), 1992 WL 220753 (C.D. Cal. July 16, 1992)................32

*Daniel v. America Board of Emergency Medical*,
  428 F.3d 408 (2d Cir. 2005).....................................................................36, 37

*Deep South Pepsi-Cola Bottling Co. v. PepsiCo, Inc.*,
  No. 88 CIV. 6243, 1989 WL 48400 (S.D.N.Y. May 2, 1989).........................57

*Dickson v. Microsoft Corp.*,
  309 F.3d 193 (4th Cir. 2002).........................................................................32

*Doctor's Hospital of Jefferson, Inc. v. Southeast Medical Alliance, Inc.*,
  123 F.3d 301 (5th Cir. 1997).........................................................................55

*Durkin v. Major League Baseball*,
  No. 94-5315 (E.D. Pa. July 17, 1995), *aff'd mem.*, 85 F.3d 611 (3d Cir. 1996)..............29

*E & L Consulting, Ltd. v. Doman Industrial, Ltd.*,
  472 F.3d 23 (2d Cir. 2006).................................................................... 4, 43, 45

*Electronics Communications Corp. v. Toshiba America Consumer Products, Inc.*,
  129 F.3d 240 (2d Cir. 1997)................................................................*passim*

*In re Elevator Antitrust Litigation*,
    502 F.3d 47 (2d Cir. 2007)..................................................................................58

*Fraser v. Major League Soccer, L.L.C.*,
    284 F.3d 47 (1st Cir. 2002)................................................................................55

*Futurevision Cable System of Wiggins, Inc. v. Multivision Cable TV Corp.*,
    789 F. Supp. 760 (S.D. Miss. 1992), *aff'd mem.*, 986 F.2d 1418 (5th Cir. 1993)............46

*Global Discount Travel Services v. Trans World Airlines, Inc.*,
    960 F. Supp. 701 (S.D.N.Y. 1997).................................................................54, 55

*Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*,
    17 F. Supp. 2d 275 (S.D.N.Y. 1998)..................................................................46

*Hack v. President & Fellows of Yale College*,
    237 F.3d 81 (2d Cir. 2000)................................................................................57

*Hanover Shoe, Inc. v. United Shoe Machine Corp.*,
    392 U.S. 481 (1968).........................................................................................26

*Hawaii v. Standard Oil Co.*,
    405 U.S. 251 (1972).........................................................................................36

*H. L. Hayden Co. of New York, Inc. v. Siemens Medical Systems, Inc.*
    879 F.2d 1005 (2d Cir. 1989)............................................................................59

*Howard Hess Dental Laboratories Inc. v. Dentsply International, Inc.*,
    602 F.3d 237 (3d Cir. 2010)........................................................................32, 45

*Howard Hess Dental Laboratories Inc. v. Dentsply International, Inc.*,
    424 F.3d 363 (3d Cir. 2005)........................................................................32, 33

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977) ...........................................................3, 25, 26, 28, 34

*Invamed, Inc. v. Barr Laboratories, Inc.*,
    22 F. Supp. 2d 210 (S.D.N.Y. 1998)..................................................................58

*Jacobs v. Tempur-Pedic International*,
    626 F.3d 1327 (11th Cir. 2010)..........................................................................46

*Jefferson Parish Hospital District No. 2 v. Hyde*,
    466 U.S. 2 (1984) ...............................................................................22, 23, 25

*Kansas v. UtiliCorp United, Inc.*,
    497 U.S. 199 (1990) ............................................................................26, 29

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008).....................................................................31

*Kingray, Inc. v. National Basketball Association, Inc.*,
    188 F. Supp. 2d 1177 (S.D. Cal. 2002)................................................*passim*

*Kingray, Inc. v. NHL Enterprises, Inc.*,
    No. 3:00-CV-1544-L (BEN) (S.D. Cal. July 2, 2002)..........................*passim*

*Klickads, Inc. v. Real Estate Bd. of N.Y.*,
    No. 04-Civ-8042, 2007 WL 2254721 (S.D.N.Y. Aug. 6, 2007)....................59

*Kloth v. Microsoft Corp.*,
    444 F.3d 312 (4th Cir. 2006)..................................................................26, 37

*Kramer v. Pollock-Krasner Foundation*,
    890 F. Supp. 250 (S.D.N.Y. 1995) ..............................................................55

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ....................................................................................43

*Lewis v. Casey*,
    518 U.S. 343 (1996) ..............................................................................25, 39

*Link v. Mercedes-Benz*,
    788 F.2d 918 (3d Cir. 1986).........................................................................32

*Linzer Products Corp. v. Sekar*,
    499 F. Supp. 2d 540 (S.D.N.Y. 2007) ...........................................54, 57, 58

*Lorenzo v. Qualcomm Inc.*,
    603 F. Supp. 2d 1291 (S.D. Cal. 2009).......................................................38

*Madison Square Garden v. National Hockey League*,
    No. 07-cv-8455, 2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008)....................35

*Major League Baseball Properties, Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008).........................................................................47

*In re NASDAQ Market-Makers Antitrust Litigation*,
    169 F.R.D. 493 (S.D.N.Y. 1996)..................................................................29

vi

*Non-Commercial Partnership Hockey Club Lokomotiv Yaroslavl v. National Hockey
    League*,
    06 Civ. 9421(LAP) (S.D.N.Y. Nov. 15, 2006) ......................................................48, 49

*NYNEX Corp. v. Discon, Inc.*,
    525 U.S. 128 (1998) .........................................................................................................21

*Paycom Billing Services, Inc. v. Mastercard International, Inc.*,
    467 F.3d 283 (2d Cir. 2006)........................................................................................25, 27

*Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.*,
    50 F.R.D. 13 (E.D. Pa. 1970), *aff'd sub nom. Mangano v. American Radiator &
    Standard Sanitary Corp.*, 438 F.2d 1187 (3d Cir. 1971).................................................37

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997).............................................................................................57

*Race Tires America, Inc., et al. v. Hoosier Racing Tire Corp.*,
    614 F.3d 57 (3d Cir. 2010)...............................................................................................24

*Re-Alco Industrial, Inc. v. National Center. for Health Education, Inc.*,
    812 F. Supp. 387 (S.D.N.Y. 1993) ..................................................................................54

*RxUSA Wholesale, Inc. v. Alcon Laboratories, Inc.*,
    661 F. Supp. 2d 218 (E.D.N.Y. 2009) .............................................................................59

*Schnall v. Marine Midland Bank*,
    225 F.3d 263 (2d Cir. 2000).............................................................................................52

*Shaw v. Rolex Watch, U.S.A., Inc.*,
    673 F. Supp. 674 (S.D.N.Y. 1987) ..................................................................................54

*Simon v. KeySpan Corp.*,
    785 F. Supp. 2d 120 (S.D.N.Y. 2011) .............................................................................24

*Simon v. KeySpan Corp.*,
    No. 10-cv-5437, 2011 WL 2135075 (S.D.N.Y. May 27, 2011) ................................25, 39

*Sira v. Morton*,
    380 F.3d 57 (2d Cir. 2004)...............................................................................................52

*Starr v. Sony BMG Music Entertainment*,
    592 F.3d 314 (2d Cir. 2010).......................................................................................44, 45

*Temple v. Circuit City Stores, Inc.*,
    No. 06 CV 5303(JG), 2007 WL 2790154 (E.D.N.Y. Sept. 25, 2007) .......................29, 33

*Texaco, Inc. v. Dagher*,
    547 U.S. 1 (2006) .................................................................................... 5, 48, 49

*Theatre Party Associates, Inc. v. Shubert Organization, Inc.*,
    695 F. Supp. 150 (S.D.N.Y. 1988) ....................................................................56

*United States v. E. I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) ..........................................................................................57

*Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ..........................................................................................58

*In re Vitamin C Antitrust Litigation*,
    279 F.R.D. 90 (E.D.N.Y. 2012) .................................................................33, 35

*Wampler v. Southwest Bell Telegraph Co.*,
    597 F.3d 741 (5th Cir. 2010) .............................................................................46

*Washington v. National Football League*,
    No. 11-3354 (PAM/AJB), 2012 WL 3017961 (D. Minn. June 13, 2012)............ 47, 50, 54

## Statutes

47 U.S.C. § 522(13) ........................................................................................................9

15 U.S.C. §§ 1291-95......................................................................................................10

## Other Authorities

2A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
    Principles and Their Application*  (3d ed. 2011)............................................34

9 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
    Principles and Their Application* (3d ed. 2011)............................................23

11 Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their
    Application* (3d ed. 2011) .............................................................................42

The *Laumann*[1] and *Garber*[2] Defendants submit this consolidated memorandum in support of their respective Motions to Dismiss the Complaints with prejudice in each case.

## PRELIMINARY STATEMENT

Plaintiffs are one current and five former subscribers of cable or satellite television or Internet "streaming" services that include live NHL or MLB game telecasts. They assert Section 1 and Section 2 claims based on a common theory: that each of the leagues and their respective member clubs allegedly have "conspired" horizontally among themselves to reduce output of live game telecasts, thereby allegedly increasing prices and reducing consumer choice. Specifically, Plaintiffs claim that they have been overcharged for telecasts (and television services generally) as a result of the alleged internal agreements by the leagues and their clubs because, in addition to games telecast on a national basis, each league: (1) grants each club exclusive telecast rights within the club's telecast territory for games played by that club; and (2)

---

[1]     The moving Defendants in *Laumann* are National Hockey League ("NHL"), NHL Enterprises, L.P., NHL Interactive Cyberenterprises, LLC, and nine NHL clubs (all twelve entities collectively referred to herein as the "NHL Defendants"), plus Comcast Corporation ("Comcast") and four of its affiliated Comcast SportsNet entities, DIRECTV, LLC ("DIRECTV"), DIRECTV Sportsnetworks LLC and one of its affiliated Root Sports entities, and The Madison Square Garden Company. All of the foregoing are referred to collectively as the *Laumann* Defendants.

[2]     The moving Defendants in *Garber* are Office of the Commissioner of Baseball, doing business as Major League Baseball ("MLB"), Major League Baseball Enterprises, Inc., MLB Advanced Media, L.P., and MLB Advanced Media, Inc., along with eight of the nine named MLB club defendants (all twelve entities collectively referred to herein as the "MLB Defendants"), plus Comcast and three of its affiliated Comcast SportsNet entities, DIRECTV, DIRECTV Sportsnetworks LLC and three of its affiliated Root Sports entities, and Yankees Entertainment & Sports Networks, LLC. All of the foregoing are referred to collectively as the *Garber* Defendants. An additional named defendant, Chicago National League Baseball Club, LLC, filed a Notice of Voluntary Chapter 11 Bankruptcy and Automatic Stay on June 28, 2012 (*Garber* Dkt. No. 53) and is not a party to this motion to dismiss.

provides packages that allow fans within a club's telecast territory also to watch the games that do not involve that club.

Plaintiffs do not allege any cross-league conspiracy between the NHL and MLB or between NHL clubs and MLB clubs.  Rather, Plaintiffs separately challenge each league's respective telecast structure—i.e., *Laumann* challenges the NHL's telecast structure and *Garber* challenges MLB's telecast structure.  In both cases, Plaintiffs would "prefer" a different, à la carte system in which they could watch only their favorite teams' games in each Plaintiff's "preferred" format and medium.  In addition to the league defendants, Plaintiffs seek to hold Comcast, DIRECTV and various regional sports networks ("RSNs") liable for making league telecasts available in accordance with the leagues' internal telecast rules.

Plaintiffs' claims simply rehash meritless claims that were dismissed in the *Kingray* cases brought against the NHL, the National Basketball Association ("NBA"), DIRECTV, and a Comcast affiliate based on the same telecast distribution system at issue here.  *See Kingray, Inc. v. NHL Enters., Inc.*, No. 00-CV-1544-L (BEN) (S.D. Cal. July 2, 2002); *Kingray, Inc. v. Nat'l Basketball Ass'n*, 188 F. Supp. 2d 1177 (S.D. Cal. 2002).  Like the claims in *Kingray*, Plaintiffs' claims are meritless for the following, independent reasons.

*First*, Plaintiffs have not alleged harm to competition in the purported relevant markets for live video presentations of professional hockey or baseball games—a required element of each of Plaintiffs' claims.  The Complaints' conclusory allegations that output has been reduced, market prices increased, and consumer choice limited are insufficient to satisfy this requirement.  As the *Kingray* court held, there is no "output reduction" as a matter of law where virtually all league games are telecast through a combination of league and individual club licenses.  Here, Plaintiffs concede on the face of the Complaints that virtually every NHL and MLB game is

exhibited through a combination of (1) cable/satellite telecasts licensed by a club within a club's telecast territory ("in-market" telecasts), (2) national telecasts licensed by the leagues to national networks (NBC, Fox, ESPN, etc.), and (3) league-wide subscription television packages licensed by the leagues ("out-of-market" packages). The fact that virtually all game telecasts were available to these Plaintiffs is fatal to their claims, as it was fatal to the claims previously asserted in the *Kingray* cases. Absent any output reduction, bald assertions that the leagues' telecast arrangements reduce consumer choice or increase price are insufficient to allege harm to competition because both claimed effects are fully consistent with a competitive market.

*Second*, even if the alleged agreements among the leagues and their respective clubs harmed competition, none of the Plaintiffs has standing to sue for any resulting "overcharge" for their cable or satellite television service since none of them bought any such service ***directly*** from any of the alleged horizontal conspirators. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 736 (1977). Plaintiffs concede that they are only indirect purchasers of NHL and MLB telecasts by alleging that they bought their television services from Comcast and DIRECTV, parties that are in a strictly vertical distributor relationship with the leagues and the clubs. The direct purchasers of the telecasts are RSNs (which license in-market telecasts of games within a club's telecast territory) and television distributors, such as Comcast and DIRECTV (which license out-of-market telecasts of games from the leagues). Plaintiffs cannot alter their indirect purchaser status merely by naming some of these direct purchasers in the Complaints. Plaintiffs do not plausibly allege that any of these television distributors were party to the alleged horizontal league-level agreements. Nor do they allege any vertical conspiracy between the leagues/clubs and Comcast/DIRECTV. Absent an allegation that Plaintiffs buy directly from the NHL or MLB

Defendants, Plaintiffs' claims should be dismissed under *Illinois Brick*, as were nearly identical claims in *Kingray*.

Plaintiffs also lack antitrust standing because their alleged injuries are too attenuated and remote from the alleged horizontal conspiracy. *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983). Additionally, none of the *Garber* Plaintiffs has standing to assert claims concerning the MLB Extra Innings television package since none of them purchased that product. Five of the six Plaintiffs also have no standing on their claims for injunctive relief in either *Laumann* or *Garber* because they are allegedly *former* subscribers who assert no intention to subscribe to any of the challenged television or Internet services in the future.

*Third*, Plaintiffs allege no cognizable anticompetitive conduct by Comcast, DIRECTV, or any of the RSN Defendants. There is no plausible allegation that any of these Defendants have horizontally conspired with the leagues and the clubs with respect to the leagues' internal telecast rules. *Kingray* holds that any such claim of horizontal conspiracy between the leagues and the distributors must fail as a matter of law because these defendants are neither actual nor potential competitors. Moreover, there is no allegation that Comcast and DIRECTV conspired to divide markets or fix prices (indeed, Comcast and DIRECTV compete vigorously to distribute programming) or that the RSNs have entered into any horizontal agreements to avoid competition (indeed, RSNs likewise compete vigorously for telecast rights). And there is no allegation about any of these Defendants' market power in the relevant markets and no allegation about other necessary elements of any purported Section 1 claim. The only plausible allegations as to these Defendants relate to their *vertical* distribution activity, which is presumptively lawful. *See E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 30 (2d Cir. 2006) ("exclusive

4

distributor arrangements are presumptively legal"); *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 245 (2d Cir. 1997) (same).  Plaintiffs have alleged no facts to rebut that presumption.

