**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THOMAS LAUMANN, FERNANDA GARBER, ROBERT SILVER, and PETER HERMAN, representing themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>   v.<br><br>NATIONAL HOCKEY LEAGUE, et al.,<br><br>       Defendants | 12-cv-1817 (SAS)<br>ECF Case |
| FERNANDA GARBER, MARC LERNER, DEREK RASMUSSEN, and ROBERT SILVER, representing themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>   v.<br><br>OFFICE OF THE COMMISSIONER OF BASEBALL, et al.,<br><br>       Defendants | 12-cv-3704 (SAS)<br>ECF Case<br><br><br>Electronically Filed |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINTS**

## <u>CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................ v

INTRODUCTION ........................................................................................... 1

BACKGROUND ............................................................................................ 4

    I.   The National Hockey League and Major League Baseball ............................. 4

    II.  Baseball and Hockey on Television ..................................................... 5

    III. The Agreements to Limit Competition.................................................. 8

        a.  Regional Sports Network Telecasts ........................................... 9

        b.  National Broadcasts ............................................................ 10

        c.  "Out-of-Market" Packages...................................................... 11

        d.  The Multilevel Conspiracies .................................................. 14

    IV. Plaintiffs .................................................................................. 16

    V.   The Application of Antitrust Law to Sports Broadcasting ........................ 16

        a.  Foundations of Antitrust Law Applied to Sports Broadcasting................. 17

        b.  The Sports Broadcasting Act ................................................... 19

        c.  The Supreme Court's Decision in *NCAA*..................................... 20

        d.  Club Challenges to League Restrictions ...................................... 21

        e.  The Rise and Fall of the Single-Entity Theory ............................... 22

DISCUSSION .............................................................................................. 23

    I.   Plaintiffs' Allegations Must Be Accepted as True ................................. 23

    II.  The Complaints Allege Harm to Competition....................................... 23

        a.  The Complaint Alleges Reduction in Output.................................. 25

            1.  The Correct Measure of Output is Viewership, Not Games................ 26

            2.  The Agreements Reduce the Number of Games Available to Consumers .......... 29

            3.  The Agreements Limit the Distinct Telecasts Available to Consumers .............. 29

4. *Kingray* Does Not Support Defendants' Theory of Output ................................... 30

b. The Blackout Systems Make Distribution of MLB and NHL Telecasts Unresponsive to Consumer Preference ........................................................................................ 31

1. Consumers' Preferences Are Relevant to Show Injury ................................. 32

III. The Leagues Must Provide Procompetitive Justifications for Their Restrictive Agreements ................................................................................................................ 33

a. Joint Ventures May Cooperate to Achieve Legitimate Goals, but Cannot Restrain Trade in Ways Unnecessary to These Objectives ........................................ 34

b. League Defendants Cannot Escape Antitrust Scrutiny by Labeling Restrictive Agreements "Core Activities" ...................................................................... 36

1. *Dagher* Does Not Support Defendants' Novel Theory ................................ 37

2. The Broadcast Activities of the Teams Are Not Activities of Any Joint Venture ............................................................................................................ 38

3. The "Core Activities" Theory Is Inconsistent with the Leagues' Past Positions .. 39

c. Teams Own the Initial Rights to the Telecasts ............................................................ 40

d. The Challenged Restrictions Are Not Necessary to Produce Telecasts .................... 41

IV. The Television Defendants Are Violating the Sherman Act ........................................... 42

a. The RSNs Have Conspired to Divide the Market ....................................................... 43

b. The MVPD Defendants Are Active Participants in, and Directly Benefit from, the Multilevel Conspiracies Challenged in the Complaints ............................................. 46

1. Comcast and Directv Actively Control RSNs that Conspire Horizontally ........... 46

2. Comcast and Directv Carry out the Restrictions on Competition ........................ 47

V. All Plaintiffs Have Standing and Are Appropriate Plaintiffs to Challenge These Anticompetitive Schemes ................................................................................................ 49

a. Directv and Comcast Directly Control Their Subsidiary RSNs ................................. 49

b. Comcast and Directv Are Co-Conspirators ................................................................ 52

c. The Television Plaintiffs Have Suffered Direct Injury ............................................... 54

d. Plaintiffs Have Standing to Seek Injunctive Relief and to Seek Damages Related to MLB Extra Innings ..................................................................................................... 59

VI.  Plaintiffs Have Properly Alleged Relevant Product Markets .......................................... 59

VII. The Complaints Properly Allege Monopoly Power ....................................................... 62

CONCLUSION .......................................................................................................................... 63

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ambook Enterprises v. Time, Inc.*,
    612 F.2d 604 (2d Cir. 1979) ................................................. 52

*American Needle Inc. v. National Football League*,
    130 S. Ct. 2201 (2010)................................. 23, 34, 35, 37, 38, 40, 41, 50

*American Needle Inc. v. National Football League*,
    538 F.3d 736 (7th Cir. 2008) ................................................. 23

*Anderson News, L.L.C. v. American Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012) ................................................. 24

*Andrx Pharmaceuticals, Inc. v. Biovail Corp. International*,
    256 F.3d 799 (D.C. Cir. 2001) ................................................. 58

*Associated General Contractors of California v. California State Council of Carpenters*,
    459 U.S. 519 (1983)................................................. 33, 55, 56, 58

*Association of Independent Television Stations, Inc. v. College Football Association*,
    637 F. Supp. 1289 (W.D. Okla. 1986) ................................................. 42

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
    472 U.S. 299 (1985)................................................. 48

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................. 23

*Bell v. Dow Chemical Co.*,
    847 F.2d 1179 (5th Cir. 1988) ................................................. 56

*Bhan v. NME Hospitals, Inc.*,
    772 F.2d 1467 (9th Cir. 1985) ................................................. 56

*Bigelow v. RKO Radio Pictures*,
    327 U.S. 251 (1946)................................................. 57

*Board of Regents of the University of Oklahoma v. National Collegiate Athletic Association*,
    546 F. Supp. 1276 (W.D. Okla. 1982)................................................. 63

*Board of Regents of the University of Oklahoma v. National Collegiate Athletic Association*,
    707 F.2d 1147 (10th Cir. 1983) ................................................. 63

*Brand Name Prescription Drugs Antitrust Litigigation*,
    123 F.3d 599 (7th Cir. 1997) ................................................. 50, 51

*Brantley v. NBC Universal, Inc.*,
   675 F.3d 1192 (9th Cir. 2012) ................................................................................. 33

*Broadcast Music, Inc. v. Columbia Broadcasting Systems, Inc.*,
   441 U.S. 1 (1979) ................................................................................. 26, 31, 35

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977) ................................................................................. 55

*Buffalo Broadcasting Co. v. American Society of Composers, Authors and Publishers*,
   744 F.2d 917 (2d Cir. 1984) ................................................................................. 31

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
   479 U.S. 104 (1986) ................................................................................. 55

*Carpet Group International v. Oriental Rug Importers Association*,
   227 F.3d 62 (3d Cir. 2000) ................................................................................. 56

*Chapdelaine Corporate Securities & Co. v. Depository Trust & Clearing Corp.*,
   No. 05-10711, 2006 WL 2020950 (S.D.N.Y. July 13, 2006) ............................... 58

*Chicago Professional Sports Limited Partnership v. National Basketball Association*,
   874 F. Supp. 844 (N.D. Ill. 1995) ................................................................................. 22

*Chicago Professional Sports Limited Partnership v. National Basketball Association*,
   95 F.3d 593 (7th Cir. 1996) ................................................................................. 22, 27

*Chicago Professional Sports Limited Partnership v. National Basketball Association*,
   961 F.2d 667 (7th Cir. 1992) ................................................................................. 20

*Clarett v. National Football League*,
   306 F. Supp. 2d 379 (S.D.N.Y. 2004) ................................................................. 25, 27

*Continental T.V., Inc. v. GTE Sylvania Inc.*,
   433 U.S. 36 (1977) ................................................................................. 45

*Cool Wind Ventilation Corp. v. Sheet Metal Workers International Association*,
   139 F. Supp. 2d 319 (E.D.N.Y. 2001) ................................................................. 62

*Copperweld Corp. v. Independence Tube Corp.*,
   467 U.S. 752 (1984) ................................................................................. 22, 23, 50

*Daniel v. American Board of Emergency Medicine*,
   428 F.3d 408 (2d Cir. 2005) ................................................................................. 55, 56

*Durkin v. Major League Baseball*,
   No. 94-5315 (E.D. Pa. July 17, 1995) ................................................................. 51

*Eastman Kodak Co. v. Image Technical Services*,
   504 U.S. 451 (1992) ................................................................................. 61

*Federal Trade Commission v. Indiana Federation of Dentists,*
476 U.S. 447 (1986) ........................................................................................... 24, 62

*Fishman v. Estate of Wirtz,*
807 F.2d 520 (7th Cir. 1986) ..................................................................................... 60

*Flood v. Kuhn,*
407 U.S. 258 (1972) ..................................................................................................... 39

*Florida Seed v. Monsanto Co.,*
105 F.3d 1372 (11th Cir. 1997) ................................................................................ 56

*Freeman v. San Diego Association of Realtors,*
322 F.3d 1133 (9th Cir. 2003) .................................................................................. 50

*General Industries Corp. v. Hartz Mountain Corp.,*
810 F.2d 795 (8th Cir. 1987) .................................................................................... 56

*General Leaseways, Inc. v. National Truck Leasing Association,*
744 F.2d 588 (7th Cir. 1984) ......................................................................... 27, 41, 54

*General Leaseways, Inc. v. National Truck Leasing Association,*
830 F.2d 716 (7th Cir. 1987) .................................................................................... 48

*Howard Hess Dental Laboratories Inc. v. Dentsply International, Inc.,*
424 F.3d 363 (3d Cir. 2005) ...................................................................................... 52

*Illinois Brick Co. v. Illinois,*
431 U.S. 720 (1977) .................................................................................................... 49

*Illinois ex rel. Ryan v. Brown,*
227 F.3d 1042 (7th Cir. 2000) .................................................................................. 55

*In re Antibiotic Antitrust Actions,*
333 F. Supp. 310 (S.D.N.Y. 1971) ........................................................................... 56

*In re Chicken Antitrust Litigation,*
669 F.2d 228 (5th Cir. 1982) .................................................................................... 50

*In re DDAVP Direct Purchaser Antitrust Litigation,*
585 F.3d 677 (2d Cir. 2009) ......................................................................... 55, 57, 58

*In re Electronic Books Antitrust Litigation,*
--- F. Supp. 2d ---, No. 11-MD-2293, 2012 WL 1946759 (S.D.N.Y. May 15, 2012) ....... 26, 44

*In re G-Fees Antitrust Litigation,*
584 F. Supp. 2d 26 (D.D.C. 2008) ..................................................................... 50, 51

*In re Intel Corp. Microprocessor Antitrust Litigation,*
496 F. Supp. 2d 404 (D. Del. 2007) ........................................................................ 58

*In re Linerboard Antitrust Litigation,*
    305 F.3d 145 (3d Cir. 2002) ................................................................... 57

*In re Public Offering Antitrust Litigation,*
    No. 98-7890, 2004 WL 350696 (S.D.N.Y. Feb. 25, 2004) .................................... 59

*In re Sugar Industry Antitrust Litigation,*
    579 F.2d 13 (3d Cir. 1978) ............................................................ 50, 57

*In re Vitamin C Antitrust Litigation,*
    279 F.R.D. 90 (E.D.N.Y. 2012) ........................................................ 50, 51

*Interstate Circuit, Inc. v. United States,*
    306 U.S. 208 (1939) .................................................................. 43, 44

*Intternational Boxing Club of New York, Inc. v. United States,*
    358 U.S. 242 (1959) ..................................................................... 61

*Kingray, Inc. v. National Basketball Association,*
    188 F. Supp. 2d 1177 (S.D. Cal. 2002) .................................................... 3

*Kingray, Inc. v. NHL Enterprises, Inc.,*
    No. 00-1544 (S.D. Cal. July 2, 2002) .................................... 3, 30, 31, 51, 54

*Law v. National Collegiate Athletic Association,*
    134 F.3d 1010 (10th Cir. 1998) ......................................................... 35

*Lorenzo v. Qualcomm Inc.,*
    603 F. Supp. 2d 1291 (S.D. Cal. 2009) .................................................. 56

*Los Angeles Memorial Coliseum Commission v. National Football League,*
    726 F.2d 1381 (9th Cir. 1984) .......................................................... 60

*Madison Square Garden, L.P. v. National Hockey League,*
    No. 07-8455, 2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008) .................................. 22

*Major League Baseball Properties, Inc. v. Salvino, Inc.,*
    542 F.3d 290 (2d Cir. 2008) ........................................................... 40

*Metropolitan Intercollegiate Basketball Association v. National Collegiate Athletic Association,*
    339 F. Supp. 2d 545 (S.D.N.Y. 2004) ................................................... 60

*Mid-South Grizzlies v. National Football League,*
    720 F.2d 772 (3d Cir. 1983) ........................................................... 61

*Mid-West Paper Products Co. v. Continental Group, Inc.,*
    596 F.2d 573 (3d Cir. 1979) ........................................................... 59

*National Collegiate Athletic Association v. Board of Regents of the University of Oklahoma,*
    468 U.S. 85 (1984).................... 2, 18, 20, 21, 25, 26, 28, 31, 32, 33, 34, 35, 36, 42, 60, 61, 63

*National Society of Professional Engineers v. United States*,
    435 U.S. 679 (1978) ................................................................................. 35

*North American Soccer League v. National Football League*,
    670 F.2d 1249 (2d Cir. 1982) ................................................................... 22

*Paper Systems Inc. v. Nippon Paper Industries Co.*,
    281 F.3d 629 (7th Cir. 2002) ............................................... 49, 52, 53, 54

*Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.*,
    50 F.R.D. 13 (E.D. Pa. 1970) .................................................................... 56

*Philadelphia World Hockey Club v. Philadelphia Hockey Club*,
    351 F. Supp. 462 (E.D. Pa. 1972) ............................................................ 61

*Pittsburgh Athletic Co. v. KQV Broadcasting Co.*,
    24 F. Supp. 490 (W.D. Pa. 1938) ........................................................ 5, 17

*Ross v. Bank of America, N.A.*,
    524 F.3d 217 (2d Cir. 2008) ............................................................... 30, 33

*Royal Printing Co. v. Kimberly-Clark Corp.*,
    621 F.2d 323 (9th Cir. 1980) .................................................................... 50

*SAS of Puerto Rico, Inc. v. Puerto Rico Telephone Co.*,
    48 F.3d 39 (1st Cir. 1995) ......................................................................... 56

*Serpa Corp. v. McWane, Inc.*,
    199 F.3d 6 (1st Cir. 1999) ......................................................................... 56

*Shaw v. Dallas Cowboys Football Club, Ltd.*,
    172 F.3d 299 (3d Cir. 1999) ............................................................... 19, 20

*Starr v. Sony BMG Music Entertainment*,
    592 F.3d 314 (2d Cir. 2010) ..................................................................... 26

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006) ................................................................................. 37, 38

*Todd v. Exxon Corp*,
    275 F.3d 191 (2d Cir. 2001) ..................................................................... 62

*Toolson v. N.Y. Yankees, Inc.*,
    346 U.S. 356 (1953) ............................................................................ 18, 39

*Toys "R" Us, Inc. v. Federal Trade Commission*,
    221 F.3d 928 (7th Cir. 2000) ............................................................. 44, 45

*United States Football League v. National Football League*,
    644 F. Supp. 1040 (S.D.N.Y. 1986) ........................................................ 60

*United States v. Addyston Pipe & Steel Co.*,
 85 F. 271 (6th Cir. 1898) ................................................................. 35

*United States v. E.I. DuPont de Nemours & Co.*,
 351 U.S. 377 (1956).......................................................................... 63

*United States v. National Football League*,
 116 F. Supp. 319 (E.D. Pa. 1953) ........................... 1, 17, 18, 19, 20, 39

*United States v. National Football League*,
 196 F. Supp. 445 (E.D. Pa. 1961) .................................................... 19

*United States v. Socony-Vacuum Oil Co.*,
 310 U.S. 150 (1940).......................................................................... 44

*United States v. Topco Associates, Inc.*,
 405 U.S. 596 (1972).............................................................. 1, 24, 28

*Vermont v. Densmore Brick Co.*,
 No. 78-297, 1980 WL 1846 (D. Vt. Apr. 10, 1980) .......................... 53

*Volvo North America Corp. v. Men's International Professional Tennis Council*,
 857 F.2d 55, 72 (2d Cir. 1988) ................................................... 44, 55

*Washington v. National Football League*,
 No. 11-3354, 2012 WL 3017961 (D. Minn. June 13, 2012) ............... 40

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
 395 U.S. 100 (1969).......................................................................... 59

**Administrative Actions**

*Comcast Corp.*,
 26 F.C.C.R. 4238 (2011)............................................................. 46, 47

*News Corp. & the Directv Group, Inc.*,
 23 F.C.C.R. 3265 (2008)................................................................. 46

**Statutes**

15 U.S.C. § 26 ............................................................................... 59

15 U.S.C. §§ 1291-95 ....................................................... 6, 19, 20, 30

**Legislative Materials**

*Organized Professional Team Sports—Hearings before the Antitrust Subcommittee. of the House
 Committee. on the Judiciary on H.R. 5307, H.R. 5319, H.R. 5383, H.R. 6876, H.R. 6877, H.R.
 8023, and H.R. 8124*, 85th Congress, 1st Sess. (1957)................................. 19

*Professional Sports Antitrust Bill—1965: Hearings on S. 950 before the Subcommittee on Antitrust and Monopoly of the Committee on the Judiciary, U.S. Senate*, 89th Cong., 1st Sess. (1965) .......................................................................................................................... 40

## Other Authorities

11 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (3d ed. 2011) .................................. 37

2A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (3d ed. 2011) ......................... 50, 53

7 Phillip E. Areeda, *Antitrust Law* (1986) ................................................................ 62

Phillip Areeda, *The "Rule of Reason" in Antitrust Analysis: General Issues* (F.J.C., June 1981) ........................................................................................... 35

Spencer Weber Waller, *Justice Stevens and the Rule of Reason*, 62 S.M.U. L. Rev. 693 (Spring 2009) ....................................................................... 26

Stephen Ross, *An Antitrust Analysis of Sports League Contracts with Cable Networks*, 39 Emory L.J. 463 (Spring 1990) ............................................................... 27, 28

Stephen Ross, *Antitrust Options to Redress Anticompetitive Restraints and Monopolistic Practices by Professional Sports Leagues*, 52 Case W. Res. L. Rev. 133 (2001) .................................................................... 16

## INTRODUCTION

For many years, Defendants have engaged in open and explicit agreements to protect baseball and hockey telecasters from competition. These agreements divide the live-hockey and live-baseball video markets into exclusive territories for the teams' telecasters. In any other context, this would so clearly violate the antitrust laws that nothing further would need to be said. Like horizontal price-fixing, division of the market into exclusive territories is "[o]ne of the classic examples of a *per se* violation." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972).

