**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————

THOMAS LAUMANN, FERNANDA GARBER,
ROBERT SILVER, GARRETT TRAUB,
DAVID DILLON, and PETER HERMAN,
representing themselves and all others similarly
situated,

                           Plaintiffs,

             v.

NATIONAL HOCKEY LEAGUE et al.,

                          Defendants.

12-cv-1817 (SAS)

———————————————————————

FERNANDA GARBER, MARC LERNER,
DEREK RASMUSSEN, ROBERT SILVER,
GARRETT TRAUB, and PETER HERMAN,
representing themselves and all others similarly
situated,

                           Plaintiffs,

             v.

OFFICE OF THE COMMISSIONER OF
BASEBALL et al.,

                          Defendants.

12-cv-3704 (SAS)

ECF Cases

<u>Electronically Filed</u>

———————————————————————

**MEMORANDUM OF LAW IN SUPPORT OF**
**COMCAST'S MOTION TO COMPEL ARBITRATION AND TO STAY CLAIMS**

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ................................................................................. iii

TABLE OF PLAINTIFFS .................................................................................. vii

PRELIMINARY STATEMENT ............................................................................ 1

PROCEDURAL HISTORY.................................................................................. 3

FACTUAL BACKGROUND ................................................................................ 4

A.      The Comcast Subscribers Agreed to Arbitrate Disputes Relating to Comcast.................. 4

      1.      Traub Accepted the Terms of a Comcast Subscriber Agreement........................... 4

      2.      Laumann Accepted the Terms of a Comcast Subscriber Agreement .................... 5

      3.      Rasmussen Accepted the Terms of a Comcast Subscriber Agreement ................. 5

      4.      Silver Accepted the Terms of a Comcast Subscriber Agreement........................... 5

      5.      The Comcast Subscriber Agreement Contains a Broad Arbitration Provision and Class Action Waiver ................................................................................ 6

B.      THE DIRECTV Subscribers Agreed to Arbitrate Disputes Relating to Programming Provided by DIRECTV............................................................ 7

      1.      Silver Accepted the Terms of a DIRECTV Customer Agreement ........................ 7

      2.      Birbiglia Accepted the Terms of a DIRECTV Customer Agreement ................... 7

      3.      The DIRECTV Customer Agreement Contains a Broad Arbitration Provision and Class Action Waiver ................................................................................ 7

C.      The Out-Of-Market Packages Include Programming Produced By the Comcast RSNs.... 8

ARGUMENT ................................................................................................... 8

I.      THE SUBSCRIBERS' AGREEMENTS WITH COMCAST AND DIRECTV ARE ENFORCEABLE UNDER THE FAA ................................................................ 9

II.     THE COMCAST SUBSCRIBERS' CLAIMS AGAINST THE COMCAST DEFENDANTS ARE SUBJECT TO INDIVIDUAL ARBITRATION ........................ 11

      A.      All Claims Against the Comcast Defendants Fall Within the Broad Scope of the Comcast Arbitration Provision .......................................................... 12

      B.      In the Case of Any Doubt, the Court Should Compel Arbitration ....................... 14

III.     THE DIRECTV SUBSCRIBERS' CLAIMS AGAINST THE COMCAST
         DEFENDANTS ARE SUBJECT TO INDIVIDUAL ARBITRATION ......................... 15

         A.     The DIRECTV Subscribers Agreed to Arbitrate Their Claims Against the
                Comcast RSNs ................................................................................................. 16

         B.     Principles of Estoppel Also Require the DIRECTV Subscribers to Arbitrate Their
                Claims Against the Comcast RSNs .................................................................. 19

IV.      THIS COURT SHOULD STAY ALL CLAIMS AGAINST THE COMCAST
         DEFENDANTS PENDING ARBITRATION ................................................................. 23

CONCLUSION ............................................................................................................................. 25

# TABLE OF AUTHORITIES

CASES

PAGE

*Ali v. Federal Bureau of Prisons,*
  552 U.S. 214 (2008)...........................................................................................17

*Allied-Bruce Terminix Cos., Inc. v. Dobson,*
  513 U.S. 265 (1995)...........................................................................................10

*American Express Co. v. Italian Colors Rest.,*
  133 S. Ct. 2304 (2013)..............................................................................1, 3, 4, 9

*Argus Media, Ltd. v. Tradition Fin. Servs.,*
  2009 WL 5125113 (S.D.N.Y. Dec. 29, 2009) .................................................24

*AT&T Mobility LLC v. Concepcion,*
  131 S.Ct. 1740 (2011) .........................................................................................9

*Bank Julius Baer & Co. v. Waxfield Ltd.,*
  424 F.3d 278 (2d Cir. 2005)..............................................................................19

*Bell v. Cendant Corp.,*
  293 F.3d 563 (2d Cir. 2002)..............................................................................14

*Bischoff v. DirecTV, Inc.,*
  180 F. Supp. 2d 1097 (C.D. Cal. 2002) ...........................................................25

*Blinco v. Green Tree Servicing LLC,*
  400 F.3d 1308 (11th Cir. 2005) ........................................................................18

*Boomer v. AT&T Corp.,*
  309 F.3d 404 (7th Cir. 2002) ............................................................................10

*Boyle v. United States,*
  556 U.S. 938 (2009)...........................................................................................17

*Brown v. DirecTV, LLC,*
  2013 WL 3273811 (C.D. Cal. June 26, 2013) .................................................11

*Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.,*
  271 F.3d 403 (2d Cir. 2001)..............................................................................19

*Cargill Int'l S.A. v. M/T Pavel Dybenko,*
  991 F.2d 1012 (2d Cir. 1993) ...........................................................................17

*Contec Corp. v. Remote Solution Co.*,
　　398 F.3d 205 (2d Cir. 2005)..................................................................... 15

*F.D. Import & Export Corp. v. M/V Reefer Sun*,
　　248 F. Supp. 2d 240 (S.D.N.Y. 2002)....................................................... 17

*First Options of Chicago Inc. v. Kaplan*,
　　514 U.S. 938 (1995).................................................................................. 14

*Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*,
　　815 F.2d 840 (2d Cir. 1987)...................................................................... 23

*Guyden v. Aetna, Inc.*,
　　544 F.3d 376 (2d Cir. 2008)........................................................................ 9

*Hanjin Shipping Co. Ltd. v. Union Pac. R.R. Co.*,
　　2006 WL 1096389 (S.D.N.Y. Apr. 26, 2006)................................. 11, 16, 19

*Hikers Indus., Inc. v. William Stuart Indus. Ltd.*,
　　640 F. Supp. 175 (S.D.N.Y. 1986) ........................................................... 24

*Howsam v. Dean Witter Reynolds, Inc.*,
　　537 U.S. 79 (2002)..................................................................................... 14

*Ibeto Petrochemical Indus. v. M/T Beffen*,
　　412 F. Supp. 2d 285 (S.D.N.Y. 2005)....................................................... 23

*In re Am. Express Merchants' Litig.*,
　　667 F.3d 204 (2d Cir. 2012)........................................................................ 3

*In re Universal Serv. Fund. Tel. Billing Practices Litig.*,
　　300 F. Supp. 2d 1107 (D. Kan. 2003)....................................................... 22

*JLM Indus., Inc. v. Stolt-Nielsen SA*,
　　387 F.3d 163 (2d Cir. 2004)................................................................ 13, 22

*Laumann v. Nat'l Hockey League*,
　　 907 F. Supp. 2d 465 (S.D.N.Y. 2012) ..................................................... 15

*Laumann v. Nat'l Hockey League*,
　　2013 WL 837640 (S.D.N.Y. Mar. 6, 2013) ............................................. 15

*Losapio v. Comcast Corp.*,
　　2011 WL 1497652 (N.D. Ga. April 19, 2011)........................................... 10

*Mercedes Homes, Inc. v. Colon*,
　　966 So. 2d 10 (Fla. App. 5th Dist. 2007)................................................... 15

iv

*Mercedes Homes, Inc. v. Rosario*,
    920 So. 2d 1254 (Fla. App. 5th Dist. 2006) ..................................................... 15

