UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THOMAS LAUMANN, FERNANDA GARBER, ROBERT SILVER, GARRETT TRAUB, DAVID DILLON, and PETER HERMAN, representing themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>NATIONAL HOCKEY LEAGUE et al.,<br><br>        Defendants. | 12-cv-1817 (SAS) |
| FERNANDA GARBER, MARC LERNER, DEREK RASMUSSEN, ROBERT SILVER, GARRETT TRAUB, and PETER HERMAN, representing themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>OFFICE OF THE COMMISSIONER OF BASEBALL et al.,<br><br>        Defendants. | 12-cv-3704 (SAS)<br><br>ECF Cases<br><br><u>Electronically Filed</u> |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
COMCAST'S MOTION TO COMPEL ARBITRATION AND TO STAY CLAIMS**

**TABLE OF CONTENTS**

PAGE

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT .................................................................................................................................. 2

I. The Comcast Subscribers' Claims Against the Comcast Defendants Are Subject to Individual Arbitration ........................................................................................................ 2

    A. All Claims Against the Comcast Defendants Fall Within the Broad Scope of the Comcast Arbitration Provision ............................................................................. 2

    B. Any Doubt Should Be Resolved in Favor of Arbitration ....................................... 4

II. The DIRECTV Subscribers' Claims Against the Comcast RSNs Are Subject to Individual Arbitration ........................................................................................................ 6

    A. The Express Language of the DIRECTV Agreement Requires Arbitration of the DIRECTV Subscribers' Claims Against the Comcast RSNs ................................ 6

    B. Equitable Estoppel Also Requires Arbitration of the DIRECTV Subscribers' Claims Against the Comcast RSNs ........................................................................ 8

III. A Stay of All Claims Against the Comcast Defendants Is Appropriate ........................... 10

CONCLUSION ............................................................................................................................. 10

**PRELIMINARY STATEMENT**

Plaintiffs concede at the outset of their brief that the Comcast Defendants' motion to compel arbitration should be granted with respect to Traub. (Pls. Opp'n at 2.) In the remainder of their brief, they rely upon false analogies and ipse dixit arguments to resist the motion with respect to the remaining subscribers. Contrary to Plaintiffs' contentions, these subscribers' claims fit comfortably within the broad arbitration provisions to which they agreed. The Comcast Defendants seek only to arbitrate claims by Comcast subscribers that encompass the services provided by Comcast and the programming produced by the Comcast RSNs. The Comcast RSNs further seek to arbitrate claims by DIRECTV subscribers, who agreed to arbitrate "any" claims relating to programming distributed by DIRECTV, including claims against unaffiliated, non-signatory programmers such as the Comcast RSNs.

First, the broad arbitration provision to which Laumann, Rasmussen, and Silver (the "Comcast Subscribers") agreed encompasses all claims relating to "any aspect" of their relationship with Comcast. As a matter of law, that provision must be construed as broadly as possible, with doubts resolved in favor of arbitration. The Comcast Subscribers' claims undoubtedly involve "aspects" of their relationship with Comcast. Laumann and Rasmussen, for example, allege they overpaid for an Internet package, which included programming *produced by the Comcast RSNs*, and which they watched via Internet service *purchased from Comcast*. They also claim that the "blackout" of certain games from the Internet package "forced" them to purchase television service, which they elected to *purchase from Comcast*.

Unable to dispute the close ties between the Comcast Subscribers' services and their claims (or the governing interpretative principles), Plaintiffs instead suggest that the ties are random, akin to a freak, fateful encounter with a Comcast truck. That analogy is both unavailing and ironic. To keep the Comcast Defendants in this litigation, Plaintiffs have spun sprawling

1

conspiracy theories encompassing multiple aspects of their relationship with the Comcast Defendants.  Plaintiffs cannot now escape arbitration by suggesting the Comcast Defendants are incidental to their claims.

Second, as for Silver and Birbiglia (the "DIRECTV Subscribers"), Plaintiffs simply ignore the language in the DIRECTV Agreement showing that its arbitration provision reaches claims involving non-signatory programmers like the Comcast RSNs.  Separately, Plaintiffs advance a cramped and demonstrably inequitable interpretation of the equitable estoppel doctrine and ignore controlling authority.  Proper application of the doctrine requires arbitration of the DIRECTV Subscribers' claims against the Comcast RSNs, which are inextricably intertwined with the claims those subscribers agreed to stay pending arbitration with DIRECTV.

