UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

THOMAS LAUMANN, FERNANDA GARBER,
ROBERT SILVER, GARRETT TRAUB, DAVID
DILLON and PETER HERMAN, representing
themselves and all other similarly situated,

        Plaintiffs,

      - against -

NATIONAL HOCKEY LEAGUE, et al.,

        Defendants.

**OPINION AND
ORDER**

**12 Civ. 1817 (SAS)**

------------------------------------------------------------ X

FERNANDA GARBER, MARC LERNER, DEREK
RASMUSSEN, ROBERT SILVER, GARRETT
TRAUB, and PETER HERMAN representing
themselves and all other similarly situated,

        Plaintiffs,

      - against -

OFFICE OF THE COMMISSIONER OF BASEBALL,
et al.,

        Defendants.

**12 Civ. 3704 (SAS)**

------------------------------------------------------------ X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

**I.     INTRODUCTION**

      Plaintiffs bring this consolidated putative class action against the

1

National Hockey League ("NHL") and Major League Baseball ("MLB"), various clubs within the Leagues (together the "League Defendants"), regional sports networks ("RSNs") that televise the games, and Comcast and DIRECTV, multichannel video programming distributors ("MVPDs").

On July 27, 2012, the defendants jointly moved to dismiss the complaints in both actions, *Garber v. Office of the Commissioner of Baseball ("Garber")* and *Laumann v. National Hockey League ("Laumann").* In an Opinion and Order dated December 5, 2012, I granted the motion in part and denied it in part.[1] Plaintiffs Fernanda Garber and Peter Herman were dismissed from both cases, and plaintiff Robert Silver was dismissed from the *Garber* case, for lack of antitrust standing. Because none of those defendants had purchased out-of-market packages in the relevant cases, their only injury from the alleged antitrust violation stemmed from "some unidentified increased price of their overall cable package."[2] Such an injury is "speculative and difficult to identify and apportion," as well as remote from the primary agreements among the League defendants.[3] Thus, only those plaintiffs who had purchased out-of-market

---

[1]     *See Laumann v. National Hockey League,* 907 F. Supp. 2d 465 (S.D.N.Y. 2012).

[2]     *Id.* at 484.

[3]     *Id.*

packages in the relevant cases were allowed to proceed.[4]

On January 7, 2013, Comcast and DIRECTV moved to stay the proceedings pending the outcome of the Supreme Court case *American Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304 (2013).  That motion was denied in a Memorandum Opinion dated March 6, 2013.[5]

In a stipulation so ordered on August 8, 2013, plaintiffs Robert Silver and Vincent Birbiglia, both of whom purchased out-of-market television packages from DIRECTV, agreed to stay their claims against DIRECTV.[6]  DIRECTV agreed not to seek a stay or dismissal of the plaintiffs' claims against other defendants based on the DIRECTV arbitration clause, or to seek a stay or dismissal of plaintiff Garrett Traub's claims against DIRECTV on the basis of the Comcast arbitration clause.[7]  The parties were unable to reach a stipulation regarding plaintiff Marc Lerner's claims against DIRECTV.

---

[4]    In the same opinion, the claim under Section Two of the Sherman Act was dismissed as to the RSNs and MVPDs, but allowed to proceed against the League defendants.  *See id.* at 492.

[5]    *See Laumann v. National Hockey League,* No. 12 Civ. 1817, 2013 WL 837640 (S.D.N.Y. Mar. 6, 2013).

[6]    *See Laumann*, No. 12 Civ. 1817, Docket No. 130; *Garber,* No. 12 Civ. 3704, Docket No. 157.

[7]    *See id.* ¶ 5.

On August 19, 2013, Comcast and the Comcast RSNs (the "Comcast Defendants") filed a motion to compel arbitration against Traub, Silver, Birbiglia, Thomas Laumann, and Derek Rasmussen, and to stay the claims of all plaintiffs, including David Dillon and Marc Lerner, pending resolution of the arbitration.  On the same date, DIRECTV filed a motion to compel arbitration and stay claims against Lerner.  For the reasons that follow, Comcast's motion is GRANTED as to Traub, Laumann, and Rasmussen, and DENIED as to Silver, Birbiglia, Dillon, and Lerner.  DIRECTV's Motion is DENIED in full.

## II.   BACKGROUND

### A.   Relevant Alleged Facts

Plaintiffs challenge "defendants' . . . agreements to eliminate competition in the distribution of [baseball and hockey] games over the Internet and television [by] divid[ing] the live-game video presentation market into exclusive territories, which are protected by anticompetitive blackouts," and by "collud[ing] to sell the 'out-of-market' packages only through the League [which] exploit[s] [its] illegal monopoly by charging supra-competitive prices."[8]  Plaintiffs claim that these agreements "result in reduced output, diminished product quality,

---

[8]     *Laumann* Second Amended Class Action Complaint ("*Laumann* Compl.") ¶¶ 2, 8; *Garber* Second Amended Class Action Complaint ("*Garber* Compl.") ¶¶ 2, 11.

