

Proskauer Rose LLP   Eleven Times Square   New York, NY 10036-8299

February 25, 2014

Honorable Shira A. Scheindlin
United States District Court, Southern District of New York
500 Pearl Street
New York, NY 10007

Bradley I. Ruskin
Member of the Firm
212.969.3465
bruskin@proskauer.com

Re:   Garber, et al. v. Office of the Commissioner of Baseball, et al., 12-CIV-3704 (SAS)

Dear Judge Scheindlin:

We represent the Office of the Commissioner of Baseball ("MLB") and other MLB-related defendants (the "MLB Defendants"). We outline the bases for a summary judgment motion the MLB Defendants are prepared to file following the April 3, 2014 pre-motion conference.

Plaintiffs attack the heart of the business of baseball: the live exhibition of games within a territorial league structure. Territories are fundamental to MLB and its relationships with fans, sponsors, and communities nationwide. Each MLB club has the opportunity, right and obligation to develop a fan base, market and promote MLB and the club in a local market. MLB has a corresponding opportunity, right and obligation to engage fans and promote the game in the national market on behalf of all clubs.

The video rights structure Plaintiffs challenge – as to which there is no factual dispute – has been in place for decades and was developed under the umbrella of MLB's Supreme Court exemption from the antitrust laws. It reflects the league's fundamental national/local precept: MLB has "national" and "out-of-market" rights, while clubs have "local," "in-market" rights defined by Home Television Territories and internal league agreements. This structure allows each club to grant telecasters (including regional programmers (RSNs)) the exclusive game content rights that are the bedrock of their business. It also allows MLB to grant national networks the meaningful, exclusive national market rights they demand. The structure thus serves fans by (1) supporting a healthy, competitively-balanced league to produce games by 30 clubs, each of which is the favorite "home team" to its fans, and (2) incentivizing the creation and distribution of live video of more games of more clubs that more distributors deliver to more fans in more ways.

In the decades since the Home Television Territories were codified, there has been an explosion of live baseball programming. Every game is available for distribution to virtually every fan across America. Nearly every game is telecast by both clubs locally and/or by a national network, so all fans can watch at least one local club (often more), plus national telecasts on four networks. And nearly all of this is provided to consumers either on free, over-the-air broadcasts or at no extra cost as part of standard television services. MLB also created two supplemental "out-of-market" ("OOM") packages, MLB Extra Innings and MLB.tv, to serve the specialized sub-set of fans living outside the territory of their favorite club, as well as avid fans who want to watch many non-local games. Together with the national telecasts, the OOM packages guarantee all fans can watch every non-local game they want, even if someone is the sole fan in town of a particular non-local club. This broad access to non-local games did not exist prior to the adoption of the rights structure Plaintiffs challenge. To the extent clubs had any rights in the distant past to broadcast beyond their regional market, only a handful were popular enough to make it possible to do so. The OOM packages thus address a situation in which individual clubs are "inherently unable to compete fully effectively." *Laumann*, 2012 WL 6043225 at *11.

In a complete inversion of the antitrust laws, Plaintiffs seek to wipe-out the territorial structure that has produced all of this output to fans of every club and replace it with nothing but a hope

and a prayer that <u>some</u> fans of <u>some</u> clubs might get some (unspecified) additional "choice" at some (unknown) price. Plaintiffs assume, without any factual basis, that more "choice" can be created without vitiating the incentives that give fans access to more than 4,500 game telecasts each season. It is undisputed that each of the television networks and MVPDs (distributors) producing and distributing game video agreed to do so based on the exclusive game content clubs and the league were able to provide.[1] In Plaintiffs' hypothetical world, both clubs playing a game would have the right to license "competing" broadcasts of that game anywhere. As a result, no national or regional networks could be offered exclusive rights where they carry a game – obliterating the foundation for the existing investments and agreements.[2]

Plaintiffs adduced <u>no facts</u> to show that in their "but for" world, fans of <u>all</u> "competing" clubs would be able to see all the non-local games they want (as they can now through the OOM packages), let alone that these Plaintiffs would be offered the personal "choices" they demand – "unbundled" services delivered to them in their locales of just the games of their preferred clubs.

