# ALSTON&BIRD LLP

333 South Hope Street, 16th Floor
Los Angeles, CA 90071-1410

213-576-1000
Fax: 213-576-1100
www.alston.com

Andrew E. Paris                    Direct Dial: 213-576-1119                    Email: drew.paris@alston.com

February 25, 2014


Honorable Shira A. Scheindlin
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Courtroom 15C
New York, NY 10007-1312


Re:     *Laumann, et al. v. National Hockey League et al.*, 12-cv-1817 (SAS); *Garber, et al. v. Office of the Commissioner of Baseball, et al.*, 12-cv-3704 (SAS)

Dear Judge Scheindlin:

The DIRECTV Defendants[1] respectfully seek leave to file a motion for summary judgment. As set forth below, the undisputed facts establish that the DIRECTV Defendants have not conspired to divide markets or engaged in any unlawful restraints.

**DSN:** This Court permitted Plaintiffs' claim against DSN to survive past the pleading stage based on allegations that DSN entered into vertical distribution arrangements "contingent" upon knowledge that other RSNs were doing the same.[2] No facts, however, support Plaintiffs' claim.

First, DSN entered into no agreement with any League Defendant contingent on the actions of other RSNs. Rather, the undisputed evidence is that DSN acted unilaterally without regard for whether other RSNs entered into similar arrangements with other teams. DSN entered into agreements with teams because the rights to telecast their games in their territories are valuable. These agreements provide that each ROOT Sports network has the exclusive right to telecast certain live games played by its club partners within a home territory that is defined by the relevant league (MLB or NHL). These

---

[1] The DIRECTV Defendants are DIRECTV, LLC ("DIRECTV") and DIRECTV Sports Networks, LLC and its three regional sports networks ("RSNs" or "ROOT Sports") (collectively "DSN").

[2] "[If] parties to vertical agreements have knowledge that other market participants are bound by identical agreements, and their participation is contingent upon that knowledge, they may be considered participants in a horizontal agreement in restraint of trade." *Laumann v. National Hockey League*, 907 F. Supp.2d 465, 486 (S.D.N.Y. 2012).

agreements are license agreements with no market dividing language. Although these agreements provide DSN with important (albeit limited) exclusive rights to certain games, nothing in the agreements gives DSN the right to exclude RSN telecasts of their games in the territory.

Second, DSN had no role in creating the territories, has no say in their enforcement, no power to modify them, and has never asked the Leagues to exclude RSNs from telecasting games in DSN's home territories. The Leagues established home territories for their clubs years before the DIRECTV Defendants even existed. The mere acceptance of exclusive rights within a territory does not violate the Sherman Act. *See Bowen v. New York News, Inc*, 522 F.2d 1242, 1254 (2d Cir. 1975); *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025, 1032 (2d Cir. 1979).

Third, the facts do not support any finding of horizontal conspiracy based on parallel action by RSNs. Even assuming Plaintiffs could show consciously parallel actions by RSNs in entering into Rights Agreements with clubs—which the record does not reflect—this is insufficient as a matter of law to establish a conspiracy where there are no "plus factors." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554 (2007). There are no "plus factors" here, such as actions against self-interest, conspiratorial communications, abrupt changes in practices or even the opportunity for interdependent conduct. *See Apex Oil Co. v. Dimauro*, 822 F.2d 246, 254 (2d Cir. 1987).

Fourth, DSN's Rights Agreements are vertical agreements with separate MLB and NHL clubs, each of which is "presumptively legal." *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 30 (2d Cir. 2006). Plaintiffs have conceded that exclusive distribution in a geographical territory is not, by itself, unlawful (*Laumann*, 907 F.Supp.2d at 487 n.123), and the undisputed evidence shows that the exclusive vertical distribution agreements have resulted in the concrete procompetitive effects associated with these types of agreements. *See Con't T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 54-55 (1977). Output has increased dramatically since the ROOT Sports networks began and so has quality of the telecasts as a result of DSN's investment of millions of dollars in production facilities and telecast technology.

**DIRECTV:** Similarly, DIRECTV has not conspired to illegally divide markets or engaged in any illegality. DIRECTV faces a take-it-or-leave-it offer to distribute television according to the Leagues' pre-established territories, or conduct no distribution at all. It had no hand in the creation of the territorial rules and has not sought to restrain competition among clubs, RSNs or MVPDs. There are no facts indicating that DIRECTV did anything more than sell the League-created out-of-market packages reflecting territories imposed by its upstream suppliers. This is not unlawful. *Bowen*, 522 F.2d at 1254; *Fuchs*, 602 F.2d at 1032-33.

Second, there is no evidence that DIRECTV participated in any common plan or design to perpetuate territorial restrictions. Plaintiffs' principal argument is that DIRECTV suppressed the distribution of games on the Internet. Again, no facts support

the charge. The Internet distribution rights are controlled exclusively by the Leagues. DIRECTV and DSN have both actively pursued acquisition of streaming rights from the Leagues. The DIRECTV Defendants have not thus far been able to secure an agreement with the Leagues to allow DIRECTV and DSN to exploit those rights, and they cannot suppress content to which they have no rights to distribute. Moreover, it is undisputed that MLB and NHL sell an Internet out-of-market product in direct competition with the out-of-market product distributed by DIRECTV.[3]

Finally, the facts establish that the TV Plaintiffs are indirect purchasers under *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977) who cannot sue for antitrust damages, where, as here, a more direct purchaser stands between the plaintiff and the alleged antitrust violator. This Court held that the first purchaser outside the conspiracy is permitted to sue, following *Paper Sys. Inc. v. Nippon Paper Indus. Co.,* 281 F.3d 629, 631 (7th Cir. 2002) (*Laumann,* 907 F. Supp.2d at 482). DSN is the first non-conspirator and DIRECTV is the second. *Illinois Brick* principles further bar the TV plaintiffs' claims because plaintiffs adduced no evidence establishing "truly complete" participation in the alleged conspiracy by alleged middlemen DSN and DIRECTV. *Perma Life Mufflers v. Int'l Parts Corp.,* 392 U.S. 134 (1968); *United States Football League v. Nat'l Football League,* 842 F.2d 1335, 1369 (2d Cir. 1988); *see also Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.,* 602 F.3d 237, 255 (3d Cir. 2010). *Illinois Brick* exists to preclude indirect purchaser suits where middlemen and suppliers would have pass through allocation issues in any suit between them, precisely the situation here.

Respectfully submitted,

Andrew E. Paris

cc: All counsel of record (by email)

---

[3] Moreover, the practice of "authentication" (a policy that any Internet product sold by DIRECTV be available only to DIRECTV customers) reflects no illegality. The facts show the policy prevents free riding and avoids selling a product that would encourage customers to "cut the cord" and terminate their DIRECTV subscription. And the issue is largely academic, because the Leagues have not afforded DIRECTV or DSN any Internet rights.