# LANGER GROGAN & DIVER P.C.

HOWARD LANGER
JOHN J. GROGAN*
EDWARD A. DIVER
IRV ACKELSBERG
PETER LECKMAN†

EDWARD A. DIVER
DIRECT DIAL (215) 320-5663
ndiver@langergrogan.com

ATTORNEYS AT LAW
1717 ARCH STREET
SUITE 4130
PHILADELPHIA, PA 19103
PHONE: 215-320-5660
FAX: 215-320-5703

GEOFFREY C. HAZARD, JR.††
OF COUNSEL

2263 CALIFORNIA STREET
SAN FRANCISCO, CA 94115
415-292-6535
ghazard@langergrogan.com

*ALSO ADMITTED IN NEW JERSEY
†ALSO ADMITTED IN CALIFORNIA
††ADMITTED IN CALIFORNIA ONLY

March 3, 2014

Honorable Shira A. Scheindlin
United States District Court, Southern District of New York
500 Pearl Street
New York, NY 10007

Re:   *Laumann, et al. v. National Hockey League, et al.*, 12-cv-1817 (SAS)
      *Garber, et al. v. Office of the Commissioner of Baseball, et al.*, 12-cv-3704 (SAS)

Dear Judge Scheindlin:

This letter responds to the two pre-motion letters that the Comcast and Directv Defendants (together, the "Television Defendants") submitted last week. The Television Defendants' letters do not establish a basis for summary judgment. They rest on arguments that the Court has already rejected and ignore the evidence Plaintiffs have adduced through discovery that establishes they were far from "mere bystanders" to the leagues' anticompetitive restraints.

The Television Defendants' primary argument is that the leagues foisted the territorial restraints upon the Regional Sports Networks (RSNs) that broadcast local games, and therefore those RSNs cannot be found to have entered into a horizontal agreement with other RSNs to restrain trade. The Court has already rejected this argument. In its opinion addressing the defendants' motions to dismiss, the Court found that RSNs do not need to enter into bilateral agreements with other RSNs "in order to implicate the RSNs in the conspiracy to divide the market." *Laumann v. NHL*, 907 F. Supp. 2d 465, 486 (S.D.N.Y. 2012) (citing *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 226 (1939), and *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 930 (7th Cir. 2000)). RSNs are participants in the horizontal agreement to restrain trade so long they agree to abide by the territorial restrictions with knowledge that other RSNs would do the same, and it "defies reason to suggest that the RSNs lack knowledge that all other RSNs have analogous agreements with the respective individual clubs …." *Id.* at 487.

Discovery has confirmed that the terms of the agreements between the clubs and their RSNs are contingent on the RSNs receiving protection from competition. Both Major League Baseball and the National Hockey League require every contract between a club and an RSN to include territorial limitations. Because these restrictions are contained in each RSN contract and because each contract expressly states that they are subject to league rules, each RSN fully understands that it will not have to face competition from "foreign" broadcasters. This is not an opaque industry. Each RSN enters into its agreements with individual clubs with a full and common understanding of the artificial market divisions these actions seek to address.

Discovery has also confirmed the common sense conclusion that RSNs value—and pay more for—their territorial protections. Multiple witnesses have confirmed that territorial exclusivity is

Honorable Shira A. Scheindlin
March 3, 2014
Page 2

highly valuable to the RSNs. Indeed, the Defendants' position that the RSNs would not participate in baseball and hockey broadcasting (or would decrease their output of such programming) in the absence of exclusivity is at odds with the Television Defendants' contention that their acceptance of the terms of their agreements are not contingent on obtaining a competition-free territory. The fact that RSN contracts contain changed circumstances clauses, which would enable RSNs to renegotiate their agreements if their exclusive territories changed, further demonstrates the value RSNs place on their protected markets and the steps they take to ensure exclusivity.

