**REDACTED**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |
|---|---|
| THOMAS LAUMANN, FERNANDA GARBER, ROBERT SILVER, GARRETT TRAUB, DAVID DILLON, and PETER HERMAN, representing themselves and all others similarly situated, | ) ) ) ) ) ) ) |

12-cv-1817 (SAS)

Plaintiffs,

v.

NATIONAL HOCKEY LEAGUE et al.,

Defendants.

---

FERNANDA GARBER, MARC LERNER, DEREK RASMUSSEN, ROBERT SILVER, GARRETT TRAUB, and PETER HERMAN, representing themselves and all others similarly situated,

12-cv-3704 (SAS)

Plaintiffs,

ECF Cases

v.

Electronically Filed

OFFICE OF THE COMMISSIONER OF BASEBALL et al.,

Defendants.

---

**MEMORANDUM OF LAW IN SUPPORT OF**
**COMCAST'S MOTION FOR SUMMARY JUDGMENT**

### TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ..................................................................................... 2

LEGAL STANDARDS ............................................................................ 4

ARGUMENT .......................................................................................... 5

I.   THERE IS NO HORIZONTAL CONSPIRACY AMONG THE RSNs. ........................... 5

     A.   Parallel Conduct Is Not Evidence of a Horizontal Agreement. ............................. 5

     B.   There Are No "Plus Factors." ................................................................. 6

     C.   Controlling Precedent Mandates Summary Judgment. ........................................... 8

     D.   The Undisputed Evidence and Plaintiffs' Theories Contradict Any Inference of
          Conspiracy. ..................................................................................... 9

II.  THE COMCAST DEFENDANTS ARE NOT PARTIES TO ANY UNLAWFUL
     VERTICAL CONSPIRACY. ..................................................................... 10

     A.   The Evidence Refutes Any Inference of a Vertical Conspiracy. .......................... 11

     B.   Plaintiffs Have Not Established Anticompetitive Harm from Presumptively
          Lawful, Vertical Distribution Contracts. ...................................................... 12

          1.   No Evidence of Anticompetitive Effects. ................................................. 13
          2.   Plaintiffs' Purported Evidence of Anticompetitive Harm Is
               Irrelevant and Disconnected from Their Claims. ....................................... 16

     C.   The Challenged Vertical Agreements Are Procompetitive and Beneficial to
          Consumers. ...................................................................................... 17

          1.   Exclusivity Results in Higher-Quality MLB and NHL Telecasts. ............. 18
          2.   Exclusivity Prevents Free Riding. ....................................................... 19

III. PLAINTIFFS LACK STANDING FOR ANY REMAINING CLAIMS. ........................ 20

CONCLUSION ....................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE</u>

CASES

*AD/SAT, Div. of Skylight, Inc. v. Associated Press*,
    181 F. 3d 216 (2d Cir. 1999) ........................................................................................ 10

*Alpha Lyracom Space Commc'ns v. Comsat Corp.*,
    968 F. Supp. 876 (S.D.N.Y. 1996) ............................................................................. 7, 8

*Apex Oil Co. v. DiMauro*,
    822 F.2d 246 (2d Cir. 1987) ........................................................................................... 6

*Ass'n of Indep. Television Stations, Inc. v. College Football Assoc.*,
    637 F. Supp. 1289 (W.D. Okla. 1986) .................................................................... 15, 19

*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012) ................................................................................. 13, 17

*Commercial Data Servers, Inc. v. IBM Corp.*,
    262 F. Supp. 2d 50 (S.D.N.Y. 2003) ............................................................................ 13

*Cont'l T.V., Inc. v. GTE Sylvania, Inc.*,
    433 U.S. 36 (1977) ........................................................................................................ 17

*Deutscher Tennis Bund v. ATP Tour, Inc.*,
    610 F.3d 820 (3d Cir. 2010) ......................................................................................... 19

*Dominguez v. UAL Corp.*,
    666 F.3d 1359 (D.C. Cir. 2012) ................................................................................... 16

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*,
    129 F.3d 240 (2d Cir. 1997) ......................................................................................... 13

*Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*,
    602 F.2d 1025 (2d Cir. 1979) ....................................................................................... 12

*Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*,
    386 F.3d 485 (2d Cir. 2004) ......................................................................................... 13

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
    424 F.3d 363 (3d Cir. 2005) ......................................................................................... 21

*Illinois Brick Co. v. Illinois*,
 431 U.S. 720 (1977) ........................................................................... 21

*In re Beef Indus. Antitrust Litig.*,
 600 F.2d 1148 (5th Cir. 1979) ........................................................... 21

*In re Ditropan XL Antitrust Litig.*,
 2007 WL 2978329 (N.D. Cal. Oct. 11, 2007) .................................... 21

*In re Ins. Brokerage Antitrust Litig.*,
 618 F.3d 300 (3d Cir. 2010) .......................................................... 7, 9

*In re Midwest Milk Monopolization Litig.*,
 730 F.2d 528 (8th Cir. 1984) ............................................................ 21

*In re Publ'n Paper Antitrust Litig.*,
 690 F.3d 51 (2d Cir. 2012) .................................................................. 5

*Interstate Circuit, Inc. v. United States*,
 306 U.S. 208 (1939) ............................................................................ 9

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
 466 U.S. 2 (1984) .............................................................................. 17

*Kingray, Inc. v. NBA, Inc.*,
 188 F. Supp. 2d 1177 (S.D. Cal. 2002) ............................................. 15

*Laumann v. NHL*,
 907 F. Supp. 2d 465 (S.D.N.Y. 2012) ..................................... 6, 20, 21, 22

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
 551 U.S. 877 (2007) .......................................................................... 13

*Link v. Mercedes-Benz*,
 788 F.2d 918 (3d Cir. 1986) .............................................................. 21

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
 542 F.3d 290 (2d Cir. 2008) ...................................................... *passim*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
 475 U.S. 574 (1986) .................................................................. 4, 5, 10

*Mayor & Council of Baltimore v. Citigroup, Inc.*,
 709 F.3d 129 (2d Cir. 2013) ................................................................ 6

*Modern Home Inst., Inc. v. Hartford Accident & Indem. Co.*,
 513 F.2d 102 (2d Cir. 1975) ................................................................ 6

*NCAA v. Board of Regents*,
　　468 U.S. 85 (1984) ............................................................... 15

*New York by Abrams v. Anheuser-Busch, Inc.*,
　　811 F. Supp. 848 (E.D.N.Y. 1993) ......................................... 19

