**REDACTED**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

FERNANDA GARBER, MARC LERNER,
DEREK RASMUSSEN, ROBERT SILVER,
GARRETT TRAUB, and PETER HERMAN,
representing themselves and all others similarly
situated,

                     Plaintiffs,

         v.

OFFICE OF THE COMMISSIONER
OF BASEBALL, et al.,

                     Defendants.

_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

12-cv-3704 (SAS)

ECF Case

Electronically Filed

MEMORANDUM OF LAW IN SUPPORT OF
THE MLB DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ......................................................................................... 1

SUMMARY OF UNDISPUTED FACTS........................................................................... 4

    A.    MLB..................................................................................................... 4

    B.    MLB's Video Rights Structure ............................................................ 5

    C.    Distribution of Live MLB Game Video to Fans ................................. 6

    D.    Expansion of Output ........................................................................... 8

ARGUMENT..................................................................................................................... 9

    I.    PLAINTIFFS' CLAIMS ARE BARRED BY THE BASEBALL
        EXEMPTION .............................................................................................. 9

        A.    The Business of Baseball Is Exempt from Antitrust Regulation ........ 9

        B.    Plaintiffs' Claims Fall Squarely within Baseball's Antitrust
            Exemption......................................................................................... 10

    II.    PLAINTIFFS' CLAIMS WOULD FAIL UNDER THE RULE OF
         REASON .................................................................................................... 12

        A.    Plaintiffs Adduced No Facts Showing a Market-Wide
            Anticompetitive Effect...................................................................... 13

        B.    Quick Look Analysis:  MLB's Territorial Video Rights Structure is
            Procompetitive as a Matter of Law.................................................... 14

            1.    Exclusivities Are Fundamental to Licensing Video Rights........... 15

            2.    MLB's Video Rights Structure Supports National and
                Local Markets ................................................................................ 15

            3.    MLB's Video Rights Structure Fosters Competitive
                 Balance ......................................................................................... 16

            4.    MLB's Structure Prevents Free Riding and Intra-Venture
                Competition .................................................................................. 17

            5.    MLB's Structure Ensures Access to Virtually All Non-
                Local Games .................................................................................. 19

C.      Plaintiffs Put Forth No Valid Less Restrictive Alternative ........................ 20

III.    PLAINTIFFS CANNOT PROVE THE NECESSARY CAUSAL NEXUS ......... 21

IV.     *ILLINOIS BRICK* BARS THE TELEVISION PLAINTIFFS' CLAIMS .............. 23

CONCLUSION ............................................................................................................. 23

## TABLE OF AUTHORITIES

Page(s)

<u>CASES</u>

*Am. Motor Inns, Inc. v. Holiday Inns, Inc.,*
    521 F.2d 1230 (3d Cir. 1975) ........................................................................20

*Am. Needle, Inc. v. NFL,*
    560 U.S. 183 (2010) ..........................................................................14, 15, 16

*Argus, Inc. v. Eastman Kodak Co.,*
    801 F.2d 38 (2d Cir. 1986) ..........................................................................21

*Ass'n of Indep. TV Stations, Inc. v. College Football Ass'n,*
    637 F. Supp. 1289 (W.D. Okla. 1986) .........................................................13

*Broad. Music, Inc. v. CBS, Inc.,*
    441 U.S. 1 (1979) ........................................................................................18

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977) .....................................................................................21

*CDC Techs., Inc. v. IDEXX Lab., Inc.,*
    186 F.3d 74 (2d Cir. 1999) ..........................................................................13

*Charles O. Finley & Co. v. Kuhn,*
    569 F.2d 527 (7th Cir. 1978) .......................................................................10

*Chicago Prof'l Sports Ltd. P'ship v. NBA, (Bulls II),*
    95 F.3d 593 (7th Cir. 1996) .........................................................................15

*Chicago Prof'l Sports Ltd. P'ship v. NBA, (Bulls I),*
    961 F.2d 667 (7th Cir. 1992) .......................................................................18

*City of Pittsburgh v. West Penn Power Co.,*
    147 F.3d 256 (3d Cir. 1998) ........................................................................21

*City of San José v. Office of the Comm'r of Baseball,*
    No. 13 Civ. 2787, 2013 U.S. Dist. LEXIS 147543 (N.D. Ca. Oct. 11, 2013) .................10, 11

*Dominguez v. UAL Corp.,*
    666 F.3d 1359 (D.C. Cir. 2012) ..............................................................21, 22

*E& L Consulting, Ltd. v. Doman Indus.,*
    472 F.3d 23 (2d Cir. 2006) ..........................................................................21

*Fed. Baseball Club of Baltimore, Inc. v. Nat'l League of Prof'l Baseball Clubs,*
    259 U.S. 200 (1922) ......................................................................................9

iii

*Flood v. Kuhn,*
407 U.S. 258 (1972) ...................................................................................9,10,11,12

*Gardella v. Chandler,*
172 F.2d 402 (2d Cir. 1949) .................................................................................11

*Gerlinger v. Amazon.com, Inc.,*
526 F.3d 1253 (9th Cir. 2008).............................................................................21

*Hale v. Brooklyn Baseball Club, Inc.,*
Civ. No. 1294 (N.D. Tex. Sept. 19, 1958)..........................................................11

*Haywood v. NBA,*
401 U.S. 1204 (1971) ............................................................................................9

*Henderson Broad. Corp. v. Houston Sports Ass'n,*
541 F. Supp. 263 (S.D. Tex. 1982)..................................................................11,12

*Illinois Brick Co. v. Illinois,*
431 U.S. 720 (1977) ............................................................................................23

*In re Dewey Ranch Hockey, LLC,*
414 B.R. 577 (Bankr. D. Ariz. 2009) .................................................................15

*Kingray, Inc. v. NHL,*
No. 00 Civ. 1544-L (S.D. Cal. July 2, 2002)...................................................1,12

*L.A. Mem'l Coliseum Comm'n v. NFL,*
726 F.2d 1381 (9th Cir. 1984) ............................................................................15

*Laumann v. NHL,*
907 F. Supp. 2d 465 (S.D.N.Y. 2012) ..........................................................passim

*MSG, L.P. v. NHL,*
No. 07 Civ. 8455, 2007 WL 3254421 (S.D.N.Y. Nov. 2, 2007), *aff'd,* 270 F. App'x
56 (2d Cir. 2008) ...........................................................................................passim

*Major League Baseball v. Butterworth,*
181 F. Supp. 2d 1316 (N.D. Fla. 2001), *aff'd sub nom., Major League Baseball v.
Crist,* 331 F.3d 1177 (11th Cir. 2003) ................................................................10

*Major League Baseball Props., Inc. v. Salvino, Inc.,*
542 F.3d 290 (2d Cir. 2008) .........................................................................passim

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986) ............................................................................................13

*Morsani v. Major League Baseball,*
    79 F. Supp. 2d 1331 (M.D. Fla. 1999)................................................................10

*Murray v. NFL,*
    No. 94 Civ. 5971, 1998 WL 205596 (E.D. Pa. Apr. 28, 1998) ............................22

*NBA v. Williams,*
    857 F. Supp. 1069 (S.D.N.Y. 1994) ....................................................................16

*New Orleans Pelicans Baseball, Inc. v. Nat'l Ass'n of Prof'l Baseball Leagues, Inc.,*
    No. 93 Civ. 253, 1994 WL 631144 (E.D. La. Mar. 1, 1994) ...............................11

*Radovich v. NFL,*
    352 U.S. 445 (1957) ..............................................................................................9

*Rock v. NCAA,*
    928 F. Supp. 2d 1010 (S.D. Ind. 2013)................................................................19

*Simon v. KeySpan Corp.,*
    No. 10 Civ. 54837, 2011 WL 2135075 (S.D.N.Y. May 27, 2011) ........................21

