**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THOMAS LAUMANN, FERNANDA GARBER, ROBERT SILVER, DAVID DILLON, GARRETT TRAUB, and PETER HERMAN, representing themselves and all others similarly situated, | 12-cv-1817 (SAS) |
| Plaintiffs, | |
| v. | |
| NATIONAL HOCKEY LEAGUE, et al., | |
| Defendants | |

| | |
|---|---|
| FERNANDA GARBER, MARC LERNER, DEREK RASMUSSEN, ROBERT SILVER, GARRETT TRAUB, and VINCENT BIRBIGLIA, representing themselves and all others similarly situated, | 12-cv-3704 (SAS) |
| Plaintiffs, | ECF Cases |
| | **REDACTED** |
| v. | |
| OFFICE OF THE COMMISSIONER OF BASEBALL, et al., | |
| Defendants | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. i

TABLE OF AUTHORITIES ....................................................................................... iii

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ........................................................................................................... 2

   I.   The Territorial Allocation of the NHL and MLB Video Distribution Markets................ 2

   II.   The History of Exclusive Television Territories in the NHL and MLB ......................... 8

     A.   The League Defendants Have Long Understood That Their Market Allocations Are Unlawful ......................................................................................... 8

     B.   The League Defendants Allocated Their Markets to Increase the Value of Their National Broadcast Contracts ...................................................................... 11

   III.   The Television Defendants Actively Protect the Territorial Restraints and Resulting Supra-Competitive Prices ............................................................................ 14

   IV.   The Economics of NHL and MLB Live-Game Programming ..................................... 16

   V.   The Current Condition of NHL and MLB Video Distribution ..................................... 25

PROCEDURAL HISTORY .......................................................................................... 27

ARGUMENT ............................................................................................................... 28

   I.   Defendants Do Not Dispute That Plaintiffs Have Met Their Initial Burden ................ 30

   II.   Defendants Cannot Meet Their Burden of Establishing Countervailing Procompetitive Effects ............................................................................................. 33

   III.   Defendants' Reverse "Quick Look" Proposal Is Misplaced .......................................... 33

   IV.   The Court May Find Defendants' Market Allocation Unlawful under the Proper "Quick Look" Framework .............................................................................................. 37

   V.   Being Joint Ventures Does Not Allow the Leagues to Suppress Competition .............. 40

     C.   The Leagues Cannot Limit Clubs' Own Output ......................................................... 40

     D.   The Restraints Are Not Justified by a Free-Riding Concern ..................................... 42

VI.    Defendants Cannot Establish That Their Restraints Are Procompetitive as a Matter of Law .................................................................................................................. 45

    A.    Market Allocation Is Neither Fundamental to Sports Video Rights nor Is It Necessary to Produce Live-Game Programming ......................................................... 45

    B.    Exclusive Territories Are Not Necessary to Accommodate Both Teams' Broadcasts ........................................................................................................ 47

    C.    Market Allocation Does Not Promote Competitive Balance .................................... 49

    D.    Market Allocation Is Not Required to Create Local and National Interest in NHL and MLB Programming ................................................................................. 52

VII.    Removing Defendants' Market Allocations Would Increase Output Overall ................. 55

VIII.    The Television Defendants Are Members of the Conspiracy to Allocate Markets ........ 58

    A.    The Terms of the RSNs' Participation Are Contingent on the Knowledge That Other Market Participants Are Bound by Identical Agreements ................................ 59

    B.    The MVPDs Actively Participate in, Benefit from, and Support the Leagues' Market Allocation Scheme ......................................................................... 68

IX.    Plaintiffs Have Standing .............................................................................................. 73

X.    The MLB Antitrust Exemption Does Not Apply to Broadcasting ................................ 78

CONCLUSION ......................................................................................................... 90

## TABLE OF AUTHORITIES

**Cases**

*Agnew v. National Collegiate Athletic Association,*
    683 F.3d 328 (7th Cir. 2012) ........................................................... 37

*American Needle, Inc. v. National Football League,*
    560 U.S. 183 (2010)................................................... 33, 34, 35, 36, 37, 40, 41, 45

*American Needle, Inc. v. New Orleans Louisiana Saints,*
    No. 04-7806, 2014 WL 1364022 (N.D. Ill. Apr. 7, 2014) ............................... 37

*Anderson News, L.L.C. v. Am. Media, Inc.,*
    680 F.3d 162 (2d Cir. 2012)........................................................... 3, 31

*Board of Regents of the University of Oklahoma v. National Collegiate Athletic Association,*
    546 F. Supp. 1276 (W.D. Okla. 1983) ................................................. 54

*Bowen v. New York News, Inc.,*
    522 F.2d 1242 (2d Cir. 1974).......................................................... 67

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,*
    441 U.S. 1 (1979)................................................................... 41

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977)................................................................. 78

*California Dental Association v. Federal Trade Commission,*
    526 U.S. 756 (1999)............................................................... 29, 34

*Capital Imaging Associates, P.C. v. Mohawk Valley Medical Associates, Inc.,*
    996 F.2d 537 (2d Cir. 1993)......................................................... 29, 30, 33

*Chicago Board of Trade v. United States,*
    246 U.S. 231 (1918)............................................................... 33, 35

*Chicago Professional Sports L.P. v. National Basketball Association,*
    754 F. Supp. 1336 (E.D. Ill. 1991)..................................................... 39

*Chicago Professional Sports L.P. v. National Basketball Association,*
    874 F. Supp. 844 (E.D. Ill. 1995)..................................................... 39, 40

*Chicago Professional Sports L.P. v. National Basketball Association,*
    95 F.3d 593 (7th Cir. 1996) ......................................................... 40, 44

*Chicago Professional Sports L.P. v. National Basketball Association,*
    961 F.2d 667 (7th Cir. 1992) ....................................................... 10, 39, 44

*City of San José v. Office of Commissioner of Baseball*,
    No. 13-02787, 2013 WL 5609346 (N.D. Cal. Oct. 11, 2013) ......................................... 84

*Copperweld Corp. v. Independence Tube Corp.*,
    467 U.S. 752 (1984).......................................................................................... 64

*DeRosa v. National Envelope Corp.*,
    595 F.3d 99 (2d Cir. 2010)............................................................................... 90

*Federal Baseball Club of Baltimore v. National League of Professional Baseball Clubs*,
    259 U.S. 200 (1922)................................................................................. 79, 80, 86

*Federal Trade Commission v. Superior Court Trial Lawyers Association*,
    493 U.S. 411 (1990)........................................................................................ 55

*Fleer Corp. v. Topps Chewing Gum, Inc.*,
    658 F.2d 139 (3rd Cir. 1981) ............................................................................ 87

*Flood v. Kuhn*,
    407 U.S. 258 (1972)............................................................................. 80, 85, 86, 89

*Fraser v. Major League Soccer, L.L.C.*,
    284 F.3d 47 (1st Cir. 2002)............................................................................... 41

*Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*,
    447 F. Supp. 867 (S.D.N.Y. 1978)..................................................................... 65

*Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*,
    602 F.2d 1025 (2d Cir. 1979)............................................................................ 65

*General Leaseways, Inc. v. National Truck Leasing Association*,
    744 F.2d 588 (7th Cir. 1984) ....................................................................... 41, 43

*Group Life & Health Ins. Co. v. Royal Drug Co.*,
    440 U.S. 205 (1979)........................................................................................ 80

*Hale v. Brooklyn Baseball Club, Inc.*,
    No. 1294 (N.D. Tex. Sept. 19, 1958) ................................................................. 88

*Henderson Broadcasting Corp. v. Houston Sports Association, Inc.*,
    541 F. Supp. 263 (S.D. Tex. 1982) ............................................................... 87, 88

*Howard Hess Dental Laboratories Inc. v. Dentsply International, Inc.*,
    424 F.3d 363 (3d Cir. 2005).............................................................................. 74

*Hydrolevel Corp. v. American Society of Mechanical Engineers*,
    635 F.2d 118 (2d Cir. 1980).............................................................................. 76

iv

*Illinois Brick Co. v. Illinois,*
    431 U.S. 720 (1977)..................................................................................... 74, 75, 76

*In re DDAVP Direct Purchaser Antitrust Litigation,*
    585 F.3d 677 (2d Cir. 2009)......................................................................... 78

*In re Electronic Books Antitrust Litigation,*
    No. 11-2293, 2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014)....................... 27

*In re Linerboard Antitrust Litigation,*
    305 F.3d 145 (3d Cir.2002)........................................................................... 75

*Interstate Circuit, Inc. v. United States,*
    306 U.S. 208 (1939)....................................................................... 59, 63, 66

*Laumann v. National Hockey League,*
    907 F. Supp. 2d 465 (S.D.N.Y. 2012).. 3, 10, 28, 31, 35, 48, 58, 59, 60, 69, 73, 74, 75, 76,
    78

*Law v. National Collegiate Athletic Association,*
    134 F.3d 1010 (10th Cir. 1998) .................................................................. 29, 34

*Link v. Mercedes-Benz of North America, Inc.,*
    788 F.2d 918 (3d Cir. 1986)......................................................................... 76

*Mackey v. National Football League,*
    543 F.2d 606 (8th Cir. 1976) ....................................................................... 51

*Major League Baseball Properties, Inc. v. Salvino, Inc.,*
    542 F.3d 290 (2d Cir. 2008)......................................................... 35, 36, 37, 41, 44, 45

*Major League Baseball v. Crist,*
    331 F.3d 1177 (11th Cir. 2003) .................................................................. 87

*Meredith Corp. v. SESAC LLC,*
    --- F. Supp. 2d ---, No. 09-9177, 2014 WL 812795 (S.D.N.Y. Mar. 3, 2014) ................ 30

*National Collegiate Athletic Association v. Board of Regents of the University of Oklahoma,*
    468 U.S. 85 (1984)........... 11, 23, 28, 29, 30, 34, 35, 36, 37, 38, 41, 49, 50, 53, 55, 58, 83

*National Society of Professional Engoneers v. United States,*
    435 U.S. 679 (1978)....................................................................... 25, 30, 43, 55

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.,*
    693 F.3d 145 (2d Cir. 2012)......................................................................... 77

*North American Soccer League v. National Football League,*
    670 F.2d 1249 (2d Cir.1982)......................................................................... 41

*Paper Systems Inc. v. Nippon Paper Industries, Co.*,
  281 F.3d 629 (7th Cir. 2002) ................................................................. 74

*Patterson v. County of Oneida*,
  375 F.3d 206 (2d Cir. 2004) ................................................................. 29

*Pension Committee of the University of Montreal Pension Plan v. Banc of America Secs., LLC*,
  716 F. Supp. 2d 236 (S.D.N.Y. 2010) ................................................... 89

*PepsiCo, Inc. v. Coca-Cola Co.*,
  114 F. Supp. 2d 243 (S.D.N.Y. 2000) ................................................... 64

*PepsiCo, Inc. v. Coca-Cola Co.*,
  315 F.3d 101 (2d Cir. 2002) ........................................................... 63, 64

*Perma Life Mufflers, Inc. v. International Parts Corp.*,
  392 U.S. 134 (1968) ............................................................... 64, 74, 75

*Piazza v. Major League Baseball*,
  831 F. Supp. 420 (E.D. Pa. 1993) ......................................................... 80

*Polk Brothers, Inc. v. Forest City Enterprises, Inc.*,
  776 F.2d 185 (7th Cir. 1985) ............................................................... 42

*Polygram Holding, Inc. v. Federal Trade Commission*,
  416 F.3d 29 (D.C. Cir. 2005) ........................................................... 42, 43

*Race Tires America, Inc. v. Hoosier Racing Tire Corp.*,
  614 F.3d 57 (3d Cir. 2010) ................................................................. 37

*Radovich v. National Football League*,
  352 U.S. 445 (1957) ............................................................... 80, 82, 86

*Rock v. National Collegiate Athletic Association*,
  928 F. Supp. 2d 1010 (S.D. Ind. 2013) ................................................. 36

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
  792 F.2d 210 (D.C. Cir. 1986) ............................................................. 42

*Starr v. Sony BMG Music Entm't*,
  592 F.3d 314 (2d Cir. 2010) ............................................................... 68

*Toolson v. New York Yankees*,
  101 F. Supp. 93 (S.D. Cal. 1951) ......................................................... 84

*Toolson v. New York Yankees, Inc.*,
  346 U.S. 356 (1953) ............................................... 79, 80, 81, 82, 84, 85, 86, 89

*Toscano v. Professional Golfers Association*,
  258 F.3d 978 (9th Cir. 2001) ................................................................ 64

*Toys "R" Us, Inc. v. Federal Trade Commission*,
  221 F.3d 928 (7th Cir. 2000) ........................................................ 59, 63

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
  512 F.2d 1264 (9th Cir. 1975) .............................................................. 87

*Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*,
  365 F. Supp. 235 (N.D. Cal. 1972) ....................................................... 87

*United States Football League v. National Football League*,
  842 F.2d 1335 (2d Cir. 1988) ............................................................... 75

*United States v. Apple Inc.*,
  952 F. Supp. 2d 638 (S.D.N.Y. 2013) ................ 32, 59, 66, 67, 68, 71

*United States v. Continental Group, Inc.*,
  603 F.2d 444 (3d Cir. 1979) ................................................................. 65

*United States v. Masonite Corp.*,
  316 U.S. 265 (1942) ............................................................................. 66

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ............................................................... 30

*United States v. National Football League*,
  116 F. Supp. 319 (E.D. Pa. 1953) ................................ 8, 9, 45, 82, 83, 87

*United States v. National Football League*,
  196 F. Supp. 445 (E.D. Pa. 1961) ................................................... 9, 47

*United States v. Sealy, Inc.*,
  388 U.S. 350 (1967) ....................................................................... 23, 41

*United States v. Shubert*,
  348 U.S. 222 (1955) ............................................................................. 86

*United States v. Socony-Vacuum Oil Co.*,
  310 U.S. 150 (1940) ....................................................................... 55, 67

*United States v. Topco Associates, Inc.*,
  405 U.S. 596 (1972) ............................................................. 3, 28, 31, 41

*United States v. Visa U.S.A., Inc.*,
  163 F. Supp. 2d 322 (S.D.N.Y. 2001) ................................................. 41

*United States v. Visa U.S.A., Inc.*,
    344 F.3d 229 (2d Cir. 2003) ................................................................ 33, 41, 64

*Uzdavines v. Weeks Marine, Inc.*,
    418 F.3d 138 (2d Cir. 2005) ............................................................................ 90

*Virgin Atlantic Airways Ltd. v. British Airways PLC*,
    257 F.3d 256 (2d Cir. 2001) ............................................................................ 30

*Wallach v. Eaton Corp.*,
    814 F. Supp. 2d 428 (D. Del. 2011) ................................................................ 67

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    395 U.S. 100 (1969) ........................................................................................ 78

**Administrative Actions**

*Comcast Corp.*,
    26 F.C.C.R. 4238 (2011) ................................................................................. 69

*News Corp. & the Directv Grp., Inc.*,
    23 F.C.C.R. 3265 (2008) ................................................................................. 69

**Statutes**

15 U.S.C. § 1 ......................................................................................................... 28, 83

15 U.S.C. § 26b ......................................................................................................... 88, 89

15 U.S.C. § 27a ............................................................................................................... 88

15 U.S.C. §§ 1291-95 .............................................................................................. 8, 9, 83

**Rules**

Federal Rule of Civil Procedure 56 ........................................................................... 29

**Legislative Materials**

*Broadcasting and Televising Baseball Games: Hearings on S. 1396 before the Comm. on
    Interstate and Foreign Commerce*, 83rd Cong. 11 (1953) ............................... 84

*Exclusive Sports Programming: Examining Competition and Consumer Choice: Hearing before
    the Senate Comm. on Commerce, Sci., and Transp.*, 110th Cong. (2007) ....................... 70

*Organized Professional Team Sports: Hearings on H.R. 5307, H.R. 5319, H.R. 5383, H.R. 6876,
    H.R. 6877, H.R. 8023, and H.R. 8124 before the Antitrust Sub-Comm. of the Senate
    Judiciary Comm.*, 85th Cong. 101 (1957) ........................................................ 82

*Organized Professional Team Sports: Hearings on S. 616 and S. 886 before the Sub-Comm. on
    Antitrust and Monopoly of the Senate Judiciary Comm.*, 86th Cong. 69 (1959) ............. 85

*Professional Sports Antitrust Bill-1965: Hearings on S. 950 before the Sub-Comm. on Antitrust and Monopoly of the Senate Judiciary Comm.*, 89th Cong. 160 (1965).......................... 85

S. Rep. No. 105-18 (1997)........................................................................................ 89

**Other Authorities**

Areeda, Phillip E. & Herbert Hovenkamp, 11 *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1912h (3d ed. 2011) ................................. 55

Areeda, Phillip E. & Herbert Hovenkamp, 13 *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 2131 (2d ed. 2004) ................................. 42

Banner, Stuart, *The Baseball Trust: A History of Baseball's Antitrust Exemption* (2013) .......... 81

Crawford, Gregory S. & Ali Yurokoglu, *The Welfare Effects of Bundling in Multichannel Television Markets*, 102 Am. Econ. Rev. 643 (June 2012) ............................. 56

Horowitz, Ira, *Sports Broadcasting*, in *Government and the Sports Business* 275 (Roger Noll ed., 1974) ....................... 14, 84

Mehra, Salil K. & T. Joel Zuercher, *Striking out "Competitive Balance" in Sports, Antitrust, and Intellectual Property*, 21 Berkeley Tech. L.J. 1499 (2006)...................... 51

Noll, Roger G., *Broadcasting and Team Sports*, 54 Scot. J. Pol. Econ. 400 (July 2007)....................................................... 17, 47

Porto, Brian L., *The Supreme Court and the NCAA* (2012) ........................................ 39

Ross, Stephen F., *Light, Less-Filling, It's Blue-Ribbon!*, 23 Cardozo L. Rev. 1675 (2002) ................................................................ 49

Szymanski, Stefan, *Economic Design of Sporting Contests*, 41 J. Econ. Lit. 1137 (2003) .................................................................. 51

Zimbalist, Andrew, *In the Best Interests of Baseball?: Governing the National Pastime* (2013) ................................................................................. 82

## PRELIMINARY STATEMENT

Defendants' motions are most notable for what they do not do. They do not contest any aspect of Plaintiffs' initial burden. They do not contest that they have entered into agreements in restraint of trade. They do not take issue with the relevant markets Plaintiffs have defined; nor do they deny that they have market power within those markets. They make no claim that Plaintiffs cannot prove that Defendants restrain competition by allocating the major-league hockey and baseball broadcast markets into exclusive territories. Instead, the League Defendants focus almost entirely on supposed "procompetitive" justifications they contend outweigh the harm to competition that their practices cause.[1]

Plaintiffs have served an extensive expert report that addresses every one of the Defendants' proposed justifications. Defendants have proffered no expert testimony. Accordingly, Defendants ask the Court to find that their proposed economic conclusions —on issues on which they bear the burden of proof—can be established as a matter of law on a record where the only expert economic evidence contradicts those conclusions.

Nor do Defendants rely on any prior economic analysis to establish any beneficial economic effects of the restraints. Defendants' witnesses testified that they never conducted such an analysis. Instead, Defendants rely on self-interested declarations that—in a subversion of the antitrust laws—acknowledge that a primary purpose of the restraints is to raise the prices that consumers pay to watch live sports programming. On this basis, the Leagues claim to be entitled to summary judgment.

---

[1] The "League Defendants" are the National Hockey League Defendants in *Laumann v. National Hockey League*, and the Major League Baseball Defendants in *Garber v. Office of the Commissioner of Baseball*. Neither the Yankees/YES Network nor the Rangers/Madison Square Garden ("MSG") submitted a substantive memorandum in support of their motions, relying instead on their respective league's arguments. MSG did not join all of the arguments set forth by the NHL Defendants, consistent with its prior position that the challenged restraints are unlawful. *See* MSG Mem. at 27, *Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 07-8455, 2008 WL 2825036 (S.D.N.Y.) ("[T]he serious harm to competition from a sports league's division of broadcasting territories has long been established as an antitrust violation.").

The Television Defendants' primary contention—that there is no evidence that they participated in agreements to restrain trade—is squarely contradicted by the record.[2] They have entered into written contracts that include geographical restraints of trade whose undisputed purpose and effect is to make the programming they produce and sell more valuable. Indeed, the League Defendants argue that the Television Defendants demand exclusive territories, and would not broadcast games without them. While this is not a plausible contention for reasons discussed below, it is undisputed that the Television Defendants actively seek exclusivity and pay a premium for it. It is the value of *their product*—the live-game programming they produce—that exclusivity increases. Contrary to their characterization of themselves as passive actors, moreover, the Television Defendants actively protect their exclusive territories. Indeed, their agreements with the clubs and the Leagues contain clauses that prevent the material alteration of any club's exclusive territory.

Finally, MLB now asserts—for the first time—that the baseball antitrust exemption bars Plaintiffs' claims. As MLB acknowledges, that exemption rests entirely on the principle of *stare decisis*, justified primarily (if at all) by baseball's reliance on earlier decisions. But courts have rejected application of the exemption to broadcasting, and MLB has never relied on it in the context of broadcasting. To the contrary, it has consistently defended the exemption—in both Congress and the Supreme Court—by arguing that the exemption does *not* apply to broadcasting.

Accordingly, this Court should deny the motions in their entirety.

## BACKGROUND

## I.    The Territorial Allocation of the NHL and MLB Video Distribution Markets

The restraints in this case are uncontested. The markets are allocated just as Plaintiffs

---

[2] The "Television Defendants" are the Comcast Defendants, which include Comcast-owned Regional Sports Networks ("RSNs") and Comcast Cable Communications, a Multichannel Video Program Distributor ("MVPD"), and the DirecTV Defendants, which include DirecTV-owned RSNs (operating under the name "Root Sports") and DirecTV, LLC, an MVPD. The Television Defendants are part of both the *Garber* and *Laumann* actions.

alleged in their complaints and as the Court described in its opinion denying, in large part, Defendants' motions to dismiss the complaints. *Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 472-75 (S.D.N.Y. 2012). Most MLB and NHL games are broadcast pursuant to agreements between individual clubs and their television partners, typically Regional Sports Networks ("RSNs").[3] All agreements between individual clubs and RSNs contain defined territories in which the RSNs may distribute the programming they produce, and outside of which they may not. While these territories sometimes overlap, especially in areas distant from the home city of any club, at their cores, home television territories are exclusive areas that protect the RSN from competing major-league hockey, or baseball, telecasts, leaving only one team's games generally available in the territory. The RSNs give up the ability to distribute their programming wherever demand warrants, but in turn, the exclusive territories protect them from competition from other clubs' games within their markets. By eliminating competition, the RSNs are able to command higher prices for televising baseball and hockey than would be the case if they competed freely for viewers throughout the country.

Thus, on standard cable and satellite television, only the local team in each league is permitted to show their games, severely limiting consumer choice. This has the purpose and effect of driving up prices for that programming.

The exclusive territorial system is a classic, horizontal division of the market, and would be a *per se* violation of the antitrust laws if it did not involve sports. *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972) ("This Court has reiterated time and time again that horizontal territorial limitations … are naked restraints of trade with no purpose except stifling of competition.") (internal quotation omitted); *see also Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012) (citing *Topco*).

---

[3] While some teams contract with over-the-air stations to televise some of their games, the number of such games is small and diminishing. *See, e.g.*, Ex. 19 to the Declaration of Edward A. Diver. ("Ex.__" refers to exhibits to the Diver declaration, unless otherwise denoted.)

Contrary to Defendants' contentions, the arrangements Plaintiffs are challenging are not like the exclusivity deals that are typical in television industry. Plaintiffs have not challenged each individual club's ability to make all of its games available only to a single, exclusive broadcaster partner. That type of exclusivity is like an arrangement between the producer of a single television show and a television network. *American Idol*, for example, is a talent-contest show shown only on the Fox network. While that exclusive arrangement is unproblematic from an antitrust perspective, it would be another thing entirely if *American Idol* reached an agreement with other, similar talent-contest shows, like *The Voice* and *The X Factor*, to create exclusive territories in which their respective networks would be mutually free from competition. That kind of "exclusivity," which is what Defendants have done here, would be a *per se* violation of the antitrust laws.

