**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THOMAS LAUMANN, FERNANDA GARBER, ROBERT SILVER, DAVID DILLON, GARRETT TRAUB, and PETER HERMAN, representing themselves and all others similarly situated, | 12-cv-1817 (SAS) |
| Plaintiffs, | |
| v. | |
| NATIONAL HOCKEY LEAGUE, et al., | |
| Defendants | |
| FERNANDA GARBER, MARC LERNER, DEREK RASMUSSEN, ROBERT SILVER, GARRETT TRAUB, and VINCENT BIRBIGLIA, representing themselves and all others similarly situated, | 12-cv-3704 (SAS) |
| Plaintiffs, | ECF Cases |
| v. | |
| OFFICE OF THE COMMISSIONER OF BASEBALL, et al., | |
| Defendants | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ...................................................................................................................... 1

    I.   Defendants Cooperate to Restrain Competition ............................................................ 1

    II.  The Challenged Restraints Increase the Price of "Out-of-Market" Packages .................. 2

    III. The Challenged Restraints Deny All Class Members Access to Market Choices ............ 4

PROPOSED CLASS AND CLASS COUNSEL ......................................................................... 5

    I.   The Proposed Class .......................................................................................................... 5

    II.  The Proposed Class Representatives ............................................................................... 5

    III. The Proposed Class Counsel .......................................................................................... 5

ARGUMENT ........................................................................................................................... 6

    I.   Class Action Standards ................................................................................................... 6

    II.  Plaintiffs Satisfy the Rule 23(a) Requirements ............................................................. 6

        A.  There Are Common Questions of Law and Fact .......................................................... 7

        B.  Typicality and Adequacy ............................................................................................. 8

    III. Plaintiffs Satisfy the Rule 23(b) Requirements ............................................................. 9

        A.  Federal Rule of Civil Procedure 23(b)(3) .................................................................... 9

            1.  Common Questions Predominate over Individual Questions ................................. 9

            2.  Class Actions Are Superior to Individual Actions ................................................ 17

        B.  Federal Rule of Civil Procedure 23(b)(2) .................................................................. 17

        C.  Defendants' Arguments Do Not Defeat Class Certification ....................................... 18

CONCLUSION ....................................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Amchem Products, Inc. v. Windsor,*
  521 U.S. 591 (1997) ................................................................................. 9

*Amgen Inc. v. Connecticut Retirement Plans & Trust Funds,*
  133 S. Ct. 1184 (2013) ........................................................................... 10

*Brown v. Kelly,*
  609 F.3d 467 (2d Cir. 2010) ..................................................... 6, 8, 9, 10

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
  429 U.S. 477 (1977) ............................................................................... 11

*Butler v. Sears, Roebuck & Co.,*
  727 F.3d 796 (7th Cir. 2013) ................................................................. 17

*Comcast Corp. v. Behrend,*
  133 S. Ct. 1426 (2013) ....................................................................... 6, 16

*Cordes & Co. Financial Services, Inc. v. A.G. Edwards & Sons, Inc.,*
  502 F.3d 91 (2d Cir. 2007) ....................................................... 9, 11, 17

*Denney v. Deutsche Bank AG,*
  443 F.3d 253 (2d Cir. 2006) .................................................................... 8

*Espinoza v. 953 Associates LLC,*
  280 F.R.D. 113 (S.D.N.Y. 2011) ............................................................. 6

*Freeland v. AT&T Corp.,*
  238 F.R.D. 130 (S.D.N.Y. 2006) ........................................................... 12

*Grogan v. Garner,*
  498 U.S. 279 (1991) ................................................................................. 6

*Houser v. Pritzker,*
  --- F. Supp. 2d ---, 2014 WL 2967446 (S.D.N.Y. July 1, 2014) ............ 12

*In re Buspirone Patent Litigation,*
  210 F.R.D. 43 (S.D.N.Y. 2002) ............................................................. 10

*In re Electronic Books Antitrust Litigation,*
  No. 11-2293, 2014 WL 1282293 (S.D.N.Y. Mar. 18, 2014) ............ 13, 14, 15, 17, 19

*In re Electronic Books Antitrust Litigation,*
  No. 11-2293, 2014 WL 1641699 (S.D.N.Y. Apr. 24, 2014) ................. 16

*In re Flag Telecom Holdings, Ltd. Securities Litigation*,
    574 F.3d 29 (2d Cir. 2009) ............................................................................. 8

*In re High-Tech Employee Antitrust Litigation*,
    985 F. Supp. 2d 1167 (N.D. Cal. 2013) .................................................. 7, 11, 12, 14

*In re IKO Roofing Shingle Products Liability Litigation*,
    757 F.3d 599 (7th Cir. 2014) ...................................................................... 8, 16

*In re Magnetic Audiotape Antitrust Litigation*,
    No. 99-1580, 2001 WL 619305 (S.D.N.Y. June 6, 2001) ........................................ 12

*In re Master Key Antitrust Litigation*,
    528 F.2d 5 (2d Cir. 1975) .............................................................................. 12

*In re NASDAQ Market-Makers Antitrust Litigation*,
    169 F.R.D. 493 (S.D.N.Y. 1996) ............................................................... 7, 14, 18

*In re Platinum & Palladium Commodities Litigation*,
    No. 10-3617, 2014 WL 3500655 (S.D.N.Y. July 15, 2014) ....................................... 7

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
    267 F.R.D. 583 (N.D. Cal. 2010) .................................................................... 6

*In re U.S. Foodservice Inc. Pricing Litigation*,
    729 F.3d 108 (2d Cir. 2013) .......................................................................... 10

