**REDACTED – PUBLIC VERSION**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| THOMAS LAUMANN, ROBERT SILVER, GARRETT TRAUB, and DAVID DILLON, representing themselves and all others similarly situated, | ) ) ) ) ) | 12-cv-1817 (SAS) |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| NATIONAL HOCKEY LEAGUE et al., | ) ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| FERNANDA GARBER, MARC LERNER, DEREK RASMUSSEN, ROBERT SILVER, GARRETT TRAUB, and PETER HERMAN, representing themselves and all others similarly situated, | ) ) ) ) ) ) | 12-cv-3704 (SAS) |
| Plaintiffs, | ) ) | ECF Cases |
| v. | ) ) | |
| OFFICE OF THE COMMISSIONER OF BASEBALL et al., | ) ) ) | |
| Defendants. | ) | |

**CORRECTED**
**JOINT MEMORANDUM OF LAW**
**IN OPPOSITION TO CLASS CERTIFICATION**

REDACTED – PUBLIC VERSION

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..........................................................................1

BACKGROUND AND SUMMARY OF THE EVIDENCE ...........................5

    A.    The Plaintiffs..........................................................................5

    B.    The Proposed Classes .............................................................5

    C.    The Existing Broadcast Supply Chain ....................................7

    D.    Plaintiffs' Asserted BFW .......................................................9

    E.    The Factual Evidence that the BFW Would Not Take the Shape Plaintiffs and Dr. Noll Presume.....................................10

ARGUMENT ..............................................................................................15

I.    PLAINTIFFS HAVE NOT SHOWN THAT IMPACT IS A COMMON QUESTION WITH A COMMON ANSWER FOR ALL CLASS MEMBERS ..............16

    A.    In the BFW, There Would Be Significant Reassessment and Bargaining in the Vertical Supply Chain .................................17

        1.    Bargains Between the Clubs ......................................20

        2.    Bargains Between the Clubs and RSNs ......................20

        3.    Bargains Between RSNs and MVPDs .........................21

        4.    Bargains Between the Leagues and MVPDs ...............22

    B.    It Is Highly Unlikely that the BFW Would Include League Packages, Lower Prices, or the Production of All Games ........................23

        1.    The League Packages Likely Would Not Exist in the BFW ..................23

        2.    Any BFW League Package Would Be More Expensive for Avid, Multi-Club Fans.....................................25

        3.    Not All Games Would Be Produced in the BFW ........26

    C.    This Is Not a Price-Fixing Case..............................................27

D.      There Is No Excuse for Dr. Noll's Failure to Model the Bargaining that Would Take Place in the BFW ........................................................27

E.      Dr. Noll's Impact Analysis Is Driven by His Faulty "Marginal Cost" Assumptions.................................................................................29

II.     DR. NOLL FAILS TO ASSESS THE IMPACT OF ONLY THE CHALLENGED ANTICOMPETITIVE CONDUCT, AS *BEHREND* REQUIRES ...................30

III.    INDIVIDUALIZED ISSUES OF DAMAGES PRECLUDE CLASS CERTIFICATION ...............................................................................32

A.      Dr. Noll Ignores ████████████████████ that Reduce the Purchase Price of the OMPs Below Plaintiffs' BFW Price ....................33

B.      Plaintiffs Have Not Modeled Damages for Comcast Subscribers or for DIRECTV Subscribers to NHL Center Ice ..........................................34

IV.     THE PUTATIVE CLASS MEMBERS' ARBITRATION OBLIGATIONS PRECLUDE CLASS CERTIFICATION .........................................................35

A.      Individualized Inquiries into Applicable Law Defeat Predominance ..................36

B.      A Named Plaintiff Cannot Represent Putative Class Members Subject to Different Arbitration Obligations ...........................................................39

C.      Joint and Several Liability Is No Substitute for Predominance, Commonality, Typicality, and Adequacy ...............................................40

V.      INTRACLASS CONFLICTS PRECLUDE CLASS CERTIFICATION.........................40

VI.     PLAINTIFFS HAVE NOT ESTABLISHED THE RULE 23(B)(2) REQUIREMENTS....................................................................................44

CONCLUSION....................................................................................................47

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ahlers v. Ryland Homes Nevada, LLC,*
    No. 52511, 2010 WL 3276221 (Nev. Apr. 16, 2010)............................................................38

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group, L.P.,*
    247 F.R.D. 156 (C.D. Cal. 2007)........................................................................................18

*Almonor v. BankAtlantic Bancorp., Inc.,*
    261 F.R.D. 672 (S.D. Fla. 2009)........................................................................................43

*Amchem Prods. v. Windsor,*
    521 U.S. 591 (1997).........................................................................................................41

*Arthur Andersen LLP v. Carlisle,*
    556 U.S. 624 (2009).........................................................................................................37

*Auto Ventures, Inc. v. Moran,*
    No. 92-426-CIV KEHOE, 1997 WL 306895 (S.D. Fla. Apr. 3, 1997) ................................42

*Bell Atl. Corp. v. AT&T Corp.,*
    339 F.3d 294 (5th Cir. 2003) ............................................................................................16

*Blades v. Monsanto, Inc.,*
    400 F.3d 562 (8th Cir. 2005) ............................................................................................34

*Blue Cross & Blue Shield United v. Marshfield Clinic,*
    152 F.3d 588 (7th Cir. 1998) ............................................................................................32

*Broussard v. Meineke Discount Muffler Shops, Inc.,*
    155 F.3d 331 (4th Cir. 1998) ............................................................................................43

*Cholakyan v. Mercedes-Benz, USA, LLC,*
    281 F.R.D. 534 (C.D. Cal. 2012)......................................................................................46

*Cinocca v. Orcrist, Inc.,*
    60 P.3d 1072 (Okla. Civ. App. 2002) ................................................................................37

*Clapper v. Amnesty Int'l USA,*
    133 S. Ct. 1138 (2013)......................................................................................................45

*Comcast Corp. v. Behrend,*
    133 S. Ct. 1426 (2013)........................................................................................... passim

*Concord Boat Corp. v. Brunswick Corp.*,
    207 F.3d 1039 (8th Cir. 2000) ............................................................17, 31

*Continental Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater N.Y., Inc.*,
    198 F.R.D. 41 (E.D.N.Y. 2000) ....................................................................16

*Decisive Analytics Corp. v. Chikar*,
    75 Va. Cir. 337 (Va. Cir. Ct. 2008) ............................................................37

*Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006) .......................................................................42

*Dominguez v. UAL Corp.*,
    666 F.3d 1359 (D.C. Cir. 2012) ...................................................................18

*Douzinas v. Am. Bureau of Shipping, Inc.*,
    888 A.2d 1146 (Del. Ch. 2006) ...................................................................37

*Duchardt v. Midland Nat'l Life Ins. Co.*,
    265 F.R.D. 436 (S.D. Iowa 2009) ................................................................43

*ev3 Inc. v. Collins*,
    No. A08-1816, 1901, 2009 WL 2432348 (Minn. Ct. App. Aug. 11, 2009) ...........37

*Fernandez v. Wells Fargo Bank, N.A.*,
    No. 12 Civ 7193 PKC, 2013 WL 4540521 (S.D.N.Y. Aug. 28, 2013) .................33

*Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*,
    301 F.R.D. 116 (S.D.N.Y. 2014) ..................................................................35

*Freeland v. AT&T Corp.*,
    238 F.R.D. 130 (S.D.N.Y. 2006) ............................................................16, 44

*George v. China Auto. Sys., Inc.*,
    No. 11 Civ. 7533 KBF, 2013 WL 3357170 (S.D.N.Y. July 3, 2013)....................15

*German Am. Fin. Advisors & Trust Co. v. Reed*,
    969 N.E.2d 621 (Ind. Ct. App. 2012) ..........................................................37

*Glictronix Corp. v. AT&T*,
    603 F. Supp. 552 (D.N.J. 1984) ..................................................................18

*Heerwagen v. Clear Channel Commc'ns*,
    435 F.3d 219 (2d Cir. 2006)........................................................................16

*Hemphill v. Ford Motor Co.*,
    206 P.3d 1 (Kan. Ct. App. 2009) .................................................................37

*Hill v. T-Mobile USA, Inc.*,
  No. 2:09-CV-1827 VEH, 2011 WL 10958888 (N.D. Ala. May 16, 2011) ...........................38

*Hoffman v. Finger Lakes Instrumentation, LLC*,
  789 N.Y.S.2d 410 (N.Y. Sup. Ct. 2005) ....................................................................37

*Household Fin. Corp. II v. King*,
  No. 2009-CA-001472-MR, 2010 WL 3928070 (Ky. Ct. App. Oct. 8, 2010).........................37

*I Sports v. IMG Worldwide, Inc.*,
  813 N.E.2d 4 (Ohio Ct. App. 2004) .........................................................................37

*In re Elec. Books Antitrust Litig.*,
  No. 11 MD 2293 DLC, 2014 WL 1282293 (S.D.N.Y. Mar 28, 2014)..................................27

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008)....................................................................................16

*In re IPO Secs. Litig.*,
  471 F.3d 24 (2d Cir. 2006)......................................................................................15

*In re Literary Works in Elec. Databases Copyright Litig.*,
  654 F.3d 242 (2d Cir. 2011)...............................................................................41, 43

*In re MTBE Prods. Liab. Litig.*,
  209 F.R.D. 323 (S.D.N.Y. 2002) ..............................................................................44

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
  522 F.3d 6 (1st Cir. 2008).......................................................................................31

*In re Photochromic Lens Antitrust Litig.*,
  No. 8:10-CV-00984-T-27EA, 2014 WL 1338605 (M.D. Fla. Apr. 3, 2014) .........................42

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  725 F.3d 244 (D.C. Cir. 2013) .....................................................................15, 16, 34

*In re Titanium Dioxide Antitrust Litig.*,
  962 F. Supp. 2d 840 (D. Md. 2013) ..................................................................36, 39

*Jacob v. Duane Reade, Inc.*,
  293 F.R.D. 578 (S.D.N.Y. 2013) ..............................................................................32

*King v. Capital One Bank (USA), N.A.*,
  No. 3:11-CV-00068, 2012 WL 5570624 (W.D. Va. Nov. 15, 2012) ..................................39

*Kohen v. Pac. Invest. Mgmt. Co.*,
  571 F.3d 672 (7th Cir. 2009) ..................................................................................43

*Kolsky v. Jackson Square, LLC,*
    28 So. 3d 965 (Fla. Dist. Ct. App. 2010) ........................................................37, 38

*Konik v. Time Warner Cable,*
    No. CV-07-763 SVW RZX, 2010 WL 8471923 (C.D. Cal. Nov. 24, 2010)..........................15

*Ligon v. City of New York,*
    288 F.R.D. 72 (S.D.N.Y. 2013) ........................................................44

*Litton Sys., Inc. v. AT&T,*
    700 F.2d 785 (2d Cir. 1983)........................................................31

*Livingston v. Metro. Pediatrics, LLC,*
    227 P.2d 796 (Or. Ct. App. 2010) ........................................................37

*Lozano v. AT&T Wireless Servs., Inc.,*
    504 F.3d 718 (9th Cir. 2007) ........................................................38

*Luke v. Gentry Realty, Ltd.,*
    96 P.3d 261 (Haw. 2004) ........................................................37

*Manson v. GMAC Mortg., LLC,*
    283 F.R.D. 30 (D. Mass. 2012)........................................................46

*MCI Commc'ns Corp. v. AT&T Co.,*
    708 F.2d 1081 (7th Cir. 1983) ........................................................32

*Nationwide Life Ins. Co. v. Haddock,*
    460 F. App'x. 26 (2d Cir. 2012) ........................................................44

*Order Homes, LLC v. Iverson,*
    685 S.E.2d 304 (Ga. Ct. App. 2009) ........................................................37

*Ouedraogo v. A-1 Int'l Courier Serv., Inc.,*
    No. 12-CV-5651 AJN, 2014 WL 4652549 (S.D.N.Y. Sept. 18, 2014) ........................15

*Pablo v. ServiceMaster Global Holdings, Inc.,*
    No. C 08-03894 SI, 2011 WL 3476473 (N.D. Cal. Aug. 9, 2011) ........................36

*Pearson v. Hilton Head Hosp.,*
    733 S.E.2d 597 (S.C. Ct. App. 2012) ........................................................37

*Pickett v. Iowa Beef Processors,*
    209 F.3d 1276 (11th Cir. 2000) ........................................................43