 *Fourth*, the alleged horizontal activities of the NHL and MLB Defendants are lawful on their face.  The conduct challenged in the Complaints constitutes the very core of what professional sports league ventures do—sell their jointly created product.  Leagues produce games so that people will watch them, either in-person or by telecast over some media.  In these circumstances, the Supreme Court has made clear that antitrust plaintiffs should not be allowed to litigate whether that core activity is "necessary."  *See Texaco, Inc. v. Dagher*, 547 U.S. 1 (2006).  Further, in *American Needle, Inc. v. National Football League*, 130 S. Ct. 2201 (2010), the Court explained that where, as here, cooperation on challenged conduct is essential—which certainly is true if clubs sell exclusive telecast rights to the same games—courts can uphold the venture activities in the "twinkling of an eye," without engaging in a detailed factual analysis pursuant to the rule of reason.  This Court should uphold these practices in the twinkling of an eye in order to avoid the chaos and diminution in output that would result absent that cooperation.  Finally, while Plaintiffs are challenging purported joint activities of the NHL and MLB Defendants as conspiratorial, they have failed to allege that individual NHL and MLB clubs even own or control the rights to market and sell out-of-market games (which rights actually are owned or controlled solely by the NHL and MLB).  NHL and MLB clubs cannot unlawfully conspire with respect to those rights.

 *Fifth*, Plaintiffs fail to allege a cognizable relevant market for live video programming of professional hockey or baseball games over media such as cable and satellite television and the Internet.  Plaintiffs allege no *facts* to explain plausibly why NHL or MLB programming is a

separate and distinct product from other sports and entertainment programming—including why NHL and MLB telecasts are distinct products from each other.  Plaintiffs' failure to allege facts regarding reasonable interchangeability or cross-elasticity of demand renders Plaintiffs' proposed relevant market insufficient as a matter of law.

*Sixth*, Plaintiffs' failure and inability to allege any cognizable anticompetitive effect in any relevant market—let alone any plausible "conspiracy" among the leagues, the clubs, and the RSNs and distributors—also compels dismissal of Plaintiffs' Section 2 claim in each case, as does Plaintiffs' failure to allege facts supporting other necessary elements of any purported monopolization claim.

In sum, this is not a case about output reduction or alleged market divisions.  Plaintiffs' complaint is simply that they would "prefer" different packaging of the very same games already available to them.  Plaintiffs' demands are legally baseless, have been rejected by prior courts, and should be dismissed in their entirety and with prejudice.

## SUMMARY OF COMPLAINTS[3]

## I.   THE PARTIES

### A.   The NHL and MLB Defendants

Defendant National Hockey League is an unincorporated association of 30 major league professional ice hockey clubs, only nine of which are named as defendants in the *Laumann* action.  (*Laumann* ¶¶17, 21.)  Defendant Office of the Commissioner of Baseball, doing business as Major League Baseball, is an unincorporated association of 30 professional baseball clubs, only nine of which are named as defendants in the *Garber* action.  (*Garber* ¶¶20, 25.)

---

[3]     The Amended Class Action Complaint in *Laumann* is cited as *Laumann* ¶__.  The Class Action Complaint in *Garber* is cited as *Garber* ¶__.

Plaintiffs plead that the NHL's and MLB's member clubs, "like the member clubs of all professional sports leagues, must cooperate to define, schedule, and produce league contests." (*Laumann* ¶56; *Garber* ¶59.)  Plaintiffs admit that this cooperation is fully consistent with, and permitted under, the antitrust laws.  (*Id.*)  Notwithstanding this admittedly lawful cooperation to produce the games, Plaintiffs allege that NHL and MLB member clubs have entered into purportedly unlawful, horizontal agreements "not to compete in business matters related to the video presentation of live [games]."  (*Laumann* ¶57; *Garber* ¶60.)  Plaintiffs further allege that the NHL and MLB have "centralized control over distribution of live video programming" of their respective clubs' games pursuant to agreements among each league's clubs.  (*Id.*)

Stripped of Plaintiffs' conclusory assertions, the facts alleged are simply that (1) each club has an exclusive right to telecast its games within its respective telecast territory; (2) each league also offers certain games by national telecast; and (3) each league also offers fans within any club's telecast territory the opportunity to view by television games that do not involve that particular club-as well as an additional option to view those out-of-market games by Internet.

**B.      The RSN and Distributor Defendants**

Plaintiffs also name as defendants (1) a small subset of the RSNs to which certain NHL and MLB clubs have granted licenses to telecast NHL and MLB games; and (2) two distributors that deliver television programming to consumers (one via cable television and one via satellite).

**1.      The RSN Defendants**

RSNs telecast a wide range of sports and sports-related programming, including one or more professional sports (e.g., NHL, MLB, NBA, Major League Soccer), college sports, and other sporting events.  Within each NHL or MLB club's telecast territory, the vast bulk of games

that are televised[4] are telecast by RSNs pursuant to contracts that each RSN negotiates with the relevant club.  (*Laumann* ¶58; *Garber* ¶61.)  Plaintiffs have named a small subset of the many RSNs across the country that telecast NHL or MLB games (the RSNs named in the Complaints are referred to hereafter as the "RSN Defendants").  Specifically, Plaintiffs name three RSNs affiliated with DIRECTV (Root Sports Pittsburgh, Root Sports Rocky Mountain, and Root Sports Northwest), together with DIRECTV Sports Networks LLC, the parent company of the Root Sports RSNs, and four RSNs affiliated with Comcast (Comcast SportsNet Philadelphia, L.P., Comcast SportsNet California, LLC, Comcast SportsNet Chicago, LLC, and Comcast SportsNet Mid-Atlantic, L.P.).  (*Laumann* ¶¶26, 28; *Garber* ¶¶29, 31.)[5]  Plaintiffs also name Yankees Entertainment & Sports Networks, LLC ("YES"), as well as The Madison Square Garden Company ("MSG"),[6] owner of the MSG Network and MSG Plus RSNs.  (*Laumann* ¶¶22-23; *Garber* ¶32.)  Plaintiffs allege that Fox Sports Net, Inc. and more than a dozen Fox-affiliated RSNs are part of the "conspiracy" in each case (*Laumann* ¶ 31; *Garber* ¶ 33), but do not name any of these entities as a defendant.  Plaintiffs also identify a number of other RSNs that telecast NHL and MLB games in the United States but that are not part of the alleged conspiracies.  (*Laumann* ¶ 32; *Garber* ¶ 34.)

---

[4]     Although nearly all NHL and MLB games are televised in some form, occasionally a game is not televised due to scheduling or other issues.

[5]     Despite notice that the Complaints misidentify several of the Comcast-affiliated RSNs, Plaintiffs have made no effort to address the misidentifications.

[6]     Defendants MSG and New York Rangers Hockey Club (the "Rangers") submit that the arguments set forth in Argument sections I(B), II(A), II(B), II(C), III(A), III(B)(2), III(C), and VI(B) herein provide a more than sufficient basis to dismiss Plaintiffs' claims and join those sections of the memorandum accordingly (without taking a position on any other portion of this memorandum).

## 2.   The Distributor Defendants

RSNs sell their programming to distributors of cable and satellite television services, including Comcast, a cable distributor, and DIRECTV, a satellite distributor.  (*See Laumann* ¶¶24, 27; *Garber* ¶¶27, 30.)  Both Comcast and DIRECTV are "multichannel video programming distributors" ("MVPDs") (47 U.S.C. § 522(13)) that compete not only with each other but also with other companies to sell television programming, entertainment and, in some instances, other services (e.g., telephone and Internet).  The television packages offered to consumers typically contain hundreds of channels in various configurations, including RSN programming.[7]  Customers who purchase satellite service from DIRECTV receive RSN programming provided by Comcast-affiliated RSNs, Fox RSNs and many others, while customers who purchase cable service from Comcast receive RSN programming provided by DIRECTV-affiliated RSNs, Fox RSNs and many others.

Comcast and DIRECTV also offer "NHL Center Ice" and "MLB Extra Innings," which are the leagues' respective out-of-market television packages (described more fully below).  (*Laumann* ¶82; *Garber* ¶88.)  Comcast and DIRECTV compete with each other (and other television providers) to distribute these packages as well.  (*Id.*)[8]

---

[7]    DIRECTV's and Comcast's programming includes retransmission of over-the-air channels (such as those associated with CBS, Fox, NBC and ABC), pay-per-service channels (for example, HBO and Showtime), sports and entertainment programming (for example, ESPN, TNT, History Channel) and various pay-per-view entertainment (such as boxing, movies and other special events).  The NHL and MLB programming at issue in this case indisputably represents a small fraction of the hundreds of competing channels and programming choices that customers view on DIRECTV and Comcast services.

[8]    Each of the leagues also offers its out-of-market game package for purchase in an Internet streaming format—NHL GameCenter LIVE and MLB.TV.  Those additional, Internet products are distributed by separate entities—NHL Interactive Cyberenterprises, LLC and MLB Advanced Media, L.P.—under licenses from the respective leagues.

C.    **The Plaintiffs**

Plaintiffs Garber, Silver and Herman (collectively, the "TV Plaintiffs") claim to be former subscribers to Comcast (Garber) and DIRECTV (Silver and Herman) television services. (*Laumann* ¶¶13, 15-16; *Garber* ¶¶16, 19.)  Plaintiffs Garber and Silver are in both actions, while Plaintiff Herman is in *Laumann* only.  Plaintiff Silver alleges that, in addition to his general DIRECTV service, he formerly (until 2010) purchased the NHL Center Ice television package through DIRECTV.  (*Laumann* ¶15.)  None of the TV Plaintiffs alleges that he or she purchased the MLB Extra Innings television package.  TV Plaintiffs in each case seek to represent a "Television Class" consisting of individuals who purchased television service from DIRECTV or Comcast (and no other cable or satellite company) that included live NHL or MLB games not available through a sponsored telecast (as that term is used by the Sports Broadcasting Act, 15 U.S.C. §§ 1291-95).  (*Laumann* ¶34; *Garber* ¶39.)

Plaintiffs Laumann, Lerner, and Rasmussen (collectively, the "Internet Plaintiffs") allege that they purchased the NHL GameCenter LIVE (Laumann) and MLB.TV (Lerner and Rasmussen) Internet packages.  (*Laumann* ¶14; *Garber* ¶¶17-18.)  Plaintiff Laumann claims to be a current NHL GameCenter LIVE subscriber.  Plaintiffs Lerner and Rasmussen each allege to be only former subscribers to MLB.TV.  The Internet Plaintiffs seek to represent classes of individual purchasers of NHL GameCenter LIVE (in *Laumann*) and MLB.TV (in *Garber*). (*Laumann* ¶34; *Garber* ¶39.)

II.    **THE ALLEGED MARKETS AND PRODUCTS**

The *Laumann* and *Garber* Plaintiffs allege relevant markets for "live video presentations of major league professional hockey games" and "live video presentations of major league baseball games."  (*Laumann* ¶¶53-54; *Garber* ¶¶56-57.)  Plaintiffs claim that each market consists of all such presentations, regardless of whether the presentation is by "cable and satellite

10

television [or] the Internet" and regardless of whether the presentation is an in-market or out-of-market telecast. (*Laumann* ¶¶53-54, 58, 60, 65-73; *Garber* ¶¶56-57, 61, 63, 68-76.)

In-market telecasts are telecasts of a club's games within that club's telecast territory. (*Laumann* ¶103; *Garber* ¶109.)  For example, when the Philadelphia Phillies play the Colorado Rockies, the Phillies' telecast of the game in the Philadelphia area (through Comcast SportsNet Philadelphia) and the Rockies' telecast of that same game in the Denver area (through Root Sports Rocky Mountain) each are in-market telecasts.  Out-of-market telecasts are those that are made available outside the telecast territories of the two clubs playing the game—i.e., outside of the Phillies' and Rockies' respective telecast territories in the above example. (*Laumann* ¶¶7, 72; *Garber* ¶¶10, 76.)

The NHL and MLB each also license certain game telecast rights to national television networks such as Fox, NBC, ESPN, TBS, NBC Sports Network, MLB Network, and the NHL Network. (*Laumann* ¶¶29, 32-33, 59; *Garber* ¶¶35-38, 62.)[9]  The NHL and MLB also license subscription packages, allowing fans to watch all available out-of-market telecasts, including those not available via national telecast.  Consumers may purchase packages that allow for viewing by television ("NHL Center Ice" and "MLB Extra Innings") or by Internet ("NHL GameCenter LIVE" and "MLB.TV"). (*Laumann* ¶¶7-8; *Garber* ¶¶10-11.)  The television packages are distributed via (1) iN DEMAND (a pay-per-view service available through most digital cable providers); (2) DIRECTV; and (3) Dish Network (for NHL Center Ice) and Verizon FiOS and Frontier (for MLB Extra Innings). (*Laumann* ¶82; *Garber* ¶88.)  The NHL

---

[9]     Plaintiffs acknowledge that certain games are made available through national and local "over-the-air" (i.e., free) telecasts and do not challenge these arrangements. (*Laumann* ¶¶29, 33; *Garber* ¶¶35, 38.)

GameCenter LIVE and MLB.TV Internet packages are sold by NHL and MLB affiliates. (*Laumann* ¶74; *Garber* ¶77.)

Virtually all NHL and MLB games are made available for telecast in every territory through three complementary distribution methods.  First, the majority of in-market games are made available for telecast within the relevant club's telecast territory.  Second, certain games are selected for national telecast on a national network (ESPN, NBC, Fox, etc.).  Third, the NHL and MLB offer out-of-market viewing packages (NHL Center Ice and MLB Extra Innings on television; NHL GameCenter LIVE and MLB.TV on the Internet) that allow fans to watch out-of-market telecasts.

The out-of-market packages have certain "black out" provisions.  (*Laumann* ¶¶75-76, 83; *Garber* ¶¶78-79, 89.)  The black out provisions do not prevent games from being televised. These provisions simply provide that when a club has the right to telecast a game in-market in its telecast territory, that same game is not telecast through the out-of-market package within that same territory.  This avoids double telecasts of a club's games within that club's telecast territory. For example, a Phillies' game shown in the Philadelphia telecast territory on the Philadelphia-area RSN (i.e., Comcast SportsNet Philadelphia), or occasionally on a national network, is not also shown in Philadelphia on the channel assigned to the Phillies on the MLB Extra Innings package.  The black out provisions do not prevent viewers from seeing games outside the telecast territories of the two clubs playing the game.  Thus, for example, a Phillies vs. Rockies game is "blacked out" from the out-of-market package only within the Phillies' and Rockies' telecast territories (where it is already made available to telecast through regional or national networks). The game is not "blacked out" in other territories, where consumers may view it through the out-of-market package.  Likewise, national telecasts and/or the out-of-market packages allow

viewers within the Phillies' and Rockies' telecast territories to watch games that do not involve their respective clubs (e.g., a fan in Philadelphia can watch a Pittsburgh Pirates vs. San Francisco Giants game even though he or she is not in the telecast territory of either of these two clubs). (*Laumann* ¶¶7, 72; *Garber* ¶¶10, 75.)