Even in the sports broadcasting context, such agreements are clear violations of the antitrust laws. Defendant Madison Square Garden ("MSG"), the owner of defendant New York Rangers Hockey Club, acknowledged this, stating in a lawsuit against the National Hockey League—in which it attacked the same restrictions at issue here—that "the serious harm to competition from a sports league's division of broadcasting territories has long been established as an antitrust violation." Pl. Mem. Opp. Mot. Dismiss at 27, *Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 07-8455 (S.D.N.Y.) ("MSG Brief").[1] MSG and the Rangers have declined to join most of Defendants' brief in these cases, effectively conceding the adequacy of the core allegations that the leagues' and clubs' divisions of the markets are unlawful.[2] MSG's agreement with Plaintiffs' core allegations fatally undercuts Defendants' repeated assertions that these allegations are "conclusory" or "implausible."

Rather than engage the key decisions that reflect this "long[-]established … antitrust violation," Defendants ignore them. They fail to mention a leading precedent, *United States v. National Football League*, 116 F. Supp. 319 (E.D. Pa. 1953) ("*NFL I*"), which established that

---

[1] Attached as Exhibit 1 to the Declaration of Edward Diver ("Diver Decl.").
[2] MSG and the Rangers join only those sections related to the television plaintiffs' standing, the RSN and television distributors' role in the conspiracies, and the existence of monopoly power for purposes of Plaintiffs' Section 2 monopolization claim.

geographical restrictions designed to prevent one team's telecast from competing with another team's telecasts—*precisely the kind of restrictions at issue here*—violate Section 1 of the Sherman Act. Nor do they cite the Supreme Court's opinion invalidating—as "naked restraints" on competition—the National Collegiate Athletic Association's restrictions on individual team broadcasts of football games. *Nat'l Collegiate Athl. Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 109-10 (1984) ("*NCAA*"). The Court unequivocally stated that such restrictions are permissible only if they are affirmatively shown to be procompetitive, *id.*, which Defendants do not attempt to do here. Defendants do not cite any authority establishing that geographical divisions of the market by sports broadcasters like those at issue here are permissible. No such authority exists.

Congress has likewise turned away repeated requests by sports leagues for broad antitrust immunity covering broadcasting restrictions. The message is clear: While clubs have a legitimate interest in cooperating to organize popular, elite sporting competitions, restraints on economic competition between clubs that do not themselves promote competition are unreasonable and unlawful under Section 1 of the Sherman Act.

Ignoring this clear message, Major League Baseball ("MLB") and the National Hockey League ("NHL") have spearheaded multilevel restraints on trade in which the clubs agree not to compete among themselves in the sale of broadcast rights; their broadcast partners agree not to compete among themselves in the sale of programming to consumers; and cable and satellite distributors agree to implement these anticompetitive schemes, in return, in part, for agreements that bar competition from Internet providers.

Defendants offer no competitive justification for these agreements. Instead, they argue, yet again, that the nature of sports leagues permits these restrictions regardless of their effects on competition. They invite this Court to recognize broad antitrust immunity to what they label

"core activities," even when those activities directly raise price, reduce output, and render both unresponsive to consumer demand. This argument blatantly ignores the settled principle that leagues must establish a procompetitive justification for such restraints.

In any event, Defendants' broadcast restrictions are not "core activities." The central activities at issue are not activities of the leagues at all—they are transactions by *individual* clubs with *individual* telecasters for their own *individual* benefits. These are not cases about the NHL or MLB deciding how they are going to market the leagues' television rights. Rather, they are about the agreements between thirty hockey teams and their respective telecast partners, and thirty baseball teams and their partners, to prevent competition between themselves in a world in which technology has opened new avenues for the clubs to provide more programming to more people at lower cost.

Defendants also argue that there is no harm to competition, even though their agreements *expressly limit competition* by dividing the market. According to Defendants, so long as they make (nearly) every game available to (most) people—at some price, fixed or otherwise—they are free to constrain supply, raise prices, and limit competition however they please—a theory that would undercut the foundations of antitrust law.

In support of this extraordinary proposition, Defendants rely on an unappealed district court ruling from the Southern District of California, *Kingray, Inc. v. NHL Enterprises, Inc.*, No. 00-1544 (S.D. Cal. July 2, 2002), arguing that it resolved many of the issues in this case in favor of the leagues.[3] It did not. As MSG has acknowledged, because it ruled that the plaintiffs lacked standing to assert their claims, *Kingray* did *not* address the fundamental question of the division of the broadcast market.

---

[3] The *Kingray* court also decided a similar case against the National Basketball Association on essentially the same grounds in *Kingray, Inc. v. National Basketball Association*, 188 F. Supp. 2d 1177 (S.D. Cal. 2002).

Defendants also seek to avoid scrutiny of their anticompetitive schemes by claiming that some—but not all—plaintiffs lack standing in these cases. They contend that Defendants Directv and Comcast—and not their customers—are the appropriate parties to challenge these practices. Yet neither Directv nor Comcast could be an appropriate plaintiff, as they both actively control participants in the horizontal conspiracies—their own subsidiaries—and play active roles in the schemes in their own right. Consumers, including Plaintiffs, are the direct and intended victims of the schemes and their injuries are precisely those the antitrust laws are designed to remedy. There are no plaintiffs who are more suitable.

Defendants' motions should be denied in their entirety.

## BACKGROUND

### I.  THE NATIONAL HOCKEY LEAGUE AND MAJOR LEAGUE BASEBALL

The NHL and MLB are not-for-profit, unincorporated associations of their respective clubs. *L* ¶ 17; *G* ¶ 20.[4] Both MLB and the NHL are comprised of independently owned and operated clubs. Each league currently has thirty teams. *L* ¶ 1; *G* ¶ 1. The leagues are ultimately controlled by, and operate for the benefit of, the clubs. In the NHL, each club owner has a seat on the board of governors, which governs the league. As defendant MSG has noted, "[T]he teams control the league, not the other way around." MSG Br. at 5; *see also* Am. Compl. ¶ 9, *Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 07-8455 (S.D.N.Y.) ("MSG Am. Compl.") (Diver Decl. Ex. 2). The same is true for MLB. Major decisions, including the appointment of the commissioner, are made by the clubs, with each club voting its own interests.

Though necessarily cooperating to produce inter-club games, each club operates as an independently owned and managed business, competing against each other in various markets. *L* ¶ 18; *G* ¶ 21. As the New York Yankees stated in a lawsuit against MLB: "[A]part from

---

[4] Citations to the Amended Complaint in *Laumann* are denoted herein as "*L* ¶_" and the paragraph number; the *Garber* Complaint is cited as "*G* ¶_."

cooperating together to the extent necessary to produce games, the Clubs compete with each other both on and off the field in ventures both related and unrelated to the exhibition of baseball games." Compl. ¶ 2, *N.Y. Yankees P'ship. v. Major League Baseball Enters., Inc.*, No. 97-1153 (M.D. Fla. May 6, 1997) (Diver Decl. Ex. 3).

The two most significant sources of revenue for the clubs are ticket sales and television earnings. In both leagues, each team sets its own ticket prices and retains the revenue from gate receipts for its home games. Each team likewise separately owns the rights to televise most of its games, and keeps the revenues it generates from its sale of these rights. *L* ¶¶ 18, 58; *G* ¶¶ 21, 61. The substantial majority of overall revenue comes from the business activities of individual teams acting on their own individual behalf.[5]

The leagues have separate entities to pursue their own commercial opportunities. Defendant NHL Enterprises, L.P. ("NHLE"), through its subsidiary, Defendant NHL Interactive Cyberenterprises LLC ("NHL ICE"), operates the NHL's website and streaming video services. *L* ¶ 19-20. Major League Baseball Enterprises, Inc. ("MLBE"), conducts certain of MLB's business activities. Defendant MLB Advanced Media, L.P. ("MLBAM"), among other things, operates the league's Internet operations, including Internet streaming of live games, pursuant to rights granted by the individual clubs. *G* ¶ 22-23.

## II.    BASEBALL AND HOCKEY ON TELEVISION

The initial rights to televise sporting events are held by the individual clubs. In particular, the home team has the right to control telecasts of games. *Pittsburgh Athletic Co. v. KQV Broad. Co.*, 24 F. Supp. 490, 492 (W.D. Pa. 1938).

In both the NHL and MLB, the substantial majority of telecasts are produced by

---

[5] The NHL and MLB both employ revenue-sharing systems that redistribute a portion of the clubs' overall revenues in order to facilitate more balanced player compensation levels. While these systems differ, for these purposes, they operate similarly. They involve limited transfers made at the end of the year, based on a measure of overall revenue and other factors.

arrangement between individual teams and their chosen telecast partners. *L* ¶ 58; *G* ¶ 61. The teams in both leagues have mutually agreed to allow the visiting team to produce a separate telecast of these games as well. A relatively small portion of the games are produced pursuant to national contracts entered into with the league. *L* ¶ 59; *G* ¶ 62. Those national telecasts are possible only insofar as the individual teams grant rights to the league. Thus, both as a quantitative and qualitative matter, live telecasting of NHL and MLB games is a matter of individual teams, operating as independent businesses, pursuing the arrangements that serve their own interests with parties of their choosing, and keeping the resulting revenues.

In years past, games were shown only on free, over-the-air broadcasts. The clubs entered into agreements individually with local television channels in the markets where most of their fans were located. Local channels' signals generally did not reach into other teams' cities. Nothing in principle stood in the way of teams reaching agreements with individual stations in other teams' cities, and that did happen occasionally.[6]

To reach broader audiences, clubs more often entered agreements with a national television network to broadcast some of their games. Initially, they did so directly with a network, as part of a consortium of teams. Later, they usually did so indirectly, by transferring their rights in certain games to the league, which in turn negotiated contracts with national networks. As discussed below, certain league-wide, over-the-air broadcast contracts were made lawful by the Sports Broadcasting Act of 1961, 15 U.S.C. §§ 1291-95 ("SBA"). After 1961, pooled rights became the norm for national broadcasts. The clubs continued to enter into agreements with individual stations or sponsors for games not included in a league-wide, national contract.

---

[6] One example was in 1958, when the Philadelphia Phillies, Pittsburgh Pirates, and St. Louis Cardinals all reached agreements with New York stations to broadcast games, mostly involving the Los Angeles Dodgers and San Francisco Giants, which had recently left New York. *See* Val Adams, *Good News on TV for Baseball Fans*, N.Y. Times, May 1, 1958, at 63.

Today, few games air on broadcast television. Most are on full-time, pay-television sports channels. These channels have a far greater capacity for sports programming, which has allowed many more NHL and MLB games to be telecast, but they require consumers to pay for them.

The substantial majority of these games are carried on regional sports networks ("RSNs") through contracts with individual teams. In most cases, a single RSN will carry all of the games of a local team, except for the few that are set aside for exclusive national telecast. While some teams also broadcast a few of their own games over the air, the number has declined over the years. Most games are now available only to pay-television subscribers.

Until recently, no cable system had sufficient capacity to carry all games of an entire league. With digital cable and satellite television, however, there are no longer technical barriers to such distribution. Directv and Comcast now have the capacity to increase output to provide every game of every team to every digital customer in the country. In fact, on both Directv and Comcast, signals for nearly all MLB and NHL telecasts are sent to each digital customer's cable box, but the signal is blocked if the viewer is not within an approved territory or is otherwise not permitted to view it.

The Internet now provides a new means of distributing games easily and cheaply. Because teams have a material incentive to distribute their games more broadly and have repeatedly sought to do so, Defendants rely on restrictive agreements to prevent competition that would lower prices and increase the availability of major league hockey and baseball programming.

Consumers directly bear the costs of these agreements. Sports programming is the most expensive on television. The New York Times recently estimated that "American television subscribers pay, on average, about $100 a year for sports programming—no matter how many

games they watch."[7] Brian Stelter & Amy Chozick, *Paying a 'Sports Tax,' Even if You Don't Watch*, N.Y. Times, Dec. 15, 2011, at A4. The primary purpose of Defendants' anticompetitive agreements is to protect Defendants' ability to extract extraordinary sums from viewers—sports fans and non-sports fans alike.[8]

## III.    THE AGREEMENTS TO LIMIT COMPETITION

In an unrestrained marketplace, NHL and MLB teams would compete with their rivals for the sale of broadcast rights to programmers, including over-the-air broadcasters, national cable networks, RSNs, and Internet streaming services, without regard to geography. RSNs would compete to offer their programming to consumers directly and through multichannel video programming distributors ("MVPDs"), such as Comcast and Directv, wherever and however consumer demand could be met. The distributors would compete with each other to offer the best programming options from all of these sources, and would also compete with Internet distribution channels.

In contrast, today's highly constrained marketplace features multilevel horizontal restraints of trade, under which the clubs agree not to compete among themselves in the sale of

---

[7] ESPN is by far the most expensive channel on most subscribers' television lineups, costing in the neighborhood of $5 per household per month. http://www.businessweek.com/articles/2012-04-05/for-sports-networks-you-gotta-pay-to-play. Next are RSNs. The average price on an RSN charges per subscriber is about $2.49. *Id.* By contrast, the most expensive non-sports channel, TNT, is barely more than $1 per subscriber. *See* Stelter, *Sports Tax* ($1.16 in 2011).

[8] All signs are that, unless these openly anti-competitive practices are stopped, the problem of rising sports-programming cost is going to continue to get worse. *See, e.g., Sports TV rights costs likely to keep rising-execs*, Reuters, May 23, 2012. The last two years have seen an enormous increase the value of local television contracts. As one baseball executive recently noted, "You're seeing clubs double or triple their TV value." Bob Nightengale, *TV deals for Angels, Rangers open door for other teams*, USA Today, Feb. 10, 2012. The Los Angeles Dodgers baseball club was recently sold for over $2 billion—about three times the price paid for any other baseball club. It is widely understood that the value of the television rights largely explains the extraordinary value. *See, e.g.*, Matthew Futterman, *Behind Dodgers Deal: TV Riches*, Wall St. J., March 29, 2012, at A1. The Los Angeles Kings hockey club recently signed a local television deal worth hundreds of millions of dollars—a significant increase over previous deals. Bill Shaikin, *Kings, Fox Sports reach agreement on $250-million TV deal*, L.A. Times, June 3, 2012.

rights, the RSNs agree not to compete against each other in providing programming, and the MVPDs implement the scheme, by blacking out competing programming. The MVPDs also profit from the conspiracies by insulating themselves from significant Internet competition. The result is higher revenues for the parties at each level of the conspiracies, and higher prices and fewer options for consumers.

### a.   Regional Sports Network Telecasts

The NHL website describes how the basic system works: "Each NHL team has a local television territory where it may show telecasts of its games. A team will partner with a local television network, usually a regional sports network, to televise its games in its territory (e.g., the Chicago Blackhawks and Comcast Sportsnet Chicago)."[9] MLB employs the same system. Each territory covers the city in which the club plays its home games, but often extends several hundred miles beyond, and, at its center, has been exclusively allocated to a single team (except multi-team cities where the market is shared). By agreement among the teams, each team's contract with an RSN includes these territorial restrictions. *L* ¶ 61; *G* ¶ 63.

The RSNs agree to these geographical limitations because they understand that competing RSNs will respect their exclusive territories in return.[10] *L* ¶ 66; *G* ¶ 69. Thus, each RSN enters an agreement in which it gets an exclusive territory, free from competition from any other entity in the broadcasting of major league games of that sport. In the absence of these restrictive agreements, they would compete with each other in all areas of the country. *L* ¶ 64; *G* ¶ 67.

The RSNs, in turn, enter into agreements with MVPDs, including Directv and Comcast. The MVPD agrees to implement these geographical monopolies by making RSNs available as

---

[9] http://www.nhl.com/ice/page.htm?id=25288.
[10] Defendants incorrectly interpret the complaints in concluding that certain of the RSNs identified in the complaint, but not named as defendants, are not members of the conspiracies. Defs. Mem. at 8.

part of standard packages only within designated areas, and blacking out games in unauthorized territories.[11] *L* ¶ 68; *G* ¶ 65. Directv threatens legal action against any viewer who attempts to circumvent its blackout mechanisms.[12] The MVPDs also directly benefit from the blackout of Internet streams of local games, which requires that viewers obtain this programming exclusively from the MVPDs. The MVPDs further profit by requiring viewers to subscribe to an expensive multichannel package to obtain the programming.