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983) .................................................................................... 9, 14

*O'Quinn v. Comcast Corp.*,
    2010 WL 4932665 (N.D. Ill. Nov. 29, 2010) .................................................. 11

*Oldroyd v. Elmira Sav. Bank*,
    134 F.3d 72 (2d Cir. 1998) ...................................................... 9, 11, 13, 16

*Paneccasio v. Unisource Worldwide, Inc.*,
    532 F.3d 101 (2d Cir. 2008) ......................................................................... 18

*Pay Phone Concepts, Inc. v. MCI Telecomms. Corp.*,
    904 F. Supp. 1202 (D. Kan. 1995) .................................................................. 10

*Ragone v. Atlantic Video at Manhattan Ctr.*,
    595 F.3d 115 (2d Cir. 2010) .............................................................. 19, 20, 22

*Ross v. American Express*,
    547 F.3d 137 (2d Cir. 2008) ................................................................... 22, 23

*Sanders v. Comcast Cable Holdings, LLC*,
    2008 WL 150479 (M.D. Fla. 2008) ................................................................ 11

*Schwartz v. Comcast Corp.*,
    256 Fed. Appx. 515 (3d Cir. 2007) ................................................................. 10

*Shaw Group, Inc. v. Triplefine Intern. Corp.*,
    322 F.3d 115 (2d Cir. 2003) .......................................................................... 15

*Sherer v. Green Tree Servicing LLC*,
    548 F.3d 379 (5th Cir. 2008) ......................................................................... 18

*Shetiwy v. Midland Credit Mgmt.*,
    2013 WL 3530524 (S.D.N.Y. July 12, 2013) .................................................... 9

*Silec Cable S.A.S. v. Alcoa Fjardaal, SF*,
    2012 WL 5906535 (W.D. Pa. Nov. 26, 2012) ............................................. 14, 15

*Sleepy's LLC v. Escalate, Inc.*,
    2010 WL 2505678 (S.D.N.Y. June 18, 2010) ................................................. 15

*Smith Barney Shearson Inc. v. Sacharow*,
    91 N.Y.2d 39 (1997) ..................................................................................... 14

*Stachurski v. DirecTV, Inc.*,
  642 F. Supp. 2d 758 (N.D. Ohio 2009)............................................................ 11

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
  559 U.S. 662 (2010) ...................................................................................... 9

*Terminix Int'l Co. v. Palmer Ranch Ltd.*,
  432 F.3d 1327 (11th Cir. 2005) ..................................................................... 15

*Thyssen, Inc. v. M/V Markos N*,
  1999 WL 619634 (S.D.N.Y. Aug. 16, 1999) ................................................. 17

*Truitt v. DirecTV, Inc.*,
  2008 WL 5054570 (E.D. La. Nov. 21, 2008) ................................................. 11

*Washington v. William Morris Endeavor Entm't, LLC*,
  2011 WL 3251504 (S.D.N.Y. July 20, 2011) ................................................. 15

## STATUTES

9 U.S.C. § 2.......................................................................................................... 9

9 U.S.C. § 3.......................................................................................................... 23

**TABLE OF PLAINTIFFS**

|  | Laumann<br><br>(12-cv-1817 (SAS)) | Garber<br><br>(12-cv-3704 (SAS)) |
|---|---|---|
| **Television Plaintiffs** | **Garrett Traub** alleges that he purchased the NHL Center Ice television package from Comcast for the 2011-2012 season. | **Garrett Traub** alleges that he purchased the MLB Extra Innings television package from Comcast for the 2011 season. |
| | **Robert Silver** alleges that he purchased the NHL Center Ice television package from DIRECTV until 2010.<br><br>Mr. Silver received DIRECTV television services and, by stipulation, has stayed his claims against DIRECTV.<br><br>Mr. Silver currently receives Comcast television services (2005; 2010 to present) and Internet services (2005 to present). | **Vincent Birbiglia** alleges that he purchases the MLB Extra Innings television package through DIRECTV.<br><br>Mr. Birbiglia currently receives DIRECTV television services and, by stipulation, has stayed his claims against DIRECTV. |
| **Internet Plaintiffs** | **Thomas Laumann** alleges that he has purchased the NHL GameCenter LIVE Internet package since at least 2010.<br><br>Mr. Laumann currently receives Comcast television services (2005 to present) and Internet services (2010 to present). | **Derek Rasmussen** alleges that he purchased the MLB.TV Internet package during the 2011 season.<br><br>Mr. Rasmussen received Comcast television and Internet services from September 2011 to May 2012. |
| | **David Dillon** alleges that he has purchased the NHL GameCenter LIVE Internet package since 2011. | **Marc Lerner** alleges that he purchased the MLB.TV Internet package for the 2011 season.<br><br>Mr. Lerner currently receives DIRECTV television services and DIRECTV is seeking to stay his claims against DIRECTV. |

Comcast Corporation ("Comcast") and its affiliated regional sports networks[1] (the "Comcast RSNs"; together with Comcast, the "Comcast Defendants") respectfully submit this memorandum of law in support of their motion seeking an order under the Federal Arbitration Act ("FAA") compelling Plaintiffs Garrett Traub, Thomas Laumann, Derek Rasmussen, Robert Silver, and Vincent Birbiglia[2] (together, the "Subscribers") to submit their claims against the Comcast Defendants to individual arbitration, and staying all claims against the Comcast Defendants pending arbitration.[3]

## PRELIMINARY STATEMENT

In order to obtain television and/or Internet service from Comcast or DIRECTV, each of the Subscribers entered into agreements containing broad arbitration provisions. All but one of the Subscribers agreed to arbitrate "any dispute" regarding "any aspect" of their relationship with the Comcast Defendants. Birbiglia agreed to arbitrate "any claim" relating to "programming" provided by DIRECTV, which includes Comcast RSN programming. Silver, who is both a current Comcast subscriber and a former DIRECTV subscriber, agreed to both arbitration provisions. As a matter of law, these broad provisions require the Subscribers to arbitrate their claims against the Comcast Defendants.

Prior to the Supreme Court's decision in *American Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304 (2013) ("*Italian Colors*"), the enforceability of the Subscribers'

---

[1] The "Comcast RSNs" are Comcast SportsNet California, LLC, Comcast SportsNet Chicago, LLC, Comcast SportsNet Mid-Atlantic, L.P., and Comcast SportsNet Philadelphia, L.P.

[2] Birbiglia is a proposed plaintiff in the Second Amended Complaint in *Garber*, which was filed and then stricken without ever having been served. Assuming the filing and service deficiencies are resolved and Birbiglia is added as a plaintiff, his claims are subject to individual arbitration and to a stay for the reasons set forth herein.

[3] Although the *Laumann* and *Garber* actions are not consolidated, this Memorandum of Law jointly addresses both actions for the Court's convenience.

arbitration agreements was in doubt because each contains a class action waiver. *Italian Colors* erased that doubt. And yet the Subscribers continue to pursue class relief on claims directly related to the television services (including out-of-market television packages) they purchased from Comcast or DIRECTV, or to Internet services they purchased from Comcast.

Plaintiffs' own allegations show all the respects in which the claims asserted by Traub, Laumann, Rasmussen, and Silver (the "Comcast Subscribers") relate to "aspect[s]" of their relationships with the Comcast Defendants.

**Traub** seeks class relief on allegations that he *overpaid Comcast* for an out-of-market television package *provided by Comcast* that included programming *produced by the Comcast RSNs*. Because those allegations clearly relate to aspects of his relationship with the Comcast Defendants, his claims must be arbitrated.