Finally, because the remaining claims against the Comcast Defendants involve the same facts and issues as the arbitrable claims, they too should be stayed pending arbitration.

## ARGUMENT

**I.     The Comcast Subscribers' Claims Against the Comcast Defendants Are Subject to Individual Arbitration**

   **A.     All Claims Against the Comcast Defendants Fall Within the Broad Scope of the Comcast Arbitration Provision**

Plaintiffs do not dispute that the Federal Arbitration Act applies, and they concede that the Comcast Subscribers entered into enforceable agreements to arbitrate claims regarding "any aspect" of their relationship with Comcast.  But Plaintiffs fail to acknowledge (let alone rebut) that Comcast's arbitration provision creates a strong "presumption of arbitrability" and, as a matter of law, must be construed "as broadly as possible."  *Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 76 (2d Cir. 1998).  Nor do plaintiffs acknowledge that the legal standard is whether it can "be said with positive assurance that the [Comcast] arbitration clause is not susceptible of an interpretation that it covers the asserted dispute."  *Id.*

2

Instead, Plaintiffs disingenuously assert that Comcast is "seeking to arbitrate *all* claims by anyone who *ever* entered *any* agreement with Comcast that contained an arbitration clause," including, for example, "a person struck by a Comcast truck ten years after cancelling a cable contract." (Pls. Opp'n at 14.) Plaintiffs then argue that the Comcast Subscribers' claims "have nothing to do with [their] contracts or their contractual relationships with Comcast." (Pls. Opp'n at 16.) That analogy and argument hold no water.

Laumann and Rasmussen allege that they were "forced" to purchase television service because Comcast conspired to limit the professional hockey and baseball games available on their Internet packages (Pls. Opp'n to Mot. to Dismiss at 11), and *they elected to purchase Comcast service*. Additionally, their claims are premised on allegations that they overpaid for the Internet package, which Plaintiffs do not dispute included programming produced by the Comcast RSNs watched via Internet service provided by Comcast. Silver's claims are premised on his allegation that he overpaid for an out-of-market television package he purchased from DIRECTV, which Plaintiffs do not dispute included programming produced by the Comcast RSNs. Those claims are indisputably related to "aspects" of their relationship with Comcast.

Plaintiffs argue that Laumann and Rasmussen's claims are unrelated to their relationship with Comcast because they assert only "claims based on their purchases of Internet packages from the leagues." (Pls. Opp'n at 15.) That argument begs the question why Plaintiffs have sued the Comcast Defendants with respect to these Internet claims in the first place. Plaintiffs are free to dismiss the Internet claims against Comcast, but absent dismissal, they cannot avoid arbitration with respect to the Comcast Defendants.

Plaintiffs' arguments also directly contradict the far-reaching conspiracy theories they have advanced throughout this litigation. For example, Plaintiffs now argue that Laumann and

3

Rasmussen's contracts with Comcast are "unrelated" to their claims. (Pls. Opp'n at 14.) But that contradicts their prior assertion that their television claims are "highly interrelated" with their Internet claims. (Pls. Opp'n to Mot. to Stay at 7.) Similarly, Plaintiffs now argue it is implausible "to suggest that their claims are related to [their] relationship [with Comcast] simply because they would prefer to have the ability to choose to watch some of the games that are only available on television on the Internet." (Pls. Opp'n at 16.) But that contradicts their earlier statements that their television and Internet claims are closely intertwined precisely because the Defendants conspired to "force" *consumers to purchase programming from Comcast*. (Pls. Opp'n to Mot. to Dismiss at 11.) Plaintiffs should not be allowed to assert indirect antitrust claims against the Comcast Defendants based on their relationship with Comcast and then avoid arbitration by arguing that relationship is incidental to their claims.

### B.   Any Doubt Should Be Resolved in Favor of Arbitration[1]

The Court should compel arbitration of the Comcast Subscribers' claims even if there is doubt about the scope of the Comcast arbitration provision because there is "clea[r] and unmistakabl[e]" evidence in the agreement that the parties intended such doubts to be resolved in arbitration. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944-45 (1995). Plaintiffs are correct that there is a rebuttable presumption that scope is for courts to decide, but the parties here have overcome that presumption by (1) unambiguously agreeing that "Disputes" subject to arbitration include the "scope of this Arbitration Provision," and (2) incorporating by reference the Commercial Arbitration Rules of the American Arbitration Association, which in

---

[1] Plaintiffs head their argument "The Application of Equitable Estoppel Is Not a Question for the Arbitrator" (Pls. Opp'n at 17), but Comcast has never argued to the contrary.