4

diminished choice and suppressed price competition" in violation of the Sherman Antitrust Act.[9]

       With the limited exception of nationally televised games, standard MVPD packages only televise "in-market" games (i.e., games played by the team in whose designated home territory the subscriber resides).  The MVPDs obtain the local programming from RSNs, who derive their rights from the individual teams subject to an agreement not to sell their content outside the regional market.[10] Several defendant RSNs are owned and controlled by Comcast, several are owned and controlled by DIRECTV, and two are independent of the MVPDs.[11]

       For a consumer to obtain out-of-market games, there are only two options – television packages and internet packages – both of which are controlled by the Leagues.[12]  Television packages – NHL Center Ice and MLB Extra Innings – are available for purchase from MVPDs such as Comcast and DIRECTV.  These packages require the purchase of all out-of-market games even if a consumer is only interested in viewing the games of one team.  Internet packages – NHL

---

[9]    *Laumann* Compl. ¶ 10; *Garber* Compl. ¶ 13.

[10]   *See Laumann* Compl. ¶¶ 70–71; *Garber* Compl. ¶¶ 74–77.

[11]   *See Laumann* Compl. ¶¶ 24–30; *Garber* Compl. ¶¶ 30–34.

[12]   *See Laumann* Compl. ¶ 75; *Garber* Compl. ¶ 75.

GameCenter Live and MLB.tv – are available directly through the Leagues and also require the purchase of all out-of-market games.  Neither local games nor nationally televised games are available through these packages, allegedly to protect the RSNs' regional monopolies and insulate the MVPDs that carry them from internet competition.[13]

> ### B.   The Comcast Agreement

The Comcast Customer Service Agreement ("Comcast Agreement") contains an arbitration clause that covers "any dispute, claim or controversy between you and Comcast regarding any aspect of your relationship with Comcast . . . whether based in contract, statute, regulation, ordinance, tort . . . , or any other legal or equitable theory" and "is to be given the broadest possible meaning that will be enforced."[14]  As used in the arbitration provision, "Comcast" includes parents, subsidiaries and affiliated companies of Comcast.[15]

The Comcast arbitration provision applies to disputes about "the

---

[13]     *See Laumann* Compl. ¶¶ 78–82; *Garber* Compl. ¶¶ 84–88.

[14]     Comcast Agreement for Residential Services, Ex. B to 8/15/13 Declaration of Christie Rossi ("Rossi Decl.") § 13(b); Ex. D to 8/15/13 Declaration of Christine McGinty ("McGinty Decl.") § 13(b); Ex. D to 8/15/13 Declaration of Renee Olivier ("Olivier Decl.") § 13(b); Ex. A to 8/15/13 Declaration of Ishania Howze ("Howze Decl.") § 13(b).

[15]     *See id.*

validity, enforceability or scope of this Arbitration Provision."[16]  It also

incorporates by reference the rules of the American Arbitration Association

("AAA"),[17] which in turn provide that the arbitrator shall have the power to decide

threshold issues of arbitrability including the existence, scope, and validity of an

agreement to arbitrate.[18]

### C.    The DIRECTV Agreement

The DIRECTV Customer Agreement ("DIRECTV Agreement")

contains an arbitration clause that covers "any legal or equitable claim relating to

this Agreement, any addendum or your Service."[19]  The DIRECTV Agreement

---

[16]     *Id.*

[17]     *See id.* § 13(d).  The version of the Comcast Agreement applicable to Laumann and one of the versions applicable to Silver permit the party initiating arbitration to choose between the rules of the AAA and the rules of the National Arbitration Forum ("NAF").  Ex. D to McGinty Decl § 13(d); Ex. D to Olivier Decl. § 13(d).  The NAF Rules provide that the "[a]rbitrator shall have the power to rule on all issues, Claims, Responses, questions of arbitrability, and objections regarding the existence, scope, and validity of the Arbitration Agreement including all objections relating to jurisdiction, unconscionability, contract law, and enforceability of the Arbitration Agreement."  NAF Rule 20(f).

[18]     *See* AAA Rule R-7(a) ("The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.").

[19]     2005 DIRECTV Customer Agreement, Ex. A to 8/16/13 Declaration of Valerie McCarthy ("McCarthy Decl.") ¶ 9; 2013 DIRECTV Customer Agreement, Ex. B to McCarthy Decl. ¶ 9.

defines "Service" as "digital satellite entertainment programming and services" provided by DIRECTV,[20] and provides that JAMS rules will govern the arbitration.[21]  JAMS rules grant the arbitrator the power to decide "[j]urisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration."[22]

## III.   APPLICABLE LAW

The Federal Arbitration Act ("FAA") indicates a "liberal federal policy favoring arbitration."[23]  The determination of whether a dispute is arbitrable under the FAA consists of two questions: "(1) whether there exists a valid agreement to arbitrate at all under the contract in question . . . and if so, (2) whether the particular dispute sought to be arbitrated falls within the scope of the arbitration agreement."[24]

---

[20]    Exs. A and B to McCarthy Decl., at 1.

[21]    *See id.*

[22]    JAMS Rule 11(c).

[23]    *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24 (1983).

[24]    *Hartford Acc. & Indemn. Co. v. Swiss Reinsurance Am. Corp.,* 246 F.3d 219, 226 (2d Cir. 2001) (quoting *National Union Fire Ins. Co. v. Belco Petroleum Corp.*, 88 F.3d 129, 135 (2d Cir. 1996)).