Eighteen fact depositions and millions of pages of documents have raised no material factual dispute with respect to any of this. The case is ripe for summary judgment as follows:

<u>Antitrust Exemption</u>: The United States Supreme Court has repeatedly made clear that "the business of baseball," which includes its territorial league structure and live video rules, is broadly exempt from the antitrust laws.[3] Each Plaintiff readily admitted that his claims implicate such "essential," "central" aspects of "the business of baseball." E.g., Lerner Tr., 29:15-30:8.

<u>Pro-competitive Justifications</u>: Because the record is devoid of facts showing that fans of every club would have "more choice" of their desired programming in the "but for" world, Plaintiffs cannot meet their initial burden to show the challenged structure has an anticompetitive effect on the alleged market as a whole. Even if that burden were met, the challenged rights structure indisputably serves multiple, well-recognized, pro-competitive interests of MLB in: (i) inducing networks and MVPDs to produce and distribute games by ensuring that clubs and the league can

---

[1] Despite the breadth of their claims and the fact that three Plaintiffs claim "injury" with respect to clubs telecast by non-defendant RSNs, Plaintiffs took no discovery of any non-defendant RSNs or MVPDs, nor any national networks. The single MVPD witness deposed confirmed that whether DirecTV carries a particular RSN depends on a number of factors, including "costs, . . . marketplace conditions, popularity of the games, [and] the ability for the games to be delivered to DirecTV and not found somewhere else." Feeney Tr. 125:19-22. Plaintiffs have adduced no facts showing how DirecTV or any other MVPD would weigh such factors in Plaintiffs' "but-for-world."

[2] There is no basis to presume both clubs would have rights to license video of any game if they were transformed into competitors in the exhibition of MLB Baseball. League rules codifying the challenged rights structure also provide for: (1) a league-wide "cross-license," so no club (home or visiting) need negotiate – or pay – for the right to locally telecast games they play; (2) mandatory access to the home ballpark for the visiting club's telecaster; and (3) the obligation to show up and play so that every MLB game can be exhibited. Clubs likewise agree to pool telecast "feeds" to create the league packages. Plaintiffs cannot presume "competitors" in the "but for" world would continue to cooperate in this highly integrated, pro-consumer manner. Indeed, when territorial video rights were threatened in 1993, clubs <u>terminated</u> the internal league video agreements. MLB1001707-36. (The clubs' concerns were subsequently addressed before any regular season telecasts were impacted.)

[3] *Flood v. Kuhn*, 407 U.S. 258, 273 (1972); *Toolson v. N.Y. Yankees*, 346 U.S. 356, 357 (1953) (applying exemption to all claims, including challenge to baseball's territorial broadcast structure. Pet. Brf., 1953 WL 78316, at *6, 8-9); *Hale v. Brooklyn Baseball Club*, (N.D. Tex.), Hr'g Tr., 9/19/58. When Congress enacted the 1998 Curt Flood Act to address certain labor issues, it deliberately preserved the exemption for "broadcast rights." 15 U.S.C. §26b(b)(3) (Act did not alter antitrust laws as to "licensing of intellectual property rights"); S.Rep. 105-118, at 6 (1997) (Act "retain[ed] the antitrust exemption" for "broadcast rights."). Every relevant case since the Act has confirmed the applicability of the exemption. *E.g., MLB v. Butterworth*, 181 F. Supp. 2d 1316, 1331, aff'd, 331 F.3d 1177 (11th Cir. 2003) ("[T]he business of baseball is exempt from the antitrust laws, as it has been since 1922, and as it will remain unless and until Congress decides otherwise. Period.").