The Television Defendants are also active protectors of their exclusive territories. RSNs and their distributors (MVPDs) routinely notify the leagues when competing RSNs or MVPDs, or one of the leagues' out-of-market packages, violate the agreements by broadcasting into an unapproved territory, and the leagues and clubs provide assurances to RSNs and MVPDs that such broadcasts will not be permitted. Both Comcast and Directv have acted to prevent distribution of games over the Internet where the league wished to do so. The Television Defendants, moreover, through their national and out-of-market-package contracts, restrict output in a number of ways, including, for example: preventing the expansion of clubs' television territories and prohibiting club distribution outside of those territories, restraining the distribution of games on the Internet, and placing limitations on the pricing of Internet products. These output restrictions are for the benefit of the Television Defendants. In any event, while Plaintiffs believe the conclusion that the Television Defendants are co-conspirators is unavoidable, it is—at the very least—a factual question that cannot be resolved for the defendants through summary judgment.

The Court has also already rejected the Television Defendants' claim that the Plaintiffs lack standing, holding "the purpose of *Illinois Brick* was *not* to prevent the only non-conspirators in a multi-level distribution chain—consumers no less—from bringing a private antitrust suit." *Laumann*, 907 F. Supp. 2d at 482. Because the Television Defendants are conspirators, all Plaintiffs have standing. In making their standing arguments, moreover, the Television Defendants continue to mischaracterize the structure of their agreements with the leagues. The RSNs do not pass through what they purchase from the clubs, they *produce* the broadcasts purchased by consumers. The market divisions occur at the retail level when the MVPDs implement and enforce the territorial restrictions. The conspiracies are directly aimed at dividing the *consumer* markets for live sports programming.

Comcast's argument that certain plaintiffs lack standing because they have stayed their claims against Directv is also misplaced. When the Court rejected the Television Defendants' attempt to stay the case pending the Supreme Court's decision in *American Express Co. v. Italian Colors Restaurant*, it held that "although the MVPDs are not alleged to have conspired with each other, their involvement in the case is not limited to claims by their own subscribers." *Laumann v. NHL*, 2013 WL 837640, *2 (S.D.N.Y. Mar. 6, 2013). The Defendants' agreements to divide the broadcast market have forced all plaintiffs to overpay for the league packages regardless of which defendant they actually overpaid, and therefore Defendants are jointly and severally liable and each plaintiff has a non-arbitrable claim against its provider's co-conspirators.

Honorable Shira A. Scheindlin
March 3, 2014
Page 3

    Finally, the Television Defendants assert—without evidence or even substantial argument—that territorial exclusivity is procompetitive and beneficial to consumers. The burden of showing procompetitive benefits lies with Defendants, and Plaintiffs have put forth substantial factual evidence that precludes summary judgment.

    If the Court were to weigh the facts at this stage of the litigation, it would necessarily find that the territorial restraints harm consumers. Most fundamentally, the Television Defendants' claim that exclusivity increases their investment in MLB and NHL broadcasts conflicts with basic economics. It is well-established that a monopoly firm invests *less* than firms in a competitive industry in convincing customers to buy the firm's product. A reduction in competition does not increase RSNs' investment in their broadcasts; it allows them to profit by not having to face the innovation and investment of potential competitors. The Television Defendants' argument is belied by examples of sports that have no territorial broadcast exclusivity. The lack of territorial exclusivity in Division I college basketball and football, for example, has not caused broadcasters—including the defendant RSNs—to stop televising college sports. In fact, after the Supreme Court eliminated restrictions on individual school broadcasts in *NCAA v. Board of Regents of University of Oklahoma*, 468 U.S. 85 (1984), college football broadcasts significantly increased. Brian L. Porto, *The Supreme Court and the NCAA*, 74 (2012).

    The territorial restrictions are not necessary. Live-sports telecasts are extremely valuable to the Television Defendants. They are paying ever increasing fees to secure this programming, which remains among the least expensive to produce. Under these circumstances, it is not plausible that the introduction of competition would stop the Television Defendants from producing high quality broadcasts. If the territories became non-exclusive, the RSNs would pay less for the clubs' broadcasting rights, but would increase their output as more purchasers, attracted by lower prices and increased availability, obtained their programming.

                                                Sincerely,

                                                Edward A. Diver

EAD/gg

cc: Counsel of record (by email).