*Paper Systems Inc. v. Nippon Paper Indus. Co. Ltd.*,
　　281 F.3d 629 (7th Cir. 2002) .................................................. 21

*PepsiCo, Inc. v. Coca-Cola Co.*,
　　315 F.3d 101 (2d Cir. 2002) ................................................. 8, 9

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
　　792 F.2d 210 (D.C. Cir. 1986) ............................................... 19

*Shain v. Ellison*,
　　356 F.3d 211 (2d Cir. 2004) .................................................. 22

*Tam Travel, Inc. v. Delta Airlines, Inc.*,
　　583 F.3d 896 (6th Cir. 2009) ................................................... 7

*Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*,
　　346 U.S. 537 (1954) .............................................................. 5, 9

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
　　142 F.3d 90 (2d Cir. 1998) ........................................................ 4

*Toscano v. PGA*,
　　258 F.3d 978 (9th Cir. 2001) .................................................. 11

*Toys "R" Us, Inc. v. Federal Trade Comm'n*,
　　221 F.3d 928 (7th Cir. 2000) ................................................. 8, 9

*Trans Sport, Inc. v. Starter Sportswear, Inc.*,
　　964 F.2d 186 (2d Cir. 1992) ................................................... 19

*United Video, Inc. v. FCC*,
　　890 F.2d 1173 (D.C. Cir. 1989) ............................................. 19

*United States v. Apple, Inc.*,
　　952 F. Supp. 2d 638 (S.D.N.Y. 2013) ...................................... 6

*Williamson Oil Co. v. Philip Morris USA*,
　　346 F.3d 1287 (11th Cir. 2003) ............................................... 7

*World Arrow Tourism Enters., Ltd. v. Trans World Airlines, Inc.*,
　　582 F. Supp. 808 (S.D.N.Y. 1984) .................................... 11, 12

## STATUTES AND RULES

Fed. R. Civ. P. 56(a) ................................................................................................... 4

## OTHER AUTHORITIES

9 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶1724b, at 320 (3d ed. 2011)...................................... 17

## TABLE OF ABBREVIATIONS AND TERMS

The following abbreviations and terms are used throughout this Memorandum of Law:

"**Bettman Decl.**" refers to the Declaration of Gary B. Bettman.

"**Birbiglia Dep.**" refers to the deposition of Plaintiff Vincent Birbiglia.

"**Burke Decl.**" refers to the Declaration of Arthur J. Burke in Support of Comcast's Motion for Summary Judgment.

"**Comcast**" refers to defendant Comcast Corporation.

"**Comcast Cable**" refers to Comcast Cable Communications, LLC, a Multichannel Video Program Distributor that provides (among other things) subscription television services.

"**Comcast Defendants**" refers to Comcast Corporation, Comcast SportsNet Philadelphia, L.P., Comcast SportsNet California, LLC, Comcast SportsNet Chicago, LLC, and Comcast SportsNet Mid-Atlantic L.P.

"**Comcast RSNs**" refers to defendants Comcast SportsNet Philadelphia, L.P., Comcast SportsNet California, LLC, Comcast SportsNet Chicago, LLC, and Comcast SportsNet Mid-Atlantic L.P.

"**Crumb Dep.**" refers to the deposition of Patrick W. Crumb.

"**Dillon Dep.**" refers to the deposition of Plaintiff David Dillon.

"**HTTs**" refers to the geographic home television territories defined by each League's rules.

"**Internet Plaintiffs**" refers to Plaintiffs Thomas Laumann and David Dillon (in *Laumann*) and Derek Rasmussen and Marc Lerner (in *Garber*).

"**Laumann Dep.**" refers to the deposition of Plaintiff Thomas Laumann.

"**Leagues**" refers to the National Hockey League and Major League Baseball.

"**Lerner Dep.**" refers to the deposition of Plaintiff Marc Lerner.

"**Litner Decl.**" refers to the Declaration of Jon D. Litner in Support of Comcast's Motion for Summary Judgment.

"**Litner Dep.**" refers to the deposition of Jon D. Litner.

"**MLB**" refers to Major League Baseball.

"**MVPD**" refers to a Multichannel Video Program Distributor.

"**NHL**" refers to the National Hockey League.

"**OOM**" refers to out-of-market broadcasts of NHL and MLB games outside of the respective teams' geographic home television territories.

"**Plaintiffs**" refers to Television Plaintiffs (Garrett Traub, Robert Silver, and Vincent Birbiglia) and Internet Plaintiffs (Thomas Laumann, David Dillon, Derek Rasmussen, and Marc Lerner).

"**Rasmussen Dep.**" refers to the deposition of Plaintiff Derek Rasmussen.

"**Rigdon Decl.**" refers to the Declaration of Gregory Rigdon in Support of Comcast's Motion for Summary judgment.

"**RSNs**" refers to Regional Sports Networks.

"**Silver Dep.**" refers to the deposition of Plaintiff Robert Silver.

"**Television Plaintiffs**" refers to Plaintiffs Garrett Traub and Robert Silver (in *Laumann*) and Vincent Birbiglia and Garrett Traub (in *Garber*).

"**Traub Dep.**" refers to the deposition of Plaintiff Garrett Traub.

"**Tully Decl.**" refers to the declaration of Christopher Tully.

## PRELIMINARY STATEMENT

Discovery has failed to provide *any* evidentiary support for Plaintiffs' convoluted conspiracy claims against the Comcast Defendants, which were added to these cases in a transparent attempt to evade the *Illinois Brick* rule against indirect purchaser claims.  To the contrary, discovery has made clear that (i) the Comcast Defendants had nothing to do with the creation of the challenged League territorial rules and (ii) the Leagues' member clubs have only offered to license their games to the Comcast Defendants on the ███████ condition that such licenses are subject to League rules.  Indeed, Plaintiffs' own arguments *contradict* their conspiracy claims.  They assert that the challenged League rules inflate the sports rights fees paid by the Comcast Defendants.  In other words, Plaintiffs imagine an unprecedented conspiracy where the defendants conspired to *pay more* than they would otherwise pay.  Such an implausible conspiracy claim must fail for the following reasons:

*First*, there is no evidence of a horizontal conspiracy among the RSNs.  At most, the record suggests conscious parallelism, which is legally insufficient to defeat summary judgment.  Plaintiffs fail to identify any "plus factors" as evidence of conspiratorial, horizontal conduct.