*Sunbeam TV Corp. v. Nielsen Media Research, Inc.,*
    711 F.3d 1264 (11th Cir. 2013) ............................................................................22

*Toolson v. New York Yankees, Inc.,*
    346 U.S. 356 (1953) ..........................................................................................9,11

*Toolson v. New York Yankees, Inc.,*
    No. 18, 1953 WL 78316 (1953) ........................................................................10,11

*United States v. Int'l Boxing Club,*
    348 U.S. 236 (1955) ..............................................................................................9

*United States v. Shubert,*
    348 U.S. 222 (1955) ..............................................................................................9

*US Airways Grp. v. British Airways PLC,*
    989 F. Supp. 482 (S.D.N.Y. 1997) ......................................................................21

*Virgin Atl. Airways v. British Airways PLC,*
    257 F.3d 256 (2d Cir. 2001) ................................................................................20

**STATUTES**

15 U.S.C. § 26b(a)........................................................................................................9

15 U.S.C. § 26b(3)......................................................................................................10

OTHER AUTHORITIES

S. Rep. 105-18 (1997); http://www.gpo.gov/fdsys/pkg/CRPT-105srpt118/pdf/CRPT-
105srpt118.pdfl ..........................................................................................................10

## ADDITIONAL AUTHORITIES INCORPORATED BY REFERECE FROM THE NHL DEFENDANTS' BRIEF

<u>CASES</u>

*Agnew v. NCCA*,
   683 F.3d 328 (7th Cir. 2012)

*California Dental Assoc'n v. FTC*,
   526 U.S. 756 (1999)

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.*,
   996 F.2d 537 (2d Cir. 1993)

*Board of Trade v. United States*,
   246 U.S. 231 (1918)

*Durkin v. Major League Baseball*,
   No. 94 Civ.-5315 (E.D. Pa. July 17, 1995), *aff'd*, 85 F.3d 611 (3d Cir. 1996)

*Hairston v. Pacific 10 Conference*,
   101 F.3d 1315 (9th Cir. 1996)

*Kingray, Inc. v. NBA, Inc.*,
   188 F. Supp. 2d 1177 (S.D. Cal. 2002)

*K.M.B. Warehouse Distribs., v. Walker Mfg. Co.*,
   61 F.3d 123 (2d Cir. 1995)

*Morris Commc'nss Corp. v. PGA Tour, Inc.*,
   364 F.3d 1288 (11th Cir. 2004)

*Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*,
   467 F.3d 283 (2d Cir. 2006)

*Polk Bros., Inc. v. Forest City Enters., Inc.*,
   776 F.2d 185 (7th Cir. 1985)

*Race Tires Am., Inc., v. Hoosier Racing Tire Corp.,*
    614 F.3d 57 (3d Cir. 2010)

*Ralph C. Wilson Indus., Inc. v. Am. Broad. Cos.,*
    598 F. Supp. 694 (N.D. Ca. 1984), *aff'd sub nom. Ralph C. Wilson Indus., Inc. v. Chronicle Broad. Co.,* 794 F.2d 1359 (9th Cir. 1986)

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,*
    792 F.2d 210 (D.C. Cir. 1986)

*Texaco, Inc. v. Dagher,*
    547 U.S. 1 (2006)

*Trans Sport, Inc. v. Starter Sportswear, Inc.,*
    964 F.2d 186 (2d Cir. 1992)

*United States v. Penn-Olin Chem. Co.,*
    378 U.S. 158 (1964)

*United States Football League v. NFL,*
    842 F.2d 1335 (2d Cir. 1988)

*Washington v. NFL,*
    880 F. Supp. 2d 1004 (D. Minn. 2012)

The MLB Defendants[1] submit this memorandum in support of their Motion for Summary Judgment.

## PRELIMINARY STATEMENT

The essential facts in this case are not in dispute and compel summary judgment.

Although Plaintiffs challenge the very core of how MLB operates its business and exhibits games locally and nationally to fans, they point to no precipitating event, no new rules, and no new restrictions. MLB's territorial video rights structure is set forth in MLB's governing documents and has been in place since at least the advent of modern cable television. That structure corresponds with explosive growth in the live video exhibition of MLB games to fans: MLB's coordinated video rights structure makes virtually *every* MLB game available for video exhibition to virtually *every* fan in the U.S. *Salvino, MSG, Kingray*, and a constellation of other cases have rejected challenges to the same type of league structures at issue here because those structures are reasonable, procompetitive, and pro-fan.[2]

A year of discovery raised no material factual dispute as to the above. Rather, Plaintiffs' case rests on a series of untenable propositions that pile speculation atop conjecture. Bottom line, Plaintiffs presume — without any facts — that existing output to fans would somehow continue apace (and improve) if Plaintiffs were to cherry-pick which aspects of MLB's structure to wipe out (territories) and which to leave intact (all other internal cross-licenses and agreements by which clubs cooperate, not compete, with respect to video exhibition of games).

First, there is no factual dispute that MLB clubs are interdependent members of a highly integrated, professional sports league that, among other things, share revenues generated by various club and league licenses. It also is undisputed that MLB's video rights structure is likewise built on cooperation — an overarching framework of royalty-free cross-licenses and

---

[1] The MLB Defendants are the Office of the Commissioner of Baseball (doing business as Major League Baseball ("MLB")), Major League Baseball Enterprises, Inc., MLB Advanced Media, L.P. ("MLBAM"), MLB Advanced Media, Inc. and eight of the MLB clubs sued in this case.

[2] This Court has acknowledged the considerable precedent upholding such restraints. *Laumann v. NHL*, 907 F. Supp. 2d 465, 479, n. 73 and 490 n. 148 (S.D.N.Y. 2012).

mutual agreements among all clubs. Yet the premise of Plaintiffs' case is that the interdependent MLB clubs (which cannot individually produce or exhibit a single MLB game, let alone an entire season) should "compete for fans" everywhere – home towns and home teams be damned.

The antitrust laws do not permit this evisceration of MLB's territorial league structure – not in general, nor under 92 years of Supreme Court precedent confirming that MLB is exempt from antitrust scrutiny. Nor is there any basis for Plaintiffs' assumption that, if telecast territories are dismantled, the "competing" clubs would agree to continue the rest of MLB's cooperative video rights structure, unchanged. For example, there is no basis to conclude that the Kansas City Royals would continue to agree to allow the New York Yankees to bring cameras into the Royals' ballpark if the Yankees could transmit that game telecast in direct competition with the Royals' telecast – in Kansas City and everywhere else.

Second, Plaintiffs do not challenge the right of clubs to grant exclusive game content licenses to programmers. And they do not dispute the benefits of *both* the home and visiting club licensing the same game. But what makes it possible for both clubs to offer exclusive rights to the same game is that each club licenses only within its territory. Eliminating territories to allow overlapping telecasts of the same game necessarily means *neither* club has exclusive content rights to license. That is a formula for taking games off the air, not helping fans.

Third, Plaintiffs do not challenge MLB's national network agreements. But those agreements expressly require MLB ████████████████████████████ The national networks – which Plaintiffs ignored in discovery – confirm that MLB's territorial video structure (and the fact that MLB is the sole licensor of rights in the national market) is material to their interest in MLB and the production of high quality programming for fans.

Fourth, Plaintiffs likewise do not challenge the league's right to create pooled, out-of-market ("OOM") packages. Yet, Plaintiffs want every club to "compete" directly with this venture product by individually licensing game telecasts nationally. The OOM packages exist because they preserve the exclusive in-market game rights under which the local telecasts are produced in the first place. It is reasonable and procompetitive to prevent members of a joint

venture from competing directly with an unchallenged product of that venture.