National television networks televise a minority of games, which are typically exclusive in one of three different ways.[4] First, for a relatively small number of games, the Leagues grant the network an exclusive window of time during which no other game can be broadcast, either locally or nationally. Thus, for example, ESPN has an exclusive window for its Sunday Night Baseball broadcasts, and NBC has an exclusive window for certain nationally televised hockey games. Second, for certain other national broadcasts, the national network is the exclusive broadcaster for that game, but local broadcasters can show different local games simultaneously. Finally, many games are exclusive for the RSN within its territory, and exclusive for the national network outside that territory. For these games, the national network blacks out the games in the RSN's exclusive territory. A few games are non-exclusive in the sense that they are carried by both the RSN and the national network simultaneously. These national broadcast exclusivities do

---

[4] MLB has agreements with ESPN, Fox, and TBS for such games. The NHL has an agreement with NBC/Universal, which Defendant Comcast owns, to show games on NBC and certain cable channels, chiefly NBC Sports Network. Both leagues also own their own networks, the MLB Network and the NHL Network, which telecast games nationally.

not affect inter-RSN exclusivity. RSN broadcasts are always exclusive with respect to other RSN broadcasts, except in those portions of their territories that overlap, in which case the RSNs share exclusivity against all others.

As a result of the territorial allocation of the video distribution markets, in order to get access to an out-of-market game that does not happen to be available on a national network, a consumer must purchase a package of all out-of-market games. A New York Rangers fan living in Detroit, for instance, must buy a package of all NHL games from outside of the Detroit Red Wings market in order to watch Rangers games. They can be purchased either through an MVPD, like Comcast or DirecTV, for MLB Extra Innings or NHL Center Ice, or directly from the league for Internet delivery, for MLB.tv or NHL GameCenter Live. These "out-of-market" packages prevent competition with local television in two ways. First, they black out all "in-market" games—regardless of whether a consumer can actually view the game locally or not. Consumers located in the allocated markets for the Philadelphia clubs, for example, cannot view Flyers or Phillies games through these services, even when their television service does not include CSN Philadelphia—the RSN that carries the Philadelphia clubs' games. And because the out-of-market packages are the only way of watching nearly all games on the Internet, there is no way for a Philadelphia resident to view either Flyers' or Phillies' games on the Internet. In fact, there is currently no way for anyone to view any team's games in either League on the Internet "in-market" anywhere in the United States. Consumers without expensive pay-television packages, therefore, have no way to watch these games.

For some people, there is *no* way to watch in-market games, because no MVPD carries the games where they live, and the leagues nevertheless continue to black out the games on their packages. These blackouts are enormously unpopular. *See, e.g.*, Jeff Passan, *10 Degrees: How*

5

*MLB's blackout policy hurts its already eroding fan base*, Yahoo! Sports, April 14, 2014.[5] Pete Iorizzo, *NHL's TV policy hurts the viewers*, Times Union, Oct. 13, 2013.[6]

The second way the packages prevent competition with local television is that they are priced to prevent competitive pressure on the local RSNs. As MLB's senior vice president of broadcasting stated, "We limit our pkg offering to maintain a high price point and restrict the number of subs[cribers]." Ex. 1. Defendants do not contest that they price the packages to limit competition. After all, maintaining a price point above the competitive level, and consequently reducing the number of subscribers for these out-of-market packages, is essential to protect the local club and RSN from telecasts of other games. If Defendants were to offer the "out-of-market" games at a competitive price, they would undermine the territorial systems' basic purpose. Declaration of Roger G. Noll at 70. Consequently, Defendants must make the "out-of-market" packages expensive enough that relatively few fans purchase them to minimize any competitive impact on local telecasts. Reduced output and supra-competitive prices—the primary measures of antitrust harm to consumers—are thus integral to Defendants' territorial systems.

The uncontested facts show that territorial exclusivity serves two basic purposes. First, as just discussed, it limits the competition local broadcasters would otherwise face from telecasts of other games in the same sport, which raises the prices the RSNs can charge for their programming, and in turn, increases the prices they are willing to pay for the rights to produce that programming. John Henry, the principal owner of the Boston Red Sox and its RSN, testified that the exclusive territorial system exists because "[i]t creates exclusivity which is very valuable to broadcasters." Henry Dep. 64:9-10. "Not to have to compete with other clubs or with the—

---

[5] *Available at* http://sports.yahoo.com/news/how-mlb-s-blackout-policy-hurts-its-already-eroding-fan-base-055955588.html.

[6] *Available at* http://www.timesunion.com/sports/article/Iorizzo-NHL-s-TV-policy-hurts-the-viewers-4929667.php.

with baseball itself in your home territory … is worth a lot to broadcasters and, therefore, to clubs." *Id.* at 63:23-64:1. One of MLB's declarants stated, "If the Fox RSNs were unable to obtain the exclusive rights and protections described above, it would materially impact the Fox RSNs' valuation of such rights …." Jones Decl. ¶ 21. MLB Commissioner Allan "Bud" Selig similarly emphasized the increased value the RSNs obtained from exclusivity. "[I]f you spent many millions for an RSN, and the next thing you start bringing in games from all over, it's absurd." Selig Dep. 109:9-11. NHL Commissioner Gary Bettman explained that RSNs "would like more subs[scibers] but you don't want to have anybody having anymore of yours." Bettman Dep. 145:11-13.

Second, the territorial system limits competition with national broadcasts. The national broadcasters will pay more for rights if they know that there are fewer competing broadcasts. If the clubs and RSNs were permitted to distribute their games wherever there was sufficient demand, those telecasts would compete with the national games in more areas, which would put downward pressure on the amount national broadcasters would be willing to pay for the programming, benefiting consumers. As discussed below, Defendants do not deny that this direct restraint on competition exists to increase the value of these contracts; in fact, their defenses inexplicably rely upon it. *See, e.g.*, NHL Mem. 19; MLB Mem. 15.

Each of the named plaintiffs in these cases purchased an out-of-market package from Defendants and was overcharged for it as a result of these practices. Plaintiffs Laumann and Dillon purchased NHL GameCenter Live from the NHL Defendants. Plaintiffs Lerner and Rasmussen purchased MLB.tv from the MLB Defendants. Plaintiff Traub purchased MLB Extra Innings and NHL Center Ice from Defendant Comcast. Plaintiff Birbiglia purchased MLB Extra Innings from Defendant DirecTV. Plaintiff Silver purchased NHL Center Ice from DirecTV. All were denied access to programming options that would be available in an unconstrained market.

**II.     The History of Exclusive Television Territories in the NHL and MLB**

The Leagues contend that the exclusive territorial system for telecasts is fundamental to sports leagues, and is needed to produce the benefits they assert are procompetitive. Yet a review of the history of these territorial systems shows that the Leagues knew that they were anticompetitive, and also shows that the restraints were created not to produce the various benefits they tout, such as competitive balance, but were created to inflate the value of programming by protecting it from competition.

**A.     The League Defendants Have Long Understood That Their Market Allocations Are Unlawful**

The challenged territorial systems in both leagues were not created until the 1980s. Although both leagues considered creating such systems before that time, they did not do so because they understood that doing so would violate the antitrust laws.

In fact, MLB briefly had a system of territorial restraints on clubs' telecasts, but it abandoned it in the early 1950s because of the antitrust laws. *See infra* p. 84. Throughout the 1950s, both leagues testified before Congress in an attempt to create an exemption to the antitrust laws that would cover sports broadcasting.[7] This was a response to *United States v. National Football League*, 116 F. Supp. 319 (E.D. Pa. 1953) ("*NFL I*"), which held that territorial restraints designed to protect one team's broadcasts from another team's—the type of restraints at issue in this case—violated the Sherman Act. Congress repeatedly declined their requests until 1961, when it granted a limited exemption through the Sports Broadcasting Act. 15 U.S.C. §§ 1291-95 ("SBA"). The SBA permits leagues to enter into league-wide contracts for over-the-air

---

[7] The history of the leagues' attempts to obtain a legislative exemption for these practices is discussed in Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Complaints, *Laumann*, Dkt. 80; *Garber*, Dkt. 72, 17-19 (Sept. 5, 2012). *See also, e.g.*, *Organized Professional Team Sports—Hearings before the Antitrust Subcomm. of the H. Comm. on the Judiciary on H.R. 5307, H.R. 5319, H.R. 5383, H.R. 6876, H.R. 6877, H.R. 8023, and H.R. 8124*, 85th Congress, 2997 (1957); Lou Hatter, *Bonus Rule Change Seen*, Balt. Sun, Sept. 10, 1958, at 19; *Baseball Informs Senators It Needs Bill to Curb Radio and Television*, Hartford Courant, May 7, 1953, at 18.

broadcasts without violating the antitrust laws, but expressly left in place a general prohibition on regional blackouts, permitting only those aimed at protecting local ticket sales, which are not at issue here. *Id*. § 1292.[8]

Until the early 1980s, both the NHL and MLB defined 50-mile territories for each club, but—consistent with the SBA and *NFL I*—they were not exclusive television territories. Clubs were permitted to broadcast their games outside of these territories. In the NHL, the home team could distribute its games anywhere in the country, except in the 50-mile territory of a team playing a home game that day. Ex. 2 at NHL-329. In baseball, under American League rules, the home team could broadcast its games anywhere in the country other than in the visiting club's territory. Ex. 3. Similarly, the National League permitted its clubs to broadcast games anywhere in the country, so long as it had the permission of the opposing team. *Id.*

Each of these arrangements, which dated from the 1950s and early 1960s, accommodated separate telecasts by visiting clubs. *See, e.g.*, Ex. 2 at NHL-329 ("[B]y reason of a policy that has been agreed for over twenty-five years, each Member Club may broadcast its away games on transmitters located in its own home territory …."); Ex. 4 at 3 ("Each Club, in its park, shall provide the visiting Club with suitable space to be used for television purposes by the television licensee of the visiting Club.").

When the leagues began developing the exclusive territorial systems in the 1980s, they understood the antitrust implications. MLB took active steps to avoid antitrust scrutiny of its new territorial restraints. Certain clubs, for example, continued to broadcast games outside of their

_____

[8] The court in *NFL I* allowed the NFL to block broadcasts where a club was playing a home game to protect it from a drop in attendance. That rationale has no application here. Neither the NHL nor MLB blacks out games to protect ticket sales, and it is the position of both leagues that televising local games helps, rather than hurts, ticket sales. *See infra* pp. 15-16. When Congress addressed the application of the antitrust laws to sports broadcasting in 1961, it was specifically responding to *NFL I* and its follow-on, *United States v. Nat'l Football League*, 196 F. Supp. 445 (E.D. Pa. 1961) ("*NFL II*").

permitted area after the territories were put in place. ██████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████ ██ ████████████████████
███████████████████████████████████████████████████████████
██████████████████████████████[10]

The NHL's understanding that the antitrust laws prohibited exclusive broadcast territories was even clearer. In 1984, in response to club inquiries about preventing competition in their territories, NHL President Ziegler issued a formal interpretation of the NHL Constitution.[11] Canvassing league documents back to the 1940s, Mr. Ziegeler found that, "although various proposals have been submitted over the years, no change has ever been made that permits the restraining of broadcasts into the home territories of the Member Clubs. Thus, it is absolutely clear that under the NHL Constitution no Member Club at this time can restrain or prevent the broadcasting of any game at any time, except the broadcasting of its home games." Ex. 2 at NHL-326, -329.

President Ziegler noted that the NHL's rules permitting blackouts when a team was playing at home (but not otherwise) "obviously followed the NFL decision (US vs. NFL, [U.S.D.C.Pa.] 116 F. Supp. 319) wherein the NFL's attempt to impose broader restrictions was

---

[9] ██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
████████████████████████████

At least one club thought that the SBA may have allowed "the fixing of home areas," but only if the Act covered "pay or cable" television. Ex. 6. It is now settled that the SBA only covers free, over-the-air broadcasts, *see Laumann*, 907 F. Supp. 2d at 489, n.141, and Defendants do not contend that the SBA allows the restrictions at issue here. Moreover, as the Seventh Circuit subsequently held, the SBA provides no protection for restraints on telecasts that are not produced pursuant to league agreements. *Chi. Prof'l Sports Ltd. P'ship v. NBA*, 961 F.2d 667, 671 (7th Cir. 1992).

[11] Before 1993, the NHL League President performed the duties now assigned to the NHL Commissioner.

struck down as violative of the U.S. anti-trust laws." *Id.* at NHL-327 (alteration and formatting in original). Mr. Ziegler determined that allowing teams to protect exclusive territories "would conflict with all of the previous rulings, *the anti-trust laws of the U.S.* and the practice and policies followed by the League since the adoption of the Constitution." *Id.* at NHL-329 (emphasis added).

The NHL has not substantively amended the portion of its constitution that President Ziegler was interpreting—Article IV—since his interpretation.[12] Daly Dep. 142:16-24. Nor has any NHL president or commissioner ever overruled Mr. Ziegler's "final and binding" interpretation.[13] Mr. Ziegler's ruling remains codified in the league's "Lex Scripta"—its official body of rules and bylaws—and continues to be expressly referenced in Article IV of the constitution itself. Ex. 2 at NHL-60. No change of law has occurred. In fact, the Supreme Court reinforced the application of the antitrust laws to sports broadcasting two weeks after President Ziegler's letter in *National Collegiate Athletic Association v. Board of Regents of University of Oklahoma*, 468 U.S. 85 (1984) ("*NCAA*").

Thus, the challenged territorial system remains—*to this day*—prohibited by the NHL's own constitution because it "conflict[s] with … the anti-trust laws of the U.S." Ex. 2 at NHL-329.

### B. The League Defendants Allocated Their Markets to Increase the Value of Their National Broadcast Contracts

The Leagues did not create the territories because they needed to develop local fan bases, or to promote competitive balance, or because of any of the other justifications the Leagues set forth. Instead, as the Leagues themselves acknowledge, they created the territories because national broadcasters were willing to pay significantly higher rights fees if the Leagues agreed to

---

[12] Doing so would require a unanimous decision of the board of governors. Ex. 2 at NHL-73.

[13] Under the constitution, a commissioner's or president's interpretation of the constitution "shall be final and binding and shall not be subject to any review." Ex. 2 at NHL-64.

protect them from the competition they would otherwise face from broader distribution of clubs' individual broadcasts. *See* NHL Mem. 4-5; MLB Mem. 6. Remarkably, both Leagues cite these anticompetitive agreements as *justifications* for their territorial systems. *See* NHL Mem. 19; MLB Mem. 15.

As it admits, MLB began confining clubs to local territories in direct response to requests from broadcasters. A 1979 memo to Commissioner Kuhn described the requests from the networks to stifle competition—described as "dilution"—and proposed that the "AL/NL Broadcasting Agreements will be revised to include … [a] clause prohibiting clubs from expanding beyond their 1979 regional TV and radio markets without approval of Commissioner's Office …. There may be some exceptions to the 'grandfathered' markets (St. Petersburg-Tampa, Salt Lake City, etc.)." Tully Decl. Ex. B.

In 1980, the League informed the clubs that they could no longer expand the areas in which they broadcast games, not because of league rules, but because of commitments to the networks: "Under the terms and conditions of baseball's TV agreements with ABC and NBC, Major League clubs are prohibited from expanding their regional TV networks beyond their traditional TV markets." Tully Decl. Ex. C at MLB0484836. MLB formalized the territories and incorporated them into the league rules later, for the 1983 season. Ex. 7 at 10-12.

The NHL also confined teams to their territories in response to a request by a broadcaster, ESPN. Just one year after NHL President Ziegler ruled that clubs could not be prevented from broadcasting anywhere in the country—because doing so would violate the antitrust laws—the league opted to do just that in order to make their national television contract more lucrative. It incorporated the restraints into its rules three years later. Ex. 2 at NHL-320.

The Leagues argue that these restraints increase the availability of games nationwide. There is no evidence that this is true. The proposal, after all, is that *decreasing* the availability of competing broadcasts will increase the availability of League broadcasts. Nothing in the record

12

suggests that the Leagues' limits increase the *overall* supply of broadcasts. To the contrary, the evidence is clear that it has the opposite effect. *See infra* pp. 16-25.

The NHL misstates the facts when it argues that it needed to limit output by the clubs in order to get what it claims was its first national contract in 1985, with ESPN. NHL Mem. 4-5, 13-14. In fact, from 1979 to 1985, the NHL had a national television deal with another major cable channel, USA Network. Ex. 8 at NHL1533058. That agreement did not contain any requirement that the clubs refrain from enlarging their broadcast territories—indeed, it was in place at the time the NHL determined that its constitution did not allow such limits and that such limits would violate the antitrust laws.

The NHL's move to ESPN did not increase the number of games shown nationally—it was the same number (thirty-three) in both agreements. Bettmann Decl. ¶ 15; Jack Craig, *Olympic Jitters Set in at ABC*, Boston Globe, June 24, 1984; *cf.* Ex. 2 at NHL-320 (1988 rule setting limit of thirty-three games per season). Nor is there any evidence that ESPN—which in 1985 was nothing like the sports-broadcasting powerhouse that it is today—had any broader distribution than USA Network. The reason that the league moved was because ESPN agreed to pay more for the protected rights. Indeed, three years earlier, the NHL's vice-president of broadcasting, "advised that the League's revenue potential for national cable would be significantly enhanced if the League could offer national cable exclusivity." Ex. 8 at NHL1533058. Protected from competition, ESPN agreed to pay $8 million per year, while USA Network had paid far less.[14] Commissioner Bettman dismissed the significance of the USA Network deal on this basis alone—even though it broadcast the same number of games. Bettman Dep. 185:5-7. ("It was a modest agreement. What was it, a million six?").[15]

---

[14] *See* Ex. 9 at NHL3188574. The 1985 ESPN agreement was never signed, but the draft produced from the NHL records appears to have represented the working agreement.

[15] This appears to have been one of a number of payments. The USA contract was reportedly worth approximately $4.4 million in 1983-84. *See* Craig, *supra* p. 12.

By preventing competing broadcasts, the NHL was able to drive up prices by *reducing* the overall supply of game broadcasts. It is a simple matter of reducing supply to increase prices—a hallmark restraint of trade.

Nor is there evidence that such restraints were necessary for MLB to enter its national contracts. MLB had long had contracts with national networks. Indeed, before the SBA, the national networks entered into agreements with the clubs directly. History shows that when MLB centralized these agreements in response to the SBA, the number of national broadcasts declined dramatically, while rights fees increased. Ira Horowitz, *Sports Broadcasting*, in *Government and the Sports Business* 275, 304 (Roger Noll ed., 1974).

These restraints are not aimed at increasing coverage; they are aimed at increasing the value of the programming by limiting output.

## III. The Television Defendants Actively Protect the Territorial Restraints and Resulting Supra-Competitive Prices

The Comcast and DirecTV Defendants are central participants and beneficiaries of the territorial allocations. There is no dispute that they have entered into explicit agreements that they know result in a geographical allocation of the market. After all, it is the product that they produce and sell—live hockey and baseball programming—that this system protects. Predictably, they request and zealously protect these territorial systems, and pay handsomely for guarantees of exclusivity.

The purpose of the territorial restraints is that "not [having] to compete with other clubs or with baseball itself in your home territory … is worth a lot to broadcasters and, therefore, to clubs." Henry Dep. 63:23-64:1. According to the former NHL Director of Team Television, exclusivity for an RSN against "another club's games" is "the benefit of their bargaining." Tortora Dep. 253:7-9. Accordingly, MLB's former President Robert DuPuy testified that RSNs "pay for the exclusivity within the territory," and "insist upon" provisions that reduce the amount they would pay if that exclusivity is changed. DuPuy Dep. 74:23-24, 75:24-76:5. Invocation of

these provisions can "result in significant rights reductions," Ex. 10 at MLB0393441, and have prevented the Leagues from altering exclusive territories. *See infra* pp. 60-62.

National broadcasters and MVPDs, including Defendants Comcast and DirecTV, also act directly to limit competition by requiring, for example, that ███████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████████████████████████. The NHL is constrained by a similar provision found in Comcast's agreement with the NHL for national coverage. NHL Mem. 18-19. Thus, the Television Defendants aggressively protect their own interests by freezing the television territories, keeping them where they were decades ago, unresponsive to changes in demographics, consumer interest, or technology, contradicting any suggestion that they have no role in the preservation of the territories.

Not only do the Television Defendants request and pay for the territorial allocation schemes, they explicitly negotiate over the schemes' terms and consciously seek to limit competition. Comcast and DirecTV have directly negotiated with one another about the borders of their RSNs' territories. For example, in 2010, Comcast proposed to DirecTV that it permit a Comcast RSN to show NHL games in one area in exchange for Comcast carrying a DirecTV RSN in another. Ex. 13 (describing proposal); *see infra* pp. 62, 69. Indeed, the Leagues have a long history of helping telecasters negotiate over territorial boundaries. For example, the NHL has brokered multiple arrangements between Defendant MSG and nearby RSNs over broadcasting in upstate New York, Pennsylvania, and Connecticut. *E.g.*, Ex. 14 NHL1467218 ("[T]he League brokered an arrangement with MSG and NESN" for carriage in Connecticut).

Far from being passive participants in the schemes, the Television Defendants are at their core. The Leagues maintain these rules because their television partners request them in return for the higher rights fees that the Leagues demand.

15

**IV.     The Economics of NHL and MLB Live-Game Programming**

Defendants make much of the increase in the availability of NHL and MLB games on television and the Internet since the 1990s, but do not explain how the territorial restrictions played a role in that increase. Many things have changed since the 1990s that explain why sports programming is more abundant; the one thing that has not changed is the territorial system that each league imposes. There is no evidence that Defendants' market allocations caused, or are necessary to maintain, increased programming.

Among the factors that have led to increased output was that the leagues and clubs abandoned what had long been an article of faith—that televising games was harmful to attendance, and consequently revenues. This fear had persisted for years. The Chicago Blackhawks hockey club, for example, held fast to that view until 2007, by which time it was otherwise accepted in both the NHL and MLB that, as Commissioner Selig testified, "home telecasts help attendance, because it's part of our marketing strategy." Selig Dep. 62:1-2. Commissioner Bettman described preventing home telecasts as "a policy that has been long discredited." Bettman Dep. 156:19-20. History bears this out. Attendance at both MLB and NHL games is now higher, not lower, than it was when many local games were not televised. *See, e.g.*, Selig Decl. Ex. B. at MLB-30549) (showing that over 20 million more fans attended MLB games in 2000s than in 1990); *'A Season Like No Other' loaded with highlights*, NHL.com, April 4, 2014 (touting new record attendance for NHL in 2013-14).[16]

Because the sale of television rights is nearly costless—as Professor Noll points out, the only non-trivial costs a club incurs are the cost of negotiating the rights agreement and the accommodation of broadcasters in the playing facility, neither of which is significant—and because televising games has promotional value that increases revenue overall, clubs would have an incentive to convey their rights even if they received little or nothing for them. *See, e.g.*,

---

[16] *Available at* http://www.nhl.com/ice/news.htm?id=714836.

Roger G. Noll, *Broadcasting and Team Sports*, 54 Scot. J. Pol. Econ. 400, 411 (July 2007)

("Because the cost of selling rights is small—and may even be negative if the long-run effect on

building interest is important—a reasonable expectation is that the minimum rights fee that a

team is willing to accept is quite low, perhaps zero."); Noll Decl. 83.[17]

 In the current market, television rights in both leagues are sold for vastly more than the

minimum that clubs would have an incentive to accept, but this was not always the case. The

NHL, for example, has televised games for their promotional value alone. After the 2004-2005

lockout, which caused the entire NHL season to be cancelled, the NHL wanted to obtain national

coverage, but was in an unusually weak bargaining position. It entered into a profit-sharing deal

with NBC that resulted in the NHL receiving no revenue at all for the first few years.