*In re Whirlpool Corp. Front-Loading Washer Products Liability Litigation*,
    722 F.3d 838 (6th Cir. 2013) ......................................................................... 17

*Jackson v. Bloomberg, L.P.*,
    298 F.R.D. 152 (S.D.N.Y. 2014) .................................................................... 6

*Laumann v. National Hockey League*,
    907 F. Supp. 2d 465 (S.D.N.Y. 2012) .............................................................. 18

*Laumann v. National Hockey League*,
    Nos. 12-1817, 12-3704, 2013 WL 837640 (S.D.N.Y. Mar. 6, 2013) ........................... 19

*Laumann v. National Hockey League*,
    Nos. 12-1817, 12-3704, 2014 WL 3900566 (S.D.N.Y. Aug. 8, 2014) ..................... 1, 3, 18

*Ligon v. City of New York*,
    288 F.R.D. 72 (S.D.N.Y. 2013) ..................................................................... 18

*Marisol A. v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997) ......................................................................... 8

*Messner v. Northshore University HealthSystem.*,
669 F.3d 802 (7th Cir. 2012) ............................................................................ 6, 14

*New York v. Hendrickson Brothers, Inc.*,
840 F.2d 1065 (2d Cir. 1988) ............................................................................. 13

*Padilla v. Maersk Line, Ltd.*,
271 F.R.D. 444 (S.D.N.Y. 2010) ......................................................................... 8

*Paper Systems Inc. v. Nippon Paper Industries Co.*,
281 F.3d 629 (7th Cir. 2002) .............................................................................. 19

*Ross v. Bank of America, N.A.*,
524 F.3d 217 (2d Cir. 2008) ............................................................................... 13

*Shahriar v. Smith & Wollensky Restaurant Group, Inc.*,
659 F.3d 234 (2d Cir. 2011) ........................................................................... 7, 16

*Suchanek v. Sturm Foods, Inc.*,
--- F.3d ---, 2014 WL 4116493 (7th Cir. Aug. 22, 2014) ................................... 19

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
283 F.R.D. 199 (S.D.N.Y. 2012) ......................................................................... 8

*UFCW Local 1776 v. Eli Lilly & Co.*,
620 F.3d 121 (2d Cir. 2010) ............................................................................... 10

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011) .................................................................................. 6, 7, 16

*Whitehorn v. Wolfgang's Steakhouse, Inc.*,
275 F.R.D. 193 (S.D.N.Y. 2011) ......................................................................... 8

## Other Authorities

Gregory S. Crawford & Ali Yurukoglu,
*The Welfare Effects of Bundling in Multichannel Television Markets*,
102 Am. Econ. Rev. 643 (June 2012) ................................................................... 3

## INTRODUCTION

These cases are ideally suited for class treatment. The central issues in each case—the legality of Defendants' agreements to prevent competition among the clubs and their television partners in the telecasting and streaming of their games—are common questions. Each class member must establish that the schemes are unlawful in the same manner as all other class members, and each class member must establish the participation of each alleged coconspirator in the same manner as all other class members.

The members of each class also seek common relief. All seek injunctive relief against the restrictive agreements and all seek to recover the amounts they overpaid for the out-of-market packages at issue. Because each case involves only variants of two products—one on the Internet and one on television—that were sold at standardized prices and were subject to identical market restraints, determination of the overcharges is readily resolvable on a class basis.

## BACKGROUND

The Court is well versed in the facts of these cases. *See Laumann v. Nat'l Hockey League*, Nos. 12-1817, 12-3704, 2014 WL 3900566 (S.D.N.Y. Aug. 8, 2014). Plaintiffs provide only a summary of the facts salient to the present motion.

## I.   DEFENDANTS COOPERATE TO RESTRAIN COMPETITION

In both leagues, the clubs have divided the United States into exclusive broadcasting territories, creating local monopolies for each club and its television partner in exchange for an agreement not to compete in broadcasting markets allocated to other clubs. By agreement, the clubs include these market-dividing restrictions in their contracts with their broadcast partners. *See generally Laumann*, 2014 WL 3900566, at *1-*3. As a result, the markets for live-baseball and live-hockey programming—which Regional Sports Networks ("RSNs") primarily produce— are subject to classic, horizontal, geographical market divisions. Defendants have openly engaged in agreements that allocate customers in this manner, all for the express purpose of

preventing competition between and among the clubs and their RSNs, creating a system that is highly profitable at every level.

Much of what ordinarily occupies the parties and the court in an antitrust action is not in dispute in these cases. There is no dispute as to the existence of agreements to create and enforce exclusive territories or that each defendant is a party to such agreements. And there is no serious dispute that these agreements are, on their face, agreements in restraint of trade. Ultimately, the dispute is over whether these restraints are reasonable; that is, whether the overall benefits of the systems outweigh their harms. These are all matters that are common to the classes and would need to be proved in any individual case.

## II. THE CHALLENGED RESTRAINTS INCREASE THE PRICE OF "OUT-OF-MARKET" PACKAGES

The territorial restraints eliminate competition that Defendants' "out-of-market" packages would otherwise face, allowing Defendants to charge supracompetitive prices. In the absence of the challenged restrictions, there would be no such thing as an "out-of-market" game, because there would be no artificially protected markets to be "out of." Class members in all locations would have access to single-team programming, without regard to location, both on the Internet and television. *See* Supplemental Declaration of Roger Noll ("Supp. Noll Decl."), at 20.