*Renton v. Kaiser Found. Health Plan, Inc.,*
    No. C00-5370 RJB, 2001 WL 1218773 (W.D. Wash. Sept. 24, 2001) ........................39

*Res. Servs., LLC v. Bridgeport Hous. Auth.*,
    No. HHDCV1060201085, 2011 WL 2739544 (Conn. Super. Ct. June 13,
    2011) ............................................................................................................................37

*Retired Chicago Police Ass'n v. City of Chicago*,
    7 F.3d 584 (7th Cir. 1993) ...........................................................................................43

*Roach v. T.L. Cannon Corp.*,
    No. 3:10-CV-0591 TJM/DEP. 2013 WL 1316452 (N.D.N.Y. Mar. 29, 2013) ...............33

*Speedway Motorsports Int'l, Ltd. v. Bronwen Energy Trading, Ltd.*,
    No. 08-CVS-9450, 2009 WL 406688 (N.C. Super. Feb 18, 2009) .............................37

*Tobel v. AXA Equitable Live Ins. Co.*,
    No. 298129, 2012 WL 555801 (Mich. Ct. App. Feb. 21, 2012)................................37

*Valley Drug Co. v. Geneva Pharms., Inc.*,
    350 F.3d 1181 (11th Cir. 2003) ...................................................................................42

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) ........................................................................................ passim

*Walsh v. Ford Motor Co.*,
    807 F.2d 1000 (D.C. Cir. 1986) ...................................................................................38

*Yarger v. ING Bank, fsb*,
    285 F.R.D. 308 (D. Del. 2012) ....................................................................................46

**OTHER AUTHORITIES**

FCC 15th Report on Status of Competition in the Market for the Delivery of
   Video Programming...........................................................................................................7

Fed. R. Civ. P. 23 .................................................................................................. passim

REDACTED – PUBLIC VERSION

## PRELIMINARY STATEMENT

To meet their burden of proof for class certification, Plaintiffs must prove that the impact of eliminating territorial exclusivity is a common question that will yield a common answer for all class members in one stroke.  Plaintiffs' motion fails because they cannot show common impact with common evidence.  In fact, many of the putative class members would be far worse off in the but-for-world ("BFW") without the Leagues' Home Television Territories ("HTTs"), but none can be identified without individual inquiry.  Even if the BFW might benefit some class members ("winners"), many others would be "losers" because the League packages they want would not exist, would cost more than they do now, or would contain fewer game telecasts.  In an effort to obtain what they want – standalone channels of preferred clubs – the named Plaintiffs would thus sacrifice the interests of the many class members who prefer the current League packages of all out-of-market games.  These individualized impact issues and fundamental intra-class conflicts preclude certification under Rule 23.

To avoid these inevitable conclusions, Plaintiffs would have this Court overlook the basic economic incentives that drive the telecasting of MLB and NHL games in the actual world. HTTs enable clubs to sell their telecast rights on an exclusive basis to regional sports networks ("RSNs").  RSNs then use these exclusive telecast rights to obtain carriage on multichannel video programming distributors ("MVPDs") for distribution to customers.  This ability to provide exclusive content is the foundation for all of the investment decisions and bargains in the entire supply chain for live MLB and NHL telecasts.  But Plaintiffs' claim of "common impact" relies on the assertion that, without HTTs, clubs, Leagues, RSNs, and MVPDs would agree to a particular BFW structure Plaintiffs posit, one that eliminates both (challenged) territorial

REDACTED – PUBLIC VERSION

exclusivity and (unchallenged) content exclusivity.[1]  Specifically, in Plaintiffs' BFW, (i) RSNs would give away their game telecasts for free to the Leagues, (ii) the Leagues would use these telecast feeds to compete against the RSNs and the Leagues' own clubs, and (iii) RSNs would stream game telecasts on the Internet, even though that would incentivize MVPDs to drop RSN programming from broad-tier distribution.  Plaintiffs also presume that, in the BFW, MVPDs would carry all clubs' games on an à la carte basis, even though for many decades the MVPD business model for all programming – sports and otherwise – has been to bundle content.  Thus, in Plaintiffs' BFW, there would be no content exclusivity for any game because there would be three competing sellers of every game everywhere – the home club, the visiting club, and the League packages.

Without content exclusivity, RSNs would not produce as many high-quality game telecasts of as many clubs, MVPDs would not distribute RSNs as broadly and some may carry fewer RSNs, and MVPDs would have no incentive to carry channels featuring each individual club in each League <u>plus</u> a wholly duplicative, competing League package.  The end result would be that the League packages either would not be available at all in the BFW, or else would be priced much higher than they are today.  Either result means there would be "losers" in the BFW among the putative classes.

In the face of these marketplace realities, Plaintiffs attempt to meet their burden through the model and opinions of Dr. Roger Noll, who opines that in the BFW there would be League

---

[1]  As Plaintiffs have represented, their challenge to HTTs does not include any challenge to the right of clubs to sell their telecast rights on an exclusive basis.  *Laumann* Dkt. 241/*Garber* Dkt. 301 (MSJ Opp.) at 45, 47-48.

packages priced at 25% less than the existing out-of-market packages ("OMPs").[2]  Dr. Noll's

conclusion is based on his opinion that, of all the many possible ways market participants might

act in the BFW without HTTs, they all would in fact make the very <u>specific</u> set of choices

needed to produce Plaintiffs' BFW.  But that singular BFW outcome Dr. Noll presumes is

inconsistent with basic economic principles, including the rational economic choices of the

clubs, Leagues, RSNs, and MVPDs in the BFW without HTTs.

Having eliminated the foundation for the entire existing system of live game telecasts –

content exclusivity – Dr. Noll fails to analyze the diverse and divergent incentives and options of

the industry participants in a scenario where the supply chain for live game telecasts must be re-

designed from the bottom up.  He instead assumes his conclusion that League packages would

exist in the BFW and would be sold in competition with single-club channels.  But rudimentary

economic analysis confirms what all the fact witnesses attest – that RSNs would not give away

their feeds for free to be used to compete against themselves, the Leagues would not offer a

League package in competition with their own clubs, and MVPDs would not carry standalone-

club channels <u>and</u> League packages with prices to consumers for the two types of products set in

competition with each other.  Rather, profit-maximizing behavior (detailed by Defendants'

experts) would lead to higher prices for League packages – even assuming such packages would

exist in the BFW where (Plaintiffs assume) each RSN would have national distribution.  Thus,

there would be little reason for a League package at all.

---

[2]  Defendants incorporate by reference in support of this motion all of the evidence offered in
support of the *Daubert* motion, all of which goes not only to the admissibility of Dr. Noll's
opinions, but also their weight.

REDACTED – PUBLIC VERSION

In sum, under any coherent economic analysis, the proposed classes include many "losers" because the League packages either will not exist or will be more expensive than the existing OMPs.  While certain class members, like the named Plaintiffs, might be happy to buy channels featuring just one "favorite" club (if offered), other class members who want League packages would be significantly worse off.  Other losers in the putative class include fans of clubs that are no longer able to telecast all their games because of renegotiation between clubs and RSNs over the economics of the distribution system.  No class can be certified where a substantial number of class members are worse off in the BFW.

Accordingly, substantial individualized issues predominate and preclude certification under Rule 23(b)(3).  The proposed classes are also internally conflicted and incohesive, which precludes certification under Rule 23(a)(4) and 23(b)(2).

Dr. Noll's model also violates the Supreme Court's clear directive in *Comcast v. Behrend* that a BFW model must measure the effects of eliminating only the challenged conduct.  Dr. Noll's BFW model wipes out both challenged territorial exclusivity and unchallenged content exclusivity, making no effort to isolate only the alleged price effects of eliminating the challenged conduct.  Conflating the price effects of challenged and unchallenged conduct is the same flaw that was fatal to certification in *Behrend*.  And Plaintiffs have not even attempted to model impact or damages for Comcast subscribers or DIRECTV Center Ice subscribers.

Class certification also is barred for the additional reason that under many states' laws, the claims of putative class members must be arbitrated, including those against Defendants who are not signatories to arbitration agreements.  Resolving these issues will require a potentially large number of individualized inquiries into different states' laws, another factor that precludes certification.

4

REDACTED – PUBLIC VERSION

## BACKGROUND AND SUMMARY OF THE EVIDENCE[3]

### A.  The Plaintiffs

The named Plaintiffs are current and former DIRECTV, Comcast, MLB.TV, and NHL GameCenter Live OMP subscribers.[4]  Most subscribed to the OMPs to watch their preferred clubs and want the option to purchase telecasts of only their favorite club.  They do not have a vested interest in whether an OMP would continue to exist in the BFW or how the BFW would affect the ability of other class members to buy telecasts of their favorite clubs.[5]  Plaintiff Traub testified, for example, that he does not care if there is a comprehensive OMP, so long as he can buy telecasts of games featuring his favorite club.[6]

### B.  The Proposed Classes

There are three categories of potential class members in each case:  (1) subscribers to OMPs distributed by DIRECTV, (2) subscribers to OMPs distributed by Comcast, and

---

[3]  Citations are to the accompanying Appendix of Evidence from witnesses from the League, RSN, and MVPD Defendants, as well as from Dr. Janusz Ordover.  The declarations are cited as [WITNESS NAME] ¶ [NUMBER].  The Appendix also includes excerpts from the depositions of the Plaintiffs and Dr. Noll, cited as [WITNESS NAME] Tr. [PAGE].

[4]  Birbiglia Tr. 24; Rasmussen Tr. 55-57; Traub Tr. 53-54, 57-58; Lerner Tr. 56-57; Silver Tr. 53-54; Dillon Tr. 85-87; Laumann Tr. 81-83.

[5]  For example, Plaintiff Lerner does not care if the American League Champion Kansas City Royals were to have fewer games televised or even go out of business because of this lawsuit. *See* Lerner Tr. 47-48, 92; *see also* Birbiglia Tr. 34-37 (he cares only about watching and paying for a package of only his favorite club, the Mets – no other clubs are of any concern for him); Rasmussen Tr. 74-75 (if one club went out of business because of this lawsuit that would be okay with him); Silver Tr. 103, 112 (he does not care if the NHL's cable OMP continues to exist or if clubs are contracted); Laumann Tr. 103 (he is not concerned about whether the NHL's online OMP ceases to exist as a result of this lawsuit).

[6]  Traub Tr. 107-08.

(3) subscribers to the Leagues' Internet OMPs.[7]

Putative class members subscribed to various versions of the OMPs – basic, premium, monthly, half-season, full-season, etc. – at various prices and with various discounts depending on when and from which provider they purchased the OMP.  Many subscribers, including Plaintiff Birbiglia, also obtained individually negotiated discounts or effective discounts, such as free services and package deals.  Jack ¶¶ 3-7; Brosnan ¶¶ 39-40.  Many potential class members are subject to arbitration provisions in subscriber agreements with one or more Defendants.  *E.g.*, Bowman ¶ 33.  *See infra* Part IV.

The named Plaintiffs represent only a small subset of the proposed classes, which date back to 2008 and represent the purchase of over ▮▮▮▮▮ OMP subscriptions.  The preferences and circumstances of the proposed class members run the gamut from those who subscribed to an OMP primarily to follow a single out-of-market club to those who subscribed to follow multiple clubs, an entire division or conference, a playoff run, an entire League, or games involving their fantasy league players[8] – and all of the countless permutations in between.

Defendants' expert, Dr. Ordover, shows that, in contrast to the named Plaintiffs, only a modest fraction of OMP subscribers focus on watching a single "favorite" club, compared to approximately ▮▮▮▮▮ of subscribers who mostly watch games involving three or more clubs.  For example, only about ▮▮▮ of MLB.TV subscribers in 2012 watched games featuring

---

[7]  The proposed classes do not include the additional fans who subscribed to OMPs distributed through other MVPDs (e.g., TimeWarner Cable, Cablevision), even though the relief sought would have a substantial impact on those subscribers.

[8]  Fantasy sports leagues allow participants to build "fantasy teams" that consist of real world players from various clubs within a professional sport.  A "fantasy team" almost by definition includes players from many different real world clubs.  Participants compete against one another using the statistics accumulated by their players, based on their real-world performances.

REDACTED – PUBLIC VERSION

their favorite club 95% of the time or more, while about ▮▮▮ of MLB.TV subscribers watched their favorite club less than 50% of the time.  For the NHL, only about ▮▮▮ of GameCenter Live ("GCL") subscribers in the 2012 season watched their favorite club at least 95% of the time, while about ▮▮▮ watched their favorite club less than 50% of the time.  Ordover ¶¶ 43-47.