## III.   THE ALLEGED UNLAWFUL AGREEMENTS

Plaintiffs allege that the NHL's telecast rules constitute an unlawful, horizontal agreement among the NHL Defendants to divide the country into purportedly "exclusive" telecast territories and to distribute telecasts outside of these "exclusive" territories as a bundled service. (*Laumann* ¶¶2, 6-8.) Plaintiffs allege the MLB Defendants separately engaged in a similar allegedly unlawful, horizontal agreement. (*Garber* ¶¶2, 9-11.) Plaintiffs also make wholly conclusory allegations that the RSN Defendants, DIRECTV, and Comcast "joined" these separate conspiracies by agreeing to distribute NHL and MLB games subject to these territorial restrictions, including the leagues' "black out" rules. (*Laumann* ¶¶60-62, 65-69, 71; *Garber* ¶¶63-65, 68-72, 74.)

Plaintiffs allege that the league telecast rules restrict output of NHL and MLB games on television and the Internet, allegedly raising prices for consumers to watch NHL and MLB games, as well as television service generally. (*Laumann* ¶¶12-16, 90-91; *Garber* ¶¶15-19, 93-94.) Plaintiffs assert that they suffer injury in the form of overcharges and that, but for the alleged wrongful conduct, they would pay "substantially lower prices." (*Laumann* ¶¶94-97; *Garber* ¶¶100-103.)

Plaintiffs complain that to watch a live telecast involving a local NHL or MLB club, they "must own a television and subscribe to a cable package that includes the channels that carry [the club's] games." (*Laumann* ¶7; *Garber* ¶10.) Plaintiffs further complain that cable and satellite television services are sold in packages, so that consumers pay not just for the relevant RSN

channels, but also other programming found in the cable/satellite provider's programming

package, which may include channels that the purchaser does not want.  (*Laumann* ¶¶95, 99;

*Garber* ¶¶101, 105.)  Plaintiffs similarly complain that out-of-market games require a

subscription to one of the out-of-market packages and that these packages are sold as a single,

bundled service that provides access to all out-of-market games for a single fee, whereas

Plaintiffs would "prefer" to buy just the games of their preferred club on an à la carte basis.

(*Laumann* ¶¶7-8, 14, 72, 77, 96-97; *Garber* ¶¶10-11, 17-18, 75, 80, 102-103.)  Plaintiffs

Laumann, Lerner and Rasmussen complain that they would "prefer" not to have to purchase a

pay television and/or full out-of-market package to watch their favorite club's games.  (*Laumann*

¶14; *Garber* ¶¶17-18.)

## IV.   <u>SUMMARY OF CLAIMS</u>

Based on the foregoing allegations, Plaintiffs purport to state four claims against all

defendants in, respectively, *Laumann* and *Garber*:

1.      For the Television Plaintiffs, a violation of Section 1 of the Sherman Act based on

alleged agreements to "forbid[] the carrying or online streaming of any [NHL/MLB] game in any

geographic market except those licensed by the [NHL/MLB] team in that geographic market"

(*Laumann* ¶103; *Garber* ¶109);

2.      For the Television Plaintiffs, a violation of Section 1 based on alleged agreements

"that [NHL/MLB] will be the exclusive provider of live 'out-of-market' games distributed

through television providers" (*Laumann* ¶109; *Garber* ¶115);

3.      For the Internet Plaintiffs, a violation of Section 1 based on alleged agreements

"that [NHL/MLB] will be the exclusive provider of live 'out-of-market' games over the Internet"

(*Laumann* ¶115; *Garber* ¶121); and

14

4.    On behalf of all Plaintiffs, a violation of Section 2 for alleged conspiracy to monopolize the "market for video presentations of major league [hockey/baseball] games and Internet streaming of the same" (*Laumann* ¶120; *Garber* ¶126.)

Plaintiffs seek both damages and injunctive relief.

## ARGUMENT

## I.    PLAINTIFFS HAVE FAILED TO ALLEGE HARM TO COMPETITION

Plaintiffs challenge the alleged agreements among the NHL Defendants and among the MLB Defendants to (1) allow each club the exclusive right to license its games for local telecast within that club's designated telecast territory; and (2) distribute out-of-market games exclusively through a package available for purchase on either television or the Internet. (*Laumann* ¶¶6-8; *Garber* ¶¶9-11.)  To state a claim under Sections 1 or 2 of the Sherman Act, Plaintiffs must plead specific facts plausibly showing that these alleged agreements harm competition in the purported relevant market.  *See Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 245-46 (2d Cir. 1997).  They cannot substitute "conclusory statements" for "minimally sufficient factual allegations" of harm to competition.  *Id.*  The requirement to plead plausible, fact-based antitrust claims was made clear by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).[10]

Here, Plaintiffs make only conclusory allegations, with no specific facts, that the alleged telecasting arrangements have harmed them by restricting output of NHL and MLB games on

---

[10]    Only factual allegations are entitled to a presumption of truth; all conclusory claims must be disregarded as irrelevant.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("[P]leadings that . . . are no more than conclusions[] are not entitled to the assumption of truth."); *Twombly*, 550 U.S. at 555 ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (second alteration in original).

television and the Internet, thereby purportedly raising prices and reducing choices for consumers to watch NHL and MLB games.  (*Laumann* ¶¶90-91; *Garber* ¶¶93-94.)  Those allegations are insufficient on their face to plead harm to competition.  *See, e.g.*, *Carell v. Shubert Org., Inc.*, 104 F. Supp. 2d 236, 266 (S.D.N.Y. 2000) (requirement of harm to competition cannot be met through the conclusory assertion that "output was reduced").

### A.    Plaintiffs' Allegations Contradict Any Plausible Theory of Reduced Output

"The core question in antitrust is output.  Unless a contract reduces output in some market, to the detriment of consumers, there is no antitrust problem.  A high price is not itself a violation of the Sherman Act. . . .  Lack of an effect on output means that the [challenged restraint] does not have antitrust significance."  *Chi. Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 95 F.3d 593, 597 (7th Cir. 1996) (hereinafter "*Bulls II*"); *see also Elecs. Commc'ns*, 129 F.3d at 244-46 (affirming dismissal of claims under Sections 1 and 2 where plaintiff challenging exclusive distributorship failed to allege reduction in output).

Plaintiffs make only conclusory allegations that the NHL and MLB telecasting arrangements and "blackout" policies have harmed competition by reducing output.  Plaintiffs' claim is refuted by the facts they admit—i.e., that ***virtually all NHL and MLB games*** (in-market and out-of-market) ***are available to Plaintiffs*** through a combination of over-the-air networks and stations, subscription television services (local cable/satellite channels), national telecasts (on NBC, NBC Sports Network, and the NHL Network for NHL games, and on Fox, ESPN, TBS, and MLB Network for MLB games), plus additional television and Internet packages of out-of-market games on NHL Center Ice, NHL GameCenter LIVE, MLB Extra Innings and MLB.TV.  As the Seventh Circuit explained in a prior antitrust case, when a "league arranges for the broadcast of every game (or if the clubs may broadcast every game the league does not),

16

there is no reduction in output." *Chi. Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 961 F.2d 667, 670 (7th Cir. 1992) (hereinafter "*Bulls I*").

Aside from their conclusory claims of "output" reduction, Plaintiffs' complaint is that they would "prefer" to receive that output in different formats and prices. Plaintiffs' "preferences," however, do not give rise to an antitrust claim. Indeed, nearly identical claims have been rejected in prior cases against the NHL and NBA challenging the same alleged restraints.

The dismissal of the complaint in *Kingray, Inc. v. NHL Enterprises, Inc.*, No. 00-CV-1544-L(BEN) (S.D. Cal. July 2, 2002), ECF No. 150 (Eckles Decl. Ex. 1),[11] is directly on point. The plaintiffs, purchasers of the NHL Center Ice package, complained that most telecasts of NHL club games outside a club's telecast territory were available only through the NHL Center Ice package pursuant to a then-exclusive license between the NHL and DIRECTV. *Kingray v. NHL*, slip op. at 2-4.[12]  As is still the case, the NHL Center Ice package (1) provided consumers the ability to watch virtually every locally-telecasted NHL game; and (2) included "blackouts" for games that were already available in particular territories through other means, such as on a local RSN. *Id.* at 3. The same is true for MLB.

Like Plaintiffs here, the plaintiffs in *Kingray* claimed that the assignment of telecast territories to each club was an unlawful market division enforced through the "blackouts" on

---

[11]     This decision is attached to the Declaration of Paul M. Eckles ("Eckles Decl."), filed herewith. The decision parallels the published decision of the companion case brought against the NBA in which the same plaintiff challenged similar league blackout rules. *See Kingray, Inc. v. Nat'l Basketball Ass'n, Inc.*, 188 F. Supp. 2d 1177 (S.D. Cal. 2002).

[12]     As detailed below, at the time of *Kingray*, DIRECTV was the *exclusive* distributor of NHL Center Ice, whereas now DIRECTV, Comcast and others compete to sell the NHL Center Ice product. Even when the distribution was exclusive, the court rejected the same antitrust claims made here.

NHL Center Ice. *Id.* at 3. The court squarely rejected the premise that the alleged restraints restricted output. The court held that there could be no harm to competition where "blacked out" games were made available to fans on a local television channel:

> The Court finds that the "black out" provision does not restrict output. Defendants' evidence shows that the NHL contracted with local television stations to air certain games; thus, DirecTV's agreement not to compete by rebroadcasting those same games on NHL Center Ice does not constitute an agreement to restrict output—*it merely prevents a double broadcast*.

*Id.* at 11 (emphasis added). In a parallel case, the court dismissed similar claims concerning the NBA's out-of-market product, NBA League Pass, because its "black-out provision does not restrict output; it only affects what channel the game is available on"—i.e., "blacked out" games are available through a local RSN or other broadcast. *Kingray v. NBA*, 188 F. Supp. 2d at 1194.

Under the sound reasoning of the *Kingray* cases, Plaintiffs have not pled output reduction with respect to any of the challenged telecasting arrangements, and the defect is incurable: Plaintiffs have no right under the antitrust laws to multiple telecasts of the same game. There can be no actionable output reduction where, as here, league agreements make virtually all games available for televised exhibition to the Plaintiffs on an RSN cable or satellite channel, on an out-of-market package channel, or from another regional or national broadcaster. Contrary to Plaintiffs' claim (*Laumann* ¶¶60-64; *Garber* ¶¶63-67), there is no requirement to permit "multiple sources" (i.e., multiple networks) to telecast the same game in any given territory. It is sufficient under the antitrust laws that Plaintiffs can watch in-market telecasts on certain channels (e.g., an RSN) and out-of-market telecasts on other channels (e.g., the NHL Center Ice or MLB Extra Innings channels), as well as any games offered solely through a national network telecast.

As pled in the Complaints, telecasts of nearly every NHL and MLB game are made available in nearly every location in the United States. In particular, Plaintiffs admit that (1)

18

games are made available by the clubs for in-market telecasts through RSNs or over-the-air broadcast stations (*Laumann* ¶58; *Garber* ¶61); (2) the NHL and MLB license games for national distribution via over-the-air telecast on NBC and Fox, respectively, as well as on cable channels NBC Sports Network and ESPN or TBS, respectively (*Laumann* ¶¶29, 59; *Garber* ¶¶36-38, 62); (3) the NHL and MLB offer *additional* telecasts through the NHL Network and the MLB Network (*id.*); and (4) the NHL and MLB offer the remaining "out-of-market games" through the NHL Center Ice and MLB Extra Innings television packages (*Laumann* ¶74; *Garber* ¶77), as well as through an additional, Internet option—the NHL GameCenter LIVE and MLB.TV packages—by which fans may view out-of-market games via on-line streaming. (*Laumann* ¶82; *Garber* ¶88.)

The "blackouts" alleged by Plaintiffs simply mean that a "blacked out" game cannot be viewed on a channel assigned to the NHL Center Ice or MLB Extra Innings packages because it is available for telecast on another channel, typically an RSN. The only thing "blacked out" is a game already made available for telecast on another channel. Instead of the same game being made available for simultaneous telecast on two channels, it is made available for telecast on one channel and blacked out on the other. These are the identical circumstances that the *Kingray* court held to be insufficient as a matter of law to state antitrust claims. Plaintiffs have pled no additional facts to distinguish this case from that one. Thus, because there has been no reduction in output, TV Plaintiffs' claims cannot survive.

The *Kingray* analysis applies equally to Internet Plaintiffs' allegations regarding NHL GameCenter LIVE and MLB.TV. Internet Plaintiffs assert that, similar to NHL Center Ice and MLB Extra Innings, telecasts on NHL GameCenter LIVE and MLB.TV involving the local club

are blacked out in that club's telecast territory.  (*Laumann* ¶¶76, 78, 98; *Garber* ¶¶79, 82, 104.)

Again, however, there is no plausible allegation of any output reduction.

First, as explained above, virtually all games are made available for viewing by television.

The Internet packages simply offer fans an *additional* product for viewing certain of those

telecasts.  Second, as with the out-of-market television packages, the "blackout" aspects of the

Internet packages apply only when the game is made available for television distribution in a

particular telecast territory.  The distribution platform (television or Internet) is irrelevant here

because Plaintiffs allege a single relevant market consisting of any "live video presentations" of

the games, whether via television or the Internet.  (*Laumann* ¶¶2, 53, 57, 94; *Garber* ¶¶2, 56, 60,

100.)  And whether output comes in the particular form that Plaintiffs allegedly would "prefer" is

of no consequence under the antitrust laws.  *See Kingray v. NHL*, slip op. at 13; *Kingray v. NBA*,

188 F. Supp. 2d at 1196.

Moreover, as the court recognized in *Kingray*, by making available their various telecast

offerings (now via both television *and* the Internet), the NHL and MLB Defendants actually have

*increased* output because more games are being telecast than ever before.  Indeed, it would turn

the antitrust laws on their head to hold that the NHL or MLB has acted anticompetitively or

harmed competition when each has created and offered not one but two products that ensure that,

in addition to in-market and national telecasts, fans across the country have access to virtually all

out-of-market games.

### B.   Plaintiffs' Conclusory Allegations Of High Prices Do Not State Injury To Competition

Plaintiffs baldly assert that the NHL and MLB Defendants' conduct has injured

competition by increasing prices either for television service as a whole or for the out-of-market

packages of NHL or MLB games.  (*Laumann* ¶¶12-16, 101-18; *Garber* ¶¶15-19, 107-24.)  But,

standing alone, the allegation that Defendants' conduct resulted in higher market prices for the products at issue is insufficient to survive a motion to dismiss.  "A high price is not itself a violation of the Sherman Act."  *Bulls II*, 95 F.3d at 597.  Similarly, as the Ninth Circuit recently held, "allegations that an agreement has the effect of reducing consumers' choices or increasing prices to consumers does not sufficiently allege an injury to competition.  Both effects are fully consistent with a free, competitive market."  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012); *see also NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 139 (1998) ("[A] simple allegation of harm to [plaintiff] does not automatically show injury to competition.").  Further, conclusory allegations of the type Plaintiffs make here—for example, "individual games and individual teams' games would be available at substantially lower prices" absent Defendants' conduct (*Laumann* ¶97; *Garber* ¶103)—are entitled to no weight without supporting *facts*. *See Iqbal*, 556 U.S. at 681.  Such facts are entirely lacking from the Complaints.