The agreements creating and implementing the regional monopolies provide the core structure to the entire video distribution system in both hockey and baseball. Other methods of distribution, including national television contracts, "out-of-market" packages, and Internet streaming, are designed to protect and reinforce these regional monopolies.

**b. National Broadcasts**

The leagues enter into separate agreements with networks to distribute a limited number of games nationally. National telecasts remain a small percentage of the total number of games on television in both leagues.[13] A few national games in both leagues are carried on broadcast television, but most are shown on national, pay-television channels. *L* ¶ 59; *G* ¶ 62. These limited national games are the only way a fan can watch a game not involving a local team

---

[11] Defendant YES Network has agreed to an additional set of restrictions in its agreements with with the MVPDs. While consumers in the New York area are able to subscribe to streams of New York Yankees games, they can do so only if they are already a subscriber to a pay-television package carrying the YES Network. In other words, they have agreed that they will not compete with MVPDs, including Comcast and Directv, in the provision of New York Yankees games "in-market."

[12] Customer Agreement, ¶ 1(i), http://www.directv.com/DTVAPP/content/legal/customer_agreement.

[13] The two Chicago baseball teams, the White Sox and Cubs, have both contracted with WGN-TV to carry certain of their games over the air in the Chicago market. These games are also carried nationwide on the WGN "superstation." WGN is the last of the superstations—local channels distributed nationwide through cable and satellite—to carry MLB games. Reinforcing the anticompetitive nature of the existing structure, MLB demands payment of a fee to the league, which is distributed to the other teams, to compensate them for facing the limited competition created by these broadcasts. *G* ¶ 96.

without purchasing an expensive "out-of-market" package.[14]

### c. "Out-of-Market" Packages

Because of the horizontal market division among clubs, the only way that consumers can watch games that are not available through the local RSN or a national telecast is to purchase an "out-of-market" package. In both leagues, there are two—one on pay television and one on the Internet—each of which is sold only by the leagues themselves, because the clubs have agreed to offer this programming only through their designated league entities. The television packages—NHL Center Ice and MLB Extra Innings—are available through MVPDs, including Comcast and Directv. *L* ¶ 72; *G* ¶ 75. Both providers allocate a significant number of channels to these packages, which allows them to distribute video of most NHL and MLB games. Comcast and Directv both require that the consumer subscribe to a standard digital television package.

The Internet packages—NHL Gamecenter Live and MLB.tv—do not require a cable or satellite subscription, but the teams have agreed not to sell their own games over the Internet in any manner that would compete with either a local broadcaster or the Internet package offered by the league. As a result, "in-market" games are not available through these programs. *L* ¶ 80; *G* ¶ 85. Although league Internet packages would be more attractive to consumers if they included local games, the clubs have agreed to restrain the quality and output of these products in order to force consumers to purchase local programming from MVPDs, including Comcast and Directv.

The very notions of "in-market" and "out-of-market" games arise from the exclusive territories that Defendants have agreed to create. An "out-of-market game" is nothing more than a game that is ordinarily not available within an area because it would compete with the monopoly rights holders. *L* ¶ 73; *G* ¶ 76. Thus, these packages exist only in the context of—and

---

[14] When local and national presentations of the same game are produced, the national telecast is typically blacked out, making the local RSN the only available source for consumers within the agreed-upon territory of either of the teams playing.

are designed to reinforce—territorial market divisions that are fundamentally anticompetitive.

The artificially high price of the packages ensures that they do not present significant competition to RSNs and their television distributors.[15] The blackouts of local games also protect the MVPDs and RSNs. *L* ¶ 75; *G* ¶ 78. Thus, a Gamecenter Live subscriber in New York cannot watch New York Rangers games as part of the package, but must subscribe to MSG through an MVPD. The packages also black out certain nationally broadcast NHL and MLB games. *L* ¶ 75; *G* ¶ 78.

This limitation on local broadcasts decreases output in a number of ways. *First*, the lack of competition from the clubs and RSNs selling their programming "out-of-market" allows the league to charge a higher price for the packages, reducing demand.

*Second*, a subscriber is unable to watch the other team's presentation of the game by any means, a significant distortion of output that is unresponsive to consumer preference. Fans have shown strong preferences for certain announcers—especially those associated with their favorite teams. Both leagues actively market the availability of both feeds of a game in certain packages, because they know that it increases demand. *L* ¶ 75; *G* ¶ 78. MLB, in fact, charges a premium for a version of MLB.tv that includes home and away broadcasts. *G* ¶ 77.

*Third*, local blackouts mean that some games are *entirely* unavailable to viewers. *L* ¶¶ 76, 83; *G* ¶¶ 82, 89. Many consumers do not get their "local" games through their television provider, either because they do not get the necessary RSN, or because the RSN does not show

---

[15] For each of these packages, the leagues offer only packages consisting of all available out-of-market games of all teams. *L* ¶¶ 77, 82; *G* ¶¶ 80, 88. The Center Ice package, as of November 2011, cost $179.80. *L* ¶ 82. Gamecenter Live cost $169.00. MLB Extra Innings costs approximately $200. *G* ¶ 88; MLB.tv costs $99.99–$119.99 for a full season. *G* ¶ 77. The NHL requires purchase of a full season (or the full portion of the season remaining at the time of purchase). MLB offers MLB.tv (but not Extra Innings) on a monthly basis (which automatically renews). *G* ¶ 77. The complaints do not challenge the league packages, as such, provided that they resulted from *non-exclusive* rights, permitting consumers to choose offerings the clubs individually decided to offer.

the game in the viewer's area. Viewers are subject to the blackout restrictions regardless of their ability to watch the game on their cable system. *Id.* If they cannot watch the game on the necessary RSN, they cannot watch the game at all.[16] In certain areas of the country, multiple teams are considered "local." In Iowa, for example, where no baseball teams are located, six teams are considered "local" for these purposes, meaning that all of those games are blacked out. Certain national telecasts are also exclusive in the sense that all other games played at the same time are unavailable by any means.

Contrary to Defendants' contention, their blackouts do not simply direct viewers from one channel to another on their television—they limit or prevent consumers' access to games and telecasts they would otherwise choose to watch. Overall, the large number of games that fans cannot see makes the blackout systems enormously unpopular, highlighting the extent to which these restrictions limit output and interfere with commerce that would otherwise occur.[17]

By excluding games involving local teams from the Internet packages, Defendants have ensured that there is *no* authorized method for viewing those games on the Internet. *L* ¶ 78, *G* ¶ 82. For viewers who do not have a pay-television subscription, or who have a subscription that does not include the necessary channel, there is no way to watch "local" games at all.[18]

The purposes of this limitation are two-fold: to protect the regional monopolies that the RSNs hold over hockey and baseball programming, and to insulate the MVPDs that carry them from competition from the Internet. *L* ¶ 79; *G* ¶ 82. To watch a New York team in the New York

---

[16] David Dillon, a potential named plaintiff in the *Laumann* action, presents a stark example. He lives near Austin, Texas. He receives Fox Sports Southwest, which carries Dallas Stars hockey games in Dallas, but his version of the RSN does not carry most Stars games. He is blacked out of all of these games through other sources whether they are showing locally or not.

[17] *See, e.g.*, Jeff Passan, *Selig's Promise*, Yahoo! Sports, July 11, 2006 ("More than 1,000 fans emailed Yahoo! Sports to voice their frustration with baseball's territorial-rights rules that black out games on the Extra Innings pay-per-view package and MLB.TV."), available at http://sports.yahoo.com/mlb/news?slug=jp-blackouts071106.

[18] This is true of the New York Yankees as well, who require a subscription to a television package including the YES Network to access Internet streams.

area, viewers must pay for a New York RSN through an MVPD such as Comcast and Directv.

The leagues freely admit the anticompetitive purposes behind these restraints. As to Center Ice, the NHL states, "Blackout restrictions exist to *protect the local telecasters* of each NHL game in the local markets of the teams."[19] The NHL makes clear that the "blackouts are not based on arena sell-outs," and apply to all games involving the local team, "whether they are playing home or away."[20] Directv states that MLB Extra Inning blackouts "protect the local rights holders who arrange separate distribution agreements for their exclusive territories."[21]

### d.  The Multilevel Conspiracies

The conspiracies have multiple levels. At the top, there are horizontal agreements among the clubs to create geographical divisions in the market for television and video *rights*. The clubs have mutually agreed to sell the rights subject to strict geographical limitations preventing competition, and to ensure that their broadcast partners distribute their programming only within the delineated territories.

The second level is between the RSNs, which produce the product at issue here: live baseball and hockey *programming*. Each RSN agrees not to permit distribution of its programming outside of its assigned territory. In return, the RSN is assured that other RSNs will not compete within its exclusive territory. RSNs' principal value is the live programming they offer to sports fans within their territory, free from competition from other teams in their sport. They are able to secure high programming fees that would be substantially reduced if they were

---

[19] http://www.nhl.com/ice/page.htm?id=26371 (emphasis added). The league similarly states of Gamecenter Live blackouts, "Blackout restrictions are designed to protect the television rightsholders of the games." http://www.nhl.com/ice/page.htm?id=26389&intcmpid=gcl:faq.
[20] *Id.* MLB similarly states, "These blackout restrictions apply regardless of whether a Club is home or away and regardless of whether or not a game is televised in a Club's home television territory." http://mlb.mlb.com/mlb/subscriptions/index.jsp?c_id=mlb&affiliateId=mlbMENU#blackout.
[21] http://support.directv.com/app/answers/detail/a_id/1723/~/how-are-blackouts-determined-for-mlb-extra-innings%3F.

subject to open competition, and consequently are willing to pay higher fees for the monopoly rights they obtain.

Because the RSNs are not physically tied to a particular geography like over-the-air broadcasts, further participants are needed to give effect to the horizontal agreements among the clubs and the RSNs. Comcast and Directv must agree to implement the regional exclusivities by enforcing the blackout system, by blocking signals (which they distribute nationwide) from being passed to viewers' televisions. They are happy to do so, not least because the blackout systems directly protect them from Internet competition, making a subscription to a standard pay-television package necessary to receive local telecasts.

While *agreements* to divide the market exist at every level, the actual division of the television market does not occur until the MVPDs implement the territorial restrictions. The final sale to consumers by the MVPDs is the *only* television-based transaction that is geographically limited. Until that point, the geographical restrictions exist only as agreements to limit competition by imposing contractual conditions that will result in limitations at the retail level. The overall conspiracies, in other words, are directed at controlling which consumers are able to obtain which products through which means—functions that only the MVPDs can perform for television distribution. On the Internet, the same function is provided by the entity providing the streaming service—again by restricting access at the consumer level based on the location of the viewer.

The multilevel conspiracies are further facilitated by vertical integration. Comcast and Directv both own and control a number of RSNs. *L* ¶¶ 25-28; *G* ¶¶ 28-31. Comcast also owns the Philadelphia Flyers Hockey Club. *L* ¶ 21.b. A number of the teams and RSNs are jointly owned, including, the New York Yankees and YES Network, *G* ¶ 32, and MSG and the New York Rangers Hockey Club, *L* ¶ 21.h.

## IV.    PLAINTIFFS

Plaintiffs are consumers who purchased programming from Defendants at supra-competitive prices. Thomas Laumann purchased the NHL Gamecenter Live Internet package from the NHL league defendants. *L* ¶ 14. Marc Lerner and Derek Rasmussen purchased the MLB.tv Internet package from the MLB league defendants. *G* ¶¶ 17-18. Laumann, Lerner, and Rasmussen are referred to as the "Internet plaintiffs."

Fernanda Garber, a plaintiff in both *Laumann* and *Garber*, purchased video service from Comcast. *L* ¶ 13; *G* ¶ 16. Robert Silver, also a plaintiff in both cases, purchased video service from Directv. *L* ¶ 15; *G* ¶ 19. He also purchased NHL Center Ice as part of his Directv service. *L* ¶ 15. Peter Herman purchased video service from Directv. *L* ¶ 16. He continues to receive that service today.[22]

## V.    THE APPLICATION OF ANTITRUST LAW TO SPORTS BROADCASTING

In arguing that restrictive broadcasting practices are fundamental to sports leagues, Defendants ignore decades of jurisprudence establishing that such practices are not immune from antitrust scrutiny and, indeed, are unlawful. As Defendant MSG has acknowledged, "a sports league's division of broadcasting territories has long been established to be an antitrust violation." MSG Br. at 27; *see also* Stephen Ross, *Antitrust Options to Redress Anticompetitive Restraints and Monopolistic Practices by Professional Sports Leagues*, 52 Case W. Res. L. Rev. 133, 141-42 (2001).

---

[22] Plaintiffs also intend to seek amend the complaints solely to correct the identity of certain Defendants, something that Comcast has specifically sought, and to add two new plaintiffs. Garrett Traub would be a plaintiff in both cases. He has subscribed to Comcast, and has purchased both NHL Center Ice and MLB Extra Innings through Comcast. David Dillon would be a plaintiff in *Laumann*. He subscribed to NHL Gamecenter Live, but has been unable to watch most games involving his "local" team, the Dallas Stars through either cable television or the Internet. Peter Herman, currently a plaintiff in the *Laumann* case, would also be added to the *Garber* complaint. No other changes are proposed.

### a. Foundations of Antitrust Law Applied to Sports Broadcasting

When sports television began in the 1940s and 1950s, all major televised sports were produced pursuant to contracts between individual teams and broadcasting partners (or sponsors). This was to be expected, because the home team is the initial owner of broadcast rights.[23] *Pittsburgh Athl. Co.*, 24 F. Supp. at 492. Early attempts by leagues to impose geographical restrictions and blackouts on clubs' broadcasts were opposed by the Antitrust Division of the United States Department of Justice and met considerable scrutiny by Congress, which repeatedly declined to permit the kind of practices at issue here.

In the early 1950s, the Justice Department successfully sued the National Football League to enjoin a set of geographical restrictions on broadcasting. *NFL I*, 116 F. Supp. 319 (E.D. Pa. 1953). The National Football League had enacted a set of bylaws that, first, prevented teams from broadcasting their games into other teams' territories when those teams were playing home games, and second, prevented teams from broadcasting into other teams' territories when those teams were providing television coverage in their territory. *Id.* at 321.

The court held that these geographical limitations plainly constituted "a contract in restraint of trade." *Id.* at 322.

> Since the clubs … have agreed at certain times not to project their games into the home territories of other clubs they have given that part of their market at those certain times exclusively to other teams. In return, each of them has been given the right to market its own games without competition in its own home area under the same circumstances. … This, therefore, is a clear case of allocating marketing territories among competitors, which is a practice generally held illegal under the anti-trust laws.

*Id.* The only question was whether, under the unique circumstances of professional football in the 1950s, the restraints were reasonable. The court concluded that restrictions that protected ticket sales were reasonable—*i.e.*, those based on whether a game was being played in that

---

[23] Moreover, because the home team controls access to the venue in which the game is played, it has the ability, as a practical matter, to limit broadcasters to those it chooses to authorize.

location at the same time—but restrictions on broadcasts that competed only with *other telecasts* were not. *Id.* at 326-27. The court found that the primary purpose of the latter restrictions was "to enable the clubs in the home territories to sell monopoly rights to purchasers of television rights to away games," *id.* at 326, which is not permitted by the Sherman Act.

The present cases involve blackouts directed at protecting competition with other teams' *telecasts*—not ticket sales—precisely what was held to be unlawful in *NFL I*.[24] Neither the NHL nor MLB imposes blackouts to protect ticket sales, *i.e.*, based on whether a home game is being played, or whether a game is sold out.[25]

After *NFL I*, the leagues turned to Congress, seeking a statutory exemption to the antitrust laws to permit them to impose restrictions on clubs' broadcasts. Ford Frick, the commissioner of Major League Baseball, acknowledged that such restrictions would violate the antitrust laws as they stood.[26] Frick stated, "Until we can get (favorable federal) legislation, there is nothing the majors can do, as a body, on radio and T.V."[27] Lou Hatter, *Bonus Rule Change*

---

[24] Moreover, the justification for the "home game" restriction that was upheld in *NFL I* was based on the fact that, at that time, the NFL was a struggling league, and the court found that protecting ticket sales was essential to the existence of the league. 116 F. Supp. at 325. As the Supreme Court subsequently made clear, however, insulating ticket sales from competition from television is generally not a legitimate justification for a restraint. "By seeking to insulate live ticket sales from the full spectrum of competition because of its assumption that the product itself is insufficiently attractive to consumers, petitioner forwards a justification that is inconsistent with the basic policy of the Sherman Act." *NCAA*, 468 U.S. at 117.

[25] It is no longer generally accepted, as it was in 1953 when *NFL I* was decided, that televising games harms ticket sales of local games. The only major professional sports league that continues to blackout local games based on ticket sales is the National Football League.

[26] Although baseball enjoyed a limited exemption to the antitrust laws, which had been reaffirmed in 1953 in *Toolson v. N.Y. Yankees, Inc.*, 346 U.S. 356 (1953), it was widely understood that the exemption did not extend to broadcasting, as shown by baseball's efforts to obtain legislation. *See also First Witness Backs Baseball*, Milwaukee Sentinel, June 18, 1957, at pt. 2, p. 2. (AP) (reporting that the head of the Antitrust Division, Victor Hansen, testified to Congress that there was "little doubt" that that Sherman Act applied to broadcasting baseball games notwithstanding *Toolson*). MLB has not attempted to assert its antitrust exemption here.