**Laumann** and **Rasmussen** seek class relief on allegations that they overpaid for an out-of-market Internet package, which included programming *produced by the Comcast RSNs*, that they watched via Internet service *provided by Comcast*. In addition, the far-flung conspiracy theories spun by Laumann and Rasmussen connect their claims to other aspects of their relationships with the Comcast Defendants. In particular, they accuse the Comcast Defendants of involvement in an alleged conspiracy that "forced" them to subscribe to television service in order to receive RSN programming, and each elected *to subscribe to Comcast* to obtain that television service. Because Laumann's and Rasmussen's claims thus regard several "aspect[s]" of their relationship with the Comcast Defendants, they too must be arbitrated.

**Silver** and **Birbiglia** (the "DIRECTV Subscribers") have entered into broad arbitration agreements with DIRECTV that require individual arbitration of their claims not only against DIRECTV, but also of their intertwined claims against the Comcast Defendants. The DIRECTV

Subscribers agreed to arbitrate "any claim" relating to the "programming" that DIRECTV provides, which includes out-of-market television packages containing programming produced by the Comcast RSNs.  The DIRECTV Customer Agreement's express reference to claims involving non-signatory "programming provider[s]" confirms that the broad arbitration provision embraces the DIRECTV Subscribers' dispute with the non-signatory Comcast RSNs.  Moreover, the doctrine of equitable estoppel requires arbitration of the DIRECTV Subscribers' claims against the Comcast RSNs.  Indeed, permitting the DIRECTV Subscribers to avoid arbitrating those claims, which are inextricably intertwined with the claims that they have agreed to stay pending arbitration with DIRECTV, would effectively thwart the strong federal policy favoring arbitration.

All of the Subscribers' claims against the Comcast Defendants are subject to individual arbitration and therefore must be stayed pending arbitration.  The claims against the Comcast Defendants asserted by the remaining Plaintiffs—**Marc Lerner** and **David Dillon**—should also be stayed because they involve the same facts and issues as the claims against the Comcast Defendants that are subject to individual arbitration.

Accordingly, the Comcast Defendants respectfully request an order enforcing the arbitration provisions agreed to by each of the Subscribers and staying all claims against the Comcast Defendants pending arbitration.

## PROCEDURAL HISTORY

Shortly after the filing of these putative class actions, Plaintiffs and Comcast agreed to defer any motions to compel arbitration pending further developments in *In re American Express Merchants' Litigation*, 667 F.3d 204 (2d Cir. 2012) ("*AMEX*"), without waiver of any rights. The Court so ordered.  (*Laumann*, ECF No. 37; *Garber*, ECF No. 31.)

On June 20, 2013, the United States Supreme Court reversed the Second Circuit's judgment in *AMEX. See Italian Colors*, 133 S. Ct. at 2312.  The Supreme Court held that an arbitration provision waiving the right to arbitrate a Sherman Act claim on a class basis is enforceable under the FAA, even where the cost of prevailing in individual arbitration likely would exceed any potential recovery.  *Id.* at 2309-11.  The Supreme Court reasoned that courts must "rigorously enforce arbitration agreements according to their terms," including class action waivers.  *Id.* at 2309 (internal quotations omitted).

Silver and Birbiglia subsequently stipulated to stay their claims against DIRECTV pending arbitration of those claims with DIRECTV.  (*Laumann*, ECF No. 130; *Garber*, ECF No. 157.)  Separately, Plaintiffs and Comcast agreed to file any motion to compel arbitration by August 19, 2013.  (*Laumann*, ECF No. 124; *Garber*, ECF No. 145.)

## FACTUAL BACKGROUND

### A.  THE COMCAST SUBSCRIBERS AGREED TO ARBITRATE DISPUTES RELATING TO COMCAST

#### 1.     Traub Accepted the Terms of a Comcast Subscriber Agreement

Garrett Traub received Comcast cable television and Internet services in Washington, D.C. in his own name beginning in 2011.  (*See* Declaration of Christie Rossi ("Rossi Decl.") ¶ 4; Traub Responses, at 5-6.) [4]  Comcast sent Traub a Comcast Agreement for Residential Services. (*See id.* ¶ 10 & Ex. B.)  Traub's use of Comcast services was conditioned on acceptance of the terms of that Agreement.  (*Id.*, Ex. B) ("You will have accepted this Agreement and be bound by its terms if you use the Services . . . .").  Further, Traub signed and initialed a work order on

---

[4] Citations in the form "____ Responses" refer to the Objections and Responses of Plaintiff ____ to the Television Defendants' First Set of Interrogatories dated May 9, 2013.  The relevant excerpts of the Responses are attached to the Declaration of Arthur Burke ("Burke Decl.").  (*See id.* ¶ 8 & Ex. C.)

August 31, 2011, "acknowledg[ing] receipt of Comcast's Welcome Kit(s) which contains the Comcast subscriber agreement(s)" and "agree[ing] to be bound by the Comcast subscriber agreement(s) which constitute the agreement(s) between Comcast and me for the service(s)." (*Id.* ¶¶ 7-8 & Ex. A.)

2.      **Laumann Accepted the Terms of a Comcast Subscriber Agreement**

Thomas Laumann has received Comcast cable television service at his Bradenton, Florida home since 2005.  (*See* Declaration of Renee Olivier ("Olivier Decl.") ¶ 4; Laumann Responses, at 5-6.)  He has also received Comcast Internet service in Bradenton since 2010.  (*See* Olivier Decl. ¶ 5; Laumann Responses, at 5-6.)  Comcast sent Laumann a Comcast Agreement for Residential Services, and his use of Comcast services was conditioned on his acceptance of the terms of that agreement.  (*See* Olivier Decl. ¶ 10, Ex. D.)  Further, Laumann signed a work order on July 27, 2011, "agree[ing] to be bound by the current Comcast Customer Agreement."  (*Id.* ¶ 8 & Ex. B.)

3.      **Rasmussen Accepted the Terms of a Comcast Subscriber Agreement**

Derek Rasmussen received Comcast television and Internet services in Fort Wayne, Indiana from September 2011 to May 2012.  (*See* Declaration of Ishania Howze ("Howze Decl.") ¶ 4.)  Comcast sent Rasmussen a Comcast Agreement for Residential Services, and his use of Comcast services was conditioned on his acceptance of the terms of that agreement.  (*See* Howze Decl. ¶¶ 5, 8 & Ex. A.)

4.      **Silver Accepted the Terms of a Comcast Subscriber Agreement**

Robert Silver has received Comcast Internet service at his home in Philadelphia, Pennsylvania since 2005.  (*See* Declaration of Christine McGinty ("McGinty Decl.") ¶ 4; Silver Responses, at 5-6.)  Silver also has received Comcast cable television service at his Philadelphia

home since 2010 and, before that, in 2005.  (*See id.*)[5]  Comcast sent Silver a Comcast Agreement

for Residential Services, and his use of Comcast services was conditioned on acceptance of the

terms of that agreement.  (*See* McGinty Decl. ¶ 9, Ex. D.)  Further, Silver signed a work order on

January 19, 2011, "agree[ing] to continue to be bound by the current Comcast subscriber

agreement(s)."  (*Id.* ¶ 6 & Ex. B.)

     5.     **The Comcast Subscriber Agreement Contains a**
                **Broad Arbitration Provision and Class Action Waiver**

On the first page of the Comcast Subscriber Agreement[6] in bold type is notice that "**[t]his**

**Agreement contains a binding arbitration provision in Section 13 that affects your rights**

**under this Agreement with respect to all Services.**"  (Rossi Decl., Ex. B; McGinty Decl., Ex.

D; Olivier Decl., Ex. D; Howze Decl., Ex. A.)  The arbitration provision in Section 13 provides

that if "you [subscriber] have a Dispute (as defined below) with Comcast that cannot be

resolved . . . you or Comcast may elect to arbitrate that Dispute in accordance with the terms of

this Arbitration Provision rather than litigate the Dispute in court."  (*Id.* § 13(a).)  "Dispute" is

defined as "any dispute, claim or controversy between you and Comcast regarding any aspect of

your relationship with Comcast . . . , whether based in contract, statute, regulation, ordinance,

tort . . ., or any other legal or equitable theory" and "is to be given the broadest possible meaning

that will be enforced."  (*Id.* § 13(b).)  As used in the arbitration provision, "Comcast" includes

"parents, subsidiaries and affiliated companies" of Comcast.  (*Id.*)

---

     [5] Additionally, Silver received periodic Comcast television service in Rehoboth Beach,
Delaware from 2007 to 2012.  (*See* Rossi Decl. ¶¶ 16-17.)