4

turn provide that the question of scope is for the arbitrator to decide.[2]  *See, e.g.*, *Washington v. William Morris Endeavor Entm't, LLC*, 2011 WL 3251504, at *6 (S.D.N.Y. July 20, 2011).[3]

Lacking an answer to this point, Plaintiffs argue that submitting the question of scope to the arbitrator would somehow be unconscionable and cite a single case in support—*In re Jiffy Lube International, Inc., Text Spam Litigation*, 847 F. Supp. 2d 1253 (S.D. Cal. 2012).  (Pls. Opp'n at 18.)  *Jiffy Lube* did not address whether parties can assign scope disputes, however, and therefore is inapposite to scenarios where, as here, the parties have unambiguously agreed to assign such disputes to the arbitrator.  Further, the dispute in question—whether defendants were liable for allegedly illegal text-message spam—had nothing to do with the services purchased from Jiffy Lube that were governed by an arbitration agreement.  *Id.* at 1262-63.  Accordingly, the court held that the plaintiff's claim did not "arise out of or relate to" the contract.  *Id.* at 1263.  In contrast, the Comcast Subscribers' claims relate directly to services purchased from, and programming produced by, the Comcast Defendants.

Finally, Plaintiffs attempt to circumvent the express assignment of scope disputes to the arbitrator by arguing that "disputes over whether people must arbitrate claims that are unrelated to the contracts they have entered are not subject to arbitration."  (Pls. Opp'n at 18.)  But that is precisely the issue that the parties agreed an arbitrator would decide in the first instance.  If the arbitrator determines that some or all of Plaintiffs' claims do *not* fall within the scope of the Comcast arbitration provision, they could return to federal court.  That would not be an "absurd

---

[2] Those rules also provide that "[t]he parties shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by [AAA] under its Commercial Arbitration Rules."  Rule R-1(a).

[3] Plaintiffs argue that incorporating rules providing for arbitrability of scope disputes is not sufficient, in and of itself, to overcome the presumption.  (Pls. Opp'n at 19 n.10.)  Whatever the merits of that position, it is of no import here because the parties have also unambiguously agreed that scope disputes are subject to arbitration.

consequence" (Pls. Opp'n at 19), but rather the very result the parties intended.

## II.  The DIRECTV Subscribers' Claims Against the Comcast RSNs Are Subject to Individual Arbitration

### A.  The Express Language of the DIRECTV Agreement Requires Arbitration of the DIRECTV Subscribers' Claims Against the Comcast RSNs

Plaintiffs do not dispute that the DIRECTV Subscribers expressly agreed to arbitrate "any claim" relating to "programming" that they received from DIRECTV. (*See* Comcast Mem. at 15-16.)  The DIRECTV Subscribers' claims relate to programming provided by DIRECTV in two respects.  First, their claims are premised on alleged overpayments for out-of-market television packages (which include Comcast RSN programming) that DIRECTV provides.  Second, the DIRECTV Subscribers challenge the manner in which DIRECTV provides professional hockey and baseball programming to them.  (*Id.* at 16-17.)

As set forth in the Comcast Defendants' opening brief, the DIRECTV arbitration provision is not limited to claims against DIRECTV itself.  "[C]ourts have held consistently that a 'broad' arbitration clause governing 'all disputes' arising under [an agreement] covers even a dispute involving a nonsignatory."  *Thyssen, Inc. v M/V Markos N.*, 1999 WL 619634, at *4 (S.D.N.Y. Aug. 16, 1999).  More importantly, the DIRECTV Agreement specifically *carves out* certain claims involving any non-signatory "programming provider" from the arbitration provision.  (Comcast Mem. at 17-18.)  If the DIRECTV arbitration provision did not cover claims against those non-signatories in the first place, this carve out would be entirely superfluous, which is not a permissible interpretation of the agreement.  *See, e.g.*, *Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101, 111 (2d Cir. 2008) (noting courts must "adopt an interpretation which gives meaning to every provision of the contract").