Arbitration is "a matter of contract, and therefore a party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit."[25]  The parties' intentions and expectations govern which issues they have agreed to arbitrate, as well as *with whom* they have agreed to arbitrate.[26]

A non-signatory may nonetheless be entitled to compel arbitration on an estoppel theory where "the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed,"[27] and there is "a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement."[28]  Such a relationship has been found where

---

[25]   *Ragone v. Atlantic Video at Manhattan Ctr.,* 595 F.3d 115, 126 (2d Cir. 2010) (quotation marks and citations omitted).

[26]   *See Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.,* 559 U.S. 662, 683 (2010) ("We think it is also clear from our precedents and the contractual nature of arbitration that parties may specify *with whom* they choose to arbitrate their disputes."); *EEOC v. Waffle House, Inc.,* 534 U.S. 279, 289 (2002) ("[N]othing in the [FAA] authorizes a court to compel arbitration of any issues, or by any parties, that are not already covered in the agreement.").

[27]   *JLM Indus. v. Stolt-Nielsen SA,* 387 F.3d 163, 177 (2d Cir. 2004) (quoting *Choctaw Generation Ltd. P'ship v. American Home Assurance Co.,* 271 F.3d 403, 406 (2d Cir. 2001)).

[28]   *Sokol Holdings, Inc. v. BMB Munai, Inc.,* 542 F.3d 354, 359 (2d Cir. 2008) (emphasizing that "*JLM Industries* did not say or mean that whenever a

9

the non-signatory is a parent company, corporate successor, guarantor, or corporate affiliate of a signatory,[29] or where the non-signatory was a co-employer with a signatory and the claims arose from the employment agreement containing an arbitration clause.[30]  However, where the sole association between the non-signatory and the signatories stems from an alleged conspiracy or wrongful act, estoppel is inappropriate.[31]

The "question whether the parties have submitted a particular dispute to arbitration, i.e., the *question of arbitrability*, is an issue for judicial

---

relationship of any kind may be found among the parties to a dispute and their dispute deals with the subject matter of an arbitration contract made by one of them, that party will be estopped from refusing to arbitrate").  *Accord Ross v. American Exp. Co.,* 547 F.3d 137, 144 (2d Cir. 2008).

[29]     *See Sokol,* 542 F.3d at 359–60 (collecting cases); *Ross,* 547 F.3d at 144 (noting that "this Court's cases which have applied estoppel against a party seeking to avoid arbitration have tended to share a common feature in that the non-signatory party asserting estoppel has had some sort of corporate relationship to a signatory party; that is, this Court has applied estoppel in cases involving subsidiaries, affiliates, agents, and other related business entities").

[30]     *See Ragone,* 595 F.3d at 127–28.

[31]     *See Sokol*, 542 F.3d at 362 (where non-signatory's association with signatories stemmed solely from its alleged tortious interference with contract of signatories, non-signatory could not compel arbitration through estoppel); *Ross,* 547 F.3d at 147–48 (reversing district court's application of estoppel based exclusively on allegations of collusion against non-signatory and noting that "the application of estoppel in the context of conspiracy allegations is problematic").

determination [u]nless the parties clearly and unmistakably provide otherwise."[32]
When "parties explicitly incorporate rules that empower an arbitrator to decide
issues of arbitrability, the incorporation serves as clear and unmistakable evidence
of the parties' intent to delegate such issues to the arbitrator."[33]   However, the
incorporation of such rules does not necessarily indicate the same intent as to a
non-signatory.[34]

## IV.   DISCUSSION

### A.   Comcast's Motion

#### 1.   Garret Traub

Plaintiffs do not contest Comcast's motion to stay Traub's claims,
which are based on the out-of-market package that he purchased directly from

---

[32]   *T.CO Metals LLC v. Dempsey Pipe & Supply, Inc.,* 592 F.3d 329, 344
(2d Cir. 2010) (quotation marks and citations omitted).

[33]   *Contec Corp. v. Remote Solution Co., Ltd.,* 398 F.3d 205, 208 (2d Cir.
2005).

[34]   *See id*. at 209 ("As an initial matter, we recognize that just because a
signatory has agreed to arbitrate issues of arbitrability with another party does not
mean that it must arbitrate with any non-signatory."); *Republic of Iraq v. BNP
Paribas USA,* 472 Fed. App'x 11 (2d Cir. 2012) (finding that incorporation by
reference did not constitute clear and unmistakable evidence when invoked by a
non-signatory).

11

Comcast.[35]  Thus, Comcast's motion is granted as to Traub.

### 2.    Thomas Laumann, Derek Rasmussen, and Robert Silver

Comcast moves to compel arbitration against Laumann, Rasmussen, and Silver on the basis that they received Comcast cable and/or internet service and agreed to the broad arbitration clause in the Comcast Agreement.  Rasmussen and Laumann both assert claims based on their purchase of out-of-market internet packages – MLB.tv and NHL GameCenter Live, respectively.  Comcast argues that these claims are covered by the broad arbitration clause in the Comcast Agreement because: 1) Rasmussen and Laumann watched the out-of-market packages via their Comcast internet service, 2) some of the programming provided through those packages was produced by Comcast RSNs, and 3) Rasmussen and Laumann allege that they were forced to purchase a separate cable service to view blacked out games, which they both elected to purchase from Comcast.[36]

Silver's claims are premised on an out-of-market television package he purchased from DIRECTV, but he separately receives Comcast television and internet services subject to the Comcast Agreement.  Comcast argues that Silver's

---

[35]    *See* Plaintiffs' Memorandum of Law in Opposition to the Television Defendants' Motions to Compel Arbitration and Stay Claims ("Pl. Mem.") at 2.