Proskauer»

provide meaningful exclusive content licenses – like every other content provider in the live video industry; (ii) maintaining strong, locally-based clubs, as well as a strong brand for the league nationally; (iii) fostering competitive balance within the league; (iv) avoiding intra-league free-riding; and (v) maintaining a structure that allows the league to create OOM packages that provide broader distribution of more non-local game telecasts than clubs could provide individually and that ensure <u>every</u> fan can watch as many such games as they desire regardless of the relative "demand" in the region where any particular fan happens to be. Case law makes clear that these justifications may establish the legality as a matter of law of rules, as here, prohibiting competition by members of a highly interdependent venture against the venture and one another, in the exhibition of the venture's product.[4]

<u>Antitrust Standing/Antitrust Injury</u>: Even if unlawful anticompetitive conduct could be proven, Plaintiffs cannot prove their specific, personal "injuries" would be remedied by eliminating the challenged structure.[5] Plaintiffs do not claim the services they demand (*e.g.*, a package of just Brewers games delivered in St. Louis) ever existed and were taken away. Rather, they posit an entirely new business model, replacing exclusive territorial rights and cooperation with <u>non-exclusive</u> rights and head-to-head competition between clubs. Plaintiffs adduced no facts that, "but for" the current territorial structure, clubs, RSNs, and distributors would be willing and able to deliver to these Plaintiffs the unbundled, individual club packages they demand. As a matter of law, Plaintiffs cannot assume the existing licensing, production and distribution chain will continue unchanged, just without territories.[6] Their hypothetical world is completely <u>implausible</u>. Plaintiffs cannot sustain their burden to prove the requisite causal connection for antitrust standing or antitrust injury.[7]

This case exemplifies why the Supreme Court, the Second Circuit, and other courts underscore the "particular importance" of summary judgment in antitrust cases – including antitrust attacks on league rules and structures – "to 'avoid [] wasteful trials and prevent [] lengthy litigation that may have a chilling effect on pro-competitive market forces.'"[8] The MLB Defendants respectfully submit that a motion for summary judgment will provide more than ample basis to dismiss all claims against them and resolve this unsustainable, anti-consumer case.

Respectfully submitted,

Bradley I. Ruskin                              cc:  Counsel of Record

---

[4] *E.g., Am Needle v. NFL*, 560 U.S. 183 (2010); *BMI v. CBS*, 441 U.S. 1 (1979); *Major League Baseball Props., Inc. v. Salvino*, 542 F.3d 290 (2d Cir. 2008); *Trans Sport v. Starter Sportswear*, 964 F.2d 186 (2d Cir. 1992); *Rothery Storage*, 792 F.2d 210 (D.C. Cir. 1986); *Chicago Prof'l Sports v. NBA*, 95 F.3d 593 (7th Cir. 1996); *MSG v. NHL*, 2007 WL 3254421 (S.D.N.Y. 2007); *Kingray v. NBA*, 188 F. Supp. 2d 1177 (S.D. Cal. 2002); *Ralph C. Wilson Indus. v. ABC*, 598 F. Supp. 694 (N.D. Cal 1986).

[5] *E.g., Argus v. Eastman Kodak*, 801 F.2d 38, 41-46 (2d Cir. 1986); *Simon v. Keyspan*, 2011 WL 2135075, *7 (S.D.N.Y.) (Scheindlin, J.), aff'd.*, 694 F.3d 196 (2d Cir. 2012); *US Airways v. British Airways*, 989 F. Supp. 482 (S.D.N.Y. 1997); *Gerlinger v. Amazon*, 526 F.3d 1253 (9th Cir. 2008).

[6] *See Dominguez v. UAL Corp.*, 666 F.3d 1359 (D.C. Cir. 2012) (no standing: if defendant airline's ticket resale restriction and "price discrimination" were eliminated, it might not continue to sell the discounted tickets at all).

[7] Consistent with the Television Defendants' motions showing no evidence of conspiracy with the MLB Defendants, the MLB Defendants also will move for summary judgment under *Illinois Brick* and its progeny.

[8] *Salvino, supra*, at 309; *Am. Needle, supra*, at 203-04 ("quick look" may uphold venture agreement); *Race Tires Am. v. Hoosier Racing Tire*, 614 F.3d 57, 80 (3d Cir. 2010) ("time-consuming and expensive antitrust litigation" may have "very real anti-competitive effect" on procompetitive conduct by sports organizations).