*Second*, Plaintiffs' vertical conspiracy claim fails because there is no evidence establishing conscious commitment to a "common scheme."  The Comcast Defendants cannot be held liable merely for distributing content licensed to them by the clubs subject to ████ ██████ territorial rules created by the Leagues.

*Third*, Plaintiffs fail to meet their burden under the rule of reason to establish that the presumptively lawful, vertical distribution agreements harm competition.  In particular, Plaintiffs present no evidence that prices would drop or output would expand if they prevailed, but instead merely fall back on speculation and conjecture about the "but-for" world.  Moreover, Plaintiffs "but-for" world does not even attempt to account for the substantial procompetitive effects

generated by the vertical distribution agreements, including incentivizing investments in higher-quality programming and preventing free riding.

*Finally*, Plaintiffs lack standing to seek relief against the Comcast Defendants for multiple, independent reasons enumerated below.

## BACKGROUND

Each League's member clubs license the right to telecast the vast majority of their games to RSNs via "rights agreements." These rights agreements provide RSNs the exclusive right to produce and telecast a club's games in geographic "Home Television Territories" ("HTTs") defined by League rules. (███████████ Tully Decl. ¶¶ 10-11; Bettman Decl. ¶¶ 7, 11-12.[1]) The Comcast Defendants played no role in creating these League rules, ████████

████████████████████████████████████████

████████████████████████████████████████

██ ████████████████████████████████████

████████████████████████████

The grant of exclusivity incentivizes the RSNs to make investments to produce high-quality telecasts of live MLB and NHL games, along with other complementary programming. (*Id.* ¶¶ 15-17.) Comcast RSNs typically pay a single MLB or NHL club ████████████

████████████████████████████████████████ to obtain the exclusive right to telecast that club's in-market games. (*Id.* ¶ 8.) After securing that exclusive right, RSNs spend █████████████ on production infrastructure such as high-

---

[1] MLB refers to "Home Television Territories" by that name (Tully Decl. ¶ 5), while the NHL describes its comparable territorial rules with different terminology (Bettman Decl. ¶ 7).

[2] "Ex. __" refers to exhibits to the Declaration of Arthur J. Burke.

definition cameras, super-slow motion replay technology, audio-visual presentation packages, and on-air commentators.  (*Id.* ¶ 13.)  Additionally, RSNs spend substantial sums producing extensive "shoulder" programming, such as pre- and post-game coverage shows, and other ancillary, sports-related programming, which promote interest in the club and game telecasts by providing fans with access to, and more information about, their favorite clubs.  (Litner Decl. ¶ 15; Ex. 4 (Litner Dep.) at 213:8-14:19.)

Comcast RSNs license their programming for distribution by MVPDs (cable, satellite, and telco companies) via "affiliation agreements."  ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████  As with most networks, the fees MVPDs pay RSNs are typically based on the number of subscribers who receive the programming (e.g., $X per subscriber per month).  It is therefore generally in an RSN's economic interest to achieve the broadest possible distribution for its programming.  (Litner Decl. ¶¶ 6, 9; Rigdon Decl. ¶ 5.)  RSNs seek to obtain distribution on every MVPD operating within a club's HTT, which typically includes multiple cable operators, two satellite distributors (DIRECTV and DISH Network), and frequently other competitors (e.g., Verizon FiOS, AT&T U-verse, etc.).  (Litner Decl. ¶ 9; Rigdon Decl. ¶ 10.)  MVPDs within a club's HTT are often (but not always) willing to pay for RSN programming due to its popularity among subscribers within that market.  (Litner Decl. ¶¶ 9, 17.)

Virtually every MLB and NHL game is telecast in virtually every area throughout the country through RSN distribution (as described above) or two other, complementary distribution methods.  *First*, MLB and NHL license certain telecast rights to national networks (e.g., ESPN,

Fox, TBS, and NBC).  (Tully Decl. ¶¶ 8, 19-21; Bettman Decl. ¶¶ 4-10.)   In order to create exclusive telecasts for the national telecasters, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *Second*, MLB and NHL sell out-of-market ("OOM") television packages (MLB Extra Innings and NHL Center Ice) and Internet packages (MLB.tv and NHL Gamecenter Live), which aggregate telecasts of OOM games (i.e., those games that do not involve a club located in the HTT in which a particular subscriber lives) produced by the RSNs.  (Rigdon Decl. ¶¶ 14-16.[3])  Because each club has the exclusive right to telecast its in-market games, a club's games are not distributed through the OOM packages within that club's HTT but rather through the RSN.[4]

## LEGAL STANDARDS

Courts must grant summary judgment where there are no genuine issues of material fact.  *See* Fed. R. Civ. P. 56(a).  Summary judgment is particularly important in antitrust cases to "avoid[] wasteful trials and prevent[] lengthy litigation that may have a chilling effect on pro-competitive market forces."  *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 95 (2d Cir. 1998); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 593-94 (1986).  Courts generally draw inferences in favor of the non-moving party at summary judgment; in an antitrust case, however, those inferences must be weighed in light of competing inferences of permissible competition, and plaintiffs "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action."  *Matsushita*, 475 U.S. at 588.

---

[3]  MLB and NHL sell the OOM Internet packages directly to consumers whereas Comcast Cable, DIRECTV and other MVPDs sell the OOM television package to their respective subscribers.  (Tully Decl. ¶¶ 27-31, 34; Bowman Decl. ¶¶ 5-9.)

[4]  For example, Boston Red Sox games are not distributed through the OOM package within the Boston area but are otherwise available via the RSN New England Sports Network.

## ARGUMENT

## I.   THERE IS NO HORIZONTAL CONSPIRACY AMONG THE RSNs.

"To survive a motion for summary judgment . . . a plaintiff seeking damages for a violation of § 1 must present evidence that *tends to exclude* the possibility that the alleged conspirators acted independently."  *Id.* at 588 (emphasis supplied) (internal quotation marks omitted).  "[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy."  *Id.*  The lack of evidence supporting a conspiracy entitles the Comcast RSNs to summary judgment.

### A.   Parallel Conduct Is Not Evidence of a Horizontal Agreement.

After extensive discovery, Plaintiffs' only "evidence" of a horizontal conspiracy among the RSNs is that multiple RSNs entered into similar distribution agreements with MLB and NHL clubs ████████████████████████████████.  Even if Plaintiffs could show that the Comcast RSNs entered into such arrangements "knowing" that other RSNs had entered into similar arrangements, that would only establish "conscious parallelism," which is insufficient to defeat summary judgment.  *See In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 62 (2d Cir. 2012) ("Conscious parallelism alone . . . does not establish an antitrust violation.  Such behavior is consistent with both unlawful conspiracy and lawful independent conduct.").