Put most simply, Plaintiffs do not dispute that MLB's video rights structure ensures that (1) virtually every MLB game can be telecast locally and/or nationally and (2) virtually every MLB fan has the choice to watch the games of the club(s) that fan prefers. Yet, Plaintiffs demand internal, head-to-head competition that, at best, offers nothing but a hope and a prayer that *some* fans of *some* clubs might get some (unspecified) additional "choice" at some (unknown) price. The antitrust laws cannot be used to play Russian roulette with fans.

Summary judgment is compelled on each of the following, independent grounds:

<u>Antitrust Exemption</u>: The Supreme Court has repeatedly confirmed since 1922 that "the business of baseball" – including its territorial league structure and live video rules – is broadly exempt from the antitrust laws. *Stare decisis*, and the express pronouncements of the Court that the exemption may be narrowed only by Congress, compel dismissal of Plaintiffs' claims.

<u>No Anticompetitive Effect</u>: Plaintiffs cannot meet their initial burden to prove a market-wide anticompetitive effect. Plaintiffs developed no facts showing any fans would have "more choice" in the Plaintiffs' "but for" world, let alone that fans of *every* club would benefit.

<u>Reasonable as a Matter of Law</u>: Even if Plaintiffs could meet their initial burden, this Court can readily uphold MLB's video rights structure as a matter of law on a "quick look" basis. That structure indisputably serves multiple, procompetitive interests recognized in case after case. Plaintiffs' failure to identify in discovery any less restrictive alternative that has all of these procompetitive virtues is an additional ground for summary judgment.

<u>Antitrust Standing/Antitrust Injury</u>: Plaintiffs also have no facts showing their specific, personal "injuries" would be remedied by eliminating the challenged structure. As a matter of law, Plaintiffs cannot assume that the existing video exhibition model will continue unchanged, just without territories. Indeed, Plaintiffs posit an entirely *new* business model, replacing exclusive territorial rights and cooperation with non-exclusive rights and head-to-head competition. Plaintiffs adduced no concrete facts that, in their theoretical world, clubs, programmers, and distributors would deliver to these Plaintiffs the games they demand.

## SUMMARY OF UNDISPUTED FACTS[3]

### A.    MLB

MLB is a professional sports league composed of 30 MLB clubs. MLB's league structure is set forth in the Major League Constitution and other governing documents and agreements. Clubs cooperate within this structure to produce and exhibit Major League Baseball, an entertainment product consisting of 2,430 regular season games, plus postseason playoffs and the World Series. Among other things, each club agrees "to act at all times in the best interests of Baseball," reflecting a fundamental compact of the venture. Each club likewise agrees to show up and play a whole season of scheduled games and permit those games to be exhibited, in person and by live video, to fans nationwide and around the globe. SUF 1-5.

Only MLB clubs can produce and exhibit Major League Baseball. No single club can produce or exhibit a single MLB game, let alone an entire season, without the consent and cooperation of the other clubs. Cooperation and agreement among the clubs are therefore necessary to produce and exhibit Major League Baseball. The agreed league structures and rules ensure every club participates in 162+ MLB games *and* every club and the league have certainty in their rights to exhibit those games (i) without the need for thousands of game-by-game negotiations every season (and the costs and risks associated with such negotiations) and (ii) without the risk of being undermined by competition from their fellow venturers in the very product of the venture. SUF 6-11, 19, 31, 66, 68, 70-71, 74-75.

A defining element of MLB's league structure and product is territoriality – *i.e.*, a roster of geographically defined clubs spread across the U.S. and Canada, each of which is the favorite home team to its fans. It is critical to MLB's success to support and grow its fan base locally *and* nationally. Thus, each club is assigned a Home Television Territory ("HTT") in which it has the opportunity, right, and obligation to develop a fan base, and promote the club and Major League Baseball. MLB has a corresponding opportunity, right, and obligation to promote the

---

[3] Cites to SUF ___ refer to the accompanying L.R. 56.1 Statement of Undisputed Material Facts.

game nationally on behalf of, and for the benefit of, all clubs.  SUF 12, 17-24, 26-30, 37-38.

Each club's "success" – however defined – is based on the fact that the club operates within MLB's league structure and with the express agreement that every other club does the same.  By design, 2/3 of clubs do not progress to the playoffs in any given year.  No club "wins" unless every club agrees that most will "lose" on the field.  Likewise, each club benefits from the web of internal league agreements, rules, and structures (and collectively bargained agreements) under which the clubs and the league produce and exhibit Major League Baseball, and seek to grow the audience for the benefit of each club and the league as a whole.  SUF 10-16, 43, 48, 61, 65, 68-71, 77, 86.

Given MLB's inherently interdependent structure and product, it is an important and legitimate goal for the league to foster competitive balance among the clubs.  It is not in the interest of any individual member club for another member of the joint venture to fail or become so financially weak that it cannot field a competitive team or garner a fan base.  SUF 50-60.

**B.    MLB's Video Rights Structure**

Live video is the primary means by which most fans watch MLB games.  And, unlike certain other sports entities (such as the NFL and many college conferences), MLB's video rights structure is such that, not only the league, but also every club has certain game telecast rights.

Among other things, MLB's video rights structure provides that:

- Home and visiting clubs each have an automatic right to telecast every game they play, other than games reserved exclusively for telecast by national networks;
- Each club is authorized to telecast within its HTT;
- Each home club must provide the visiting club's licensed programmer access to the home ballpark "free of charge" to telecast games;[4]
- The Commissioner of Baseball has the exclusive right to sell (for the benefit of all clubs)

_____

[4] Often, the visiting club programmer needs to pay only a nominal facilities fee.  But it cannot be charged a fee for the right to telecast the game or for stadium access.  SUF 69.

video rights nationally and internationally; and

- Every game telecast produced by a club's licensed programmer is provided, ███████ to MLB and MLBAM to create the OOM packages. SUF 61, 68, 150.

MLB codified the HTT structure in 1981 to enhance "each club's ability to effectively market its current and future tv . . . properties" (*i.e.*, maximize local telecasts) and fortify MLB's efforts "to bring baseball to millions of additional fans, especially in the outer markets" (which clubs typically had not developed on their own). Clearly defined club rights also allowed MLB to assure national networks that national telecast rights licensed by the league (on behalf of all clubs) would not be "dilut[ed]" by individual club telecasts. SUF 82-85, 129-35.

### C.   Distribution of Live MLB Game Video to Fans

Virtually all MLB games are available to virtually all fans by a combination of methods. SUF 76-78, 92-182.

Local Distribution: Clubs grant programmers (typically regional sports networks ("RSNs")) exclusive rights to telecast games played by that club, home and away.[5] Exclusive game rights are fundamental to RSNs. Distributors ("MVPDs") expect that the vast majority of games on an RSN will be exclusive to that RSN within its territory. SUF 93, 101-05, 114-16.

Local telecasts are critical to a club's connection with its fan base, promote its brand, and generate other revenues (*e.g.*, ticket sales, merchandise sales, etc.). And local telecast licenses themselves are a key source of revenue for clubs. SUF 27-33, 95-97.

National Telecasts: MLB also arranges national telecasts of hundreds of MLB games on free, over-the-air broadcast and standard cable, satellite, and telco television packages. The national telecasts are critical to promote MLB in the national market and grow the audience for the benefit of all clubs nationally and locally. National telecasts are not used to "compete" with any club for fans and audience. SUF 36, 41-44, 124-129.

---

[5] RSNs telecast the vast majority of club games (on average, 150 of each club's 162 games each season), allowing fans to follow the full "story" of their club each year. SUF 35, 98.