Nevertheless, Commissioner Bettman testified that it was a valuable and important deal for the

league because of its promotional value. Bettman Dep. 55:11-55:17 ("[I]t's also a

mischaracterization of … the facts … when you say for free. Obviously, getting promotion from

NBC Network and having games on a national platform that made us look like a major league

sport was important.").[18]

 The increased willingness of clubs to broadcast their own games has coincided with

---

[17] The size of player salaries does not bear on this. The clubs will sell their rights for whatever
maximizes their revenue, and what they pay their players has no effect on the revenues they are
able to command from programming partners. In fact, the effect works the other way around.
Player salaries are so high because the leagues are able to obtain monopoly profits. *See* Noll
Decl. 74 & note 119 (citing James Quirk & Rodney D. Fort, *Pay Dirt*, ch. 7 (1992)).

[18] Other sports leagues recognize this as well. Major League Soccer clubs offer their rights for
broadcast for little or no money—even when they understand that they will lose money. *See, e.g.*,
*MLS Crew Execs Forced to Response to Fan Backlash Over Team's New Media-Rights Deal*,
Sports Bus. Daily, Mar. 10, 2014, http://www.sportsbusinessdaily.com/Daily/Issues/
2014/03/10/Media/MLS-Crew.aspx (quoting club owner as stating that club's investment in
production outweighs any potential return). The National Women's Soccer League, which was
formed in 2013, recently announced that it would offer all of its games in high definition for free
on the Internet. *See All NWSL games this season to be streamed live on YouTube*, Seattle Times,
Apr. 8, 2014, *available at* http://blogs.seattletimes.com/soundersfc/2014/04/08/all-nwsl-games-
this-season-to-be-streamed-live-on-youtube/.

significantly increased capacity to deliver those games as a result of technological advances. Analog cable systems could deliver only a modest number of channels. With the advent of digital satellite television and then digital cable systems, television capacity has expanded dramatically. Each of the systems operated by Defendants DirecTV and Comcast has hundreds of channels, which gives them the ability to do what they could not have done before: offer every NHL and MLB game to all customers regardless of location. In fact, they have shown the capacity to do just that. DirecTV and Comcast both dedicate substantial numbers of channels to show the games through the out-of-market packages. DirecTV almost always sets aside two separate high-definition channels so that it can offer both the home and visiting teams' feeds.[19] Comcast, through In Demand, offers multiple feeds as well, but not as consistently as DirecTV.[20]

DirecTV also sets aside additional channels for nearly all of the RSNs, with most being available nationwide as part of its "Sports Pack."[21] Although games are blacked out on these channels out of market (due to the restrictions being challenged here), the channel capacity has been set aside by DirecTV for most RSNs in all areas of the country, in addition to the channels allocated for the out-of-market packages. Thus, most subscribers have four high-definition channels (two for the RSNs and two more for the packages) set aside for a given MLB and NHL game, plus the same number of standard-definition channels. The same game might also be on a national network at the same time, occupying a fifth channel. These signals are typically sent to every subscriber in the country whether or not they are permitted to watch. The subscriber's set-top box will either decode and pass the signal to the television or not based on whether the

---

[19] *See* http://www.directv.com/sports/mlb _schedules.
[20] Comcast is the majority owner of In Demand, a video-on-demand provider for cable MVPDs. Comcast Corp. & Time Warner Cable Inc., *Applications and Public Interest Statement*, Dkt. No. 14-57 (FCC Apr. 8, 2014), at 12, *available at* http://online.wsj.com/public/resources/documents /comcast20140408.pdf. In Demand's other owners are Cox Communications and Time Warner, two other leading cable MVPDs that also carry Extra Innings. In Demand, Ownership, http://www.indemand.com/business/business-overview/about/ownership.php.
[21] *See* http://www.directv.com/sports/sports_pack?lpos=Header:3.

subscriber is authorized to view it.

The principal cause of expanded game broadcasts is improvements in technology, which make it easy and inexpensive to distribute digital signals anywhere in the country. There is no evidence of higher costs associated with distributing this programming in one location rather than another. Indeed, because DirecTV already carries the channels, all that it would have to do is stop blacking out the games, which would make the channels *less* expensive to distribute, while substantially increasing their value.[22]

On the Internet, there are no meaningful capacity limitations. Each telecast can be streamed to anyone anywhere in the country, and for next to no marginal cost. There is now an active, competitive market for providing high-definition, live-streaming services on the Internet, often for free, on advertising-supported sites, such as YouTube.[23] Even given the quality and reliability requirements of the Leagues, distribution costs are extremely low. *See* Noll Decl. 80-84 (summarizing economic data produced by both leagues). The costs associated with distributing digital video are overwhelmingly fixed costs, moreover, with *de minimis* marginal costs for additional distribution.[24]

In order to maintain the territorial system on the Internet, the Leagues employ sophisticated "geo-gating" systems to determine the location of the viewer. In fact, Defendant MLB Advanced Media ("MLBAM") has obtained "a series of patents" on its geo-gating technology. Bowman Dep. 146:12-16. The current system, in other words, is significantly more

---

[22] Indeed, Mr. Henry conceded with respect to his RSN's efforts to blackout live Red Sox games on its national network feed and replace them with other programming: "it would be easier [to show live Red Sox games] than not showing them, in all probability." Henry Dep. at 97:18-98:18.

[23] *See Youtube opens up live streaming to all verified accounts*, CNET.com, Dec. 12, 2013, http://www.cnet.com/news/youtube-opens-up-live-streaming-to-all-verified-accounts/.

[24] Professor Noll found that even if *all* costs of the NHL's and MLB's streaming are understood as marginal costs, the profit margin for both streaming products is still at least 74%. Noll Decl. 80-82. The actual profit margin associated with each additional subscriber is substantially higher.

cumbersome and expensive than it would be without the geographical restraints.

Because of these low costs, clubs in other sports leagues such as the recently formed National Women's Soccer League can and do offer free high-definition streams of their games. Minor leagues, including the American Hockey League and Minor League Baseball, regularly stream their games. A recent check of ESPN's online streaming service, ESPN3, showed that college baseball, softball, track and field, and gymnastics, as well as professional and collegiate lacrosse, were all available to stream for free to anyone with Internet access through most major Internet-service providers, including Comcast.[25] Defendant MLBAM operates ESPN's streaming service, and uses the same production process regardless of the sport being shown. Bowman Dep. 61:4-62:5.

If it makes sense to produce a program, then there is no economic barrier to distributing it to anyone who wishes to purchase it, without regard to location.[26] And it makes sense to produce sports programming because the cost of production is low. Television companies have long recognized the cost advantages of sports programming, because the game is already being staged. The additional video production costs—commentators, camera operation, technical production, and the like—are all relatively inexpensive, which was a primary reason for the early rise of sports broadcasting. *See, e.g.*, Scott R. Rosner & Kenneth L. Shropshire, *The Business of Sports* 143 (2004) (explaining that sports programming was attractive to early television producers because it was inexpensive to produce).

Jon Litner, of Comcast, asserts in support or its summary judgment motion that the

---

[25] *See* http://espn.go.com/watchespn/index#type/upcoming/startDate/20140419/.

[26] There is no question that the demand exists to justify nationwide distribution. The existence of national broadcasts, as well as the out-of-market packages themselves, shows that it is economically rational to distribute games nationwide. The Leagues' own analyses show that very large percentages of fans are "displaced," meaning residing outside of the television territories of their favorite teams. Noll Decl. 45-46. Carriage data also show that most RSNs are available throughout their permitted footprints on at least one MVPD. Noll Decl. 96-97.

average cost of producing a game on Comcast RSNs is between ███ and ███ per game. Litner Decl. ¶ 13. Discovery produced by Comcast shows that its costs of producing games on its RSNs is actually less than ███ per game. *See, e.g.*, Ex. 15 (███████████████) (production of a home Oakland A's baseball game cost ███ in 2013 and production of a home Sharks hockey game was ███). By either measure, these costs are insignificant. An average NHL or MLB game provides about three hours of advertising-supported programming. This means that the production costs are roughly ███ to ███ per hour.

Compared to other programming, the cost of producing live-game programming might as well be nothing. Hour-long dramas typically cost millions of dollars to produce.[27] The pay-television comedy, "It's Always Sunny in Philadelphia," is widely seen as a low-cost success story, because it cost, as of 2010, only "$400,000 per episode—about one-fourth the industry average." Meg James, *'It's Always Sunny in Philadelphia': A low-budget hit*, L.A. Times, Sept. 25, 2010. Because it is a half-hour show, that puts its production cost at "only" $800,000 per hour, or about ███ times more than the average live NHL or MLB programming.

The prices networks are willing to pay for the rights to distribute MLB and NHL games highlight the relative insignificance of production costs. As the Television Defendants acknowledge, the vast majority of their costs are the fees that they must pay for the rights to live NHL and MLB programming. ████████████████████████████

████████████████████████████████████████

The networks' willingness to pay for these rights represents the difference between their actual

---

[27] *See, e.g.,* Scott Collins, *Cable networks are TV's biggest stars*, L.A. Times, Sept. 20, 2013, http://articles.latimes.com/2012/sep/30/entertainment/la-et-st-homeland-market-20121001, (noting the drama, "Homeland," costs about $3 million per episode); Sam Schechner, *Web Shows Get Ambitious*, Wall St. J., Mar. 21, 2011 ("Traditional scripted TV shows often cost $3 million, and sometimes much more, for the roughly 43 minutes of programming that fills an hour-long advertising-supported slot."); Amy Chozick, *Small Screens, Big Budgets*, Wall St. J., July 23, 2010.

costs and the overall costs they believe they can profitably absorb. In some markets, this difference is enormous. For example, the Los Angeles Dodgers recently entered a deal with an RSN that will pay the club an average of ███████ per year. Ex. 16 ("Local MLB TV RSN Deals as of 1/31/13"). Assuming the RSN broadcasts the norm of about 150 of the 162 games the Dodgers play, the RSN has agreed to pay over ████████ for a game that costs less than ██████ to produce.[28] Even the clubs with the most modest contracts in both leagues command fees at multiples of the cost of production.[29]

    A number of factors affect the amount networks are willing to pay for sports rights, including, of course, how much competition the programming will face. Defendants have emphasized how much the Television Defendants value exclusivity. Litner Decl. ¶ 17; Crumb Decl. ¶¶ 14-16. The reason that networks value exclusivity is straightforward—by protecting this programming from competition, networks can charge higher prices while increasing their market shares. Because exclusivity makes programming more valuable, networks are willing to pay a higher price for exclusive rights. Defendant witnesses have consistently confirmed this, testifying that for both national and regional rights, exclusivity is a significant part of what they bargain for. *See* Litner Decl. ¶¶ 17, 30-32; *see also* Phillip Weinberg Dep. 91:21-25 (Comcast); Tortora Dep. 253:6-8.

    The ability to charge higher prices and protect market share is not a procompetitive benefit; it is the anticompetitive harm Plaintiffs seek to remedy. The agreements to restrain trade artificially raise the prices of live baseball and hockey programming. They work in the same way

---

[28] The remaining games will be broadcast on national networks exclusively. While the Dodgers previously showed games on over-the-air television, they no longer do so.

[29] *See, e.g.*, Ex. 17 (Columbus Blue Jackets obtained ████████ in 2012, or roughly ███████ production costs); Ex. 16 (Miami Marlins obtained ████████ per year, or roughly ███████ production costs). NHL teams typically show about 70 games on an RSN. At ███████ per game, that puts the season total at ███████. MLB teams typically televise about 150 games per year, resulting in a total of ███████.

for national and regional programming. In both cases, the networks are protected from *other* game programming—the rights to which they do not own—in order to increase the value of their product. This is classic case of restraining competition in order to increase prices. *See, e.g.*, *United States v. Sealy, Inc.*, 388 U.S. 350 (1967).

In the absence of this "exclusivity," access to telecasts of major league baseball and hockey games would not cost consumers as much, the networks would derive less revenue from this programming, which, in turn, means that they would not be willing to pay as much for the rights. ███████████████████. But given the extraordinary rise in the costs of rights—reflecting increasing demand from the networks—the networks' willingness to pay would have to fall precipitously before they would cease to be willing to pay anything for the rights. It is not plausible that high-quality programmers would lose interest in producing live NHL and MLB programming without these restraints. There is nothing in the record that suggests that networks willing to pay millions of dollars per year—in some cases, hundreds of millions of dollars per year—would abandon the market in the face of competition; to the contrary, as the price of rights dropped, it would encourage new entrants to compete for them. And, as we saw, clubs would have an incentive to sell their rights even if the price dropped to zero or even below. There is no basis for concluding that any programming would cease to be produced.

Broadcasting practices in other sports that lack the territorial controls of MLB and the NHL confirm that networks would continue to produce these games even without protection from competition. Largely because of the Supreme Court's 1984 decision in *NCAA*, 468 U.S. 85, collegiate sports telecasts are subject to few limitations on competition, and there are no exclusive territories. As a result, Division I college football and basketball, the two most popular college sports, are more widely available than ever. All four major broadcast networks carry college football games, as do at least three ESPN channels (EPSN, ESPN 2, and ESPNU), Fox

Sports 1, CBS Sports Network, and NBC Sports Network. Most RSNs also carry college football, as do the three regional Fox College Sports Networks. Certain conferences have created new channels devoted to conference sports, including football and basketball.[30] While RSNs are primarily distributed regionally, when out-of-area consumers subscribe, these games are not blacked out.[31]

These contracts are typically "exclusive" in the sense that only one or two networks have the right to produce and distribute a telecast of a particular game. But no network may prevent competition from other games in the same sport, involving other schools and conferences—the kind of exclusivity at issue here. The result, as expected, is *more* output, not less.

Nor does Defendants' argument that the absence of competition creates an incentive for the RSNs or other networks to invest in quality productions comport with the evidence. Mr. Litner states that without exclusivity, "the Comcast RSNs would have much less incentive to produce a high quality product," ¶ 17, yet Comcast RSNs spend the same amount to produce college football and basketball games and other sports without territorial restraints as they do MLB and NHL games. *See* Ex. 15 (Sharks (▉▉▉); A's (▉▉▉); West Coast Conference college basketball (▉▉▉); Earthquakes, Major League Soccer (▉▉▉); University of California-Davis college football (▉▉▉)). Likewise, Root Sports Northwest's "per game budget" in 2011 was ▉▉▉ for a Mariners game, but ▉▉▉ for an Oregon State basketball game and ▉▉▉ for a Washington State football game. Ex. 18. There is no evidence that the quality of production for sports without territorial restraints is less than for sports with those restraints.

Defendants have a heavy burden of explaining why the basic rule that monopoly

---

[30] The Big-Ten Network and the Pac-12 Network are already widely available, and the SEC Network is planned for launch in 2014.

[31] Similarly, college basketball is carried nationally on CBS, ABC, Fox, the same three ESPN channels, NBCSN, Fox Sports 1, CBS Sports Network, and TBS. Most RSNs and the Fox College Sports Networks carry games as well.

*decreases* incentives to improve quality and lower prices does not apply here. *See Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978) ("The Sherman Act reflects a legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services."). As Professor Noll explains, Defendants' argument that a regional monopoly is required to encourage investment rests on "the false premise that a reduction in competition increases investments in building a customer base and hence increases output." Noll Decl. 109. "[T]he benefits of monopoly derive from the fact that a monopoly firm does not need to spend as much as firms in a competitive industry in convincing customers to buy the firm's product rather than another firm's product. Monopoly leads to less, not more, output and consumer satisfaction." *Id.*

## V.    The Current Condition of NHL and MLB Video Distribution

The rise in the cost of NHL and MLB programming has been dramatic. Networks have been aggressively bidding up the price of rights. MLB internal surveys show that the club average for telecast revenue in 1990 was less than ▮▮▮▮▮ per year. *See* Ex. 19 (2010 chart showing actual and projected television revenue). By 2010, that number had grown to nearly ▮▮▮ ▮▮▮▮, with projections showing the League itself expecting this average to grow to ▮▮▮▮▮ in the next ten years. *Id.* The largest MLB club contract, which began with the 2014 season, now provides an average rights fee of ▮▮▮▮▮ per year. Ex. 16. This trend is present in the NHL as well. For instance, the New Jersey Devils received ▮▮▮▮▮▮ for their rights in 1990-91, but now receive ▮▮▮▮. Ex. 34.

This rise in rights fees is not limited to MLB and the NHL; rights fees have been rising dramatically in "virtually all sports." Litner Decl. ¶ 25. There are many reasons for this rise, including the increasing value that programmers and advertisers place on events that are viewed live. Litner Decl. ¶ 23; Feeney Decl. ¶ 11. The increasing value of sports programming has led to increased competition among networks to acquire rights, both in terms of the number of

networks and their willingness to pay. Litner Decl. ¶¶ 24-25.

Unlike most other programming, live major-league sports, including the clubs' local broadcasts here, also remains largely unavailable through alternative sources like the Internet, which makes it an important driver of expensive pay-television subscriptions. With the exception of the out-of-market packages, to obtain such programming on the Internet, if available at all, the consumer must almost always already have a pay-television subscription, ensuring that the Internet does not compete with MVPD subscriptions. MVPDs are thus increasingly willing to pay high carriage fees to RSNs with live MLB and NHL game programming so long as they continue to control the means by which consumers can watch that programming, which gives them significant leverage with sports consumers.

The result is widely viewed, even by many of the defendants themselves, as a situation in which prices for sports programming are too high. "Pretty much everybody in the business agrees that the overall costs are outrageous." Brian Stelter, *Rising TV Fees Mean All Viewers Pay to Keep Sports Fans Happy*, N.Y. Times, Jan. 25, 2013. Leading television-industry analyst Craig Moffett said of sports programming costs, "Everybody in this business knows what the problem is, and most of them are even willing to acknowledge it. Diagnosis is not the problem." Todd Spangler, *Sports Fans: Get Ready to Spend More Money to Watch Your Favorite Teams*, Variety, Aug. 13, 2013. Michael White, the CEO of Defendant DirecTV, has stated bluntly, "I think the regional sports network's structure in the industry is broken, and it is, but I'm probably not going to be able to change that overnight."[32] Last year, Comcast CEO Brian Roberts acknowledged that there needed to be a conversation about the structure of sports broadcasting due to rapidly rising costs.[33]

---

[32] *DIRECTV Management Discusses Q3 2012 Results—Earnings Call Transcript*, Nov. 6, 2012, http://seekingalpha.com/article/984751-directv-management-discusses-q3-2012-results-earnings-call-transcript?part=single.

[33] *Comcast CEO Goes All in for NBCUniversal*, CNBC, Feb. 13, 2013 7:15 a.m., *available at* http://video.cnbc.com/gallery/?video=3000147213&play=1, video at 8:16.

The rise in costs has not been limited to sports that impose territorial restraints on broadcasts. Feeney Decl. ¶ 11; Litner Decl. ¶ 25. This shows that demand is high—and rising—for sports programming across the board, regardless of territorial exclusivity. Thus, the territorial restraints are not a necessary element of the networks' demand for the rights to produce this programming.

Defendants' position is that, even in a world in which sports-programming costs are, by all accounts, unreasonably high, the networks need the *additional*, artificial increase in value that results from allocating territories in order to create a sufficient incentive to continue to produce high-quality programming. This position is incapable of being established as a matter of law for summary judgment, and it is implausible on its face. In the current market, supply is not coming close to keeping up with demand, which is why prices are rising. Constraining supply only makes a bad situation worse.

## PROCEDURAL HISTORY

The parties agreed that expert discovery relevant to summary judgment would precede their filings. All parties were to serve economic expert reports "on any issue (other than class certification and merits damages) on which that party bears the initial burden of proof." *See Laumann*, Dkt. 171, at 1; *Garber*, Dkt. 228, at 1. Pursuant to this schedule, in February, Plaintiffs served the Declaration of Roger G. Noll, an undisputed expert in the fields of antitrust economics, sports economics, and broadcast economics. Professor Noll has been a leading figure in sports economics for over four decades, and his antitrust expertise is broadly recognized. *See, e.g.*, *In re Elec. Books Antitrust Litig.*, No. 11-2293, 2014 WL 1282293, *8-9, *25-*26 (S.D.N.Y. Mar. 28, 2014) ("Noll is eminently qualified and nationally respected in the field of antitrust economics."). Professor Noll's report addressed not only the issues on which Plaintiffs bear the initial burden of proof—such as market power and anticompetitive effect—but also those issues on which Defendants bear the initial burden of proof—their so-called "procompetitive justifications." Noll Decl. 105-20. Professor Noll's report also addressed anticompetitive effects

27

directly through a pricing model that shows that if the clubs were to offer their games independently and not subject to geographical limitations, the price of a package of games would decrease dramatically. Noll Decl. 99-105.

Defendants did not serve an expert report in February and have not included any economic expert testimony in their moving papers. Defendants have not challenged Professor Noll's report in any fashion for purposes of summary judgment. Defendants are permitted to submit expert evidence with class certification briefing and subsequently for merits issues not previously addressed, but their opportunity to do so for purposes of summary judgment has now passed. Consequently, the *only* economic expert testimony that is part of the record for summary judgment is the unrebutted declaration of Professor Noll, whose conclusions, based on extensive facts adduced in this case and decades of study of antitrust and sports economics, are directly contrary to the positions Defendants seek to establish as a matter of law.

## ARGUMENT

Defendants do not dispute that they have agreed to a horizontal division of the market.[34] In any other context, the Defendants' market allocations would be *per se* violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.[35] *Topco*, 405 U.S. at 608. Because some cooperation is necessary for sports, however, the Supreme Court has held that the *per se* rule does not apply in this context, and instead courts should evaluate sports broadcasting restraints under the rule of reason. *NCAA*, 468 U.S.at 101.

Under the rule-of-reason framework, the plaintiff bears the initial burden of showing that

---

[34] The Television Defendants contest that they have participated in these agreements in a manner that renders them liable, but they do not dispute the underlying agreements to divide the market.
[35] The League Defendants scarcely mention Plaintiffs' section 2 monopolization claims, contending only that they should be dismissed "for the same reasons." NHL Mem. 22; MLB Mem. 12 n.22. Defendants do not challenge market power, however, and as discussed herein, "the NHL and MLB have used their monopoly power to restrict the broadcast of television programming in a manner that harms competition." *Laumann*, 907 F. Supp. 2d at 492 (denying League Defendants' motions to dismiss section 2 claims); *see also* Noll Decl. 6-8.

the challenged restraints have an effect on competition. The Defendants' moving papers do not challenge this basic premise of Plaintiffs' case. The burden then shifts to the defendant to come forward with procompetitive justifications for those restraints. Where, as here, defendants have imposed explicit restraints on output, they bear "a heavy burden of establishing an affirmative defense which competitively justifies this apparent deviation from the operations of a free market." *Id.* at 113. If a defendant meets this "heavy burden," the plaintiff may still prevail by showing that the defendant could achieve the articulated benefits by less restrictive means. *Law v. Nat'l Collegiate Athl. Ass'n*, 134 F.3d 1010, 1019 (10th Cir. 1998). The ultimate question never changes: "whether or not the challenged restraint enhances competition. Under the Sherman Act the criterion to be used in judging the validity of a restraint on trade is its impact on competition." *NCAA*, 468 U.S. at 104 (references omitted); *see also, e.g.*, *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993) ("Ultimately, it remains for the factfinder to weigh the harms and benefits of the challenged behavior."). The inquiry, in other words, is directed at determining the "net anticompetitive effect." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 774 (1999).