In a competitive market, the prices for combined, league-wide packages would be considerably lower than the prices currently offered. Supp. Noll Decl., Exs. 5A-5C. Each of the packages is priced artificially high to prevent any competition with the local monopolies, as MLB's senior vice-president of broadcasting, Chris Tully, has stated. *See* Ex. 1 to Diver Decl. Opp. S.J., *Garber* Dkt. 303-1 ("We limit our pkg offerings to maintain a high price point and restrict the number of subs[cribers]."). Indeed, artificially high prices are a necessary part of their schemes. *See* Pls.' Mem. Opp. Mot. S.J., *Laumann* Dkt. 241, at 16-25.

The league-wide packages do not depend on the presence of the existing market allocations, "given the low added cost of creating the packages and the convenience of bundling

2

to many consumers." *Laumann*, 2014 WL 3900566, at \*11. As Professor Noll explains: "Because the profit margin of the league package is so large, the league could lose a very large share of the customers for its league package and still profit from continuing to offer it. Likewise … [t]he continued existence of national telecasts of games in college sports demonstrates that such national packages are financially viable even when the broadcaster does not enjoy exclusive rights to broadcast a particular sport in a particular time period." Declaration of Roger G. Noll ("Noll Decl."), at 114. In fact, Professor Noll has shown that "teams would indeed prefer to participate in a league-wide bundle even if they also offer their own nationwide telecasts of live games," because it would be profitable to do so. Supp. Noll Decl., at 39 & Ex. 7.

This is a matter of economic common sense and is reflected in the pricing of entertainment bundles in the music and movie world, where competition is strong and consumers have options as to how to buy content. Movies, television shows, and music are all available online both separately and in services that combine large numbers of titles. These bundled products, like Netflix and Spotify, are priced very low—each less than ten dollars per month— not much more than the price of individual offerings. *See, e.g.*, "A Quick Update on our Streaming Plans and Prices," *available at* http://blog.netflix.com/2014/05/a-quick-update-on-our-streaming-plans.html.

The pricing model described in Professor Noll's accompanying report provides a basis for determining the prices consumers would pay for a league-wide bundle of programming on both television and the Internet. The model applies an established technique used to determine rational, stand-alone prices for cable television channels by assessing viewing patterns and prices paid for the bundle of channels. *See* Supp. Noll Decl., at 24. The method is described in a well-known paper in the *American Economic Review*, one of the leading academic economic journals. *See* Gregory S. Crawford & Ali Yurukoglu, *The Welfare Effects of Bundling in Multichannel Television Markets*, 102 Am. Econ. Rev. 643 (June 2012). The model determines what each

team/broadcaster would rationally charge for its own games, and calculates rational prices for bundles in this competitive market. Despite a number of conservative assumptions, it confirms what common sense suggests: the prices for the bundles, like other media bundles today, would be substantially lower than the prices the class members have been required to pay, and output would be substantially higher. *See* Supp. Noll Decl., Exs. 5A-5C.

## III.   THE CHALLENGED RESTRAINTS DENY ALL CLASS MEMBERS ACCESS TO MARKET CHOICES

The purpose of the restraints is to deny consumers market options that they would otherwise enjoy. Clubs and their RSN partners are prevented from distributing their games outside their territories to prevent consumers from choosing to watch their programming instead of the programming of the protected broadcaster in the consumer's territory. These restraints limit the choices that would be available to all class members.

All class members are outside the market of the majority of teams in each league.[1] Once the programming for any given team is created, there is close to no cost to distributing outside the team's current territory. Noll Decl., at 89. Indeed, nearly every RSN in these cases is already available on a nationwide basis, but the games themselves are blacked out. Noll Decl., at 96-97. Blacking out games only increases the price of distribution, while lowering the value of the product. As John Henry, the owner the Boston Red Sox admitted, "it would be easier [to show live Red Sox games] than not showing them" on the nationally distributed version of the Red Sox' RSN, New England Sports Network. Henry Dep. 98:16-17, Ex. 43 to Diver Decl. Opp. S.J., *Garber* Dkt. 303-43.

Similarly, for Internet streaming, Defendants incur substantial costs *not* to distribute the games more widely, because of the sophisticated means they employ to prevent distribution nationally. Consequently, all class members are denied access to the broadcasts of most teams

---

[1] Everyone is outside the market of at least 24 of the 30 teams in baseball, and at least 26 of the 30 teams in the NHL. Noll Decl., at 48.

4

unless they purchase an expensive league-wide package. Thus, all class members share a common interest in removing the restraints.

## PROPOSED CLASS AND CLASS COUNSEL

### I.    THE PROPOSED CLASS

In each action, Plaintiffs seek certification of the following proposed class:

> All individuals in the United States who purchased television service from DirecTV and/or Comcast, or their subsidiaries, which included [MLB Extra Innings or NHL Center Ice], and/or who purchased [MLB.tv or NHL GameCenter Live] from the League Defendants or their subsidiaries, at any time within four years prior to the filing of this action and until the effects of the anti-competitive conduct end. Excluded from the Class are Defendants and their employees, officers, directors, and legal representatives.

### II.   THE PROPOSED CLASS REPRESENTATIVES

The class representatives in *Laumann* include purchasers of NHL GameCenter Live (Thomas Laumann and David Dillon), NHL Center Ice through DirecTV (Robert Silver), and NHL Center Ice through Comcast (Garret Traub). The class representatives in *Garber* include purchasers of MLB.tv (Marc Lerner and Derek Rasmussen), MLB Extra Innings through Comcast (Garrett Traub), and MLB Extra Innings through DirecTV (Vincent Birbiglia). Each of these individuals purchased "out-of-market" packages during the class period and was injured as a result of Defendants' conduct.