The willingness and ability of different proposed class members to subscribe to an OMP through DIRECTV or Comcast or on the Internet also varies.  At the beginning of the proposed class period in 2008, a substantial number of households did not have the high-speed Internet service needed to view a live-streaming, high-definition, Internet OMP.  Noll Decl. at 55.  Even as recently as 2012, many fans did not have Internet-ready televisions or gaming devices that would allow them to stream an OMP to their television.  Similarly, not every class member has the choice of subscribing to DIRECTV or Comcast to obtain television OMPs.[9]

## C.    The Existing Broadcast Supply Chain

As detailed in the Defendants' motions for summary judgment, RSNs license exclusive content rights from clubs under rights agreements that allow the RSNs to telecast the games only in the clubs' respective HTTs.  Krolik ¶¶ 5-6.  Content exclusivity is valuable and the norm for almost all live sports and non-sports content licensing, including other professional sports. Litner ¶¶ 2-4; Krolik ¶¶ 6-7; Bettman ¶ 3; Brosnan ¶ 21.  Content exclusivity also is the norm in college football and basketball, where no territorial rules exist, but clubs and conferences still license each game to only one network for production and telecast.  Litner ¶ 3; *see* Brosnan ¶ 8.

---

[9]  FCC 15th Report on Status of Competition in the Market for the Delivery of Video Programming, ¶¶ 5, 12, 25, *available at* http://www.fcc.gov/document/fcc-adopts-15th-report-video-competition-0 (less than 23% of households had Internet-ready televisions as of 2012; Comcast does not service all states; and DIRECTV is not available to all homes).

REDACTED – PUBLIC VERSION

In exchange for exclusive content, RSNs pay clubs rights fees, agree to obtain MVPD carriage in broadly penetrated tiers or packages (usually to at least 70 percent of the MVPD's subscribers) (*see* Feeney ¶¶ 4-5, 9 (referencing "Choice" package)) and further agree to provide their live game feeds for free to the Leagues for use in the OMPs.  Crumb ¶¶ 9-10.  ██████ ██████████████████████████████████████████████████████████████ the Leagues do not telecast or stream the RSNs' feeds back into the clubs' HTTs.  ██████████ Brosnan ¶ 7.  This ensures the content exclusivity that forms the bases of the business models and bargaining throughout the broadcast supply chain – i.e., among the clubs, Leagues, RSNs, and MVPDs.  Litner ¶¶ 7, 11, 13; Feeney ¶ 4; Crumb ¶¶ 3, 7, 9; Brosnan ¶¶ 24-25; Bowman ¶ 10; Bettman ¶ 4; Krolik ¶ 6; Biard ¶ 3.

RSNs enter into affiliation agreements with MVPDs, which package the RSN channels with other programming and sell the bundled programming to subscribers in "tiers" or packages. MVPDs pay RSNs per-subscriber license fees based on the number of subscribers who receive the channel in their tier of service, not just for the subscribers who actually watch the RSN.  That is, RSNs (like the vast majority of channels) do not sell themselves à la carte.  Feeney ¶¶ 4-5; Crumb ¶ 10; Rigdon ¶¶ 9-10; Noll Tr. 36-37.

Even with the benefit of content exclusivity, RSNs are not fully carried everywhere. Some MVPDs operating in a club's HTT do not carry its licensed RSN at all, and some do not carry an RSN in the outer regions of the HTT.[10]  Feeney ¶ 6; Crumb ¶ 6; Biard ¶¶ 4-5; Brosnan ¶ 12.

---

[10]  For example, DIRECTV does not presently carry the Los Angeles Dodgers and does not distribute the Colorado Rockies in parts of its territory in New Mexico.  Feeney ¶ 6.

D.    **Plaintiffs' Asserted BFW**

Plaintiffs claim that all absent class members would have been better off – "winners" – in the BFW without HTTs.  Mem. at 11-13.  Plaintiffs rely on Dr. Noll's assertion that League packages would exist and be lower priced in the BFW, which he posits would have one specific form in which <u>all</u> of the following would take place:

- League video rights structures stay exactly the same – home and visiting clubs cross-licensing telecast rights for no charge, clubs authorizing League packages, etc. – except clubs are permitted to license the live telecast and streaming of their games everywhere in the U.S.

- The RSNs provide their game feeds for free to the Leagues for inclusion in League packages, even though those feeds are used to compete against the RSN in its home region and nationally.

- RSNs license as many games from as many clubs as they do today, but choose to license those rights nationally from every club.

- Every RSN reaches agreement with one or more MVPDs for carriage nationwide and the MVPDs offer those RSN channels on an à la carte basis.

- Every RSN jeopardizes its own MVPD sales by offering Internet streaming versions on an over-the-top ("OTT") basis (i.e., purchasers are not required to be authenticated MVPD subscribers).

- Clubs authorize League packages for distribution nationwide, but without blackouts, such that game feeds are distributed both out-of-market and in-market ("BFW League Packages") and overlap everywhere with the RSN telecasts clubs license individually.

9

- MVPDs agree to carry the BFW League Packages in addition to and in competition with the RSN channels.

Neither Plaintiffs nor Dr. Noll confirmed with the market participants whether they would have agreed to all of the bargains and business models implicit in this specific BFW outcome ("Plaintiffs' BFW").  Dr. Noll instead opined that it was reasonable to assume all of the conditions of the Plaintiffs' BFW because, he claims, it would generate "positive revenues" on a collective basis.  Noll Tr. 75-76.

The Defendants' fact witnesses, as well as Dr. Ordover, explain in detail why Dr. Noll's BFW assertions are implausible and based on a fundamental failure to understand how each of the entities in the supply chain that delivers game telecasts to fans – clubs, Leagues, RSNs, and MVPDs – would act without HTTs.  We summarize that evidence immediately below.

**E.      The Factual Evidence that the BFW Would Not Take the Shape Plaintiffs and Dr. Noll Presume**

The witnesses from each of the Leagues, the RSNs, and the MVPDs attest that all of the business models and bargains that exist in the actual world supply chain for live MLB and NHL game telecasts are premised on the content exclusivity provided under the current structures with HTTs.  Indeed, they explain that the RSNs and OMPs each were created only in the specific context of HTTs and the resulting value of the content exclusivity the HTTs afford. Bettman ¶¶ 3-4; Brosnan ¶¶ 23-24; Bowman ¶ 8.  In the absence of HTTs, all business models that arose in the context of HTTs would need to be re-assessed and all bargains and agreements at each step of the BFW supply chain would need to be considered in light of the profit-maximizing options facing the participants under that very different circumstance.  Litner ¶¶ 7, 11, 13; Rigdon ¶¶ 17-18, 24-25; Crumb ¶¶ 4-7; Feeney ¶¶ 4-6; Bettman ¶¶ 5, 7-15; Brosnan ¶¶ 25-38; Bowman ¶¶ 8-10; Biard ¶ 5; Krolik ¶¶ 7, 11-12.

*First*, the League witnesses attest that ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████ In particular, the premise for the

existing agreements among clubs to cross-license home and away game telecast rights would fall

away if every club had the right to telecast nationally in competition with every other club.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████ Moreover,

both MLB and the NHL confirm that the OMPs ████████████████████████████

███████████████████████████ The Leagues operate as joint ventures of their

member clubs and the OMPs were created, and approved by the clubs, only to <u>supplement</u> club-

licensed local telecasts and League-licensed national network telecasts. ████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

     *Second*, even if there were a business case for League packages when clubs are individually telecasting everywhere, ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ The most likely scenario is that RSNs ████████ ████████████████████████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████████████████████████████████ There is no reasonable scenario under which every club would see most of its games licensed for nationwide distribution in that context. The most likely outcome in the BFW is that only a few of the most nationally-popular clubs would secure national distribution and that many smaller-market clubs would be relegated to telecasting only a much smaller inventory of games. Krolik ¶¶ 8-10, 14-15; Brosnan ¶¶ 11-13.

████████████████████████████████████████████████████
████████████████████████████████████████████████████

when faced with competition from every other club in their respective League.  Bettman ¶ 9.[11]

(Similarly, the witnesses attest that it is very unlikely that every RSN carrying every club would

obtain nationwide distribution, as Plaintiffs' BFW presumes.[12]  Rigdon ¶ 17; Feeney ¶¶ 5-9;

Brosnan ¶¶ 12-13; Biard ¶ 9.)

Third, the League, RSN, and MVPD witnesses also explain that Plaintiffs and Dr. Noll's

BFW is implausible because it posits that RSNs and MVPDs would adopt entirely new business

models, namely:

- Licensing, production, and distribution of live/first-run programming with no content
  exclusivity.  That business model does not exist in mainstream television – sports or
  otherwise.  Litner ¶¶ 2-4; Brosnan ¶¶ 21-22.[13]

---

[11]  That type of selectivity already exists with ███████████████████████████████████ ███████████████████ Similarly, some RSNs (like Fox Sports Kansas City, affiliated with the Kansas City Royals) choose not to broadcast all of a club's games, even within that club's HTT. Krolik ¶ 13; Bettman ¶ 7.

[12]  As noted above, even with HTTs, MVPDs and RSNs do not always agree on carriage terms, particularly where HTTs overlap.  Feeney ¶ 6; see Crumb ¶ 14. ████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████

[13]  Dr. Noll admits that content is virtually always distributed on an exclusive basis and could point to no example where a content provider gives its content to a competitor for free.  Noll Tr. 34.  Dr. Noll and Plaintiffs point to supposed examples of bundled and unbundled programming. None of the examples is relevant, however, because none involves the simultaneous sale of the same, live programming through competing packages.  Dr. Noll cites the fact that multiple college football games may be telecast at the same time by different national networks.  Mem. at 3 (quoting Noll Decl. at 114).  But, in all but the rarest instance, only one network is licensed to telecast any one game.  There are no overlapping telecasts of the same game – the scenario Dr. Noll posits for his BFW.  For their part, Plaintiffs cite Netflix and Spotify as examples of bundled sales of individual offerings.  Mem. at 3.  These too are inapposite.  Netflix does not simultaneously stream live video programming available elsewhere (and, indeed, Netflix's own original content, such as House of Cards, is exclusive to Netflix in its first run).  Likewise, a Spotify membership does not replicate the actual sale of "individual offerings."

- Transformation of every RSN from the regional model under which each was created and operates into a network with a <u>national</u> footprint. ████████████████

████████████████████████████████████████████████

- Sale of RSN channels on a standalone, à la carte basis. ████████████████

████████████████████████████████████████████████

████████[14]

- Sales of OTT, live streaming services comprising the game telecasts produced by the RSNs.  There is no precedent for RSNs consenting to or launching such OTT services ████████████████[15]  RSNs were not created, and do not operate as, ████████████████████████████████

████████████  Bowman ¶¶ 11-15, 30; Brosnan ¶ 14.

---

[14] Dr. Noll admitted that his model assumes standalone channels and the only BFW pricing he offers is pricing for such channels.  Noll Tr. 194.  But Dr. Noll also admitted that the MVPD business model is not based on standalone channels because MVPDs invariably bundle their content.  *Id.* at 203-04. ████████████████████████████████████

[15]  RSNs are hardly alone in this regard.  The overwhelming majority of cable networks have not been eager to adopt an over-the-top streaming model, in part because of concerns that it would undermine their relationships with MVPDs.  It is only very recently, for example, that CBS announced its intent to launch some form of OTT service, the scope and pricing of which is not yet clear, but is expected to have limitations.  Bowman ¶¶ 13-14.

## ARGUMENT

The Court is well-versed in the "rigorous" analysis required for class certification under current law, particularly after the decision in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013).[16] We therefore only briefly review the most salient requirements here.

Plaintiffs bear the burden of proving by a preponderance of the credible evidence that the requirements of Rule 23 are satisfied "in fact." *Behrend*, 133 S. Ct. at 1432.[17] Plaintiffs bear that burden both with respect to Rule 23(a) and the "even more demanding" predominance requirement of Rule 23(b)(3). *Id.* at 1433.[18] The court must "assess" all of the relevant evidence and actually resolve any factual dispute – or disputes between experts – as to whether Rule 23 is satisfied.[19] The court must make those determinations even when Rule 23's requirements overlap with merits issues, as they frequently will. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551-52 (2011).[20] "Rule 23 not only authorizes a hard look at the soundness of statistical models

---

[16] *See, e.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 255 (D.C. Cir. 2013) ("Before *Behrend*, the case law was far more accommodating to class certification under Rule 23(b)(3).").