### C.  Plaintiffs' Allegations About Lack Of "Consumer Choice" State No Claim

Plaintiffs' assertions of reduced "consumer choice" resulting from a lack of "multiple sources" of major league professional hockey and baseball programming (*Laumann* ¶64; *Garber* ¶67)[13] over a limited "range of media" (*Laumann* ¶91; *Garber* ¶94) are insufficient to plead injury to competition.  Plaintiffs admit that their lawsuit seeks to obtain video telecasts of the live NHL and MLB games in the *form and manner* they desire.  They would "*prefer* not to be required to purchase a full 'out-of-market' package to get [their preferred club's] games, and would *prefer* not to have to subscribe to pay television to be able to watch [their preferred club's] games." (*Laumann* ¶14; *Garber* ¶¶17, 18 (emphasis supplied).)  But it is well settled that a plaintiff cannot state an antitrust claim merely by alleging he or she would prefer to purchase

---

[13]     *See also Laumann* ¶¶81, 100; *Garber* ¶¶87, 106.

products in a different package or that the plaintiff was required to purchase an unwanted

product.  *See generally Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 16 (1984).

The *Kingray* cases rejected an identical challenge, premised upon the plaintiffs'

"prefer[ence]" to purchase access to games in a smaller or different bundle.  There, the court

observed:

> Plaintiffs have not cited, nor is the Court aware of, any authority indicating that
> when a defendant offers a new product in a competitive manner (e.g., all out-of-
> market games via NHL Center Ice), a party can allege a Section 1 violation on the
> basis that the product is not being offered in the manner the Plaintiffs would
> prefer (out-of-market games in a non-bundled format).  Antitrust laws ensure that
> competition is not unlawfully harmed; economic market forces will dictate
> whether the product will be successful.

*Kingray v. NHL*, slip op. at 13; *accord Kingray v. NBA*, 188 F. Supp. 2d at 1196.

This holding is consistent with widely accepted antitrust doctrine.  In *Brantley*, 675 F.3d

at 1200-04, for example, the Ninth Circuit rejected a consumer antitrust challenge to the alleged

practice of MVPDs selling consumers multi-channel "package" services—a practice that

Plaintiffs here also challenge.  (*See Laumann* ¶99; G*arber* ¶105).[14]  Indeed, Plaintiffs' complaint

that in order to watch in-market games, they are required to "purchase a full pay-television

subscription, including tens or hundreds of other channels Plaintiffs may not want" (*Laumann*

¶99; *Garber* ¶105) is very similar to the antitrust claim dismissed in *Brantley*.  The plaintiffs in

*Brantley* alleged that the required sale of multi-channel packages restrained competition among

the television providers because they purportedly were unable to offer à la carte programming,

which the plaintiffs claimed reduced consumer choice and increased prices.  675 F.3d at 1201.

---

[14]    It is unclear if Plaintiffs are advocating some form of distribution of NHL or MLB game
telecasts that would not involve the purchase of a multi-channel cable package or even television
service at all.  In any event, Plaintiffs cannot state an antitrust claim on the basis the product is
not being offered in the manner they would prefer.

The court affirmed dismissal of this claim, reasoning that "allegations that an agreement has the effect of reducing consumers' choices or increasing prices to consumers does not sufficiently allege an injury to competition.  Both effects are fully consistent with a free, competitive market."  *Id.* at 1202.  The court further rejected plaintiffs' claim that they would have "preferred" to purchase products in smaller or different bundles by explaining that "[c]ompelling the purchase of unwanted products is not itself an injury to competition."  675 F.3d at 1203.  The court concluded that at best, the plaintiffs' allegations showed "only that plaintiffs have been harmed as a result of the practices at issue, not that those practices are anticompetitive."  *Id.* Here, it is equally clear that Plaintiffs have not sufficiently alleged injury to competition from the Defendants' purported failure to offer NHL or MLB games on the Plaintiffs' allegedly preferred à la carte basis.

The *Brantley* court relied upon the Supreme Court's holding in *Jefferson Parish* that "when a purchaser is 'forced' to buy a product he would not have otherwise bought even from another seller . . . , there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed."  466 U.S. at 16.  Professors Areeda and Hovenkamp similarly explain why "bundling" of wanted and unwanted products does not amount to unlawful "tying" under the antitrust laws:

> In order to obtain desired product *A*, let us suppose, the defendant's customer is forced to take product *B*, which it does not want, cannot use, and would not have purchased from anyone.  This is typically the equivalent of a higher price for product *A*.  From the viewpoint of the defendant seller, its revenue on product *A* consists of the *A* price plus the excess of the *B* price over *B*'s cost to the seller. From the viewpoint of the customer, the cost of obtaining the desired product *A* is the nominal *A* price plus the excess of the *B* price over its salvage value.  *This has nothing to do with gaining power in the B market or upsetting competition there.*

9 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶1724b, at 320 (3d ed. 2011) (emphasis added).

Thus, offering a bundled "package" of goods is not an antitrust violation simply because a buyer may prefer an unbundled choice.  Perhaps in recognition of this deficiency (among others), Plaintiffs do not even attempt to plead a tying claim.  As such, their alleged complaints about the bundled nature of the pay television and out-of-market packages are insufficient as a matter of law to state an antitrust claim.  In this situation, dismissal is appropriate to prevent time consuming and expensive litigation.  *See Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984) ("When the requisite elements are lacking, the costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that plaintiffs can construct a claim from the events related in the complaint."); *see also Race Tires Am., Inc., et al.  v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 80 (3d Cir. 2010) (in adopting "bright line rule" permitting sports organizations to adopt exclusive supplier contracts, court recognized "very real anti-competitive effect" of "time consuming and expensive antitrust litigation").

## II.   <u>TV PLAINTIFFS LACK STANDING TO BRING THEIR CLAIMS</u>

An antitrust plaintiff must have antitrust standing.  *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 109-11 (1986); *Balaklaw v. Lovell*, 14 F.3d 793, 797-98 & n.9 (2d Cir. 1994). Antitrust standing requires:  (1) that the plaintiff has suffered antitrust injury; and (2) that the plaintiff is a "proper party" to bring suit against the defendant—i.e., an "efficient enforcer" of the antitrust laws.  *Balaklaw*, 14 F.3d at 797 n.9; *see also Simon v. KeySpan Corp.*, 785 F. Supp. 2d 120, 134-35 (S.D.N.Y. 2011) (Scheindlin, J.).  Both requirements must be met.  Here, Plaintiffs meet neither.[15]

---

[15]   The standing inquiry necessarily focuses solely on the named Plaintiffs.  As this Court has held, "[t]o establish standing . . . plaintiff 'must allege and show that [he] personally ha[s] been injured, not that injury has been suffered by other, unidentified members of the class to

*(cont'd)*

To satisfy the antitrust injury requirement, a plaintiff must plead specific facts showing that its injury is of a type protected by the antitrust laws—i.e., that the alleged restraint harmed competition as a whole in the relevant market—and that the claimed injury flows from that which makes the defendant's conduct unlawful. *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 290 (2d Cir. 2006); *Elecs. Commc'ns*, 129 F.3d at 244-45.  As shown above, Plaintiffs have not pled and cannot plead any reduction of output, but rather allege injury in the form of a viewing preference. *See supra* Section I.  Since there is a failure to allege harm to competition, any claimed "injury" is not of a type protected by the antitrust laws.

There are two independent reasons why TV Plaintiffs are not proper parties to bring these claims.  First, TV Plaintiffs are indirect purchasers whose claims are barred by *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).  Second, separate and apart from the *Illinois Brick* doctrine, TV Plaintiffs' alleged injury—overpriced television service from DIRECTV and/or Comcast (*see Laumann* Count One; *Garber* Count One)—bears only a remote and speculative relationship to the purported misconduct and thus fails to meet the requirements of *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535-45 (1983).[16]

In addition, Count Two in the *Garber* case should be dismissed because it is based on claimed overcharges for the MLB Extra Innings package, but no Plaintiff has standing to assert the claims since none alleges he or she ever purchased the package.  Moreover, with the

_____

*(cont'd from previous page)*
which [he] belongs and which [he] purports to represent.'"  *Simon v. KeySpan Corp.*, No. 10-cv-5437, 2011 WL 2135075, at *7 (S.D.N.Y. May 27, 2011) (Scheindlin, J.) (dismissing antitrust claims of indirect purchasers) (quoting *Lewis v. Casey,* 518 U.S. 343, 357 (1996)).

exception of Plaintiff Laumann, each of the Plaintiffs lacks Article III standing to seek injunctive relief because each no longer subscribes to Comcast, DIRECTV, or the Internet packages and thus stands to gain nothing from an injunction against any Defendant.

### A.  TV Plaintiffs' Claims For Damages Are Barred Under *Illinois Brick*

In *Illinois Brick*, the Supreme Court established a bright-line rule that a plaintiff lacks standing to sue for damages under the Sherman Act if a more direct purchaser (e.g., a distributor or other middleman) stands between the plaintiff and the defendant who supplied the product or service impacted by the alleged antitrust violation. *Illinois Brick*, 431 U.S. at 736-46.  In this situation, the direct purchaser, not the plaintiff, has incurred the immediate impact of the defendant's claimed anticompetitive conduct.  The purposes of the bright-line rule are elimination of the speculation of tracing and apportioning injuries between direct and indirect purchasers, elimination of duplicative recoveries, and the promotion of antitrust law enforcement by purchasers who have been most directly injured by the alleged violation.  *Illinois Brick*, 431 U.S. at 728-33, 741-47; *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 488-94 (1968).  The Court reaffirmed *Illinois Brick* in *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 208-18 (1990), holding that indirect purchasers lack standing even where the indirect purchasers allege that the direct purchasers "passed on" *all* of the overcharges arising from the alleged antitrust violation.  According to the Court, "[t]he possibility of allowing an exception, even in rather meritorious circumstances, would undermine the rule."  *Id.* at 216.

---

*(cont'd from previous page)*

[16]     "Although courts sometimes blend the indirect purchaser rule of *Illinois Brick* and the requirement of § 4 standing under *Associated General Contractors*," the principles of the two cases are "analytically distinct."  *Kloth* v. *Microsoft Corp.*, 444 F.3d 312, 323 (4th Cir. 2006).

1.      **TV Plaintiffs Are Indirect Purchasers And Thus Lack Standing To Sue For Damages**

TV Plaintiffs are indirect purchasers under *Illinois Brick* and thus cannot recover antitrust damages. *See Paycom Billing Servs.*, 467 F.3d at 291-92. The "core" of each Complaint is an alleged horizontal geographic market division—among the NHL Defendants in *Laumann* and the MLB Defendants in *Garber*. (*Laumann* ¶60; *Garber* ¶63.) TV Plaintiffs assert that they have been harmed by these purported agreements among the NHL Defendants and among the MLB Defendants to designate exclusive telecast territories for in-market telecasts (which allegedly result in RSNs enjoying exclusive telecast rights) and to jointly sell out-of-market telecasts through the NHL Center Ice and MLB Extra Innings packages. (*Laumann* ¶¶101-12; *Garber* ¶¶107-18.) TV Plaintiffs have no standing to pursue damage claims for these alleged horizontal conspiracies because they have purchased nothing directly from the NHL or MLB Defendants. Their only purchases were made from the distributors, Comcast and DIRECTV, which (1) cannot, as a matter of law, be a party to the challenged **horizontal** agreements and (2) are not plausibly alleged to be a party to any unlawful **vertical** conspiracy. In short, even if Plaintiffs pled an unlawful horizontal agreement among the league and club defendants, they made no direct purchase of any television services from any party to such alleged unlawful agreement.

On the face of the Complaints, there can be no dispute that TV Plaintiffs are only indirect purchasers of RSN telecasts of in-market games and of the leagues' out-of-market packages. TV Plaintiffs allege that they paid too much for television service purchased solely from DIRECTV or Comcast, not from the RSNs who produce the in-market telecasts and not from the NHL or MLB Defendants who supply the out-of-market packages. (*Laumann* ¶¶12-13, 15-16, 34, 101-12; *Garber* ¶¶15-16, 19, 39, 107-18.) But DIRECTV and Comcast are middlemen—they purchase and distribute in-market telecasts from the RSNs, and they purchase and distribute out-

27

of-market game packages from the NHL and MLB Defendants.  (*Laumann* ¶¶58, 72, 82; *Garber*
¶¶61, 75, 88.)  The RSNs are likewise middlemen—they purchase telecast rights from NHL and
MLB clubs, and they sell their channels containing telecasts to DIRECTV and Comcast (as well
as other MVPDs).  TV Plaintiffs did not purchase any products or services from the NHL or
MLB Defendants.

       Thus, even if the NHL and MLB Defendants' alleged conduct resulted in
supracompetitive prices for in-market telecasts and out-of-market packages, it was the direct
purchasers (the RSNs and cable and satellite providers)—and not TV Plaintiffs—that paid those
purportedly inflated prices to the NHL and MLB Defendants.  The difficulty in tracing the
alleged "overcharges"—from the relevant NHL or MLB Defendants to the relevant RSN, and
then down through the cable or satellite company, and finally to the consumer—is obvious.
Indeed, because the services purchased by TV Plaintiffs included both NHL and MLB telecasts,
often from the same RSN, it would be impossible to trace and apportion the separate impact
allegedly flowing from the NHL and MLB Defendants' supposed separate conspiracies.  *Illinois
Brick* makes clear that the answer is *not* to attempt to trace or allocate at all, but rather to follow
the bright line prohibition on indirect purchaser claims.  *Illinois Brick*, 431 U.S. at 737
("However appealing this attempt to allocate the overcharge might seem in theory, it would add
whole new dimensions of complexity to treble-damages suits and seriously undermine their
effectiveness.").

       The *Kingray* court applied *Illinois Brick* to dismiss nearly identical claims against the
NHL and its member clubs for lack of standing.  There, the court held that because the plaintiffs
purchased NHL Center Ice from DIRECTV and iN DEMAND (a Comcast affiliate), and not
from the NHL defendants, they were indirect purchasers, and *Illinois Brick* barred their antitrust

claim against the NHL defendants. *Kingray v. NHL*, slip op. at 16; *see also Kingray v. NBA*, 188 F. Supp. 2d at 1199 (holding that as indirect purchasers, plaintiffs lacked standing to maintain horizontal conspiracy claim against NBA defendants). Likewise, in *Durkin v. Major League Baseball*, No. 94-5315 (E.D. Pa. July 17, 1995) (Eckles Decl. Ex. 2), *aff'd mem.*, 85 F.3d 611 (3d Cir. 1996), the court dismissed for lack of standing the antitrust claims of indirect purchaser consumers who challenged the rules and agreements of the four major sports leagues (including MLB and the NHL) relating to the pooling of telecast rights. *See Durkin*, slip op. at 1-2, 6-11. As in *Kingray* and *Durkin*, TV Plaintiffs are indirect purchasers whose damage claims are barred as a matter of law under *Illinois Brick*.

### 2.     No Purported "Co-Conspirator" Exception To *Illinois Brick* Applies

TV Plaintiffs might attempt to invoke a supposed "co-conspirator" exception to avoid "run[ning] squarely into the *Illinois Brick* wall." *In re ATM Fee Antitrust Litig.*, No. 10-17354, 2012 WL 2855813, at *6 (9th Cir. July 12, 2012). Any reliance upon purported exceptions to *Illinois Brick* should be rejected for at least four reasons.