[27] While Frick expressly sought a change in the law to permit league-imposed limits on broadcast, Clarence Campbell, the president of the NHL, was more willing to accept the limits imposed by *NFL I*. He testified at the 1957 hearings that he believed that the NHL could

*Seen*, Balt. Sun, Sept. 10, 1958, at 19; *see also Baseball Informs Senators It Needs Bill to Curb Radio and Television*, Hartford Courant, May 7, 1953, at 18 (AP). Throughout the 1950s, however, Congress repeatedly declined to exempt sports broadcasting from the antitrust laws in response to *NFL I*, and each of the major sports leagues abided by the court's decision.

### b. The Sports Broadcasting Act

In 1961, *United States v. NFL* was again before the trial court, this time on a league proposal to pool all teams' rights, which the league would then sell as a package to a national broadcast network. The court determined that it would violate its 1953 injunction, because "the member clubs of the League have eliminated competition among themselves in the sale of television rights to their games." *United States v. Nat'l Football League*, 196 F. Supp. 445, 447 (E.D. Pa. 1961) ("*NFL II*").

The NFL then obtained from Congress a narrow exemption to the antitrust laws that responded directly to *NFL II*, but consciously preserved the basic framework of *NFL I*. The Sports Broadcasting Act of 1961 ("SBA")[28] permits leagues to combine and sell the clubs' rights in "sponsored telecasts," which encompasses only free, over-the-air television.[29] The Act has no

_____

continue to operate "within the limits of the decision of [*NFL I*]." *Organized Professional Team Sports—Hearings before the Antitrust Subcomm. of the H. Comm. on the Judiciary on H.R. 5307, H.R. 5319, H.R. 5383, H.R. 6876, H.R. 6877, H.R. 8023, and H.R. 8124*, 85th Congress, 1st Sess. 2997 (1957) (Diver Decl. Ex. 4).

[28] Title 15 U.S.C. § 1291 provides, in relevant part:
    The antitrust laws, as defined in section 1 of the Act of October 15, 1914, as amended (38 Stat. 730), or in the Federal Trade Commission Act, as amended (38 Stat. 717), shall not apply to any joint agreement by or among persons engaging in or conducting the organized professional team sports of football, baseball, basketball, or hockey, by which any league of clubs participating in professional football, baseball, basketball, or hockey contests sells or otherwise transfers all or any part of the rights of such league's member clubs in the sponsored telecasting of the games of football, baseball, basketball, or hockey, as the case may be, engaged in or conducted by such clubs.

[29] *See, e.g., Shaw v. Dallas Cowboys Football Club, Ltd.*, 172 F.3d 299, 301-02 (3d Cir. 1999) (noting that the NFL Commissioner, in seeking the legislation, acknowledged that it "covers only the free telecasting of professional sports contests, and does not cover pay T.V.").

application to complaints here, which involve pay television and the Internet. Nor does it have any application where the rights are retained by the individual clubs, which Congress left subject to the Sherman Act in general, and to the holding in *NFL I* in particular. The SBA "does not apply" where "the league has regulated the activities of individual clubs." *Chi. Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 961 F.2d 667, 670 (7th Cir. 1992).

Moreover, the SBA limits the exemption where blackouts are involved. A joint agreement among the teams *is* subject to the antitrust laws, notwithstanding § 1291, if it includes geographical blackouts of games other than "within the home territory of a member club of the league on a day when such club is playing a game at home." § 1292.[30] This provision demonstrates Congress's clear intent to permit blackouts only to protect ticket sales. It preserves the holding in *NFL I* prohibiting blackouts designed to prevent competition between *broadcasts*.

As the Supreme Court noted in its 1984 decision in *NCAA*, "The legislative history of this exemption demonstrates Congress' recognition that agreements among league members to sell television rights in a cooperative fashion could run afoul of the Sherman Act, and in particular reflects its awareness of the decision in *United States v. National Football League*, 116 F. Supp. 319 (E.D. Pa. 1953)." 468 U.S. at 104 n.28.

### c. The Supreme Court's Decision in *NCAA*

*NCAA* is the definitive decision regarding sports broadcasting. The Supreme Court confirmed that agreements restricting the televising of sporting events are subject to careful examination under the antitrust laws and, where those agreements increase price, decrease

---

The court in *Shaw* mistakenly cited the 1953 opinion as abrogated by the SBA, rather than the 1961 opinion. *Id.* at 301 n.6.

[30] Section 1292 provides, in full:

Section 1291 of this title shall not apply to any joint agreement described in the first sentence in such section which prohibits any person to whom such rights are sold or transferred from televising any games within any area, except within the home territory of a member club of the league on a day when such club is playing a game at home.

output, or render supply unresponsive to consumer preference, are unlawful.

Like the agreements at issue here, *NCAA* involved agreements limiting individual teams' ability to sell their broadcast rights for their games. The particular agreements there limited the number of broadcasts by college football teams. The Court found that each team's agreement to refrain from broadcasting its games in return for an equivalent promise from other teams was a "naked restraint" that "requires some competitive justification." 468 U.S. at 110. "The anticompetitive consequences of this arrangement are apparent. Individual competitors lose their freedom to compete. Price is higher and output lower than they would otherwise be, and both are unresponsive to consumer preference." 468 U.S. at 106-07.

The Court recognized that the NCAA operated as a joint venture to establish rules and otherwise facilitate games, and whose cooperation made the product of collegiate football possible. The desirability of this cooperation, however, did not justify restriction on the ability of its individual members to enter into competing broadcasting contracts. *Id.* at 101-08. Yet that is what Defendants argue here, once again seeking to expand the justification for necessary league cooperation into a broad license for nearly any restriction on competition—including one that has long been recognized to violate the antitrust laws.

### d. Club Challenges to League Restrictions

Since *NCAA*, a few challenges to professional sports broadcasting restrictions have been brought by teams seeking to be free of them. In each case, the teams reached settlements that permitted the basic restrictive schemes to remain. No court has ever upheld league-imposed restrictions on broadcasting like those at issue here.

Defendant MSG recently brought one of these challenges against the NHL. Except to the extent that the court found that MSG had released certain claims through its contracts with the

league, the court agreed that MSG had stated a claim under the antitrust laws.[31] *Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 07-8455, 2008 WL 4547518, *11 (S.D.N.Y. Oct. 10, 2008) (permitting challenge to NHL's "New Media" policies).

In another action, the Chicago Bulls basketball team challenged the National Basketball Association's limitations on the Bulls presenting its games on a national "superstation"—WGN. The district court described the NBA's system of exclusive territories as "a horizontal agreement among competitors to divide markets and restrain output." *Chi. Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 874 F. Supp. 844, 858 (N.D. Ill. 1995). The district court concluded that "the NBA's attempt to prevent WGN and the Bulls from televising any games [nationally] is a naked restraint on output which will reduce the product available to consumers and is not procompetitive. It therefore violates Section 1 of the Sherman Act …." *Id*. at 862.

### e.  The Rise and Fall of the Single-Entity Theory

On appeal from an order barring the NBA from enforcing its territorial restrictions against the Bulls, the Seventh Circuit vacated, but not because it disagreed with any of these findings by the district court. Rather, it remanded to permit the district court to further consider the possibility that the NBA was a "single entity" that was incapable of entering into an antitrust conspiracy, citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984), in which the Supreme Court held that a parent corporation and its wholly owned subsidiary were not capable of an antitrust conspiracy, because they were functionally a single enterprise. *Chi. Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 95 F.3d 593, 599 (7th Cir. 1996). Most courts had rejected the single-entity theory as applied to sports leagues, including the Second Circuit,[32]

---

[31] Defendants note that only "new media" claims remained, Defs. Mem. at 35 n.21, but restrictions on streaming video were part of the "New Media" policy, and consequently remained subject to challenge.

[32] *N. Am. Soccer League v. Nat'l Football League*, 670 F.2d 1249, 1256-58 (2d Cir. 1982) (concluding that the NFL was not a single entity).

but the Seventh Circuit formally adopted it and applied it to the NFL in *American Needle Inc. v. National Football League*, 538 F.3d 736 (7th Cir. 2008).

In 2010, the Supreme Court unanimously reversed the Seventh Circuit, holding that the NFL could *not* be treated as a "single entity," because "[e]ach of the teams is a substantial, independently owned, and independently managed business. '[T]heir general corporate actions are guided or determined' by 'separate corporate consciousnesses,' and '[t]heir objectives are' not 'common.'" *American Needle Inc. v. National Football League*, 130 S. Ct. 2201, 2212 (2010) (quoting *Copperweld*, 467 U.S. at 771).

In responding to MSG's challenge to the NHL in 2008, before the Supreme Court's decision in *American Needle*, the NHL's primary argument was that it was a single entity. That defense is no longer tenable. This leaves in place the unambiguous body of law establishing that agreements to divide broadcasts markets among teams in sports leagues are unlawful.

## DISCUSSION

### I.   PLAINTIFFS' ALLEGATIONS MUST BE ACCEPTED AS TRUE

In addressing motions to dismiss complaints under Federal Rule of Civil Procedure 12(b)(6), Plaintiffs' allegations must, of course, be accepted as true. Since the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), it has become *de rigueur* for defendants to attack allegations as "implausible" or "conclusory." Defendants have done so again, but there is no place for these arguments here. As noted, Plaintiffs' core allegations, and the inferences they have derived from them, are the same as those advanced by MSG and the Rangers in their lawsuit against the NHL. Defendants cannot reasonably argue that those allegations are "implausible" or "conclusory" when two of their members—who are active participants in the challenged conduct—have taken the same position.

### II.   THE COMPLAINTS ALLEGE HARM TO COMPETITION

Defendants assert the implausible claim that the complaints, which describe series of

explicit agreements to divide markets geographically and prevent competition—with the purpose and effect of increasing the prices consumers pay for live hockey and baseball programming—are subject to dismissal for failing to allege harm to competition.

If this case involved anything other than sports, it would present a clear *per se* violation of Section 1 of the Sherman Act. The Supreme Court "has reiterated time and time again that horizontal territorial limitations are naked restraints of trade with no purpose except stifling of competition." *Topco*, 405 U.S. at 608 (quotation omitted). Like horizontal price-fixing, dividing a market into exclusive territories is "[o]ne of the classic examples of a *per se* violation." *Id.*; *see also Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012) (same).

Here, Defendants have *openly* entered into a series of agreements to divide the market geographically. "Out-of-market" games are offered only through a single source against which the clubs agree not to compete, and all out-of-market packages are designed to limit competition with the clubs and their telecast partners. The very purpose of these agreements, in other words, is to stifle competition.

Nor is there any question that these restrictions directly harm consumers.[33] Basic economic theory establishes that such restrictions limit output and raise prices, insulating these factors from market demand. *See, e.g.*, *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 456 (1986) (holding that economic theory that consumers would be better off if defendants were not permitted to conspire is sufficient to demonstrate harm to competition).

Moreover, MSG specifically stated that it would offer Rangers telecasts more broadly and at lower costs in the absence of these agreements: "In a fully competitive marketplace, the Rangers could and would compete to an even greater extent. In particular, … by increasing the

---

[33] As MSG emphasized, "The necessary effect of these agreements to restrict competition, in the distinct market for professional ice hockey broadcasts, is higher prices and reduced consumer welfare." MSG Br. at 8.

opportunity to view Rangers games throughout the country, whether through cable, satellite or on the internet." MSG Am. Compl. ¶ 37. Those statements are more than just economic common sense—they are fatal to Defendants' argument that these allegations are "conclusory."

### a. The Complaint Alleges Reduction in Output

Defendants' claim that there is no harm to competition is based on the fallacy that their restrictive agreements cannot reduce output because every game is available to viewers in some form, and at some price. MSG and the Rangers have not joined the portion of the brief making this argument because it is inconsistent with their view, as expressed in their papers in *MSG v. NHL*.[34] *See* Defs. Mem. at 8 n.6.

As an initial matter, Defendants' contention that harm to competition can be measured only by a change in "output" is incorrect. An effect on price *or* output, measured in terms of either quantity or quality is sufficient to establish harm. *See, e.g.*, *NCAA*, 468 U.S. at 109. Indeed, in some cases, an effect on output or price may not be necessary. "[A]n effect on price or output is a sufficient but not a necessary element of antitrust injury." *Clarett v. Nat'l Football League*, 306 F. Supp. 2d 379, 399 (S.D.N.Y. 2004) (Scheindlin, J.), *rev'd on other grounds*, 369 F.3d 124 (2004). The suggestion that the clubs could collude to increase the price of games simply because all games were available at some price is absurd. As MSG conceded, "the proposition … that the horizontal allocation of broadcasting territories causes no consumer harm, because Center Ice gives consumers 'the ability to watch virtually every NHL game,' MTD at 32, is untenable." MSG Br. at 30. This system of restrictions on competition "produces higher

---

[34] In its Amended Complaint, MSG stated:

> Output of broadcasts, rebroadcasts and internet and other distribution of NHL games … is lower, and prices are higher, than they would be in the absence of the 'exclusive' agreements …. Competition by individual clubs independently acting to exploit the broadcasting, rebroadcasting and other distribution of their teams' games would produce consumer benefits, such as an increase in the availability of broadcasts over a wider range of media, including cable, the internet and wireless devices.

MSG Am. Compl. ¶ 43.D.

prices and reduced consumer welfare. … This is the essence of antitrust injury." *Id.* The complaints clearly allege higher prices and reduced consumer welfare, which would establish antitrust injury regardless of any change in output. *See, e.g.*, *L* ¶¶ 64, 71, 81, 90, 94, 96-100; *G* ¶¶ 67, 74, 87, 93, 100, 102-06.

     In any event, by any measure—including Defendants'—output *is* reduced.

## 1.  The Correct Measure of Output is Viewership, Not Games

     It is no more correct to assert, as Defendants do, that the only measure of output of sports telecasts is the number of games available than it is to say that the measure of output of books is the number of titles available. Successful antitrust challenges to the publishing and record industries, such as *Starr v. Sony BMG Music Entertainment*, 592 F.3d 314 (2d Cir. 2010), *cert. den'd*, 131 S. Ct. 901 (U.S. 2011), would be wrongly decided under Defendants' theory. *See also In re Elec. Books Antitrust Litig.*, --- F. Supp. 2d ---, No. 11-MD-2293, 2012 WL 1946759 (S.D.N.Y. May 15, 2012). This view would also contradict the Supreme Court's position in *Broadcast Music, Inc. v. Columbia Broadcasting Systems, Inc.*, 441 U.S. 1 (1979) ("*BMI*"), which held that the availability of the same songs from multiple sources was essential to its upholding BMI's blanket music licenses. "Under the NHL's approach, the Court should have deemed such individual competition superfluous, because music licensees could obtain any song by purchasing the blanket license—just as NHL fans can 'watch virtually every NHL game' if they purchase the Center Ice blanket license. Needless to say, neither the Supreme Court nor any other court has adopted this view." MSG Br. at 31; *see also NCAA*, 468 U.S. at 114 (noting that freedom to compete individually was essential to the holding in *BMI*).

     Viewership is the accepted measure of output in this context. *See, e.g.*, Spencer Weber Waller, *Justice Stevens and the Rule of Reason*, 62 S.M.U. L. Rev. 693, 713 n.138 (Spring 2009); Stephen Ross, *An Antitrust Analysis of Sports League Contracts with Cable Networks*, 39

Emory L.J. 463, 476 (Spring 1990). The number of viewers rises and falls with the availability and price of the telecasts, just as with any other product. People who do not subscribe to an out-of-market package and live in New York City cannot view most games not involving New York teams. It is true that they could choose to buy expensive packages to watch those games, but many will not do so at the prices charged. In the absence of these agreements, those games would be available more widely and less expensively, which would lead to higher consumption of baseball and hockey programming.

That is classic reduction in output. Defendants here are constraining supply—pursuant to restrictive agreements among competitors—and are likewise controlling price.[35] Whether Defendants reduce output by raising prices or raise prices by restricting output is irrelevant. As Judge Posner has noted, "If firms raise price, the market's demand for their product will fall, so the amount supplied will too—in other words, output will be restricted. If instead the firms restrict output directly, price will as mentioned rise in order to limit demand to the reduced supply. Thus, with exceptions not relevant here, raising price, reducing output, and dividing markets have the same anticompetitive effects." *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 594-95 (7th Cir. 1984). However described, consumers are getting less and paying more—precisely what the antitrust laws are designed to avoid.

---

[35] Defendants suggest that high prices do not establish antitrust injury. High prices plainly do constitute antitrust injury, however, if they are the direct and foreseeable consequence of restrictions on competition, which Plaintiffs have plainly alleged here.

Defendants cite the Seventh Circuit's opinion in opinion *Chicago Prof'l Sports*, 95 F.3d at 597, for the proposition that a high price is lawful in the absence of a restriction in output. As an initial matter, this Court has previously rejected another statement by Judge Easterbrook in another phase of the Bulls case that output *or* price was necessary to show injury as *dicta* that "finds little support in the case law." *Clarett*, 306 F. Supp. 2d at 398. Moreover, Judge Easterbrook was not talking about the relationship between price and output in the usual manner. The "price" he discussed was not the price of the programming at issue, but the amount the league would charge the Bulls for its out-of-market telecasts. It was, in other words, a question of how the league and the Bulls would divide the revenue derived from those telecasts, not a question of how the price and output of the telecasts themselves affected each other. As Judge Posner noted, altering the price of a product will affect the output of *that product*, and vice versa.

The number of games telecast is, to be sure, one of the factors that can affect output. Where no other factors, such as price or the number of outlets, affect viewership, the number of games broadcast can be a good proxy for output.[36] *See, e.g.*, Ross, 39 Emory L.J. at 476. It hardly follows that the number of games available is the *only* measure of output relevant to the antitrust laws where, as here, cost and access to those games are constrained by defendants.