     [6] The Comcast subscriber agreements agreed to by Traub, Laumann, Rasmussen and
Silver are identical in pertinent part and are hereinafter referred to simply as the "Comcast
Subscriber Agreement."

The Comcast arbitration provision contains a class action waiver.  (*Id.* § 13(f)(2).)  The provision also prominently advises subscribers of the "Right to Opt Out" within 30 days of receiving the Comcast Subscriber Agreement, and emphasizes that opting out would have no effect on the delivery of services.  (*Id.* § 13(c).)  None of Traub, Laumann, Rasmussen and Silver opted out within 30 days of receiving the Comcast Subscriber Agreement, or at any time thereafter.  (*See* Rossi Decl. ¶ 21; McGinty Decl. ¶ 12; Olivier Decl. ¶ 13; Howze Decl. ¶ 9.)

**B.    THE DIRECTV SUBSCRIBERS AGREED TO ARBITRATE DISPUTES RELATING TO PROGRAMMING PROVIDED BY DIRECTV**

1.    **Silver Accepted the Terms of a DIRECTV Customer Agreement**

In addition to being a current Comcast subscriber, Silver is a former DIRECTV subscriber who received satellite television service in Philadelphia from 2005 to 2010.  (*See* Declaration of Valerie McCarthy, *Garber* ECF No. 159 ("McCarthy Decl.") ¶¶ 10, 14-15; Silver Responses, at 5-6.)  DIRECTV sent Silver a DIRECTV Customer Agreement and his use of DIRECTV service was conditioned on acceptance of its terms.  (*See* McCarthy Decl. ¶¶ 14-15 & Ex. D.)

2.    **Birbiglia Accepted the Terms of a DIRECTV Customer Agreement**

Vincent Birbiglia has received DIRECTV satellite television service in Las Vegas, Nevada since 2009.  (*Id.* ¶¶ 10, 16-17; Birbiglia Responses, at 5-6.)  DIRECTV sent Birbiglia a DIRECTV Customer Agreement and his use of DIRECTV service was conditioned on acceptance of its terms.  (*See* McCarthy Decl. ¶¶ 16-17 & Ex. B.)

3.    **The DIRECTV Customer Agreement Contains a Broad Arbitration Provision and Class Action Waiver**

On the first page of the DIRECTV Customer Agreement in bold type is notice that the Agreement "**DESCRIBES THE TERMS AND CONDITIONS OF YOUR RECEIPT OF AND PAYMENT FOR DIRECTV® SERVICE AND IS SUBJECT TO ARBITRATION**

(**SECTION 9**).” (*Id.*, Ex. B; *see also id.* Ex. D.)  The arbitration provision in Section 9 provides

that in the event of a dispute, “any Claim either of us asserts will be resolved only by binding

arbitration.”  (*Id.*, Exs. B, D § 9(b).)  “Claim” is defined as “*any* legal or equitable claim relating

to this Agreement, any addendum, or your Service.”  (*Id.*, Exs. B, D § 9 (emphasis added).)

“Service” is defined on the first page as “digital satellite entertainment programming and

services” provided by DIRECTV.  (*Id.*, Exs. B, D.)  The arbitration provision contains a class

action waiver.  *(Id.*, Exs. B, D § 9(c).)

**C.    THE OUT-OF-MARKET PACKAGES INCLUDE
         PROGRAMMING PRODUCED BY THE COMCAST RSNS**

Both the out-of-market television packages and the out-of-market Internet packages for

NHL and MLB are comprised of programming produced by RSNs, including the Comcast RSNs.

Subscribers to the television packages—MLB Extra Innings and NHL Center Ice—are able to

view feeds produced by out-of-market RSNs, including the Comcast RSNs, via television service

they receive from Comcast, DIRECTV or another MVPD.  (*See* Burke Decl., Ex. A.)  The out-

of-market Internet packages—MLB.TV and NHL GameCenter Live—work in a similar manner.

Subscribers to the Internet packages are able to watch feeds produced by out-of-market RSNs,

including the Comcast RSNs, via Internet service they receive from Comcast or another Internet

service provider.  (*See* Burke Decl., Ex. B.)

## ARGUMENT

Under the FAA, the Court should order the Comcast Subscribers to arbitrate their claims

against the Comcast Defendants on an individual basis pursuant to the Comcast Subscriber

Agreement.  Likewise, it should order the DIRECTV Subscribers to arbitrate their claims against

the Comcast Defendants on an individual basis pursuant to the DIRECTV Customer Agreement.

The Court should also stay all claims against the Comcast Defendants pending arbitration.

"Congress enacted the FAA in response to widespread judicial hostility to arbitration."

*Italian Colors*, 133 S. Ct. at 2308-09.  The FAA embodies the "liberal federal policy favoring

arbitration agreements."  *Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008) (quoting

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).  A long line of

Supreme Court decisions, in which *Italian Colors* is the latest, has emphasized the force of that

policy.  *See, e.g., AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011); *Stolt-Nielsen S.A.*

*v. AnimalFeeds Int'l Corp.*, 559 U.S. 662 (2010).[7]

In determining arbitrability under the FAA, courts in the Second Circuit ask: "(1) whether

the parties have entered into a valid agreement to arbitrate, and if so, (2) whether the dispute at

issue comes within the scope of the arbitration agreement."  *Shetiwy v. Midland Credit Mgmt.*,

2013 WL 3530524, at *2 (S.D.N.Y. July 12, 2013) (Scheindlin, J.) (quotation omitted).  The

party resisting arbitration bears the burden on both issues.  *Id.*, at *2.  Where, as here, the parties

have agreed to a broad arbitration provision, there is "a presumption of arbitrability" that can be

overcome *only* if the provision is not susceptible of any interpretation that covers the dispute.

*See, e.g., Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 76 (2d Cir. 1998).  Further, "any

doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration" as a

matter of federal law.  *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25.

## I.    THE SUBSCRIBERS' AGREEMENTS WITH COMCAST
   ## AND DIRECTV ARE ENFORCEABLE UNDER THE FAA

The FAA requires enforcement of any "written provision in any . . . contract evidencing a

transaction involving commerce."  9 U.S.C. § 2.  It is beyond dispute that the written arbitration

---

[7] *Italian Colors* made abundantly clear that any arbitration under the Comcast Subscriber
Agreement or the DirecTV Customer Agreement must proceed on an individual basis due to the
class action waivers in those agreements.

agreements here satisfy the "commerce" requirement. (*See, e.g.*, *Laumann* ¶¶ 14-16, 26-29; *Garber* ¶¶ 18-20, 29-32; *Garber* Second Am. Compl. ¶ 22; Rossi Decl., Ex. B (§ 13(e)));[8] *see also Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 273-81 (1995).

The Subscribers are bound by the Comcast Subscriber Agreement and the DIRECTV Customer Agreement for three independently sufficient reasons. *First*, each of the Subscribers received a copy of the agreements containing the arbitration provision.[9] Notice of that provision is sufficient to create a binding agreement to arbitrate. *See Schwartz v. Comcast Corp.*, 256 Fed. Appx. 515, 520 (3d Cir. 2007) (finding enforceable arbitration agreement where subscriber was "aware" of Comcast subscriber agreement); *Pay Phone Concepts, Inc. v. MCI Telecomms. Corp.*, 904 F. Supp. 1202, 1207 (D. Kan. 1995) (finding enforceable arbitration agreement between a communications company and subscriber where made pursuant to Communications Act procedures for forming and amending agreements through notice to subscribers).