Plaintiffs fail even to acknowledge (let alone address) the text of the DIRECTV Agreement and the governing interpretative principles that confirm non-signatory programmers

6

can enforce the arbitration provision.[4]  Plaintiffs instead assert that the DIRECTV Agreement lacks (1) the word "Comcast" or (2) "any language that suggests that any part of the agreement applies to anyone other than Directv entities." (Pls. Opp'n at 6.)  The first assertion is irrelevant, particularly in light of the express reference to non-signatory "programming provider[s]."  The second assertion is demonstrably wrong, because the DIRECTV Agreement expressly refers to "programming provider[s]" unaffiliated with DIRECTV.  (Comcast Mem. at 17-18.)

Nor is there merit to Plaintiffs' argument that the DIRECTV Agreement cannot be invoked by Comcast because the Agreement applies only to "'you' (the customer), 'we' [DIRECTV], and 'us'". (Pls. Opp'n at 7.)  That language signifies only that the customer and DIRECTV are the *signatories* to the contract, and has no bearing on whether a non-signatory can invoke the arbitration provision.  Indeed, the agreement in *Thyssen* had a similar structure "arguably limiting the scope of the clause to those two parties," but the court explained that "courts have interpreted similar language, not as a limitation, but as a reflection merely of the fact that the [agreement] involved two parties at the time of drafting." 1999 WL 619634, at *5.

As a last resort, Plaintiffs seek to leverage improperly their stipulation with DIRECTV, in which they agreed to arbitrate certain claims under the DIRECTV arbitration provision. (Pls. Opp'n at 8.)  But the fact that DIRECTV agreed not to enforce the DIRECTV arbitration provision on behalf of unaffiliated non-signatories does not show that the provision fails to reach

---

[4] Plaintiffs criticize the Comcast Defendants for citing "only two" cases in support of this argument. (Pls. Opp'n at 7 n.5.)  In fact, Comcast relied principally on two cases from this Court and two federal appellate decisions. (Comcast Mem. at 16-19).  In response, Plaintiffs cite *no* authority, disregard the cases from this Court, and fail to distinguish the appellate decisions.  Plaintiffs argue that *Sherer v. Green Tree Servicing LLC*, 548 F.3d 379 (5th Cir. 2008) and *Blinco v. Green Tree Servicing LLC*, 400 F.3d 1308 (11th Cir. 2005) involve different language than the DIRECTV Agreement. (Pls. Opp'n at 7 n.5.)  But that in no way undermines the support those decisions provide for the proposition that non-signatories can compel arbitration with signatories where, as here, the agreement contains an express textual basis for allowing non-signatories to do so.

those claims. Indeed, to the extent that agreement is probative, it implies that the DIRECTV arbitration provision *does reach* claims against at least some unaffiliated non-signatories. Moreover, Plaintiffs' contention that DIRECTV has "agreed that its arbitration clause does not permit Comcast to enforce it" (Pls. Opp'n at 3) is demonstrably false, because the stipulation is silent on whether Comcast (or any other non-signatory) can enforce DIRECTV's arbitration provision. Finally, the fact that other Defendants have not joined Comcast's motion says nothing about its merits, because those Defendants do not have the same relationships with the DIRECTV Subscribers that the Comcast Defendants do.

### B. Equitable Estoppel Also Requires Arbitration of the DIRECTV Subscribers' Claims Against the Comcast RSNs

Plaintiffs argue that equitable estoppel applies *only* to claims that depend on the contract containing the arbitration provision not to be void. (Pls. Opp'n at 10 (arguing that is the "essential question")). Plaintiffs' cramped characterization of equitable estoppel is contrary to the inherently flexible nature of equity. *See*, *e.g.*, 3 William Blackstone, *Commentaries*, at 28 ("[T]here can be no established rules and fixed precepts of equity . . . without destroying its very essence"). And Plaintiffs' narrow depiction of the doctrine is disproved by, for example, the Second Circuit's decision in *Ragone v. Atlantic Video*, 595 F.3d 115 (2d Cir. 2010), in which the plaintiff asserted employment claims that would have been viable even if the employment agreement containing the arbitration provision had been void.[5]

---

[5] Plaintiffs invoke state law (Pls. Opp'n at 9), but Nevada law is silent as to whether a non-signatory who does not rely on the contract as the basis for relief can invoke equitable estoppel, and Plaintiffs concede that the Pennsylvania Supreme Court has never reached the issue. In these circumstances, federal court decisions are, at a minimum, persuasive authority. Indeed, the Nevada Supreme Court looks to federal authority, including Second Circuit decisions, in deciding related issues. *See, e.g., Ahlers v. Ryland Homes Nevada, LLC*, 2010 WL 3276221, at *1-2 (Nev. Apr. 16, 2010) (citing federal circuit and district court decisions).