[36]    *See* Reply Memorandum of Law in Support of Comcast's Motion to Compel Arbitration and to Stay Claims ("Comcast Reply Mem.") at 3.

claim is subject to the broad arbitration clause in the Comcast Agreement because some of the out-of-market programming in his DIRECTV package was produced by Comcast RSNs.[37]

Before this Court can decide whether the Comcast arbitration clause applies, however, there is the threshold question of whether the parties clearly and unmistakably agreed to submit the question of arbitrability to the arbitrator.  Here, the Comcast arbitration clause expressly covers disputes about "the validity, enforceability or scope of this Arbitration Provision."[38]  It also incorporates by reference the rules of the American Arbitration Association.[39]  Thus, any colorable dispute about the scope or validity of the arbitration clause must be referred to the arbitrator.

Plaintiffs argue that their claims are wholly unrelated to their cable service from Comcast, and that compelling arbitration against them on the basis of an unrelated contract would be akin to forcing arbitration on a customer injured by

---

[37]    *See id.*  Plaintiffs contend that Silver did not in fact receive any programming produced by Comcast RSNs, because "CSN Philadelphia is not available on DIRECTV, and it is the only Philadelphia RSN."  Pl. Mem. at 11.

[38]    "Comcast Agreement," Ex. B to Rossi Decl; Ex. D to McGinty Decl.; Ex. D to Olivier Decl.; Ex. A to Howze Decl. § 13(b).

[39]    *See id.* § 13(d).

a Comcast bus.[40]  Even if the language of the arbitration clause permitted such a wide-ranging application, they argue, the clause would be unconscionable and unenforceable.[41]

      With respect to Laumann and Rasmussen, there is at least a colorable argument that their claims are subject to the arbitration clause.  Comcast argues that Laumann and Rasmussen watched their internet packages using their Comcast internet service, and that part of their alleged injury stems from the need to purchase a separate cable service to view blacked out games, which they both elected to purchase from Comcast.  Because there is a legitimate dispute about the scope and applicability of the clause, the threshold question of arbitrability must be referred to the arbitrator.

      With respect to Silver, however, the sole nexus between his claims and his Comcast service is the allegation that his DIRECTV package contained material produced by the Comcast RSNs.  Even that much is uncertain, since Silver indicates that the only Philadelphia RSN owned by Comcast is unavailable on DIRECTV in Philadelphia.[42]  Given the attenuated relationship between Silver's

---

[40]    *See* Pl. Mem. at 14–15.

[41]    *See id.* at 15 (citing *Smith v. Steinkamp*, 318 F.3d 775, 777 (7th Cir. 2003)).

[42]    *See id.* at 11.

claim and the Comcast Agreement, there is no genuine dispute requiring referral to the arbitrator, even for a threshold determination. Indeed, referral of Silver's claim to the arbitrator would only waste time and resources. For the foregoing reasons, Comcast's motion is granted as to Laumann and Rasmussen and denied as to Silver.

### 3. Vincent Birbiglia and Robert Silver (DIRECTV Agreement)

Comcast also attempts to compel arbitration of Birbiglia's and Silver's claims against Comcast pursuant to the arbitration clauses in their contracts with DIRECTV. Comcast was neither a signatory to the DIRECTV Agreement nor mentioned in it by name. However, Comcast argues that the language of the DIRECTV Agreement is broad enough to encompass disputes against Comcast. Comcast further argues that Birbiglia and Silver should be estopped from denying the arbitration clause because their claims against Comcast are intertwined with the DIRECTV contract.

### a. The Court Should Decide the Question of Arbitrability

As a threshold matter, the first question is whether the plaintiffs agreed with Comcast, by clear and unmistakable evidence, to arbitrate the question

of arbitrability.  This is a question of contract formation and intent,[43] and there is no clear and unmistakable evidence that Birbiglia or Silver agreed to arbitrate arbitrability with Comcast, a non-signatory.[44]  Thus, it falls to the court to decide whether the DIRECTV arbitration clause applies.

### b.  The DIRECTV Agreement Does Not Expressly Encompass Claims Against Comcast

Comcast's first argument is that the DIRECTV arbitration clause expressly covers any disputes with the Comcast Defendants because it applies to "any claim" related to "programming," and Comcast RSNs produced some of the programming in the DIRECTV packages.  Comcast also points out the following provision in the DIRECTV Agreement: "Notwithstanding the provisions of [the

---

[43]     *See First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944–45 (1995) ("Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute . . . so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about that matter. Did the parties agree to submit the arbitrability question itself to arbitration?").