Purporting to rely on this Court's prior ruling, Plaintiffs argue that conscious parallelism alone is sufficient, disregarding at least six decades of binding Supreme Court precedent.  *See Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 541 (1954).  But this Court made no such ruling.  Instead, the Court ruled only that Plaintiffs adequately *alleged* the existence of a horizontal conspiracy among RSNs, noting that if the "parties to vertical agreements [i.e., the RSNs] have knowledge that other market participants are bound by identical

agreements, *and their participation is contingent upon that knowledge*, they may be considered participants in a horizontal agreement in restraint of trade." *Laumann v. NHL*, 907 F. Supp. 2d 465, 486-87 (S.D.N.Y. 2012) (emphasis supplied). Thus, the Court confirmed that evidence of conscious parallelism by itself is insufficient, but must instead be joined by *additional evidence*—frequently referred to as "plus factors"—to distinguish independent, legal conduct from conspiratorial conduct. Here, there is no such additional evidence.

> **B.     There Are No "Plus Factors."**

"Since mere parallel behavior can be consistent with independent conduct," Plaintiffs must point to evidence of "plus factors" to demonstrate that the defendants acted in a manner that could *only* be explained by a horizontal conspiracy. *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253-54 (2d Cir. 1987). "Plus factors" include "evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators." *Mayor & Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). "An abrupt shift from defendants' past behavior" may also be evidence of a "plus factor." *United States v. Apple, Inc.*, 952 F. Supp. 2d 638, 690 (S.D.N.Y. 2013).[5]

No such evidence is present here. In particular, there is no evidence that any Comcast RSN acted against its independent self-interest, and therefore no evidence that its decision to participate in licensing MLB and/or NHL games was "contingent" on the action of other RSNs. *See Modern Home Inst., Inc. v. Hartford Accident & Indem. Co.*, 513 F.2d 102, 110-14 (2d Cir. 1975) (allegations of a "mutually interdependent" conspiracy insufficient to defeat summary

---

[5] Even evidence of a "plus factor" does not raise a material question of fact if it simply demonstrates "an equally plausible inference of mere interdependent behavior, i.e., actions taken by market actors who are aware of and anticipate similar actions taken by competitors, but which fall short of a tacit agreement." *Apex Oil*, 822 F.2d 246 at 253-54.

judgment); *Alpha Lyracom Space Commc'ns v. Comsat Corp.*, 968 F. Supp. 876, 894-95 (S.D.N.Y. 1996) (granting summary judgment because "[p]laintiffs wholly failed to show that any individual [alleged co-conspirator's] decision . . . was against its self-interest").[6]  Local sports content is "one of the most compelling local programs," and RSNs compete vigorously against each other to acquire the exclusive rights to telecast such content—precisely because it is in each RSN's independent economic interest to acquire those compelling local rights.[7]

In addition, the Comcast RSNs have not engaged in an abrupt behavioral shift.  To the contrary, the undisputed evidence is that the Comcast RSNs have done business in the same manner they have for two decades or more.  (*See* Litner Decl. ¶¶ 10-11; Bettman Decl. ¶¶ 11-12; Tully Decl. ¶¶ 10-12.)  Indeed, the Leagues established these rules in 1981 (MLB) and 1984 (NHL)—over a decade before Comcast had ownership of any RSNs.  (Litner Decl. ¶ 10; Tully Decl. ¶ 11; Bettman Decl. ¶¶ 6-7.) ███████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████  Simply put, "[n]o horizontal agreement [is] necessary" for Comcast RSNs to decide independently to purchase telecast rights for popular programming subject to territorial rules.  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 327-28 (3d Cir. 2010).  There is also no evidence of communications among the RSNs relating to the creation or enforcement of territorial rules.[8]

---

[6] Nor does recognizing the state of a marketplace, including competitors' actions, render a party in a conspiracy with its competitors.  *See, e.g., Tam Travel, Inc. v. Delta Airlines, Inc.*, 583 F.3d 896, 908 (6th Cir. 2009); *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1310-14 (11th Cir. 2003).

[7] *See, e.g.*, Litner Decl. ¶ 24; Ex. 4 (Litner Dep.) at 35:9-18, 87:16-17; Ex. 5 (Crumb Dep.) at 155:23-157:5 ████████████████████████████████████

[8] ██████████████████████████████████████████████████

(….continued)

C.      **Controlling Precedent Mandates Summary Judgment.**

The Second Circuit's decision in *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101 (2d Cir. 2002), provides compelling support for summary judgment.   There, Coca-Cola entered into vertical distribution contracts with multiple distributors that required each of them to distribute Coca-Cola's product exclusively and prohibited them from distributing Pepsi's product.   *Id.* at 103-04.   Like Plaintiffs here, the *PepsiCo* plaintiffs claimed that the distributors were participants in an illegal horizontal conspiracy, citing evidence that the distributors entered into these exclusive distribution contracts knowing that other distributors were also doing so.   *Id.* at 109-10.   The *PepsiCo* plaintiffs also cited evidence that Coca-Cola had "assured" each distributor that other distributors would be subject to the exclusivity requirement and "encouraged them to report violations."   *Id.* at 110.   The Second Circuit held that there was "insufficient evidence of a horizontal agreement [among the distributors] to withstand summary judgment."   *Id.*   Plaintiffs have far less evidence here, making summary judgment even more appropriate than in *PepsiCo*.

The cases Plaintiffs are likely to rely upon are readily distinguishable.   For example, *Toys "R" Us, Inc. v. Federal Trade Comm'n*, 221 F.3d 928, 936 (7th Cir. 2000), involved multiple "plus factors" that are not present here.   Indeed, as noted in *PepsiCo*, the Seventh Circuit in *Toys "R" Us* relied upon (i) *testimonial admissions* from the alleged conspirators "that the only condition on which each [alleged conspirator] would agree to [its purchaser's] demands was if it

---

(continued….)

█████████████████████████████████   *See, e.g.*, *Alpha Lyracom Space Commc'ns*, 968 F. Supp. at 894 (granting summary judgment despite "hundreds" of communications among alleged conspirators because these "contacts among alleged conspirators cannot alone support an inference of conspiracy").

could be sure its competitors were doing the same thing," *Toys "R" Us, Inc.*, 221 F.3d at 936;

(ii) *direct evidence of communications* regarding the conspiracy; and (iii) a *sudden otherwise*

*inexplicable change* in behavior by the alleged conspirators. *PepsiCo, Inc.*, 315 F.3d at 110-11.