National telecast licenses generate substantial revenues for the league, which are evenly distributed to the clubs. These shared revenues help alleviate revenue disparities among the clubs. They also ensure all clubs benefit from their cooperative efforts in creating and exhibiting Major League Baseball, regardless of inherent variations with respect to local market size, current popularity in the national market, or on-field success. SUF 25, 43-44, 54-57, 59, 139.[6]

Out-of-Market Packages: To supplement local and national telecasts, MLB also creates two out-of-market packages, MLB Extra Innings (available by television since 1996) and MLB.TV (available by Internet since 2002). These packages are designed to serve fans living outside the HTTs of their favorite club(s), as well as MLB's most avid fans. The OOM packages allow fans to watch virtually all non-local games – i.e., games in which neither club is based in the HTT where the fan is watching. A fan of the Milwaukee Brewers or the San Diego Padres living in Bangor, Maine, for example, can follow either team on the OOM packages even if that fan is the only one in Bangor who wants to watch those games. SUF 45-46, 79, 143.[7]

The OOM packages are structured to avoid undermining local club efforts and the rights of local programmers that produce the very live game feeds that form the OOM packages. To preserve the exclusive licenses under which local programmers produce the feeds, the packages

---

[6] ███████████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████████████████
███████ These provisions are material to FOX and ESPN and benefit MLB's fans by incentivizing the networks "to produce and provide high-quality entertainment to fans." SUF 133-34. ████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████

[7] Because the clubs have agreed to contribute local live game feeds, ██████████ to the pooled league packages, MLB and MLBAM do not have to negotiate for thirty separate licenses ████████ ██████ for the feeds for the OOM packages. This allows the packages to be efficiently and reliably assembled on behalf of all clubs. SUF 148, 150.

do not allow in-market viewing.[8]  The OOM packages also are positioned primarily to reach non-local fans, not to undermine the viability and success of local clubs.  SUF 43, 47, 141, 149.  Like the national telecasts, the OOM packages generate funds that clubs share equally.  SUF 153.

**D.    Expansion of Output**

There has been an explosion of live baseball programming under MLB's video rights structure.  SUF 184-90.  By codifying the HTTs, MLB addressed the concerns of national networks that the national rights they were licensing could be "diluted" if clubs could individually license competing national telecasts.  At the same time, codifying the HTTs allowed the clubs to take advantage of the growth in cable television because each club could offer exclusive rights to game content locally for virtually *every* game it played, home and away.  SUF 73.  And it is MLB's territorial structure that allows the league to efficiently create and distribute the OOM packages that guarantee non-local fans game programming never available before.  SUF 80-83, 140-44, 146-49.  In short, a triple-play benefitting consumers.

From the advent of the OOM packages in 1996 thru 2013, the total number of games telecast by national networks and the OOM packages each season increased from 1,586 to 2,388.  The number of games locally telecast likewise meaningfully increased during that same period.  And those games are reaching more fans in more ways.  As the direct result of substantial efforts, investment, and innovation by league entities, fans now have more choices than ever before in how to watch games – *i.e.*, through broadcast, cable, satellite or telco television services *and* on literally hundreds of interactive media devices (Xbox, iPads, smart phones, laptops, etc.) across multiple platforms (Apple iOS, Google Android, etc.).  SUF 176-78, 184, 189-90.

---

[8] For example, a Cardinals/Phillies game is telecast "in market" within the HTTs of those two clubs and distributed in the OOM packages for viewing outside those HTTs.

## ARGUMENT[9]

### I.   PLAINTIFFS' CLAIMS ARE BARRED BY THE BASEBALL EXEMPTION

Ninety-two years of Supreme Court precedent bars Plaintiffs' claims. The "business of baseball," including MLB's territorial structure and video rules, is exempt from antitrust scrutiny.

#### A.   The Business of Baseball Is Exempt from Antitrust Regulation

In 1922, the Supreme Court established that the business of baseball is not subject to antitrust regulation.[10]  Although that first case, *Federal Baseball*, rested on the premise that baseball is not interstate commerce, the Supreme Court has since held that the exemption does not depend on any intrastate/interstate commerce distinction.  Rather, the Court has repeatedly reaffirmed baseball's antitrust exemption as a matter of *stare decisis* and its express pronouncements that the exemption's scope can be narrowed only by Congress.

In *Toolson v. New York Yankees, Inc.*, the Court observed that, in the thirty years since *Federal Baseball*, professional baseball had developed "on the understanding that it was not subject to existing antitrust legislation," and only Congress could lift or limit the exemption.[11]  In *Flood v. Kuhn*, the Court further confirmed that, while "[p]rofessional baseball is a business" clearly "engaged in interstate commerce," it is nonetheless exempt from antitrust laws as a matter of *stare decisis* and Congressional inaction.[12]  In particular, "[t]he advent of radio and television, with their consequent increased coverage and additional revenues, has not occasioned an overruling of *Federal Baseball* and *Toolson*."[13]

---

[9] We incorporate the exposition of the summary judgment standard in the brief filed by the NHL Defendants in the *Laumann* action.  NHL Brf. at 6.

[10] *Fed. Baseball Club of Balt. v. Nat'l League of Prof'l Baseball Clubs*, 259 U.S. 200, 208-09 (1922).

[11] 346 U.S. 356, 357 (1953).  The Court reaffirmed *Toolson* over the next twenty years, declining to extend the exemption to other sports and entertainment products.  *See U.S. v. Shubert*, 348 U.S. 222, 230 (1955); *U.S. v. Int'l Boxing Club*, 348 U.S. 236, 241-42 (1955); *Radovich v. NFL*, 352 U.S. 445, 451-52 (1957); *Haywood v. NBA*, 401 U.S. 1204, 1205-06 (1971).

[12] 407 U.S. 258, 282-83, 285 (1972).

[13] *Id.* at 285.

Since *Flood*, Congress has acted to change baseball's antitrust exemption, but it expressly did so in a specifically limited manner that further compels the conclusion that the exemption applies here. In 1998, Congress enacted the "Curt Flood Act," which removed the exemption from certain Major League player employment issues. *See* 15 U.S.C. § 26b(a). However, Congress specifically preserved the remainder of baseball's exemption. The Act states that it did not change antitrust law with respect to issues such as "the marketing or sales of the entertainment product of organized professional baseball" and "the licensing of intellectual property rights" by clubs "individually or collectively." *Id.* § 26b(b)(3).

The official Senate Report likewise confirms that passage of the Act "retain[ed] the antitrust exemption" for issues such as "league expansion, franchise location, the amateur draft ***and broadcast rights***") (emphasis added). Congress thus confirmed that it does not intend the antitrust laws to apply to the business of baseball other than Major League player employment.[14]

### B.   Plaintiffs' Claims Fall Squarely within Baseball's Antitrust Exemption

Baseball's antitrust exemption has been broadly interpreted and applied, particularly since the 1972 ruling in *Flood*. As the Seventh Circuit found, "the Supreme Court intended to exempt the business of baseball, not any particular facet of that business, from the federal antitrust laws."[15] Courts have repeatedly confirmed that issues of league structure -- including territorial restrictions on exhibition of games to live and broadcast audiences -- are exempt from antitrust laws. Likewise, each Plaintiff readily admitted at deposition that live video exhibition of MLB games is not just a "facet" of "the business of baseball," but is "central," and "essential" to that business -- and that this lawsuit "challeng[es] decisions that are central to the business of

---

[14] S. Rep. 105-18, at 6 (1997), http://www.gpo.gov/fdsys/pkg/CRPT-105srpt118/pdf/CRPT-105srpt118.pdf; *Morsani v. MLB*, 79 F. Supp. 2d 1331, 1335 n.12 (M.D. Fla. 1999); *San José v. Office of the Comm. of Baseball*, 2013 U.S. Dist. LEXIS 147543, *36 (N.D. Ca. 2013) (applying exemption to operating territories), appeal pending.