Because these are motions for summary judgment and Defendants do not contest Plaintiffs' initial burden, the burden is on Defendants to establish that their procompetitive justifications are of such force that, assessing the evidence in the light most favorable to Plaintiffs, any reasonable finder of fact would necessarily conclude that their restraints are, on balance, beneficial to competition. Fed. R. Civ. P. 56; *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (the Court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."). Even then, because Plaintiffs put forth less restrictive means of achieving these benefits, Defendants can only prevail if a reasonable finder of fact would be compelled to find the challenged system, on balance, remains procompetitive vis-à-vis these alternative means as a matter of law. *See Law*,

134 F.3d at 1019.[36]

## I.     Defendants Do Not Dispute That Plaintiffs Have Met Their Initial Burden

Plaintiffs can meet their initial burden of proof in one of three ways. First, they can establish that the defendants have directly restrained price and output; second, they can establish market power through evidence of concentration in a relevant market; and third, they can show direct anticompetitive effects. Plaintiffs have done all three.

In *NCAA*, the Supreme Court held that the burden was immediately placed on the defendant NCAA, because its rules directly restrained output and effectively restrained prices. "[W]hen there is an agreement not to compete in terms of price or output, 'no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement.'" 468 U.S. at 109 (quoting *Prof'l Eng'rs*, 435 U.S. at 692). Thus, a direct restraint on output that makes "price and output … not responsive to demand" is sufficient to meet the initial burden and places a "heavy burden" on the Defendants to justify the practice. *Id.* at 110, 113.

Like the restraints in *NCAA*, the territorial restraints here constrain the operation of the free market. They directly constrain output for the purpose of increasing the value of

---

[36] The NHL interprets *Virgin Atlantic Airways Ltd. v. British Airways PLC*, 257 F.3d 256 (2d Cir. 2001), to suggest that summary judgment must be granted unless Plaintiffs proffer a less restrictive alternative that precisely replicates "all of the procompetitive justifications of the alleged restraint," without regard to whether those purported justifications outweigh the anticompetitive effects. NHL Mem. 9, 17-18. To the contrary, if a scheme has legitimate objectives that could not have been achieved by less restrictive alternatives (which is not the case here), the fact-finder must still "weigh the harms and benefits of the challenged behavior." *Capital Imaging Assoc., P.C. v. Mohawk Valley Med. Assoc., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993); *see also, e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001) ("[I]f the [defendants'] procompetitive justification stands unrebutted, then the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit."); *Meredith Corp. v. SESAC LLC*, --- F. Supp. 2d ---, No. 09-9177, 2014 WL 812795, at *34 (S.D.N.Y. Mar. 3, 2014) (denying summary judgment despite defendant's unrebutted procompetitive benefits; "[i]t is not for the Court, on [defendant's] motion for summary judgment, to resolve this debate, particularly without the benefit of [defendant's] expert analysis or compelling evidence on these points").

programming. They do so by preventing clubs, RSNs, and MVPDs from responding to consumer demand by distributing live-game programming outside their defined territories. They are express restraints on trade that Defendants must justify in order to escape liability. *Id.*; *see also Topco*, 405 U.S. at 608; *Anderson News*, 680 F.3d at 182.

Second, Plaintiffs have also put forth substantial evidence to establish market power. It is ultimately a matter of common sense that video presentations of live major-league hockey games, in *Laumann*, and video presentations of live major-league baseball games, in *Garber*, constitute relevant markets. As this Court noted, "It is well established that '[t]here are peculiar and unique characteristics that set major league men's ice hockey [and baseball] apart from other sports or leisure activities, ... that [c]lose substitutes do not exist' and that the Leagues possess monopolies of their respective sports." *Laumann*, 907 F. Supp. 2d at 491-92 (collecting cases). Similarly, video presentations of games are distinct from in-person tickets to those events; as MLB has previously argued, they are "created for a different market." Br. for Resp'ts at 20, *Kowalski v. Chandler*, 346 U.S. 356 (1953) (No. 53-23) 1953 WL 78334 ("*Kowalski* Br."). It is equally obvious that Defendants dominate those markets in a manner that gives them market power. Nevertheless, Professor Noll has provided a thorough analysis of these markets and Defendants' market power. Noll Decl. 6-7; 24-95.[37] Defendants do not contest any of this. *See, e.g.*, MLB Mem. 12 n.22 (acknowledging that MLB is not moving for summary judgment on the basis of "relevant market [or] market power"); NHL Mem. 3 n.3 (same).

Third, Professor Noll has also established direct evidence of harm to competition in the form of a model of bundled-game pricing that establishes that the prices the Leagues charge for their out-of-market packages are more than twice what they would be in a competitive market.

---

[37] Because Defendants have not challenged these matters, and consistent with the Court's request that the size of submissions be kept to a minimum, Plaintiffs have submitted an excerpt of Professor Noll's report that omits most of his analysis of market definition and power. If the Court determines that it would be helpful for a comprehensive understanding of the economic issues in this case to have the full report, Plaintiffs will provide it.

Noll Decl. 104. This is not surprising. There are analogous markets in which bundled media subscriptions compete with separate offerings of the same media, and the prices for the bundles are far lower than they are here. For example, Netflix offers a subscription that provides Internet access to thousands of movies and television shows for $7.99 per month.[38] Different companies offer the same movies for download for $15 or $20, or by a streaming "rental" for $3 or $4.[39] Similarly, music can be purchased for $9.99 for an album, or streamed on demand as part of a subscription that includes millions of songs for free or, with more features, for $9.99 per month on a service such as Spotify.[40] If Netflix or Spotify were the only source of content, there is no question that they would charge far more. In the same way, by ensuring that they are the only source of the games in their "out-of-market" packages, the Leagues can, and do, charge far more than they would charge for league-wide packages in a competitive market.

Defendants do not contest any of this.[41] In fact, they admit that the restraints have the purpose and effect of raising prices, but contend that it is not "a concern under the antitrust laws that exclusive broadcast territories may allow teams to obtain higher rights fees than they might otherwise." NHL Mem. 12. While perhaps not conclusive evidence of an antitrust violation alone, higher prices are indeed a central concern under the antitrust laws, especially when they derive from express agreements to exclude competition, as they do here. *See, e.g.*, *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 708 (S.D.N.Y. 2013) (rejecting alleged procompetitive benefit because "from the consumer's perspective—a not unimportant perspective in the field of antitrust—the [conspiracy] brought less price competition and higher prices").

---

[38] *See* https://www.netflix.com/?locale=en-US.

[39] For example, the movie Titanic is currently included in a Netflix subscription, while the high definition version can be purchased for $14.99 or rented for $3.99 from Amazon.com. http://www.amazon.com/Titanic-Leonardo-DiCaprio/dp/B0098G7AWS/ref=tmm_aiv_title_0.

[40] *See* https://www.spotify.com/us/.

[41] MLB asserts that Plaintiffs cannot meet their "initial burden" in their introductory material, but they have mislabeled their argument that Plaintiffs cannot meet their *ultimate* burden of establishing overall effects to the market. *See* MLB Mem. 3.

In fact, the evidence of impact is so overwhelming that Defendants embrace it rather than fight it. Their position is not that their restrictive practices do not raise prices—it is that the increases in prices are so significant that they are necessary to make the system work. According to Defendants' arguments, they can only serve consumers in the way that they do by allocating the market and artificially making the programming "more valuable"—*i.e.*, more costly to consumers—than it would be in free market. This turns the Sherman Act on its head.

## II.    Defendants Cannot Meet Their Burden of Establishing Countervailing Procompetitive Effects

Defendants acknowledge that they bear the burden of establishing that their procompetitive justifications necessarily outweigh the direct harm to competition. NHL Mem. 6-7; MLB Mem. 12 n.22 (incorporating NHL's exposition). Because they have not contested Plaintiffs' ability to show an adverse effect on competition, they must "show that the anticompetitive effects of their exclusionary rules are outweighed by procompetitive benefits." *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 243 (2d Cir. 2003). Such weighing is for a jury, *see Capital Imaging*, 996 F.2d at 543, and cannot be resolved as a matter of law.

The question under the rule of reason "is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 203 n.10 (2010) (quoting *Chi. Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918)). Professor Noll directly contradicts Defendants' conclusions on each of their purported justifications in a report that they have not challenged. Consequently, even if the Defendants had put forth expert testimony of their own, at most they would have created a disputed factual issue. But they have not even done that. Under the circumstances, they cannot possibly meet their "heavy burden" of proving an overall benefit to competition—much less can they do so as a matter of law.

## III.    Defendants' Reverse "Quick Look" Proposal Is Misplaced

Recognizing that they cannot meet their factual burden of establishing that their territorial

restraints promote competition, Defendants urge the Court to change the standard. They contend that they can win on a novel, defensive application of the "quick-look" doctrine merely by articulating potentially procompetitive justifications for their restraints. They contend that they are relieved from the burden of establishing an overall benefit to competition because sports are entitled to special treatment. There is no basis for this position.

One of the first articulations of the "quick look" doctrine—though it was not there named as such—was the Supreme Court's opinion in *NCAA*. There, as here, the defendant had imposed express restrictions on the ability of individual teams (there, schools) to compete in the televising of live sporting contests (there, football). The Court held that, where there was an "agreement not to compete in terms of price or output," a full rule-of-reason analysis may not be necessary. 468 U.S. at 110. A "naked restraint on price and output requires some competitive justification even in the absence of a detailed market analysis." *Id.* Under the "quick-look" framework, in other words, when there are explicit restraints on competition—or other arrangements such that "an observer with even a rudimentary understanding of economics could conclude that [they] would have an anticompetitive effect on customers and markets," *Cal. Dental*, 526 U.S. at 770—the burden is on the defendants to set forth procompetitive justifications for the restraints. And if the defendant is unable to meet this burden, the practice can be condemned without a full market analysis. *See also Law*, 134 F.3d at 1024 (holding NCAA's limits on coaches' compensation unlawful by application of quick-look analysis).

Defendants base their reverse "quick look" theory on a misinterpretation of *American Needle*. In that case, the Court unanimously rejected another theory designed to grant broad antitrust protection to professional sports leagues—the theory that leagues are, in effect, "single entities," and that member clubs are therefore incapable of conspiring with one another. Defendants rely on the Court's discussion, which draws on *NCAA*, that restraints that are necessary for the product to exist at all are subject to the rule of reason and are "likely to survive

34

the rule of reason." *Id.* at 203. In such cases, under *NCAA*, the rule of reason might be "applied in the twinkling of an eye." *Id.* Separately, the Court noted that the structure of sports leagues means that certain procompetitive benefits, such as a competitive balance, may be part of the analysis. *Id.*

Nothing in *American Needle* suggests that the Court was creating a new rule for sports leagues that allows them to prevail as a matter of law simply by pointing to a sports-specific benefit. The rule-of-reason test remains, as reiterated in *American Needle* itself, whether the restraint "merely regulates and perhaps thereby promotes competition" or whether it is "such as may suppress or even destroy competition." *Id.* at 203 n.10 (quoting *Chi. Bd. of Trade*, 246 U.S. at 238). The Court simply made three points, none of which helps Defendants here: first, that restraints that are necessary for the product to exist are likely to survive a rule-of-reason analysis; second, that the depth of the required analysis under the rule of reason will vary depending on the circumstances; and third, that there are certain kinds of justifications that are unique to sports leagues that may be considered as part of the rule-of-reason analysis.

When Defendants first made this argument in support of their motions to dismiss, this Court interpreted the quick-look doctrine after *American Needle* correctly: "certain challenged practices warrant an 'abbreviated or quick-look rule of reason analysis' either 'because the great likelihood of anticompetitive effects can be easily ascertained' *or*, on the flip side, where 'restraints on competition are essential if the product is to be available at all [such that] the agreement is likely to survive the Rule of Reason.'" *Laumann*, 907 F. Supp. 2d at 479 (supporting footnotes omitted; alteration in original). There is no basis for a version of the "quick look" doctrine that allows the leagues to skip over their evidentiary burden, ignore extensive contrary record evidence, and obtain summary judgment without ever addressing the facts.

The contrast between this case and *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290 (2d Cir. 2008), on which Defendants rely, highlights how inappropriate

summary judgment would be here. In that case, the plaintiff sought to avoid a full rule-of-reason analysis by alleging that the challenged agreement relating to the licensing of MLB clubs' intellectual property was either illegal *per se* or illegal under a quick-look test. The district court found that the defendant demonstrated sufficient procompetitive justifications to require a full rule-of-reason analysis. The plaintiff, however, "proffered no evidence" of "actual injury to competition or … power in the relevant market," and "presented no basis" for finding against the defendant on a rule-of-reason analysis. 542 F.3d at 306, 334. Because of the plaintiff's strategic decision not to present evidence sufficient to allow a jury to find liability under the rule of reason, the defendant necessarily prevailed once the court ruled that a rule-of-reason analysis was required. As then-Judge Sotomayor summarized in her concurring opinion, "[W]e need not and do not decide whether a successful Sherman Act claim could have been brought against MLBP with a properly supported record, including whether the procompetitive justifications for the two challenged provisions could be achieved in a substantially less restrictive manner." *Id.* at 341; *see also id.* at 334 (majority op.).

Here, in contrast, Plaintiffs have presented an unrebutted and unchallenged economic record demonstrating the competitive harm caused by Defendants' restraints. Like the plaintiff in *Salvino*, the Defendants have made a decision not to put in "a properly supported record" in the hope that they can prevail by a "truncated analysis" that ignores all of the contrary evidence. Nothing in *American Needle* or *Salvino* supports such a clear abandonment of longstanding antitrust principles.

Nor do the other cases cited by Defendants, which involve amateurism in collegiate sports and basic equipment-standards rules, support their position here. As the *NCAA* Court noted, NCAA rules directed at amateurism are often different in kind from restraints on broadcasting, because they essentially define the "product." 468 U.S. at 102. In *Rock v. National Collegiate Athletic Association*, 928 F. Supp. 2d 1010, 1026 (S.D. Ind. 2013), an Indiana district

court found that certain limits on athletic-based aid "actually widens consumer choice in the marketplace, [so] it can be viewed as procompetitive as a matter of law." In *Agnew v. National Collegiate Athletic Association*, 683 F.3d 328 (7th Cir. 2012), the court was likewise focused on an issue concerning amateurism in college sports. It nevertheless held that claims challenging certain limitations on scholarships could *not* be dismissed, because those limitations were not necessary for the product to exist. *Id.* at 344 ("These Bylaws … are not inherently or obviously necessary for the preservation of amateurism, the student-athlete, or the general product of college football.").[42] Similarly, the restraints challenged here are not necessary for live NHL and MLB programming—they exist merely to limit competition and increase the products' value.

Notably, on remand from the Supreme Court, the district court in *American Needle* recently denied the NFL's motion for summary judgment. *Am. Needle, Inc. v. New Orleans La. Saints*, No. 04-7806, 2014 WL 1364022, *4 (N.D. Ill. Apr. 7, 2014). That case, like *Salvino*, involved an exclusive licensing arrangement by the league. On a "properly supported record," summary judgment was inappropriate, as it is here. Mere assertions that restraints are beneficial to competition are not sufficient.

## IV.   The Court May Find Defendants' Market Allocation Unlawful under the Proper "Quick Look" Framework

*NCAA* remains the leading case applying the antitrust laws to sports broadcasting. Indeed, *American Needle*—in the very portions relied upon by Defendants—repeatedly cites to *NCAA* for the appropriate application of the rule of reason in sports cases generally. 560 U.S. at 203-04.

---

[42] Even less helpful to Defendants is *Race Tires America, Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 80 (3d Cir. 2010). That case involved a standards-setting body's decision to impose a "single-tire" rule—which are common in motorsports because of their effect on the race itself. They are part of the basic rules of the contests. No one is suggesting that leagues' standards concerning playing fields, equipment, and the like are likely to be condemned under the antitrust laws. The Court highlighted this distinction in *NCAA*. 468 U.S. at 101-02. As the Court stated in *American Needle*, "Although two teams are needed to play a football game, not all aspects of elaborate interleague cooperation are necessary to produce a game." 560 U.S. at 199 n.7.

In *NCAA*, the Court determined that the NCAA had not met its burden of proof on its procompetitive justifications after a full trial—and the NCAA had offered nearly all of the same procompetitive justifications that the League Defendants assert here. The NCAA's unsuccessful Supreme Court brief shares much with the League Defendants' briefs here. Br. for Pet'r, *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85 (1984) (No. 83-271), 1983 U.S. S. Ct. Briefs LEXIS 935 ("*NCAA* Br."). Like the Defendants here, the NCAA specifically argued that its television plan promoted competitive balance, *id.* at 35-36, prevented free riding, *id.* at 41, promoted investment in production, *id.* at 20, 41-42, ensured that there would be sufficient viable teams, *id.* at 37, promoted a local base of fans to attend games, *id.* at 45-46, and promoted college football widely, *id.* at 40-42.

The NCAA also argued its plan should be upheld as the product of a legitimate joint venture, *id.* at 29-30, whose output necessarily involved the cooperation of more than one school, *id.* at 39, 42. "The NCAA's members share the benefits of success and the risks of failure in this common adventure." *Id.* at 31. It contended that "[c]ooperation is inevitable in team sports, and the arrangements challenged here make the sport more attractive to spectators and those who watch on TV. Thus they increase competition and output." *Id.* at 19.

The Supreme Court was not convinced. It concluded that the NCAA's restraints were "naked," 468 U.S. at 109-10, and that none of its proffered justifications sufficed, *id.* at 113-20. Here, the Leagues are asking for much more—a ruling that these same justifications are now so clearly adequate that no jury could reasonably find to the contrary. And they do so in a case in which there is substantial evidence supporting the contrary view—including *all* the expert economic evidence.

Moreover, the effect of *NCAA* on the college sports broadcasting market is squarely at odds with what Defendants claim will happen if the Court removes its broadcast restraints. After *NCAA* eliminated the restrictions, college football broadcasts immediately multiplied, and

advertising rates plummeted. Brian L. Porto, *The Supreme Court and the NCAA* 74 (2012).[43] The reduced value of the programming did not cause there to be less of it—the value was reduced because there was more. College football continues to thrive on television, with no evidence that a lack of exclusivity deters networks from producing programming—to the contrary, every broadcast and sports-oriented national network carries college football. Consumers can now choose from scores of games to watch, a great many of which are played at the same time. The market, in other words, worked as expected—when restraints are removed, output increases to respond to consumer demand.

The other major case involving league restraints on broadcasting that went to trial resulted in similar findings. In *Chicago Professional Sports L.P. v. National Basketball Association*, 754 F. Supp. 1336 (E.D. Ill. 1991), the NBA imposed limitations on games that teams could license for distribution on superstations—local television stations with national distribution. As here, the NBA sought to confine clubs' broadcasts to defined territories and to reduce the number of games shown nationwide on superstations. The district court concluded, after trial, that restraints "will reduce availability and competition in the hope of raising the price of the product in the future. Such a restraint is unreasonable and therefore unlawful." *Id.* at 1364. The Seventh Circuit affirmed. 961 F.2d 667 (7th Cir. 1992).

After the NBA changed its rules and sought to eliminate Chicago Bulls games on superstations entirely, the parties went to trial a second time. The NBA offered some of the same procompetitive justifications offered here: free-riding, competitive balance, increased national exposure, and protecting weaker teams. *Chi. Prof'l Sports L.P. v. Nat'l Basketball Assoc.*, 874 F. Supp. 844, 859-62 (E.D. Ill. 1995). After a full trial, the court rejected each of these

---

[43] ESPN, which now claims that exclusivity is so important to its decision to carry professional baseball games, was one of the first competitors to rush in, broadcasting its first game in early September, 1984, at the start of the season following the Supreme Court's June 1984 decision in *NCAA*. Cathy Harasta, *ESPN Celebrates Five Years with Its Ratings on the Rise*, Dallas Morning News, Sept. 7, 1984.

justifications. *Id.* at 862. The Seventh Circuit subsequently remanded, but not because it took issue with the district court's findings on these issues. Rather, it wanted the district court to give further consideration to the "single-entity" theory—a theory that might have granted the NBA broad antitrust immunity notwithstanding these findings. 95 F.3d 593, 599 (7th Cir. 1996). The parties subsequently settled, and a unanimous Supreme Court later rejected the single-entity theory in *American Needle*. 560 U.S. at 199-201.

In short, when the procompetitive justifications Defendants now assert have been tested at trial in cases involving restraints on sports broadcasting, they have been found inadequate. Defendants' suggestion that they can nevertheless establish their adequacy here as a matter of law is not credible, all the more so since they have not proffered any economic analysis in support of their claims.

In fact, given the lack of evidentiary support for Defendants' procompetitive justifications, the Court should find that they are *inadequate* as a matter of law.[44] Just as in *NCAA*, Defendants have engaged in explicit restraints on output. They have done so for the admitted purpose of increasing the value of live-game programming, which, in turn, raises the fees the clubs are able to command for their rights. Professor Noll's unchallenged economic report confirms that these restraints reduce output and raise prices. The lack of economic analysis, either by expert testimony or prior economic study, leaves Defendants with nothing but unsupported statements of interested witnesses that conflict with the record, basic economics, and common sense.

## V.      Being Joint Ventures Does Not Allow the Leagues to Suppress Competition

### C.      The Leagues Cannot Limit Clubs' Own Output

Contrary to the Leagues' contention, there is no general rule that allows a joint venture to

---

[44] Plaintiffs have not moved for summary judgment at this time. Under the schedule, Plaintiffs may move for summary judgment after the resolution of the class certification motions. *See Laumann*, Dkt. 171, at 4; *Garber*, Dkt. 228, at 4.

suppress competition by separate products that compete with the products of a joint venture. The Supreme Court rejected this argument in the sports-broadcasting context in *NCAA*, where it held, "Ensuring that individual members of a joint venture are free to increase output has been viewed as central in evaluating the competitive character of joint ventures." 468 U.S. at 114 n.58; *see also Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 24 (1979) ("*BMI*") (upholding joint selling of music licenses under a blanket license, but only where "there was no legal, practical, or conspiratorial impediment to … obtaining individual licenses.").

"Far from being 'presumptively legal,' such arrangements are exemplars of the type of anticompetitive behavior prohibited by the Sherman Act." *Visa U.S.A.*, 344 F.3d at 243 (citing, inter alia, *NCAA*, 468 U.S. at 99; *Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47, 57 (1st Cir. 2002); *N. Am. Soccer League v. Nat'l Football League*, 670 F.2d 1249, 1252 (2d Cir.1982)); *see also Topco*, 405 U.S. at 608; *Sealy*, 388 U.S. at 355 (finding joint venture acting to divide market into exclusive territories a *per se* violation); *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 406 (S.D.N.Y. 2001) ("Courts have been especially concerned where horizontal competitors have agreed via their joint ventures to restrict the output of individual members of the venture.").

In *American Needle*, the Court stressed that sports leagues could not use their joint venture products to immunize restraints on competition between clubs: "If the fact that potential competitors shared in profits or losses from a venture meant that the venture was immune from § 1, then any cartel 'could evade the antitrust law simply by creating a "joint venture" to serve as the exclusive seller of their competing products.'" 560 U.S. at 201 (quoting *Salvino*, 542 F.3d at 335 (Sotomayor, J., concurring)). "It does not follow that because two firms sometimes have a cooperative relationship there are no competitive gains from forbidding them to cooperate in ways that yield no economies but simply limit competition." *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 594 (7th Cir. 1984).

In *Polygram Holding, Inc. v. FTC*, the D.C. Circuit found that two record companies who

41

formed a joint venture to release a "Three Tenors" album could not agree not to market earlier records by the Three Tenors that the venturers published separately. 416 F.3d 29, 38 (D.C. Cir. 2005) (applying Federal Trade Commission Act). Although the companies were free to agree on marketing and distribution of the joint venture product, they could not also restrict competition from other products. What Defendants may not do here is exclude competition from other games in order to protect the joint national games, just as the record companies could not prevent competition from non-venture records by the same artists.