### III.  THE PROPOSED CLASS COUNSEL

Plaintiffs request that the Court appoint Langer, Grogan & Diver, P.C., lead class counsel. The other firms working on behalf of the plaintiffs are Boni & Zack LLC; Cohen Milstein Sellers & Toll, PLLC; Klein Kavanagh Costello, LLP; Kohn, Swift & Graf, P.C.; Motley Rice LCC; and Pomerantz LLP.[2]

---

[2] Defendants have stated that they will not contest the adequacy of proposed class counsel, and counsel's work on behalf of the plaintiffs to date allows the Court to assess their ability to represent the class. If necessary, counsel can provide additional supporting material.

## ARGUMENT

### I.   CLASS ACTION STANDARDS

A court considering class certification should undertake a "rigorous analysis" of the parties' arguments. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)). Plaintiffs need not prove the Rule 23 requirements "to a degree of absolute certainty. It is sufficient if each disputed requirement has been proven by a preponderance of evidence." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012); *see also Brown v. Kelly*, 609 F.3d 467, 476 (2d Cir. 2010).[3]

Even after *Behrend* and *Dukes*, courts in the Second Circuit give Rule 23 a "liberal rather than restrictive construction, and it seems beyond peradventure that the Second Circuit's general preference is for granting rather than denying class certification." *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 159 (S.D.N.Y. 2014) (quoting *Espinoza v. 953 Assoc. LLC*, 280 F.R.D. 113, 124 (S.D.N.Y. 2011) (Scheindlin, J.)). "Courts have stressed that price-fixing cases are appropriate for class certification because a class-action lawsuit is the most fair and efficient means of enforcing the law where antitrust violations have been continuous, widespread, and detrimental to as yet unidentified consumers." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 592 (N.D. Cal. 2010), *amended*, 2011 WL 3268649 (N.D. Cal. July 28, 2011).

### II.   PLAINTIFFS SATISFY THE RULE 23(a) REQUIREMENTS

None of the threshold requirements under Rule 23(a) pose a challenge to class certification. These cases involve hundreds of thousands of class members,[4] all of whom are challenging the same underlying schemes with the same legal theories. All bought the same products subject to the same restraints and suffered the same injuries, including the class

---

[3] "[T]he preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants …." *Grogan v. Garner*, 498 U.S. 279, 286 (1991).

[4] Defendants have indicated that they will not contest numerosity, which is indisputably satisfied.

representatives.

### A.   There Are Common Questions of Law and Fact

Commonality is established where "plaintiffs' grievances share a common question of law or of fact." *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 252 (2d Cir. 2011) (citation omitted). "[F]or purposes of Rule 23(a)(2) even a single common question will do," *Dukes*, 131 S. Ct. at 2556 (quotation and alterations omitted), so long as "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 2551. In general, cases involving an allegation of conspiracy that affects the entire class easily meet the commonality requirement. *See, e.g.*, *In re Platinum & Palladium Commodities Litig.*, No. 10-3617, 2014 WL 3500655, at *9 (S.D.N.Y. July 15, 2014) ("Numerous courts have held that allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2).") (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 509 (S.D.N.Y. 1996)).

The plaintiffs in each case challenge the same underlying conduct: Defendants' agreements to prevent competition between the clubs and their television partners by dividing the hockey and baseball video markets into exclusive territories. Plaintiffs' contention that these agreements reduce output and raise prices plainly raises common issues. Similarly, the extent to which particular defendants are liable as coconspirators is common to all class members. Defendants' purported justifications and defenses are equally common. *See, e.g.*, *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1226-27 (N.D. Cal. 2013). The Court's recent decision on summary judgment addressed numerous issues, all of which applied to all class members' claims on a common basis. The Court's decision did not require any individualized inquiry.

All class members have suffered the same injuries: they all purchased products for which

they were overcharged, and they were all subject to restraints preventing them from having access to the full array of market choices. As Judge Easterbrook recently observed, plaintiffs have suffered "the same injury" where they allege wrongdoing "common to all instances of a consumer product." *In re IKO Roofing Shingle Prods. Liab. Litig.*, 757 F.3d 599, 602 (7th Cir. 2014).[5]

### B.  Typicality and Adequacy

Typicality and adequacy are also present in these cases. The typicality requirement is "not demanding," *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 283 F.R.D. 199, 208 (S.D.N.Y. 2012), and "'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" *Brown*, 609 F.3d at 475 (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)). Here, all claims in each case arise from one course of conduct taken by Defendants and are based on identical legal arguments.

Similarly, adequacy requires that "the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006). To render class representatives inadequate, conflicts must be "fundamental." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009).

Plaintiffs are fans who purchased "out-of-market" packages from the NHL or MLB. These packages are sold on a mass-market basis to consumers, on standardized terms and prices. Supp. Noll Decl., Exs. 1 -3. The members of each class are challenging precisely the same underlying conduct and assert identical legal theories. These cases are not about what the

---

[5] Even if individual plaintiffs' damages could not be determined on a common basis, "the need for an individualized determination of damages suffered by each class member generally does not defeat the [commonality] requirement." *Whitehorn v. Wolfgang's Steakhouse, Inc.*, 275 F.R.D. 193, 199 (S.D.N.Y. 2011) (quoting *Padilla v. Maersk Line, Ltd.*, 271 F.R.D. 444, 448 (S.D.N.Y. 2010)).

consumers did, but about whether Defendants' systems of restraints are lawful.