[17] Plaintiffs thus bear a much heavier burden here than in opposing summary judgment. *Konik v. Time Warner Cable*, 2010 WL 8471923, at *9 n.8 (C.D. Cal. Nov. 24, 2010) ("Plaintiffs' burden at the motion for class certification phase is more stringent" than on summary judgment).

[18] Plaintiffs' reference to the supposed ease of class certification in "price-fixing cases" (Mem. at 6, 14-17) is both irrelevant and wrong. This is not a price-fixing case. MTD Order at 24-25. And, in any event, class certification is denied in price-fixing cases where, as here, plaintiffs fail to satisfy the requirements of Rule 23. *See, e.g.*, *In re Rail Freight*, 725 F.3d at 244.

[19] *Ouedraogo v. A-1 Int'l Courier Serv., Inc.*, 2014 WL 4652549, at *3 (S.D.N.Y. Sept. 18, 2014) (quoting Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 546 F.3d 196, 202 (2d Cir. 2008)); *George v. China Auto. Sys., Inc.*, 2013 WL 3357170, at *1, 9 (S.D.N.Y. July 3, 2013) (denying class certification after evidentiary hearing revealed that plaintiffs' expert analysis was faulty and not credible).

[20] Factual determinations under Rule 23 are "solely for purposes of class certification" and are "not binding on the trier of facts," including a court. *In re IPO Secs. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006).

REDACTED – PUBLIC VERSION

that purport to show predominance – the rule commands it."[21] Here, as in other cases, Plaintiffs' classwide impact arguments cannot survive that "hard look" because the BFW would impact different individual class members differently – i.e., there would be "losers" even if there may also be "winners."

## I.   PLAINTIFFS HAVE NOT SHOWN THAT IMPACT IS A COMMON QUESTION WITH A COMMON ANSWER FOR ALL CLASS MEMBERS

Plaintiffs acknowledge that, to certify a class under Rule 23(b)(3), they must prove that antitrust impact is a common question with a "common answer" that can be determined without need for individualized inquiry.  Mem. at 11-13.[22]  Class certification cannot be granted if some class members would be worse off – "losers" – in a world without HTTs, even if other class members might be better off – "winners."[23]

---

[21]  *In re Rail Freight*, 725 F.3d at 255 (denying certification for lack of predominance after weighing testimony of competing experts and finding the plaintiffs' expert's model "flaw[ed]"); *id.* ("No damages model, no predominance, no class certification.").  *See also In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312 (3d Cir. 2008) (Rule 23 requires a "rigorous assessment" of proffered theory of antitrust impact, including of the persuasiveness and credibility of expert evidence proffered to prove impact); *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 148-52 (S.D.N.Y. 2006) (class certification denied for lack of classwide issue of injury where plaintiffs' econometric model ignored actual business practices).

[22]  While Fed. R. Civ. P. 23(b)(3) requires that common questions must "predominate," Rule 23(a) sets the standards for what constitutes a "common question" in the first place.  The Supreme Court set that standard, most recently, in *Wal-Mart*, holding that a "common question" must be one for which there will be a "common answer" that will be determined – yes or no – for all class members "in one stroke."  131 S. Ct. at 2551.

[23]  *E.g.*, *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 229 (2d Cir. 2006) (class certification denied in antitrust case where "particular proof – specific to individual members of the putative class who reside in different geographic markets – would predominate"); *Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) ("Where fact of damage cannot be established for every class member through proof common to the class, the need to establish antitrust liability for individual class members defeats Rule 23(b)(3) predominance."); *Continental Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater N.Y., Inc.*, 198 F.R.D. 41, 46-47 (E.D.N.Y. 2000) (denying certification).

REDACTED – PUBLIC VERSION

Dr. Noll's prediction that League packages would have existed in the BFW and would have been sold at lower prices than the OMPs in the actual world is not reliable or meaningful proof. Among its many flaws, Dr. Noll's model baselessly assumes that the vast web of game telecast rules and agreements that has evolved in the actual world based on the HTT structure also would have evolved exactly the same way in the absence of HTTs, and that the status quo would remain the same despite the radically <u>different</u> circumstance of no HTTs and every club licensing nationwide. Most egregiously, Dr. Noll assumes a BFW in which content that is exclusive in the actual world would be offered non-exclusively by competing sellers, a complete reality flip that also ignores that Plaintiffs say they do not challenge content exclusivity.

Dr. Noll's assumption of non-exclusivity is contrary to the basic legal requirement that Plaintiffs must prove, through an actual examination of how the market operates, what clubs, the Leagues, RSNs, and MVPDs would and would not agree to do in the "completely different" world without HTTs. Here, Plaintiffs and Dr. Noll do not offer any reliable proof that League packages would have been created at all in the BFW and, if so, offered at lower prices than in today's world.[24] If League packages were not offered or were priced higher – BFW outcomes that the witnesses and Dr. Ordover show are extremely likely – a significant number of fans would have been worse off without HTTs and, therefore, Plaintiffs cannot show common impact.

## A.   <u>In the BFW, There Would Be Significant Reassessment and Bargaining in the Vertical Supply Chain</u>

Where the BFW without the challenged conduct would be "completely different" from the actual world in which the parties operate, a plaintiff <u>cannot assume</u> that one challenged

---

[24] *E.g., Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir. 2000) (antitrust impact requires comparison of the actual world with a "but-for market" free of the restraint).

aspect of a defendant's business model can be excised, but the remainder of its business – or the industry – would remain the same.[25]

For example, in *Dominguez v. UAL Corp.,* 666 F.3d 1359 (D.C. Cir. 2012), the plaintiff alleged that one aspect of United Airlines' ticket pricing model was unlawful, namely a prohibition on resale of discounted tickets.  The D.C. Circuit found that even if United's price discrimination were unlawful, the plaintiff could not prove injury-in-fact because, without the resale prohibition, United might not have offered discounted tickets <u>at all</u>.  *Id.* at 1364, 1369 ("It piles speculation atop speculation to assume that United would continue to offer discounted tickets if it could no longer price discriminate.").  The court explained, "in antitrust cases, injury turns on the impact of the alleged wrong on the relevant market itself, so that the <u>fact finders cannot take a market structure as given</u>." *Id.* (emphasis added).

Similarly, in *Allied Orthopedic Appliances v. Tyco Healthcare Group*, the court found that the question of antitrust impact was complex and individualized where the BFW "would have been <u>completely different</u> from the market that actually prevailed."  247 F.R.D. at 165.  The court observed that, unlike in a price-fixing case, the plaintiffs were alleging conduct that had only an <u>indirect</u> effect on prices.  As such, even if the plaintiffs' "simplistic theory ha[d] superficial appeal, it [did] not adequately account for, evaluate, or even consider, the complexities in their theory and [the product] markets." *Id.* at 168.

Here, as in *Dominguez* and *Allied Orthopedic Appliances,* the BFW would be "completely different" in that an integral element of the Leagues' video rights structure – the

---

[25]  *Allied Orthopedic Appliances v. Tyco Healthcare Group*, 247 F.R.D. 156, 165, 168-70, 175 (C.D. Cal. 2007) (denying certification for lack of predominance in case where BFW admittedly "would have been completely different from the market that actually prevailed"); *Glictronix Corp. v. AT&T*, 603 F. Supp. 552, 589 (D.N.J. 1984) (denying class certification for lack of predominance where some class members would not have been better off in the BFW).

REDACTED – PUBLIC VERSION

HTTs – would not exist.  That difference would have a cascading effect on all market participants and their BFW incentives, bargains, and decisions.  While Defendants dispute that this network of agreements constitutes any actionable conspiracy, Plaintiffs – the parties asserting such a conspiracy – cannot dispute that, at a minimum, the Leagues' video rights structures have been material to the formation and terms of the agreements under which game telecasts are produced and distributed.

It is impossible to describe with precision what decisions all those entities would have made absent HTTs.  But there are numerous alternative – indeed, highly likely – BFW scenarios in which, even if there may be certain "winners" among the class members, there also would be many "losers."  The "winners" and "losers" cannot be identified through any classwide analysis.

The scenarios in which there would be "losers" include any BFW in which:

- League packages were never created by the Leagues and/or do not continue to be offered;

- League packages exist, but have fewer games and/or fewer clubs, or are priced higher than in the actual world;

- Fewer games or games of fewer clubs (or both) are telecast at all; or

- Game telecasts of one or more clubs are carried less widely than today in standard television packages, either by virtue of RSNs "regionalizing" distribution or MVPDs replacing RSNs of less popular clubs with RSNs of more popular clubs, or moving less popular RSNs to more expensive "sports tiers."

A realistic look at the BFW – and the choices the market participants themselves confirm they would have made (or almost certainly would make) in the BFW – shows that some or all of these scenarios are likely.  The real world facts attested to by the Leagues, RSNs, and MVPDs, as well

as the economic analyses of Dr. Ordover, show that Plaintiffs' very specific, idealized BFW flies in the face of actual industry operations and sound economic principles.  In no event can Plaintiffs show that the specific BFW outcome they depend on in trying to satisfy the requirement of common impact is <u>more likely than not</u> what would exist without HTTs. *E.g.*, Brosnan ¶¶ 26-27.

The major links in the vertical supply chain that must be addressed include:

1.   <u>Bargains Between the Clubs</u>

The Leagues are joint ventures made up of their member clubs.  In the BFW, clubs would have to assess the overarching agreement that all home and visiting clubs will cross-license telecast rights, or instead adopt bilateral agreements in which less nationally-popular clubs can exercise "hold out" leverage over more nationally-popular clubs.  Brosnan ¶ 10.  Clubs also would need to consider whether it makes sense to offer League packages in the BFW when each club and its RSN would have the right to distribute games nationally.  The uniform testimony from the Leagues is that OMPs would not have been created without the underlying HTT structure.  Bettman ¶¶ 4-5, 10; Brosnan ¶¶ 23-24.

2.   <u>Bargains Between the Clubs and RSNs</u>

Eliminating HTTs also would require renegotiation of all 60 clubs' rights agreements with their RSNs.  Crumb ¶¶ 4, 14; Litner ¶ 20; Krolik ¶ 7.  For Plaintiffs' BFW to exist, each RSN would have to agree to:  (i) license nationwide rights, (ii) disadvantage itself by continuing

20

to provide its feeds to the Leagues for free, to be used in direct competition with the RSN's own telecasts, and (iii) launch a wholly new and costly OTT Internet business, a consumer-facing business RSNs have never had and that would significantly reduce the attractiveness of the RSNs' telecasts to MVPDs.  The parties would then have to agree on a new rights fee.  Crumb ¶¶ 4, 14.  There is no reasonable possibility that all of the foregoing would be agreed to and Plaintiffs have adduced no evidence that RSNs with rights to all clubs would be willing and able to do so.  Crumb ¶¶ 5-13; Krolik ¶¶ 2-3, 7, 17; Brosnan ¶¶ 14-16, 28-33.[26]

> 3.   Bargains Between RSNs and MVPDs

Plaintiffs' BFW presumes every RSN would obtain distribution nationwide.  But that ignores that RSNs and MVPDs have different business models, bargaining strength, and capacity limitations.  MVPDs do not have unlimited appetite for or capacity to carry RSNs.  Rigdon ¶ 14; Feeney ¶¶ 4, 6-9; Biard ¶ 9; Brosnan ¶¶ 30-31, 34-37.  Carriage issues that exist today would be worse because every club's BFW telecast territory would overlap entirely with every other club's. ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ Expansion of carriage of RSNs for clubs with relatively strong national appeal, like YES, may result in MVPDs

----

[26] ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

moving other less popular RSNs to a higher priced tier, or dropping them altogether in outer areas. Biard ¶ 5.

Dr. Noll modeled none of this. Indeed, his model ignores even the fact that, in the television distribution chain, there would be two mark-ups for any RSN channel – the mark-up from the RSN to the MVPD and the additional mark-up from the MVPD to the consumer.[27] ▮



### 4. Bargains Between the Leagues and MVPDs

In the BFW, each League also would need to bargain with MVPDs over carriage of League packages, if they exist at all. ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ Instead, it is more likely to create its own multi-club package, which would not necessarily include every club, and set prices for any bundled and unbundled versions of the programming it chooses to offer at price points that are jointly profit-maximizing for the MVPD. Feeney ¶¶ 4, 6-9; Brosnan ¶ 38; Ordover ¶ 62.

---

[27] *See* Declaration of Dr. Ariel Pakes in support of Defendants' *Daubert* motion, ¶¶ 31-40.