*First*, neither the Supreme Court nor the Second Circuit has recognized any co-conspirator exception to *Illinois Brick*. *See, e.g.*, *Temple v. Circuit City Stores, Inc.*, No. 06 CV 5303(JG), 2007 WL 2790154, at *7 n.9 (E.D.N.Y. Sept. 25, 2007) (noting that "[t]he Second Circuit does not appear to have addressed th[e co-conspirator exception] question"). Indeed, the Supreme Court has held that it would be "an unwarranted and counterproductive exercise to litigate a series of exceptions" to *Illinois Brick*. *Utilicorp*, 497 U.S. at 217; *see also In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 505 (S.D.N.Y. 1996) ("[T]he Supreme Court has strictly adhered to the bright-line rule established in *Illinois Brick*, holding that the 'possibility of allowing an exception, even in rather meritorious circumstances, would

undermine the rule.'"").  This Court should also resist TV Plaintiffs' effort to create ad hoc exceptions to the bright line rule of *Illinois Brick*.

*Second*, TV Plaintiffs cannot invoke any co-conspirator exception because they have offered nothing but conclusory allegations of conspiracy involving Comcast, DIRECTV, and the RSN Defendants.  TV Plaintiffs' unsupported allegations that Comcast and DIRECTV "joined" separate conspiracies among the league defendants (*see, e.g.*, *Laumann* ¶¶62, 68; *Garber* ¶¶65, 71) are entitled to no weight.  *See Iqbal*, 556 U.S. at 679 ("[C]onclusions . . . are not entitled to the assumption of truth.").  TV Plaintiffs' threadbare allegations that the RSNs participated in a conspiracy (*see, e.g.*, *Laumann* ¶¶65, 68, 102; *Garber* ¶¶68, 71, 108) are equally unavailing.  *See Twombly*, 550 U.S. at 555 ("a formulaic recitation of the elements of a cause of action" is insufficient to state a claim).

The failure of the Complaints to satisfy the *Twombly* pleading requirements is well illustrated with regard to YES, which is mentioned in only two places in the *Garber* Complaint: paragraph 32 (which merely identifies YES) and paragraph 86 (which alleges that the Yankees provide "in market [Internet] streaming" through YES, "but only to consumers who already subscribe" to YES through an MVPD and pay an extra fee).  Plaintiffs cannot merely imply a conspiracy by YES.  Plaintiffs fail to allege any specific facts as to YES, such as the relevant provisions of YES's license agreement with the Yankees, or any of YES's carriage agreements with the many competing MVPDs that carry YES in the New York region.  The *Garber* Complaint also does not contain any factual allegations that YES conspired with non-party RSN SportsNet New York ("SNY"), which produces telecasts of New York Mets games for distribution to MVPDs *within* the New York region, and any such allegation would be frivolous as SNY and YES are both carried by MVPDs throughout the New York region and compete

head-to-head for viewers. The Complaint's allegations are insufficient to state any conspiracy claim against YES, and the similarly threadbare claims against the other RSN Defendants are equally insufficient.

Moreover, any claim that Comcast, DIRECTV, or the RSN Defendants participated in a horizontal conspiracy with the NHL or MLB Defendants must fail as a matter of law. Again, *Kingray* is instructive. In *Kingray*, the plaintiffs (indirect purchasers) attempted to invoke the purported co-conspirator exception by contending that DIRECTV and iN DEMAND engaged in a conspiracy with the NHL defendants to restrict output and to provide NHL Center Ice at artificially inflated prices. *Kingray v. NHL*, slip op. at 16-17. The court rejected the plaintiffs' arguments, holding that the co-conspirator exception did not apply because the plaintiffs' conspiracy "allegations [were] conclusory and fail[ed] to allege sufficient facts to support a vertical conspiracy theory." *Id.* at 17.[17] The court also held that DIRECTV and iN DEMAND could not engage in a horizontal conspiracy with the NHL defendants. *Id.* at 17.[18] The court in *Kingray v. NBA* rejected the application of the co-conspirator exception for the same reasons, noting that any co-conspirator exception "is to be construed narrowly." *Kingray v. NBA*, 188 F. Supp. 2d at 1199-1200; *see also Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1050 (9th Cir. 2008) (refusing to apply a co-conspirator exception to *Illinois Brick* because the indirect purchaser

---

[17]    *Kingray* was decided prior to the Supreme Court's decision in *Twombly* heightening the pleading requirements for conspiracy allegations. In light of *Twombly*, the *Kingray* court's rejection of conclusory allegations of conspiracy is even more persuasive.

[18]    As detailed below, the court held that, as a matter of law, DIRECTV and iN DEMAND (a Comcast affiliate) could not engage in a horizontal conspiracy with the NHL defendants because they were not competitors with the NHL defendants but rather were purchasers of NHL games. *Kingray v. NHL*, slip op. at 17.

plaintiffs "simply allege[d] the [middlemen were] coconspirators, without providing any facts to support such an allegation").[19]

     *Third*, even if a plausible conspiracy claim were stated against Comcast, DIRECTV, or the RSN Defendants, TV Plaintiffs have not attempted to plead the *type* of conspiracy that may qualify for the co-conspirator exception.  Courts recognizing the co-conspirator exception typically limit it to conspiracies to *fix retail prices.  See Dickson v. Microsoft Corp.*, 309 F.3d 193, 214-215 (4th Cir. 2002) ("*Illinois Brick* is inapplicable to a particular type of conspiracy—price-fixing conspiracies."); *In re ATM Fee Antitrust Litig.*, 2012 WL 2855813, at *7-12 (rejecting application of co-conspirator exception and affirming dismissal of complaint for lack of standing where consumer plaintiffs did not allege conspiracy to fix the price actually charged to them).  Here, Plaintiffs allege no facts to support any claim that NHL or MLB Defendants conspired with Comcast, DIRECTV, and the RSN Defendants to "directly fix retail prices" paid by TV Plaintiffs.  *See, e.g.*, *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, No. MDL 150(AWT), 1992 WL 220753, at *3 (C.D. Cal. July 16, 1992).

     *Finally*, Plaintiffs' failure to name as defendants other members of the alleged conspiracy precludes any invocation of a co-conspirator exception.  *See Hess I,* 424 F.3d at 370 ("We have rejected attempts to invoke a co-conspirator exception to *Illinois Brick's* bar on indirect purchaser standing when plaintiffs have not named the co-conspirators immediately upstream as defendants."); s*ee also Link v. Mercedes-Benz*, 788 F.2d 918, 931-33 (3d Cir. 1986).  This is

---

[19]     Plaintiffs also fail to plead facts suggesting that the distributors (here, DIRECTV, Comcast, and the RSN Defendants) were "substantially equal" or "truly complete" participants in the purported conspiracy with the upstream seller(s) (here, the NHL and MLB Defendants), another limitation for any co-conspirator exception.  *See, e.g.*, *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 378-79 (3d Cir. 2005) (hereinafter "*Hess I*"); *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 259 (3d Cir. 2010) (hereinafter "*Hess II*").

because unless the middlemen (the direct purchasers who are the more "efficient enforcers" of any claimed wrongful conduct) are named, "the risk of duplicative liability looms."  *Hess I*, 424 F.3d at 370.  Plaintiffs identify "as part of the conspiracy," but fail to name as defendants, *fourteen* additional RSNs in *Laumann* (¶¶31-32) and *twenty* additional RSNs in *Garber* (¶¶33-34).  Plaintiffs also fail to name as defendants other cable or satellite providers that distribute NHL or MLB telecasts or NHL Center Ice and MLB Extra Innings packages.  These failures highlight the apportionment problems with Plaintiffs' claims under *Illinois Brick* and independently require dismissal of their Complaints.  *See Temple*, 2007 WL 2790154, at *7 ("The general rule requires dismissal of a complaint that fails to join the other members of the conspiracy as co-defendants.").

### 3.   No Other Exception To *Illinois Brick* Is Available

TV Plaintiffs also cannot salvage their claims by relying upon any other *Illinois Brick* exception, including the so-called "ownership or control" exception.  As an initial matter, the Second Circuit has not endorsed any "ownership or control" exception.  To the extent any such exception is recognized, it must be given a "narrow construction," and may be applied only where the "relationship between the defendant and the middleman [direct purchaser] involve[s] such functional economic or other unity that there effectively has been only one sale between the defendant and the indirect purchaser."  *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 101-102 (E.D.N.Y. 2012) (quotations and citations omitted).

There are no allegations here that the NHL and MLB Defendants are the middlemen.  Nor are there any allegations suggesting any "functional economic or other unity" between the middleman defendants and the leagues that might suggest there has been "only one sale between the [league] defendant[s] and indirect purchaser."  *Id.*  In this regard, TV Plaintiffs' allegation that Comcast and DIRECTV "own and control" certain RSNs is irrelevant.  (*See Laumann* ¶¶26,

28; *Garber* ¶¶29, 31.)[20]   Even if every distributor and RSN Defendant were part of a single entity

(which they are not), that middleman entity would not be owned or controlled by the NHL or

MLB Defendants.  In the absence of a functional economic unity between all of the

distributors/RSNs and the leagues, there can be no suggestion that TV Plaintiffs effectively made

"only one sale" directly with a club.

Equally unavailing is the alleged affiliation between a single NHL club (the Philadelphia

Flyers) and Comcast.  (*See Laumann* ¶21.)  The rationale for an "ownership or control"

exception, if any, is the absence of *Illinois Brick* apportionment difficulties where the middleman

is owned or controlled by its supplier because in that situation the middleman and supplier are, in

effect, a single entity.  *See Illinois Brick*, 431 U.S. at 736 & n.16; 2A Phillip E. Areeda &

Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*

¶346f, at 169 (3d ed. 2011).  Here, the apportionment difficulties are myriad.  The Flyers are

only one of *nine* hockey clubs named as defendants in *Laumann*—out of *thirty* NHL clubs—that

license games to numerous RSNs, most of which are also not named in *Laumann*.  The Flyers are

not only merely 1/30th of the clubs alleged to participate in the challenged horizontal restraints,

but all NHL games telecast by RSNs are combined with games from many other sports and

regional events, and Comcast and DIRECTV, in turn, combine this diverse programming with

other satellite and cable network programming and then sell subscriptions to consumers.  Given

this complex distribution chain, it would be effectively impossible to apportion any overcharge

by the Flyers, through the RSN Defendants, and on to MVPD consumers.  *See In re Vitamin C*

---

[20]    It is not just irrelevant, but wrong.  For example, DIRECTV, LLC (identified herein as DIRECTV, the entity that distributes satellite programming) has no ownership or control of any RSN, or DIRECTV Sports Networks, LLC, the parent company of the DIRECTV-affiliated RSNs named in the Complaint.

*Antitrust Litig.*, 279 F.R.D. at 101-102 (any exception to *Illinois Brick* "should be narrowly construed to apply only to those situations in which the court is sure that a calculation of damages would not require consideration of complex market interactions").

Moreover, Plaintiffs' allegation that the Rangers, MSG Network, and MSG Plus are owned and controlled by defendant MSG (*Laumann* ¶¶21-22) is completely irrelevant, since Plaintiffs make no claim—and cannot make any claim—that MSG has any affiliation with the distributor defendants.  Plaintiffs necessarily deal with an independent middleman when they purchase MSG programming from Comcast or DIRECTV.[21]

Finally, there is no basis for invocation of any purported ownership or control exception to any defendant in *Garber*.  The alleged affiliation between the Flyers and Comcast and the irrelevant affiliation between the Rangers and MSG have no bearing on any defendant in *Garber*.  And the *Garber* Complaint does not allege commonality of ownership between the MLB clubs and the purported non-league conspirators.  Further, as to YES, there is no allegation of any affiliation or control between YES and any MVPD.  Even if such affiliation were a basis to invoke the ownership or control exception (though it plainly is not), this would not apply to YES, who thus should be dismissed for this additional reason as well.

    **B.**    **TV Plaintiffs Lack Standing Under *Associated General Contractors* Because The Claimed Injuries Are Too Remote From The Alleged Wrongful Conduct**

Separate and apart from the *Illinois Brick* requirement of a direct purchaser, the Supreme Court also requires that a particular plaintiff's injury be sufficiently related and proximate to the

---

[21]    MSG's prior litigation with the NHL (*Madison Square Garden v. National Hockey League*, No. 07-cv-8455, 2008 WL 4547518, (S.D.N.Y. Oct. 10, 2008)) is equally irrelevant. The Court in that case found that MSG had standing to sue the NHL because MSG owned a club. The case provides no support for *indirect purchaser* claims against the league or any club. Moreover, Plaintiffs fail to mention that the only MSG claims not dismissed in the prior action related to a specific NHL "new media" initiative that is not at issue in this case.

alleged antitrust violation to warrant relief under Section 4 of the Clayton Act. *Associated General Contractors*, 459 U.S. at 540-45. "'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.'" *Id.* at 534 (quoting *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263 n.14 (1972)). Here, TV Plaintiffs' asserted injuries are too attenuated and remote from the allegedly unlawful telecast agreements. Thus, even if *Illinois Brick* did not bar TV Plaintiffs' claims, they must be dismissed for lack of standing under *Associated General Contractors*.

TV Plaintiffs claim that the alleged conspiracies to restrain trade have injured TV Plaintiffs who have purchased an overpriced television package that includes an RSN "that is protected from competition." (*Laumann* ¶¶12-13, 15-16, 34, 101-06; *Garber* ¶¶15-16, 19, 39, 107-12.) Thus, the alleged injury for which these TV Plaintiffs seek to recover damages is some unidentified overcharge in the price TV Plaintiffs pay Comcast or DIRECTV for television service generally, regardless of whether they have ever watched, or even desired to watch, an NHL or MLB game. (*See Laumann* ¶95; *Garber* ¶101.) This speculative harm alleged by TV Plaintiffs and the remote relationship, if any, between the NHL and MLB Defendants' alleged misconduct and TV Plaintiffs' asserted injuries are additional reasons to deny standing to TV Plaintiffs to bring their damage claims.

A number of factors impact standing under *Associated General Contractors*, including: "(1) 'the directness or indirectness of the asserted injury'; (2) 'the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement'; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries." *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 443 (2d

Cir. 2005) (citing *Associated General Contractors*, 459 U.S. at 540-45). Where the nature of the purported harm is not readily demonstrable and the causal connection between the claimed injury and the alleged antitrust violation is too tenuous, a plaintiff cannot maintain a claim for damages. *Id.*; *see also Kloth*, 444 F.3d at 323-25.[22]

Plaintiffs admit that NHL and MLB clubs license telecast rights to their games to RSNs (many of which are not named here), which in turn contract with Comcast and DIRECTV (and many other unnamed MVPDs) to carry the RSN's channel. (*Laumann* ¶¶58, 65, 68; *Garber* ¶¶61, 68, 71.) Comcast and DIRECTV then sell their television services to TV Plaintiffs. (*Laumann* ¶¶12-13, 15-16, 34; *Garber* ¶¶15-16, 19, 39.) As TV Plaintiffs also concede, Comcast and DIRECTV sell their general television service as a package of tens or hundreds of channels, one or more of which is commonly an RSN that carries, among other programming, NHL and/or MLB games. (*Laumann* ¶99; *Garber* ¶105.)