Under Defendants' view (excepting MSG and the Rangers), the clubs could set the price of "out-of-market" packages so high that nearly no one paid for them, and thereby grant themselves full immunity from the antitrust laws for all broadcasting practices because the games would be "available." Or they could explicitly agree to fix the price of all telecasts at any arbitrary price, thereby dramatically reducing the size of the market and the extent of viewership, and such price-fixing would be immune from antitrust challenge so long as every game was available for purchase at the fixed price. That is not the law.[37]

Defendants' theory would also lead to the absurd conclusion that the availability of live-streamed games on the Internet, or on mobile devices, could never have any effect on output, for it would simply provide another way of watching games that are already available somewhere, at some price. Nor, presumably, would the fact that a given cable company does not carry a channel required to see a particular game, so long as viewers could switch to another cable company that

---

[36] When broadcasts were only available on free, over-the-air television, for example, whether or not a game was broadcast would typically have been the only significant, relevant factor in determining television viewership in a given area, as cost would not have been an issue for viewers, and there were no other outlets for these telecasts. This factor takes on even greater significance, of course, when the restrictions at issue are directly targeted at the number of games available. *See, e.g.*, *NCAA*, 468 U.S. at 106-07 (highlighting reduced number of games telecast but identifying responsiveness to viewer demand as "perhaps the most significant" point).

[37] Indeed, it is unclear why this theory would not immunize *any* price-fixing cases where the total *variety* of products remained the same for anyone willing to pay the inflated price. Supermarkets, for example, could fix prices or divide the market with impunity, so long as each of the products sold was still available, albeit at an artificially inflated price. *See, e.g.*, *Topco*, 405 U.S. at 608 (holding that geographical market division for sales of private-label supermarket products is a *per se* violation).

did. As MSG has noted, limiting the analysis of output to the number of games available "is untenable." MSG Br. at 30.

### 2.  The Agreements Reduce the Number of Games Available to Consumers

Even adopting Defendants' unsupportable measure of output, there is no question that the restrictive agreements reduce output. The complaints allege that many games cannot be viewed by large numbers of fans, short of travelling to an approved territory. As noted, potential plaintiff David Dillon is unable to watch most games involving his favorite hockey team on television or over the Internet. Video presentations of these games could be cheaply and easily distributed to anyone who wants to watch them. Yet large numbers of consumers cannot watch them only because the teams have agreed not to allow them access. *See generally* Jeff Passan, *MLB's blackout problem keeps sport in dark ages*, Yahoo! Sports, June 22, 2012.[38] Even the Commissioner of Baseball, Allan "Bud" Selig, has complained about getting blacked out of games himself: "'I hear more about people who can't get the game,' Selig said, 'and, yes, I've already told our people we have to do something about it.'" Passan, *supra* note 17.

### 3.  The Agreements Limit the Distinct Telecasts Available to Consumers

In addition, even when people can watch a particular game, they typically cannot view all of the telecasts that have been produced. At least two different telecasts of each game, produced by each participating team's television partner, are ordinarily available. They are plainly two different products; otherwise, there would be no need to go to the expense of producing both. Telecasts in other languages also constitute separate products. Both leagues actively promote the availability of multiple feeds of the same game, featuring different announcers, in certain packages, because they know that fans are willing to pay more to get the version they prefer. MLB even charges a substantial premium to fans wishing to have the ability to watch either

---

[38] Available at http://sports.yahoo.com/news/mlb%E2%80%99s-blackout-problem-keeps-sport-in-dark-ages.html.

team's presentation. Viewers in all markets are prevented from choosing market alternatives that they would prefer only because of the restrictive agreements. It is beyond dispute that "reduction in choice and diminished quality" constitutes antitrust injury. *Ross v. Bank of Am., N.A.*, 524 F.3d 217, 224 (2d Cir. 2008). These restrictions unquestionably prevent viewers "from making free choices between market alternatives." *Id.* (quotation omitted).

### 4. *Kingray* Does Not Support Defendants' Theory of Output

In *Kingray*, the court rejected a challenge to the NHL's out-of-market television package, finding that the mere *addition* of the package did not itself cause a reduction in output. Slip op., at 11. That case is inapposite because, as MSG correctly noted, *Kingray* assessed output only after it assumed the validity of the core territorial division that is being challenged here: "Contrary to the NHL's suggestion that *Kingray* found that the NHL clubs' horizontal allocation of broadcasting territories caused no harm to competition, the court in fact expressly refused to address such a claim." MSG Br. at 29.

Once it accepted the legitimacy of the territorial system and disregarded all horizontal-conspiracy challenges,[39] *Kingray* held that the agreement to create the Center Ice package did not harm competition because Center Ice blackouts occurred only when the game was on the local channel carrying the contest, so they did not block access, but merely directed viewers to a different channel.[40] In that context, the creation of Center Ice increased output by offering

---

[39] While the *Kingray* court determined that the plaintiffs did not have standing to challenge horizontal agreements amongst the clubs, including territorial restrictions, it appears to have also mistakenly assumed that these arrangements were permitted by the Sports Broadcasting Act, apparently because plaintiffs in that case admitted as much. *See* Slip Op. at 13 ("Indeed, the [complaint] acknowledges that the NHL Defendants' agreements regarding broadcasts were made pursuant to the SBA."). As noted above, the SBA permits only pooled contracts, not agreements between teams to divide the market between themselves, applies only to broadcast television, and expressly exempts agreements to black out games where a team is not playing a home game. Defendants in this case do not assert the SBA as a defense to Plaintiffs' allegations.

[40] There is no evidence that the parties raised, or that the court considered, the question whether permitting only one team's presentation of the game to be available was a reduction in output.

consumers new choices. The court emphasized that the legality of the teams' agreements not to compete in broadcasting generally was "irrelevant" to the narrow question it was addressing: "the issue of whether NHL Center Ice itself reduces output." *Id.* at 13.

The question here is not whether an additional product adds to output, but whether *explicit horizontal agreements not to compete*—between the clubs, the RSNs, the MVPDs, and providers of "out-of-market" packages—harm competition by reducing output—an issue never addressed in *Kingray*.[41] Here, there are express agreements between potential competitors not to offer products in certain territories or through certain channels. Viewers are not merely required to change the channel, as in *Kingray*, but are *denied options* they would otherwise have to watch more telecasts of more games at lower prices through more outlets in the absence of restrictive agreements. Defendants' agreements are naked restrictions on competition that directly reduce output, and are precisely the kind of agreements that courts have always condemned as unlawful.

### b. The Blackout Systems Make Distribution of MLB and NHL Telecasts Unresponsive to Consumer Preference

It is equally true that blackout systems make distribution of these telecasts "unresponsive to consumer preference," a factor the Supreme Court has identified as a "hallmark" of an antitrust violation because "Congress designed the Sherman Act as a consumer welfare

---

Since *Kingray* was decided, however, both MLB and the NHL began offering "home and away feeds" of most games on certain out-of-market packages. Thus, it is now clear that preventing two different telecasts of the same game, as opposed to a double broadcast of a single telecast, is a reduction in output of something that the market values.

[41] It is not the existence out-of-market packages themselves that is challenged by Plaintiffs here, but rather the fact that they are exclusive—that the clubs and their partners are precluded from offering competing programming. This distinction is critical, because where a package of products from potential competitors is the exclusive source of products, it prevents competition, while a non-exclusive bundled product may simply be "one alternative competing on the basis of price and services with others." *Buffalo Broad. Co. v. ASCAP*, 744 F.2d 917, 934 (2d Cir. 1984) (Winter, J., concurring). *Buffalo Broadcasting* upheld a non-exclusive blanket license, distinguishing prior judgments against the same defendant in which exclusive licenses were found to reduce competition and violate the law. *Id.* at 932; *see also NCAA*, 468 U.S. at 114 (noting that availability of music licenses from individual rights-holders was essential to the holding in *BMI*, which upheld blanket music licenses).

prescription." *NCAA*, 468 U.S. at 107 (quotation omitted). Restricted territories are, by definition, unresponsive to consumer preference, as their very purpose is to present artificial barriers to transactions that would reflect consumer choice.[42] In the absence of these restrictions, the clubs and their television partners would respond to demand by offering their products more widely and in geographical areas that reflected consumer demand rather than league directive. *L* ¶¶ 88-91; *G* ¶¶ 92-98. In addition, the restrictions on Internet webcasts that preserve the exclusive territorial scheme are unresponsive to the preferences of many consumers to watch favored teams on their preferred devices.

In short, the harm to competition in these cases is clear. The agreements expressly limit access to programming in order to increase consumer prices. Consumers have access to fewer distinct presentations of fewer games, through fewer means, and at higher prices than they would in an unrestricted market. These allegations not conclusory; indeed, Defendants MSG and the Rangers—participants in these markets—have asserted them themselves.

### 1.   Consumers' Preferences Are Relevant to Show Injury

Defendants disparage Plaintiffs' allegations that they, and other class members, would "prefer" to purchase products that are not available under the present restrictive scheme. Like price, *see supra*, note 35, the loss of a preferred choice does not by itself establish an antitrust violation, but it *is* antitrust injury if it is the direct and foreseeable consequence of unlawful, restrictive agreements. "[R]eduction in choice and diminished quality" constitutes antitrust

---

[42] Nowhere is this more evident than in eastern North Carolina, which is within the territories of the Washington and Baltimore baseball clubs, even though more of its fans favor the Atlanta Braves. Those fans do not have access to the Braves' RSN, Fox Sports South, and can only view Braves games through an out-of-market package. An executive at Time Warner Cable "complained that blackout rules precluding coverage of the Atlanta Braves was 'a big sore spot' for the area systems." *See* David Sherfinski, *Court shuts out Nationals, Orioles fans' viewing in N.C.*, Wash. Times, May 28, 2012. Many cable channels do not carry the Washington and Baltimore RSN due to a relative lack of demand, yet games of both teams are blacked out on the out-of-market packages anyway.

injury. *Ross*, 524 F.3d at 224. "[O]ne form of antitrust injury is '[c]oercive activity that prevents its victims from making free choices between market alternatives.'" *Id.* (quoting *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 (1983)). The cases cited by Defendants are not contrary. *See, e.g.*, *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 n.11 (9th Cir. 2012) (noting that "reduced consumer choice and increased prices … *when they are the result of an anticompetitive practice*, constitute antitrust injury") (emphasis added).

The preferences of potential buyers are plainly relevant because they reflect demand. MSG has already acknowledged that it would meet this demand in the absence of the restrictive agreements at issue. These agreements make price and output "unresponsive to consumer preference." *NCAA*, 468 U.S. at 106-07.

Defendants cite a number of cases involving "tying"—where a single firm requires the purchase of an unwanted item along with a wanted item. Yet Plaintiffs are not suggesting that an unrestrained, unilateral decision by a single defendant to offer any product in its chosen manner is an antitrust violation. Rather, Defendants here are not offering products that consumers would prefer *only because of unlawful agreements between Defendants that restrain trade.* The remedy is to eliminate these restraints, allowing each Defendant to make its own, independent decision how to compete in the market.

## III.   THE LEAGUES MUST PROVIDE PROCOMPETITIVE JUSTIFICATIONS FOR THEIR RESTRICTIVE AGREEMENTS

Ignoring decades of jurisprudence to the contrary, the league and club defendants claim *de facto* immunity from antitrust liability for *any* agreement with respect to broadcasting—regardless of its consequences—because these agreements are "central to and inherent in a league." Defs. Mem. at 47. The upshot of such a sweeping theory would be that no sports broadcast practices could ever be found to be unlawful restraints of trade. Defendants do not

attempt to show that the challenged restrictions are procompetitive; indeed, they argue instead that the leagues are entitled to impose them *regardless* of their effect on competition.

In *American Needle*, the Supreme Court rejected the notion that sports leagues are "single entities" for purposes of Section 1 of the Sherman Act, concluding that the teams are separate entities fully capable of conspiring under the antitrust laws. 130 S. Ct. at 2217. While Defendants have abandoned any reliance on the single-entity theory as such, they attempt to resurrect it in a new form, arguing that the restrictions on teams' broadcasts are "core activities" of the joint ventures (the leagues) and are consequently immune from the antitrust laws. They argue that, notwithstanding *American Needle*, agreements to restrain the clubs' broadcasting activities necessarily "are not 'conspiracies' actionable under the antitrust laws." Defs. Mem. at 48.

This is little more than an attempt to resurrect the "single-entity" theory under a new name. Defendants MSG and the Rangers have rightly declined to join in the request to recognize this novel, sweeping theory of antitrust immunity.

a. **Joint Ventures May Cooperate to Achieve Legitimate Goals, but Cannot Restrain Trade in Ways Unnecessary to These Objectives**

Restrictions on competition in the context of joint ventures are typically permitted if they "are essential if the product is to be available at all." *Am. Needle*, 130 S. Ct. at 2216 (quotation omitted). The Supreme Court has recognized that some horizontal cooperation may be necessary to organize sports competitions between separately owned clubs. The basic rules necessary to the existence of a sports league are often viewed as procompetitive. *NCAA*, 468 U.S. at 101. This does not immunize all related agreements from antitrust liability, however, as Defendants suggest. Rather, *American Needle* made it clear that sports leagues' restraints must be considered under the rule of reason.[43] *Id.* at 101-04.

---

[43] While *per se* treatment is not appropriate, a full-scale rule-of-reason analysis is not required. Indeed, *NCAA* is one of the original cases in which the Court adopted a truncated rule-of-reason

This is consistent with long-settled law. Courts have understood, for more than a century, that Section 1 of the Sherman Act bars trade restraints that are not reasonably necessary (or "ancillary") to a legitimate purpose. *See United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 280 (6th Cir. 1898), *aff'd*, 175 U.S. 211 (1899).[44]

In *NCAA*, the Supreme Court applied this framework, holding that "a certain degree of cooperation is necessary if the type of competition that petitioner and its member institutions seek to market is to be preserved. … The specific restraints on football telecasts that are challenged in this case do not, however, fit into the same mold as do rules defining the conditions of the contest, the eligibility of participants, or the manner in which members of a joint enterprise shall share the responsibilities and the benefits of the total venture." 468 U.S. at 117. Indeed, the Court held that, because its broadcast rules increased price and reduced output, "[u]nder the Rule of Reason," the NCAA faced "a heavy burden of establishing an affirmative defense which competitively justifies this apparent deviation from the operations of a free market." *Id.* at 113; *see also Law v. Nat'l Collegiate Athl. Ass'n*, 134 F.3d 1010, 1024 (10th Cir. 1998) (applying rule of reason in in finding NCAA coach compensation limits unlawful).

In *American Needle*, the Supreme Court held, "Although two teams are needed to play a football game, not all aspects of elaborate interleague cooperation are necessary to produce a

---

approach—or "quick look." It held that "when there is an agreement not to compete in terms of price or output, 'no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement.'" 468 U.S. at 109 (citing *Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978)). "[T]he rule of reason can sometimes be applied in the twinkling of an eye." *Id.* at 109 n.39 (quoting Phillip Areeda, *The "Rule of Reason" in Antitrust Analysis: General Issues* (F.J.C., June 1981), at 37–38). Given the open and explicit nature of Defendants' agreements, the Court may similarly conclude that they are anticompetitive under the quick-look doctrine.

[44] For example, in *BMI*, the Court recognized that rival owners of copyrights in songs could legitimately agree to market them under a blanket license with a set price, but critical to its determination was that the blanket was not exclusive—"there was no legal, practical, or conspiratorial impediment to … obtaining individual licenses." 441 U.S. at 24. The Court also remanded for consideration under the rule of reason of whether it was unreasonable for defendants themselves to refuse to offer other packages. *Id.* at 24-25.

35

game. Moreover, even if leaguewide agreements are necessary to produce football, it does not follow that concerted activity in marketing intellectual property is necessary to produce football." 130 S. Ct. at 2214 n.7.

Defendants here do not offer *any* procompetitive justification for these restraints. They do not claim, for example, that they are necessary to promote a level of competitive balance that increases the market for their programming.[45] Nor, indeed, do they argue that these restrictions are necessary to produce the product (as discussed below, they argue only that *some* cooperation is necessary to produce telecasts, but do not argue that the exclusive territorial system is itself necessary). Agreements to restrict price and output "require[] some competitive justification," and Defendants have offered none. *NCAA*, 468 U.S. at 110.

### b. League Defendants Cannot Escape Antitrust Scrutiny by Labeling Restrictive Agreements "Core Activities"

Once again seeking to avoid having to justify their restraints as beneficial to consumers under the rule of reason, the NHL and MLB defendants (except for the New York Rangers) have now manufactured a theory that "core activities" that are "central to and inherent in a league" are entirely immune from a judicial determination that the agreements unjustifiably raise prices or reduce output. Defs. Mem. at 47. Because Defendants argue that broadcasting practices are "core activities," under their theory, *all* restrictions on broadcasting, no matter the effect on competition, "cannot form the basis for an antitrust claim." (*Id.*) There is no basis for this theory.

---

[45] Nor could they. The agreements here cement in place a dramatic *imbalance* in the ability of clubs to generate revenue. Small-market clubs are locked into television markets that are small fractions of the size of large markets, with no ability to compete more broadly. Revenue-sharing programs are largely designed to correct precisely the imbalance that these restricted territories create. *Cf. NCAA*, 468 U.S. at 119 ("The television plan is not even arguably tailored to serve such an interest. It does not regulate the amount of money that any college may spend on its football program, nor the way in which the colleges may use the revenues that are generated by their football programs, whether derived from the sale of television rights, the sale of tickets, or the sale of concessions or program advertising.").