*Second*, each of the Subscribers accepted the terms of the respective Comcast Subscriber Agreement or DIRECTV Customer Agreement by using the Comcast and DIRECTV services. *See, e.g.*, *Boomer v. AT&T Corp.*, 309 F.3d 404, 415-17 (7th Cir. 2002) (enforcing an arbitration provision in a mailed notice where subscribers continued to use the carrier's services); *Losapio v. Comcast Corp.*, 2011 WL 1497652, at *3 (N.D. Ga. April 19, 2011) (valid arbitration agreements "may be formed by a party's continued use or acceptance of services without objection"); *Stachurski v. DirecTV, Inc.*, 642 F. Supp. 2d 758, 766 (N.D. Ohio 2009) (finding

---

[8] The Second Amended Class Action Complaint in *Laumann* is cited as *Laumann* ¶ __. The First Amended Class Action Complaint in *Garber* is cited as *Garber* ¶ __.  The Second Amended Class Action Complaint in Garber is cited as *Garber* Second Am. Compl. ¶ __ despite that it was stricken (*see* n.2 *supra*) because it is the only pleading that includes Birbiglia is found.

[9] Indeed, Laumann and Silver received multiple notices of the Comcast arbitration provision. (*See* Olivier Decl. ¶¶ 7, 9-10 & Exs. A, C, D; McGinty Decl. ¶¶ 8-9 & Exs. C, D; Rossi Decl. ¶¶ 18-19 & Ex. C.)

that plaintiffs agreed to the terms of DIRECTV's customer agreement by continuing to accept services); *Truitt v. DirecTV, Inc.*, 2008 WL 5054570, at *3 (E.D. La. Nov. 21, 2008) (same).

*Third*, Traub, Laumann and Silver each expressly accepted the terms of the Comcast Subscriber Agreement, including the arbitration provision, by signing work orders. (*See* pp. 4-6 *supra*.) Those signatures are independently sufficient, although not necessary, to create binding arbitration agreements. *See, e.g.*, *O'Quinn v. Comcast Corp.*, 2010 WL 4932665, at *3-4 (N.D. Ill. Nov. 29, 2010) (enforcing signed work order accepting the terms of Comcast subscriber agreement); *Brown v. DirecTV, LLC*, 2013 WL 3273811, at *1-5 (C.D. Cal. June 26, 2013) (enforcing signed equipment lease agreement accepting arbitration provision set forth in DIRECTV customer agreement).

Moreover, the arbitration provision in the Comcast Subscriber Agreement prominently noted that subscribers could opt out of arbitration entirely—without affecting their Comcast service—as easily as by visiting Comcast's website. But none of the Comcast Subscribers availed themselves of that option. (*See* p. 7 *supra*.) They are therefore bound by the Comcast Subscriber Agreement. *See Sanders v. Comcast Cable Holdings, LLC*, 2008 WL 150479, at *3-6 (M.D. Fla. Jan. 14, 2008).

## II.   THE COMCAST SUBSCRIBERS' CLAIMS AGAINST THE COMCAST DEFENDANTS ARE SUBJECT TO INDIVIDUAL ARBITRATION

The broad Comcast arbitration provision "creates a presumption of arbitrability which is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that it covers the asserted dispute." *Oldroyd*, 134 F.3d at 76. The Comcast Subscribers cannot meet their burden of overcoming that presumption because all their claims against the Comcast Defendants regard an "aspect" of their relationship with Comcast.

A.   **All Claims Against the Comcast Defendants Fall Within
     the Broad Scope of the Comcast Arbitration Provision**

The Comcast arbitration provision broadly covers any "dispute" between the subscriber

and Comcast "regarding any aspect of [the subscriber's] relationship with [the Comcast

Defendants]," including but not limited to contractual and statutory claims.  (*See* p. 6 *supra*.)

The provision therefore is broader than the "'paradigm of a broad [arbitration] clause,'" which

"submits to arbitration '[a]ny claim or controversy arising out of or relating to th[e] agreement.'"

*Hanjin Shipping Co. Ltd. v. Union Pac. R.R. Co.*, 2006 WL 1096389, at *3 (S.D.N.Y. Apr. 26,

2006).

All of Traub's claims against the Comcast Defendants concern "aspect[s]" of his

relationship with them because they are premised upon overpaying Comcast for an out-of-market

television package provided by Comcast, which included programming produced by the Comcast

RSNs.  (*See Laumann* ¶ 99; *Garber* ¶ 106; Burke Decl., Ex. A.)  Traub further challenges the

manner in which Comcast is authorized to, and does, make programming available to him.  (*See

Laumann* ¶¶ 101-03; *Garber* ¶¶ 108-10.)  Delivery of, and payment for, Comcast services are

indisputably "aspect[s]" of Traub's relationship with the Comcast Defendants.

The claims asserted by Laumann and Rasmussen also concern "aspect[s]" of their

relationship with the Comcast Defendants.  Laumann and Rasmussen allege that they overpaid

for out-of-market Internet packages that they watched via Internet service *provided by Comcast*

and that included programming *produced by the Comcast RSNs*.  (*See Laumann* ¶ 100; *Garber* ¶

107; Burke Decl., Ex. B.)  Further, Laumann and Rasmussen accuse the Comcast Defendants of

involvement in a conspiracy to omit "in market" games from the Internet packages in order to

"force" consumers such as themselves to subscribe to a television service.[10]  That Laumann and

Rasmussen each elected to subscribe to Comcast for television service directly links their

Internet claims to their relationship with the Comcast Defendants.[11]  Construing Comcast's

arbitration provision "as broadly as possible," it cannot "be said with positive assurance that the

arbitration clause is not susceptible of an interpretation that it covers the asserted dispute."

*Oldroyd*, 134 F.3d at 76.  To the contrary, Laumann's and Rasmussen's claims against the

Comcast Defendants fit comfortably within the broad provision.

Silver, who currently receives Comcast television and Internet services and formerly

received DIRECTV television services, asserts a claim based on overpayment for an out-of-

market television package provided by DIRECTV.  (*Laumann* ¶ 15.)  Like Traub, the out-of-

market television package Silver received included programming *produced by the Comcast*

*RSNs*.  (Burke Decl., Ex. A.)  Further, Silver has asserted that the purported horizontal division

of the markets between the RSN Defendants is "at the core of every aspect" of these actions.

(Pls.' Opp'n to Mot. to Stay, at 7.)  Having insisted that his claims relate to an alleged conspiracy

among the Comcast RSNs and others, Silver cannot now overcome the presumption of

arbitrability created by the broad Comcast arbitration provision.[12]  *See, e.g., JLM Indus., Inc. v.*

---

[10] *See* Pls.' Opp'n to Mot. to Dismiss, at 11; *see also* Pls.' Opp'n to Mot. to Stay, at 2 ("By limiting broadcasts to 'out-of-market' games, they ensure that viewers are required to purchase 'local' game programming from an RSN through a Multichannel Video Programming Distributor ('MVPD'), such as Comcast and Directv.").

[11] *See Laumann* ¶ 14 (Laumann would "prefer not to have to *subscribe to pay television* to be able to watch New York Islanders games involving the Florida Panthers and Tampa Bay Lighting, which are blacked out when he tries to watch them through NHL Gamecenter Live.") (emphasis added); *see also Garber* ¶¶ 14, 86; Howze Decl. ¶ 4; Olivier Decl. ¶¶ 4-6.

[12] Both Silver and Traub purportedly subscribed to out-of-market Internet packages (*see* Silver Responses, at 6; Traub Responses, at 6-7), although neither asserts a claim based on those packages.  To the extent Silver and Traub subsequently seek relief based on an out-of-market

(....continued)

*Stolt-Nielsen SA*, 387 F.3d 163, 175-76 (2d Cir. 2004) (finding dispute covered by broad

arbitration provision where alleged damages resulted from overcharge paid pursuant to the

contract, even if the "conspiracy . . . was formed *independently* of the specific contractual

relations between the parties.") (emphasis added).