8

In *Ragone*, the Second Circuit held that equitable estoppel allows a non-signatory to compel arbitration against a signatory where, as here, "the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Id.* at 126-27 (internal citations omitted).[6] Plaintiffs' attempt to distinguish *Ragone* fails. Viewers subscribe to satellite television knowing that they will obtain programming from non-signatory programmers. Here, the DIRECTV Agreement and Plaintiffs' allegations demonstrate this understanding. (Comcast Mem. at 19-20.) This is directly analogous to the *Ragone* plaintiff entering into an employment agreement with a television studio knowing that she would provide services to ESPN, a non-signatory programmer who produced programming in that studio.

Indeed, the facts here more strongly support arbitration than in *Ragone*. First, the DIRECTV Subscribers not only knew that they would receive programming from non-signatory programming providers, but they subscribed to DIRECTV *in order to* obtain that programming—including to obtain allegedly "must have" programming from the Comcast RSNs. (Comcast Mem. at 19-20.) Second, there is a direct textual reference to those providers in the DIRECTV Agreement. *See, e.g.*, *In re A2P SMS Antitrust Litig.*, 2013 WL 5202824, at *9 (holding that such "textual linking" supported a finding of equitable estoppel).

Further, as in *Ragone*, the DIRECTV Subscribers' dispute with DIRECTV is "factually intertwined" with their dispute with the Comcast RSNs—indeed, the two disputes are indistinguishable. (Comcast Mem. at 21-22.) Accordingly, Plaintiffs' assertion that the DIRECTV Subscribers had no "cognizable relationship with Comcast through their subscriptions with Directv" (Pls. Opp'n at 13) lacks merit, and equitable estoppel requires the DIRECTV

---

[6] These principles are equally applicable in the antitrust context. *See, e.g.*, *In re A2P SMS Antitrust Litig.*, 2013 WL 5202824, at *6-10 (S.D.N.Y. Sept. 16, 2013) (citing *Ragone*).

Subscribers to arbitrate their claims against the Comcast RSNs for the same reasons as in *Ragone*.[7]

### III.   A Stay of All Claims Against the Comcast Defendants Is Appropriate

Plaintiffs do not dispute that the facts and issues in the claims they admit should be stayed by virtue of arbitration agreements—Traub's claims against the Comcast Defendants and Silver and Birbiglia's claims against DIRECTV—are *identical* to the facts and issues in the other claims against the Comcast Defendants.  And Plaintiffs are simply wrong in claiming that Comcast did not cite authority for the proposition that claims by a plaintiff not subject to an arbitration agreement (e.g., Dillon and Lerner) should be stayed where those claims are similar to claims subject to arbitration.  (Comcast Mem. at 25 (citing *Bischoff v. DirecTV, Inc.*, 180 F. Supp. 2d 1097, 1114-15 (C.D. Cal. 2002).)  Accordingly, all of the claims against the Comcast Defendants should be stayed pending arbitration of the claims that Plaintiffs admit are subject to individual arbitration, as well as the claims discussed above that are also subject to individual arbitration.  *See In re A2P SMS Antitrust Litig.*, 2013 WL 5202824, at *27-28.

### CONCLUSION

Comcast respectfully requests that the Court issue an order compelling individual arbitration of the Subscribers' claims against the Comcast Defendants and staying all claims against the Comcast Defendants pending arbitration.

---

[7] Plaintiffs rely on *Ross v. American Express*, 547 F.3d 137 (2d Cir. 2008), but, in *Ross*, American Express lacked *any* connection to the plaintiffs.  547 F.3d at 146 ("[T]he plaintiffs do not know Amex from Adam.").  As explained above, this is decidedly not the case with respect to the Comcast RSNs and the DIRECTV Subscribers.  (*See also* Comcast Mem. at 22-23.)

Dated:  October 4, 2013

                                        Respectfully submitted,

<u>*/s/ Arthur J. Burke*</u>
Arthur J. Burke
James W. Haldin
**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, New York  10017
Telephone:  (212) 450-4000
Facsimile:  (212) 701-5800
arthur.burke@davispolk.com
james.haldin@davispolk.com

*Attorneys for Defendants Comcast Corporation, Comcast SportsNet Philadelphia, L.P., Comcast SportsNet Mid-Atlantic L.P., Comcast SportsNet California, LLC, and Comcast SportsNet Chicago, LLC*