[44]     *See Contec,* 398 F.3d at 209 (finding agreement to arbitrate arbitrability where non-signatory was a direct corporate successor to the signatory, and the change in corporate form had not affected the parties' behavior under the contract).  *But see BNP Paribas,* 472 Fed. App'x at 13 (distinguishing *Contec* and finding that the arbitration clause did not afford purported third party beneficiary "the right to have arbitrators rather than the court determine the arbitrability of its dispute"); *Holzer*, 2013 WL 1104269, at *9 (finding that non-signatory did not have a sufficiently close relationship to compel arbitration of arbitrability because it was not an officer, director, member, manager, employee, shareholder or agent of signatory, nor had it succeeded to or guaranteed the signatory's interests or conducted itself as if it were subject to the agreements).

arbitration clause], we or any programming provider may prosecute violations of the [prohibition against rebroadcasting] against you and other responsible parties in any court of competent jurisdiction . . . ."[45]  Comcast argues that if programming providers were not covered by the arbitration provision, the above clause would be superfluous.[46]

However, the two tangential references to "programming providers" noted above are insufficient to create a valid agreement to arbitrate between the plaintiffs and the Comcast Defendants.  The affirmative statement that both DIRECTV and programming providers retain the right to prosecute rebroadcasting violations in court does not support the conclusion that programming providers can otherwise invoke the arbitration clause against DIRECTV customers.  Moreover, the plaintiffs might not even have known that Comcast RSNs produced some of the programming available through their DIRECTV service.  Thus, the text of the DIRECTV arbitration clause does not expressly encompass Silver's and Birbiglia's claims against the Comcast Defendants.

### c.    Estoppel

Comcast further argues that it can enforce the DIRECTV arbitration

---

[45]     Memorandum of Law in Support of Comcast's Motion to Compel Arbitration and to Stay Claims ("Comcast Mem.") at 18.

[46]     *See id.*

clause against Birbiglia and Silver on a theory of estoppel, which is a question

governed by Nevada and Pennsylvania state law, respectively.[47]

       In *Ahlers v. Ryland Homes Nevada, LLC*, the Nevada Supreme Court

held that a non-signatory to an agreement with an arbitration clause may only

compel arbitration against a signatory where the latter's claims "rely on the

contract as the basis for relief."[48]   Although *Ahlers* is unpublished and not binding,

it is directly on point and gives a strong indication of how the Nevada Supreme

Court would address the question at hand.[49]

---

[47]    *See Arthur Andersen LLP v. Carlisle,* 556 U.S. 624, 630–32 (2009) (holding that non-signatory's ability to enforce arbitration provision through estoppel is determined by state law, and noting that the FAA does not "alter background principles of state contract law regarding the scope of agreements (including who is bound by them)"); *BNP Paribas,* 472 Fed. App'x at 13–14 (applying state contract law, under *Carlisle,* to determine non-signatory's right to compel arbitration against signatory as a third party beneficiary); *FR 8 Singapore Pte. Ltd. v. Albacore Mar. Inc.,* 794 F. Supp. 2d 449, 455 (S.D.N.Y. 2011) (noting that in *Carlisle,* "notwithstanding the 'substantive federal law' about the enforceability of arbitration agreements, the question of who was bound by such agreements was treated as a question of state law").  Both parties agree that Birbiglia's contract is governed by Nevada law, while Silver's contract is governed by Pennsylvania law.

[48]    No. 52511, 2010 WL 3276221, at *2 (Nev. Apr. 16, 2010).  *Accord In re Zappos.com, Inc., Customer Data Sec. Breach Litig.,* 893 F. Supp. 2d 1058, 1066 (D. Nev. 2012) (citing *Ahlers* for statement of Nevada law).

[49]    *See Maska U.S., Inc. v. Kansa Gen. Ins. Co.,* 198 F.3d 74, 78 (2d Cir. 1999) (noting that federal courts applying state law must "predict how the state's highest court would resolve the uncertainty or ambiguity" (quotation marks and citations omitted)).

The parties agree that the Pennsylvania Supreme Court has never directly addressed the question of estoppel by a non-signatory in the context of arbitration agreements.[50]  However, the most recent Superior Court decision on point declined to allow a non-signatory to compel arbitration against a signatory where the claims were not "inextricably entwined with the Contract."[51]

Here, Silver and Birbiglia have not asserted claims against Comcast pursuant to the DIRECTV Agreement, nor are their claims "inextricably intertwined" with it.  Their claims stem from Comcast's alleged participation in a conspiracy with the League Defendants, not its violation of the terms of the DIRECTV Agreement.  Thus, the conditions for equitable estoppel against Birbiglia and Silver under state law have not been met.

Comcast argues that, in the absence of clear and binding state law on the topic, the Court should look to federal law for guidance.  However, an analysis

---

[50]    *See* Pl. Mem at 9–10; Comcast Reply Mem. at 8 n.5.  *See also MacDonald v. Unisys Corp.*, No. 12–1705, 2013 WL 2626929, at *6 (E.D. Pa. June 12, 2013) (noting that "there is no controlling decision from the Supreme Court of Pennsylvania on the applicability of the doctrine of equitable estoppel to the arbitration context and there is a dearth of Pennsylvania case law on the issue").