No such evidence exists here.[9]

> **D.    The Undisputed Evidence and Plaintiffs' Theories**
> **Contradict Any Inference of Conspiracy.**

Plaintiffs' conspiracy theory fails to account for the *actual, indisputable evidence*

showing that RSNs are vigorous competitors, not co-conspirators.  RSNs owned by Fox Sports,

DIRECTV, Comcast, and other entities, as well as independent RSNs, compete to win the right

to telecast clubs' games.  (*See supra* n.7.)  RSNs also compete actively for viewers in the many

locations in the country that have access to multiple RSNs that produce broadcasts of different

MLB and NHL games.[10]

---

[9] The Supreme Court's 1939 *Interstate Circuit* decision is similarly distinguishable. There, a horizontal conspiracy was inferred among upstream movie suppliers on the basis that each instituted restrictions on pricing and display of their movies that would not—without agreement of all—have been individually economically beneficial in response to a request from a downstream movie theater. *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 221-22 (1939).  "Key to *Interstate Circuit*'s conspiracy finding was its determination that each [movie supplier's] decision to accede to Interstate's demands would have been economically self-defeating unless the other [movie suppliers] did the same." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 331.  Here, as noted, Plaintiffs have no evidence that accepting telecast rights offered by the Leagues' member clubs was against each RSN's individual self-interest.  Further, *Interstate Circuit* also must be read in light of subsequent Supreme Court precedent emphasizing that conscious parallelism is insufficient to support a conspiracy claim.  *See Theatre Enters., Inc.*, 346 U.S. at 541 ("'[C]onscious parallelism' has not yet read conspiracy out of the Sherman Act entirely.").

[10] For example, Vincent Birbiglia testified that he has access to multiple RSNs showing the games of six different MLB teams and at least two different NHL teams independent of any OOM package (Ex. 6 (Birbiglia Dep.) at 26:5-27:2; 27:21-28:2), and Comcast Cable subscribers in Northern New Jersey have access to the YES Network, SportsNet New York, MSG, and MSG Plus (Rigdon Decl. ¶ 11).

Moreover, Plaintiffs' own arguments *contradict* any inference of conspiracy.  Plaintiffs contend that the Leagues' territorial rules inflate the prices of sports telecast rights that they sell. (*See* Laumann Complaint ¶ 69; Garber Complaint ¶ 78.)  But the Comcast RSNs and, further downstream, Comcast Cable are the *purchasers* of these sports rights.  In other words, Plaintiffs claim that the Comcast Defendants have conspired to *inflate* the rights fees that they pay to the clubs and Leagues.  This claim is facially implausible.  *See Matsushita*, 475 U.S. at 587 ("[I]f the factual context renders respondents' claim implausible—if the claim is one that simply makes no economic sense—respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary."); *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 235 (2d Cir. 1999) (no conspiracy could be inferred at summary judgment where defendants "had no rational economic motive to join the alleged conspiracies").

Earlier in these cases, Plaintiffs attempted to spin out a convoluted theory that the Leagues' territorial rules somehow protect the Comcast Defendants from Internet competition. But there is no record evidence to support this claim.  To the contrary, the Leagues' territorial rules were adopted long before the advent of video distribution over the Internet ███████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████

## II.  THE COMCAST DEFENDANTS ARE NOT PARTIES TO ANY UNLAWFUL VERTICAL CONSPIRACY.

Plaintiffs' remaining conspiracy theory—that the Comcast Defendants entered into unlawful vertical agreements with the Leagues and the clubs—cannot survive summary judgment for multiple reasons, including (i) the lack of evidence that the Comcast Defendants were involved in the creation of the Leagues' territorial rules, (ii) the lack of any anticompetitive harm resulting from the Comcast Defendants' presumptively lawful, vertical distribution

contracts, and (iii) the procompetitive benefits of those contracts.

**A.    The Evidence Refutes Any Inference of a Vertical Conspiracy.**

Despite many months of discovery, Plaintiffs have not uncovered any evidence to suggest, let alone establish, that the Comcast Defendants do anything more than purchase rights to distribute content within the HTTs defined by the Leagues and/or the clubs.  Where plaintiffs cannot point to any facts "that even remotely support an inference" that the distributors "participated in [the] decision" to engage in allegedly anticompetitive behavior, a Section 1 claim against the distributors necessarily fails.  *See World Arrow Tourism Enters., Ltd. v. Trans World Airlines, Inc.*, 582 F. Supp. 808, 810 (S.D.N.Y. 1984).

*Toscano v. PGA*, 258 F.3d 978 (9th Cir. 2001), is instructive.  There, the plaintiff brought an antitrust claim against certain sponsors of Professional Golfers' Association ("PGA") tournaments premised upon the sponsors' agreements to abide by the PGA's allegedly anticompetitive rules and regulations.  *Id.* at 980.  The Ninth Circuit affirmed the district court's decision granting summary judgment for defendants on the grounds that the sponsors "did not commit to a common scheme to act in restraint of trade" with the PGA because the PGA set those rules and regulations unilaterally and the sponsors merely agreed to abide by them.  *Id.* at 984.  Similarly, in this case, Plaintiffs can point to no facts demonstrating that the Comcast Defendants played any role in setting the Leagues' territorial rules.  Indeed, all the evidence is to the contrary.  The most Plaintiffs can show is that the Comcast Defendants (like the PGA sponsors) agreed to operate by the League rules and regulations that they had no role in creating—which is insufficient for a Section 1 claim.  *See, e.g.*, *Fuchs Sugars & Syrups, Inc. v.*

*Amstar Corp.*, 602 F.2d 1025, 1031 (2d Cir. 1979) (no Section 1 conspiracy where distributors did not have any role in manufacturer's decision to change its distribution system).[11]

Similarly, in *World Arrow*, the plaintiff alleged that travel agents violated Section 1 when they sold tickets subject to the alleged anticompetitive policies established by Trans World Airlines, Inc. ("TWA").  *See World Arrow*, 582 F. Supp. at 809-10.  The court dismissed the claim because there were no facts supporting an inference that the agents "played any role whatsoever in causing TWA to adopt that [allegedly anticompetitive] policy," and "a unilateral business decision by TWA" could not support a Section 1 claim against the agents.  *Id.* at 811.