[15] *Charles O. Finley & Co. v. Kuhn*, 569 F.2d 527, 541 (7th Cir. 1978); "[T]he business of baseball is exempt from the antitrust laws, as it has been since 1922, and as it will remain unless and until Congress decides otherwise. Period." *Major League Baseball v. Butterworth*, 181 F. Supp. 2d 1316, 1331, *aff'd*, *Major League Baseball v. Crist*, 331 F.3d 1177 (11th Cir. 2003).

baseball." SUF 63-64. These admissions are inescapable: live video is the principal means by which fans watch MLB games and generates substantial revenues for MLB and the clubs. SUF 61-62. As such, Plaintiffs' claims fall squarely within the exemption.

The MLB territorial video structure at issue here is the modern equivalent of the rules exempted from antitrust scrutiny in *Toolson*. In *Toolson*, the plaintiff's claims included a challenge to baseball's territorial broadcast restrictions that reads as if written by Plaintiffs here:

> Defendant Baseball clubs and those combined with them have refused to authorize a telecast of the games of such clubs to be made from a station located outside of the home territory within the home territory of another club, during the time that (a) a home game of such other club is being played or (b) an away from home game is being telecast from any television station or stations located within the home territory of such club[.]

1953 WL 78316, at *9. *Toolson* broadly affirmed application of baseball's antitrust exemption to ***all*** of the challenges, including the challenge to broadcast territories.[16] Indeed, MLB's territorial restrictions lie at the very core of the antitrust exemption.[17]

Relying on *Toolson's* broad holding, the Northern District of Texas held that live video exhibition of MLB games was exempt as part of the business of baseball shortly after *Toolson*. In *Hale v. Brooklyn Baseball Club*, plaintiffs challenged the allegedly "monopolistic restraint of radio broadcasting and telecasting" of games."[18] *Hale* found the importance of broadcasting to MLB was "certainly within the mind and thinking of every member of the [Supreme] Court" when *Toolson* affirmed the exemption.[19] *Hale* held that broadcasting is integral to the business of baseball, as much a part of the game-day experience as in-person attendance, because:

> The telecasting simply lifts the horizon, so to speak, and brings in another set of

---

[16] 346 U.S. at 357; *San José, supra*, at *21 n.10 (*Toolson* affirmed exemption as to "certain territorial restrictions, including those related to the media broadcasting of baseball exhibitions").

[17] As one court explained: "defendants are in the business of baseball. Their business is a legally sanctioned monopoly. One of the central features of that monopoly is the power to decide who can play where." *New Orleans Pelicans Baseball v. Nat'l Ass'n of Prof'l Baseball Leagues*, 1994 WL 631144, at *9 (E.D. La. 1994) (addressing minor league structure).

[18] Tr. of Mtn. to Dismiss Hr'g at 2-3 (N.D. Tex. 1958) (attached).

[19] *Id.* and *see* 346 U.S. at 356-57. Indeed, the Second Circuit had already determined four years before *Toolson* that game telecasts were "part of the business [of baseball] itself." *Gardella v. Chandler*, 172 F.2d 402, 407-08, 413 (2d Cir. 1949).

> viewers of the same identical game that those present in the grandstand are seeing at the same time, ordinarily, and I believe it's straining realities to suggest that this television business has become a new facet of activity that you can look at apart from the ordinary business of baseball....

*Id.* at 3. *Hale* thus held that broadcasting is within the exemption and dismissed the claims. *Id.*

Only one antitrust challenge relating to broadcasting of baseball games survived a motion raising the antitrust exemption. In *Henderson Broad. v. Houston Sports Ass'n*, the Southern District of Texas misinterpreted *Flood* and limited the exemption to conduct "central ... to the 'unique characteristics and needs' of baseball."[20] To the extent *Henderson* may conflict with *Flood*, this court is bound by the controlling Supreme Court precedent. Even in its misreading of *Flood*, however, *Henderson* confirmed the exemption applies to MLB's internal league structure, the subject of this lawsuit.[21] Moreover, in *Henderson*, the defendant was sued in its capacity as a network, not as an MLB club. *Id.* at 271. Here, plaintiffs attack not just a single network contract, but the central paradigm of the relationships among MLB clubs. Finally, *Henderson* was decided before Congress affirmed the broad scope of the exemption in enacting the 1998 Curt Flood Act. For all of these reasons, *Henderson* does not lead to a contrary result.

Live video exhibition of MLB games is indisputably part of the business of baseball as a matter of law and fact. Thus, MLB's structures and rules governing such exhibitions are exempt from antitrust scrutiny, and Plaintiffs' claims must be dismissed.

## II.   PLAINTIFFS' CLAIMS WOULD FAIL UNDER THE RULE OF REASON[22]

Even if the antitrust laws applied here, Plaintiffs' claims would fail as a matter of law under the Rule of Reason, including under the "quick look" approved in *American Needle*.

---

[20] 541 F. Supp. 263, 268-69 (S.D. Tex. 1982) (quoting *Flood*, at 282); *compare Flood*, at 285.

[21] *Id.* at 269.

[22] We incorporate the NHL's exposition of the standards governing the rule of reason analysis, including the applicability of the "quick look" approach, as well as the case law confirming that the failure of Plaintiffs' § 1 claims also compels dismissal of their § 2 claim. NHL Brf. at 6-9, 22-23. Although not addressed in this motion, the MLB Defendants do not concede Plaintiffs can prove a relevant market, market power, damages, or the right to injunctive relief.

A.      **Plaintiffs Adduced No Facts Showing a Market-Wide Anticompetitive Effect**

It is undisputed that, unlike the restriction challenged in *NCAA*, MLB's video rights structure does not preclude any game from being licensed for telecast.  SUF 67.  Rather, as in *Salvino*, the league structure merely "alters the identity" of the licensor -- *i.e.*, the home and visiting clubs license in their respective HTTs, and the league licenses nationally/OOM.[23]

*Salvino* also squarely rejected any argument that there is an inherent "adverse effect" on competition from such rules -- even when, in *Salvino*, the league was the exclusive licensor such that individual clubs could not offer licenses, competing or non-competing.  Plaintiffs must adduce real world facts to show that, in the absence of the challenged territorial restrictions, clubs could and would effectively "compete" with each other and with the league such that fans would benefit from more "choice," more output, or lower prices.[24]

Plaintiffs bear a particularly heavy burden to come forward with actual facts to support their claims because the "but for" world they posit is inherently *implausible*.[25]  As one court aptly observed, "[w]ithout exclusivity, it is doubtful that many licensees could afford to develop programs fully."[26]  Allowing two teams the unfettered right to license telecasts of the same game is a recipe for "chaos," not efficient market operation.  *Id.*  Having them "compete" with their collective venture licensor, MLB, only makes matters worse and is nonsensical within an interdependent venture.  It is inherently contradictory for Plaintiffs to presume a "but for" world in which clubs ruthlessly compete with each other, yet also presume those "competitors" would

---

[23] 542 F.3d 290, 318 (2d cir. 2008).  *See also Kingray v. NHL*, 00-CV-1544 (S.D. Cal. 2002), Slip Op. at 11-12 (distinguishing *NCAA*; no anticompetitive effect because rules did not prevent games from being telecast, just prevented "double" broadcasts) (attached).  *Salvino* also distinguished *NCAA* because, unlike MLB clubs, NCAA teams have "no real interdependence." 542 F.3d at 327.

[24] *Laumann*, 907 F. Supp. 2d at 490 (alleging consumers forego purchases "from other distributors" "resulting in decreased consumer choice and increased price."); *CDC Tech. v. IDEXX*, 186 F.3d 74, 80 (2d Cir. 1999) (affirming summary judgment; plaintiff failed to raise issue of material fact "that the exclusive dealing agreements 'harm competition market-wide.'").