There are cases in which restrictions on competition with a joint-venture product were upheld, but not because the court applied a blanket rule permitting such restrictions. Rather, these decisions found that the restrictions were "ancillary" to the legitimate purposes of the joint venture—triggering the rule of reason—and had a beneficial effect on competition overall. The conclusion that such restraints are acceptable, in other words, is the *result* of a rule-of-reason analysis, not a means of avoiding it. *See Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 191 (7th Cir. 1985) (finding rule of reason analysis required and resolving case for Defendant where Plaintiff presented only a *per se* case); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 223 (D.C. Cir. 1986) (distinguishing *NCAA* and concluding that, under a full rule-of-reason analysis, the challenged practices "produce none of the evils of monopoly but enhance consumer welfare by creating efficiency").[45]

### D.    The Restraints Are Not Justified by a Free-Riding Concern

The Leagues here argue that their system is necessary to prevent free-riding, but they do not explain how. As Professor Noll states, "Free-riding becomes a relevant economic issue only

---

[45] The court reached this conclusion where it found that the venture lacked market power, 792 F.2d at 221, and the members *could* compete with the joint venture, so long as they did not use venture trademarks or services, *id.* at 213. *See* 13 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 2131, 166 (2d ed. 2004) ("[I]ts numerous members' unrestrained ability to make sales outside the venture virtually eliminated the possibility of an anticompetitive marketwide output reduction.").

when a public good that benefits consumers is under-produced because collectively a group of firms lack a sufficient incentive to provide enough of it." Noll Decl. 112. The Leagues make no serious attempt to explain why allowing a team and its RSN to broaden distribution decreases output. And even if it did, the Leagues make no attempt to prove that the overall effect of this "free-riding" would outweigh the direct anticompetitive effects. Even less, of course, can they establish this as a matter of law for purposes of summary judgment.[46] *See, e.g.*, *General Leaseways*, 744 F.2d at 593 (finding free-rider argument put forth by joint venture not plausible).

In any event, simply taking advantage of market conditions improved by other firms is not free-riding in any relevant sense. Just as with the Three Tenors, "[t]he 'free-riding' to be eliminated … [is] nothing more than the competition of products that were not part of the joint undertaking." *Polygram,* 416 F.3d at 38. It is no different, as the court explained, than if General Motors aggressively promoted an SUV, and other car companies took advantage of the increased demand for SUVs generally. *Id.* That type of "free-riding" is not a basis for suppressing competition with competitors. "The 'procompetitive' justification [Defendants] offer[] is 'nothing less than a frontal assault on the basic policy of the Sherman Act.'" *Id.* (quoting *Professional Engineers*, 435 U.S. at 695).

Nor is it clear who is free-riding on whom. The Leagues suggest, for example, that the clubs and their RSNs will obtain benefits from the promotion provided by the national networks. But it is equally clear that the national networks obtain benefits from the promotion by clubs and RSNs. Games involving popular teams are far more valuable to the national networks, and their

---

[46] In fact, the only clear case of free-riding here, as Professor Noll points out, is the free-riding associated with revenue sharing. "[A] team may earn more profit by weakening the team and relying on revenue sharing for its revenues, which amounts to 'free-riding' on the agreement to share revenues." Noll Decl. 118. Because teams that receive revenue sharing obtain that revenue without having to expend any effort of their own, they have reduced incentives to compete vigorously, a fact that the Leagues have attempted to deal with by creating countervailing incentives. *See, e.g.*, Bettman Dep. 215:7-18; Dupuy Dep. 172:14-23.

ratings are higher in areas where the sport is popular regardless of the team playing. As NHL

Commissioner Bettman testified, "[I]t goes both ways. I think the profile of the Red Wings as an

important property, has been raised by NBC. And I also think NBC benefits by having the

Detroit Red Wings followed and having their games on national TV." Bettman Dep. 194:3-9.

Moreover, even if there were a concern that the clubs' and RSNs' obtaining free benefits

resulted in a relevant economic effect, the Leagues have the means to prevent its effects without

restraining output. In the *Bulls* case, Judge Easterbrook rejected a similar claim that one NBA

club and its broadcast partner were free-riding on the efforts of national broadcasters. "When

payment is possible, free-riding is not a problem because the 'ride' is not free." *Bulls (1992)*, 961

F.2d at 675; *see also Bulls (1996)*, 95 F.3d at 596. As in that case, "there are substantial revenue

transfers, propping up the weaker clubs in order to promote vigorous competition … Without

skipping a beat the [Leagues] may change these payments to charge for [a club's] ride." *Id.* The

court then noted that MLB already did this in response to clubs' broadcasts on superstations. *Id.*

The Leagues' reliance on *Salvino* here is misplaced. The court there did distinguish *BMI*'s

insistence on non-exclusivity on the basis of MLB's interdependence, but it did not therefore

conclude that the restraints were procompetitive. The NHL omits the conclusion of the paragraph

it quotes, NHL Mem. 16, which is that these factors, in the context of that case, "foreclose[d] the

imposition of *per se* or quick-look liability." 542 F.3d at 323.[47] On the limited record in that case,

moreover, the *Salvino* court found no evidence of any decrease in output or increase in price.[48]

542 F.3d at 318-19. Yet here, Defendants have conceded such an effect, as they must, because the

acknowledged purpose of the restraints is to increase the value of programming by protecting it

from competition.

---

[47] As noted, the interdependence of the NCAA was unsuccessfully argued to the Court in *NCAA* as a basis for upholding the restraints.

[48] One notable absence was an adequate expert report for the plaintiffs. 542 F.3d at 312. Here, by contrast, Plaintiffs served a 121-page report (plus exhibits) by a well-recognized expert in sports and antitrust economics, while Defendants served no economic report at all.

In any event, in her concurring opinion, then-Judge Sotomayor highlighted the significance of exclusivity under the rule of reason: "In my view, the exclusivity provision is the single most important distinguishing factor between this case and *Broadcast Music*, yet the majority offers little analysis of this distinction and no explanation as to how such an arrangement should be analyzed."[49] 542 F.3d at 341. She also emphasized that the court was not deciding "whether a successful Sherman Act claim could have been brought against MLBP with a properly supported record." *Id.* Neither opinion supports the Leagues' argument that they are entitled to summary judgment here.

## VI.   Defendants Cannot Establish That Their Restraints Are Procompetitive as a Matter of Law

### A.   Market Allocation Is Neither Fundamental to Sports Video Rights nor Is It Necessary to Produce Live-Game Programming

The Leagues contend that the exclusivity challenged here is somehow foundational to broadcasting.[50] As discussed, however, the type of exclusivity that is the norm in the broadcast industry has nothing to do with the exclusivity challenged here. The clubs own rights to broadcast their games, and Plaintiffs accept that a club can choose to offer its rights to a particular game on an exclusive basis to a single network. This kind of "own-game exclusivity" is akin to the exclusivity one often finds in the television industry, but has nothing to do with exclusivity vis-à-vis other programing whose rights the club does not own. *See supra* pp. 4-5. And as Professor Noll states, "The alleged efficiencies asserted by the defendants apply only to

---

[49] The Supreme Court, in *American Needle*, largely endorsed Judge Sotomayor's alternative analysis of the application of joint-venture doctrine, 560 U.S. at 201-02.

[50] The Leagues also rely on statements about the importance of exclusive *playing* territories in support of their television territories. Plaintiffs are not challenging the appropriateness of assigning exclusive areas in which clubs are permitted to play their home games, an issue that has long been treated as a separate issue. In *NFL I*, for example, the government challenged only broadcast territories and not operating territories. While not challenged here, protected playing territories are *not* a necessary part of sports leagues. *See, e.g.*, Noll Decl. 64-65 (describing English professional soccer leagues).

the sale of exclusive rights by a team, and not to the exclusion of other teams from a market." Noll Decl. 8.

Defendants also argue that this exclusivity is necessary to induce networks to carry live games. Demand for rights to live NHL and MLB game programming has increased dramatically, and the supply is insufficient to meet this demand. There is no evidence that removing exclusivity would so dramatically reduce demand that the number of games broadcast would diminish. Indeed, as discussed above, the economics of sports broadcasting make this claim implausible.

The Leagues have enlisted the help of witnesses representing networks in support of their contention that output would decrease if they abolished the territories, but not surprisingly, none says unequivocally that they would stop producing this programming if they lacked exclusivity. Fox's witness states, "If the Fox RSNs were unable to obtain the exclusive rights and protections described above, it would materially impact the Fox RSNs' valuation of such rights, or whether they would continue licensing MLB and NHL game telecasts at all." Jones Decl. ¶ 21. The ESPN witness declarant was only willing to state that "it is likely that ESPN would have less interest (and, depending on the precise circumstances, potentially much less interest) in securing the rights to MLB games and delivering those games to fans." Wildhack Decl. ¶ 18. Jon Litner, of NBC Sports, stated that "NBC would have to reassess its entire relationship with the NHL" in the absence of exclusivity, but did not state that it would lack sufficient incentive to bid on the rights and produce the programming.[51] Litner Decl. ¶ 32.

These statements do not establish—as a matter of law or otherwise—that the number or quality of games would decrease without exclusive territories. All they show is that networks are

---

[51] DirecTV, for its part, does not emphasize the value of exclusivity (other than own-game exclusivity), although the record shows that it is protective of its territorial exclusivity. *See, e.g.*, Ex. 13 (declining to permit Comcast RSN to expand distribution into a DirecTV RSN's territory).

willing to pay a premium for monopoly rights. They are willing to pay more because they can charge more, and they can charge more because output is *decreased*. The fact that these same networks broadcast all manner of sports that do not share the restraints at issue here further undercuts the defendants' claims that the restraints are necessary.

The Leagues also seek to justify their market allocation by claiming the territories are necessary because they are required under their league-wide national network contracts, which they claim Plaintiffs do not challenge. This is incorrect. Plaintiffs are not challenging the *existence* of league-controlled national contracts.[52] But that does not mean that Plaintiffs do not challenge the legitimacy or lawfulness of particular provisions in those contracts. Much less does it immunize the underlying allocation of the broadcast territories simply because they are provided for in the national contracts. To the contrary, the territorial restraints in the national contracts underscore the anticompetitive purposes of the territorial system, as well as the fact that it is ultimately driven by the interests of television networks in increasing the value of their programming by suppressing competition. It is no coincidence that both Leagues embodied these restraints first in agreements with television networks, and only later codified them as part of the Leagues' own rules.

**B.    Exclusive Territories Are Not Necessary to Accommodate Both Teams' Broadcasts**

MLB claims that without the territorial restraints home teams may not allow visiting clubs to broadcast the games. MLB Mem. 2. But the exclusive territorial system has nothing to

---

[52] This is not to say that joint selling of broadcast rights is without antitrust concerns. Indeed, it is an issue of such concern that it prompted Congress to pass the SBA to permit league-wide contracts in certain situations because they were understood to violate the antitrust laws, following *NFL II*. The leagues would not need an exception to the antitrust laws for something that did not violate them. Scholars have concluded that centralized licensing of television by leagues decreases output and raises prices. *E.g.*, Noll (2007), *supra* p. 16, at 419 ("[C]entralization of the sale of television rights in leagues will cause increasing harm to consumers by restricting choice and raising prices.").

do with arrangements for visiting teams and their broadcast partners to produce game programming. In fact, as noted, both Leagues had rules that accommodated visiting team broadcasts long before they had the exclusive territorial system challenged here. As this Court has stated, just because *some* agreement is necessary for a product to be created, it does not follow that any agreement having any relation to that product is immune from antitrust scrutiny. *Laumann*, 907 F. Supp. 2d at 488. And, in any event, "a less restrictive alternative to the system of exclusive home territories is simply for the league to adopt the rule that a team has the right to telecast its away games." Noll Decl. 114.

Moreover, even in the absence of a league-wide agreement granting rights to visiting teams, the clubs would almost certainly arrange for this themselves. Every club would want to be able to have a telecast of each game aimed at its fans, so they all would have an incentive to permit away broadcasts by other clubs. The market has shown that providing two broadcasts increases demand, and would consequently increase revenue. *See* Noll Decl. 114. MLB is apparently arguing that some of their member clubs would act irrationally to prevent this beneficial outcome, but provides no evidence to support this scenario. Nor has it pointed to anything that would stop them from imposing less-restrictive league-wide rules to address cross-licensing if their speculation were to come to pass.

MLB contends a dispute between the clubs in 1993 shows the necessity of these arrangements, MLB Mem. 14 n.27, but that dispute shows that the territories are *not* necessary to encourage dual broadcasts. The dispute arose when five National League clubs refused to renew the National League Television Agreement. That agreement had existed since 1956 and included provisions for visiting team telecasts from the beginning—long before the exclusive territories were put in place. Ex. 4 at 3. The five clubs used this threat as leverage to seek a greater share of local television money from both the large-market clubs and the superstation clubs. None of this was occasioned by any "threat" to the territorial system. In fact, their primary concern was that

48

the agreement that granted royalty-free licenses to visiting teams for telecasts—the agreement that the League now touts as so plainly procompetitive—was unfair, a position with more than arguable merit that is caused, in large part, by the exclusive territorial system. *See* Ex. 20 (conference call minutes noting that the objecting clubs stated that "the only leverage they have is to hold up a broadcasting agreement for 1994").[53] It was, in other words, a dispute about revenue sharing, and was one that was resolved as part of a "Revenue Sharing Agreement." Ex. 21 (Minutes of Special Meeting).

There is no reason to think that arranging for home and away telecasts depends on the territorial system, and whatever is necessary to accommodate the two teams involved, it does not require excluding the telecasts of the *other* twenty-eight teams. Thus, at a minimum, less restrictive means exist to promote this goal.

### C.       Market Allocation Does Not Promote Competitive Balance

The facts do not support the League Defendants' suggestion that the challenged restraints promote competitive balance. The assertion proves only that "competitive balance" is a defense that sports leagues will put forth in virtually any antitrust action, regardless of the facts.

As in *NCAA*, the restraints here are "not even arguably tailored to serve" competitive balance. 468 U.S. at 119. The systems here lock clubs into territories of vastly differing values, which Defendants acknowledge. *See, e.g.*, DuPuy Dep. 55:20-56:3. The difference in local television revenue is dramatic. In 2012, the Columbus Blue Jackets earned less than ███████ from their RSN while the Detroit Red Wings earned over ███████. Ex. 17. MLB clubs' local

---

[53] The combination of exclusive territories and royalty-free licenses to visiting teams causes a transfer of wealth from smaller-market clubs to larger-market clubs. A small market club like the Minnesota Twins is essentially trading the rights to carry the games it plays in larger markets, like New York, for the right of the Yankees to carry back Twins games into New York. The Twins are giving the Yankees something far more valuable than what they are receiving. As one scholar put it, "If this were negotiated as a bilateral barter deal, the Twins' lawyer would be liable for malpractice." Stephen F. Ross, *Light, Less-Filling, It's Blue-Ribbon!*, 23 Cardozo L. Rev. 1675, 1680 (2002).

rights are even more disparate. The Miami Marlins' deal with its RSN (███████ per year on average), for example, is less than one-tenth of the amount of the Los Angeles Dodgers' deal with their RSN (█████████ per year). Ex. 16. There is no evidence that either League ever made any attempt to make the territories even roughly equal in value.

As Professor Noll highlights, the primary cause of competitive *imbalance* is the differing values of the clubs' allocated territories. Noll Decl. 117. The Leagues' territorial restraints exacerbate imbalance by taking away valuable rights possessed by the smaller-market teams to show their home games in large markets and giving that value to the larger-market teams. "[A] team in a smaller market, such as the Kansas City Royals, has more to gain from the right to televise games into New York State than the Yankees have to gain by televising games into the Royals' less populous home broadcast territory." *Id*.

The Leagues contend that the equal sharing of national and out-of-market revenue promotes competitive balance, which justifies their restraints. There are several problems with this contention. First, there is a genuine question as to the extent to which sharing revenue promotes competitive balance at all. Professor Noll concludes that it does not promote competitive balance, a conclusion shared broadly by economists. Noll Decl. 119. Defendants provide no contrary analysis. Much less do they show how this would overcome the territorial systems' clear promotion of imbalance.

Second, the relationship between competitive balance and increased output is a factual matter. Competitive balance is not an independent virtue that trumps the antitrust laws. Instead, it is a factor that may increase interest, and therefore demand, in a league's games, thereby leading to more output. "The hypothesis that legitimates the maintenance of competitive balance as a procompetitive justification under the Rule of Reason is that equal competition will maximize consumer demand for the product." *NCAA*, 468 U.S. at 120. Thus, even if the Leagues were able to show a positive effect on competitive balance, which they cannot, they would also have to

50

show that that balance promoted demand for their product to an extent that overcame the anticompetitive effects of their territorial restraints. Significant scholarly authority questions the magnitude of the effect of competitive balance on demand. *See, e.g.*, Salil K. Mehra & T. Joel Zuercher, *Striking out "Competitive Balance" in Sports, Antitrust, and Intellectual Property*, 21 Berkeley Tech. L.J. 1499 (2006); Stefan Szymanski, *Economic Design of Sporting Contests*, 41 J. Econ. Lit. 1137, 1156 (2003).

Finally, even if Defendants could show a positive effect on competitive balance that, in turn, had a positive overall effect on demand, the Court must still reject the restraints if they are not the least restrictive means of achieving that benefit. *See, e.g.*, *Mackey v. Nat'l Football League*, 543 F.2d 606, 622 (8th Cir. 1976) (holding that even if "a system of inter-team compensation for free agents moving to other teams is essential to the maintenance of competitive balance in the NFL," the challenged rule "is significantly more restrictive than necessary" and therefore violates the Sherman Act). Here, the challenged system is unnecessary to equalize revenue among the clubs. Both leagues have extensive revenue sharing programs. If the aim is to achieve a more equal allocation of revenue than the market would produce, it is not necessary to restrain output and charge monopoly prices to do so. Direct revenue sharing can achieve the same aim without any of these restraints and consequent harm to consumers. As Professor Noll states, "If the leagues wish to share revenue more equally, simply increasing the share of total revenue that is shared is a much simpler mechanism for achieving this goal that also is much less anticompetitive than dividing the nation into exclusive local broadcasting territories, especially when the economic value of these territories is highly variable and actually advantages the teams in the best [markets]." Noll Decl. 119-20. The Leagues recognize this. *See, e.g.*, Selig Dep. 51:25-52:11 (confirming his view that "with respect to the approach to media rights in general, we need to concentrate on creating revenue, and then deal with revenue sharing later.")

Defendants have made no showing as to the extent of the effect on competition of their alleged promotion of competitive balance—and, on that basis alone, the Court may disregard the Leagues' competitive balance assertions. The Leagues' argument would only support summary judgment if they could show that competitive balance necessarily outweighs the anticompetitive effects of the restraints, and outweighs them so greatly that the Court would be required to conclude that the system is beneficial to competition as a matter of law. On this record, the only conclusion the Court can reach is that the territorial system does not promote competitive balance and, in fact, promotes competitive *im*balance.

### D.   Market Allocation Is Not Required to Create Local and National Interest in NHL and MLB Programming

The Leagues propose that their systems are justified by two separate factors, which are at cross-purposes, and consequently insist that they must be permitted to pursue the appropriate "balance" between these two factors. At most, this is a plainly factual issue on which summary judgment is inappropriate.

On the one hand, protecting the local broadcasts from most competition is necessary, the Leagues contend, to ensure that clubs develop "tribal" fan bases that promote rivalries. NHL Mem. 14; MLB Mem. 15-16. To this extent, they acknowledge that one of their core purposes is to reduce the availability of games that would otherwise be available to fans in a particular area. On the other hand, the Leagues recognize that this can go too far, because they also want to create fans who are interested in games involving teams outside of their territories, through national broadcasts and the "out-of-market" packages. *Id*.

In effect, the Leagues are arguing that their attempts to address one of the problematic consequences of their restrictive territorial systems are, paradoxically, justifications for the systems as a whole. Showing only a single club's games in an area is, predictably, going to mean that fans are more likely to be interested in that club's games, which the Leagues view as a problem. *See, e.g.*, Ex. 35 ("Fans are only getting one-dimensional exposure (local market

52

broadcasts/coverage)"). The Leagues thus claim the need to promote (but also simultaneously constrain) national broadcasts to address the problem the exclusive territories create, and thereby achieve an appropriate "balance."

The Leagues do not explain why permitting fans to watch the games they want to watch without regard for geography would not achieve a proper balance. Teams have a natural advantage in their home areas, apart from any television exclusivity, because they are the only team whose games local fans can regularly attend, and they have identities tied to particular cities and regions. There is no reason to expect that the market would fail to produce an appropriate balance reflecting the actual distribution of consumer preferences. The Leagues do not suggest that any of the sports that lack geographical exclusivity, such as the NFL, Major League Soccer, or Division I College Football and Basketball are unable to achieve an efficient balance. Ultimately, the League Defendants' "justification" of the need for a proper local/national balance only confirms the inefficiencies caused by the territorial restraints.

Moreover, the Leagues' actions are inconsistent with their purported justifications. Both leagues have created their own television networks that show several games each week on a national basis. The majority of the games these networks carry are RSN-produced local telecasts. They are, in other words, the very telecasts that the local clubs need to be "protected" from. On almost every night of the week, in both leagues, there is at least one nationally-distributed game available in any given area, competing with local broadcasts. The number of such games is strictly controlled, and the Leagues and their television partners select which games are broadcast, rather than responding to consumer preference. This arrangement is indistinguishable from the broadcasting restraints the Supreme Court found unlawful in *NCAA*.[54] 468 U.S. at 107

---

[54] As the NCAA did, MLB promotes as a justification this ability to restrain output to prevent the games being shown that people want to see. *See* MLB SUF ¶ 44 ("MLB negotiates limits on the number of times any one network can telecast games played by any one club during a season so as to enhance exposure across all clubs.") The Court found that to be an especially significant harm. *NCAA*, 468 U.S. at 107 n.34 ("'Perhaps the most pernicious aspect is that under the

("A restraint that has the effect of reducing the importance of consumer preference in setting price and output is not consistent with this fundamental goal of antitrust law.").

MLB has long permitted superstation broadcasts by some of its clubs. Through their contracts with WGN America, the Chicago White Sox and Chicago Cubs continue to do what the Leagues insist the clubs must *not* be permitted to do: distribute their own games nationwide.[55] The evidence shows that these broadcasts have not caused any of the harm that the Leagues insist would result from clubs' broadcasts being distributed outside of the local territories. *See, e.g.*, Ex. 22 at MLB-14776 (MLB minutes reflecting the view that "the out-of-market package is for out-of-market fans and, like superstations, is not harmful."); Selig Dep. 94:17-95:3.

Similarly, Comcast, through agreements with the NHL, frequently distributes its RSNs' NHL games on its other, out-of-market RSNs. Thus, for example, Comcast itself may occasion the "invasion" of a number of Washington Capitals or Chicago Blackhawks game into Philadelphia. There is no evidence that this practice is harmful to the local team (which, in the case of the Philadelphia Flyers, Comcast owns) or reduces its ability to obtain coverage or build a fan base.

In any event, the Leagues' concerns about local and national balance are unfit for summary adjudication. One cannot determine that the "balance" the Leagues have attained is optimally procompetitive as a matter of law, especially where Defendants have proffered no economic analysis on the issue. Other sports leagues operate without territories with no difficulty, and the Leagues here have allowed exceptions with no evidence of attendant harm.

---

controls, the market is not responsive to viewer preference. … Many games for which there is a large viewer demand are kept from the viewers, and many games for which there is little if any demand are nonetheless televised.'") (quoting district court opinion, *Bd. of Regents of Univ. of Okla. v. Nat'l Collegiate Athl. Assoc.*, 546 F. Supp. 1276, 1319 (W.D. Okla. 1983)).

[55] While some Chicago Blackhawks games are also available in Chicago on WGN-TV, they are not available on WGN America.

## VII.   Removing Defendants' Market Allocations Would Increase Output Overall

Defendants contend that output would decrease overall if the Court invalidated the territorial restraints. In support of this contention, they rely on after-the-fact and unsupported declarations of their own witnesses while ignoring extensive record evidence, all of the expert testimony, and basic economics. In reality, their systems limit output with the purpose and effect of causing a huge shift in revenue from consumers to teams through admittedly "outrageous" prices for sports programming.