Defendants have asserted that the named plaintiffs are atypical and cannot "fairly and adequately protect the interests of the class," Fed R. Civ. P. 23(a)(4), because some class members may have a greater interest in the continuing existence of league-wide packages than some of the named plaintiffs. Yet they have not explained how this supposed difference creates anything approaching a "fundamental" conflict. All plaintiffs favor the existence of valuable options, and all plaintiffs have produced evidence that league-wide packages would continue to exist as an option for the entire class going forward. There is no conflict, much less a fundamental one.

## III.    PLAINTIFFS SATISFY THE RULE 23(b) REQUIREMENTS

### A.   Federal Rule of Civil Procedure 23(b)(3)

To certify a class under Rule 23(b)(3), plaintiff must show that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members" and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

#### 1.   Common Questions Predominate over Individual Questions

As the Supreme Court has noted, "Predominance is a test readily met in certain cases alleging … violations of the antitrust laws." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 108 (2d Cir. 2007). This is because "where plaintiffs were allegedly aggrieved by a single policy of the defendants, and there is a strong commonality of the violation and the harm, this is precisely the type of situation for which the class action device is suited." *Brown*, 609 F.3d at 484 (quotations omitted).

"Rule 23(b)(3) … does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof. What the rule does require is that common

questions *predominate* over any questions affecting only individual class members." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1196 (2013) (quotations and related modifications omitted) (emphasis in original); *accord, e.g.*, *Brown*, 609 F.3d at 484. The legal or factual issues that can be resolved through classwide proof need only be "'more substantial than the issues subject only to individualized proof.'" *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013) (quoting *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 131 (2d Cir. 2010)). Common questions need only be "susceptible to generalized proof," not actually proven at the class-certification stage. *Id.* at 113; *see also Amgen*, 133 S. Ct. at 1191 ("Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class.") (emphasis in original).

Common issues overwhelmingly predominate in these cases. Whether the issues concern liability, class impact, or damages, the resolution of *all* material issues in these cases will be done on the basis of common proof.

### a.  Common Issues of Liability Predominate

The core issues of liability turn on the legality of Defendants' agreements to restrain trade. In both cases, whether these agreements are legal is a purely common question.

For both the Section 1 and Section 2 claims, the same evidence would be introduced to prove the elements of the claims regardless of whether they proceeded as class actions or as individual cases. The existence of agreements in restraint of trade and monopoly power, and their effect on competition, present no individual issues. These claims focus on the actions of the defendants, the markets in which they operate, and the effects of their actions on competition. None of these issues vary among individual class members. Thus, whether Defendants' conduct violated the antitrust laws is a common question that predominates over any individual questions. *See, e.g.*, *In re Buspirone Patent Litig.*, 210 F.R.D. 43, 58 (S.D.N.Y. 2002) ("[C]ommon issues of fact and law … clearly predominate … [because] [p]roof of the allegedly monopolistic and

anti-competitive conduct at the core of the alleged liability is common to the claims of all the plaintiffs.").

Put differently, a jury, in assessing Defendants' liability, will consider only questions with common answers: Did Defendants agree to restrict competition through a series of territorial broadcasting restrictions? Did they exclude competition in Internet streaming? Did each of the defendants participate in the schemes in a manner that renders them liable? Does the system of restrictions reduce output and/or raise prices? Are there other pro- or anticompetitive effects that support a conclusion that these restrictions are reasonable or unreasonable? Are there less restrictive alternatives that would achieve any procompetitive benefits? The answers to all of these questions will be determined by common evidence. Defendants have made it clear that they will contest these common issues with common defenses. Thus, the legality of Defendants' conduct will be "central to this litigation" and "common questions will predominate with respect to the alleged antitrust violation." *High-Tech*, 985 F. Supp. 2d at 1191.

Simply put, *all* of the substantive issues of Defendants' liability are common questions.

**b. Common Issues of Impact Predominate**

Whether the class members suffered antitrust impact is similarly common. A plaintiff must make a two-part showing to establish antitrust injury. *Cordes*, 502 F.3d at 106. The first part is the "factual question whether the plaintiff has indeed suffered harm, or 'injury in fact.'" *Id*. The second part "is the legal question whether any such injury is an 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). This inquiry addresses only the fact—not the amount—of injury. *Cordes*, 502 F.3d at 107 n.11 (distinguishing "the injury-in-fact question—that is, *whether* a plaintiff was harmed—and the damages question—that is, *by how much* a plaintiff was harmed").

"'[O]n a motion for class certification, the Court only evaluates whether the method by

which plaintiffs propose to prove class-wide impact could prove such impact, not whether plaintiffs in fact can prove class-wide impact.'" *Houser v. Pritzker*, --- F. Supp. 2d ---, 2014 WL 2967446, at *17 (S.D.N.Y. July 1, 2014) (quoting *In re Magnetic Audiotape Antitrust Litig.*, No. 99-1580, 2001 WL 619305, at *4 (S.D.N.Y. June 6, 2001)); *see also, e.g.*, *High-Tech*, 985 F. Supp. 2d at 1192 ("Ultimately, the Court is not tasked at this phase with determining whether Plaintiffs will prevail on these theories. Rather, the question is narrower: whether Plaintiffs have presented a sufficiently reliable theory to demonstrate that common evidence can be used to demonstrate impact.").