**B.      It Is Highly Unlikely that the BFW Would Include
         League Packages, Lower Prices, or the Production of All Games**

Taking all of the BFW reassessment and bargaining discussed above into consideration, the central questions for this Court are whether Plaintiffs have established that, in the BFW, League packages would have been created, League packages would be less expensive than the OMPs in the actual world, and all MLB and NHL games would still have been produced. As summarized below, Plaintiffs cannot carry their burden to establish any of the foregoing and, therefore, cannot show that there would not be substantial numbers of "losers" in the BFW.

### 1.      The League Packages Likely Would Not Exist in the BFW

Even assuming all the game feeds that are being produced today would exist in the BFW, the Leagues explain that OMPs almost certainly would not have been created in the BFW and that they almost certainly would not and could not continue in their current form or at their current prices if HTTs were eliminated today. Dr. Ordover likewise shows that a proper analysis of the profit-maximizing incentives of the Leagues (a collection of the clubs) and RSNs likely would lead them to elect not to offer League packages in competition against the RSN telecasts licensed by the member clubs.

*First*, the Leagues, joint ventures of their constituent clubs, have no incentive to compete against themselves. Brosnan ¶¶ 17-19. As Dr. Ordover explains, "rather than demonstrating the effects of the territorial restrictions on the purported class members, Dr. Noll's analysis assesses the pricing effects of forcing the Leagues to compete against their own clubs in distributing the same live game telecasts." Ordover ¶ 70.[28]

---

[28]  Dr. Pakes likewise conducted the bargaining analysis Dr. Noll failed to do. Dr. Pakes concludes that big market clubs would have no incentive to participate in BFW League Packages – a conclusion Dr. Noll also admitted at deposition. Pakes ¶¶ 62-75; Noll Tr. 96.

*Second*, offering League packages comprised of RSN game feeds <u>in the same markets</u> as the RSN telecasts themselves would wipe out the content exclusivity value to the RSN in its feed.  Brosnan ¶¶ 11-12, 20.  Because content exclusivity is "the standard arrangement" for live sports content that creates well-recognized incentives to produce and promote game content, it would be contrary to the interests of the Leagues and their clubs to offer the League packages that Dr. Noll contemplates that would destroy that valuable – and unchallenged – exclusivity.  Ordover ¶¶ 28-32; Brosnan ¶¶ 17-18.

Absent HTTs – especially under Dr. Noll's three-competitor assumption – there would be no reason for the RSNs to facilitate League packages to compete against the RSNs.  Dr. Noll admitted that, in the actual world, the RSNs provide free feeds only because they are <u>not</u> used in a manner that destroys content exclusivity.  Noll Tr. 59.  Nor would it make sense for the clubs to try to force RSNs to compete against themselves if clubs can get paid more by RSNs to allow RSNs to be the sole sellers of their feeds.  Brosnan ¶ 15.

*Third*, Dr. Ordover confirms what the fact witnesses attest – that, even if MVPDs

However, because the MVPDs are unlikely to carry RSNs for every club everywhere, MVPD bundles thus would not prevent there from being "losers" – namely class members who are fans of clubs that do not obtain MVPD carriage and,

therefore, would not be available to the fan either on a standalone RSN channel <u>or</u> in an MVPD bundle.  In the current, actual world, those class members are better off because they can watch those games on the OMPs.

          2.      <u>Any BFW League Package</u>
                    <u>Would Be More Expensive for Avid, Multi-Club Fans</u>

Dr. Ordover also shows that, to the extent they would be offered at all, the likely prices for any BFW League Packages would be <u>higher</u> than the actual world prices for the OMP.  For purposes of analysis only, Dr. Ordover examines the bargaining that would need to take place between the Leagues and RSNs to offer League packages.  He uses Dr. Noll's own model and data to demonstrate that, under a profit-maximizing paradigm, RSNs would negotiate a fee for the use of their feeds to compensate them for the loss of content exclusivity.  He shows that the sum of the fees that the Leagues would need to pay to all the RSNs necessary to obtain all the game feeds would lead to prices for those packages (using Dr. Noll's pricing model) being <u>substantially</u> higher – ███████ higher – than the prices for the OMPs in the actual world. Ordover ¶¶ 33-40.  This is not surprising because the BFW customers in question would be just the avid, <u>multi-club</u> fans; in Plaintiffs' BFW, fans who want to watch only a single club are presumed <u>not</u> to buy the BFW League Package, but just a single-club channel.  The result is that those class members would pay more in the BFW, and thus be "losers," even though the market participants rationally pursue their individual interests in the very different world without HTTs.

Dr. Ordover further concludes that, because of the above, the League packages may not even be economically viable in the BFW.  As Dr. Ordover shows, at the higher prices, demand and profits for League packages would be lower in the BFW than in the actual world. Ordover ¶¶ 33-40.  That possibility means there may be "losers" among the class members.

### 3.   Not All Games Would Be Produced in the BFW

There is no basis to conclude that in the BFW virtually every game of every club would be produced and made available virtually everywhere, as they are today.  The RSNs and Leagues explain that a BFW with no HTTs would ███████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████  Dr. Ordover likewise shows that, in the absence of content exclusivity, RSNs would have a less valuable product and hence less incentive to produce games.  Ordover ¶¶ 28-32.  Clubs with the strongest national appeal or a large number of RSNs may be able to secure national deals for some or all of their games.  But RSNs for less popular clubs, on the other hand, would have more difficulty obtaining carriage, both nationally and even on MVPDs within their local market.  ████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████  In the end, it is likely that the full schedule of only the most popular clubs would be produced, and for some clubs, moderately few games would be produced by RSNs.

In the likely event that games of certain clubs are not produced –  or worse still if that club is no longer viable (*see* Brosnan ¶ 31) – fans of just that club, as well as fans who bought an OMP to watch that club (along with others), would be "losers."

C.    **This Is Not a Price-Fixing Case**

As the foregoing shows, this case is nothing like *In re Electronic Books Antitrust Litig.*, 2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) and the other *per se* price-fixing cases on which Plaintiffs rely.  Mem. at 6, 12-16.  In those cases, the causal link between the unlawful act and the injury is usually direct and easily traced:  the agreement is about price, the only change in conduct was to raise prices, and therefore the only difference between the world with and without the agreement is that prices are higher with the agreement.  Here, the territorial video rights structures Plaintiffs challenge are not agreements about who will charge what prices for a given product.  Rather, the rules govern far more fundamental questions of (i) who has what rights to create what products in the first place, (ii) who will cooperate with whom and on what terms to create the products, and (iii) where and to whom what products may then be sold at <u>any</u> price.  Thus, in contrast to a standard price-fixing case, the first and critical question here is whether any given game telecast would be available to a given class member <u>at all</u> in the BFW – and, only then, at what price.

D.    **There Is No Excuse for Dr. Noll's Failure to Model**
      **the Bargaining that Would Take Place in the BFW**

Instead of modeling the bargaining that necessarily would take place in the BFW, Dr. Noll testified that his BFW was plausible because, <u>if</u> all the parties acted exactly the same in the BFW as they do now – except allowed clubs to telecast and stream nationwide in competition with each other and their respective League packages – there would be "positive revenues" for everyone – i.e., the BFW bargains would just work themselves out.  Noll Tr. 75-76.  This, of course, is not economic analysis at all, let alone an assessment of what in concrete practical terms would likely occur in the BFW.  As Dr. Ordover explains in detail, Dr. Noll's analysis ignores (i) more than half the business (in-market telecasts), and (ii) all fixed costs.

REDACTED – PUBLIC VERSION

Ordover ¶¶ 77-86; *see also* Bowman ¶¶ 31-32.  As a result, Dr. Noll's analysis creates a skewed portrait of "profitability" in the BFW, making the BFW League Packages appear more attractive for clubs to participate in than they might be.

More fundamentally, Dr. Noll claims only that his BFW scenario allegedly would maximize positive <u>revenues</u>, not that it would actually maximize <u>profits</u> for any of the actors – a critical goal of any sound BFW analysis.  Noll Tr. 75-76.  And, as Dr. Ordover has shown, if the Leagues chose to allow RSNs and League packages to co-exist in the same markets, it would be rational for the Leagues to pay RSNs to do so.  But doing so, of course, would result in many "losers" among members of the putative classes who would have to pay a higher price for the League packages.  Ordover ¶¶ 33-38.

Alternatively, Dr. Noll argued that no bargaining analysis was needed because he assumed RSNs would offer OTT Internet channels and that such offerings would be substitutes for RSN channels on MVPDs, thereby allegedly leaving MVPDs with no bargaining power.  Noll Tr. 466-67.  As a threshold matter, whether RSNs would offer Internet streaming or not does not address the core problems with Plaintiffs' BFW – namely, that elimination of HTTs would almost certainly result in fewer games of fewer clubs being produced for telecast (and relatively few clubs distributing nationwide) <u>and</u> that, without HTTs, clubs almost certainly would not have created the League packages and RSNs would not contribute their game feeds for free to be used in direct competition.

Moreover, all the evidence shows ███████████████████████████████████████
█████████████████████████████████████████████████████████████
████████████████████████████████   Dr. Noll himself also admitted that (i) OTT Internet products would <u>not</u> have been a reasonable substitute for television products for most of the class

period, and (ii) his model provides for "no price competition between the Internet version and the MVPD version" of the OMPs (Noll Tr. 134), which indicates no assumed substitution between the products. [29] Even today, where the Leagues offer both television and Internet OMPs, the television products command higher prices than their Internet counterparts (even though the Internet OMPs offer more features).[30]

## E.   Dr. Noll's Impact Analysis Is Driven by His Faulty "Marginal Cost" Assumptions

Dr. Noll's model ultimately has nothing to do with either demand or supply analysis or his predicted prices of standalone channels. Rather, Dr. Noll admitted at his deposition that his analysis "hinges" on the alleged low cost of including games in the bundle.[31]

As shown above, Dr. Noll did not model and fails to appreciate the real costs of the BFW he presumes. Dr. Noll also confirmed at his deposition, however, that he simply assumed that the marginal cost to produce a streaming version of any single-club channel would be 1/30 of the marginal cost to produce an Internet OMP. Noll Tr. 312. Dr. Noll also admitted he examined no data to determine the marginal costs of the OMPs and simply assumed the costs would be

---

[29]  In lieu of analyzing the complex bargains in the BFW, Dr. Noll also claimed that it was sufficient to conduct a "Bertrand" analysis to confirm his predicted prices because the RSNs' products are too homogeneous to justify bargaining analysis. Noll Tr. 292-93. Dr. Noll's own data refutes the claim. Ordover ¶¶ 57-61. Consumers consider their favorite clubs to be no less heterogeneous than different entertainment channels offered by MVPDs (e.g., Food Network and CNN). Dr. Noll also contradicted himself by testifying at deposition that Bertrand is not an appropriate model when products are homogeneous. Noll Tr. 223 ("[T]he Bertrand model is not used by economists in cases of homogenous products because it makes an unrealistic prediction.").

[30]  As detailed in the *Daubert* motion, and in the accompanying Declaration of Dr. Ordover, Dr. Noll's BFW piles speculation upon speculation when attempting to define consumer demand for his model. While Dr. McFadden describes in detail why Dr. Noll's work is unreliable from several methodological perspectives, Dr. Ordover builds on that with a detailed discussion of why none of what Dr. Noll asserts has any basis in economic, logical, or marketplace reality.

[31]  "[I]t all hinges on the fact that the costs are low;" "there's essentially zero cost of including something in the bundle, all right, given that the RSNs are distributed anyway." Noll Tr. 98.

scalable based on his understanding of the costs to set up a "website."  Noll Tr. 315-17.  Of course, creating, marketing and distributing a high quality, live streaming subscription product involves far more than just setting up a website – and the costs are considerably more.[32]  As Mr. Bowman from MLB Advanced Media attests in detail, high quality, live video streaming services needed to create products such as MLB.TV are not off-the-shelf services purchased by the gigabyte, but rather capital and labor intensive services that must be created for each streaming product – and, in many respects, each _device_ to which the product will be delivered.  The efforts and costs to create one streaming channel or thirty are not scalable, and certainly not to the extent Dr. Noll assumed.  Bowman ¶¶ 16-25.

Dr. Noll's unrealistic marginal cost assumptions thus undermine his entire analysis and render that analysis unable to bear the weight of Plaintiffs' heavy burden on class certification.