As the foregoing makes clear, TV Plaintiffs base their injury claims on the prices charged by RSNs to the distributors (Comcast and DIRECTV), and on the prices charged by these distributors two steps removed in the distribution chain from the NHL or MLB Defendants. Moreover, because the allegedly overpriced RSN channel itself includes more than just MLB or NHL programming and is but one channel among tens or hundreds of channels included in the general television packages offered by Comcast and DIRECTV, it would be impossible to ascertain what effect, if any at all, the alleged violation had on the pricing of the various packages sold by Comcast and DIRECTV to consumers. *See, e.g.*, *Phila. Hous. Auth. v. Am. Radiator & Standard Sanitary Corp.*, 50 F.R.D. 13, 19-20, 25-27 (E.D. Pa. 1970) (granting

---

[22]     The standing analysis of *Associated General Contractors* also applies to claims for injunctive relief. *Daniel*, 428 F.3d at 443.

motion to dismiss for lack of standing where injury purportedly caused to purchasers of houses was too remote from alleged antitrust conspiracy in market for a minor component (plumbing fixtures) of the purchased houses), *aff'd sub nom. Mangano v. Am. Radiator & Standard Sanitary Corp.*, 438 F.2d 1187 (3d Cir. 1971); *In re Antibiotic Antitrust Actions*, 333 F. Supp. 310, 311-13 (S.D.N.Y. 1971) (dismissing claims of purchasers of animal feed products containing broad spectrum antibiotics, which were allegedly the subject of a conspiracy); *Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291, 1301-02 (S.D. Cal. 2009) (dismissing claims where technology at issue in allegedly anticompetitive licensing practices was only one of multitude of components in manufacture of chipset, and subsequently cell phone, purchased by plaintiffs).

Further complicating the task of apportioning alleged damages here is the fact that the RSN Defendants carry games from clubs in multiple leagues.  For example, Plaintiffs Garber and Silver allege they were overcharged for television service that included, respectively, the Comcast SportsNet Bay Area and Comcast SportsNet Philadelphia networks as a result of the *separate* anticompetitive conduct of the NHL Defendants in *Laumann* and the MLB Defendants in *Garber*.  (*Compare Laumann* ¶¶13, 15 *with Garber* ¶¶16, 19.)  Thus, a finder of fact would be faced with the insurmountable task of apportioning the purported "supracompetitive" cost of these networks between the *separate* conduct of the NHL Defendants and the MLB Defendants—and presumably many others.

Finally, the principles of *Associated General Contractors* apply to Comcast, DIRECTV and the RSN Defendants for the added reason that none of these defendants has *any* involvement in the alleged horizontal restraints which purportedly have resulted in higher prices.  Indeed, it is Comcast, DIRECTV and the RSN Defendants, not Plaintiffs, who are the direct victims and most

"efficient enforcers" of any claimed unlawful conduct by the leagues that has resulted in higher prices for NHL or MLB telecasts.

As in *Associated General Contractors*, the "relevant factors—the nature of [TV Plaintiffs'] injury, the tenuous and speculative character of the relationship between the alleged antitrust violation and the [TV Plaintiffs'] alleged injury, the potential for duplicative recovery or complex apportionment of damages, and the existence of more direct victims of the alleged conspiracy—weigh heavily against judicial enforcement of [TV Plaintiffs'] antitrust claim." *See Associated General Contractors*, 459 U.S. at 545.  Accordingly, TV Plaintiffs do not have standing to maintain their damage or injunction claims under Count One of the Complaints.

### C.   Count Two In *Garber* Should Be Dismissed For Lack Of Standing, And TV Plaintiffs And Internet Plaintiffs Lerner And Rasmussen Lack Article III Standing To Seek Injunctive Relief

Count Two in *Garber* purports to allege a claim for overcharges in the MLB Extra Innings out-of-market package.  No Plaintiff has standing to pursue the claim, because none alleges they ever purchased the product, and thus none suffered the claimed overcharge.  *Lewis v. Casey,* 518 U.S. 343, 357 (1996) ("That a suit may be a class action . . . adds nothing to the question of standing."); *Simon v. KeySpan Corp.*, No. 10-cv-5437, 2011 WL 2135075, at *7 (S.D.N.Y. May 27, 2011) (Scheindlin, J.) (dismissing complaint where purported class representatives lacked standing).

Moreover, all of the TV Plaintiffs as well as Internet Plaintiffs Lerner and Rasmussen lack Article III standing to seek injunctive relief because each no longer subscribes to Comcast, DIRECTV, or MLB.TV, alleges no intent to subscribe in the future, and thus stands to gain nothing from an injunction against any defendant.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02, 111-12 (1983).

In the *Laumann* action, none of the three TV Plaintiffs (Garber, Silver, and Herman) currently subscribes to Comcast or DIRECTV. Their subscriptions are alleged solely in the past tense. (*Laumann* ¶13 (Ms. Garber subscribed to Comcast until "March 2011"), ¶39 (Ms. Garber "was" a Comcast subscriber), ¶15 (Mr. Silver subscribed to NHL Center Ice through DIRECTV "[u]ntil 2010"), ¶40 (Mr. Silver "was" a subscriber to DIRECTV), ¶16 (Mr. Herman "subscribed" to DIRECTV)). Similarly, in *Garber*, the two TV Plaintiffs (Garber and Silver) again admit that they no longer subscribe to Comcast (*Garber* ¶16) or DIRECTV (*Garber* ¶19). The two Internet Plaintiffs in *Garber* (Messrs. Lerner and Rasmussen) likewise admit that neither currently subscribes to MLB.TV. (*Garber* ¶¶17, 18.)

Plaintiffs do not allege that any of these former television or Internet subscribers intend to re-subscribe to their respective services. Thus, none of the former subscribers stands to gain anything from an injunction against Comcast, DIRECTV, or the MLB Defendants. They therefore have no Article III standing to seek injunctive relief because an injunction will not redress any of their claimed injuries. *See Lyons*, 461 U.S. at 101-02.

## III. THE COMPLAINTS DO NOT STATE AN ANTITRUST CLAIM AGAINST COMCAST, DIRECTV, OR THE RSN DEFENDANTS

Even if TV Plaintiffs had standing to sue, the Complaints do not allege any conduct by Comcast, DIRECTV or the RSN Defendants that is unlawful. TV Plaintiffs' allegations focus on the NHL and MLB Defendants' purported horizontal agreements to establish exclusive telecast territories for their clubs. Each of Plaintiffs' Section 1 claims thus is expressly premised on alleged "horizontal restraints" that supposedly caused injury. (*Laumann* ¶¶ 102, 108, 114; *Garber* ¶¶ 108, 114, 120.) But Comcast's, DIRECTV's, and the RSN Defendants' only alleged involvement in this case is purely *vertical* in nature—they entered into vertical agreements to distribute NHL and MLB telecasts. And the Complaints contain no factual allegations plausibly

40

suggesting that Comcast's or DIRECTV's vertical distribution of the leagues' or RSNs' products harms competition or that Plaintiffs' claimed injuries flow from those vertical distribution activities.  To the contrary, the well-pled facts describe nothing more than lawful vertical distribution arrangements in which the RSN Defendants purchase programming content from MLB and NHL clubs, sell that content to Comcast and DIRECTV, and then Comcast and DIRECTV sell television programming to consumers that includes both the channels offered by RSNs and the out-of-market packages offered by the NHL and MLB.[23]

### A.    Comcast, DIRECTV, And The RSN Defendants Cannot Horizontally Conspire With The NHL Or MLB Defendants, As A Matter Of Law

Plaintiffs assert that Comcast, DIRECTV and the RSN Defendants "joined" separate, horizontal conspiracies among the NHL and MLB Defendants.  (*See, e.g., Laumann* ¶62 ("Comcast and DIRECTV have joined the conspiracy by agreeing to enforce and maintain [the NHL Defendants'] anticompetitive restrictions."), ¶68, ¶102 ("Defendants and their co-conspirators entered into a continuing agreement  . . . with the purpose, intent and effect of restraining horizontal competition among the NHL member clubs and their television partners"), ¶108; *Garber* ¶¶65, 71, 108, 114 (same).)  However, Comcast, DIRECTV, and the RSN Defendants cannot *as a matter of law*, horizontally conspire with the NHL or MLB Defendants because they do not compete with the NHL or MLB Defendants.

---

[23]    As detailed below, the unsupported assertions that Comcast, DIRECTV, and the RSN Defendants "conspired" and "agree[d]" to "enforce and maintain" the NHL's and MLB's telecast restrictions (*see, e.g., Laumann* ¶¶62, 68; *Garber* ¶¶65, 71) add nothing to the Complaint.  *See Iqbal*, 556 U.S. at 679 ("[C]onclusions . . . are not entitled to the assumption of truth.").  The *Kingray* court rejected similarly conclusory allegations of conspiracy, even before the Supreme Court adopted the heightened plausibility standard in *Twombly* and *Iqbal*.

A horizontal conspiracy is by definition a conspiracy among *actual or potential competitors*. *See Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988) ("Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints."); 11 Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶1901b (3d ed. 2011) ("An arrangement is said to be 'horizontal' when its participants are (1) either actual or potential rivals at the time the agreement is made; and (2) the agreement eliminates some avenue of rivalry among them.")  Comcast and DIRECTV distribute television programming; they do not compete with the NHL or MLB Defendants in presenting professional sporting events or with the RSNs in producing telecasts of sporting events. Likewise, the RSN Defendants produce telecasts; they do not compete with the leagues in creating professional sports or with Comcast and DIRECTV in distributing television programming.  Only the NHL and MLB Defendants create and participate in professional sports leagues.

Because Comcast, DIRECTV, and the RSNs do not operate a league and produce league games, they are neither actual nor potential competitors of the NHL or MLB Defendants, and therefore cannot enter into horizontal conspiracies with the NHL or MLB Defendants.  The court in *Kingray* dismissed purported conspiracy claims against DIRECTV and a Comcast affiliate on precisely this basis, and the same result should apply here.  *See Kingray v. NHL*, slip op. at 17 (dismissing claims against DIRECTV and iN DEMAND because they "could not engage in a horizontal conspiracy with the NHL Defendants.").

**B.     The Vertical Distribution Activities Of Comcast, DIRECTV, And The RSN Defendants Do Not Harm Competition**

Stripped of the conclusory and legally insufficient assertions that Comcast, DIRECTV and the RSN Defendants participated in the purported horizontal conspiracies alleged against the NHL and MLB Defendants, the Complaints describe only vertical distribution activity that is completely lawful.  Any challenge to vertical distribution activity must show that the activity is unlawful under the rule of reason.  *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007).  Plaintiffs' allegations about Comcast, DIRECTV and the RSN Defendants' vertical distribution activities state no claim because none of the alleged conduct causes any harm to competition.  *See, e.g.*, *E & L Consulting, Ltd. v. Doman Indus., Ltd.*, 472 F.3d 23, 28 (2d Cir. 2006) (harm to competition is "an element of a *prima facie* Section 1 claim").

**1.     Comcast's And DIRECTV's Vertical Distribution Activities Are Lawful**

TV Plaintiffs sprinkle the Complaints with antitrust buzzwords such as "anticompetitive effects" (*Laumann* ¶104) and lowered "output" (*Garber* ¶93) when discussing the NHL or MLB Defendants' *horizontal* restrictions, but they do not allege facts suggesting that Comcast's or DIRECTV's *vertical* distribution agreements with the NHL or MLB Defendants (respecting distribution of NHL Center Ice and MLB Extra Innings) or with the RSNs reduce output or otherwise harm competition.  To the contrary, TV Plaintiffs acknowledge that Comcast's and DIRECTV's distribution efforts *increase* the number of NHL and MLB telecasts available to fans.  (*See, e.g.*, *Laumann* ¶¶7, 72 (acknowledging that NHL Center Ice delivers games that "are not available through a local cable or over the air").)  *See also supra* Section I.  Plaintiffs thus acknowledge what the *Kingray* court recognized:  "[O]utput of out-of-market NHL games has increased by virtue of NHL Center Ice, rather than decreased."  *Kingray v. NHL*, slip op. at 11-12.

In point of fact, if the NHL Center Ice and MLB Extra Innings packages were not available, then consumers would have far *fewer* opportunities to watch NHL and MLB games.  Likewise, the RSN Defendants' telecasts of games, and Comcast and DIRECTV's distribution of those telecasts, only increases the games available to consumers.

TV Plaintiffs' inability to allege facts about how Comcast's or DIRECTV's vertical distribution activities harm competition is understandable; vertical distribution agreements like those alleged here simply do not harm competition and thus are of no concern to the antitrust laws.  The truth, of course, is that Comcast and DIRECTV compete vigorously with each other and with other distributors over NHL Center Ice and MLB Extra Innings, the distribution of RSN programming, and every other aspect of the MVPD market.  Nothing in the Complaints suggests otherwise.

## 2.    The RSN Defendants' Vertical Distribution Activities Are Equally Lawful

Although TV Plaintiffs have sued several RSNs, they do not claim that the RSN Defendants agreed with each other to restrain trade, nor do they allege that the RSN Defendants' vertical distribution agreements with the clubs or with Comcast or DIRECTV harm competition. Instead, they allege that each RSN entered into an exclusive telecast agreement with a club knowing that other RSNs were doing the same with other clubs.  (*Laumann* ¶66 ("The networks (and their corporate parents) agree to these requirements knowing that other networks must agree not to compete in their territories."); *Garber* ¶69 (same).)  These allegations plainly are insufficient to plead conspiracy or any other wrongful conduct involving the RSN Defendants. At most, TV Plaintiffs' allegations amount to a claim that the RSN Defendants engaged in conscious parallelism, an assertion that is insufficient as a matter of law to support a claim of horizontal conspiracy. *See Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 322 (2d Cir. 2010)

("[A]n allegation of parallel conduct coupled with only a bare assertion of conspiracy is not sufficient to state a Section 1 claim.") (citing *Twombly*, 550 U.S. at 557);[24] *Hess II*, 602 F.3d at 255-56 (rejecting conspiracy allegations that did "no more than intimate merely parallel conduct that could just as well be independent action" (internal quotation marks omitted)).

Moreover, Plaintiffs' assertion that RSNs enjoy exclusive telecast rights (*Laumann* ¶¶6, 65-71; *Garber* ¶¶9, 68-74) does not support any claim.  The Second Circuit has recognized that "exclusive distributorship arrangements are presumptively legal."  *E & L Consulting*, 472 F.3d at 30 (affirming dismissal of exclusive-distributorship claims under the now-discarded "no set of facts" standard); *Elecs. Commc'ns*, 129 F.3d at 244 ("Nor is it a violation of the antitrust laws, without a showing of an actual adverse effect on competition market-wide, for a manufacturer . . . to appoint an exclusive distributor.").[25]  And as the Seventh Circuit succinctly explained in *Bulls I*, "exclusivity" is inherent to any effective telecast license because "what the network owns, a club cannot show separately (without the network's permission)."  961 F.2d at 670.  The same is true about exclusive licenses between the NHL and MLB Defendants and the RSN Defendants.

Indeed, although Defendants have no burden to make such a showing to prevail on this motion, courts have recognized that exclusivity in sports telecast license agreements—even "agreements that limit head-to-head competition"—is not only lawful but can benefit interbrand

---

[24]    In *Starr*, the complaint contained "specific" and "non-conclusory" factual allegations of parallel conduct that was inconsistent with lawful or pro-competitive activity, and those allegations "raise[d] a suggestion of a precedent agreement."  592 F.3d at 323-24.  No such facts are alleged here.