### 1.  *Dagher* Does Not Support Defendants' Novel Theory

Sweeping aside "more than a century of settled joint venture case law," MSG Br. at 3, Defendants cite language in *Texaco Inc. v. Dagher*, 547 U.S. 1 (2006), as the lone precedential basis for their position. *Dagher* has no application here. In that case, two firms created a joint venture that *fully* consolidated their gasoline refining and marketing operations. At issue was whether selling gasoline by the joint venture was price-fixing that amounted to a *per se* violation of the antitrust laws. Accepting for purposes of its decision that the joint venture was legitimate, the Supreme Court held that the price setting was not subject to *per se* condemnation, for it was nothing more than the new, unitary entity setting prices of the products it produced and sold. *Id.* at 7-8.[46]

The holding in *Dagher* is that the joint venture's price setting was not a *per se* violation; instead, "respondents should have challenged it pursuant to the rule of reason." 547 U.S. at 7. Plaintiffs here are not asserting that the agreements at issue are *per se* violations, so *Dagher* has no application. *See supra*, note 43.

Moreover, in *Dagher*, it was crucial that the firms created a unitary entity that fully consolidated all of the production and distribution of the product at issue. Because the joint venture was a fully unified entity, the Supreme Court held that "the pricing policy challenged here amounts to little more than price setting by a *single entity*." 547 U.S. at 6 (emphasis added).

In *American Needle*, the Court made clear both: (1) that sports leagues are *not* single entities and (2) that full integration was critical to *Dagher*. *See* 11 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1906a, at 262 (3d ed. 2011) ("*Dagher* should not be read … broadly, as the subsequent *American Needle* decision makes clear."). For in *American Needle*, the Court determined that the basic licensing activities conducted by NFL Properties, an analog

---

[46] The plaintiffs in *Dagher* did not challenge the legitimacy of the joint venture and, in fact, the government had approved it. *Id.* at 4.

to NHLE and MLBE, were properly viewed as concerted activity among the clubs, unlike in *Dagher*, because the clubs, which controlled NFLP, remained potential competitors with their own interests. The Court concluded, "In making the relevant licensing decisions, NFLP is therefore 'an instrumentality' of the teams." 130 S. Ct. at 2215. These licensing decisions would be "core" activities of the joint venture under Defendants' reading of *Dagher*—they were decisions how and to whom to sell the product that the joint venture was formed to market—but the Supreme Court found them subject to antitrust analysis as concerted activity in *American Needle*. *Id.*

To accept Defendants' theory would be to erase decades of settled law. *NCAA* would have to be implicitly overruled, for example, for the "exhibition" of college football games on television is no less a core activity of the NCAA than are the telecasts of the leagues here. The Sports Broadcasting Act would be unnecessary, and its limitations would be irrelevant, because the leagues could enter into any broadcast arrangements they pleased. *Dagher* would also have to be understood to have overruled the *BMI* decision *sub silentio*, as the Court's insistence there on rule-of-reason analysis of restraints on the "core" product sold by BMI would have to be rejected.

### 2. The Broadcast Activities of the Teams Are Not Activities of Any Joint Venture

"Core activities," as used in *Dagher*, are properly understood to refer only to agreements, like the fixing of a price of a product sold by a single entity, that are inherently necessary to the legitimate purpose of a joint venture. But even under a more expansive interpretation of *Dagher*, the broadcast practices at issue could not be "core activities" of any league-based joint venture. Most games are telecast pursuant to transactions between the *individual* clubs and their chosen RSN partners. They are not produced and sold by a joint venture at all. The only sense in which these telecasts are related to a joint venture is that the leagues—which are nothing but

associations of the club owners—impose anticompetitive restrictions on the clubs that the RSNs

agree to join. In no sense is it a "core activity of the joint venture itself" as it is *not an activity of*

*a joint venture at all*. As MSG notes, "*Dagher* simply has no application to a venture's

restrictions on the separate activities of its members." MSG Br. at 21.

### 3. The "Core Activities" Theory Is Inconsistent with the Leagues' Past Positions

Defendants' novel "core activity" claim is also inconsistent with positions the leagues

have previously taken. As discussed, both MLB and the NHL long accepted that the Sherman

Act applied to their television practices and, in particular, that *NFL I* applied.

Baseball, for its part, has repeatedly argued that broadcasting is *not* a fundamental aspect

of baseball, when defending its special antitrust exemption.[47] In his brief to the Supreme Court in

*Flood v. Kuhn*, for example, Commissioner Kuhn stressed that the exemption did not provide

broad immunity from the antitrust laws, but only applied to "essential sports aspects and

practices." Br. of Resp'ts at 29-30, *Flood v. Kuhn*, 407 U.S. 258 (1972) (No. 71-32), 1972 WL

125826. He then clarified: "no broad principles are at stake here. The issue is simply whether this

Court should abandon its historic position that the *structure and rules of baseball* are not subject

to the antitrust laws." *Id.* at *30 (emphasis added). The Commissioner emphasized that baseball

had consistently taken this narrow view, citing a 1964 letter of Paul Porter, counsel for the

commissioner, to Commissioner Frick as an example.[48] *Id.* at *29. Mr. Porter urged that the

exemption should be understood to apply only to "essential sports activities" and not "broadcast

---

[47] MLB has not asserted its antitrust exemption as a basis for dismissing the complaint.

[48] Other examples include baseball's position before the Court in *Toolson*, in 1953. A central
issue there was the rise of broadcasting of baseball games, which all parties agreed was interstate
commerce. The question was whether that commerce was sufficient to make baseball itself
interstate commerce under the antitrust laws. Baseball argued that "the business of exhibiting
professional baseball games" was separate from broadcasting, so the fact that broadcasting was
interstate commerce did not alter the local character of baseball itself. Br. of Resp'ts at 13, 41-54,
*Toolson v. N.Y. Yankees*, 346 U.S. 356 (1953) (No. 53-18), 1953 WL 78318.

aspects."[49] To adopt Defendants' view here would therefore be to recognize a new antitrust exception for *all* major sports leagues that is far *broader* than even MLB's own understanding of its antitrust exemption.

### c. Teams Own the Initial Rights to the Telecasts

Defendants contend that the clubs cannot conspire as to "out-of-market" rights because they do not own them and never did. This is false. The initial rights to televise games are held by the individual clubs. The clubs either retain those rights or transfer them to the league. If it were true that the clubs had transferred all of their rights in "out-of-market" games to the leagues, then that would simply be a consequence of the manner in which they have unlawfully divided the market, as the leagues' "out-of-market" rights would be defined entirely in terms of the unlawful exclusive territories at issue, and would exist only as a result of agreement between the clubs. "[C]ompetitors 'cannot simply get around' antitrust liability by acting 'through a third-party intermediary or "joint venture".'" *Am Needle*, 130 S. Ct. at 2215-16 (quoting *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 335 (2d Cir. 2008) (Sotomayor, J., concurring in judgment)).

In any event, the materials cited by Defendants do not show that the leagues own any such rights.[50] The NHL Constitution shows that the *home team*—not the league— has ownership

---

[49] "Background Memo on CBS Acquisition of Yankees," Oct. 7, 1964, contained in *Professional Sports Antitrust Bill—1965: Hearings on S. 950 before the Subcomm. on Antitrust and Monopoly of the Comm. on the Judiciary, U.S. Senate*, 89th Cong., 1st Sess. 159-61 (1965) (Diver Decl. Ex. 5). This was a central concern of both the Porter letter and the Senate hearings, as CBS television's purchase of the New York Yankees placed the issue of the application of antitrust laws to baseball broadcasting front and center.

[50] Defendants' reliance on *Washington v. National Football League*, No. 11-3354, 2012 WL 3017961 (D. Minn. June 13, 2012), is misplaced. The court found that the plaintiffs really had disputes about copyrights, "and no amount of legal tongue-twisting will turn their claims into antitrust claims." *Id.* at *3. Moreover, the court there specifically found that the *NFL* owned the rights to the film footage in question. The NFL employs a different model for broadcast and film rights than do the leagues in these cases, under which all such rights are transferred to the league pursuant to the SBA.

40

of all broadcast rights in a game.[51] And the MLB constitution affirmatively shows that the league does *not* own the rights to the broadcasts. Instead, the Commissioner is the *agent for selling the clubs' rights* on their behalf.[52] This structure is indistinguishable from that in *American Needle*, where football clubs agreed to license their trademarks exclusively through the NFL's commercial entity. Just as, in that case, "decisions by the NFLP regarding the teams' separately owned intellectual property constitute concerted action," decisions by the leagues acting with respect to the clubs' broadcast rights here constitute concerted action. 130 S. Ct. at 2215.

### d.  The Challenged Restrictions Are Not Necessary to Produce Telecasts

Defendants further argue that, even if the agreements are not necessary to produce baseball and hockey games, they are necessary to produce live game *telecasts*. Yet teams produced radio and television broadcasts without any league restrictions for many years. The teams—not the league—own the video rights in first instance, so there is no need for league intervention. Before the Sports Broadcasting Act, the clubs themselves freely entered into both local and national television contracts without league restriction, and the clubs continue to enter into their own contracts involving their own rights.

Moreover, even if *some* agreements were needed to produce a telecast, it would not follow that leagues would have the right to impose any kind of restrictions at all, no matter how restrictive of competition. The particular "restraint on competition" at issue itself must be "essential" to make the product available to be justified under this rule. *Am. Needle*, 130 S. Ct. at 2216. A restraint is not essential if a less restrictive alternative exists. *See Gen. Leaseways*, 744

---

[51] "4.4 *Property Rights of Home Club.* Each member hereby irrevocably conveys, grants and assigns forever all right, title and interest which it has or may have in and to each hockey game played by its team as a visiting club and in the news of said game … to the member in whose home territory said game is played." Eckles Ex. 4.

[52] The baseball constitution contemplates that clubs grant to the commissioner, "acting as their agent, the right to sell, on their behalf, throughout the United States …." Art X § 4. Ostertag Ex. 1 at 14.

F.2d at 595 (rejecting restriction where "some degree of cooperation" was appropriate, but "no reason has been suggested why that cooperation requires that members be forbidden to compete with each other").

Defendants' theory is flatly inconsistent with *NCAA*. They contend, citing *Association of Independent Television Stations, Inc. v. College Football Ass'n*, 637 F. Supp. 1289, 1296 (W.D. Okla. 1986), that because some cooperation is needed to televise collegiate football games, such arrangements are permissible "as a matter of law." Defs. Mem. at 52. But if that were true, the agreements rejected in *NCAA* would equally need to be upheld as necessary, rather than unlawful restrictions on competition, as the Court held.[53]

Defendants have made no attempt to show that their particular restrictive agreements are essential to produce telecasts, as *NCAA* requires. Nor could they. There is no conceivable reason that a telecast of a game involving two teams is only possible if all *other* teams' telecasters agree not to compete with that telecast. In any event, it certainly cannot be established that these agreements are necessary on the pleadings.

## IV.   THE TELEVISION DEFENDANTS ARE VIOLATING THE SHERMAN ACT

To make the argument that they are not part of any conspiracy, the television defendants mischaracterize the structure of the schemes. The RSNs do not "pass through" what they purchase from the clubs, they *produce* the products that are purchased by consumers and are subject to the territorial restrictions. The market divisions occur at the retail level, when the MVPDs implement and enforce the unlawful restrictions. The conspiracies are not to fix prices of the clubs' rights or RSNs' fees, but to divide the *consumer* markets for live sports *programming*.

---

[53] Moreover, *Independent Television Stations* merely held that "some cooperation" was necessary to produce college football broadcasts and that the agreements there at issue could not, therefore, be condemned as *per se* violations on a motion for summary judgment. 637 F. Supp. at 1296. It provides no support for Defendants' expansive theory of immunity.

### a.  The RSNs Have Conspired to Divide the Market

As Defendants describe it, the clubs sell their "games" to the RSNs, which resell "games" to the MVPDs, which resell them to the viewers. This is simply untrue: clubs do not sell *games*, they sell *rights*, which are used by RSNs to produce video presentations of those games. Viewers do not purchase either games or rights, any more than they purchase players. They purchase video *programming*, which is produced and sold subject to anticompetitive agreements *by the RSNs*. The RSNs' production of programming pursuant to rights that they purchase is not reselling, any more than a movie producer "resells" books when it markets a movie based on a book.[54] A purchase of rights in this context is nothing more than an agreement governing the RSN's ability to produce and distribute its product: live sports programming.

These agreements contain market-dividing geographical limitations. Root Sports has agreed, for example, that it will distribute Pittsburgh Penguins hockey programming only within the defined territory surrounding Pittsburgh. Its inability to sell its programming for distribution elsewhere would be inexplicable were it not for the fact that Root Sports knows that, for example, Comcast Sportsnet Philadelphia had likewise agreed not to sell Philadelphia Flyers programming in Pittsburgh.

The fact that the clubs have a central role in orchestrating this horizontal agreement does not alter its character. Multilevel conspiracies are nothing new. In *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939), the Supreme Court affirmed a finding that the owner of a movie theater was liable for its role in a horizontal conspiracy among film distributors where it sent letters to film distributors proposing that they impose conditions on other theaters setting minimum prices. The Court agreed that it was proper to infer agreement among the distributors themselves because "[e]ach distributor was advised that the others were asked to participate;

---

[54] There is no reason in theory the RSN could not resell rights to another program producer, but that would be a different type of transaction entirely.

each knew that cooperation was essential to successful operation of the plan." *Id.* at 226; *cf. United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 167 (1940) (conspiracy involving major oil companies, independent refiners and others in complex, multilevel conspiracy to fix retail gasoline prices).

Similarly, in *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000), the Seventh Circuit, per Judge Diane Wood, affirmed a Federal Trade Commission ruling that Toys "R" Us was liable for orchestrating a horizontal agreement among major toy manufacturers. Rejecting Toys "R" Us's argument that there was only a series of vertical agreements between Toys "R" Us and the manufacturers, the court found that the evidence was sufficient to establish that "the only condition on which each toy manufacturer would agree to TRU's demands was if it could be sure its competitors were doing the same thing. That is a horizontal agreement." *Id.* at 936.

Recently, in *Electronic Books*, this Court, per Judge Cote, held that Apple, which sells e-books through its online store, can be liable for an inferred horizontal agreement between book publishers that resulted from its contractual dealings with the publishers. The court concluded, "Apple and the Publisher Defendants' agreement in restraint of trade is unlawful *per se* because it is, at root, a horizontal price restraint." 2012 WL 1946759 at *14; *see also Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 72 (2d Cir. 1988) (finding that a tennis sanctioning body, through its alleged agreements with independent tournament owners, "agreed to restrain competition among the owners and producers of sanctioned events," and could consequently be held liable for the resulting horizontal agreement.)

Here, each RSN plainly understood that it was getting a regional monopoly in exchange for an agreement to respect other RSN's regional monopolies. In the words of the NHL, "Blackout restrictions exist to protect the local telecasters of each NHL game in the local

markets of the teams."[55] As in *Toys "R" Us*, "[t]hat is a horizontal agreement." 221 F.3d at 936.

Even when the focus is on the horizontal agreement at the club level, the RSNs are still liable, as their role in carrying out the clubs' division of the market is not innocent. They have expressly agreed with their club partners to participate in the schemes to divide the markets for their products. Whether the RSNs are seen as horizontally conspiring, as agreeing to carry out the clubs' horizontal conspiracies, or as being in a partnership with a club that conspires with other such partnerships, the result is the same: the RSNs have agreed to join schemes in which the markets for live baseball and hockey telecast produced by those RSNs are divided horizontally by geography in order to "protect" the RSNs themselves from competition.

The RSNs suggest that they are merely exclusive distributors, which are generally allowed because they often promote *interbrand* competition. *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 53 (1977). But Plaintiffs are not challenging the exclusivity of the relationship between a single club and its RSN (which are not, in any event, "distributors"). The Pittsburgh Penguins are entitled to enter into an exclusive relationship with Root Sports to produce Penguins programming, just as they are entitled to enter into a non-exclusive relationship. They may even be entitled to enter into an agreement to limit Root's distribution geographically so long as that decision is unilateral, and not made pursuant to an agreement not to compete. In any event, the exclusive arrangements here could not possibly encourage interbrand competition, between the clubs, because the distributor for each club is prevented from competing with other brands entirely.[56] When the clubs and the RSNs mutually agree not to compete with one another, they do not promote competition between the clubs' brands—they eliminate it.

---

[55] http://www.nhl.com/ice/page.htm?id=26371.
[56] The exclusivity has no plausible connection to competition between a club and teams in other sports, or other forms of entertainment, as the RSNs are exclusive only with respect to the other clubs in that league. Moreover, as discussed below, there are no interchangeable substitutes for baseball and hockey programming.

**b.  The MVPD Defendants Are Active Participants in, and Directly Benefit from, the Multilevel Conspiracies Challenged in the Complaints**

Comcast and Directv are also active participants in the challenged schemes in two distinct ways. *First*, they directly and actively control their subsidiary RSNs in the very matters that are the subject of this lawsuit. In fact, Comcast and Directv are both subject to FCC orders requiring that they refrain from unfair practices with respect to the RSNs they control because of their history of using RSNs to benefit the parent MVPDs, rather than allowing the RSNs to conduct their own business for their own interests.[57] *Second*, the MVPDs are the only parties that can actively implement the geographical divisions for television programming. In the digital television era, the parties now need the MVPDs to block their customers from receiving signals that would otherwise reach them—and the MVPDs have agreed to do just that. In return, the MVPDs are the direct beneficiaries of restrictions that prevent Internet streaming of local games, which can *only* be viewed with a subscription from an MVPD like Comcast and Directv.