### B.   In the Case of Any Doubt, the Court Should Compel Arbitration

As shown above, the Comcast arbitration provision is sufficiently broad to require

individual arbitration of the Comcast Subscribers' claims.  Regardless, "any doubts concerning

the scope of arbitrable issues should be resolved in favor of arbitration," as a matter of federal

law.  *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25.  That same conclusion follows from the

"clea[r] and unmistakabl[e]" evidence in the agreement itself that the parties intended any doubts

about whether a claim falls within the scope of the provision to be arbitrated.  *See First Options

of Chicago Inc. v. Kaplan*, 514 U.S. 938, 944-45 (1995); *see also Howsam v. Dean Witter

Reynolds, Inc.*, 537 U.S. 79, 83 (2002) ("[T]he question of arbitrability[ ] is an issue for judicial

determination unless the parties clearly and unmistakably provide otherwise.") (internal

quotations omitted).  Permitting arbitrability to be arbitrated may be done expressly or by

incorporating the rules of an arbitration organization that themselves provide for arbitration of

the issue.  *See Shaw Group, Inc. v. Triplefine Intern. Corp.*, 322 F.3d 115, 121-22 (2d Cir. 2003);

*Bell v. Cendant Corp.*, 293 F.3d 563, 568 (2d Cir. 2002).[13]  The parties here have done both.

---

(continued….)

Internet package, they must individually arbitrate that dispute pursuant to the terms of the
Comcast Subscriber Agreement.

[13] Parties may also assign arbitrability to an arbitrator by using broad scope language of
the type used in the Comcast arbitration provision.  *See Shaw Group*, 322 F.3d at 121-22; *Smith
Barney Shearson Inc. v. Sacharow*, 91 N.Y.2d 39, 46-47 (1997).

*First*, the Comcast arbitration provision defines "Dispute" to include the "scope of this Arbitration Provision."  *See, e.g.*, *Washington v. William Morris Endeavor Entm't, LLC*, 2011 WL 3251504, at *6 (S.D.N.Y. July 20, 2011).[14]  *Second*, the parties incorporated by reference the Commercial Arbitration Rules of the American Arbitration Association ("AAA"), which in turn provide that the question of arbitrability is an issue for the arbitrator to decide.  As this Court has previously found, that constitutes clear and unmistakable evidence that parties intended an arbitrator to determine arbitrability.  *See Sleepy's LLC v. Escalate, Inc.*, 2010 WL 2505678, at *2 (S.D.N.Y. June 18, 2010) (Scheindlin, J.).[15]

## III.  THE DIRECTV SUBSCRIBERS' CLAIMS AGAINST THE COMCAST DEFENDANTS ARE SUBJECT TO INDIVIDUAL ARBITRATION

As set forth below, the broad DIRECTV arbitration provision requires the DIRECTV Subscribers (Silver and Birbiglia) to arbitrate not only their claims against DIRECTV but also their claims against the Comcast RSNs and their claims, if any, against Comcast.[16]  The DIRECTV Subscribers expressly agreed to arbitrate "any claim" relating to "programming"

---

[14] *See, e.g.*, *Mercedes Homes, Inc. v. Colon*, 966 So. 2d 10, 12-14 (Fla. App. 5th Dist. 2007); *Mercedes Homes, Inc. v. Rosario*, 920 So. 2d 1254, 1255-56 (Fla. App. 2d Dist. 2006); *Silec Cable S.A.S. v. Alcoa Fjardaal SF*, 2012 WL 5906535, at *16-17 (W.D. Pa. Nov. 26, 2012).

[15] *See also Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 208 (2d Cir. 2005); *Shaw Group*, 322 F.3d at 123; *Terminix Int'l Co. v. Palmer Ranch Ltd.*, 432 F.3d 1327, 1332 (11th Cir. 2005); *Silec Cable*, 2012 WL 5906535, at *16-17; *Washington*, 2011 WL 3251504, at *6.

[16] Neither of the DIRECTV Subscribers has a claim against Comcast because, as the Court has stated repeatedly, Plaintiffs have not alleged that Comcast and DIRECTV are co-conspirators.  *See, e.g.*, *Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 487 (S.D.N.Y. 2012) ("Plaintiffs do not allege that the MVPDs have agreed amongst themselves in any way, and in fact, it is clear that MVPDs compete with each other to sell packages containing hockey and baseball programming."); *Laumann v. Nat'l Hockey League*, 2013 WL 837640, at *2 (S.D.N.Y. Mar. 6, 2013) (stating that "the MVPDs are not alleged to have conspired with each other").  In an abundance of caution, however, the Comcast Defendants have moved to compel and to stay any claims the DIRECTV Subscribers have against Comcast.

provided by DIRECTV, which includes claims based on out-of-market packages containing programming produced by the Comcast RSNs, and the non-signatory Comcast RSNs can enforce the DIRECTV arbitration provision.  Furthermore, the doctrine of equitable estoppel requires arbitration of the DIRECTV Subscribers' claims against the Comcast RSNs.  Indeed, permitting the DIRECTV Subscribers to avoid arbitrating those claims, which are inextricably intertwined with the claims that they have agreed to arbitrate with DIRECTV, would effectively thwart the strong federal policy favoring arbitration.

      **A.**      **The DIRECTV Subscribers Agreed to
Arbitrate Their Claims Against the Comcast RSNs**

Like the Comcast arbitration provision, the DIRECTV arbitration provision is broader than the typical arbitration clause.  *See Hanjin Shipping Co.*, 2006 WL 1096389 at *3.  It requires the DIRECTV Subscribers to arbitrate "any legal or equitable claim relating to [the DIRECTV Customer] Agreement, any addendum, or [their] Service," where Service is defined to include "programming" provided by DIRECTV.  (McCarthy Decl., Ex. B § 9(b).)

The DIRECTV Subscribers cannot overcome the presumption of arbitrability created by the broad DIRECTV arbitration provision.  *See Oldroyd*, 134 F.3d at 76.  All of their claims relate to programming provided by DIRECTV—and thus the "Service"—because they are premised on alleged overpayments for out-of-market television programming packages provided by DIRECTV.[17]  Further, the DIRECTV Subscribers challenge the manner in which DIRECTV is authorized to, and does, provide programming to them.  (*See Laumann* ¶ 71; *Garber* ¶ 75.)  Their claims therefore relate both to the programming provided to plaintiffs by DIRECTV, and

---

[17] *See, e.g.*, *Laumann* ¶ 15 ("Plaintiff Robert Silver . . . subscribed to the NHL Center Ice, which he received through *Directv satellite service*. . . .  He was charged supra-competitive prices *for his service* due to Defendants' conduct." (emphasis added).)

to the DIRECTV Customer Agreement pursuant to which that programming is provided. Accordingly, they fall squarely within the category of claims for which the broad DIRECTV arbitration provision requires individual arbitration.

Nor is the scope of the DIRECTV arbitration provision limited to claims against DIRECTV itself.  Instead, the provision requires arbitration of "any" claim relating to the DIRECTV Customer Agreement or "Service."  "[R]ead naturally, the word 'any' has an expansive meaning, that is, one or more indiscriminately of whatever kind."  *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 219 (2008); *see also Boyle v. United States*, 556 U.S. 938, 944 (2009) ("The term 'any' ensures that the definition has a wide reach.").

"[C]ourts have held consistently that a 'broad' arbitration clause governing 'all disputes' arising under [an agreement] covers even a dispute involving a nonsignatory."  *Thyssen, Inc. v. M/V Markos N.*, 1999 WL 619634, at *4 (S.D.N.Y. Aug. 16, 1999).  In *Thyssen*, for example, the arbitration clause required arbitration of "any dispute" which "arises under" a contract.  *Id.* at *5. Based upon this broad langauge, the Court held that the contract's arbitration clause governed disputes involving non-signatories.  *Id.* at *5-6; *see also F.D. Import & Export Corp. v. M/V Reefer Sun*, 248 F. Supp. 2d 240, 247 (S.D.N.Y. 2002) (Scheindlin, J.) (stating that a broad arbitration clause "may govern disputes of non-signatories").[18]

This conclusion is confirmed by the plain language and structure of the DIRECTV Customer Agreement.  It specifically carves out from the arbitration provision certain claims involving non-signatories, including "programming provider[s]":

---

[18] The contract at issue was a so-called "charter party."  "[A] Charter Party is just a species of contract, subject to the same rules of interpretation as any other binding agreement." *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1019 (2d Cir. 1993).