[51]    *Elwyn v. DeLuca*, 48 A.3d 457, 463 (Pa. Super. Ct. 2012).  *But see Dodds v. Pulte Home Corp.*, 909 A.2d 348, 351 (Pa. Super. Ct. 2006) (finding that "non-signatories to an arbitration agreement can enforce such an agreement when there is an obvious and close nexus between the non-signatories and the contract or the contracting parties").

19

under federal law yields the same result.  Estoppel is appropriate under federal law if the claims against Comcast are sufficiently intertwined with the DIRECTV Agreement, and the relationship between the parties is such that allowing the plaintiffs to avoid arbitration against Comcast would be inequitable.[52]

Here, Comcast lacks a sufficient relationship with either DIRECTV or the plaintiffs to justify enforcing the arbitration clause on an estoppel theory. Comcast cites *Ragone v. Atlantic Video at Manhattan Ctr.*, in which the Second Circuit allowed a non-signatory to compel arbitration against a signatory even though it was not named in the agreement.  Plaintiff Ragone was hired by AVI to provide hair services for ESPN employees, and her employment contract with AVI contained an arbitration provision.  Ragone brought a sexual harrassment lawsuit against both AVI and ESPN on the basis of "concerted actions of both defendants."[53]  The court compelled Ragone to arbitrate her claims against ESPN because "it is plain that when Ragone was hired by AVI, she understood ESPN to be, to a considerable extent, her co-employer."[54]  Furthermore, the claim against ESPN was the "same dispute" as Ragone's claim against AVI pursuant to the

---

[52]      *See Sokol,* 542 F.3d at 359; *JLM*, 387 F.3d at 177.

[53]      *Ragone*, 595 F.3d at 119.

[54]      *Id.* at 127.

contract.[55]

By contrast, in *Ross v. American Express Co.*, the Second Circuit held that non-signatory American Express could not compel arbitration against credit card holder plaintiffs where its sole relationship with the plaintiffs and the credit card companies stemmed from the "alleged antitrust conspiracy."[56]  The court collected cases noting that courts generally permit non-signatories to compel arbitration only when they are closely related to a signatory (such as a subsidiary, affiliate, or agent) or where they are expressly named in the contract as having duties to perform.[57]  The court noted that "Amex is a complete stranger to the plaintiffs' cardholder agreements; it did not sign them, it is not mentioned in them, and it performs no function whatsoever relating to their operation."[58]  Furthermore, "there [was] no reason for someone signing up for a Chase Visa card, for example, to believe that he (or she) was entering into any kind of relationship with [Amex]. Indeed, [Amex] was ostensibly competing against the issuing banks and their Visa and MasterCard brands/networks, in a supposedly bitter marketplace rivalry."[59]

---

[55]     *Id.* at 128.

[56]     *Ross,* 547 F.3d at 140.

[57]     *See id.* at 144–45.

[58]     *Id.* at 148.

[59]     *Id.* (citation omitted).

21

This case more closely resembles *Ross* than *Ragone*.  Not only does Comcast lack a close corporate relationship with DIRECTV, the two entities are competitors.[60]  Comcast was not mentioned in the DIRECTV Agreement, and the plaintiffs had no reason to believe that they were entering into any agreement with Comcast, or to know that Comcast RSNs may have produced some of the programming they were viewing.  Under these circumstances, the application of estoppel against the plaintiffs would not be justified.  Comcast's motion to compel arbitration against Birbiglia and Silver on the basis of the DIRECTV arbitration clause is denied.

### 4.    Marc Lerner and David Dillon

Although Comcast does not allege that either Lerner or Dillon is subject to any arbitration clause, Comcast argues that their claims should also be stayed because they involve "the same facts and issues as the claims against the Comcast Defendants that are subject to individual arbitration."[61]  Given that Comcast's motion is only granted as to some of the plaintiffs, compelling arbitration against Lerner and Dillon would not simplify the case or preserve judicial resources.  Thus, Comcast's motion as to Lerner and Dillon is denied.

---

[60]    *See id.* at 146 (noting that non-signatory's status as competitor of signatory undermined its claim of a close relationship).

[61]    Comcast Mem. at 3.

B.     **DIRECTV's Motion**

DIRECTV separately moves to compel arbitration against Lerner on the basis of his household's DIRECTV cable subscription and the associated DIRECTV Agreement, which are in the name of his wife, Nina Rifkind. It is uncontested that Lerner did not personally sign the contract with DIRECTV for cable services and the MLB Extra Innings package that his household received.[62] Nonetheless, DIRECTV contends that Lerner's claims are subject to the arbitration provision in the DIRECTV Agreement through his own admissions and the doctrine of equitable estoppel.

1.     **Lerner Is Not Bound to the Arbitration Clause by Admission**

DIRECTV argues that Lerner has admitted that he is a DIRECTV customer in his Complaint and his interrogatory responses, and should be bound by his admissions. Specifically, the Complaint alleges that Lerner "would prefer not to have to subscribe to pay television."[63] In addition, Lerner stated in his interrogatory responses that "from 2006 to the present, Plaintiff has subscribed to

---

[62]     *See* Memorandum of Law in Support of DIRECTV Defendants' Motion to Compel Arbitration and Stay Claims ("DIRECTV Mem.") at 3 n.4.

[63]     *Garber* Compl. ¶ 17.