Moreover, as discussed above, Plaintiffs' theory of a vertical conspiracy involving Comcast RSNs and Comcast Cable is economically incoherent.  (*See supra* I.D.)  The premise of Plaintiffs' case is that the Leagues' rules *inflate* the price of sports rights purchased by RSNs and MVPDs like the Comcast Defendants.  As purchasers, the Comcast Defendants would have no rational economic reason to join such a "conspiracy."

### B. Plaintiffs Have Not Established Anticompetitive Harm from Presumptively Lawful, Vertical Distribution Contracts.

Plaintiffs will no doubt attempt to satisfy the "agreement" requirement of Section 1 by pointing to rights agreements between the Leagues/clubs and the Comcast RSNs.  But these agreements are entirely *vertical* in nature and evaluated, if at all, under the rule of reason.  *Leegin*

---

11



*Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 907 (2007).  Under the rule of reason, "plaintiffs bear an initial burden to demonstrate the defendants' challenged behavior had an *actual* adverse effect on competition as a whole in the relevant market."  *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 506-07 (2d Cir. 2004) (quotation marks omitted). Plaintiffs' initial burden is heightened here because the exclusive distribution agreements at issue are "presumptively legal."  *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 245 (2d Cir. 1997).  To rebut this presumption, Plaintiffs must establish harm to competition, the "traditional indicators" of which are "reduced output, increased price, or decreased quality."  *Commercial Data Servers, Inc. v. IBM Corp.*, 262 F. Supp. 2d 50, 78 (S.D.N.Y. 2003).  Here, Plaintiffs fail to demonstrate that the exclusive distribution agreements harm competition.[12]

        1.    <u>No Evidence of Anticompetitive Effects</u>.

Plaintiffs fail to identify any evidence that the Comcast Defendants' alleged vertical agreements resulted in higher prices for consumers.  Plaintiffs seem to think that it is sufficient to note that sports programming is often very expensive.  But "increasing prices" alone are not sufficient to show harm to competition because "higher consumer prices can result from pro-competitive conduct" and are "fully consistent with a free, competitive market."  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012).  Instead, it is Plaintiffs' burden to demonstrate a *causal link* between the challenged territorial rules and higher prices for sports

---

[12] Indeed, it is unclear whether Plaintiffs believe their vertical claims can survive summary judgment given the absence of evidence that a horizontal conspiracy exists.  Plaintiffs have conceded that clubs and RSNs "are entitled to enter into an exclusive" distribution agreement and "may even be entitled to enter into an agreement to limit [the RSN's game telecast] distribution geographically so long as that decision is unilateral" rather than part of a horizontal conspiracy.  (*See* Plaintiffs' Opposition to Motion to Dismiss at 45; Dkt. No. 72 (*Garber*), Dkt. No. 80 (*Laumann*).)

programming.  There is no evidence in the record to establish any such link.  To the contrary, the

Leagues' territorial rules date back to at least the mid-1980s, whereas the rise in sports

programming costs is a more recent phenomenon across virtually all sports, including those

without territorial rules.  ████████████████████

  Nor can Plaintiffs identify any evidence that the Comcast Defendants' vertical

distribution agreements have suppressed output.  Indeed, from the late 1980s and early 1990s

(shortly after the Leagues established territorial rules), MLB and NHL teams have seen upward

of a twofold or threefold increase in the number of their games that are telecast.[13]  Due to the fact

that there is a high-quality telecast of virtually every game for every team produced by an RSN

under these League rules, the Leagues are able to aggregate those RSN telecasts to create

comprehensive OOM packages, which provide fans with access to *substantially more* live games

than were ever before available.  (*See* Tully Decl. ¶¶ 36-37; Bettman Decl. ¶¶ 13-17.)   Further,

as detailed below, the quality of the RSN telecasts has dramatically improved and the amount of

ancillary RSN programming (e.g., pre- and post-game shows) has dramatically increased over

this same period.  ████████████████████  The result is that today a high-quality telecast of

virtually every game for every club is made available to virtually every fan through either a

national telecast, an "in-market" telecast (via an RSN or a local broadcast station), or an OOM

package.  *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 319 (2d Cir.

2008) (noting that the record confirmed that output increased rather than decreased following

---

[13] *See, e.g.*, Ex. 7 at MLB1000109-10 and MLB0006767 (local telecasts of Oakland
Athletics regular season games increased from 49 to 145 between 1988 and 2012); Ex. 7 at
MLB1000109-10 and MLB0006767 (local telecasts of San Francisco Giants regular season
games increased from 76 to 152 between 1988 and 2012); Ex. 7 at SJ0051871 and NHL3628433
(2011-2012 NHL Schedule) (local telecasts of San Jose Sharks regular games increased from 30
to 76 between 1991-92 and 2011-12); *see also* Bettman Decl. ¶ 15; Tully Decl. ¶¶ 35-36.

adoption of league licensing rules); *Kingray, Inc. v. NBA, Inc.*, 188 F. Supp. 2d 1177, 1192-93

(S.D. Cal. 2002) (league rules preventing duplicative game telecasts is not an output

restriction).[14]  Given this undisputed evidence, Plaintiffs have no basis to claim that output or

quality have been reduced by the Comcast Defendants' vertical distribution agreements.[15]

In the end, Plaintiffs can only demonstrate higher prices or decreased output by reference

to some benchmark—presumably the level of prices or output that would prevail in the "but-for"

world if the Plaintiffs obtained the relief they seek from the Comcast Defendants.  But the

Plaintiffs rely only upon inadmissible speculation and implausible conjecture to support this

claim.[16]  They offer no proof, for example, that the "but-for" world would still have telecasts

produced of each game at all in the absence of the telecast exclusivities created by the HTTs, let

alone that such telecasts would be available nationwide at reduced cost.  *See Ass'n of Indep.*

*Television Stations, Inc. v. College Football Assoc.*, 637 F. Supp. 1289, 1304 (W.D. Okla. 1986)

("Without exclusivity it is doubtful that many licensees could afford to develop programs

fully.").  Speculation and conjecture lacking evidentiary support are insufficient to defeat

summary judgment.  *See Salvino*, 542 F.3d at 310-11 (non-movants cannot defeat summary

---

[14] Bettman Decl. ¶ 15; Tully Decl. ¶¶ 35-36.