[25] *E.g.*, *Matsushita Elec. Indus. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

[26] *Ass'n of Indep. TV v. College Football Ass'n*, 637 F. Supp. 1289, 1304 (W.D.Okla. 1986).

continue to agree to the web of internal league agreements that make it possible for **any** club to license telecast rights without the need to negotiate or pay for those rights. That is not how true "competitors" behave. In the absence of MLB's current internal video rights agreements, it is pure speculation to assume any specific level of output (no matter how measured), pricing, or package options – including the continued existence of league packages.[27]

Even if clubs agreed to continue cooperating to give one another automatic rights to license game telecasts, there are no facts showing RSNs would simply "go national" in the absence of territories and "compete" nationally with every other RSN. No RSN (much less all) said it would be willing and able to obtain national distribution, one expressed doubt that there would be sufficient demand to make it a plausible possibility, and each expressed grave concern about how telecast rights would even operate if neither club playing a game could offer exclusivity (as they can today by virtue of the territorial divisions). Likewise, no MVPD said it would be willing to carry 30 different, complete RSN feeds in **any** locale, let alone nationwide.[28]

Thus, summary judgment is compelled because Plaintiffs offer no facts to satisfy their burden to prove an actual, market-wide anticompetitive impact on fans. *Salvino, supra.*

**B.     Quick Look Analysis:  MLB's Territorial Video Rights Structure is Procompetitive as a Matter of Law**

Professional sports leagues are not "trapped by antitrust law." League restraints may be found valid in the "twinkling of an eye" given the "special characteristics" of professional sports leagues, including the necessary interdependence of clubs and their "legitimate and important"

---

[27] Plaintiffs' conclusory allegations that clubs have the unilateral ability to license all the MLB games they play ignore the realities of an integrated, interdependent professional sports league. Nor is there any basis to presume that "the league" can impose cooperation by fiat. The internal league agreements are exactly that, agreements that may be amended or terminated by the clubs and other league entities. In 1993, for example, clubs temporarily threw out then-existing National League broadcasting agreement (which contained the clubs' overarching cross-licenses and pooling arrangements) where, as here, territorial rights were threatened. SUF 86-91.

[28] SUF119-23.Plaintiffs adduced no facts showing clubs would or could continue to agree to pool their local telecast feeds in a league package in a "but for" world in which RSN game telecasts would compete head to head **and** with the league. And again, Plaintiffs cannot presume that "the league" could dictate the pooling agreement that makes the OOM packages possible today.

interest in "maintaining a competitive balance."[29]  As this Court recognized, a challenge to a league restraint may be rejected with just a "quick-look" as multiple courts have now done based on the well-recognized needs of sports organizations.[30]  Here, *Am. Needle*, *Salvino*, *MSG*, and a host of other cases provide ample basis for this Court to reject Plaintiffs' challenge on just a "quick look" based on the indisputable, longstanding procompetitive interests served by MLB's video rights structure — and without needless "weighing" or speculative second-guessing.

### 1.    Exclusivities Are Fundamental to Licensing Video Rights

MLB's video rights structure unquestionably facilitates the ability of clubs and the league to provide programmers the exclusive content licenses that are the bedrock of the television industry, as courts have long recognized.[31]  Crucial exclusivity is provided in two ways.

First, HTTs allow home and visiting clubs each to provide exclusive licenses for the same game content — the foundation of the RSN business model.  SUF 68, 72, 99, 101, 117-18.[32]  This critical exclusivity would disappear if every game could be simulcast everywhere by both clubs.

Second, MLB's video rights structure also permits the league to license national networks to provide hundreds of games to fans through free broadcasts and standard television packages.  MLB's national licenses – which Plaintiffs *do not challenge* – expressly oblige the league to ████████████████████████████████████ Those licenses ████████████ if MLB's territorial video rights structure were eliminated.  SUF 124-36.

### 2.    MLB's Video Rights Structure Supports National and Local Markets

Professional sports leagues have legitimate, procompetitive interests in supporting strong local markets and fan bases while, at the same time, developing the national brand of the league

---

[29] *Am. Needle v. NFL*, 560 U.S. 183, 202-04 (2010).

[30] *Laumann*, *supra*, at 479 n. 73.

[31] We incorporate here the NHL's review of the cases recognizing the procompetitive benefits of exclusive licenses.  NHL Brf. at 11-13.

[32] Plaintiffs do not dispute the benefits of the internal agreement among MLB clubs giving every home and away club equal, automatic, and free rights to telecast the games they play.

and growing overall interest in the sport.[33] MLB's video rights structure allows MLB to promote Major League Baseball through national telecasts -- and make supplemental OOM packages available -- without undermining the critical local identity and viability of clubs.

Turning the system on its head to allow every club to independently "go national," as Plaintiffs demand, would wipe out the foundation for MLB's national telecasts and place MLB at a competitive *disadvantage* to other sports and entertainment offerings in the national market. SUF 137. Moreover, the "competition" Plaintiffs demand would eviscerate the local club identities, fan bases and markets recognized to be important and legitimate interests of a professional sports league. SUF 27-33, 48. Plaintiffs expressly demand that every club use telecasts to "compete for fans" with every other club.[34] Thus, unlike the national and OOM packages that are managed by the league for the benefit of all clubs, Plaintiffs posit a world where clubs compete, unfettered, for "eyeballs" everywhere, even if that competition takes viewers from the "home team" -- or telecasts from local fans.

### 3.    MLB's Video Rights Structure Fosters Competitive Balance

As this Court recognized, the Supreme Court and Second Circuit have repeatedly underscored that professional sports leagues, including MLB, have a unique and indisputable

---

[33] Professional sports leagues such as MLB are inherently territorial in nature, consisting of a roster of "geographically diverse" clubs. *Salvino*, 542 F.3d at 290; *In re Dewey Ranch Hockey*, 414 B.R. 577, 591 (Bankr. D. Ariz. 2009) ("very nature of professional sports requires some territorial restrictions to incentivize and sustain team ownership"; right of league to control territories so important that it overrides interests in effectuating sale for benefit of creditors). The resulting "rivalries" make "a more attractive product, which attracts a larger audience" and strong local club identities "promote local boosterism" and provide a "powerful incentive" for each club ownership group "to field a better team, which makes the contests more exciting and thus more attractive." *Bulls II*, 95 F.3d at 597-98; *L.A. Mem'l Coliseum v. NFL*, 726 F.2d 1381, 1396 (9th Cir. 1984) ("Territories foster fan loyalty," which "promotes traditional rivalries between teams, each contributing to attendance at games and television viewing."). Teams also have a "common interest" in promoting the league "brand." *Am. Needle*, 560 U.S. at 198; *MSG*, 2007 WL 3254421, *6 (S.D.N.Y. 2007) (rules designed to "enhance the NHL's 'national brand'" and foster competition with "other sports and entertainment products" were procompetitive).
[34] Pltfs.' 7/8/13 ltr. to Court at 4.

need to promote competitive balance among their clubs.[35] *Salvino* held that competitive balance is "essential" to "public interest" in MLB's product, "the viability of the clubs," and "the well-being of the [league]."[36] MLB's need to foster competitive balance is, thus, a "legitimate and important" interest that "unquestionably" can "justify a variety of collective decisions made by the teams." *Am. Needle*, 560 U.S. at 204.