As an initial matter, the Defendants do not dispute that one of the primary purposes of the territorial restraints is to makes their programming more valuable, *i.e.*, more expensive. The programming is more valuable, of course, because the territorial restraints reduce output in the context of high demand. Defendants have thus put forth a theory under which increases in prices, caused by a reduction in output, create an incentive to invest in the protected product and are, therefore, justified under the antitrust laws. Such an argument, if it worked, could justify any illegal cartel, but finds no support in the law or logic. One could argue, for example, that we should eliminate competition in the telephone market in order to make a company like AT&T more interested in the market and invest more money in it. *See* 11 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1912h, 369-70 (3d ed. 2011). The argument that the benefits of reduced output are procompetitive in this fashion is not only incorrect as a matter of fact, it runs counter to the very purposes of the Sherman Act.[56] *Cf. NCAA*, 468 U.S. at 117 ("By seeking to insulate live ticket sales from the full

---

[56] Courts have universally rejected antitrust defenses based on the claimed need to increase prices or protect firms or products from competition. *See, e.g.*, *FTC v. Super. Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 423 (1990) (rejecting argument that agreement causing increased lawyer fees justified by improved quality of representation); *Prof'l Engineers*, 435 U.S. at 696 (rejecting claim that agreement that increased engineers' prices was necessary for quality and safety and holding that "the Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable."); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221 (1940) (noting Congress "has not permitted the age-old cry of ruinous competition and competitive evils to be a defense to price-fixing conspiracies.").

spectrum of competition because of its assumption that the product itself is insufficiently attractive to consumers, petitioner forwards a justification that is inconsistent with the basic policy of the Sherman Act.").

Defendants also do not address directly the economic model Professor Noll described in his report, which shows that removing the restraints would reduce the prices of each club's broadcasts and the price of the bundle of games. This uncontradicted model shows empirically what one would expect as a matter of common sense. If the clubs were permitted to offer their games in competition with one another, the prices of their games, and the prices of a bundle of all the games in a league, would be substantially lower than the packages currently offered by the Leagues. In fact, prices in a competitive market would be less than half the current prices. Noll Decl. 104.[57] The model also demonstrates that, in a competitive market, broadcasts by each club and the bundle would remain profitable (at the lower prices), thereby refuting Defendants' assertion that there would be no incentive to offer them. *Id*.

Rather than challenge the model directly, Defendants instead insist that a competitive market, which is what the model is based upon, is not a realistic possibility for two reasons. First, they claim that the clubs would not find partners to produce programming of all of their games and distribute those games nationwide. As described, *supra*, at 16-25 (The Economics of NHL and MLB Live-Game Programming), this is implausible given the minimal cost and growing

---

[57] The model employs a technique used to determine rational, stand-alone prices for cable television channels by assessing viewing patterns and prices paid for the bundle of channels. The method is described in a well-known paper in the *American Economic Review*, one of the leading academic economic journals. *See* Gregory S. Crawford & Ali Yurukoglu, *The Welfare Effects of Bundling in Multichannel Television Markets*, 102 Am. Econ. Rev. 643 (June 2012). Professor Yurukoglu is assisting Professor Noll in applying the model to the facts in this case.

The model assumes that the clubs would sell a season of games as a package. This is not to suggest that they would not distribute their rights in other ways, such as through broader distribution of the RSNs, but it focuses on one very likely method of distribution. Moreover, because the parties all agree that the various means of distributing the programming are all competing in the same relevant market, it indicates an effect on output and price regardless of how the games are offered.

demand for live hockey and baseball programming.[58]

Moreover, the only evidence that Defendants have to support their contention that output would decrease are unsupported statements of league officials and other interested parties. This kind of argument is familiar. League officials were every bit as certain, for example, without having conducted any economic studies or analysis, that free agency would destroy competitive balance and therefore the leagues. MLB quoted the president of one club in a Supreme Court Brief in *Flood v. Kuhn* for the proposition that "'in such a system the poorer or weaker franchises would not be able to compete for the better players and therefore baseball would be destroyed.'" Br. for Resp'ts at 8, *Flood v. Kuhn*, 407 U.S. 258 (1972) (No. 71-32), 1972 WL 125826 ("*Flood Br.*"). There is now consensus that free agency did not undermine competitive balance. Noll Decl. 116. League officials were equally certain that broadcasting games in local markets would hurt ticket sales. Now they universally reject that premise. *See, e.g.*, Selig Dep. 61:17-62:2; Bettman Dep. 156:19-21. And the NCAA was equally certain that its broadcast restrictions were procompetitive, promoted competitive balance, and were necessary for stability, but history has shown that removing those "necessary" restraints has been nothing but beneficial for consumers and has increased output of college football telecasts. Defendants offer no economic surveys or analysis to support their claims about the competitive effects of their restraints, because they have never conducted any. *See, e.g.*, DuPuy Dep. 151:6-9, 155:4-156:7; Bettman Dep. 237:7-18. The unsupported declarations of their own witnesses are not more adequate to support their factual positions as a matter of law now than they were in the past.

The other aspect of the economic model Defendants attack, albeit indirectly, is the assumption that a league-wide bundle would still be available if the territorial system were

---

[58] The costs are so low, in fact, that when games are not produced by an RSN, which is increasingly rare, MLBAM produces game programming solely for MLB.tv, to make the game available live to out-of-market fans only. If the universe of out-of-market fans who subscribe to a League package is sufficient to justify that cost, then it would obviously be far more justified if it was available in-market, where the highest concentration of fans resides.

abolished. As noted, bundled subscriptions are offered throughout the digital-media world, and nearly everything on services such as Netflix and Spotify is available on a standalone basis, or by other means. And because the content is available by other means, the bundled subscription prices are aggressively priced. *See supra* p. 32.

There is a sound economic reason for the proliferation of inexpensive, bundled subscriptions. As Commissioner Bettman points out in his declaration, "there is no incremental cost" in making additional teams' games available as part of a package. Bettman Decl. ¶ 14. While many consumers would naturally be attracted to a lower-cost package with only their favorite team's games, many would pay at least a little bit more to have access to other teams' games. Because that extra revenue could be captured with "no incremental cost," it would be rational to offer a bundled option at any premium over the single club's package. Every team could earn more money than it otherwise would, making it rational for every club to participate. Indeed, Robert Bowman, the CEO of MLBAM, has long predicted that someone would aggregate multiple sports' and other live-event programming, like Hulu does for television shows on the Internet. Mr. Bowman suggested that the different leagues would "still have their own offering, but they're [sic] will be one offering and there will be one-stop shopping for live."[59]

There is every reason to believe that the market will meet the demand for programming in an efficient and cost-effective manner by "respond[ing] to consumer preference." *NCAA*, 468 U.S. at 120. Defendants offer no basis for concluding otherwise.

## VIII.   The Television Defendants Are Members of the Conspiracy to Allocate Markets

In denying Defendants' motions to dismiss, the Court ruled that the facts alleged by Plaintiffs, if true, established participation by both the RSNs and the MVPDs in schemes to geographically divide the markets for professional hockey and baseball games. *Laumann*, 907 F.

---

[59] Jay Yarrow, *Bob Bowman Interview, Part Two*, Bus. Insider, Aug. 30, 2012, http://www.businessinsider.com/bob-bowman-interview-part-two-2012-8.

Supp. 2d at 486-87. Discovery has proven those facts true and more. Comcast and DirecTV voluntarily joined the Leagues' illegal market allocation schemes, then aggressively perpetuated them for their own benefit.

### A. The Terms of the RSNs' Participation Are Contingent on the Knowledge That Other Market Participants Are Bound by Identical Agreements

As the Court explained previously, "where parties to vertical agreements have knowledge that other market participants are bound by identical agreements, and their participation is contingent upon that knowledge, they may be considered participants in a horizontal agreement in restraint of trade." *Laumann*, 907 F. Supp. 2d at 486-87. This is well-settled law. Horizontal competitors violate the antitrust laws when they agree to a vertical partner's anticompetitive contract terms knowing "that the others were asked to participate" and "that cooperation was essential to successful operation of the plan." *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 226 (1939). It is "enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it." *Id.* at 226-27; *accord Apple*, 952 F. Supp. 2d at 707. A "horizontal agreement" exists if "the only condition on which each [competitor] would agree to [the vertical partner's] demands was if it could be sure its competitors were doing the same thing." *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 936 (7th Cir. 2000).

This is the situation here. Neither Comcast nor DirecTV disputes that its RSNs know that the restraints protect their territories from competition from other RSNs' games, save for a limited number of national broadcasts and the supra-competitively priced "out-of-market" packages. As MLB Commissioner Selig said, "The RSN knows what the ground rules are. There's only X amount of games that come in." Selig Dep. 112:3-4. NHL Commissioner Bettman put it even more bluntly: RSNs "would like more subs[cribers] but [they] don't want to have anybody having anymore of [theirs]." Bettman Dep. 145:11-13. Patrick Crumb, President of DirecTV Sports Networks, affirmatively declared that DirecTV is "aware that the Leagues

59

provide their member clubs with certain exclusivities in their HTT." Crumb Decl. ¶ 9. As the Court said, "It defies reason to suggest that the RSNs lack knowledge that all other RSNs have analogous agreement with the respective individual club." *Laumann*, 907 F. Supp. 2d at 487.

This point is beyond dispute, and Comcast and DirecTV contend only that this knowledge is irrelevant to their decisions to participate in the market allocation scheme. The facts, however, do not support this claim. As Red Sox owner John Henry—both a member of the MLB Executive Council, which has the power to set territories, and an owner of NESN, the Red Sox' and Bruins' RSN—put it, "Not to have to compete with other clubs or with baseball itself in your home territory … is worth a lot to broadcasters and, therefore, to clubs." Henry Dep. 63:23-64:1. Indeed, Mr. Henry could not think of any other purpose to the home territory rule than "creat[ing] exclusivity which is very valuable to broadcasters." *Id.* at 64:9-10, 17. Commissioner Selig made it clear that the RSNs play a role in determining what competition is and is not acceptable, and that MLB "ha[s] to respect that." Selig Dep. 112:3-9. Former NHL Director of Team Television similarly stated that RSNs' "exclusivity in the marketplace" against "another club's games" is "the benefit of their bargaining." Tortora Dep. 253:7-9. MLB's senior vice president of broadcasting testified, "I have heard executives representing RSNs confirm for me that the varying degrees of exclusivity impact the value proposition." Tully Dep. 114:25-115:4.

RSNs not only "pay for the exclusivity within the territory," DuPuy Dep. 74:23-24, they include contractual provisions in their rights agreements that ensure that the Leagues do not allow competition from other clubs' RSNs. These provisions, known as "changed circumstances" or "haircut" provisions, ensure that broadcasters "would not have to pay as much" if "they weren't getting the same exclusivity." DuPuy Dep. 75:24-76:3. Such provisions place significant financial pressure on the Leagues to preserve the territorial restraints, because altering

exclusivity would "result in significant rights reductions." Ex. 10 at MLB0393441.[60]

While Comcast and DirecTV claim that they merely take the terms MLB gives them, this claim is contradicted by MLB's former President Robert DuPuy, who testified that RSNs "insist upon" these changed-circumstances provisions. DuPuy Dep. 76:5. Indeed, MLB recognizes that it has a choice in dealing with RSNs between conditioning or limiting exclusivity on the one hand, or "[c]harg[ing] a premium for complete exclusivity" on the other. Ex. 23 at MLB0506043. Faced with the choice of less-exclusive contracts at lower fees, or fully exclusive contracts at higher fees, RSNs have chosen to retain—and pay for—exclusivity. In short, the RSNs do not passively accept what the Leagues offer; they ask for and pay for the exclusivity that benefits them. Simply put, an agreement by which a buyer pays higher fees to a seller who agrees to restrain output is the epitome of a contract in restraint of trade.

Indeed, the RSNs have fought hard against changes to the territorial restraints, using the changed-circumstances provisions as a weapon. In the 2008-2009 baseball offseason, faced with the fact that many fans were unable to see their "local" teams' games, MLB considered several options to address these "underserved fans"—including "a full redrawing of the territorial lines." Ex. 10 at MLB0393441; *see also* Tully Dep. 51:14-19 (noting that a "change to the home television territory" might have addressed the issue); DuPuy Dep. 69:8-10 ("I see no reason why there ought to be so many clubs able to black out in those territories."). MLB settled on requiring Clubs to release territory to the "out-of-market" packages, a plan that had unanimous support among MLB and the clubs. DuPuy Dep. 70:6-12, 72:20-73:13. But as Mr. DuPuy explained, "The club owners were not the only constituent here." DuPuy Dep. 72:6-7; *see also id.* at 84:6-9 ("[T]he clubs supported this. But the question is, could we get the RSNs, and could we get the MSOs [Multiple-System Operators, another term for MVPDs], you know, to agree to

---

[60] The change-of-circumstances provisions directly support the proposition that prices would decrease if the territorial restraints were removed.

this modification?"). Comcast and Fox vigorously opposed it, with Comcast threatening to use "all of their respective rights and remedies with respect to any change in MLB's current rules and practices that negatively impacts the clubs' respective home television territories and the breadth of the exclusive rights heretofore granted to the corresponding Comcast RSNs." Ex. 24 at 2. As Mr. DuPuy put it, MLB "attempted to obtain a solution to this issue, and [RSNs] weren't enamored with the idea." DuPuy Dep. 105:13-15. After receiving these objections, MLB kept its policies unchanged. Tully Dep. 99:10-100:2.

Comcast and DirecTV also directly negotiate with one another about the borders of their territories. For example, Comcast proposed to DirecTV that DirecTV's Pittsburgh RSN and the Pittsburgh Penguins "lift[] the blackout of Philadelphia Flyers games" within Penguins territory, in exchange for increased distribution of DirecTV's Pittsburgh RSN in on Comcast systems in Pennsylvania. Ex. 13. DirecTV declined this offer, citing the importance of its exclusivity. *Id.*

As noted, the Leagues have long negotiated with multiple RSNs over the boundaries of territories, which is not surprising, given their direct interest in the restraints. In Connecticut, for example, in the 1990s, the NHL brokered a deal by which MSG, the Rangers' RSN, and NESN, the Boston Bruins RSN split up the state. The RSN for the New York Islanders and New Jersey Devils at that time, SportsChannel New York, opted not to participate.[61] The Rangers' territory currently extends further into Connecticut than the other New York clubs because of this deal worked out among the three RSNs nearly twenty years ago. Ex. 14 at 1.

The evidence is thus clear that the terms of the RSNs' participation in the market allocation scheme is contingent upon their knowledge that they will receive territorial protection against other Clubs' and RSNs' broadcasts. No RSN would agree to give up the ability to distribute its product outside of its limited territory without assurances that others would stay out

---

[61] SportsChannel New York is now owned by Defendant MSG and operated as MSG+. It opted not to enter Connecticut because of SportsChannel New England's presence in Connecticut, which is now owned by Comcast and operated as Comcast SportsNet New England.

of its territory, and certainly not at the prices they are paying for rights. RSNs pay tens, even hundreds, of millions of dollars for that guarantee of exclusivity. These facts fall squarely into the line of cases where a vertical contracting partner coordinates a conspiracy among horizontal competitors. Each RSN knew "that the others were asked to participate" in the territorial division, and "each knew that cooperation was essential to successful operation of the plan." *Interstate Circuit*, 306 U.S. at 226. The territorial division is impossible without "concerted action" in which telecasters "g[i]ve their adherence to the scheme and participate[] in it." *Id.* at 226-27. Moreover, as the Seventh Circuit concluded in *Toys "R" Us*, "the only condition on which each [RSN] would agree to [the Leagues'] demands was if it could be sure its competitors were doing the same thing." 221 F.3d 928, 936 (7th Cir. 2000). "That is a horizontal agreement." *Id.*

The cases Comcast and DirecTV rely on to distance themselves from the *Interstate Circuit* line are inapposite. Comcast emphasizes *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101 (2d Cir. 2002), in which the court rejected Pepsi's claim that Coca-Cola's decision to begin enforcing loyalty policies in its distributorship agreements with independent food service distributors ("IFDs")—which prohibited the handling of Pepsi products—amounted to an attempt to monopolize by Coke and an unlawful group boycott by the distributors. The Court rejected the monopolization claim after finding that distributing through IFDs was not cheaper than other delivery methods, which meant that Coca-Cola's loyalty clauses did not enable it to charge supra-competitive prices. *Id.* at 108. The Court also rejected Pepsi's claim that Coca-Cola had organized a group boycott by the IFDs because the sole evidence of a horizontal agreement among the distributors was that Coke had allegedly assured them that it would enforce its loyalty clauses uniformly. *Id.* at 110. There was no evidence that the distributors benefited from or relied on that knowledge in any way; indeed, it appears they had each entered into the contracts "for many years" before Coke ever expressed its intent to enforce the clauses. *PepsiCo, Inc. v. Coca-*

*Cola Co.*, 114 F. Supp. 2d 243, 246 (S.D.N.Y. 2000). Here, by contrast, the evidence shows that the RSNs rely heavily on the exclusivity provisions and protect them jealously. While the loyalty provision only benefited Coca-Cola, here Comcast and DirecTV are directly benefited by their participation in the conspiracy and actively seek the protection of the restrictive practices.

It would be a separate matter entirely if the IFDs requested that Coca-Cola and Pepsi agree to divide their markets geographically, with each IFD knowing that other IFDs would not offer Coca-Cola or Pepsi products in their protected territory, and with each IFD paying a premium for the products based on this assurance of exclusivity. *See Visa U.S.A.*, 344 F.3d at 242 (rejecting similar Coca-Cola/Pepsi distribution analogy).

Most of Comcast's and DirecTV's other cases similarly involved downstream parties who merely "agreed to purchase a product or provide a service under conditions set by the other party." *Toscano v. Prof'l Golfers Ass'n*, 258 F.3d 978, 984 (9th Cir. 2001). Here, however, the RSNs have done far more than enter an agreement that contains a potentially anticompetitive term; they affirmatively value that term, pay more to obtain it, and push to maintain it. They pay more for the exclusive territories because they recognize that all other RSNs will do the same. In this sense, they do not act independently of the Leagues or one another, as the IFDs in *PepsiCo* and local sponsors in *Toscano* did.

*PepsiCo* and *Toscano* both involve limitations that are "detrimental to [the downstream defendants'] interests." *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 139 (1968), *overruled on other grounds by Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984). Here, by contrast, Comcast and DirecTV are direct, substantial beneficiaries of eliminating competition from their horizontal competitors in their local markets. "[E]xclusivity in the marketplace" is the very "benefit of their bargaining." Tortora Dep. 253:7-8. The case against Comcast and DirecTV is thus far more compelling than the case against the distributors in *PepsiCo* or the sponsors in *Toscano*. Indeed, no reasonable jury could conclude that they did

anything other than welcome, support, and further the territorial divisions, which are directed at inflating the value of the products they produce and distribute.[62]

Comcast and DirecTV make various other arguments, none of which suffice (individually or jointly) to establish summary judgment. They argue that: (1) they were not involved in creating the territorial system, and joined at different times; (2) RSNs compete to acquire telecast rights and compete in areas where multiple RSNs exist; (3) the conspiracy causes RSNs to pay larger rights fees than they would otherwise have to; (4) the contracts do not explicitly include a right to exclude other RSNs' broadcasts of other Clubs' games; (5) they have purportedly never tried to enforce the territorial system; and (6) there are allegedly no traditional plus factors.

First, there is no requirement that a conspirator join the conspiracy at its inception. *United States v. Cont'l Grp., Inc.*, 603 F.2d 444, 452, 453 (3d Cir. 1979). Moreover, while Comcast and DirecTV may not have been present at the creation of the territorial schemes, they were there for their expansion from network broadcasts to packaged distribution and then the Internet, and (as detailed below) played a significant role in the creation and design of those distribution channels—including their territorial restrictions.[63] And DirecTV was one of the prime movers in the creation of the "out-of-market" packages. It is no coincidence that both leagues' out-of-market packages began soon after DirecTV launched.[64]

---

[62] DirecTV also cites *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025 (2d Cir. 1979), but misstates its holding. DirecTV Mem. 10-11. The Second Circuit held that the main defendant's alleged coconspirators "were an instrumentality of the [defendant] and consequently were not independent entities with whom [defendant] could conspire." *Id.* at 1030-31. There is no indication in the appellate or district court opinion that the plaintiffs even alleged a horizontal conspiracy. Indeed, plaintiffs' theory was that the downstream brokers "were coerced into acquiescing," *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 447 F. Supp. 867, 875 (S.D.N.Y. 1978), not that they explicitly or implicitly conspired with each other.

[63] As noted, *supra* p. 11, NBC was one of the parties that initially demanded that baseball impose territorial restraints on club broadcasts. NBC is now owned by Comcast.

[64] *See* Ex. 25 at NHL1402523 (early proposal to NHL noting "DIRECTV's commitment to sports programming will differentiate it from other programming delivery services. … DIRECTV is having continuing discussions with all major professional leagues to distribute to a subscriber out-of-market games.").

Nor is it material that rights agreements "come up for renewal on a staggered basis." DirecTV Mem. 5. "It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators." *United States v. Masonite Corp.*, 316 U.S. 265, 275 (1942) (quoting *Interstate Circuit*, 306 U.S. at 226). Even if it were "not clear at what precise point of time each [defendant] became aware of the fact that its contract was not an isolated transaction but part of a larger arrangement … it is clear that as the arrangement continued each became familiar with its purpose and scope." *Id.*

Second, it is immaterial that "DIRECTV, Comcast, and other entities, as well as independent RSNs, compete to win the right to telecast clubs' games." Comcast Mem. 9. The same was true in the E-Books conspiracy, where the publisher defendants "were serious competitors" but only in "their preferred fields of competition … over authors and agents." *Apple*, 952 F. Supp. 2d at 651. There, as here, the horizontal competitors competed for inputs while simultaneously reducing consumer-facing competition. Both the publishers and the RSNs want to compete for distribution rights without having to compete for customers. Far from being "wholly inconsistent with any common plan or scheme," DirecTV Mem. 14, this illustrates that horizontal competitors have agreed to reduce the competition they would otherwise face. Similarly, the fact that "RSNs also compete actively for viewers in the many locations in the country that have access to multiple RSNs that produce broadcasts of different MLB and NHL games," Comcast Mem. 9, merely shows that RSNs bow to the reality or settled practice in some locations.

Third, the Television Defendants claim that it is implausible for them to have "conspired to *pay more* than they would otherwise pay." Comcast Mem. 1. Quite to the contrary, the increased rights fees simply show how valuable the schemes are to all Defendants. The market allocation eliminates competition for consumers of major league baseball and hockey programming, allowing MVPDs to charge higher subscriber fees. MVPDs, RSNs, and the clubs

then negotiate over how those local monopoly rents will be divided: how much will be retained by MVPDs, how much will be paid to RSNs in carriage fees, and how much will be paid to clubs in rights fees. This is no more implausible than, for example, horizontal competitors conspiring to exclude a monopolist's competitor so that they could "share in the profits resulting from this monopoly." *Wallach v. Eaton Corp.*, 814 F. Supp. 2d 428, 433 (D. Del. 2011).[65] The NCAA unsuccessfully made a similar argument to the Supreme Court. *NCAA* Br. 80.

Fourth, DirecTV notes that its RSNs' contracts with clubs do not formally provide the "right to exclude any RSN from telecasting games in the HTT that do not involve the home territory club." DirecTV Mem. 5. This argument ignores reality. A system in which each team is restricted to its own territory is functionally identical to a system in which each team has the power to exclude all other teams (or most other teams, in the case of overlapping territories). And the agreements contain change-of-circumstances clauses that everyone understands would be enforced if there were such an encroachment. *See, e.g.*, DuPuy Dep. 76:5.