Here, all class members suffered the same core injury: overcharge for subscription packages of MLB or NHL games. The injury for which Plaintiffs seek compensation is the amount that they paid for their out-of-market packages minus the value of those packages in a competitive market.[6] The prices charged were uniform and are readily determinable for each class member. Whether those prices would have been higher, lower, or the same in a competitive market is a common question. *See, e.g.*, *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 144 (S.D.N.Y. 2006) ("If the plaintiffs could establish that 'the defendants engaged in an unlawful national conspiracy which had the effect of stabilizing prices above competitive levels, and further establish that the [plaintiffs] were consumers of that product, … the jury could reasonably conclude that [defendants'] conduct caused injury to each [class member].") (quoting *In re Master Key Antitrust Litig.*, 528 F.2d 5, 12 n.11 (2d Cir. 1975)) (alterations in original). In all significant regards, all class members present a single fact pattern: they purchased an out-of-market package, and the price of the package was either unlawfully inflated or it was not.

Moreover, the challenged schemes reduce the available choices for all class members, and "reduction in choice and diminished quality"—when it is the result of anticompetitive

---

[6] Class members were further injured by an overcharge in their pay-TV packages because those packages' prices incorporated the overcharge the RSNs were able to extract by maintaining exclusive, protected territories. Plaintiffs are not seeking damages for those injuries, and instead seek to address those harms prospectively through the requested injunctive relief.

conduct—constitutes antitrust injury. *Ross v. Bank of Am., N.A.*, 524 F.3d 217, 224 (2d Cir. 2008). The current system prevents distribution of so-called "out-of-market" games across the country, making those games available—if at all—only through one of the league-controlled packages. Indeed, the express purpose of the restrictions is to prevent consumers from purchasing programming they may prefer wherever they are located.

### c.   Damages Are Determinable on the Basis of Common Evidence

Damages will be resolved on the basis of class evidence. Every class member in *Laumann* purchased either the NHL GameCenter Live Internet package or the NHL Center Ice television package. For Center Ice, each class member purchased it either through Comcast or DirecTV. Similarly, in *Garber*, each class member purchased either an MLB.tv package from the league or MLB Extra Innings from either Comcast or DirecTV.

Plaintiffs allege that these products were overpriced because of the restrictions on competition at issue. The standard measure of damages to consumers who purchased goods subject to unlawful restraints is "the difference between the prices actually paid and the prices that would have been paid absent the conspiracy." *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1077 (2d Cir. 1988); *In re Elec. Books Antitrust Litig.*, No. 11-2293, 2014 WL 1282293, at *16 (S.D.N.Y. Mar. 18, 2014) ("*Ebooks*"), *23(f) pet. denied*, No. 14-1092 (2d Cir. May 29, 2014). The parties will, of course, dispute what the prices of the packages would be in a competitive market, but the answer to that question will apply to all class members.

Given the scope of these cases, there are remarkably few variations in either product or pricing. In each case, both the television and Internet packages are sold nationwide at set price points that vary based on when in the season the package was purchased and whether the purchaser was renewing from the previous season. *See* Supp. Noll Decl., Exs. 1-3.[7] Both

---

[7] In the case of MLB.tv, there are two Internet packages, distinguished mainly by whether they feature away broadcasts of each game. The two variants' prices move in parallel over the course of the season. *See* Supp. Noll Decl., Ex 1.

DirecTV and Comcast sell the television packages at similar prices. *See* Supp. Noll Decl., Exs. 2 & 3. Monthly packages have sometimes been made available as well, with prices tied to the overall price of the package. Supp. Noll Decl., Exs. 1-3. Pricing does not vary by geography. It has never mattered where a consumer lives, which team or teams a consumer prefers, or which team or teams are blacked out at the consumer's location. Everyone pays the same price, subject only to the few, systematic variations explained in the accompanying expert declaration.

There is every reason to believe that consistent, nationwide pricing would remain the norm in a competitive market as it is now. This is consistent not only with the Defendants' own practices, but with other mass-market television and Internet media packages, including video-streaming products like Netflix and Hulu, and music-streaming products like Spotify and Rdio. Consequently, once an overcharge amount is determined, it can easily be applied to the handful of pricing variations at issue, making it perfectly suited for determination on a class basis.

Courts regularly certify classes even when, unlike here, there is substantial variety in pricing, and even when, unlike here, there is significant individual negotiation. "Neither a variety of prices nor negotiated prices is an impediment to class certification if it appears that plaintiffs may be able to prove at trial that, as here, the price range was affected generally." *NASDAQ*, 169 F.R.D. at 523; *see also, e.g.*, *Messner*, 669 F.3d at 816 (vacating denial of class certification where relevant market was "particularly complex," involving "third-party payors negotiat[ing] sophisticated contracts" for "complex bundles of many different services and products"); *Ebooks*, 2014 WL 1282293, at *14 ("Although each transaction has 'its own unique history,' it need only be 'evaluated separately' if it is not susceptible to class-wide proof."); *High-Tech*, 985 F. Supp. 2d at 1214 (certifying employee class despite contention that defendants' "compensation policies and practices were highly individualized with wide variation in compensation").

The present cases—involving two nearly identical products sold on a mass-market basis

at uniform prices with limited variants—present far fewer complications than most antitrust class actions. Judge Cote's recent certification of a class in *Ebooks* highlights the relative simplicity of these cases. Class members there made more than 149 million purchases of 1.3 million different titles, sold by different publishers and through different distributors. *Ebooks*, 2014 WL 1282293, at *9. Because the conspiracy involved moving control of consumer pricing from retailers to publishers, pricing determinations were made by different entities during the conspiracy than they would have been made by in the but-for world. *Id.* at *21. Even so, Judge Cote found that the plaintiffs' economic model—offered there, as here, by Professor Noll—allowed a jury to determine damages on a common basis.