## II.   DR. NOLL FAILS TO ASSESS THE IMPACT OF ONLY THE CHALLENGED ANTICOMPETITIVE CONDUCT, AS _BEHREND_ REQUIRES

A class seeking recovery for alleged antitrust violations cannot be certified if the Plaintiffs' damages model "fail[s] to measure damages resulting from the particular antitrust injury on which [Defendants'] liability in this action is premised."  _Behrend_, 133 S. Ct. at 1432-33.  Here, Dr. Noll's model fails "to measure only those damages attributable to [the plaintiffs'] theory" of liability – territorial exclusivity.  Accordingly, Dr. Noll's model "cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of

---

[32] MLBAM, for example, estimates it has invested more than ███████ to develop and launch MLB.TV – and has invested considerably more to consistently improve the product, add all manner of special Interactive features, _and_ make the service available to fans on hundreds of different devices (more than any similar sports streaming product).  Bowman ¶¶ 23, 26-29.  Further, Dr. Noll's starting point – the marginal cost of the League to produce the package – is based on the assumption of free feeds, i.e., the League has no cost to acquire the product.  If the feeds were not free, under Dr. Noll's own analysis, the marginal cost would be much higher.

30

Rule 23(b)(3)." *Id.* That defect is fatal to Plaintiffs' motion for certification under Rule 23(b)(3). *See id.*[33]

Plaintiffs' theory of liability is that territorial exclusivity is unlawful. Plaintiffs do not and cannot challenge content exclusivity – "the club's right to grant production and distribution rights for their own games to only one RSN." MSJ Order at 5 n.13. As the Court has recognized, Plaintiffs concede that exclusive content rights are "typical" in television and "unproblematic from an antitrust perspective." *Laumann* Dkt. 241/*Garber* Dkt. 301 (MSJ Opp.) at 4, 45, 49; MSJ Order at 5 n.13.

Dr. Noll's model is oblivious to the critical distinction between alleged unlawful territorial exclusivity and unchallenged content exclusivity. As detailed above, Dr. Noll's BFW eliminates both territorial exclusivity and content exclusivity. Therefore, Dr. Noll's estimates of "impact" and "damages" cannot claim to – and do not – isolate the price effect of the elimination of territorial exclusivity.

This is exactly the same type of defect that the Supreme Court held fatal to class certification in *Behrend*. Like Dr. Noll, the plaintiffs' expert in *Behrend* sponsored a model that calculated "but for" prices that he compared to actual prices to estimate alleged antitrust impact and aggregate damages. Also like Dr. Noll, the *Behrend* expert modeled a "but for" world that eliminated both challenged and unchallenged reductions in competition. *See* 133 S. Ct. at

---

[33] *See also, e.g., In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 20, 27-28 (1st Cir. 2008) (vacating class certification because plaintiffs' expert did not "sort out" the effects of legal activity from "the effects of the alleged, impermissible horizontal conspiracy"); *Concord Boat Corp*, 207 F.3d at 1056-57 (damages model inadmissible because it "failed to account for market events that both sides agreed were not related to any anticompetitive conduct" and "did not separate lawful from unlawful conduct"); *Litton Sys., Inc. v. AT&T*, 700 F.2d 785, 825 (2d Cir. 1983) ("[D]amage studies are inadequate when only some of the conduct complained of is found to be wrongful and the damage study cannot be disaggregated.").

1434.[34] The Supreme Court found that the proffered model could not carry the plaintiffs' burden of proof to show that common issues predominate because it did not isolate the price effect of unlawful conduct from the price effect on the class of unchallenged conduct. *Id.* at 1435.

Dr. Noll's failure to "isolate damages resulting" from the challenged territorial exclusivity is likewise fatal to class certification here. *Id.* at 1431. Dr. Noll's model does not exclude the possibility that the difference between the actual world prices and the BFW prices he calculated is attributable to the elimination of content exclusivity and the resulting competition between the League and each club over simultaneous, identical telecasts of the club's live games. Indeed, Dr. Ordover shows that Dr. Noll is principally, if not exclusively, measuring the price effect of content exclusivity. *See* Ordover ¶¶ 66-70. Dr. Noll's model therefore cannot satisfy Rule 23 because it does not and cannot establish the required "linkage between [the] theory of liability and [the] theory of damages." *Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578, 581 (S.D.N.Y. 2013) (citing Behrend).[35]

## III.   INDIVIDUALIZED ISSUES OF DAMAGES PRECLUDE CLASS CERTIFICATION

Under *Behrend*, Plaintiffs must establish "that the damages resulting from [the alleged antitrust] injury [are] measurable 'on a class-wide basis' through use of a 'common

---

[34] Specifically, in *Behrend*, the only reduction in competition that remained subject to classwide challenge was deterrence of overbuilding. But the expert's model of the "but for" world eliminated not only that reduction but also, for example, reduction in competition from satellite providers, which was <u>not</u> subject to classwide challenge. 133 S. Ct. at 1434.

[35] *See also MCI Commc'ns Corp. v. AT&T Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983) (It is "essential" that alleged "damages reflect only the losses directly attributable to unlawful competition."); *Blue Cross & Blue Shield United v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) (Posner, J.) ("Statistical studies that fail to correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining do not provide a rational basis for a judgment.").

methodology.'" 133 S. Ct. at 1430.[36]  Without a proper damages methodology, "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *Id.* at 1433.  Since *Behrend*, New York federal courts have denied certification repeatedly where determination of damages requires individualized inquiries.  *E.g.*, *Fernandez v. Wells Fargo Bank, N.A.*, 2013 WL 4540521 (S.D.N.Y. Aug. 28, 2013); *Roach v. T.L. Cannon Corp.*, 2013 WL 1316452 (N.D.N.Y. Mar. 29, 2013).

## A.   Dr. Noll Ignores ███████████████████████ that Reduce the Purchase Price of the OMPs Below Plaintiffs' BFW Price

Even if Dr. Noll's model were admissible, reliable, or entitled to any weight, Plaintiffs' damages class fails with respect to class members who purchased OMPs through DIRECTV because individualized inquiry would be needed to determine their damages, if any.  DIRECTV subscribers did not and do not uniformly pay posted prices for MLB Extra Innings, contrary to what Dr. Noll assumed.  Noll Supp. at 4.  Rather, subscribers ███████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████[37]  Some customers' effective prices would be <u>lower</u> than the BFW price Dr. Noll calculates and, therefore, they would have <u>zero</u> damages or actually be worse off in the BFW.  Plaintiffs have not and cannot offer any classwide "model" to calculate damages given these individualized pricing issues.

DIRECTV offers ████████████████████████████████████████ ████████████████████████████████████████████████████████████

---

[36]  Contrary to Plaintiffs' suggestion (Mem. at 16-17), the question that the Supreme Court addressed in *Behrend* was, in the Court's own words, whether "certification was improper because [the plaintiffs] had failed to establish that damages could be measured on a classwide basis."  133 S. Ct. at 1431 n.4.

[37]  Jack ¶¶ 3-4, 7-8.

█████████████████████████████████████████ render damages highly individualized and preclude classwide determination of damages through a one-size-fits-all model such as Dr. Noll's. *See Blades v. Monsanto, Inc.*, 400 F.3d 562, 571 (8th Cir. 2005). ███████████████████████████ that are directly tied to the MLB Extra Innings package and reduce the effective price of the package below Dr. Noll's posited BFW price. Jack ¶¶ 3-7.

### B.   Plaintiffs Have Not Modeled Damages for Comcast Subscribers or for DIRECTV Subscribers to NHL Center Ice

Plaintiffs offer <u>no</u> model measuring damages for Comcast subscribers. Noll Supp. at 5 (claiming that Comcast data is "too fragmentary" to support a damages model). Nor do Plaintiffs offer a model measuring damages for DIRECTV subscribers to NHL Center Ice. *Id.* Without a damages model, Plaintiffs have failed to meet their burden of showing that damages for Comcast class members and DIRECTV class members in the *Laumann* case can be calculated on a classwide basis. As the D.C. Circuit stated in *In re Rail Freight*, "[n]o damages model, no predominance, no class certification." 725 F.3d at 253.

Dr. Noll attempts to cure this fatal omission by baldly claiming that "the overcharge as a fraction of the monopoly price [would be] close to the same" for Comcast subscribers and for DIRECTV subscribers to NHL Center Ice as it was for DIRECTV subscribers for MLB Extra Innings. Noll Supp. at 8. This is baseless conjecture, not admissible expert analysis, and is wholly insufficient to satisfy Plaintiffs' burden to establish the Rule 23 requirements "in fact." *Behrend*, 133 S. Ct. at 1433 (certifying a class without determining whether damages model "[was] a just and reasonable inference or speculative" is not permitted and "would reduce Rule 23(b)(3)'s predominance requirement to a nullity.")

Like Dr. Noll, plaintiffs' expert in *Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.* failed to offer a "damages calculation method that will be usable for all class members' claims" but suggested three potential ways to calculate "class-wide damages . . . in a formulaic manner." 301 F.R.D. 116, 141-42 (S.D.N.Y. 2014). "[W]ithout assurance beyond [the plaintiff expert's] say-so," the court concluded that plaintiffs had "failed to meet their burden of showing that damages can be calculated on a classwide basis." *Id.* For the same reason, Dr. Noll's speculation does not cure the fatal omission of a damages model measuring damages for Comcast class members and DIRECTV class members in the *Laumann* case.

## IV. THE PUTATIVE CLASS MEMBERS' ARBITRATION OBLIGATIONS PRECLUDE CLASS CERTIFICATION

Each MVPD and League Defendant that dealt directly with the putative class members had an arbitration clause in its subscriber agreements during part or all of the alleged class period. Indeed, the Court already has ordered that the claims against Comcast and DIRECTV asserted by five of the named plaintiffs must be pursued, if at all, via arbitration in light of the broad arbitration provisions in their subscriber agreements. *Laumann* Dkts. 130, 167/*Garber* Dkts. 157, 222 (Stipulation and Order). Many putative class members are subject to multiple arbitration provisions with multiple Defendants, including putative class members who purchased both a TV and an Internet OMP during the class period. Bettman ¶ 16; Bowman ¶ 33.[38] These arbitration provisions raise individualized factual questions, as well as legal questions under the laws of all 50 states and the District of Columbia, including contract formation and defenses and whether non-signatory defendants can compel arbitration under

---

[38] Putative class members who purchased television service from DIRECTV and Internet service from Comcast or who switched between Comcast and DIRECTV television service are also subject to multiple arbitration provisions. Any number of factual combinations produce the same result.

equitable estoppel principles.  The necessity of individualized inquiries concerning arbitration obligations is an independent basis to deny class certification.  *See Pablo v. ServiceMaster Global Holdings, Inc.*, 2011 WL 3476473 (N.D. Cal. Aug. 9, 2011).  Moreover, a named plaintiff cannot represent an absent class member subject to different arbitration obligations because they are in fundamentally different legal positions.

A.    **Individualized Inquiries into Applicable Law Defeat Predominance**

To the extent that individual class members argue they are not bound by the arbitration provisions, the Court would have to undertake an individualized inquiry into the specific facts showing agreement to the arbitration provision.  Depending on the number of challenges, that could entail thousands, tens of thousands, or hundreds of thousands of individualized inquiries. Indeed, because a purported class member could be subject to up to four arbitration agreements, the number of individualized inquires could be a multiple of the size of the class.

Similarly, to the extent that individual class members challenge the scope of any of these arbitration provisions, the Court would need to conduct a threshold choice-of-law analysis to determine which state's law applies to each subscriber's challenge.  All but three of the named Plaintiffs whose claims Comcast and DIRECTV sought to arbitrate made such challenges.  The Court would then have to analyze the laws of the relevant states – potentially 50 states and the District of Columbia[39] – with respect to contract interpretation.  *See In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 862 (D. Md. 2013) ("For each class member who challenges the applicability of one or more of the contractual provisions at issue, this Court could

---

[39]  The MLB.TV and GameCenter Live agreements are governed by New York law. Bettman ¶ 16; Bowman ¶ 33.  The DIRECTV and Comcast subscriber agreements are governed by the laws of the state in which the subscriber resides, and DIRECTV provides television service in all fifty states and the District of Columbia.  *See Laumann* Dkt. 135/*Garber* Dkt. 159 (DIRECTV Motion to Compel Arbitration); Order on Mtn. to Compel Arbitration at 18, 24.

be forced to conduct extensive analysis regarding choice of law, and contract formation and interpretation, for each contract.").