[25]    The same rule applies to Comcast's and DIRECTV's vertical distribution.  In *Kingray*, the court assumed for argument's sake that DIRECTV was the exclusive distributor of NHL Center Ice and still dismissed the claims against DIRECTV because the plaintiffs had not alleged how that purported "exclusive" distributorship harmed competition.  *See Kingray v. NHL*, slip op. at 15.  Here, Plaintiffs concede that DIRECTV competes with Comcast and others.  There is nothing exclusive about the MVPD distribution activity for NHL or MLB programming.

45

competition among competing television content. *See Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV Corp.*, 789 F. Supp. 760, 770 (S.D. Miss. 1992) ("From the . . . viewer's perspective, it is equally clear that the exclusive contracts increase the diversity of programming available to the viewing public."), *aff'd mem.*, 986 F.2d 1418 (5th Cir. 1993).

### C.    The Complaint Fails To Allege Other Necessary Elements Of Any Purported Claim Against Comcast, DIRECTV, Or The RSN Defendants

Finally, a sure indication that there is no basis for any Section I claim against Comcast, DIRECTV or the RSN Defendants based on their vertical distribution activities is Plaintiffs' failure even to attempt to allege facts establishing, among other things, the relevant product and geographic markets in which Comcast, DIRECTV, and the RSN Defendants operate, or market power in those markets. *See, e.g., Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F. Supp. 2d 275, 296 (S.D.N.Y. 1998) ("The relevant product market must be identified, and the plaintiff must allege how the net effect of the alleged violation is to restrain trade in the relevant market . . . .") (citations omitted). Indeed, neither Complaint contains a *single* factual allegation about the alleged relevant markets in which Comcast and DIRECTV operate (markets that at least include numerous other MVPDs) or about the alleged relevant markets in which the RSN Defendants operate (markets that at least include many other types of programming providers). And neither Complaint contains any allegations establishing that Comcast, DIRECTV, or the RSN Defendants possess market power in any identified relevant market. Absent such allegations, TV Plaintiffs' claims against the Comcast, DIRECTV, and the RSN Defendants must fail. *See Jacobs v. Tempur-Pedic Int'l*, 626 F.3d 1327, 1338 (11th Cir. 2010) (affirming dismissal for failure to allege a plausible relevant market); *Wampler v. Sw. Bell Tel. Co.*, 597 F.3d 741, 745-46 (5th Cir. 2010) (same).

## IV.   THE COMPLAINTS DO NOT STATE AN ANTITRUST CLAIM AGAINST THE NHL AND MLB DEFENDANTS

Plaintiffs' claims regarding the alleged "horizontal" activities of the NHL and MLB

Defendants also fail to describe any conduct that is unlawful.  Unlike most antitrust cases,

Plaintiffs are *not* alleging that there were secret conspiracies among the purported horizontal

conspirators (here, the member clubs in the NHL and MLB).  Instead, they are challenging each

league's internal agreements concerning the exhibition of league games via live telecast.

Plaintiffs concede, as they must, that there is nothing unlawful in league members

agreeing and cooperating to schedule and produce major league games in the first instance.

(*Laumann* ¶56; Garber ¶59.)  *See also Major League Baseball Props., Inc. v. Salvino, Inc.*, 542

F.3d 290, 296 (2d Cir. 2008) (league baseball is "vastly different and more marketable product"

than individually presented "scrimmage" events).  In short, a "league" game is necessarily a

"league" product.  The premise of Plaintiffs' case—that the *exhibition* of those league games on

television and the Internet is somehow, illogically not a "league" issue—is patently wrong and

should be rejected on its face, as was a recent similar claim concerning video footage of NFL

games.  *See Washington v. Nat'l Football League*, No. 11-3354 (PAM/AJB), 2012 WL 3017961,

at *2 (D. Minn. June 13, 2012).

Put simply, games are made to be watched, whether in person or by telecast.  Thus, the

exhibition of league games is central to and inherent in a league.  And, like the production of the

games, the exhibition of games necessarily requires cooperation, consent and agreement among

the league members.  Indeed, Plaintiffs make no averment that the NHL or MLB clubs actually

own or control any out-of-market telecast rights.  Clubs cannot conspire with respect to those

rights.  Such "core," necessarily cooperative activities of an admittedly lawful, cooperative joint

venture cannot form the basis for an antitrust claim.

**A.      Plaintiffs Are Challenging The NHL And MLB Defendants' "Core" Venture Activities That Are Reasonable As A Matter of Law**

The NHL and MLB internal agreements concerning the respective telecast rights of league clubs and of the league itself are "core" decisions among joint producers of a product—major league games—about the exhibition of those games—i.e., how the joint producers will, individually or collectively, distribute their jointly created product.  Such core venture agreements about a venture product are not "conspiracies" actionable under the antitrust laws. *Texaco Inc. v. Dagher*, 547 U.S. 1, 2 (2006); *Non-Commercial P'ship Hockey Club Lokomotiv Yaroslavl v. Nat'l Hockey League*, 06 Civ. 9421(LAP), Tr. of R. at 86 (S.D.N.Y. Nov. 15, 2006) (Eckles Decl. Ex. 3) (finding on motion for preliminary injunction that NHL policy on transfer fees is among the "core activities" of NHL joint venture "[a]nd thus, would not constitute a combination in restraint of trade").

In *Dagher*, the Supreme Court reviewed the decision by a legitimate joint venture between Shell and Texaco concerning the price at which both brands would sell the venture's gasoline.  547 U.S. at 3.  While technically holding only that such conduct would be governed by the "rule of reason," the Court went out of its way to explain that "core" decisions of an otherwise lawful joint venture about the joint venture's product cannot be viewed as unlawful "restraints" of trade.  547 U.S. at 2 (citing *Broad. Music, Inc. v. Columbia Broadcasting Sys., Inc.*, 441 U.S. 1, 23 (1979)).

As the Court explained, "core" decisions of an otherwise lawful joint venture about its product are matters necessarily within the "discretion" of the joint venturers. *Id.* at 7.  Thus, according to the unanimous Court, "internal" venture decisions on such issues are permissible regardless of whether they are "necessary" in the view of antitrust plaintiffs:

> The court below reached the opposite conclusion [condemning the joint pricing] by invoking the ancillary restraints doctrine.  That doctrine governs the validity of

48

restrictions imposed by a legitimate business collaboration, such as a business association or joint venture, on nonventure activities. Under the doctrine, courts must determine whether the nonventure restriction is a naked restraint on trade, and thus invalid, or one that is ancillary to the legitimate and competitive purposes of the business association, and thus valid. *We agree with petitioners that the ancillary restraints doctrine has no application here, where the business practice being challenged involves the core activity of the joint venture itself— namely, the pricing of the very goods produced and sold by Equilon*.

*Id.* at 7-8 (emphasis added) (citations omitted); *see also Bulls II*, 95 F.3d at 598 ("To say that participants in an organization [the NBA] may cooperate is to say that *they may control what they make and how they sell it . . . .*") (emphasis added). Thus, for "core" venture activities, there is no role for antitrust intervention, and the conduct must be viewed as reasonable as a matter of law. *See, e.g.*, *Lokomotiv Yaroslavl*, Tr. of R. at 86.

The simple question under *Dagher*, then, is whether the activity at issue—here exhibition of league games via live telecast—is a "core" league activity. The answer is yes. Games are produced so that people will watch them, in person or by telecast over some media. As such, decisions among the league participants concerning how, where and by whom those games may be distributed for viewing are "core" league decisions that do not constitute an unlawful restraint of trade.

### B. The Supreme Court Has Made Clear That Necessary Venture Activities May Be Viewed As Reasonable As A Matter of Law

Soon after *Dagher*, the Supreme Court used *American Needle* to explain further how courts should apply the rule of reason to the conduct of members of a cooperative venture—such as a sports league—where the conduct in question involves an area in which the members must cooperate. *See Am. Needle, Inc. v. Nat'l Football League*, 130 S. Ct. 2201, 2216-17 (2010). While not a holding of the Court, the unanimous opinion in *American Needle* makes clear that courts should quickly reject attempts by antitrust plaintiffs to interfere with activities that are necessary to a league's operations and to the availability of the league product.

49

In *American Needle*, the Supreme Court considered whether the NFL was a "single entity" for purposes of Section 1 of the Sherman Act's plurality of actors requirement in the context of the licensing of the right to use individual member club intellectual property. Although the Court rejected the NFL's argument that it was a single entity, it nonetheless found that the "necessity" of joint action can be dispositive in a rule of reason inquiry. *Am. Needle*, 130 S. Ct. at 2214 n.6. Declaring that "[f]ootball teams that *need to cooperate* are not trapped by antitrust law," the Court explained that a truncated rule of reason is appropriate where such need exists:

> The fact that NFL teams share an interest in making the entire league successful and profitable, *and that they must cooperate in the production and scheduling of games*, provides a perfectly sensible justification of making a host of collective decisions. . . . *When "restraints on competition are essential if the product is to be available at all" . . . the agreement is likely to survive the Rule of Reason. And depending upon the concerted activity in question*, the Rule of Reason may not require a detailed analysis [but] "*can sometimes be applied in the twinkling of an eye*."

*Id.* at 2216-17 (citations omitted; emphasis added). The Supreme Court thus instructed that, where cooperation is necessary, courts may dismiss antitrust challenges to league agreements under a "quick look" rule of reason in favor of defendants. *See, e.g.*, *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 341 (7th Cir. 2012) (concluding that under *American Needle*, certain restraints, particularly necessary venture activities, may be held procompetitive, and thus lawful, in the "twinkling of an eye"—i.e., "at the motion-to-dismiss stage").

Another recent case granted a motion to dismiss antitrust claims concerning league (NFL) control of game video on precisely this basis. In *Washington v. National Football League*, 2012 WL 3017961, at *2, the court held that, because NFL teams must necessarily coordinate concerning the use of historical game footage—intellectual property not individually owned by any player or team—the conduct cannot violate the antitrust laws *as a matter of law*. *Id.* (the

50

"Rule of Reason compels the conclusion that, even if there is concerted action to restrain trade in Plaintiffs' images, that agreement 'is necessary to market the product at all' and is therefore not illegal.") (quoting *Broad. Music, Inc.*, 441 U.S. at 23).

Moreover, as courts have recognized, because no one club has an exclusive right to telecast any game that, necessarily, involves another club, it would be impossible for any one club to telecast a game without, at a minimum, the agreement of the other club.  And where, as here, the games are *league* games, no individual league club has or could have the unfettered freedom to telecast league games without some form of consent and agreement from the other clubs in the league playing in the games.

This issue of "necessity" was squarely addressed in *Association of Independent Television Stations, Inc. v. College Football Association*, 637 F. Supp. 1289 (W.D. Okla. 1986), in which television stations challenged the exclusive telecast territories and related telecast packages of the College Football Association.  The court there denied Plaintiffs' motion for summary judgment based on its recognition that cooperation of league participants is essential to the distribution of games by telecast—not just to creating the telecast content on the playing field:

> The need for horizontal cooperation in intercollegiate football is not limited to arrangements for the playing of the game.  It is apparent that some cooperation is essential for the *televised product* to be available at all.  For example, if two colleges each sell season-long exclusive rights to televise their own games and then meet in competition on the playing field, their output may be restricted rather than enhanced by their unilateral and incompatible sales of rights.  In light of the competing "exclusive" rights to televise the games, no game might be aired as all.  The antitrust laws were not designed to spawn chaos by requiring each competitor utterly to ignore the interest of the others in the market.  The policy of antitrust law favors competition but it does not oppose cooperation.

*Id.* at 1296; *see also id.* at 1298 ("Since the product of one college football team alone is without apparent value, some combinations of competing institutions must be necessary and therefore

reasonable."); *Bulls II*, 95 F.3d at 598-99 (NBA "produces a single product; cooperation is essential (a league with one team would be like one hand clapping)").

The court in *Association of Independent Television Stations*, of course, did not have the benefit of *American Needle* and the Supreme Court's express guidance that challenges to such necessary league cooperation may be dismissed early on the face of the pleadings. But the reality that *Association of Independent Television Stations* recognized—that agreement is necessary to distribute telecasts, as well as to play the game itself—applies fully here: cooperation and agreement among NHL and MLB clubs for the telecast of games is essential for the sale and distribution of games over television and the Internet. No individual NHL or MLB club has the right or ability to license the live telecast of the games in which it plays without the agreement of the other clubs in the league. This is precisely a situation in which cooperation and agreement are necessary for there to be any "product" (telecasts) at all. Accordingly, Plaintiffs' claims should be rejected as a matter of law on the face of the Complaint.

### C.   The NHL And MLB Clubs Lack The Capacity To Conspire With Respect To Rights They Do Not Own Or Control

Finally, Plaintiffs' conspiracy allegations are premised on a fact not pled in either Complaint—that NHL and MLB clubs have the right to market and sell out-of-market games. However, that premise is incorrect. As was the case in *Washington v. National Football League*, the necessarily cooperative, joint nature of league telecast rights (described above) is confirmed in each league's governing documents.[26] Those documents reflect the fact that any rights that an

---

[26]   By referencing the "series of agreements" that relate to exclusive telecast territories, Plaintiffs' Complaints incorporate the NHL's Constitution and By-Laws (among other agreements), as well as the Major League Constitution of MLB. *See Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) ("A complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint.") (citations omitted); *Schnall v. Marine Midland*

*(cont'd)*

individual *league* member has to play a *league* game or to exhibit *league* games within its telecast territory arise solely from a grant under the leagues' governing documents themselves. And, in each league, the out-of-market rights are owned or controlled solely by the league, and not by any individual club.

With respect to the NHL, Article IV of the NHL Constitution provides that the League has "exclusive control of the playing of hockey games" except for those rights granted to the clubs within their home territories. (NHL Constitution, Article 4.2 (Eckles Decl. Ex. 4).) The property rights of a "home club" include the "news of said games (including . . . the right to disseminate and sell . . . by . . . television)"—i.e., the "broadcast" within that club's "home territory." (*Id.*, Articles 4.1 and 4.4.) Thus, out-of-market broadcasts remain the sole property of the league, for sale by the league only, and the NHL clubs cannot act in concert for the purpose of marketing intellectual property they do not individually own.

With respect to MLB, the Major League Constitution provides that "[t]here shall be 30 Major League Clubs" and grants those "Major League Clubs" the "right" (as well as the "obligation") "to play baseball games as the home club" in their designated territories. (Major League Constitution, Art. VIII, §§ 1 and 8 (Declaration of Thomas J. Ostertag, Ex. 1).) The Major League Constitution further grants each club a "home television territory" (*id.*, Art. VIII, § 9) and provides that each club shall have telecast rights for its games "only within its home television territory." (*Id.*, Art. X, § 3(a).) Thus, the individual Major League Clubs have no out-of-market television rights. Rather, national television rights and all Internet rights are granted exclusively to the Commissioner of Baseball. (*Id.*, § 4.)

_____
*(cont'd from previous page)*
*Bank*, 225 F.3d 263, 266 (2d Cir. 2000) (documents that are integral to plaintiffs' claim may be relied on at motion to dismiss stage).