**1.  Comcast and Directv Actively Control RSNs that Conspire Horizontally**

Comcast and Directv both directly control decisions about what major-sports programming their subsidiary RSNs will carry, to whom they sell it, and at what price. Comcast has a long history of using its control over RSNs for its own benefit. Most notably, it has refused to offer its Philadelphia RSN to satellite providers—including Directv, which has repeatedly complained of these actions—in order to give Comcast itself a competitive advantage. Comcast has never denied that this was its decision. Nor could it, as no rational RSN acting in its own interests would refuse to provide its programming to a distributor of the size of Directv. The FCC has now specifically required that Comcast share all of its RSNs on non-discriminatory bases. In 2011, the FCC reiterated that this condition was still necessary, based on its past

---

[57] *Comcast Corp.*, 26 F.C.C.R. 4238, 4258, 4295 (2011); *News Corp. & the Directv Group, Inc.*, 23 F.C.C.R. 3265, 3268 (2008).

behavior and existing incentives. *Comcast*, 26 F.C.C.R. at 4258.

Like Comcast, Directv is subject to orders specifically requiring that it share its RSN programming with rival MVPDs on fair terms. *See* note 57, *supra*. No such orders would be required if the RSNs were acting independently and the parents were simply purchasing and reselling their products.

The distributors control all of the important decisions of their RSNs. They obtain the exclusive sports programming rights and create the RSNs to produce the programming.[58] The prices of RSNs controlled by MVPDs are consistently higher than other RSNs, because such pricing helps the parent, even if it makes the RSN less competitive. *Comcast*, 26 F.C.C.R. at 2399. The MVPDs, in other words, control the very transactions at issue in this case.

### 2.   Comcast and Directv Carry out the Restrictions on Competition

In addition to controlling their RSNs' participation in the anticompetitive horizontal agreements, Comcast and Directv play a direct and necessary role in their execution. RSNs are free to compete for any club's broadcast rights, regardless of their location. Similarly, in the transaction between the RSNs and Comcast and Directv, geography is irrelevant. Geography matters here only when the MVPDs provide the programming to customers. Comcast and Directv actually send the signals that carry live-game programming nationwide, but block their customers from viewing the programming in order to carry out the restrictive agreements.

The television transactions that are directly subject to anticompetitive restrictions, therefore, are the ones to which Plaintiffs and the members of the television class are parties. The upstream agreements are aimed at dividing the territories for *consumer* transactions. Comcast

---

[58] For example, Comcast acquired the rights to Houston Rockets basketball games and Houston Astros baseball games prior to the existence of the Houston Sportsnet that it is creating. *See* John Ourand, *Comcast close to Houston TV rights deal*, Sports Business Journal, May 24, 2010, available at http://www.sportsbusinessdaily.com/Journal/Issues/2010/05/20100524/This-Weeks-Issue/Comcast-Close-To-Houston-TV-Rights-Deal.aspx.

and Directv are not incidental to this scheme, they are central to it. They turn what are merely unlawful agreements into anticompetitive market distortions that benefit all Defendants at the expense of consumers. The market division is not completed until Comcast and Directv prevent viewers from watching telecasts.

Moreover, specific elements of the scheme are designed to protect the MVPDs. The MVPDs have the greatest interest in suppressing the distribution of games on the Internet, as the clubs and RSNs could just as easily distribute their product over the Internet and collect revenue in that way. For this reason, the system requires not only that a consumer subscribe to the appropriate RSN to get the games in question, but requires that the RSN games be obtained only through the MVPDs. No RSN is available on the Internet as a complete channel. And where RSNs have offered to webcast the games locally, as the Yankees still do (and the San Diego Padres previously did), they require that the consumer subscribe to the RSN through an MVPD, ensuring the MVPDs do not lose any customers to competition. The Yankees and its RSN, the YES Network, both stand to derive revenue from sales to people without pay-television subscriptions, but they have agreed to forgo these sales to ensure that no such sales are at the expense of Directv, Comcast, and the other MVPDs that participate in the program.

Indeed, because Directv and Comcast are responsible for the exclusionary behavior of their RSNs *and* implement the restrictive schemes at the retail level, they bear at least as much responsibility as the other RSNs in the division of the programming market. Comcast's and Directv's involvement in the conspiracies is complete and their fault is more than "substantially equal." *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 830 F.2d 716, 720-23 (7th Cir. 1987). Consequently, they would be prevented, as a matter of law, from bringing an action against the RSNs. *See id.*; *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310-11 (1985) (applying antitrust case law to securities case and holding that plaintiff is barred from

challenging conduct "where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public").

## V.   ALL PLAINTIFFS HAVE STANDING AND ARE APPROPRIATE PLAINTIFFS TO CHALLENGE THESE ANTICOMPETITIVE SCHEMES

Defendants challenge the standing of some, but not all, of the plaintiffs to seek damages in these cases. In particular, Defendants contend that the television plaintiffs—Fernanda Garber, Robert Silver, and Peter Herman—lack standing because they purchased programming from Comcast and Directv, rather than from the RSNs or league defendants. Defendants thus claim that these plaintiffs are "indirect purchasers." They do not challenge the standing of the Internet plaintiffs, Thomas Laumann, Marc Lerner, and Derek Rasmussen, to seek damages.[59]

Given the structure of the conspiracies, Defendants' standing argument makes no sense. Comcast and Directv are active participants in the conspiracies, and directly control their subsidiary RSNs with respect to the very transactions at issue in this case. They would not and could not sue their own subsidiaries for these practices. Consequently, customers of Directv and Comcast are the proper plaintiffs for challenging these agreements.

### a.   Directv and Comcast Directly Control Their Subsidiary RSNs

In *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), the Supreme Court held that, in most cases, only the "direct purchaser" of a price-fixed product was a proper plaintiff to recover damages under the antitrust laws. In that same opinion, however, it recognized certain exceptions that may apply where the direct purchaser was not a proper plaintiff, including "where the direct

---

[59] Because all Defendants are conspirators, a finding that the television plaintiffs did not have standing would not result in the dismissal of any Defendants, each of which would still be jointly and severally liable to the Internet plaintiffs. *See, e.g., Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 632 (7th Cir. 2002).

purchaser is owned or controlled by its customer." 431 U.S. at 736 n.16. Plaintiffs allege that the market manipulation occurred at the retail level, so they are direct purchasers of the fixed product. But even viewed as indirect purchasers, they have standing under the control exception.

"The 'ownership or control' exception is now firmly established and has been expanded to include instances where the defendant owns or controls the intermediary that sold the goods to the indirect-purchaser plaintiff." *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 101 (E.D.N.Y. 2012); *see also Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1146 (9th Cir. 2003); *Brand Name Prescrip. Drugs Antitrust Litig.*, 123 F.3d 599 (7th Cir. 1997); *Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323, 326 (9th Cir. 1980); *In re Chicken Antitrust Litig.*, 669 F.2d 228, 229 (5th Cir. 1982); *In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13, 18-19 (3d Cir. 1978); *In re G-Fees Antitrust Litig.*, 584 F. Supp. 2d 26 (D.D.C. 2008). Where it applies, "[t]he indirect purchaser has obviously borne all of the loss; denying relief would insulate the violator from suit." 2A Areeda & Hovenkamp, ¶ 346f.

Here, all but two of the Defendant RSNs are subsidiaries of Defendants Comcast and Directv. "A division of a corporation is not a separate entity but is the corporation itself. Although the subsidiary does have a separate legal existence, it is owned by the parent company, and would not ordinarily sue it." *Sugar*, 579 F.2d at 18. In clear contrast to the leagues, the MVPDs and their RSNs operate as "single entities." Comcast's and Directv's RSNs are "division[s] within a corporate structure [that] pursue[] the common interests of the whole." *Copperweld*, 467 U.S. at 770; *Am. Needle*, 130 S. Ct. at 2212. Consequently, the acts of the RSNs and their parents are "really unilateral behavior flowing from decisions of a single enterprise." *Id.* Here, the case is especially strong, as the *distributors* are the ones calling the shots in the conspiracies. Thus, Plaintiffs purchased directly from the defendants who are driving

their companies' participation in the conspiracies.[60]

Defendants do not seriously contest Plaintiffs' allegations of control, which must, in any event, be accepted as true at this stage.[61] *See, e.g.*, *G-Fees*, 584 F. Supp. 2d at 34 (finding allegations sufficient to permit inference of control). As noted above, not only do the complaints adequately allege such control, the fact of control is clear. The FCC's orders binding Comcast and Directv are predicated on it. It is clear that Comcast and Directv control the RSNs' contracts with the clubs, their decisions on which MVPDs to do business with, and at what price—the very matters at issue in this case.

Under the circumstances, it is inconceivable that Comcast and Directv would sue their own subsidiaries. If they did, they would be challenging *the very agreements and transactions that they actively controlled*. Consequently, whether the distributor defendants' ownership of the RSNs is enough, or whether a showing of "functional economic or other unity" is required, *e.g.*, *Vitamin C*, 279 F.R.D. at 101, the requirements for the control exception have been met, especially for purposes of a motion to dismiss the complaints.

Defendants again rely on *Kingray* to support their position that Plaintiffs lack standing. But when *Kingray* was decided, Directv had no interest in any RSN or other defendant in that case. There was no reason that Directv could not have challenged the horizontal division of the market at that time.[62] Moreover, the plaintiffs there did not name the RSNs as defendants or allege a conspiracy among them.

Defendants incorrectly characterize both the RSNs and distributors as "middlemen." The

---

[60] As Judge Posner has noted, there is no reason that the same reasoning does not also apply when the direction of control is reversed. *Brand Name Drugs*, 123 F.3d at 605.

[61] Directv claims in a footnote that Directv's corporate structure is such that Defendant Directv LLC does not directly own or control the RSNs, but it does not appear to dispute the adequacy of the allegation at this stage. In any event, common corporate control is beyond serious dispute.

[62] The same is true of *Durkin v. Major League Baseball*, No. 94-5315 (E.D. Pa. July 17, 1995), which Defendants attach as an exhibit to the Declaration of Paul M. Eckles.

RSNs are not middlemen. They are not resellers. They produce the products that are the subject of the conspiracies and have entered horizontal agreements not to compete with each other. The relevant control relationship here is that between the distributors and their RSNs.

Because Comcast and Directv own and control several of the defendant RSNs, they could not be plaintiffs in a suit challenging the RSNs horizontal agreements in restraint of competition. Consequently, their customers are the correct and only plaintiffs able to challenge these practices as to the programming distributed by Comcast and Directv.[63]

### b.  Comcast and Directv Are Co-Conspirators

Apart from their control of their subsidiary RSNs, Comcast and Directv are also critical participants in the conspiracies, as described above. The geographical division of the markets could not happen if the distributors did not implement the scheme, by blacking out programming that viewers could otherwise view. These are not "conclusory" allegations representing speculation about possible agreements. The distributors have entered into explicit contracts with the RSNs to implement the scheme to prevent competition.[64]

The television plaintiffs are direct purchasers from members of the conspiracies, Directv and Comcast. "The first buyer from a conspirator is the right party to sue." *Nippon Paper*, 281 F.3d at 631. As Judge Easterbrook noted, "The right to sue middlemen that joined the conspiracy

---

[63] Defendants suggest that "apportionment" difficulties counsel against application of the control exception. The only "apportionment" issue that is relevant to the *Illinois Brick* analysis is that between the consumers and the distributors, and because the distributors are beneficiaries, not victims, and would not be appropriate parties to challenge these practices, there is no such issue.

[64] Defendants contend that the television plaintiffs need to name *all* of the conspirators in order to assert this basis for standing. But as the very language Defendants quote makes clear, that requirement is only that plaintiffs name "the co-conspirators *immediately upstream* as defendants." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 370 (3d Cir. 2005) (emphasis added). Indeed, the court there found the that plaintiffs had standing (on certain claims) even though not every distributor was named. *Id.* at 377-78. Plaintiffs here have named the distributors from whom they purchased programming, which is all that would be required if the Third Circuit rule were to apply. It is a fundamental tenet of the law that conspirators are jointly and severally liable, and that plaintiffs need not sue all conspirators. *See, e.g., Nippon Paper*, 281 F.3d at 632; *Ambook Enters. v. Time, Inc.*, 612 F.2d 604, 620 (2d Cir. 1979).

is sometimes referred to as a co-conspirator 'exception' to *Illinois Brick*, but it would be better to recognize that *Hanover Shoe* and *Illinois Brick* allocate to the first non-conspirator in the distribution chain the right to collect 100% of the damages." *Id.* at 631-32. "Whether one adopts a co-conspirator exception or regards this situation as outside *Illinois Brick*'s domain," a plaintiff is properly found to have antitrust standing. 2A Areeda & Hovenkamp, ¶ 346h; *see also Vermont v. Densmore Brick Co.*, No. 78-297, 1980 WL 1846 (D. Vt. Apr. 10, 1980) ("[T]he restriction imposed in *Illinois Brick* only applies where a plaintiff suing to terminate a price-fixing conspiracy is removed from the conspiracy by one or more stages of distribution.").

The co-conspirator exception has most often been recognized in the context of retail price maintenance, but it is not the only context in which it has been recognized. *Nippon Paper*, for example, was a traditional price-fixing case among manufacturers.[65] 281 F.3d at 631. In any event, the reason that retail-price-fixing agreements are the most typical cases is that they so clearly fall outside *Illinois Brick*'s justification. When the conspiracy is directed at manipulating the price at the retail level, the initial overcharge occurs at that point, and is not passed through to anyone. *See* 2A Areeda & Hovenkamp, ¶ 346h. Whether the manufacturers can extract higher wholesale prices as a result is neither here nor there. There is no pass-through of a wholesale overcharge, because the retail price is manipulated directly. Consumers are direct purchasers of the price-manipulated product.

Similarly here, the market manipulation occurs at the retail level, where output is restricted and competition squelched. These limitations raise the prices viewers pay, which, in turn, may permit the participants up the chain to extract higher fees. But it is not a case of passing on the direct consequences of agreements not to compete, as the immediate result of those agreements occurs only at the retail stage. Whether that manipulation is in the form of

---

[65] The Second Circuit has not analyzed the contours of the co-conspirator exception.

53

direct price-fixing or market division is irrelevant. "[R]aising price, reducing output, and dividing markets have the same anticompetitive effects." *Gen. Leaseways*, 744 F.2d at 594-95.

Consequently, whether or not the co-conspirator exception is construed as applying only to retail price manipulation or not, it applies here.[66] The television plaintiffs are the "first non-conspirator[s] in the distribution chain," and consequently have "the right to collect 100% of the damages" involving sales by Directv and Comcast. *Nippon Paper*, 281 F.3d at 632.

Again, Defendants invoke *Kingray*, and again, *Kingray* is inapposite. The court there considered two potential bases for Directv's involvement. *First*, it addressed the contention that Directv had conspired with the NHL to fix the retail price of NHL Center Ice. It found that the plaintiffs had not adequately alleged such a conspiracy. Slip Op. at 10. Plaintiffs here do not allege that the NHL or MLB conspired with Directv or Comcast to set a fixed retail price of NHL Center Ice or MLB Extra Innings. *Second*, it considered whether Directv was a horizontal participant in a conspiracy with the NHL teams, which it found to be impossible, as it was not a potential competitor with the clubs. *Id.* at 17. Again, in *Kingray*, the RSNs were not named as defendants or co-conspirators, and there was no allegation of a horizontal conspiracy among RSNs that Directv expressly agreed to implement or otherwise had a role in.[67]

### c. The Television Plaintiffs Have Suffered Direct Injury

Defendants separately argue that the television plaintiffs lack antitrust standing because their injuries are too remote from the alleged misconduct, citing *Associated General Contractors*

---

[66] Even if the Second Circuit were to adopt the minority rule that that only "truly complete" middlemen participants in a conspiracy could be "co-conspirators," and the Court determined that Plaintiffs were indirect purchasers, that requirement would be easily met, as discussed. The MVPDs are responsible for the exclusionary conduct of their RSNs and for their own exclusionary conduct, making them more culpable than other RSNs. Moreover, the agreements contain provisions whose chief purpose and effect is to benefit MVPDs by protecting them from competition. They would thus be precluded from bringing a challenge to the division of the programming market against the RSNs.

[67] Even if the *Kingray* holding were applicable, it is, of course, of no precedential weight.

*of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 540-45 (1983)

("*AGC*"), which establishes the "efficient enforcer" rule. *See In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009). The television plaintiffs would plainly be efficient enforcers here, as they are not only purchasers of the product at issue—live baseball and hockey programming—they are the *only* purchasers who could act as enforcers as to the injuries suffered by the television classes.[68]

The Second Circuit has recognized four factors in assessing whether a plaintiff is an efficient enforcer under *AGC*:

> (1) the directness or indirectness of an asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.[69]

*DDAVP*, 585 F.3d at 688 (quoting *Volvo*, 857 F.2d at 66).

As an initial matter, the *AGC* test is properly applied where the plaintiff is "neither a consumer nor a competitor in the market in which trade was restrained." 459 U.S. at 539. Plaintiffs are consumers, and "there is agreement that competitors and consumers constitute a baseline set of parties that generally *do* meet these tests." *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 451 (2d Cir. 2005) (Katzmann, J., dissenting in part).[70] Defendants rely on the

---

[68] Except for their argument that there is no reduction in output, Defs. Mem. at 25, Defendants do not contend that Plaintiffs' alleged injury is not "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

[69] While *AGC* may apply to standing to seek injunctive relief, certain considerations, such as identifying and apportioning damages, and the threat of duplicative recovery, would not prevent standing to seek equitable relief. *See Volvo*, 857 F.2d at 66. "[B]ecause standing under § 16 raises no threat of multiple lawsuits or duplicative recoveries, some of the factors other than antitrust injury that are appropriate to a determination of standing under § 4 are not relevant under § 16." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 n.6 (1986).