> Notwithstanding the provisions of Section 9 [*i.e.*, the DIRECTV arbitration provision], we *or any programming provider* may prosecute violations of the foregoing [prohibition against, *inter alia*, rebroadcasting the programming] against you *and other responsible parties* in any court of competent jurisdiction . . . .

(McCarthy Decl., Ex. B § 1(h) (emphasis added).)  If the DIRECTV arbitration provision were limited solely to disputes between DIRECTV and its subscribers, then the clause excluding from its scope certain claims involving non-signatories such as "programming provider[s]" would be superfluous.  But it is a fundamental principle of contract interpretation that courts must "adopt an interpretation which gives meaning to every provision of the contract."  *See, e.g.*, *Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101, 111 (2d Cir. 2008).  Therefore, a narrow interpretation of DIRECTV's arbitration provision that does not embrace arbitration with non-signatory "programming provider[s]" is not a permissible reading.

Other courts have granted motions by non-signatories to compel arbitration with signatories (without invoking theories of estoppel) where, as here, the agreement contains an express textual basis for allowing non-signatories to invoke the arbitration clause.  *See, e.g.*, *Sherer v. Green Tree Servicing LLC*, 548 F.3d 379, 382 (5th Cir. 2008) ("Based on the Loan Agreement's language, [signatory] Sherer has validly agreed to arbitrate with a nonsignatory, such as the loan servicer Green Tree, and the language is sufficiently broad to permit Green Tree to compel arbitration."); *Blinco v. Green Tree Servicing LLC*, 400 F.3d 1308, 1312 (11th Cir. 2005) (per curiam) ("[T]he language of the arbitration clause at issue is broad enough to permit both Green Tree entities to invoke it, regardless of their signatory status.").  Given the breadth of the DIRECTV arbitration provision, including the references to "any" claim and to non-signatory "programming provider[s]," that provision is indisputably "susceptible of an interpretation that covers the asserted dispute" between the DIRECTV Subscribers and the Comcast RSNs, which provided programming for the very out-of-market television packages upon which the

DIRECTV Subscribers' claims are based.  *See Hanjin Shipping Co.*, 2006 WL 1096389, at *2

(quoting *Bank Julius Baer & Co., Ltd. v. Waxfield Ltd.*, 424 F.3d 278, 284 (2d Cir. 2005)).

Therefore, the Comcast RSNs should be permitted to invoke that provision to compel the

signatory DIRECTV Subscribers to arbitrate their claims.

       **B.**       **Principles of Estoppel Also Require the DIRECTV**
                 **Subscribers to Arbitrate Their Claims Against the Comcast RSNs**

Under principles of estoppel, a non-signatory to an arbitration agreement may compel a

signatory to arbitrate a dispute where a careful review of the "relationship among the parties, the

contracts they signed . . . , and the issues that had arisen" among them discloses that "the issues

the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the

estopped party has signed."  *Ragone v. Atlantic Video at Manhattan Ctr.*, 595 F.3d 115, 126-27

(2d Cir. 2010) (quoting *Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.*, 271 F.3d

403, 406 (2d Cir. 2001)).

Here, the DIRECTV Subscribers purchase from DIRECTV a television service that

contains programming provided by the Comcast RSNs, including the out-of-market sports

programming that is at the heart of their claims.  Based on those purchases, the DIRECTV

Subscribers claim standing to assert antitrust claims against the Defendants, including the

Comcast RSNs.  Those claims, in turn, are inextricably intertwined with the DIRECTV

Customer Agreement, in which the DIRECTV Subscribers agreed to arbitrate "any" dispute

relating to programming provided by DIRECTV, including disputes involving non-signatory

programming providers.  Under these circumstances, the DIRECTV Subscribers are estopped

from refusing to arbitrate their claims against the Comcast RSNs.

As to the relationship among the parties, television viewers subscribe to satellite

television to receive programming, including RSN programming that is bundled into out-of-

market packages.  (*See*, *e.g.*, Pls.' Opp'n to Mot. to Dismiss, at 43 ("Viewers . . . purchase video *programming*, which is produced and sold subject to anticompetitive agreements *by the RSNs*." (emphasis in original).)  This indisputable fact is reflected in the DIRECTV Customer Agreement containing the arbitration provision to which the DIRECTV Subscribers agreed. (*See*, *e.g.*, McCarthy Decl., Ex. B at 1 (defining "Service" as "digital satellite entertainment programming and services").)  It is further reflected in the DIRECTV Subscribers' allegations. (*See*, *e.g.*, *Laumann* ¶ 42 (alleging that "Silver was a subscriber to NHL Center Ice as part of [his DIRECTV] service"); *Garber* Second Am. Compl. ¶ 22 (alleging that Birbiglia "is a subscriber to MLB Extra Innings through his Directv service"); *Garber* ¶ 60 (alleging a "relevant market for live video presentations of major league baseball games over media such as cable and satellite television and the Internet").)  Indeed, RSN programming is so important in the view of the DIRECTV Subscribers that they describe it as alleged "must have" programming.  (*Laumann* ¶ 73; *Garber* ¶ 77.)

The relationship between DIRECTV and the Comcast RSNs is also embedded in the DIRECTV Subscribers' claims.  Plaintiffs allege that the RSNs "enter agreements with multichannel video distributors (MVPDs), like defendants Comcast and Directv, to implement the blackouts."  (*Laumann* ¶ 71; *Garber* ¶ 75.)  Plaintiffs also have argued that "RSNs . . . produce the product at issue here:  live baseball and hockey *programming*" (Pls.' Opp'n to Mot. to Dismiss, at 14 (emphasis in original)), and insisted that "[t]he conduct of the RSN defendants" is "central" to their claims.  (Pls.' Opp'n to Mot. to Stay, at 7.)[19]

---

[19] The Comcast Defendants dispute all of Plaintiffs' allegations and assertions, including those relating to the relevant product market.

The facts here parallel those in *Ragone v. Atlantic Video*, 595 F.3d 115 (2d Cir. 2010), in which the Second Circuit held that a non-signatory to an arbitration agreement could compel a signatory to arbitrate.  In *Ragone*, the plaintiff was a make-up artist who was hired by the operator of a television studio called AVI, whose clients included ESPN.  Her employment agreement, to which ESPN was not a signatory, included an arbitration provision.  When she subsequently sued both AVI and ESPN for sexual harassment, the Second Circuit held that she was estopped from refusing to arbitrate with ESPN.  Examining the close relationship between AVI and ESPN, the Second Circuit concluded that "when Ragone was hired by AVI, she understood ESPN to be, to a considerable extent, her co-employer."  *Id.* at 127.  Further, the Court concluded that "the subject matter of the dispute between Ragone and AVI is factually intertwined with the dispute between Ragone and  ESPN."  *Id.* at 128.  On that basis, the Court compelled arbitration of the plaintiff's claims against non-signatory ESPN.

Similarly, when the DIRECTV Subscribers purchased DIRECTV service, they knew that they would be indirectly purchasing programming from non-signatory programming providers, including the alleged "must have" programming that the Comcast RSNs contribute to the basic subscription packages and to the out-of-market packages.  Indeed, whereas ESPN was not mentioned in the employment agreement at issue in *Ragone*, *id.* at 127, "programming provider[s]" are expressly referenced in the DIRECTV Customer Agreement.  (*See*, *e.g.*, McCarthy Decl., Ex. B § 1(h).)  The facts more strongly support arbitration here than in *Ragone* for the additional reason that the signatory (DIRECTV) and the non-signatories (the Comcast RSNs) have allegedly acted in concert.