MLB Extra Innings."[64]

    Neither of these statements constitutes an admission that Lerner is bound by the DIRECTV Agreement.  Lerner's statement that he would prefer not to have to pay for cable service in order to watch games that are blacked out on his MLB.tv internet package does not even mention a specific cable provider. Moreover, the interrogatories defined the term "Plaintiff" to include "immediate families."[65]  Thus, the statement "Plaintiff has subscribed to MLB Extra Innings" does not indicate that Lerner himself signed the contract.  Moreover, the fact that he has watched the DIRECTV service in the family home does not constitute an admission that he is subject to the terms of the contract.

    **2. Lerner Is Not Bound to the Arbitration Clause by Estoppel**

    In a footnote, DIRECTV also asserts that Lerner should be estopped from denying the arbitration clause because he received the benefits of his wife's contract by watching the DIRECTV service in his home.[66]  Under Mississippi law,

---

[64] Plaintiff Marc Lerner's Objections and Responses to the Television Defendants' First Set of Interrogatories, Ex. A to 8/19/13 Declaration of Andrew E. Paris, response 4.

[65] First Set of Interrogatories of Television Defendants Upon Plaintiffs, Ex. A to 9/18/13 Declaration of Edward Diver at 2.

[66] This question is governed by ordinary state law principles of estoppel. *See Carlisle,* 556 U.S. at 630–32; *BNP Paribas,* 472 Fed. App'x at 13–14; *FR 8 Singapore,* 794 F. Supp. 2d at 455.

"a non-signatory party may be bound to an arbitration agreement if so dictated by the ordinary principles of contract and agency."[67]  However, equitable estoppel is an "extraordinary remedy . . . [that] should be applied cautiously and only when equity clearly requires it."[68]

DIRECTV cites a Mississippi case, *Terminix International, Inc. v. Rice*, for the proposition that a non-signatory spouse can be estopped from denying an arbitration agreement in a contract involving the family home.[69]  However, the *Terminix* court "afforded great weight to the fact that the wife's suit relied exclusively on the contract."[70]  In a more recent case, the Mississippi Supreme Court declined to compel arbitration against non-signatory household members where the claims were "not dependent on the terms of the contract."[71]

Here, Lerner does not assert rights under the contract that might estop him from denying the arbitration clause.  Lerner is not named as a "television

---

[67]     *Scruggs v. Wyatt*, 60 So. 3d 758, 767 (Miss. 2011) (quoting *Mississippi Care Ctr. of Greenville, LLC v. Hinyub,* 975 So. 2d 211, 216 (Miss. 2008)).

[68]     *B.C. Rogers Poultry, Inc. v. Wedgeworth,* 911 So. 2d 483, 491 (Miss. 2005) (quotations and citations omitted).

[69]     *See* 904 So. 2d 1051 (Miss. 2004).

[70]     *Simmons Hous., Inc. v. Shelton ex rel. Shelton,* 36 So. 3d 1283, 1288 (Miss. 2010).

[71]     *Id.*

plaintiff" and has not asserted claims on the basis of his cable subscription.[72]  His

standing derives from his purchase of MLB.tv directly from the League, not his

purchase of cable television from DIRECTV.  The fact that he might have watched

the DIRECTV service purchased by his wife does not bind him to the terms of the

contract without asserting some benefit or right pursuant to its terms.[73]

### 3.   Lerner Is Not Bound to the Arbitration Clause as a Third Party Beneficiary

Although DIRECTV has not argued that Lerner is bound to the

DIRECTV Agreement as a third party beneficiary, the Court notes that such an

argument would be unavailing.  Under Mississippi law, a third party beneficiary is

entitled to enforce the contract only when the benefit he received under the

contract was "the direct result of the performance within the contemplation of the

parties as shown by [the] terms [of the contract]."[74]  In other words, "the right of

---

[72]    *See Garber* Compl. ¶ 119.  Furthermore, any claims asserted by any plaintiffs based on the price of cable service were dismissed in this Court's December 5, 2012 Order.  See *Laumann,* 907 F. Supp. 2d at 465.

[73]    The Mississippi Supreme Court has also indicated that estoppel is primarily appropriate where there has been detrimental reliance.  *See Kimball Glassco Residential Ctr., Inc. v. Shanks,* 64 So. 3d 941, 947–48 (Miss. 2011) ("For the doctrine of equitable estoppel to apply, the plaintiff must have relied on a misrepresentation by the defendant. . .").  Even if Lerner had held himself out as a signatory to the contract, there is no indication that DIRECTV changed its position or suffered any harm in reliance.

[74]    *Burns v. Washington Sav.,* 251 Miss. 789, 796 (1965).

the third party beneficiary to maintain an action on the contract must spring from the terms of the contract itself."[75]  It is not enough that the individual received a benefit under the contract, or that the parties foresaw such a benefit, if the terms of the contract do not expressly reflect that intent.[76]  In this case, the DIRECTV Contract does not mention Lerner by name or as part of a specified group of intended beneficiaries.  Although the contract contemplates that family members and guests may watch the service, the mention of these parties is more incidental than direct.[77]  Moreover, the contract does not indicate an intent to confer any rights or obligations upon such individuals by virtue of having watched the service.

---

[75]     *Id.  Accord Adams v. Greenpoint Credit, LLC,* 943 So. 2d 703, 708–09 (Miss. 2006).