[15] Plaintiffs in the past have proffered an alternative definition of output of game telecasts based on the number of consumers who view the telecasts.  This definition contradicts Supreme Court authority that holds that output is measured in terms of televised games rather than number of viewers, and to date Plaintiffs have been unable to cite a single case supporting their alternative definition.  *See NCAA v. Board of Regents*, 468 U.S. 85, 107-08 (1984) (finding a reduction of output because "as the District Court found, many telecasts that would occur in a competitive market are foreclosed by the NCAA's plan"); *id.* at 129 (dissent notes that the majority relied on lower court's finding that "output is measured solely in terms of the number of televised games" and "made no finding concerning the effect of the plan on total viewership") (White, J. dissenting).

[16] *See* MLB Summary Judgment Brief § III; NHL Summary Judgment Brief § I.D; *see also* ███████████████████████████.

judgment "merely by making assertions that are conclusory . . . or based on speculation," even where such assertions are supported by expert testimony) (internal citation omitted); *see also Dominguez v. UAL Corp.*, 666 F.3d 1359, 1362-64 (D.C. Cir. 2012) (plaintiff could not prove injury through an expert report that failed to account for relevant market conditions and "pile[d] speculation atop speculation").[17]

2. <u>Plaintiffs' Purported Evidence of Anticompetitive Harm Is Irrelevant and Disconnected from Their Claims</u>.



Nor is the manner in which the Leagues package the OOM games for purchase evidence of anticompetitive harm.  Plaintiffs' counsel have represented that they are not challenging the

---

[17] For many of these same reasons, Plaintiffs are unable to demonstrate any injury to themselves that would be cured by the relief sought.  For example, no Plaintiff can demonstrate that the games of the particular team he follows would be available to him at all, let alone less expensively, in a "but-for" world.  This shortcoming, whether viewed as an issue of causation or one of standing, provides another independent basis for summary judgment.  (*See* MLB Summary Judgment Brief § III; NHL Summary Judgment Brief § I.D.)

Leagues' practice of bundling OOM games.[18]  But Plaintiffs *themselves* have testified that their actual complaint is that they would prefer to buy only the games of a single team, rather than the full OOM package.[19]  Taking Plaintiffs at their word, their complaint cannot withstand summary judgment.  The Supreme Court has squarely held that a seller's requirement that a purchaser buy "unwanted" products does not violate the antitrust laws, because this practice does not foreclose competition.  *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 16 (1984).[20]

### C.    The Challenged Vertical Agreements Are Procompetitive and Beneficial to Consumers.

The Comcast Defendants' exclusive distribution agreements also satisfy a rule of reason analysis because of their undisputed procompetitive effects.  *See Salvino*, 542 F.3d at 317.  As the Supreme Court has explained, vertical agreements are generally procompetitive because they "promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products" and therefore "compete more effectively against other manufacturers."  *Cont'l T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 54-55 (1977).  Here, the vertical agreements indisputably increase output, improve the quality of MLB and NHL programming, and prevent free riding.  Plaintiffs bear the burden of proving these

---

[18] *See* Plaintiffs' July 8, 2013 Letter to the Court, at 4 ("Plaintiffs do not assert that the mere existence of a bundled package is unlawful.").

[19] *See* Ex. 6 (Birbiglia Dep.) at 35:2-37:9; Ex. 12 (Lerner Dep.) at 65:3-6; Ex. 13 (Rasmussen Dep.) at 61:6-62:3; Ex. 11 (Traub Dep.) at 88:6-21; Ex. 8 (Dillon Dep.) at 60:16-19, 122:8-25; Ex. 9 (Laumann Dep.) at 28:2-14, 121:14-122:6; Ex. 10 (Silver Dep.) at 52:10-24.

[20] *See also Brantley*, 675 F.3d at 1195, 1201-02 (bundling of cable channels did not constitute a "cognizable injury to competition" where consumers did not "forego the purchase of substitutes for the tied product"); 9 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶1724b, at 320 (3d ed. 2011) (explaining that if plaintiff buyer is purchasing an item he wants at a price for which he is willing to buy it, the fact that another product was also provided does not state a claim).

procompetitive benefits "could have been achieved through less restrictive means," but they fail even to attempt to account for them in their "but-for" world.  *Salvino*, 542 F.3d at 317.

　　　　1.　　Exclusivity Results in Higher-Quality MLB and NHL Telecasts.

As explained by the Leagues, the territorial rules establishing HTTs are necessary to create exclusivities for each telecaster.[21]  In the absence of territorial rules, Plaintiffs posit a "but-for" world where game telecasts would be available via the Leagues' OOM packages to viewers who also receive the same games via original RSN telecast.  Further, in the Plaintiffs' world, each of the two teams participating in any game could sell its game telecast rights to different RSNs, which would then be able to telecast the same game nationwide.  Accordingly, without HTTs, each game telecast would necessarily be *non-exclusive* to any RSN.

But exclusivity directly and substantially improves the quality of MLB and NHL telecasts. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Comcast RSNs spend upwards of ▆▆▆▆▆▆▆▆ on average to produce each home and away game of the clubs they distribute with numerous high-definition cameras (allowing multiple viewing angles), popular announcers, audio-visual effects, and other expensive production elements.  (Litner Decl. ¶¶ 13, 17.) ▆▆▆▆▆▆▆ Comcast RSNs produce pre- and post-game shows and other sports-related programming that promote interest in the club and the sport.  (*Id.* ¶¶ 15-17.)  NBC Sports Group President Jon Litner testified that ▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

---

[21] *See* MLB Summary Judgment Brief § II.B; NHL Summary Judgment Brief § I.B.2-3.



, [22] as

recognized by both courts and the FCC.  "Exclusive licenses in the television industry have

commonly been found to advance competition by providing incentives to telecasters to invest in

promotion and development of programs," and "[e]xclusivity therefore holds the potential to

increase the number of available programs and simultaneously minimizes fragmentation of the

audience for each offering." *College Football Assoc.*, 637 F. Supp. at 1304; *United Video, Inc. v.

FCC*, 890 F.2d 1173, 1180-81 & n.4 (D.C. Cir. 1989) (FCC recognizes that telecast exclusivity

increases incentives to produce telecasts).[23]

        2.    <u>Exclusivity Prevents Free Riding</u>.