*Salvino*'s competitive balance analysis is on all fours here. MLB's national telecast licenses and OOM packages generate substantial revenues for the equal benefit of *all* clubs. SUF 55-56, 138-39, 153-54. *Salvino* squarely held that such equal distribution of revenues from league licenses is "precisely tailored" to foster competitive balance.[37] The local/national rights structure that supports MLB's collective licenses also allows each club to get virtually all of its games telecast locally, fostering competitive balance by allowing each club to generate substantial individual revenues and to develop its local fan base. SUF 34, 51, 53. By virtue of MLB's HTT structure, each club can pursue these crucial local efforts without undermining the ability of each other club to do the same. SUF 31. Thus, MLB's structure supports its interest in a roster of geographically diverse local clubs, not just a few of the currently most popular or successful clubs. SUF 23-24, 51. By contrast, *Salvino* recognized that uncontrolled individual licensing by clubs within a professional sports league would "foster competitive *imbalance*."[38]

4.    MLB's Structure Prevents Free Riding and Intra-Venture Competition

Plaintiffs do not challenge MLB's national network agreements or the legality of its OOM packages.[39] Yet Plaintiffs contend clubs should "compete" against MLB's national telecasts and OOM packages by licensing nationally on their own. SAC ¶¶ 11-12, 81. Within a

---

[35] *Laumann*, 907 F. Supp. 2d at 479 n. 73 & 490 n. 148 (citing *Am. Needle*, *Salvino*, *MSG*). *See also* SUF 50-60.

[36] 542 F.3d at 327, 331-32. *Accord NBA v. Williams*, 857 F. Supp. 1069, 1079 (S.D.N.Y. 1994) ("maintenance of competitive balance" is procompetitive justification for league rule).

[37] 542 F.3d at 328, 333.

[38] *Id.* at 332-33.

[39] Pltfs.' 7/8/13 ltr. to Court at 4.

professional sports league, such "competition" is "free riding" that MLB may prevent to benefit all members and fans.[40]

To the extent any MLB club would have any ability to obtain national distribution on its own, that opportunity derives from, among other things, (i) its membership in MLB, (ii) the overarching agreements among *all* MLB clubs to produce and allow the exhibition of MLB games they play, and (iii) the intense promotional efforts by all MLB clubs and the league to generate interest in Major League Baseball locally and nationally. SUF 10-16, 37-49. Clubs that win should not be able to benefit disproportionately from a structure that *requires* 2/3 to lose.

As *Salvino* concluded, because of the inherently interdependent and joint nature of Major League Baseball, allowing indiscriminate licensing by clubs in the national market threatens to "overcompensate" individual clubs. *Id.* at 332-33. A joint enterprise has a procompetitive interest in controlling such potential, internal free riding because it "makes investment in design and distribution of products less attractive, to the ultimate detriment of consumers."[41] Likewise, because competition by venture members *with their venture product* is fundamentally at odds with a joint venture, "[a]greements among the parents not to compete with the joint venture in the market in which the joint venture operates generally have been upheld as reasonable ancillary restraints," particularly where cooperation is needed to make the product available at all.[42]

Like the restraints upheld in *Salvino* and *MSG*, MLB's territorial restriction on individual club telecast licenses is a lawful, reasonable, "ancillary" restraint because it supports MLB's *unchallenged* right and interest in creating its collective league products – the national network

---

[40] *See Salvino*, 542 F.3d at 340 ("Because of the interdependence of the clubs within the setting of a sports league, free riding would occur if one of the clubs is able to benefit disproportionately from the actions of Major League Baseball or other clubs in the licensing of products.") (Sotomayor, J., concurring); *MSG*, 2007 WL 3254421, at *9 ("the restriction imposed by the joint venture - of not operating a rival Rangers site - serves the procompetitive purpose[] of . . . . preventing individual teams free-riding on the efforts of collective League action").

[41] *Bulls I*, 961 F.2d at 674-75.

[42] *MSG*, 2007 WL 3254421, at *7 n. 7. We incorporate the NHL's discussion of the cases upholding restrictions that prevent free riding and intra-venture competition. NHL Brf. at 10-11, 15-16.

and OOM packages. Plaintiffs' demand that clubs should license telecasts in direct competition with the OOM packages ignores that the OOM packages are a pool of the local telecasts and that the packages work because they preserve the exclusive licenses under which those telecasts are produced. Likewise, MLB's unchallenged national network licenses expressly require MLB ▪

███████████████████████████████████████████████████████

Allowing every club to "compete" with MLB's national telecasts and OOM packages by telecasting nationally is exactly the type of free riding and direct competition the league is permitted to restrain. [43] Indeed, *Salvino*'s holdings are all the more compelling here: whereas *Salvino* concerned licensing of merchandise that, as a practical matter, could be unilaterally created and sold by individual clubs, the creation and video exhibition of any MLB game necessarily requires the cooperation of and input from at least both clubs playing the game — and indeed from every team to license a package of games, as team sports rights typically are sold.

5.    MLB's Structure Ensures Access to Virtually All Non-Local Games

MLB's territorial structure also is procompetitive because it enables MLB to ensure that **all** fans have the choice to watch non-local games of **all** clubs.[44] Prior to MLB's adoption of the HTTs and creation of the OOM packages, non-local fans had no way to watch all the games they wanted. Now, the OOM packages guarantee all non-local fans can follow "their" favorite club(s) regardless of how popular a club may be where a non-local fan lives. SUF 46, 80, 143-44.

Clubs licensing video rights individually cannot guarantee any of this because, in addition to the many other reasons addressed herein, demand for any single club varies from region to region across the country. SUF 25, 180-83. As such, certain currently less popular or less successful clubs inevitably will be "inherently unable to compete fully effectively" on their own in the national market for the sale of live game video rights — whether that competition is

---

[43] *Salvino* rejected Plaintiffs' argument that, under *BMI v. CBS*, 441 U.S. 1 (1979), MLB clubs may agree only to **non-exclusive** bundled licensing. *Salvino* distinguished *BMI* and held that non-exclusive licensing was not required because MLB clubs are members of a sports league whose "interests are interdependent." 542 F.3d at 323.

[44] *Rock*, 928 F. Supp. 2d, 1025 ("wide[r] consumer choice" "procompetitive as a matter of law").

measured as one club against another or individual clubs against the panoply of other sports and entertainment content available to license and distribute.[45] The OOM packages, by contrast, offer MLB games on a bundled basis that leverages demand for MLB programming as a whole rather than depending on demand for any particular club in any particular area.[46] However, if Plaintiffs' "but for" world were imposed such that individual club telecasts would ostensibly *compete* with the league OOM packages, there is no factual basis to conclude that all those newly minted competitors would continue to agree to participate in the competing league OOM package — or that the RSNs would allow their live game video to be included in such a competing package, let alone at no cost. SUF 116, 119-23, 150-52, 179-80, 194.

C.   **Plaintiffs Put Forth No Valid Less Restrictive Alternative**

Independent of the "quick look" approach, summary judgment also is required because, in discovery, Plaintiffs failed to identify any less restrictive alternative that "would achieve the same procompetitive effect[s]" as the challenged structure. Under *Virgin*, that failure compels summary judgment because it "leaves intact" the undisputed procompetitive effects.[47] No "weighing" of anticompetitive and procompetitive effects is needed.

The antitrust laws do not convert businesses into "guarantors that the imaginations of lawyers could not conjure" up a more idyllic world in which cooperation took a different form.[48] Here, Plaintiffs have offered no alternative other than prohibiting HTTs completely. SUF 193. There are no facts to show that the procompetitive virtues of MLB's current structure would be achieved in that "but for" world. By definition, Plaintiffs cannot show that the HTTs could be eliminated without also eliminating the ability of both clubs to license exclusive rights to the

---

[45] *Laumann*, 907 F. Supp. 2d at 490.

[46] No individual club can unilaterally offer the games played by any other club in any event. *Salvino*, 542 F.3d at 296, 323 (no club owns the rights to another club's intellectual property). Only the league can create a package with the procompetitive efficiencies recognized in *Salvino* - e.g., decreased transaction costs and the ability to offer one-stop shopping. *Id.* at 337.

[47] 257 F.3d at 264.