Fifth, DirecTV claims that its RSNs have "not sought to enforce the Leagues' territorial restrictions against other RSNs." DirecTV Mem. 11.[66] As an initial matter, while such evidence is certainly relevant to the case against DirecTV, *see, e.g., Bowen v. N.Y. News, Inc.*, 522 F.2d 1242, 1254 (2d Cir. 1974), it is by no means necessary. DirecTV's claim is, in any event, contradicted by the record. For example, DirecTV declined to agree to allow Comcast to distribute Flyers games in central Pennsylvania, citing the value of exclusivity. Ex. 13. The fact

---

[65] *See also, e.g., Apple*, 952 F. Supp. 2d at 665 (finding a conspiracy even though "the revenue each Publisher Defendant would receive per e-book sold through the Apple store was substantially less than what it was currently receiving"). *See also Socony-Vacuum*, 310 U.S. at 167 (conspiracy involving major oil companies, independent refiners and others in complex, multilevel conspiracy to fix retail gasoline prices).

[66] Comcast cannot make this claim because, as discussed above, it threatened to use "all of their respective rights and remedies with respect to any change in MLB's current rules and practices that negatively impacts the clubs' respective home television territories and the breadth of the exclusive rights heretofore granted to the corresponding Comcast RSNs." Ex. 24 at 2.

that this happens only infrequently merely show that RSNs rarely cheat on the conspiracy, making explicit enforcement unnecessary.

Finally, Comcast and DirecTV claim that Plaintiffs merely allege conscious parallelism without plus factors. Comcast Mem. 6-7; DirecTV Mem. 13. As an initial matter, their conduct is anything but mere parallel conduct by independent actors. They are not taking similar steps (such as raising prices) in parallel, but rather entering interdependent contracts through unified systems that specifically assign competitors different territories. And even if this case were to be analyzed as a conscious parallelism case, there are ample "plus factors." In addition to the direct evidence of their motives and roles in the schemes, it would be irrational for an RSN to accept a limited territory if other RSNs were not similarly limited. No RSN would accept a contract limiting its telecasts to, say, Philadelphia if the other twenty-nine RSNs carrying league games could broadcast nationwide, including Philadelphia. The territorial limits only make economic sense if all RSNs understand that other RSNs are playing by the same rules. Noll Decl. 18-19. An RSN's acceptance of a limited territory would "contravene each defendant's self-interest 'in the absence of similar behavior by rivals.'" *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 327 (2d Cir. 2010); *see also, e.g.*, *Apple*, 952 F. Supp. 2d at 692 ("[U]nless the Publisher Defendants joined forces … their expected loss of revenue would not be offset by the achievement of their ultimate goal.").

### B.   The MVPDs Actively Participate in, Benefit from, and Support the Leagues' Market Allocation Scheme

The MVPDs participate in the conspiracy in at least five ways: (1) they implement the market allocation; (2) directly and actively control their affiliated RSNs in the conduct described above; (3) coordinate with each other on the terms and pricing of the out-of-market packages; (4) entrench the territorial restrictions in the Leagues' packages; and (5) determine the conditions of Internet streaming. In exchange, they reap increased consumer prices from the sheltered local territories, and forestall competition from Internet sources.

68

First, the MVPDs "are essential to the horizontal market divisions." *Laumann*, 907 F.

Supp. 2d at 488. There is no dispute that they implement the system by blacking out games that

consumers would otherwise watch outside of the approved territories. "The market division is

not complete until Comcast and DirecTV prevent viewers from watching telecasts." *Id.* at 488

n.128.

Second, the MVPDs collaborate with and control their affiliated RSNs. As discussed

above, Comcast Cable offered to carry DirecTV's Pittsburgh RSN in certain areas in exchange

for DirecTV permitting Comcast's Philadelphia RSN to expand Flyers-game distribution in

Pennsylvania (and, indeed, changing the territorial boundaries to allow it). Ex. 13. This

reciprocal arrangement only makes sense if the interests and decision-making of the two

vertically integrated content and delivery systems are united. Indeed, Comcast Cable (the

Comcast MVPD) has a long history of using its control over its RSNs for its own benefit. Most

notably, Comcast has refused to offer its Philadelphia RSN to satellite providers in order to give

its MVPD a competitive advantage, a strategy that no independent RSN acting in its own

interests would take. Because of such conduct, the FCC ordered both Comcast and DirecTV not

to use their RSNs to benefit their respective MVPDs. *See Comcast Corp.*, 26 F.C.C.R. 4238,

4258, 4295 (2011); *News Corp. & the DirecTV Grp., Inc.*, 23 F.C.C.R. 3265, 3268 (2008). The

FCC's orders would not be necessary if the RSNs were acting independently and the

corresponding MVPDs were simply purchasing and reselling their products. Nor would the

prices of RSNs controlled by MVPDs be consistently higher than other RSNs, a fact that makes

the RSN itself less competitive but helps the larger corporate entity. *See Comcast*, 26 F.C.C.R. at

4255.

Third, Comcast and DirecTV have conspired with each other and with the Leagues over

the creation and pricing of league-wide packages to inflate prices and ward off competitors. In

2007, as MLB was facing congressional scrutiny over its Extra Innings distribution,[67] top executives at MLB and DirecTV met to discuss the terms on which DirecTV would be comfortable with the In Demand cable consortium[68] and other competitors carrying Extra Innings. MLB and DirecTV agreed that the deals should have a "Bona-fide r[igh]ts fee + sub[scriber] formula to protect ag[ainst] price wars," discussing cable having the "same lang[uage] as DTV" and the number of subscribers cable had "committed." Ex. 26 (handwritten notes of MLB Senior Director of Broadcasting Susanne Hilgefort). DirecTV explained that it "would rather not give Telcos[69] the product +/or to charge them extra," and "want[ed] protection that MLB won't give it away to DISH," DirecTV's main satellite competitor. *Id.* DirecTV planned "to get creative w/ solution" to these issues. *Id.* DirecTV even informed MLB that its then-CEO, Chase Carey, wanted "approval r[igh]t[s] over any deal" with a telco. *Id.*

     The MVPDs' collaboration over the pricing and distribution of Extra Innings has continued ever since. Before DirecTV and the In Demand cable consortium (whose majority owner is Comcast) publicly announce their consumer pricing and package offers each season, MLB's Broadcasting Department shares the MVPDs' forthcoming pricing plans between the erstwhile competitors so that they can "work to be on similar lines."[70] Ex. 28. MLB shares this information "to maintain the value and the integrity of that sort of product offering and for some

---

[67] *See Exclusive Sports Programming: Examining Competition and Consumer Choice: Hearing before the Senate Comm. on Commerce, Sci., and Transp.*, 110th Cong. (2007).

[68] Comcast CEO Brian Roberts was the ultimate decision-maker for determining In Demand's carriage of Extra Innings. *See, e.g.,* Ex. 27.

[69] "Telcos" refers to traditional telephone-company MVPDs, such as AT&T and Verizon.

[70] As MLB's Hilgefort explained to a colleague:

    I always tried to share each other's pricing and dates in an attempt to be 'fair and equitable' amongst the partners and at least keep them informed, if not on same page. They frequently will work to be on similar lines, just need the info to do so. Did you get the pricing DirecTV wanted to go with already? That would be what I'd share, verbally, w/Ed [Reinhardt of In Demand] so he can adjust and/or decide not to. Once [In Demand] sets their pricing, I share it back w/ DirecTV so there are no surprises and no one yells about anything.

Ex. 28.

level playing field." Hilgefort Dep. 197:4-6.

It is thus undisputed that the MVPDs designed mutually agreeable contract terms and now share advance pricing information. When it comes to out-of-market packages, then, the MVPDs have abandoned their normal competitive stances, as reflected in the nearly uniform, elevated prices they both charge for the NHL and MLB packages.

Fourth, the MVPDs have played an integral role in entrenching the market allocation scheme. Both DirecTV and Comcast have long required, in their agreements to carry MLB Extra Innings, that ███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████. The NHL is limited by a similar provision in Comcast's agreement with the NHL for national coverage. NHL Mem. 19. These provisions—included for the protection of the Television Defendants—guarantee that the market allocation schemes will remain frozen in their current forms, because of terms insisted upon by Comcast and DirecTV.

In footnotes, DirecTV and Comcast try to excuse these provisions, claiming that they merely "warrant[] the continued existence of the product over the term of the agreement," DirecTV Mem. 19 n.14, or "preserv[e] the 'national' nature of the rights packages," Comcast Mem 12 n.11. But these provisions do not protect the scope of their offerings—they prevent enlargement of the scope of potentially competing options. It would be one thing to guarantee that the territory in which they provide programming is not diminished; it is another thing to prevent others from expanding their territorial reach. The provisions do not warrant the continued *existence* of national broadcasts and packages, but their continued *value*.[71] And they

---

[71] Comcast and DirecTV also point out that similar provisions exist in non-defendant contracts for national broadcasts and out-of-market packages. But of course, "it is no defense to participation in an illegal price fixing conspiracy to suggest that others did it too." *Apple*, 952 F. Supp. 2d at 699. Additionally, Comcast and DirecTV brought the provisions into the contracts, vastly increasing the League's disincentive to modify territories in any way. And despite

do so by preventing the Leagues from changing the territorial system in which the Television Defendants claim to have no say.

Fifth, the MVPDs have played a significant role in determining the conditions for in-market streaming of local Clubs' games—a role that cannot be understood in the absence of the territorial system. While MVPDs play no role in the distribution of in-market streaming of local clubs' games and do not have exclusive rights to the programming, where the Leagues have authorized in-market streaming, MVPDs have ensured that they receive a cut of the proceeds. The MVPDs are "compensated" here *only* because they are members of the overall scheme, and are treated as partners.

This "compensation" is in addition to the requirement that consumers have a subscription to an MVPD service in order to access in-market streaming. The RSNs themselves are giving up the ability to sell their programming directly to consumers in order to maintain the system in which a subscription to an MVPD is necessary. As MLB Advanced Media CEO Bob Bowman explained, "all three entities"—the Club, the RSN, and the MVPD—"will need to approve these deals." Ex. 29 at 2 ("Overview of In-Market Live Streaming"). Thus, the MVPDs are protected from Internet competition even though they do *not* have exclusive rights to the programming and even though they are "compensated" despite adding no value. This protection deprives consumers unwilling to pay for an MVPD subscription of the opportunity to view the games through in-market streaming, and deprives clubs of a large and potentially growing source of revenue. It makes economic sense only in the context of the inflated fees MVPDs pay RSNs and RSNs pay clubs.

This last role reflects the MVPDs' and Leagues' shared desire to protect the MVPDs from "cord-cutting" whereby consumers stop buying cable packages in exchange for an Internet-based

---

DirecTV's protestations that it was not present at the creation of the territorial scheme, it *was* involved in the creation of Extra Innings and Center Ice and thus the establishment of the market allocation in the packages.

programming. The Leagues' interest in preserving the current business model means, of course, protecting the MVPDs' business model in particular. *See id.* at 1 (Robert Bowman explaining that system "protects the RSN and the cable operators from any substitution and therefore ensures the continuation of the existing economic paradigm."). The clubs and RSNs could distribute their programming in any fashion, but they resist Internet-based developments that are not tied to MVPD subscription and thus threaten to disrupt MVPDs' place in the content distribution world, because the MVPDs pay handsomely for this protection. MVPDs have made this concern plain to the Leagues; for example, when MLB made MLB.tv available through Roku (a device that allows select Internet viewing on television), DirecTV's then-executive vice president of content strategy and development contacted MLB "pretty worked-up about this." Ex. 30.[72]

While RSNs and MVPDs would have every incentive to continue to offer NHL and MLB programming if the Court invalidated the restrictive territories, it is clear that they want—and actively protect—the restraints in order to share in the monopoly profits that the territories generate.

## IX.    Plaintiffs Have Standing

Plaintiffs have standing to assert their claims because they are "the first … victims of alleged anticompetitive agreements." *Laumann*, 907 F. Supp. 2d at 481. As the "first non-conspirator in the distribution chain," Plaintiffs here have "the right to collect 100% of the damages." *Id.* (quoting *Paper Sys. Inc. v. Nippon Paper Indus., Co.*, 281 F.3d 629, 631-32 (7th

---

[72] MLB has also recognized that distributors' insistence on tying online content to cable subscription may be anticompetitive. Ex. 31 at 5 ("new competitors claim anti-competitive"; "tied to cable subscription and each distributor agreeing not to offer to other guy's subs"); *see generally* Marvin Ammori, *TV Competition Nowhere: How the Cable Industry Is Colluding to Kill Online TV*, Free Press, Jan. 2010, at 21-30, *available at* http://www.freepress.net/sites/ default/files/fp-legacy/TV-Nowhere.pdf (explaining why MVPD strategy to deal with online competition appears to be collusive and anti-competitive).

Cir. 2002)).

Defendants' principal argument for why Plaintiffs do not have standing is that the Television Defendants are not conspirators, and therefore Plaintiffs who purchased television packages are indirect purchasers under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). These arguments are based on the premise that Comcast and DirecTV did not participate in the territorial-division conspiracy, and thus fail because, as detailed above, they did in fact conspire.

Notwithstanding this Court's prior ruling that Plaintiffs have standing under *Illinois Brick* so long as they purchased from coconspirators, Comcast and DirecTV repeat their prior argument that the conspirators who sold to Plaintiffs must be "'substantially equal' participants in the alleged conspiracy." Comcast Mem. 21 (quoting *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 383 (3d Cir. 2005)); *see also* DirecTV Mem. 21. They made this argument in support of their motions to dismiss.[73] This Court, noting that the circuit courts had not taken a "uniform view of its scope," declined to adopt that requirement, and instead recognized that "the first purchaser who is not party to the unlawful agreements" has standing, adopting the standard recognized by the Seventh Circuit in *Paper Systems*. *Laumann*, 907 F. Supp. 2d at 482. Defendants cite no basis for concluding Second Circuit law has changed since this Court's opinion in *Laumann*; nor do they cite any other basis for reconsidering that decision.

DirecTV's claim that the "underpinning" of *Paper Systems* was "that suit was brought against a middleman who had 'truly complete' involvement" is baseless. DirecTV Mem. 22. *Paper Systems* required only that Plaintiffs be "the first purchasers from *outside* the conspiracy." 281 F.3d at 631 (emphasis in original). As *Paper Systems* explained—and this Court echoed, 907 F. Supp. 2d at 483—it is wrong to think of this as an "exception" to *Illinois Brick*. 281 F.3d at 631.[74] Rather, it is "a recognition that *Illinois Brick* 'bans Clayton Act lawsuits by persons who

---

[73] *See* Mem. Supp. Defs.' Mot. to Dismiss, *Laumann* Dkt. 75, *Garber* Dkt. 66, 32 n.19.

[74] The "truly complete" involvement concept was articulated in a different context in *Perma Life*, where the Court described (but did not adopt) a defense that bars a plaintiff from suing other

74

are not direct purchasers *from the defendant antitrust violator[s]*.'" *Laumann*, 907 F. Supp. 2d at 482 (quoting *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 158-60 (3d Cir.2002)). Discovery has confirmed that it is unrealistic to suggest that the solution in this case is for consumers to rely on Comcast and DirecTV to sue MLB and the NHL for a conspiracy that enriches Comcast and DirecTV and that simultaneously provides them a shield against competition from Internet programming. *See Laumann*, 907 F. Supp. 2d at 482-83 ("Even if the RSN and MVPD defendants could hypothetically 'change sides and align themselves as plaintiffs,' they have shown no inclination to do so, and plaintiffs allege that doing so would run counter to their interests in maintaining the challenged agreements.").

Moreover, the Television Defendants are not "middlemen."[75] Comcast's and DirecTV's RSNs themselves produce the relevant, restrained products: "live video presentations of major league professional hockey [or baseball] games." *Laumann* Compl. ¶ 56; *Garber* Compl. ¶ 62; *see also Laumann*, 907 F. Supp. 2d at 481 n.82. No facts have been adduced that challenge Plaintiffs' allegation that "RSNs do not merely 'pass through' the relevant product unchanged from the Leagues to the consumers: rather, RSNs purchase *rights* from the clubs, and produce video presentations of the games—the product in question—subject to anticompetitive agreements not to sell programming for a given hockey or baseball club outside the defined

---

conspirators if that plaintiff's involvement in the conspiracy is "truly complete." 392 U.S. at 140. DirecTV cites *United States Football League v. National Football League*, 842 F.2d 1335, 1369 (2d Cir. 1988), apparently hoping to create the impression that the Second Circuit limits a vertical conspirator's liability to situations where it was "present at the creation" of the unlawful scheme. DirecTV Mem. 21. But *USFL* did not cite or construe *Illinois Brick*. It was speaking only of the *Perma Life* defense, and even then was merely describing a situation in which the defense might be available, rather than setting up a requirement. *See id.* The Second Circuit has never imported this concept, or adopted anything similar, in this context.

This Court previously ruled that it does not matter for these purposes whether or not the Television Defendants could sue the other conspirators. *Laumann*, 907 F. Supp. 2d at 482-83.
[75] Because the MVPDs also compete horizontally with the Leagues in selling out-of-market packages, they also fall outside of the *Illinois Brick* rule for that reason. *See Laumann*, 907 F. Supp. 2d at 482 n.95. *See, e.g.*, Ex. 33 (Bob Dupuy describing possibility of "eliminate[ing] cable as a competitor" with MLB.tv).

territory surrounding that club." *Laumann*, 907 F. Supp. 2d at 486. The direct purpose of the schemes is to limit the market output of the products the RSNs produce in order to increase the price that can be charged for their products. None of the Defendants challenge the market definitions, and, therefore, there is no question that the restrained product is created by the Defendant RSNs, restrained by the MVPDs, and sold to Plaintiffs.[76] Nor is there any dispute that Comcast and DirecTV control their RSNs, as detailed above.[77] Thus, although not necessary to establish standing, the record amply supports a finding that the Television Defendants are "substantially equal" members whose participation is "truly complete."

Defendants' other arguments against standing are readily rejected. Comcast argues that the stay of Plaintiffs Silver and Birbiglia's claims against DirecTV pending arbitration eliminates their standing against any defendant. Comcast Mem. 21-22. But there is no "risk of duplicative liability" or "difficult[y] in apportioning recovery" because any amounts paid by one defendant in a settlement or judgment may be deducted from a judgment against another defendant. *See Hydrolevel Corp. v. Am. Soc'y of Mech. Eng'rs*, 635 F.2d 118, 130 (2d Cir. 1980). All that Comcast's cited cases require is that the direct sellers to plaintiffs be named as codefendants, which is the case here. Comcast cites no cases, and Plaintiffs are aware of none, where an arbitration clause was found to destroy standing against other coconspirators with whom the plaintiff had no contractual relationship.[78]

---

[76] DirecTV argues in a footnote that "NHL and MLB teams create the relevant products— baseball and hockey games." DirecTV Mem. 17 n.10. This is incorrect. The "relevant products" are not the games themselves, but the live video presentations of the games, and neither DirecTV nor any other defendant has challenged the relevant product markets put forth by Plaintiffs.

[77] Plaintiffs also have standing under the "control exception" to *Illinois Brick*, an issue raised by Plaintiffs that this Court did not reach in its prior opinion. *Laumann*, 907 F. Supp. 2d at 482 n.94.

[78] Moreover, the rationale for requiring the direct seller to be named is that a finding that the direct seller conspired would otherwise have no collateral estoppel effect against that conspirator in a subsequent suit against its confederates. *See Link v. Mercedes-Benz of N. Am., Inc.*, 788 F.2d 918, 932 (3d Cir. 1986). Here, of course, a judgment would have collateral estoppel against DirecTV, as it is a defendant to other plaintiffs' claims.

Comcast and DirecTV also argue that certain plaintiffs lack standing to pursue injunctive relief because they supposedly stated in their depositions that they do not intend to purchase out-of-market packages in the future. This misstates the deposition testimony. It is not disputed that each plaintiff is a serious fan and very well might purchase a package if it were offered at a competitive price without unlawful blackouts.[79] But even if that were not the case, they have standing to seek injunctive relief because they continue to be overcharged for programming and continue to be denied market choices. Moreover, even if it were true that some plaintiffs lacked standing to seek injunctive relief against some or all defendants for themselves, the question of whether a plaintiff who purchased MLB.tv or GameCenter Live would be suitable to represent other plaintiffs who purchases Extra Innings or Center Ice (or vice versa) turns on whether their claims implicate "the same set of concerns," *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012), an issue that Defendants have never addressed and is plainly the case here.

Finally, MLB makes the odd argument that Plaintiffs do not have standing because they cannot establish that Defendants' practices caused the harm they suffered. MLB Mem. 21-23. All Plaintiffs purchased out-of-market packages—either on television or the Internet—which were overpriced in order to protect local broadcast territories from competition. Defendants' conduct has forced Plaintiffs to pay supra-competitive prices for these products, and "[s]uch an injury plainly is 'of the type the antitrust laws were intended to prevent.'" *In re DDAVP Direct*

---

[79] *See, e.g.*, Burke Decl. Ex. 8 at 86:25-87:3 (Plaintiff Dillon stating that he would buy GameCenter Live "[i]f the blackout rules change"); Ex. 9 at 53:7-10 (Plaintiff Silver stating that he was "thinking about" purchasing Center Ice in the future and did not do so last year only because it "was a blackout period" and he was "disabled" and "in such extreme pain that I really just could not watch TV"); Ex. 11 at 55:3-11 (Plaintiff Traub stating that he purchases MLB.tv and might switch back to Extra Innings if "there was some change in … the way the product operates"). DirecTV singles out Traub as supposedly having "no intention of purchasing either a baseball or hockey out-of-market television package in the future," but Mr. Traub, in fact, stated that he switched to MLB.tv because it was a "superior product" and might switch back if that changes. *Compare* DirecTV Mem. 22 *with* Burke Decl. Ex. 11 at 54:9-12.

*Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977)).

As for their injunctive claims, to establish standing or causation, Plaintiffs do not need to show that, "but for MLB's rights structure, they would be offered the specific unbundled choices they want." MLB. Mem. 23. As described above, the unbundled choices are non-controversial options that a free market would be expected to offer, but even if that were not true, it would not affect Plaintiffs' standing. All they must show is that they will continue to be harmed if the Defendants' anticompetitive practices do not end. *See, e.g., Zenith Radio Corp. v. Hazeltine Research*, *Inc.*, 395 U.S. 100, 130 (1969) (holding that for a plaintiff to have standing to seek injunctive relief "he need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur."). Unless Defendants cease the challenged practices, Plaintiffs will continue to be denied market choices, they will continue to pay too much for any out-of-market package that they purchase, and they will continue to pay too much for their basic pay-television packages due to inflated RSN prices.[80]

## X.     The MLB Antitrust Exemption Does Not Apply to Broadcasting

MLB asserts that the judicially-created antitrust exemption it has enjoyed for certain aspects of the "business of baseball" applies to its role in this multi-tiered broadcast conspiracy. Asserting it now, two years after this litigation began, is inconsistent with its long-held view that broadcasting restraints are *not* encompassed by the exemption. In fact, MLB itself has repeatedly defended the exemption by insisting to the Supreme Court, Congress, and the Department of Justice that the exemption does not apply to the business of broadcasting. Because the exemption

---

[80] While the Court found that television subscribers generally are too removed from the restraints to assert a claim for the increase in their cable bills due to supra-competitive RSN prices, it held that the remaining Television Plaintiffs could continue to pursue these claims. *Laumann*, 907 F. Supp. 2d at 484 n.107.

exists as a narrow application of *stare decisis*, based on MLB's presumed reliance on past holdings, MLB cannot now argue that the Court should expand those holdings to encompass its broadcast practices.

The origin of the exemption is the Supreme Court's 1922 decision in *Federal Baseball Club of Baltimore v. National League of Professional Baseball Clubs*, 259 U.S. 200 (1922). In that case, decided before the modern view of the Commerce Clause had fully developed, the Court held that the "business [of] giving exhibitions of baseball" is inherently local, because each "exhibition"—*i.e.*, each game—was necessarily within the boundaries of a particular state. *Id*. at 209. Spectators could purchase that product only by attending it in person, the Court reasoned, so the exhibition did not involve interstate commerce. The Court held that the interstate travel of teams and the like was merely "incident" to the commerce at issue: the live exhibition of baseball games. *Id*.