As discussed in Professor Noll's supplemental declaration, the determination of competitive pricing involves analysis of consumer demand based on purchasing and viewership data.[8] This analysis applies an established econometric method for studying the economic effects of unbundling cable channels, to large sets of data collected by the Defendants from subscribers to out-of-market packages showing which games each individual watched. *See* Crawford & Yurukoglu, *supra* at 3. By using that information together with information about what the subscribers paid for the bundle, the model can estimate demand for each individual teams' live-game programming.

The model then calculates the prices that each club's RSN would charge for its own programming in a competitive market, as well as a price for a league-wide package, in a market where consumers could choose between individual team offerings and a bundle. The same model has now been applied to viewership data for NHL GameCenter Live, MLB.tv, and DirecTV's Extra Innings subscribers. The model shows that the package prices are substantially more

---

[8] Courts commonly accept the methodologies described in Professor Noll's declaration to calculate damages. *See, e.g.*, ABA Section of Antitrust Law, Antitrust Law developments (5th ed. 2002) at 873-80 (collecting cases).

expensive than they would be in a competitive world.[9] Supp. Noll Decl., Exs. 5A-5C.[10] The

benchmark prices produced by the model are determined on a classwide basis—the

determination of the overcharge for any and all purchases can be estimated using these methods.

Defendants may challenge the accuracy of the model, but their challenge will not be

individualized, but classwide.

Indeed, even if this were a single-plaintiff action, that plaintiff would need to establish

benchmark pricing and would do so on the basis of the same common evidence that the model

uses for determining class damages. *See In re Elec. Books Antitrust Litig.*, No. 11-2293, 2014

WL 1641699, at *9 (S.D.N.Y. Apr. 24, 2014) (method used to determine impact and damages

would not "have been any different had [Professor Noll] been asked to calculate the overcharge

for a single plaintiff"). Thus, all of the important questions in these cases—liability, injury, and

damages—are "capable of classwide resolution," *Dukes*, 131 S. Ct. at 2551, and common

questions plainly predominate.

Moreover, class certification would be appropriate even if determining the amount of

damages required individual determinations. *See, e.g.*, *Behrend*, 133 S. Ct. at 1437 (Ginsburg &

Breyer, JJ., dissenting) ("Recognition that individual damages calculations do not preclude class

certification under Rule 23(b)(3) is well nigh universal."); *IKO Roofing*, 757 F.3d at 603

(reversing holding that "commonality of damages" is required for predominance); *Shahriar*, 659

F.3d at 253 (holding certification appropriate even though "class plaintiffs' individualized

damages will vary"). Thus, Plaintiffs need not show that damages can be determined on a

---

[9] The model has been refined since Professor Noll's initial report, resulting in a different
overcharge figure, and may be further refined until Plaintiffs' final damages report.

[10] In determining the competitive price of the package, Professor Noll calculated the price of a
complete package of games. That is, of course, an improvement on what plaintiffs actually
received, which was a compromised version subject to blackouts. The but-for price is to that
extent an overestimate, making Professor Noll's estimate of damages even more conservative.

common basis to justify certification, although the record here clearly shows that they can be.[11]

## 2. Class Actions Are Superior to Individual Actions

The four factors set forth in Rule 23(b)(3)(A)-(D) weigh in favor of certification. *First*, no class member has demonstrated any interest in litigating individually, nor does any class member have special circumstances or unique damages that provide him or her a greater interest in controlling the litigation. *See* Fed. R. Civ. P. 23(b)(3)(A). *Second*, there is no other "litigation concerning the controversy already commenced" in which the proposed Class is represented. Fed. R. Civ. P. 23(b)(3)(B). *Third*, judicial efficiency counsels strongly in favor of "concentrating the litigation of the claims in the particular forum," given the Court's thorough familiarity with the facts of the case through its resolution of Defendants' motions to dismiss and for summary judgment. Fed. R. Civ. P. 23(b)(3)(C). *Fourth*, there is no reason to expect any "difficulties in managing a class action"; as described above, the litigation presents a relatively straightforward set of common questions. Fed. R. Civ. P. 23(b)(3)(D).

Moreover, class treatment is necessarily superior to other forms of adjudication here because it is the *only* realistic way for anyone to seek damages. "Where individual class members' possible recoveries are so small that no other practical method of adjudication exists, superiority is often satisfied." *Ebooks*, 2014 WL 1282293, at *23. Prosecution of these claims together also "will achieve economies of time, effort and expense and promote uniformity." *See Cordes*, 502 F.3d at 104. So long as predominance is met, a class action is superior to individual adjudication here, and Defendants have not suggested otherwise.

## B. Federal Rule of Civil Procedure 23(b)(2)

Certification of Plaintiffs' request for injunctive relief is appropriate under Rule 23(b)(2)

---

[11] The Court could also certify certain issues for class resolution, such as the existence of antitrust violations, while reserving other issues for individual adjudication under Rule 23(c)(4)(A). *See, e.g.*, *Cordes*, 502 F.3d at 109; *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013); *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 860 (6th Cir. 2013). Plaintiffs do not believe any issues need to be deferred for individual adjudication, but even if there were, certification of common issues would still be appropriate.

because Defendants' conduct applies "generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). It is not necessary to determine whether common issues predominate or whether a class action is a superior means of adjudication under Rule 23(b)(2), because the injunction sought by the individual plaintiffs would necessarily benefit all class members. *Ligon v. City of New York*, 288 F.R.D. 72, 80 (S.D.N.Y. 2013).[12]

Defendants' agreements to divide the live-hockey and live-baseball video markets into exclusive territories affect all class members. As such, Plaintiffs seek a common declaration that the challenged practices and agreements are unlawful under the antitrust laws and injunctive relief preventing continuation of these practices, which will apply generally to the class.[13]