Likewise, the Court would have to analyze the equitable estoppel jurisprudence of 48 additional states[40] and the District of Columbia to determine whether absent class members with valid arbitration agreements also must arbitrate with non-signatory Defendants. Even a cursory review of state law reveals significant differences on this issue.[41] For example, many states apply equitable estoppel to permit non-signatory defendants to enforce an arbitration agreement against a signatory plaintiff where, as here, the claims allege "concerted misconduct" by a non-signatory defendant and a signatory defendant.[42] *See, e.g., Kolsky v. Jackson Square, LLC*, 28 So. 3d 965, 969 (Fla. Dist. Ct. App. 2010). In these states, an absent class member bound by an

---

[40] Order on Mtn. to Compel Arbitration at 17-19 (analyzing equitable estoppel under Nevada and Pennsylvania law); *see also Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630-32 (2009).

[41] Order on Mtn. to Compel Arbitration at 17-19 (finding that the equitable estoppel jurisprudence of the only two states the Court had occasion to analyze were different).

[42] Based on preliminary research, at least 17 states have adopted the "concerted misconduct" standard. *See Res. Servs., LLC v. Bridgeport Hous. Auth.*, 2011 WL 2739544, at *8 (Conn. Super. Ct. June 13, 2011); *Douzinas v. Am. Bureau of Shipping, Inc.*, 888 A.2d 1146, 1153 (Del. Ch. 2006); *Kolsky v. Jackson Square, LLC*, 28 So. 3d 965, 969 (Fla. Dist. Ct. App. 2010); *Order Homes, LLC v. Iverson*, 685 S.E.2d 304, 310 (Ga. Ct. App. 2009); *Luke v. Gentry Realty, Ltd.*, 96 P.3d 261, 268 (Haw. 2004); *German Am. Fin. Advisors & Trust Co. v. Reed*, 969 N.E.2d 621, 628 (Ind. Ct. App. 2012); *Hemphill v. Ford Motor Co.*, 206 P.3d 1, 7 (Kan. Ct. App. 2009); *Household Fin. Corp. II v. King*, 2010 WL 3928070, at *4 (Ky. Ct. App. Oct. 8, 2010); *Tobel v. AXA Equitable Live Ins. Co.*, 298129, 2012 WL 555801, at *3 (Mich. Ct. App. Feb. 21, 2012); *ev3 Inc. v. Collins*, 2009 WL 2432348, at *6 (Minn. Ct. App. Aug. 11, 2009); *Hoffman v. Finger Lakes Instrumentation, LLC*, 789 N.Y.S.2d 410, 414-15 (N.Y. Sup. Ct. 2005); *Speedway Motorsports Int'l, Ltd. v. Bronwen Energy Trading, Ltd.*, 2009 WL 406688, at *6 (N.C. Super. Feb. 18, 2009); *I Sports v. IMG Worldwide, Inc.*, 813 N.E.2d 4, 8-9 (Ohio Ct. App. 2004); *Cinocca v. Orcrist, Inc.*, 60 P.3d 1072, 1074 (Okla. Civ. App. 2002); *Livingston v. Metro. Pediatrics, LLC*, 227 P.3d 796, 805 (Or. Ct. App. 2010); *Pearson v. Hilton Head Hosp.*, 733 S.E.2d 597, 605 (S.C. Ct. App. 2012); *Decisive Analytics Corp. v. Chikar*, 75 Va. Cir. 337, at *4-8 (Va. Cir. Ct. 2008).

arbitration provision would have to arbitrate <u>all</u> claims against <u>all</u> defendants.[43]   Certain states

analyze whether the claims "rely upon" or otherwise "arise out of" the agreement containing the

arbitration provision (*see, e.g.*, *Ahlers v. Ryland Homes Nevada, LLC*, 2010 WL 3276221, at *2

(Nev. Apr. 16, 2010)), yet even in these states the meaning of "rely upon" and "arise out of"

differ.   Plaintiffs bear the burden of establishing that the predominance requirement of Rule

23(b)(3) is satisfied despite these fundamental variances among state laws.   *Walsh v. Ford Motor

Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986).   Plaintiffs cannot meet that burden here and class

certification must therefore be denied.   *See Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718,

728 (9th Cir. 2007) (affirming denial of certification of a nationwide class under Rule 23(b)(3)

because the defendants' arbitration agreements with putative class members necessitated a state-

by-state analysis of contract jurisprudence); *Hill v. T-Mobile USA, Inc.*, 2011 WL 10958888, at

*18 (N.D. Ala. May 16, 2011) (denying certification of nationwide class because plaintiffs

"failed to factor in the varying impact that class action waivers, agreements to arbitrate and

challenges to such provisions' contractual enforceability as a matter of state law will have on the

predominance inquiry").

---

[43]   For example, Plaintiffs' allegations easily satisfy the "concerted misconduct" standard set forth in *Kolsky*, 28 So. 3d at 969.   *See, e.g., Garber* Dkt. 177 (Second Amended Complaint) (alleging that all Defendants "entered into a continuing agreement, combination or conspiracy with the purpose, intent and effect of restraining horizontal competition" and that all Defendants are members in a "contract, combination, agreement, understanding or concerted action").   Accordingly, and as just one of many examples, Florida law allows all non-signatory Defendants to compel arbitration of Plaintiffs' claims.   Were the same result to obtain in but a fraction of the 17 states, *supra*, tens, if not hundreds, of thousands of putative class members throughout the class period would have no claims against any Defendant.

**B.**      **A Named Plaintiff Cannot Represent Putative Class Members Subject to Different Arbitration Obligations**

Certification must be denied for the additional, independent reason that the commonality, typicality, and adequacy requirements of Rule 23(a) are not met where, as here, most but not all putative class members are bound by arbitration obligations.  Class representatives must be similarly situated to class members they wish to represent by having the same obligations, rights, and avenues to potential vindication of their claims against the same defendants in order for the rights of putative class members to be protected.  A named plaintiff subject to an obligation to arbitrate with a particular defendant has no incentive to pursue a claim, and would have no incentive to enforce a judgment, against that defendant because that plaintiff would not participate in the recovery.  In that important respect, that plaintiff's interests conflict with all members of the purported class who are not subject to an obligation to arbitrate with that defendant.  Similarly, a named plaintiff who is not subject to an obligation to arbitrate with a particular defendant has a conflict with all class members who are subject to arbitrate with that defendant, because they have no interest in seeking recovery from that defendant.  Where divergent arbitration obligations put some putative class members "in a different legal position" than others, the Rule 23(a) requirements are not met.[44, 45]

---

[44] *See In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d at 861; *King v. Capital One Bank (USA), N.A.*, 2012 WL 5570624, at \*14 (W.D. Va. Nov. 15, 2012); *Renton v. Kaiser Found. Health Plan, Inc.*, 2001 WL 1218773, at \*5-7 (W.D. Wash. Sept. 24, 2001).

[45] Any attempt to create subclasses to address this issue would create an intractable ascertainability issue, because the Court would have to conduct individualized inquiries into contract formation and equitable estoppel under state law in order to determine which absent class member belongs in which subclass.  Further, as discussed above, some putative class members are subject to arbitration agreements with more than one defendant.

C.     **Joint and Several Liability Is No Substitute for Predominance, Commonality, Typicality, and Adequacy**

Plaintiffs address the broad and overlapping arbitration provisions solely with the assertion that "it is unclear why a class member's ability to recover against a particular defendant presents a significant individualized issue" so long as that class member is not barred from asserting claims against other jointly and severally liable Defendants.  Mem. at 19-20.  As an initial matter, that unsupported assertion rests on the unstated premise that the non-signatory Defendants cannot enforce the arbitration agreements.  But that premise is not true in many states, and determining its validity for the putative nationwide class would require this Court to analyze the equitable estoppel jurisprudence of 48 more states and the District of Columbia. Plaintiffs' assertion is therefore no answer to the predominance problems.

Nor is it an answer to the commonality, typicality, and adequacy problems demonstrated above.  Any joint and several liability among the Defendants does nothing to avoid individualized issues or to resolve the antagonism between named plaintiffs and absent members of the putative classes.  Even with joint and several liability, the Court would have to determine which absent class members are barred from recovering against a particular Defendant (assuming the Defendant is found liable), because that Defendant could be liable only for the recovery owed to the class members entitled to recover from it – a subset of the entire class.  Further, joint and several liability does nothing to eliminate fundamental conflicts of interest between named Plaintiffs and absent members of the purported class.

V.     **INTRACLASS CONFLICTS PRECLUDE CLASS CERTIFICATION**

Each of the named Plaintiffs acknowledged that he would prefer to buy telecasts of only a single club.  Yet it is not disputed that there are many absent class members who want a League package rather than a single-club channel.  Plaintiffs try to side-step this obvious and

fundamental conflict among class members by claiming "all of the class members' interests are aligned" because each allegedly seeks "the same relief." *Laumann* Dkt. 258/*Garber* Dkt. 325 (Pltfs.' 8/26/14 Ltr.) at 2.  But, as shown above, the Plaintiffs' BFW is extremely unlikely under rational economic assumptions.  Instead, what is more likely is MVPDs creating and carrying their own bundles at prices higher than the actual world OMPs.  The named Plaintiffs, therefore, are not "aligned" with the entire class; they are advocating for relief that would sabotage the interests of other class members.  Plaintiffs cannot satisfy the adequacy requirement of Rule 23(a)(4) where such fundamental conflicts exist.  *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997); *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011).

Plaintiffs seek to bury those conflicts under Dr. Noll's unproven hypotheses, untethered to the real world – namely, that in the BFW, all games of all 30 clubs in each League would be telecast and those telecasts would be bundled into BFW League Packages competing directly with the exact same, unbundled versions of those telecasts.  As shown above, Dr. Noll's approach would throw MLB and NHL game programming into a wholly non-exclusive content regime that is completely at odds with how the television industry operates with respect to both sports and non-sports programming.  And it presumes Leagues, clubs, RSNs, and MVPDs would act contrary to sound economic theory by assuming, for example, that (i) programmers (RSNs) would give away their first-run, live content to be sold by a competitor (the Leagues) in a manner that would cannibalize viewers from that programmer, all without charging the Leagues a dime, and (ii) MVPDs would carry and price two licensed products (RSNs and BFW League Packages) in competition with each other, rather than creating their own bundles and pricing the RSNs and

the bundle at prices that maximize profits for the MVPDs, as MVPDs do today with all their licensed programming.

Even if one assumes, contrary to the weight of the evidence, that the named Plaintiffs would get their preferred club telecasts in the BFW, the relief they seek in fact endangers the viability of League packages, thereby pitting them against those putative class members who prefer to watch multiple clubs. As such, the named Plaintiffs cannot "fairly and adequately protect the interests" of the substantial numbers of OMP subscribers who do not want to buy single-club channels.

In sum, Plaintiffs' proposed class would "collapse[] into distinct groups of winners and losers" based on individual viewing preferences. *Auto Ventures, Inc. v. Moran*, 1997 WL 306895, at *5 (S.D. Fla. Apr. 3, 1997) (denying certification of proposed antitrust class). The would-be class members who benefit from the actual-world territorial restrictions vis-à-vis increased output and viewing options – the "winners" – "do not have the same incentives to prosecute this action as the 'losers' do." *In re Photochromic Lens Antitrust Litig.*, 2014 WL 1338605, at *14 (M.D. Fla. Apr. 3, 2014) (certification denied). This conflict is fundamental: the relief sought might benefit some class members, but materially harm others. *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) ("A fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefitted other members of the class."). As the Second Circuit has observed, Rule 23(a)(4) requires that class representatives "must have no interests antagonistic to the interest of other class members." *Denney* v. *Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006). Courts

routinely conclude that certification is inappropriate in the face of such fundamental conflicts.[46,47]

Ultimately, Plaintiffs fail to prove by a preponderance of the evidence that all class members – including the named Plaintiffs – share the same interests and would all benefit from the relief being sought.  Even if the HTTs were deemed unlawful due to their alleged cumulative anticompetitive effect on the "market as a whole," eliminating the HTTs likely would harm a great many absent class members.  As a result, Plaintiffs cannot satisfy their burden to prove that the class is sufficiently cohesive to satisfy Rule 23(a)(4).