This issue was addressed recently in *Washington*, in which the plaintiffs, former professional football players, claimed that the NFL and its member clubs were violating the antitrust laws by conspiring to constrain the sale of the plaintiffs' images and likenesses in videos of historical games. *Washington*, 2012 WL 3017961, at *1. Following the guidance of *American Needle*, the court held that clubs cannot unlawfully "conspire" with respect to rights that they do not individually own or control. *Id.* at *2 ("The NFL and its teams can conspire to market each teams' individually owned property, but not property the teams and the NFL can only collectively own.").

Thus, as in *Washington*, because Plaintiffs do not—and cannot—allege that any of the NHL or MLB clubs possesses the right individually to sell its out-of-market games, there can be no conspiracy and Plaintiffs' antitrust claims fail.

## V.   PLAINTIFFS HAVE FAILED TO PLAUSIBLY ALLEGE A LEGALLY COGNIZABLE RELEVANT MARKET

"'In order to survive a motion to dismiss, a claim under Sections 1 and 2 of the Sherman Act must allege a relevant geographic and product market in which trade was unreasonably restrained or monopolized.'" *Linzer Prods. Corp. v. Sekar*, 499 F. Supp. 2d 540, 553 (S.D.N.Y. 2007) (Scheindlin, J.) (quoting *Global Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 704 (S.D.N.Y. 1997)).  Plaintiffs must define a plausible relevant market by either (1) alleging facts regarding substitute products, (2) distinguishing among comparable products, or (3) alleging facts relating to cross elasticity of demand; otherwise, dismissal is appropriate. *Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc.*, 812 F. Supp. 387, 391 (S.D.N.Y. 1993); *see also Shaw v. Rolex Watch, U.S.A., Inc.*, 673 F. Supp. 674, 678 (S.D.N.Y. 1987) ("To raise a question of fact, . . . plaintiff must allege a plausible product market.").  The

failure to adequately allege a legally cognizable relevant market is dispositive of each of Plaintiffs' claims.[27]

The *Laumann* Plaintiffs allege by name only a market for "live video presentations of major league professional hockey games," whether on television or via the Internet (*Laumann* ¶53), and the *Garber* Plaintiffs likewise allege by name only a market for "live video presentations of major league baseball games over media such as cable and satellite television and the Internet." (*Garber* ¶56.)[28]  Plaintiffs allege in wholly conclusory terms that NHL and MLB games have unnamed "characteristics" or "attributes" that set them apart from "other sports or leisure activities." (*Laumann* ¶51; *Garber* ¶54.)  Without any further explanation, Plaintiffs baldly allege that "[c]lose substitutes do not exist" and "[w]atching (or participating as a fan in) major league professional ice hockey [or baseball] cannot be reasonably interchanged with watching (or participating as a fan in) other sports or other leisure activities." (*Laumann* ¶51; *Garber* ¶54.)

---

[27]   Although a plaintiff need not allege market power in order to state a claim for conspiracy to monopolize, a plaintiff must allege the relevant market at which the conspiracy to monopolize is aimed so that the anticompetitive effects of the challenged conduct may be assessed.  *See Global Disc. Travel*, 960 F. Supp. at 704 (dismissing conspiracy to monopolize claim, among others, for failure to plead relevant market); *Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 254-55 (S.D.N.Y. 1995) (same); *see also Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47, 67-68 (proof of a relevant market may be necessary to establish a conspiracy to monopolize claim); *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.*, 123 F.3d 301, 311 (5th Cir. 1997) ("To establish Section 2 violations premised on attempt and conspiracy to monopolize, a plaintiff must define the relevant market."); *Bill Beasley Farms, Inc. v. Hubbard Farms*, 695 F.2d 1341, 1343 (11th Cir. 1983) ("In this circuit it is clear that relevant market is a necessary element of a conspiracy to monopolize.").

[28]   Although there are two separate purported classes of plaintiffs (Television Class and Internet Class), Plaintiffs allege a single market.  Plaintiffs apparently concede the fact that new distribution platforms and video technologies have effectively eliminated the lines between television, computer, and mobile devices, so that consumers substitute video distribution over one medium for distribution over another.

At best, these statements are merely vague descriptions of consumer preferences and legal conclusions, not factual allegations regarding whether consumers substitute other sports or entertainment video programming for NHL or MLB video programming when faced with increased prices. *See Theatre Party Assocs., Inc. v. Shubert Org., Inc.*, 695 F. Supp. 150, 154-55 (S.D.N.Y. 1988) (dismissing antitrust claims where complaint did not explain why market was limited to "the most popular Broadway shows" and excluded "other forms of entertainment, namely other Broadway shows, the opera, ballet, or even sporting events"). "Merely asserting that a commodity is in some way unique is insufficient to plead a relevant market. Rather, an antitrust complaint must explain why the market it alleges is the relevant, economically significant product market." *B.V. Optische Industrie de Oude Delft v. Hologic, Inc.*, 909 F. Supp. 162, 171 (S.D.N.Y. 1995). As noted in Section III.C above, Plaintiffs do not even attempt to allege markets in which Comcast, DIRECTV, or the RSN Defendants operate.

Plaintiffs make no attempt to explain why video presentations of NHL or MLB games are separate and distinct products from video presentations of other sports and entertainment programming. Indeed, two of the four named plaintiffs in the *Garber* action are also named plaintiffs in the *Laumann* action, and four of the RSN Defendants in the *Garber* action are named as defendants in the *Laumann* action. Thus, these named plaintiffs are fans of both MLB and NHL video programming, and these RSN Defendants purchase and distribute both MLB and NHL video programming together with other sports and entertainment content. "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion

to dismiss may be granted." *Linzer Prods*, 499 F. Supp. 2d at 554 (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)).

Moreover, the fundamental "restriction" Plaintiffs challenge is their inability to view the NHL or MLB games played by their preferred clubs on their preferred platform at their preferred price. This necessarily implies that the product market allegedly restrained is the NHL or MLB games of a *single club* over a *single platform*. Plaintiffs have not—and cannot—allege facts in support of such a narrow market definition. It is well settled, for example, that a single brand of a particular product cannot constitute its own distinct relevant market. *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 393 (1956); *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 86 (2d Cir. 2000) (Yale University competes with other schools and is thus is not its own product market); *Deep S. Pepsi-Cola Bottling Co. v. PepsiCo, Inc.*, No. 88 CIV. 6243, 1989 WL 48400, at *8 (S.D.N.Y. May 2, 1989) ("[T]he law is clear that the distribution of a single brand, like the manufacture of a single brand, does not constitute a legally cognizable market.").

## VI.  THE COMPLAINTS DO NOT STATE A CLAIM UNDER SECTION 2 OF THE SHERMAN ACT

At the end of each of the Complaints, Plaintiffs have tacked on a half-hearted Section 2 claim. The nature of the claim is unclear, because Plaintiffs recite the conclusory elements of a monopolization claim, but refer to the alleged "co-conspirators" as if they were claiming a conspiracy to monopolize. In all events, the claim requires little response and fails for most of the same reasons as the Section 1 claims.

### A.  Plaintiffs Have Not Pled Harm To Competition In A Relevant Market

As demonstrated above, Plaintiffs have failed to plausibly allege a legally cognizable relevant market or harm to competition in such market, and their Section 2 claims should be dismissed for these reasons alone. *See Elecs. Commc'ns Corp.*, 129 F.3d at 245-46 (affirming

dismissal of Section 1 and Section 2 conspiracy to monopolize claims challenging exclusive distributor agreement); *Linzer Prods.*, 499 F. Supp. 2d at 553 ("In order to survive a motion to dismiss, a claim under Sections 1 and 2 of the Sherman Act must allege a relevant geographic and product market in which trade was unreasonably restrained or monopolized.").

       **B.**    **Plaintiffs Fail To Plead Monopoly Power**

       To state a claim under Section 2 of the Sherman Act, a plaintiff also must allege *facts* plausibly suggesting that the defendant (1) possessed monopoly power in the relevant market and (2) willfully acquired or maintained that power. *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004); *see also Elecs. Commc'ns*, 129 F.3d at 246 (affirming dismissal of Section 2 claim); *Invamed, Inc. v. Barr Labs., Inc.*, 22 F. Supp. 2d 210, 218 (S.D.N.Y. 1998) (dismissing Section 2 claim). Plaintiffs' conclusory allegation that "Defendants and their co-conspirators . . . possess monopoly power" is the kind of barebones legal conclusion that fails under *Twombly* and *Iqbal*. *See, e.g.*, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51 (2d Cir. 2007) (rejecting conclusory allegations of conspiracy because plaintiffs merely enumerated "'basically every type of conspiratorial activity that one could imagine, [which could be done] without knowing any facts whatsoever'") (citation omitted). Moreover, simply alleging that a defendant *has* monopoly power is not enough—the plaintiff also must allege facts showing "'the *willful* acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Trinko*, 540 U.S. at 407 (emphasis added; citation omitted); *see also Elecs. Commc'ns*, 129 F.3d at 246 (requiring "specific intent to monopolize"). Plaintiffs do not purport to allege facts about Defendants' supposed specific intent to acquire or to maintain monopoly power.

This claim fails against YES for the additional reason that, as the Complaint expressly admits, the New York region has "two independent RSNs carrying major league baseball games." (*Garber* ¶63.) The Complaint asserts that these two independent "RSNs carrying the New York Yankees and New York Mets operate as a duopoly." (*Id.* ¶72.) In the Second Circuit, however, allegations of "duopoly" or "shared monopoly" do not state a violation under Section 2 of the Sherman Act. *See H. L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1008 (2d Cir. 1989) ("the market shares [of two defendants] could not be aggregated to establish an attempt to monopolize in violation of Sherman Act section two"); *Klickads, Inc. v. Real Estate Bd. of N.Y.*, No. 04-Civ-8042, 2007 WL 2254721, at *8-9 (S.D.N.Y. Aug. 6, 2007) (with respect to "claims of actual or attempted monopolization, the Second Circuit has specifically indicated that it will not entertain arguments based on a 'shared monopoly' theory of liability").[29] The Section 2 claim thus fails against YES for this independent reason.

To the extent that Plaintiffs seek recovery for conspiracy to monopolize, the claim still fails because, again, Plaintiffs fail to plead facts alleging a plausible conspiracy among the "horizontal" league defendants and their "vertical" network and distributor co-defendants.

---

[29]     *See also Consol. Terminal Sys., Inc. v. ITT World Commc'ns, Inc.*, 535 F. Supp. 225, 228-29 (S.D.N.Y. 1982) ("[A]n oligopoly, or a shared monopoly, does not in itself violate § 2 of the Sherman Act . . . . [A] plaintiff must allege the necessary *market domination of a particular defendant*.") (emphasis added); *RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*, 661 F. Supp. 2d 218, 235 (E.D.N.Y. 2009) ("The Second Circuit has specifically rejected monopolization claims under Section 2 based on a shared monopoly theory of liability.") (citing *H. L. Hayden*, 879 F.2d at 1018).

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the *Laumann* and *Garber* Complaints be dismissed with prejudice.

Dated:  July 27, 2012                                          Respectfully submitted,


/s/ Shepard Goldfein                                          /s/ Bradley I. Ruskin
Shepard Goldfein                                              Bradley I. Ruskin
James A. Keyte                                               Helene D. Jaffe
Paul M. Eckles                                               Jennifer R. Scullion
Matthew M. Martino                                           Robert D. Forbes
**SKADDEN, ARPS, SLATE,**                                    **PROSKAUER ROSE LLP**
    **MEAGHER & FLOM LLP**                Eleven Times Square
Four Times Square                                            New York, New York  10036-8299
New York, New York  10036-6522                               Telephone:  (212) 969-3000
Telephone:  (212) 735-3000                                   Facsimile:  (212) 969-2900
Facsimile:  (212) 735-2000                                   bruskin@proskauer.com
shepard.goldfein@skadden.com                                 hjaffe@proskauer.com
james.keyte@skadden.com                                      jscullion@proskauer.com
paul.eckles@skadden.com                                      rforbes@proskauer.com
matthew.martino@skadden.com

*Attorneys for Defendants National Hockey League,*          Thomas J. Ostertag
*NHL Enterprises, L.P., NHL Interactive*                    Senior Vice President and General Counsel
*Cyberenterprises, LLC, Chicago Blackhawk*                  Office of the Commissioner of Baseball
*Hockey Team, Inc., Comcast-Spectacor, L.P.,*               245 Park Avenue
*Hockey Western New York LLC, Lemieux Group,*               New York, New York  10167
*L.P., Lincoln Hockey LLC, New Jersey Devils LLC,*          Telephone:  (212) 931-7855
*New York Islanders Hockey Club, L.P. and San*              Facsimile:  (212) 949-5653
*Jose Sharks, LLC*

                                                                   *Attorneys for Defendants Office of the*
     *Commissioner of Baseball, Major League*
     *Baseball Enterprises Inc., MLB Advanced Media*
     *L.P., MLB Advanced Media, Inc., Athletics*
     *Investment Group, LLC, The Baseball Club of*
     *Seattle, L.L.P., Chicago White Sox, Ltd.,*
     *Colorado Rockies Baseball Club, Ltd., The*
     *Phillies, Pittsburgh Baseball, Inc., and San*
     *Francisco Baseball Associates, L.P.*

/s/ Stephen R. Neuwirth
Stephen R. Neuwirth
Richard I. Werder, Jr.
Ben M. Harrington
**QUINN EMANUEL URQUHART &**
  **SULLIVAN, LLP**
51 Madison Avenue, 22nd Floor
New York, New York  10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100
stephenneuwirth@quinnemanuel.com
rickwerder@quinnemanuel.com
benharrington@quinnemanuel.com

*Attorneys for Defendants The Madison Square*
*Garden Company and New York Rangers Hockey*
*Club*

/s/ Jonathan D. Schiller
Jonathan D. Schiller
Alan Vickery
Christopher Duffy
**BOIES, SCHILLER & FLEXNER LLP**
575 Lexington Avenue, 7th Floor
New York, New York  10022
Telephone:  (212) 446-2300
Facsimile:  (212) 446-2350
jschiller@bsfllp.com
avickery@ bsfllp.com
cduffy@bsfllp.com

*Attorneys for Defendants New York Yankees*
*Partnership and Yankees Entertainment & Sports*
*Network, LLC*

/s/ Louis A. Karasik
Louis A. Karasik
Drew E. Paris
**ALSTON & BIRD LLP**
333 South Hope Street, 16th Floor
Los Angeles, California  90071-3004
Telephone:  (213) 576-1148
Facsimile:  (213) 576-1100
lou.karasik@alston.com
drew.paris@alston.com

*Attorneys for Defendants DIRECTV, LLC,*
*DIRECTV Sports Networks, LLC, DIRECTV Sports*
*Net Pittsburgh, LLC a/k/a Root Sports Pittsburgh,*
*DIRECTV Sports Net Rocky Mountain, LLC a/k/a*
*Root Sports Rocky Mountain, and DIRECTV Sports*
*Net Northwest, LLC a/k/a Root Sports Northwest*

/s/ Arthur J. Burke
Arthur J. Burke
James W. Haldin
**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, New York  10017
Telephone:  (212) 450-4000
Facsimile:  (212) 701-5800
arthur.burke@davispolk.com
james.haldin@davispolk.com

*Attorneys for Defendants Comcast Corporation,*
*Comcast SportsNet Philadelphia, L.P., Comcast*
*SportsNet Mid-Atlantic L.P., Comcast SportsNet*
*California, LLC, and Comcast SportsNet*
*Chicago, LLC*