[70] There is extensive authority for this presumption. *See, e.g.*, *Ill. ex rel. Ryan v. Brown*, 227 F.3d 1042, 1046 (7th Cir. 2000); *Carpet Group Int'l v. Oriental Rug Imps. Ass'n*, 227 F.3d 62, 76-77

majority opinion in *Daniel* to support their view, but it too is consistent with the presumption the consumers are appropriate plaintiffs under *AGC*. The majority suggested that the plaintiff doctors there were likely not efficient enforcers, primarily because health insurers—the effective purchasers of the emergency-room services at issue—were the more efficient enforcers. 428 F.3d at 444.

Plaintiffs are not aware of any case in which purchasers of the very product subject to the unlawful restraints were found to lack standing under *AGC*.[71] This is not surprising, as the test for whether a purchaser is too remote to seek damages is *Illinois Brick*. It would be anomalous for a plaintiff to be found to be an appropriate plaintiff under *Illinois Brick*, but nevertheless to be too remote under *AGC*. The presumption that purchasers, like competitors, meet the test under *AGC* eliminates this potential anomaly.

In any event, Plaintiffs readily meet the requirements of *AGC*. Increasing the prices consumers pay for live-sports programming—by directly controlling the ability of those consumers to purchase programming—is the direct and intended result of the unlawful

---

(3d Cir. 2000); *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 10 (1st Cir. 1999) ("Competitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury."); *Fla. Seed v. Monsanto Co.*, 105 F.3d 1372, 1374 (11th Cir. 1997); *SAS of Puerto Rico, Inc. v. Puerto Rico Tel. Co.*, 48 F.3d 39, 44 (1st Cir. 1995) ("[T]he presumptively 'proper' plaintiff is a customer who obtains services in the threatened market or a competitor who seeks to serve that market."); *Bell v. Dow Chem. Co.*, 847 F.2d 1179, 1183 (5th Cir. 1988); *Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 809 (8th Cir. 1987); *Bhan v. NME Hosps., Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985).

[71] The cases cited by Defendants are not to the contrary. Defs. Mem. at 37-38. Two of them, *Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.*, 50 F.R.D. 13 (E.D. Pa. 1970), and *In re Antibiotic Antitrust Actions*, 333 F. Supp. 310 (S.D.N.Y. 1971), are pre-*Illinois Brick* cases wrestling with the issues subsequently addressed in *Illinois Brick*. The other, *Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291, 1301 (S.D. Cal. 2009), was a case in which the court found that the plaintiff was not "a participant in the market where [the] unlawful conduct allegedly occurred." There, the market for technology patent licenses was allegedly manipulated, which the plaintiff alleged caused the price of telecom chips to rise. These costs were passed through by telephone manufacturers to dealers, which passed the charges on the plaintiff. There was no dispute that the plaintiff did not have standing to seek damages there under *Illinois Brick*. Here, by contrast, Plaintiffs allege that the price of live-sports programming has been manipulated, a market in which the Plaintiffs are unquestionably participants.

agreements.

There are no conceptual challenges to determining damages—any more than there are for the Defendants themselves when making decisions on costs and pricing. The chains of causation are straightforward. Nor are there any issues relating to apportionment between different victims. Each consumer was individually overcharged. The task, rather, is to isolate the effects of the agreements from other pricing and output effects, just as must be done in any Section 1 case. The overcharges can be measured using well-established economic theories and models. While it is rarely easy "to account precisely for the likely effects" of unlawful agreements, uncertainty in the precise amount is not a reason to deny standing. *DDAVP*, 585 F.3d at 689. "'The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.'" *Id.* (quoting *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946)).

This is especially true where the complicating factors are of the defendants' own making. Defendants claim that their practice of bundling these channels with tens or hundreds of other channels should immunize them from antitrust challenge. Defendants cannot contend that they can obtain a license to restrict competition merely by including the restricted product in a bundle of this sort. In any event, they are sophisticated businesses that necessarily understand the effects of additional programming on the prices they set, which will provide a sound basis for determining damages. *Cf. In re Linerboard Antitrust Litig.*, 305 F.3d 145, 159 (3d Cir. 2002) (holding that purchasers of corrugated cardboard products were appropriate plaintiffs for challenge to price-fixing of linerboard, a component); *Sugar*, 579 F.2d at 18 (finding standing where "[t]he difficulty in computation here is not in parceling out damages among entities in the chain, but in isolating the excessive cost of one ingredient which goes into the product purchased by the plaintiff."). Moreover, courts have declined to dismiss claims at the pleading stage due to

potential "complex and intensely factual" damages issues absent "a more fully developed factual record." *In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp. 2d 404, 410 (D. Del. 2007); *see also Chapdelaine Corporate Sec. & Co. v. Depository Trust & Clearing Corp.*, No. 05-10711, 2006 WL 2020950, *4 (S.D.N.Y. July 13, 2006) (Scheindlin, J.) (holding that injury was not unduly speculative "[f]or pleading purposes").

Defendants suggest that Directv and Comcast and the RSNs are more appropriate plaintiffs, because they are "direct victims." They are not victims at all; they are operators and beneficiaries of the schemes and could not possibly challenge their own anticompetitive conduct in a scheme from which they directly benefit. Their customers are the only conceivable consumer plaintiffs who could challenge these agreements with respect to the transactions in which Directv and Comcast are involved, and there is no risk of duplicative recovery.[72]

In short, the television plaintiffs are the direct, intended victims of these schemes. There are no other parties who could seek to recover for the injuries at issue here. The damages are not speculative. There is no risk of duplicative recovery, and the damages are no more complicated than any number of complex price-fixing and market-division cases.[73]

---

[72] The only realistic potential plaintiffs besides the consumers are the clubs themselves, which have, as discussed, challenged their leagues on occasion. Defendants have not even suggested that they are more "efficient enforcers" than Plaintiffs, however, and for good reason. As we have seen, these challenges are few and far between and, because of the clubs' interest in maintaining the overall collusive scheme, inevitably end with settlements under which the clubs are co-opted back into the conspiracies as full participants. Moreover, because they are potential competitors, not consumers, they would be seeking lost profits, rather than compensation for overcharge. As the Second Circuit has emphasized, these are "distinct injuries." *DDAVP*, 585 F.3d at 689 (citing *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 817 (D.C. Cir. 2001). Both consumers and the clubs are appropriate plaintiffs under *AGC*. "Denying the plaintiffs a remedy in favor of a suit by competitors would thus be 'likely to leave a significant antitrust violation undetected or unremedied.'" *Id.* (quoting *AGC*, 459 U.S. at 542).

[73] The considerations relating to complexity of damages would not, of course, be relevant to a determination of the television plaintiffs' ability to seek injunctive relief.

### d. Plaintiffs Have Standing to Seek Injunctive Relief and to Seek Damages Related to MLB Extra Innings

All plaintiffs have standing to seek injunctive relief.[74] Even if the television plaintiffs were indirect purchasers who lacked standing to seek damages, they would have standing to seek injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26. *See, e.g.*, *Mid-West Paper Prods. Co. v. Cont'l Group, Inc.*, 596 F.2d 573, 594 (3d Cir. 1979); *In re Pub. Offering Antitrust Litig.*, No. 98-7890, 2004 WL 350696, *8 (S.D.N.Y. Feb. 25, 2004).

All plaintiffs are likely to purchase television and sports programming in the future, and defendants have given no indication that they intend to cease the challenged practices.[75] *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969) (standing to seek injunction where there is "a significant threat of injury from … a contemporary violation likely to continue or recur."). They need not be current subscribers. In any event, Defendants are incorrect that none of the television plaintiffs is a current subscriber. Peter Herman continues to subscribe to Directv, and plainly has standing to seek injunctive relief.[76]

Plaintiffs also intend to seek to amend their complaints to add new plaintiffs, including Garrett Traub, a subscriber to Comcast. He has also subscribed to MLB Extra Innings, which eliminates any concern that the plaintiffs do not adequately represent those who overpaid for that product.

## VI. PLAINTIFFS HAVE PROPERLY ALLEGED RELEVANT PRODUCT MARKETS

Defendants incorrectly maintain Plaintiffs have failed to plausibly allege a relevant product market by "fail[ing] . . . [to] propose [a] relevant market with the rule of reasonable

---

[74] Defendants admit that Thomas Laumann has standing to seek injunctive relief.

[75] The complaints allege that Plaintiffs will be harmed by these practices in the future. *L* ¶¶ 106, 112, 118, 122; *G* ¶¶ 112, 118, 124, 128. In any event, given the nature of the products at issue, it is a matter of common sense that Plaintiffs are likely to participate in these markets in the future.

[76] Herman is currently a plaintiff only in *Laumann*, but would be added to the *Garber* case as part of the potential amendments.

interchangeability and cross-elasticity of demand." Defs. Mem. at 56. Plaintiffs have explicitly stated that there are no interchangeable substitutes for the relevant markets they defined. Specifically, Plaintiffs define the relevant product markets as the "live video presentations of major league [baseball and hockey] games." Each league's games lack "close substitutes," there are "high barriers to entry," and "[w]atching … cannot be reasonably interchanged with watching … other sports or other leisure activities." *L* ¶¶ 51- 53; *G* ¶¶ 54-56.

Defendants complain that these are "bald" allegations. Yet MSG and the Rangers have made essentially the same allegations. MSG alleged in its Amended Complaint, for example, "There are peculiar and unique characteristics that set major league men's professional ice hockey apart from other sports and leisure activities. Close substitutes do not exist, and watching (or participating as a fan in) major league men's professional ice hockey is not reasonably interchangeable with watching (or participating as a fan in) other sports or other leisure activities," and defined their relevant market "as the provision of major league professional ice hockey contests in North America." MSG Am. Compl. ¶¶ 29-32.

Similarly, the Yankees stated in their complaint against MLB that "Major league baseball has supply and demand characteristics sufficiently distinct from the supply and demand characteristics of other baseball exhibitions and other sporting events so that at reasonably competitive prices major league baseball has no reasonably close substitutes and constitutes a separate market." NYY Compl. ¶ 89.

Product markets have long been recognized to be confined to particular leagues of individual sports.[77] In *NCAA*, for example, the Supreme Court recognized that intercollegiate

---

[77] *See, e.g.*, *Fishman v. Estate of Wirtz*, 807 F.2d 520, 531 (7th Cir. 1986) (professional basketball); *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1393 (9th Cir. 1984) (professional football); *Metro. Intercollegiate Basketball Ass'n v. Nat'l Collegiate Athl. Ass'n*, 339 F. Supp. 2d 545, 550 (S.D.N.Y. 2004) (college basketball); *U.S. Football League v. Nat'l Football League*, 644 F. Supp. 1040, 1056 (S.D.N.Y. 1986) (professional

football telecasts constituted a separate market from telecasts of other sports and, indeed, from professional football telecasts.[78] 468 U.S. at 111. The Court previously found that championship boxing matches constituted a separate from market from non-championship boxing. *Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242 (1959).

Moreover, in *NCAA*, the Court held that "when there is an agreement not to compete in terms of price or output, no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement." 468 U.S. at 109. (quotation omitted). "There was no need for the respondents to establish monopoly power in any precisely defined market for television programming in order to prove the restraint unreasonable." *Id.* at 110 n.42 (quotation omitted). When agreements are shown to "raise prices and reduce output" defendants have "a heavy burden of establishing an affirmative defense which competitively justifies this apparent deviation from the operations of a free market," *id.* at 113, regardless of whether they have established market power in a "precisely defined market."[79] "Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, 'proof of actual detrimental effects, such as

---

football), *aff'd*, 842 F.2d 1335 (2d Cir. 1988); *Mid-South Grizzlies v. Nat'l Football League*, 720 F.2d 772, 783 (3d Cir. 1983) (same); *Phila. World Hockey Club v. Phila. Hockey Club*, 351 F. Supp. 462, 501 (E.D. Pa. 1972) (major league hockey).

[78] Defendants contend Plaintiffs are committed to product market definitions that consist of the games of a "single club over a single platform" because many viewers "prefer" certain teams. Defs. Mem. at 57. That is mischaracterization of the complaints, whose market definitions are not limited to individual clubs. Nor is there any basis for the notion that if consumers "prefer" a particular version of a product, then the market would then necessarily be limited to that version. That would essentially eliminate price-fixing cases in any market where consumers exhibit any brand preference at all.

(Defendants are also incorrect that a single brand of a product can never constitute a relevant market. *See Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 481-82 & n.30 (1992), (holding that a single brand can form a relevant market where substitutes are not available).)

[79] These market definitions are also supported by the fact that the restrictions at issue would make no sense in the absence of market power. It would be irrational for a team and its broadcast partner to agree to limit sales to a particular region if it they did not have the power to extract supra-competitive prices in their confined markets, which they could not do if they lacked market power because, for instance, other sports' telecasts were part of the same market.

a reduction of output,' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.'" *Ind. Fed'n of Dentists*, 476 U.S. at 460-61(quoting 7 Phillip E. Areeda, *Antitrust Law* ¶ 1511, at 429 (1986)).

Lastly, courts do not typically grant motions to dismiss on market definition grounds—as facts needed to properly define the market have yet to be determined at the pleading stage. *See, e.g.*, *Todd v. Exxon Corp*, 275 F.3d. 191, 199-200 (2d Cir. 2001) (Sotomayor, J.) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market."); *Cool Wind Vent. Corp. v. Sheet Metal Workers Int'l Ass'n*, 139 F. Supp. 2d 319, 327 (E.D.N.Y. 2001).

## VII.   THE COMPLAINTS PROPERLY ALLEGE MONOPOLY POWER

The complaints also allege market power. "MLB's dominance in the production of major league baseball games in the United States gives it the ability, together with its television partners, to exercise market power in the market for live video presentations of MLB games." *G* ¶ 56. The NHL similarly maintains a dominant position that "gives it the ability to exercise market power, together with its television partners, in the market for live video presentations of major league professional hockey games." *L* ¶ 53.

Defendants themselves insist that the leagues dominate the markets for major-league hockey and baseball programming, respectively, by contending that they are core activities of the leagues, and that the "joint ventures" inherently control the programming practices. There is no question that, given the market definitions described above, the complaints adequately allege monopolization.

In *NCAA*, the district court found the NCAA to have violated Section 2 of the Sherman Act (in addition to violating Section 1), finding that it was "clear that NCAA exercises monopoly power," because "NCAA controls all of regular season college football television." *Bd. of*

*Regents of Univ. of Okla. v. Nat'l Collegiate Athl. Ass'n*, 546 F. Supp. 1276, 1323 (W.D. Okla. 1982) (citing *United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377, 394 (1956) ("When a product is controlled by one interest, without substitutes available, there is monopoly power.")). While the Supreme Court did not reach the Section 2 issue, it held that "the NCAA's complete control over those broadcasts provides a solid basis for the District Court's conclusion that the NCAA possesses market power with respect to those broadcasts."[80] 468 U.S. at 112. In their case against MLB, the Yankees similarly alleged that the league was liable under Section 2 for preventing the Yankees from competing in the professional baseball sponsorship and retail licensing markets. NYY Compl., ¶¶ 81, 161.

Just as in *NCAA*, the leagues here are maintaining monopoly power by preventing the individual teams from freely competing in the marketplaces for live baseball and hockey programming. Nowhere is this clearer than in the Internet area, where the leagues provide all Internet streaming services. Indeed, the NHL imposed severe penalties on the Rangers when MSG acted to distribute Rangers programming over the Internet. *L* ¶ 86 (citing *MSG* Am. Compl. ¶4). This is patent monopolization actionable under Section 2 of the Sherman Act.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss should be denied in their entirety.

---

[80] The Court of Appeals noted that the NCAA admitted that it "obviously has the dominant share" of the collegiate football broadcast market, and challenged the monopolization claim only by disputing that relevant market definition. *Bd. of Regents of Univ. of Okla. v. Nat'l Collegiate Athl. Ass'n*, 707 F.2d 1147, 1159 n.16 (10th Cir. 1983).

Dated: September 5, 2012                    Respectfully Submitted,

                                    __/s/ Edward Diver__
                                    Edward Diver
                                    Howard Langer
                                    Peter Leckman
                                    **LANGER, GROGAN & DIVER, P.C.**
                                    1717 Arch Street, Suite 4130
                                    Philadelphia, PA 19103
                                    Telephone: (215) 320-5660
                                    Facsimile: (215) 320-5703
                                    ndiver@langergrogan.com
                                    hlanger@langergrogan.com
                                    pleckman@langergrogan.com

                                    Michael M. Buchman
                                    John A. Ioannou
                                    **POMERANTZ GROSSMAN HUFFORD**
                                          **DAHLSTROM & GROSS LLP**
                                    600 Third Avenue
                                    New York, NY 10016
                                    Telephone: 212-661-1100
                                    Facsimile: (212) 661-8665
                                    mbuchman@pomlaw.com
                                    jaioannou@pomlaw.com

                                    J. Douglas Richards
                                    Jeffrey Dubner
                                    **COHEN, MILSTEIN, SELLERS &**
                                          **TOLL, PLLC**
                                    88 Pine Street
                                    14th Floor
                                    New York, NY 10005
                                    Telephone: (212) 838-7797
                                    Facsimile: (212) 838-7745
                                    drichards@cohenmilstein.com
                                    jdubner@cohenmilstein.com

                                    Kevin Costello
                                    Gary Klein
                                    **KLEIN KAVANAGH**
                                        **COSTELLO, LLP**
                                    85 Merrimac Street, 4th Floor
                                    Boston, MA 02114
                                    Telephone: (617) 357-5500
                                    Facsimile: (617) 357-5030
                                    costello@kkcllp.com
                                    Klein@kkcllp.com

Robert LaRocca
**KOHN, SWIFT & GRAF, P.C.**
One South Broad Street
Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
Facsimile: (215) 238-1968
rlarocca@kohnswift.com

Alex Schmidt
Mary Jane Fait
**WOLF HALDENSTEIN ADLER
    FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653
schmidt@whafh.com
fait@whafh.com

*Attorneys for Plaintiffs*