There can be "no question" that the subject matter of the DIRECTV Subscribers' dispute with the Comcast RSNs is "factually intertwined" with their dispute with DIRECTV, which they

agreed to stay pending arbitration—as in *Ragone*, "[i]t is, in fact, the same dispute." 595 F.3d at 128. The DIRECTV Subscribers allege that the Comcast RSNs and DIRECTV are co-conspirators; allege that they overpay DIRECTV for out-of-market programming provided, in part, by the Comcast RSNs and distributed to them by DIRECTV; and seek to hold the Comcast RSNs and DIRECTV jointly and severally liable for the same underlying facts. (*See* p. 16 *supra*; Pls.' Opp'n to Mot. to Dismiss, at 49 n.59; Pls.' Opp'n to Mot. to Stay, at 6.) Indeed, the alleged overcharges on which their claims rest were paid pursuant to the DIRECTV Customer Agreement, which expressly references programming from non-signatory "programming provider[s]," such as the Comcast RSNs.[20]

The Second Circuit's decision in *Ross v American Express*, 547 F.3d 137 (2d Cir. 2008), is no obstacle to compelling arbitration here. In *Ross*, the plaintiffs held credit cards issued by banks, but not by American Express. *Id.* at 139-140. The plaintiffs alleged that American Express had conspired with the banks to fix certain credit card fees and to include compulsory arbitration clauses in card agreements, thus suppressing competition over the cards' terms. *Id.* American Express sought to compel the plaintiffs to arbitrate those claims pursuant to the arbitration clauses in the agreements between the plaintiffs and the banks. *Id.* The Second Circuit held that American Express could not invoke those clauses under principles of estoppel. *Id.* at 148. The Court reasoned that American Express, a competitor to the banks whose only

---

[20] *See, e.g., JLM Indus.*, 387 F.3d at 178 ("The questions the [non-signatories] seek to arbitrate are undeniably intertwined with the [agreements containing an arbitration provision], since . . . it is the fact of [the signatory's] entry into the [agreements] containing allegedly inflated price terms that gives rise to the claimed injury."); *In re Universal Serv. Fund. Tel. Billing Practices Litig.*, 300 F. Supp. 2d 1107, 1139-41 (D. Kan. 2003) (invoking principles of equitable estoppel to compel the plaintiffs to arbitrate antitrust claims against alleged co-conspirators of their respective long distance carriers, where the carriers' allegedly collected overcharges pursuant to contracts with their customers).

relationship to them was through the alleged conspiracy, "utterly lack[ed]" any connection to the plaintiffs "sufficient to demonstrate that the plaintiffs intended to arbitrate this dispute with Amex." *Id.* at 146.  In short, "the plaintiffs did not know Amex from Adam." *Id.*  The exact opposite is true here.  As set forth above, the very reason the DIRECTV Subscribers subscribed to DIRECTV service was to access programming, including alleged "must have" programming from RSNs.  Further, their claims rest on their purchase of a basic television package and an out-of-market package that include programming produced by the Comcast RSNs.  Thus, unlike in *Ross*, the DIRECTV Subscribers cannot argue that the Comcast RSNs are strangers to their relationship with DIRECTV.

Under all of these circumstances, principles of estoppel require the DIRECTV Subscribers to arbitrate their claims against the Comcast RSNs.  This is especially appropriate because the DIRECTV Subscribers have agreed to stay their claims against DIRECTV pending arbitration.  (*See Laumann*, ECF No. 130; *Garber*, ECF No. 157.)  Plaintiffs should not be permitted to pursue claims against the Comcast RSNs that are inextricably intertwined with the stayed claims against DIRECTV.

## IV.   THIS COURT SHOULD STAY ALL CLAIMS AGAINST THE COMCAST DEFENDANTS PENDING ARBITRATION

All of the Subscribers' claims against the Comcast Defendants are subject to arbitration and therefore must be stayed pending arbitration under Section 3 of the FAA.  *See* 9 U.S.C. § 3; *Genesco, Inc. v. T. Kakiuchi & Co., Ltd*., 815 F.2d 840, 855-56 (2d Cir. 1987); *see also Ibeto Petrochemical Indus. v. M/T Beffen*, 412 F. Supp. 2d 285, 292 (S.D.N.Y. 2005) (Scheindlin, J.).  Nevertheless, if the Court does not compel arbitration of the DIRECTV Subscribers' claims against the Comcast Defendants, those claims should be stayed pending the outcome of the contemplated arbitration with DIRECTV because the facts and issues in the two sets of claims

are virtually identical. *Hikers Indus., Inc. v. William Stuart Indus. Ltd.*, 640 F. Supp. 175, 177-78 (S.D.N.Y. 1986) (staying entire case pending outcome of arbitration because claims against non-signatory defendant involved "substantially similar" facts and issues, "making substantial duplication of effort inevitable").

The Court also should stay the claims against the Comcast Defendants asserted by the remaining Plaintiffs—Dillon and Lerner.  Like Laumann and Rasmussen, Dillon and Lerner assert claims based upon their alleged purchase of out-of-market Internet packages from the NHL and MLB Defendants, respectively.  (*Laumann* ¶ 17; *Garber* ¶ 17.)  Like Laumann and Rasmussen, Dillon and Lerner accuse the Comcast Defendants of involvement in a conspiracy to omit "in market" games from the Internet packages in order to "force" consumers such as themselves to subscribe to a television service.[21]  Thus, regardless of whether Dillon and Lerner's claims are arbitrable, they involve the same facts and issues as the arbitrable claims asserted by Laumann and Rasmussen against the Comcast Defendants and, for that matter, the same facts and issues as every other claim against the Comcast Defendants.  Indeed, Plaintiffs have previously conceded that, in the event some claims were subject to arbitration by virtue of the Comcast or DIRECTV arbitration agreements, "[t]he core issues [in the cases] would be unchanged," "[t]he legality of the schemes to divide the market would be assessed in exactly the same manner," and "the RSNs' and the distributors' involvement and participation in those schemes would be equally relevant."  (Pls.' Opp'n to Mot. to Stay, at 6-7.)  Accordingly, all of the claims against the Comcast Defendants should be stayed pending arbitration of the arbitrable claims.  *See, e.g.*, *Argus Media, Ltd. v. Tradition Fin. Servs.*, 2009 WL 5125113, at \*3-4

---

[21] *See* pp. 12-13 *supra*.  Lerner currently receives television service from DIRECTV, which has separately moved to compel arbitration and to stay his claims.  (*See Garber*, ECF No. 159.)

(S.D.N.Y. Dec. 29, 2009) (staying non-arbitrable claims where "the exact same type of conduct" was the subject of the court and arbitration proceedings); *Bischoff v. DirecTV, Inc.*, 180 F. Supp. 2d 1097, 1114-15 (C.D. Cal. 2002) (staying entire case where plaintiffs' claims against DIRECTV were subject to arbitration even though claims against DIRECTV's alleged co-conspirators were not).

## CONCLUSION

For the foregoing reasons, the Comcast Defendants respectfully request that the Court issue an order compelling individual arbitration of the Subscribers' claims against the Comcast Defendants and staying all claims against the Comcast Defendants pending arbitration.

Dated:  August 19, 2013

> Respectfully submitted,
>
> */s/ Arthur J. Burke*
> Arthur J. Burke
> James W. Haldin
> **DAVIS POLK & WARDWELL LLP**
> 450 Lexington Avenue
> New York, New York  10017
> Telephone:  (212) 450-4000
> Facsimile:  (212) 701-5800
> arthur.burke@davispolk.com
> james.haldin@davispolk.com
>
> *Attorneys for Defendants Comcast Corporation, Comcast SportsNet Philadelphia, L.P., Comcast SportsNet Mid-Atlantic L.P., Comcast SportsNet California, LLC, and Comcast SportsNet Chicago, LLC*