[76]     *See Simmons,* 36 So. 3d at 1287 (finding that children were not third party beneficiaries to their parents' contract for the family mobile home because they "were not referenced or alluded to in the contract," and living in the mobile home made them incidental rather than direct beneficiaries); *Knight's Marine & Indus. Servs. Inc. v. Lee,* 110 So. 3d 795, 798 (Miss. Ct. App. 2012), *cert. denied,* 110 So. 3d 789 (Miss. 2013) (noting that contract must identify third party beneficiary by name or as member of a specified class in order to give rise to rights or obligations under the contract); *Brown v. Anderson*, 80 So. 3d 878, 883 (Miss. Ct. App. 2012) (where only husband signed sale agreement for family home, "contract did not create any contractual duties [to wife] either as a party or third-party beneficiary").

[77]     *See* 2005 DIRECTV Customer Agreement, Ex. A to McCarthy Decl. ¶ 1(m); 2013 DIRECTV Customer Agreement, Ex. B to McCarthy Decl. ¶ 1(*l*) ("It is your responsibility to impose any viewing restrictions on other family members or guests as you think appropriate.").

In fact, a section of the Agreement entitled "Third Party Beneficiary" identifies Tivo as an intended third party beneficiary to the contract, but not Lerner or anyone else.[78]  Thus, Lerner is not bound by the arbitration clause as a third party beneficiary under Mississippi law.

Because Lerner is not bound to the DIRECTV Agreement by admission or estoppel, or as a third party beneficiary, DIRECTV's motion to compel arbitration against Lerner is denied.

## V.    CONCLUSION

For the foregoing reasons, Comcast's Motion to Compel Arbitration and Stay Claims is GRANTED as to Garret Traub, Thomas Laumann, and Derek Rasmussen for the purpose of determining whether their claims are subject to the Comcast arbitration clause.  Comcast's motion is DENIED as to Vincent Birbiglia, Robert Silver, Marc Lerner and David Dillon.  DIRECTV's Motion to Compel Arbitration against Marc Lerner is DENIED in full.  The Clerk of the Court is directed to close these motions [Docket Entry No. 131, 12 Civ. 1817, and Docket Entry Nos. 159 and 160, 12 Civ. 3704].  A conference is scheduled for December

---

[78]    *See* 2005 DIRECTV Customer Agreement, Ex. A to McCarthy Decl. ¶ 7(h); 2013 DIRECTV Customer Agreement, Ex. B to McCarthy Decl. ¶ 7(h).  Note that the 2013 Contract additionally identifies "DIRECTV's licensors and suppliers" as third party beneficiaries in addition to TiVo.  *See* 2013 DIRECTV Customer Agreement, Ex. B to McCarthy Decl. ¶ 7(g).

11, 2013 at 5:00 pm.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      November 25, 2013
            New York, New York

**- Appearances -**

**For Plaintiffs:**

Edward A. Diver, Esq.
Howard I. Langer, Esq.
Peter E. Leckman, Esq.
Langer Grogan & Diver, P.C.
Three Logan Square, Suite 4130
1717 Arch Street
Philadelphia, Pennsylvania 19103
(215) 320-5663

Kevin M. Costello, Esq.
Gary E. Klein, Esq.
Klein Kavanagh Costello, LLP
85 Merrimac St., 4th Floor
Boston, Massachusetts 02114
(617) 357-5034

Michael Morris Buchman, Esq.
John A. Ioannou, Esq.
Pomerantz Haudek Block Grossman & Gross LLP
600 Third Avenue
New York, New York 10016
(212) 661-1100

Alex Schmidt, Esq.
Mary Jane Fait, Esq.
Wolf Haldenstein Adler Freeman & Herz LLP
270 Madison Avenue
New York, New York 10016
(212) 545-4600

Robert LaRocca, Esq.
Kohn, Swift & Graf, P.C.
One South Broad Street
Suite 2100

Philadelphia, Pennsylvania 19107
(215) 238-1700

J. Douglas Richards, Esq.
Jeffrey Dubner, Esq.
Cohen, Milstein, Sellers & Toll, PLLC
88 Pine Street
New York, New York 10005
(212) 838-7797


**For Defendants DIRECTV, LLC, DIRECTV Sports Networks, LLC, DIRECTV Sports Net Pittsburgh, LLC a/k/a Root Sports Pittsburgh, DIRECTV Sports Net Rocky Mountain, LLC a/k/a Root Sports Rocky Mountain, and DIRECTV Sports Net Northwest, LLC a/k/a Root Sports Northwest:**

Andrew E. Paris, Esq.
Joann M. Wakana, Esq.
Louis A. Karasik, Esq.
Alston & Bird LLP
333 South Hope Street
Los Angeles, California 90071
(213) 576-1000


**For Defendants Comcast Corporation, Comcast SportsNet Philadelphia, L.P., Comcast SportsNet Mid-Atlantic L.P., Comcast SportsNet California, LLC, and Comcast SportsNet Chicago, LLC:**

Arthur J. Burke, Esq.
James W. Haldin, Esq.
Davis Polk & Wardwell
450 Lexington Avenue
New York, New York 10017
(212) 450-4000