The benefits of exclusivity described above can also be viewed in terms of limiting the

problem of free riding, which is also a well-established procompetitive benefit of vertical

agreements. *See Salvino*, 542 F.3d at 340 (Sotomayor, J., concurring) (citing *Rothery Storage &

Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 228 (D.C. Cir. 1986)).  Free riding occurs where

one party's investment in a product is exploited by a second party, which in turn reduces the

initial party's "incentive to invest in the promotion and development" of the product in the first

place. *Id.*

---

[22]

[23] Preservation of a distributor's incentives to invest is widely recognized as a
procompetitive benefit of vertical agreements in other contexts as well.  *See, e.g.*, *Trans Sport,
Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 190 (2d Cir. 1992); *Deutscher Tennis Bund v. ATP
Tour, Inc.*, 610 F.3d 820, 825-26, 833 (3d Cir. 2010); *New York by Abrams v. Anheuser-Busch,
Inc.*, 811 F. Supp. 848, 876-77 (E.D.N.Y. 1993).

In this context, Plaintiffs seek to compel the Comcast RSNs to permit their *own telecast* of a team's games to be distributed by another entity (e.g., the Leagues) in the team's HTT.  This is plainly free riding on the investments of the RSN.  No RSN would have any incentive to produce a high-quality telecast of every game or to promote those telecasts through production of extensive shoulder programming if that same production were then used *in direct competition* with the RSN itself by another entity.  In sum, exclusivity preserves each RSN's incentive to invest in, produce, and distribute high-quality telecasts.[24]

## III.    PLAINTIFFS LACK STANDING FOR ANY REMAINING CLAIMS.

Plaintiffs lack standing to seek relief against the Comcast Defendants for multiple, independent reasons.  *First*, as noted above, Plaintiffs cannot establish redressable injury, which is necessary for Article III standing.  (*See supra* II.B.1-2.)

*Second*, the Television Plaintiffs lack standing under *Illinois Brick*.  At the motion to dismiss stage, the Court noted that the Second Circuit has not addressed, let alone recognized, the so-called co-conspirator exception to *Illinois Brick* and that the Fourth and Ninth Circuits have limited its application to conspiracies to fix retail prices.  *Laumann*, 907 F. Supp. 2d at 481-82.  The Court, however, found persuasive the Seventh Circuit's conclusion in *Nippon* that *Illinois Brick* "allocate[s] to the first non-conspirator in the distribution chain the right to collect

---

[24] 

100% of the damages." *Id.* at 482 (citing *Paper Systems Inc. v. Nippon Paper Indus. Co., Ltd.*, 281 F.3d 629, 631-32 (7th Cir. 2002)).

The Third Circuit considered *Nippon* in the context of an alleged conspiracy involving multiple distribution levels analogous in some respect to that of the television industry. *See Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363 (3d Cir. 2005). It concluded that the logic of *Nippon* was inapplicable where the middlemen were not "substantially equal" participants in the alleged conspiracy. *Dentsply*, 424 F.3d at 383-84. As explained above, the Comcast Defendants played *no* role, let alone a substantially equal role, in creating the Leagues' territorial rules, but rather purchased rights offered on a ███████ basis. Thus, the Television Plaintiffs' indirect purchaser claims are barred by *Illinois Brick*.

*Third*, Silver and Birbiglia lack standing for the additional reason that they agreed to stay their claims against DIRECTV. *See Laumann*, Dkt. No. 130; *Garber*, Dkt. No. 157. Unless and until those claims against DIRECTV are adjudicated,[25] the risk of duplicative liability and the difficulties in apportioning recovery that inform *Illinois Brick*'s bright-line rule remain at play.[26] Indeed, courts have routinely rejected attempts to invoke the co-conspirator exception where (as here) claims against the direct purchasers were not part of the litigation.[27]

---

[25] The Comcast Defendants are not aware of any effort by Silver and Birbiglia to pursue arbitration against DIRECTV in the seven plus months since the stipulation was entered.

[26] *See Illinois Brick*, 431 U.S. at 736-46; *Laumann*, 907 F. Supp. 2d 465 at 480 (citing *Illinois Brick*, 431 U.S. at 728-33, 741-47) (main purposes of the direct purchase requirement are "to avoid the difficulties of 'apportion[ing] recovery among all potential plaintiffs . . . from direct purchasers to middlemen to ultimate consumers' and eliminate the possibility of duplicative recovery").

[27] *See, e.g.*, *Dentsply*, 424 F.3d 363, 370 (3d Cir. 2005); *Link v. Mercedes-Benz*, 788 F.2d 918, 931-33 (3d Cir. 1986); *In re Midwest Milk Monopolization Litig.*, 730 F.2d 528, 532 (8th Cir. 1984); *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1163 (5th Cir. 1979); *In re Ditropan XL Antitrust Litig.*, 2007 WL 2978329, at *4-5 (N.D. Cal. Oct. 11, 2007).

*Finally*, five of the seven Plaintiffs acknowledged in discovery having no intention of purchasing OOM packages in the future and therefore lack standing to seek injunctive relief.[28] *See Shain v. Ellison*, 356 F.3d 211, 215-16 (2d Cir. 2004); *Laumann*, 907 F. Supp. 2d at 480 n.76.  Further, there is no Television Plaintiff in *Laumann* and no Internet Plaintiff in *Garber* with standing to seek injunctive relief.

## CONCLUSION

For the foregoing reasons, the Comcast Defendants respectfully request that the Court grant Comcast's motion for summary judgment.

---

[28] Traub and Silver, who do not currently subscribe to a OOM television package, each denied having a plan to purchase such a package.  (Ex. 11 (Traub Dep.) at 55:3-57:4; Ex. 10 (Silver Dep.) at 53:7-54:14.)  Dillon, Lerner and Rasmussen, who do not currently subscribe to an OOM Internet package, each denied having a plan to purchase such a package.  (Ex. 12 (Lerner Dep.) at 171:6-173:22, 182:24-183:2, 184:10-18; Ex. 8 (Dillon Dep.) at 86:2-23; Ex. 13 (Rasmussen Dep.) at 90:9-17.)

Dated:  April 8, 2014

Respectfully submitted,

Arthur J. Burke
James W. Haldin
Christopher P. Lynch
Andrew N. DeLaney
**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, New York  10017
Telephone:  (212) 450-4000
Facsimile:  (212) 701-5800
arthur.burke@davispolk.com
james.haldin@davispolk.com
christopher.lynch@davispolk.com
andrew.delaney@davispolk.com

*Attorneys for Defendants Comcast Corporation,*
*Comcast SportsNet Philadelphia, L.P., Comcast*
*SportsNet Mid-Atlantic L.P., Comcast SportsNet*
*California, LLC, and Comcast SportsNet*
*Chicago, LLC*