[48] *Am. Motor Inns. v. Holiday Inns*, 521 F.2d 1230, 1249 (3d Cir. 1975).

same game. Likewise, there are no facts to show that, if clubs individually licensed nationally, every club would secure distribution guaranteeing non-local fans *everywhere* in the U.S. the access to game telecasts that they get now through the OOM packages -- much less for just cents a game. Nor can Plaintiffs show how individual clubs could be permitted to "go national" without violating the league's unchallenged national telecast agreements, materially undermining MLB's ability to license telecast rights in the national market, and allowing for of free riding. Finally, Plaintiffs cannot reconcile their insistence that the Red Sox should be "competing" for Mets fans in New York, the Cubs "competing" for Brewers fans in Milwaukee, and so on, with MLB's undisputed, procompetitive interest in sustaining a roster of healthy clubs with loyal fan bases and local markets. Allowing all clubs to "compete" everywhere to get distribution of their games without regard for the ability of the local club to distribute its games to its fans is the exact opposite of the league's interest in having all clubs work together to "grow the game" at every level and for the collective benefit of all clubs and fans.

## III. PLAINTIFFS CANNOT PROVE THE NECESSARY CAUSAL NEXUS

Whether under the rubric of Article III standing, antitrust standing or antitrust injury, the law is clear: each Plaintiff must prove not only that the challenged conduct harms competition generally, but also that the challenged conduct is the actual and proximate cause of their specific, personal injuries, such that eliminating the challenged conduct will redress the claimed injury.[49] The law does not presume harm to competition is the cause of any particular plaintiff's injuries.[50] Standing requires proof of "personalized, redressable injury."[51]

---

[49] *Brunswick v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 489 (1977); *Argus v. Eastman Kodak*, 801 F.2d 38, 41, 45-46 (2d Cir. 1986). *Accord US Airways v. British Airways*, 989 F. Supp. 482, 488-89 (S.D.N.Y. 1997) (antitrust violation must be "but-for cause" of injury); *Dominguez v. UAL*, 666 F.3d 1359, 1364 (D.C. Cir. 2012) (even if *some* consumers were harmed by policy, plaintiff did not show he "was one of them"); *Gerlinger v. Amazon*, 526 F.3d 1253, 1256 (9th Cir. 2008) (plaintiff did not show "he himself experienced" alleged injury); *Pittsburgh v. West Penn Power*, 147 F.3d 256, 268-69 (3d Cir. 1998) (injury must be "direct effect" of antitrust violation).

[50] "Antitrust injury and competitive injury are conceptually distinct." *E& L Consulting v. Doman Indus.*, 472 F.3d 23, 28 n. 3 (2d Cir. 2006).

[51] *Simon v. KeySpan*, 2011 WL 2135075, at *7 (S.D.N.Y.) (no antitrust standing) (Scheindlin, J.).

Plaintiffs cannot meet their burden through "'conjecture or speculation'" as to what might occur – or what they hope might occur – "but for" the challenged conduct.[52] Likewise, where a plaintiff challenges one aspect of the model under which a service is sold, it cannot presume the defendant will retain the rest of the model if the challenged aspect is eliminated. In *Dominguez*, for example, the plaintiff challenged United's policy prohibiting resale of discounted tickets, theorizing resale in a secondary market would lower prices. But, as the D.C. Circuit explained,

> [In antitrust cases,] injury turns on the impact of the alleged wrong on the relevant market itself, so that the *fact finders cannot take a market structure as given*.

*Dominguez* held that, because the restriction was part of United's overall pricing structure, "[i]t piles speculation atop speculation to assume that United would continue to offer discounted tickets if it could no longer price discriminate."[53]

Proof of causation is heightened "when the factual context renders [a] claim implausible." *Argus*, 801 F.2d at 42. When the theory of injury presumes steps would be taken "free" of the restraint, a plaintiff must show parties are "willing and able" to take those steps.[54]

Here, Plaintiffs adduced no actual facts during discovery to prove that anything near the current level of live game video distribution would persist in their implausible hypothetical world. *See*, Sec. III.A., *supra*. Moreover, they adduced no facts to show that, in the "but for" world, *these Plaintiffs* would be offered more desirable viewing choices than they have today.

None of these Plaintiffs personally complains of a lack of "choice" of baseball programming generically, without regard to which clubs are featured. Rather, each Plaintiff wants a specific "choice," namely a service featuring just his favored team – *e.g.*, Mr. Rasmussen wants an unbundled package consisting only of all Milwaukee Brewers games offered to him in

---

[52] *Argus*, 801 F.2d at 41-42, 45.

[53] 666 F.3d at 1364 (emphasis added).

[54] *E.g.*, *Sunbeam Television v. Nielsen Media Research*, 711 F.3d 1264, 1273 (11th Cir. 2013). For example, in a case challenging an NFL prohibition on public financing of club acquisition, the court granted summary judgment because the plaintiff adduced no facts that "a public offering would have been viable" and, therefore, "no reasonable jury" could find the policy caused the alleged injury. *Murray v. NFL*, 1998 WL 205596 at *8 (E.D. Pa. 1998).

St. Louis, MO. SUF 191-92. If the "competition" Plaintiffs assume in their "but for" world means that St. Louis residents are offered packages of *some* additional clubs, but *not* the Brewers, Mr. Rasmussen is still "injured."

Plaintiffs have no concrete facts to show that, but for MLB's rights structure, they would be offered the specific unbundled choices they want.[55] They simply "pile[ ] speculation atop speculation." *Dominguez, supra.* As in *Dominguez,* Plaintiffs cannot presume that MLB would continue the current, cooperative video rights "model" if the critical element of territoriality were removed. Even if clubs were allowed to license nationally in head-to-head competition, Plaintiffs adduced no facts to show all clubs and RSNs would be willing or able to do so, let alone that the clubs these Plaintiffs' desire – Brewers, Mets, and Yankees – would or could obtain distribution to these Plaintiffs in their particular out-of-market locales. And even if an RSN were able to license rights to distribute game video to these Plaintiffs, there are no facts showing any MVPD servicing these Plaintiffs' locales would be willing and able to carry the programming. It is undisputed that MVPDs do not always distribute an RSN everywhere within the RSN's licensed territory, particularly in areas distant from the home stadium. SUF86, 108-12, 119, 151. It is thus pure speculation for Plaintiffs to presume MVPDs would carry *all* RSNs *everywhere.*

## IV.   *ILLINOIS BRICK* BARS THE TELEVISION PLAINTIFFS' CLAIMS

We incorporate here the NHL's arguments concerning *Illinois Brick.* NHL Brf. at 23.

### CONCLUSION

For the foregoing reasons, the MLB Defendants respectfully request that the Court grant summary judgment in their favor and dismiss the case with prejudice.

Dated: May 19, 2014                              Respectfully submitted,

                                                Bradley I. Ruskin
                                                Jennifer R. Scullion

---

[55] *Argus,* 801 F.2d at 41. Plaintiffs waived any challenge to the "bundling" of OOM packages *per se,* challenging only lack of competition with the packages. Pltfs.' 7/8/13 ltr. to Court at 4.

Jordan B. Leader
Jill Streja
Jane Wu
Joelle Milov
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York  10036-8299
Telephone:  (212) 969-3000
Facsimile:  (212) 969-2900

Thomas J. Ostertag
Senior Vice President and General Counsel
Office of the Commissioner of Baseball
245 Park Avenue
New York, New York  10167
Telephone:  (212) 931-7855
Facsimile:  (212) 949-5653

*Attorneys for Defendants Office of the
Commissioner of Baseball, Major League
Baseball Enterprises Inc., MLB Advanced Media
L.P., MLB Advanced Media, Inc., Athletics
Investment Group, LLC, The Baseball Club of
Seattle, L.L.P., Chicago Cubs Baseball Club,
LLC, Chicago White Sox, Ltd., Colorado Rockies
Baseball Club, Ltd., The Phillies, Pittsburgh
Baseball, Inc., and San Francisco Baseball
Associates, L.P.*