By 1953, when the Court again addressed the application of the Sherman Act to baseball's reserve clause, which restricted player movements from one club to another, it was clear that *Federal Baseball* was inconsistent with its contemporary interpretation of the Commerce Clause. Nevertheless, the Court, in a one-paragraph opinion, affirmed that the reserve clause was not subject to antitrust scrutiny "on the authority of *Federal Baseball Club of Baltimore v. National League of Professional Baseball Clubs*, … so far as that decision determines that Congress had no intention of including the business of baseball within the scope of the federal antitrust laws." *Toolson v. N.Y. Yankees, Inc.*, 346 U.S. 356, 357 (1953).

In 1972, the Court again considered the applicability of the antitrust laws to baseball's reserve clause and again decided to adhere to a holding it recognized was inconsistent with its Commerce Clause and antitrust jurisprudence. "With its reserve system enjoying exemption from the federal antitrust laws, baseball is, in a very distinct sense, an exception and an anomaly. *Federal Baseball* and *Toolson* have become an aberration confined to baseball." *Flood v. Kuhn*,

79

407 U.S. 258, 282 (1972).

In *Flood*, the Court expressly found that professional baseball was, in fact, interstate commerce, 407 U.S. at 482, cutting away the foundation of *Federal Baseball*, and leaving in its place a free-floating exemption grounded on nothing but *stare decisis*. The Court kept the exemption alive due to the League's reliance on the exemption, the fact that Congress had not acted to change it, and "baseball's unique characteristics and needs." *Id.* at 283-85.

MLB does not argue here that its "unique characteristics and needs" justify the territorial restraints. Rather, it contends that *Toolson* held that the "business of baseball" was exempt from the antitrust laws and that broadcasting is part of that business. This contention cannot be sustained, because the law—and the League itself—have consistently distinguished between "the business of baseball" and the business of broadcasting.

"It is well settled that exemptions from the antitrust laws are to be narrowly construed." *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 231 (1979). This is particularly apt here, given that the Supreme Court has expressly recognized that the baseball exemption is an "aberration," *Flood*, 407 U.S. at 282, and "of at best dubious validity," *Radovich v. Nat'l Football League*, 352 U.S. 445, 450 (1957).

Because the Supreme Court rejected the underlying reasoning of *Federal Baseball*, the exemption cannot extend beyond the narrow holdings of the Court's prior decisions. The Supreme Court has never held that the exemption encompasses the business of broadcasting and thus the exemption cannot be expanded here to include it.[81]

---

[81] As the Eastern District of Pennsylvania held in *Piazza v. Major League Baseball*, "Application of the doctrine of *stare decisis* simply permits no other way to read *Flood* than as confining the precedential value of *Federal Baseball* and *Toolson* to the precise facts there involved." 831 F. Supp. 420, 437 (E.D. Pa. 1993). The *Piazza* court held that the exemption applied only to the reserve clause, based on its understanding that *Federal Baseball*, *Toolson*, and *Flood* all involved challenges only to the reserve clause. Whatever the scope of the Supreme Court's holdings, the *Piazza* court was correct in its approach—*i.e.*, that the exemption must be confined to the facts of those cases, because no other principle than *stare decisis* justifies it.

Even in 1922, when the Court decided *Federal Baseball*, there was no question that broadcasting baseball games by television and radio were interstate commerce, and therefore were subject to the Sherman Act. Indeed, when *Toolson* came to the Supreme Court in 1953, the principal question was whether the rise of broadcasting, which was undisputedly interstate commerce, had changed the character of baseball sufficiently to bring all its commercial aspects, including labor restraints, within the Sherman Act. In arguing that baseball still did not amount to interstate commerce, the League distinguished broadcasts of baseball games from the live exhibition of the games themselves. "It is not the baseball game, but merely a description or representation thereof, which is transmitted in interstate commerce. These descriptions are an entirely different form of entertainment created for a different market and presented to an entirely different audience by entirely different producers than the form of entertainment produced by the ball clubs." *Kowalski* Br. 23.[82] "*The essential difference between the status of an interstate reporter and the thing reported must never be lost sight of.*" Br. for Resp'ts at 43, *Toolson v. N.Y. Yankees*, 346 U.S. 356 (No. 53-18), 1953 WL 78318 (emphasis in original).

The League specifically argued that the broadcasting of games *was* subject to the antitrust laws: "Each and all of the reporting media are subject to all the federal interstate regulatory laws, including the Anti-trust Statutes." *Id.* As one commentator recently described baseball's position in *Toolson*, "Radio and television were subject to the antitrust laws; baseball itself was not." Stuart Banner, *The Baseball Trust: A History of Baseball's Antitrust Exemption* 116 (2013).

After *Toolson*, the League continued to adhere to the view that its broadcast practices in general, and its desire to impose territorial restrictions on the clubs' broadcasts in particular, remained subject to the antitrust laws. Baseball Commissioner Ford Frick repeatedly sought legislation throughout the 1950s to permit baseball to impose territorial controls on broadcasts, arguing that he was powerless to do so without legislation exempting such restraints from the

---

[82] *Kowalski*, along with *Corbett v. Chandler*, No. 53-25, was decided together with *Toolson*.

Sherman Act. *See* Andrew Zimbalist, *In the Best Interests of Baseball?: Governing the National Pastime* 63-64 (2013) ("By his own count, Frick testified seventeen times before congressional committees."). In one of many similar statements, Commissioner Frick stated, "Until we can get (favorable federal) legislation, there is nothing the majors can do, as a body, on radio and T.V." *New Baseball Bonus Rule Appears Certain for 1959*, Balt. Sun, Feb. 14, 1959, at S13.[83]

This view was widely shared. In *NFL I*—decided only days after *Toolson* and before the Court held the exemption did not apply to other sports in *Radovich*, 352 U.S. at 450, the court held that, assuming the exemption applied to football, it nevertheless did not cover territorial broadcast restrictions: "The present case … primarily concerns restrictions imposed by the National Football League on the sale of radio and television rights. Therefore, the present case basically concerns the League's restraint of interstate commerce in the radio and television industries. It is obvious that whether professional football itself is or is not engaged in interstate commerce is immaterial in the present case and that *the decisions in the baseball cases referred to do not control the present case*." *NFL I*, 116 F. Supp. at 328 (emphasis added). In 1957, the head of the Antitrust Division, Victor Hansen, testified to Congress that there was "little doubt" that the Sherman Act applied to broadcasting baseball games. *First Witness Backs Baseball*, Milwaukee Sentinel, June 18, 1957, pt. 2 at 2.[84]

Congress did ultimately take action to address the application of the antitrust laws to

---

[83] Frick clearly understood that baseball and broadcasting were two separate businesses, complaining that his inability to control broadcasting meant that "one industry"—broadcasting—was being allowed to "grow fat on the lifeblood of another"—baseball. *Text of Commissioner Frick's Address*, N.Y. Times, Feb. 1, 1954.

[84] Commissioner Frick also testified at the 1957 hearings, and reiterated that the League's understanding was that it was not able to control geographical distribution of television because the exemption did not apply. *Organized Professional Team Sports: Hearings on H.R. 5307, H.R. 5319, H.R. 5383, H.R. 6876, H.R. 6877, H.R. 8023, and H.R. 8124 before the Antitrust Sub-Comm. of the Senate Judiciary Comm.*, 85th Cong. 101 (1957) ("The Chairman: Of course, one thing we have got to remember, Commissioner, is that television and radio are not exempt from the antitrust laws. Mr. Frick: … we have proceeded on the safe theory that they are not exempt and there are time[s] when I wish that were not true …").

broadcasting, but it declined to expand the baseball exemption to grant a broad exemption for television. Instead, it enacted the Sports Broadcasting Act of 1961, a narrow exemption for clubs to sell rights jointly to over-the-air broadcast networks. Baseball officials understood that, absent this legislation, if MLB clubs sold their rights collectively through the leagues, this would violate the antitrust laws. Ex. 32 at 130 (1963 minutes stating that the SBA removed "legal obstacles" to the league offering "a nation-wide television program in which all members of the League would participate."). While the SBA allowed league-wide contracts for over-the-air television broadcasts and allowed blackouts within the local area of a home game, it expressly left the antitrust laws in place for blackout restrictions at other times and of non-sponsored broadcasts. 15 U.S.C. § 1292.

The SBA applies equally to "organized professional team sports of football, *baseball*, basketball, or hockey." § 1291 (emphasis added). Application of the Act to baseball would have been unnecessary if Congress understood the baseball exemption to encompass broadcasting already. Indeed, in *NCAA*, the Supreme Court highlighted the fact that, in enacting the SBA, "Congress felt the need to grant professional sports an exemption from the antitrust laws for joint marketing of television rights." 468 U.S. at 104 n.28.[85] All parties agree that the SBA does not excuse the much broader restraints at issue here.

In its summary judgment memorandum, MLB does not address its own past position that the business of broadcasting is distinct from the business of baseball. Instead, it asserts that the

---

[85] The Court continued:

The legislative history of this exemption demonstrates Congress' recognition that agreements among league members to sell television rights in a cooperative fashion could run afoul of the Sherman Act, and in particular reflects its awareness of the decision in *United States v. National Football League*, 116 F. Supp. 319 (E.D Pa. 1953), which held that an agreement among the teams of the National Football League that each team would not permit stations to telecast its games within 75 miles of the home city of another team on a day when that team was not playing at home and was televising its game by use of a station within 75 miles of its home city, violated § 1 of the Sherman Act.

*Id.*

"territorial video structure at issue here is the modern equivalent of the rules exempted from antitrust scrutiny in *Toolson*." MLB Mem. 11. MLB relies entirely on the *Toolson* petitioner's description of his complaint, filed several years earlier, in which he discussed the territorial system. *Id*. But the League fails to inform the Court that, by the time *Toolson* reached the Supreme Court, baseball had *abandoned* its territorial broadcast system—and it did so precisely to avoid antitrust concerns. *Broadcasting and Televising Baseball Games: Hearings on S. 1396 before the Comm. on Interstate and Foreign Commerce*, 83rd Cong. 11 (1953); Horowitz, *supra* p. 14, at 279-80.

The Court's opinion in *Toolson* does not mention the territorial distribution of games, which is hardly surprising. The League did not defend the lawfulness of the challenged restraints on broadcasting in *Toolson*, and its primary argument in defense of the exemption was that broadcasting was *not* part of the business of baseball.[86] Moreover, if *Toolson* had exempted broadcasting in 1953, as MLB now claims, the League would not have spent the rest of the 1950s repeatedly trying to convince Congress to extend the exemption to broadcasting to permit it to impose territorial restraints on clubs' broadcasts. Indeed, in 1959, Commissioner Frick expressly testified in Congress, in a response to a question whether *Toolson* "says you can do whatever you want to," that "it doesn't, not entirely, not in television. … It restricts us and gives us no more than we had before." *Organized Professional Team Sports: Hearings on S. 616 and S.*

---

[86] MLB also cites the recent decision regarding San José's challenge to the antitrust exemption in the relocation context in which the court stated that the underlying facts of *Toolson* included territorial restrictions on media broadcasting. *See* MLB Mem. 11 n.16 (citing *City of San José v. Office of Comm'r of Baseball*, No. 13-02787, 2013 WL 5609346, *6 n.10 (N.D. Cal. Oct. 11, 2013)). (Certain of the same counsel represent MLB in both cases.) The district court was incorrect. As explained above, the television territories were not an issue in *Toolson* and the discussion regarding media rights in the lower-court cases was limited to determining whether the baseball was a local or interstate affair. *See, e.g., Toolson v. N.Y. Yankees*, 101 F. Supp. 93, 94 (S.D. Cal. 1951) ([P]laintiff … emphasizes the broadcasting of baseball exhibitions through the media of radio and television, alleging that receipts from these activities exceed the sum of twenty per-cent of the net profits of professional baseball each year.").

*886 before the Sub-Comm. on Antitrust and Monopoly of the Senate Judiciary Comm.*, 86th Cong. 69 (1959).

Baseball maintained its narrow view of the exception in the brief it submitted to the Supreme Court in 1972 in support of its position in *Flood*. "[B]aseball has always recognized the narrow applicability of such precedents even to it, and has never considered them blanket immunity from all antitrust regulation. Rather, baseball has interpreted the *Toolson* rule to mean only that its historic and evolving internal structure and rules are not subject to antitrust attack." *Flood* Br. 29. As an example of this "narrow applicability," the League cited to a 1964 memorandum written by Paul Porter of Arnold, Fortas, and Porter, to the commissioner in which Mr. Porter analyzed, on behalf of the League, *Toolson*'s applicability to CBS's acquisition of the New York Yankees. *Id*. Mr. Porter argued that the exemption should not be viewed as "extending general immunity to organized baseball, *including broadcast aspects…*" "Background Memo on CBS Acquisition of Yankees," Oct. 7, 1964, contained in the record of *Professional Sports Antitrust Bill-1965: Hearings on S. 950 before the Sub-Comm. on Antitrust and Monopoly of the Senate Judiciary Comm.*, 89th Cong. 160 (1965) (emphasis added). The Porter Memorandum also expressed the view of CBS that the transaction was not a violation of the antitrust laws primarily because "baseball and broadcasting were different lines of commerce." *Id.* Thus, the League communicated to the Court what it had represented to Congress in 1964—that it did not view the business of baseball so broadly as to include "broadcast aspects," and had not relied on it for those purposes.

In *Flood*, the League argued that the Court should accept this narrow interpretation as a reason to maintain the limited exemption: "there are no broad principles at stake here. The issue is simply whether this Court should abandon its historic position that the *structure and rules of baseball* are not subject to the antitrust laws." *Flood* Br. 30 (emphasis added). The League's position carried the day, and the *Flood* Court decided to "adhere once again to *Toolson* and

*Federal Baseball*." 407 U.S at 284. Baseball's continued reliance on the exemption, and Congress's continued inaction, led the Court to leave the exemption where it was. The history is clear, however, that baseball never relied on the exemption in its broadcasting practices because it understood that those precedents did not exempt its broadcast policies from the antitrust laws—instead, it consistently argued to both the Court and Congress that broadcasting was separate and apart from "the business of baseball," and it made this distinction precisely so that it could preserve a more limited exemption.

Nor could Congress's "inaction" be read as an affirmation that broadcasting fell within the exemption. The history of baseball's attempts to broaden the exemption, and Congress's decision to grant only a very narrow exemption to baseball for its broadcasting practices shows that Congress *did* address this issue, and understood, consistent with what MLB executives had repeatedly testified before it, that the exemption did not cover baseball's broadcasting rules.

Further, there is no basis for concluding that by "adhering" to *Federal Baseball* and *Toolson*, the Court was recognizing that broadcasting fell within the exemption. There is no dispute that *Federal Baseball* could not have applied to broadcasting, as broadcasting would have constituted interstate commerce by any understanding of the term. Nor is there any basis for MLB's assertion that *Toolson* expanded the exemption *sub silencio* to cover broadcasting—a position at odds with the League's position in and after *Toolson* and with the Supreme Court's repeated holding that "*Toolson* was a narrow application of the rule of *stare decisis*." *Flood*, 407 U.S. at 276 (quoting *United States v. Shubert*, 348 U.S. 222, 230 (1955)); *Radovich*, 352 U.S. at 451 (same).

Thus, to accept Defendants' position now would require the Court to read *Flood* to *expand* the exemption that had existed at that time notwithstanding that the Court held that it would merely "adhere" to the holdings of its prior opinions. *Flood*, 407 U.S. at 284. Moreover, in *Flood* itself, the Court made clear that it viewed broadcasting as separate from the business of

86

baseball: "Baseball is today big business that is packaged with beer, *with broadcasting*, and with other industries." 407 U.S. at 287 (emphasis added). Nobody argues that the selling of beer or any "other industries" fall within the exemption just because they are "packaged with" the business of baseball. They are packaged with baseball because they are *not* baseball, but are ways of making money by exploiting the commercial opportunities that arise in relation to the business of baseball itself.[87]

Since *Flood*, the only decision addressing this issue concluded that broadcasting fell outside of the exemption. *Henderson Broad. Corp. v. Houston Sports Ass'n, Inc.*, 541 F. Supp. 263, 271 (S.D. Tex. 1982). As that court noted, to apply the exemption to the business of broadcasting "would be to extend and distort the specific baseball exemption, transform it into an umbrella to cover other activities and markets outside baseball." *Id.* at 271. As in *Henderson*, the business at issue here "is not baseball but a distinct and separate industry, broadcasting." *Id.* By entering into agreements to divide the broadcasting market with broadcasting entities here, Defendants have engaged in "restraint of interstate commerce in the radio and television industries," which is not protected by any exemption. *NFL I*, 116 F. Supp. at 328.[88]

---

[87] Considered at its broadest levels, nearly anything could be considered part of the "business of baseball," including parking, video games, and countless "other industries." MLB's reliance on the "admissions" of the individual named plaintiffs that broadcasting is an important part of the business of baseball is an inappropriate reach. The plaintiffs were neither qualified nor asked to interpret the Supreme Court's use of the term "the business of baseball," which is the only sense of the term that is relevant here.

[88] The baseball exemption also cannot be used to cover dealings with third parties. "[T]he antitrust exemption has not been held to immunize the dealings between professional baseball clubs and third parties." *Major League Baseball v. Crist*, 331 F.3d 1177, 1183 (11th Cir. 2003); *see also Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139 (3rd Cir. 1981) (finding memorabilia merchandiser's contracts with players subject to antitrust laws); *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 365 F. Supp. 235 (N.D. Cal. 1972) (concessions), *rev'd on other grounds*, 512 F.2d 1264 (9th Cir. 1975). Based on this principle, the court in *Henderson* concluded that "an exempt baseball team, like a labor union or agricultural cooperative which is exempted from the Sherman Act by statute, loses its exemption when it combines with a non-exempt radio station." 541 F. Supp. at 271 n.9.

MLB seeks to distinguish *Henderson* by contending that the territorial broadcast system *is* part of the internal structure of the league, simply because the broadcast rules are reflected in league-wide agreements. But that would turn any system of restraints among the clubs into the internal structure of the league, even where, as here, the restraints are directed at the markets of third parties. Moreover, it is inconsistent with MLB's own understanding of the scope of its "internal league structure," which it argued to the Supreme Court in *Flood* did *not* include broadcasting. And it was an attempt to impose television territories in the 1950s that led it to seek an expansion of its exemption from Congress. Congress gave it an answer: baseball's broadcasting practices are exempt from the antitrust laws to the extent specified in the SBA and no further.[89]

Finally, MLB suggests that the Curt Flood Act establishes that the exemption encompasses broadcasting. Not only is this incorrect, to the extent the League means to suggest that the Act changed the applicable law, it is inappropriate. The Curt Flood Act removed the antitrust exemption for labor matters for major league players. It left the exemption otherwise untouched. In fact, it explicitly provides that "[n]o court shall rely on the enactment of this section as a basis for changing the application of the antitrust laws" except as to employment matters. 15 U.S.C. § 26b(b).[90] The fact that language contained in a Senate Report mentions broadcasting as an area unaffected by the Act does not imply that that Congress endorsed or

---

[89] The only contrary case that MLB can find is an unpublished bench opinion from the Northern District of Texas in 1958. *Hale v. Brooklyn Baseball Club, Inc.*, No. 1294 (N.D. Tex. Sept. 19, 1958). As noted above, that was a time in which baseball itself, other courts, Congress, and the Justice Department all concurred that the exemption did not apply to broadcasting. It was also before the SBA, when Congress defined the scope of the application of the antitrust laws to baseball broadcasting.

[90] It further provides, "It is the purpose of this legislation to state that major league baseball players are covered under the antitrust laws …, along with a provision that makes it clear that the passage of this Act does not change the application of the antitrust laws in any other context or with respect to any other person or entity." 15 U.S.C. § 27a note.

codified or expanded the exemption to cover broadcasting.[91] Since 1961, the SBA has governed the application of the antitrust laws to baseball's broadcasting practices, an arrangement the Curt Flood Act expressly left unaltered. Indeed, the only mention of "broadcasting" in the Act itself is the provision that it does not change the application of the antitrust laws to acts covered by the SBA, § 26b(b)(4)—a provision that would be superfluous if the exemption encompassed broadcasting more broadly.

In sum, MLB is asking the Court to apply the exemption (1) to a form of commerce to which the exemption would not have applied under the narrow view of the Commerce Clause that underlay *Federal Baseball*, (2) where the Supreme Court, Congress, and baseball itself rejected such application up through the *Flood* decision, (3) where the exemption itself is recognized to be a historical anomaly, and (4) despite the fact that courts must construe narrowly even well-justified exemptions to the antitrust laws. There is no basis for expanding the exemption as MLB now suggests.

Although it is unnecessary to resolve the issue given that it is clear that the baseball exemption has never encompassed broadcasting, the Court should find that MLB is judicially estopped from asserting that it is entitled to a broad exemption that encompasses the challenged practices. MLB's current position is directly contrary to the arguments it made to the Supreme Court in in *Toolson* and *Flood* in defense of the exemption. "The equitable doctrine of judicial estoppel provides that, '[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, [it] may not thereafter, simply because [its] interests have changed, assume a contrary position ....'" *Pension Comm. of the Uni. of Montreal Pension Plan v. Banc of Am. Secs., LLC*, 716 F. Supp. 2d 236, 240 (S.D.N.Y. 2010) (Scheindlin, J.) (quoting

---

[91] In fact, the language MLB quotes in the Senate report is from a Congressional Budget Office cost estimate, not from the Senate itself or any committee or member thereof. The CBO staff's understanding is plainly not evidence of what Congress intended or what the statute means. S. Rep. No. 105-18, at 6 (1997).

*Uzdavines v. Weeks Marine, Inc.,* 418 F.3d 138, 147 (2d Cir. 2005) (alterations in original)). Judicial estoppel is appropriate where its proponent establishes that: "(1) a party's later position is 'clearly inconsistent' with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel[; and (4)] … the risk of inconsistent results with its impact on judicial integrity is certain." *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010) (quoting *Uzdavines*, 418 F.3d at 148).

MLB successfully argued to the Supreme Court on two occasions that it should preserve a narrowly defined exemption that excluded broadcasting—including territorial restraints on clubs' telecasts—that broadcasting was not part of the business of baseball, and that it had never relied on application of the exemption to broadcasting. Absent estoppel, MLB would be permitted to assert mutually exclusive, contradictory legal and factual positions in the service of broadening the application of an "aberration."

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that Defendants' motions for summary judgment be denied in their entirety.

Dated: May 27, 2014                              Respectfully submitted,

                                                 Edward Diver
                                                 Howard Langer
                                                 Peter Leckman
                                                 **LANGER, GROGAN & DIVER, P.C.**
                                                 1717 Arch Street, Suite 4130
                                                 Philadelphia, PA 19103
                                                 Telephone: (215) 320-5660
                                                 Facsimile: (215) 320-5703

Michael M. Buchman
John A. Ioannou
**MOTLEY RICE, LLC**
600 Third Avenue, Suite 2101
New York, NY 10016
Telephone: (212) 577-0040
Facsimile: (212) 577-0054

Kevin Costello
Gary Klein
**KLEIN KAVANAGH
COSTELLO, LLP**
85 Merrimac Street, 4th Floor
Boston, MA 02114
Telephone: (617) 357-5500
Facsimile: (617) 357-5030

J. Douglas Richards
**COHEN, MILSTEIN, SELLERS &
TOLL, PLLC**
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745

Jeffrey B. Dubner
**COHEN MILSTEIN SELLERS &
TOLL, PLLC**
1100 New York Ave. NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

Robert J. LaRocca
Craig W. Hillwig
**KOHN, SWIFT & GRAF, P.C.**
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
Facsimile: (215) 238-1968

Marc I. Gross
Adam G. Kurtz
**POMERANTZ, LLP**
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212)-661-1100
Facsimile: (212) 661-8665

Michael J. Boni
Joshua D. Snyder
**BONI & ZACK, LLC**
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Telephone: (610) 822-0200
Facsimile: (610) 822-0206

***Attorneys for Plaintiffs***