### C. Defendants' Arguments Do Not Defeat Class Certification

From their pre-motion letter and argument, Defendants' primary challenge to class certification seems to be that "there would be winners and losers among purported class members" because some teams might be "disadvantaged in the [but-for world]," which would supposedly defeat both predominance and typicality. *Laumann* Dkt. 259 at 2. This argument depends wholly on Defendants' speculation that market-based competition would drive profits so low that some clubs would not make some games available. This prediction is unfounded. *See, e.g., Laumann*, 2014 WL 3900566, at *11 ("Far from being implausible, plaintiffs' 'but-for'

---

[12] "[W]here injunctive relief and damages are both important components of the relief requested, court[s] have regularly certified an injunctive class under Rule 23(b)(2) and a damages class under Rule 23(b)(3) in the same action." *NASDAQ*, 169 F.R.D. at 515 (internal quotation omitted). Plaintiffs seek damages only within the context of Rule 23(b)(3).

[13] Defendants suggest that certain plaintiffs lack standing to seek injunctive relief because they are "former subscribers." *Laumann*, Dkt. 259, at 3 (Pre-Class Cert. Motion Letter by Arthur Burke (Aug. 29, 2014)). The Court has already rejected that argument, finding that Plaintiffs' purchase of a package of out of market games created a "sufficient likelihood" that they would purchase the packages again. *See Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 480 n.76 (S.D.N.Y. 2012); *Laumann*, Dkt. 82 at 2 (Dec. 17, 2012) (clarifying order on standing). Moreover, as previously explained, these arguments rely on misrepresentations of individual plaintiffs' testimony. *See* Pls.' Mem. Opp. Mot. S.J., *Laumann* Dkt. 241, at 77 & n.79.

world is at least as likely as defendants' prognostications."); s*ee also, e.g.*, *Laumann* Dkt. 241, at 16-27, 45-58. It is also irrelevant: Plaintiffs' damages will be determined by the overcharge, if any, of the package they actually purchased, not what they theoretically might have wanted in a counterfactual world of Defendants' imagining. *See Ebooks*, 2014 WL 1282293, at *15-*20. And, even if Defendants' theory was plausible and relevant, its accuracy would present a common question. *Id*. at *19.

Even if Defendants could somehow prove their speculation that games would not have been telecast absent the restraints, that finding would not defeat class certification, because certification can be appropriate even if "some of the class members probably were net gainers from the alleged" misconduct. *Kohen v. Pac. Inv. Mgmt. Co*., 571 F.3d 672, 678 (7th Cir. 2009); *see also Halliburton Co. v. Erica P. John Fund, Inc*., 134 S. Ct. 2398, 2412 (2014) ("That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate."). It is not enough to defeat class certification to show that some individuals were not harmed. Rather, Defendants must show that a great many persons *could not* have been harmed—for example, because they had contracts protecting them from price increases. *See, e.g.*, *Suchanek v. Sturm Foods, Inc*., --- F.3d ---, 2014 WL 4116493, at *7 (7th Cir. Aug. 22, 2014).

Defendants also assert that the fact that some class members' claims against particular defendants may be arbitrable somehow undermines certification. "The fact that plaintiffs may have no judicial recourse against certain alleged conspirators in an anti-competitive agreement because of arbitration agreements has no bearing on the viability of their claims against core members of the alleged conspiracy." *Laumann v. Nat'l Hockey League*, Nos. 12-1817, 12-3704, 2013 WL 837640, at *3 (S.D.N.Y. Mar. 6, 2013). Each conspirator is jointly and severally liable for the injuries to every person harmed by any member of the conspiracy. *See, e.g., Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 633 (7th Cir. 2002). Arbitration will not affect

any class member's right to relief in this Court or the amount of damages they may seek. As such, it is unclear why a class member's ability to recover against a particular defendant presents a significant individualized issue.

## CONCLUSION

Plaintiffs respectfully request that the Court grant Plaintiffs' motions for class certification and appointment of class counsel.

Dated: September 19, 2014

Respectfully Submitted,

*/s/ Edward Diver*
Edward Diver
Howard Langer
Peter Leckman
**LANGER, GROGAN & DIVER, P.C.**
1717 Arch Street, Suite 4130
Philadelphia, PA 19103
Telephone: (215) 320-5660
Facsimile: (215) 320-5703

Michael J. Boni
Joshua D. Snyder
**BONI & ZACK, LLC**
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Telephone: (610) 822-0200
Facsimile: (610) 822-0206

J. Douglas Richards
**COHEN, MILSTEIN, SELLERS &
TOLL, PLLC**
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745

Jeffrey B. Dubner
**COHEN MILSTEIN SELLERS &
TOLL, PLLC**
1100 New York Ave. NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

Kevin Costello
Gary Klein
**KLEIN KAVANAGH
COSTELLO, LLP**
85 Merrimac Street, 4th Floor
Boston, MA 02114
Telephone: (617) 357-5500
Facsimile: (617) 357-5030

Robert J. LaRocca
Craig W. Hillwig
**KOHN, SWIFT & GRAF, P.C.**
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
Facsimile: (215) 238-1968

Michael M. Buchman
John A. Ioannou
**MOTLEY RICE, LLC**
600 Third Avenue, Suite 2101
New York, NY 10016
Telephone: (212) 577-0040
Facsimile: (212) 577-0054

Marc I. Gross
Adam G. Kurtz
**POMERANTZ, LLP**
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212)-661-1100
Facsimile: (212) 661-8665

*Attorneys for Plaintiffs*