---

[46] *See, e.g., Literary Works*, 654 F.3d at 254-55; *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) ("[A] class cannot be certified [under Rule 23(a)(4)] when its members have opposing interests or when it consists of members who benefit from the same acts alleged to be harmful to other members of the class.").  *See also Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 338-39 (4th Cir. 1998); *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993); *Duchardt v. Midland Nat'l Life Ins. Co.*, 265 F.R.D. 436, 450-51 (S.D. Iowa 2009) ("Despite [plaintiff's] efforts to carefully tailor a remedial scheme that averts the most obvious conflicts between the 'winners' and 'losers,' the Court does not believe that a remedial scheme can sidestep the need for adequate representation of all subgroups within a larger injunctive class when those subgroups have clearly conflicting positions."); *Almonor v. BankAtlantic Bancorp., Inc.*, 261 F.R.D. 672, 677 (S.D. Fla. 2009) ("In this way, the class collapses into distinct groups of winners and losers, as there is a fundamental conflict between those who were harmed and those who were benefitted by Defendants' breaches. . . . Plaintiff's economic interests and objectives differ in a significant way from the economic interests and objectives of class members she purports to represent.  Therefore, class certification under these circumstances is inappropriate.").

[47] Plaintiffs' effort to marginalize the existence of intra-class conflict is unavailing.  Mem. at 19 (citing *Kohen v. Pac. Invest. Mgmt. Co.*, 571 F.3d 672, 678 (7th Cir. 2009)).  The Seventh Circuit (Judge Posner) recognized that "a class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant[.]"  Where the disparity among class members is widespread and more definitely known, certification is not appropriate.  *Kohen*, 571 F.3d at 677.  Here, "a great many persons" in the putative class certainly benefit from the territorial restrictions, insofar as they are able to view the clubs and games they prefer but would not be able to do so in the BFW.

## VI.   PLAINTIFFS HAVE NOT ESTABLISHED THE RULE 23(B)(2) REQUIREMENTS

Plaintiffs' attempt to certify an injunctive/declaratory relief class under Rule 23(b)(2) (Mem. at 17-18 n.12) fails for three fundamental reasons.

*First*, certification under Rule 23(b)(2) is improper because Plaintiffs' monetary damages claims are not "merely 'incidental'" to the injunctive relief demanded.  *See, e.g.*, *Nationwide Life Ins. Co. v. Haddock*, 460 F. App'x. 26 (2d Cir. 2012) ("In *Wal-Mart*, . . . the Supreme Court instructed that unless merely 'incidental' to the requested declaratory or injunctive relief, claims for individualized monetary damages preclude class certification under Rule 23(b)(2).").

*Second*, the existence of "winners" and "losers" in the putative class that precludes satisfaction of the "predominance" requirement of Rule 23(b)(3) also precludes satisfaction of the "cohesiveness" requirement under Rule 23(b)(2).  *In re MTBE Products Liability Litig.*, 209 F.R.D. 323, 342-43 (S.D.N.Y. 2002).  Indeed, "[t]he cohesiveness requirement is greater in a Rule 23(b)(2) class action [than in a 23(b)(3) action], because unnamed class members are bound by the action without the opportunity to opt out." *Id.* (emphasis added).   In *Freeland*, Judge Cote denied certification of a Rule 23(b)(2) injunction class because some proposed class members may have benefited from the allegedly anticompetitive bundling of products – cellular telephones and wireless services.  *Freeland*, 238 F.R.D. at 156-57.  So too here, the putative class contains persons who benefit from the status quo – the BFW "losers."[48]

*Third*, the key to a Rule 23(b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted – the notion that the conduct is such that it can be enjoined or

---

[48]  *Ligon v. City of New York*, 288 F.R.D. 72, 80 (S.D.N.Y. 2013), cited by Plaintiffs, is inapposite.  *Ligon* was a civil rights case seeking broad relief, the type of case for which Rule 23(b)(2) was "designed specifically."  *In re MTBE Prods. Liab. Litig.*, 209 F.R.D. at 341.

44

declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 131 S. Ct. at 2557 (citations omitted). Here, the claim for injunctive relief is not "indivisible" because many putative class members have no right to such relief and/or would not benefit from an injunction. *Id.*

In addition to the BFW "losers" who would not benefit from an injunction, the putative class (which dates back to 2008) includes former purchasers of OMPs who have no claim to forward-looking injunctive relief.[49] Subscribers add and drop packages for myriad reasons and many simply discontinue their television service altogether if they have changed residences or switch to a new MVPD service.[50] This is evident even among the named Plaintiffs. For example, Plaintiff Lerner purchased MLB.TV for only one season, 2011, and testified he did not purchase the Internet package again because he "was able to access [Extra Innings on his] home TV and [] thought the quality was better there." Lerner Tr. 182-83. Similarly, Plaintiff Rasmussen testified that he purchased MLB.TV for only one season in 2011, and that he did not buy it in 2012 or 2013. Rasmussen Tr. 79-80. Plaintiff Traub purchased NHL Center Ice and MLB Extra Innings in 2011 from Comcast, but then switched to buying the Internet packages

---

[49] To seek injunctive relief, the requesting party must establish injury-in-fact and that future harm is imminent. This requires a showing that the "threatened injury [is] certainly impending." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1143 (2013) (reversing Second Circuit's "objectively reasonable likelihood" of future injury standard) (quotes omitted). "Allegations of possible future injury are not sufficient." *Id.* at 1147 (emphasis original).

[50] Approximately 1.5% of DIRECTV's subscriber base leaves the platform each month. DIRECTV 2012 Annual Report, at 44, *available at* http://investor.directv.com/files/doc_financials/annual/DIRECTV_2012_AR.PDF. This 1.5% monthly "churn rate" is substantial turnover reaching back to 2008. The number of Comcast television subscribers decreased from approximately 24.2 million in 2008 to approximately 22 million in 2012. Comcast 2012 10K, *available at* http://files.shareholder.com/downloads/CMCSA/3507171854x0x650076/e95fd726-8a42-4ca9-afb3-dfbd95113b40/comcast10K.pdf.

directly from the Leagues because he believes they are superior to the television packages. Traub Tr. 55, 109-110, 120.  Plaintiff Dillon purchased GCL in 2011, but did not renew it because "it wasn't worth the money."  Dillon Tr. 92.  The interest of these former subscribers is fundamentally different than those of putative class members who currently subscribe to OMPs because former subscribers' sole remedy, if any, would be monetary relief for the past purchases. To the extent that standing turns on whether each former subscriber among the absent class members intends to purchase an OMP in the future, it would be impossible to ascertain the members of the class by reference to objective criteria.  Defendants only discovered through depositions that Traub, Silver, Dillon, Lerner, and Rasmussen, who do not currently subscribe to an OMP, do not have a plan to purchase such a package.  Traub Tr. 55-57; Silver Tr. 53-54; Lerner Tr. 171, 173, 182-183, 184; Dillon Tr. 86; Rasmussen Tr. 90.

In *Wal-Mart*, the Supreme Court reversed certification of a Rule 23(b)(2) class consisting of current and former employees of Wal-Mart who alleged the company discriminated against them on the basis of sex.  131 S. Ct. at 2557.  The Court reasoned that certification was improper because the class included a large number of former employees who "ha[d] no claim for injunctive or declaratory relief at all" and thus the relief was not "indivisible." *Id.* at 2560.  Like the former employees in *Wal-Mart*, members of the putative class who have not renewed their purchases of the out-of-market packages are former subscribers who have no claim for injunctive or declaratory relief, rendering 23(b)(2) certification improper.[51]  Restricting the putative class to

---

[51] *See also Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 568 (C.D. Cal. 2012) (denying certification of a Rule 23(b)(2) class because plaintiff's requested remedies would not result in classwide relief); *Manson v. GMAC Mortg., LLC*, 283 F.R.D. 30, 40 (D. Mass. 2012) (denying certification of Rule 23(b)(2) class given the class members' differing circumstances and differing requests for equitable relief); *Yarger v. ING Bank, fsb*, 285 F.R.D. 308 (D. Del.
*(cont'd)*

current subscribers is no solution because the class membership would then have to be constantly evaluated by the Court. *See Wal-Mart*, 131 S. Ct. at 2546 (stating that a "district court would have to reevaluate the roster of class members continuously to excise those who leave their employment and become ineligible for classwide injunctive or declaratory relief.").

## CONCLUSION

For the reasons stated above and in their moving papers, the Defendants respectfully request that Plaintiffs' Motion for Class Certification be denied.

Dated: November 12, 2014

Respectfully submitted,

_____/s/_____
Bradley Ruskin
Jennifer Scullion
Colin Kass
Stephen Ahron
Joelle Milov

**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York  10036-8299
Telephone: (212) 969-3000
Facsimile:  (212) 969-2900
bruskin@proskauer.com
jscullion@proskauer.com

Thomas J. Ostertag
Senior Vice President and General Counsel
Office of the Commissioner of Baseball
245 Park Avenue
New York, New York  10167
Telephone: (212) 931-7855
Facsimile:   (212) 949-5653

---

*(cont'd from previous page)*
2012) (denying class certification under Rule 23(b)(2) because the injunctive relief would need to be tailored to individual class members).

REDACTED – PUBLIC VERSION

*Attorneys for Defendants Office of the Commissioner of Baseball, Major League Baseball Enterprises Inc., MLB Advanced Media L.P., MLB Advanced Media, Inc., Athletics Investment Group, LLC, The Baseball Club of Seattle, LLLP., Chicago Cubs Baseball Club, LLC, Chicago White Sox, Ltd., Colorado Rockies Baseball Club, Ltd., The Phillies, Pittsburgh Baseball, Inc., and San Francisco Baseball Associates LLC*

_____/s/_____
Shepard Goldfein
James A. Keyte
Paul M. Eckles
Matthew M. Martino
**SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP**
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Facsimile:  (212) 735-2000
shepard.goldfein@skadden.com
james.keyte@skadden.com
paul.eckles@skadden.com
matthew.martino@skadden.com

*Attorneys for Defendants National Hockey League, NHL Enterprises, L.P., NHL Interactive Cyberenterprises, LLC, Chicago Blackhawk Hockey Team, Inc., Comcast-Spectacor, L.P., Hockey Western New York LLC, Lemieux Group, L.P., Lincoln Hockey LLC, New Jersey Devils LLC, New York Islanders Hockey Club, L.P. and San Jose Sharks, LLC*

_____/s/_____
Louis A. Karasik
Andrew E. Paris
Stephanie A. Jones
**ALSTON & BIRD LLP**
333 South Hope Street, 16th Floor

Los Angeles, California 90071-3004
Telephone: (213) 576-1000
Facsimile: (213) 576-1100
lou.karasik@alston.com
drew.paris@alston.com
stephanie.jones@alston.com

*Attorneys for Defendants DIRECTV, LLC,*
*DIRECTV Sports Networks, LLC, DIRECTV*
*Sports Net Pittsburgh, LLC a/k/a Root*
*Sports Pittsburgh, DIRECTV Sports Net*
*Rocky Mountain, LLC a/k/a Root Sports*
*Rocky Mountain, and DIRECTV Sports*
*Net Northwest, LLC a/k/a Root Sports*
*Northwest*

_____/s/_____
Beth A. Wilkinson
Samantha P. Bateman
**PAUL, WEISS, RIFKIND WHARTON &**
**GARRISON LLP**
2001 K St. NW
Washington, D.C. 20006-1047
Telephone: (202)-223-7300
Facsimile: (202)-223-7420
bwilkinson@paulweiss.com
sbateman@paulweiss.com

*Attorneys for Defendant Yankees*
*Entertainment & Sports Network*

_____/s/_____
Jonathan D. Schiller
Alan Vickery
Christopher Duffy
**BOIES, SCHILLER & FLEXNER LLP**
575 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350
jschiller@bsfllp.com
avickery@ bsfllp.com
cduffy@bsfllp.com

*Attorneys for Defendants New York Yankees*
*Partnership*

49

REDACTED – PUBLIC VERSION

_____/s/_____
Stephen R. Neuwirth
Deborah Brown
Richard I. Werder, Jr.
**QUINN EMANUEL URQUHART &**
**SULLIVAN, LLP**
stephenneuwirth@quinnemanuel.com
deborahbrown@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
stephenneuwirth@quinnemanuel.com
rickwerder@quinnemanuel.com

*Attorneys for Defendants The Madison*
*Square Garden Company and New York*
*Rangers Hockey Club*

_____/s/_____
Arthur J. Burke
David B. Toscano
James W. Haldin
**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, New York  10017
Telephone:  (212) 450-4000
Facsimile:  (212) 701-5800
arthur.burke@davispolk.com
david.toscano@davispolk.com
james.haldin@davispolk.com

*Attorneys for Defendants Comcast*
*Corporation, Comcast SportsNet*
*Philadelphia, L.P., Comcast SportsNet Mid-*
*Atlantic L.P., Comcast SportsNet California,*
*LLC, and Comcast SportsNet Chicago, LLC*