**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THOMAS LAUMANN, FERNANDA GARBER, ROBERT SILVER, DAVID DILLON, GARRETT TRAUB, and PETER HERMAN, representing themselves and all others similarly situated, | 12-cv-1817 (SAS) |
| Plaintiffs, | |
| v. | |
| NATIONAL HOCKEY LEAGUE, et al., | |
| Defendants | |
| FERNANDA GARBER, MARC LERNER, DEREK RASMUSSEN, ROBERT SILVER, GARRETT TRAUB, and VINCENT BIRBIGLIA, representing themselves and all others similarly situated, | 12-cv-3704 (SAS) |
| Plaintiffs, | ECF Cases |
| | ~~Filed under Seal~~ |
| v. | **REDACTED VERSION** |
| OFFICE OF THE COMMISSIONER OF BASEBALL, et al., | |
| Defendants | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTIONS FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

Table of Authorities ............................................................................................... ii

Introduction ............................................................................................................ 1

Discussion ............................................................................................................... 3

   I.   Common Issues Overwhelmingly Predominate .................................... 3

      A.   Defendants Misstate the Applicable Law ......................................... 4

      B.   Defendants' Speculation Cannot Defeat Class Certification ........................ 5

   II.  Defendants' Criticisms of Dr. Noll's Damages Model Are Based on Fundamental
      Errors ................................................................................................. 10

      A.   Defendants' Errors Concerning "Content Exclusivity" .................. 10

      B.   The Packages Would Continue to Exist in the But-for World. .................. 13

      C.   The Packages Would Be Less Expensive in the But-for World ................ 15

   III.  Defendants' "Winners and Losers" Argument Has No Basis in the Record ................... 19

   IV.  There Are No Individualized Damages Issues, and Individualized Damages Issues
      Would Not Preclude Certification Even If Any Existed .................... 21

   V.  There Are No Class Conflicts ............................................................. 23

   VI.  Class Members' Arbitration Agreements with Individual Defendants Do Not
      Preclude Class Certification .............................................................. 25

      A.   All Class Members Can Proceed in Federal Court ........................ 25

      B.   Arbitration Does Not Affect Commonality, Typicality, or Adequacy ................ 27

   VII.   An Injunctive Class May Be Certified Under Rule 23(b)(2) ......................... 28

Conclusion ............................................................................................................ 30

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allen v. Dairy Farmers of America*,
  No. 09-230, 2012 WL 5844871 (D. Vt. Nov. 19, 2012)......................................................... 17

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.*,
  247 F.R.D. 156 (C.D. Cal. 2007)..................................................................................... 8

*American Bankers Insurance Group, Inc. v. Long*,
  453 F.3d 623 (4th Cir. 2006) ........................................................................................ 27

*Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*,
  133 S. Ct. 1184 (2013)........................................................................................ 1, 3, 4

*Argus Inc. v. Eastman Kodak Co.*,
  801 F.2d 38 (2d Cir. 1986) ........................................................................................... 20

*Associated General Contractors of California, Inc. v. California State Council of Carpenters*,
  459 U.S. 519 (1983)...................................................................................................... 10

*Auto Ventures v. Moran*,
  No. 92-426, 1997 WL 306895 (S.D. Fla. Apr. 3, 1997)................................................. 24

*Bell Atlantic Corp. v. AT&T Corp.*,
  339 F.3d 294 (5th Cir. 2003) ......................................................................................... 8

*Bigelow v. RKO Radio Pictures, Inc.*,
  327 U.S. 251 (1946)...................................................................................................... 23

*Blades v. Monsanto Co.*,
  400 F.3d 562 (8th Cir. 2005) ........................................................................................ 22

*Brantley v. NBC Universal, Inc.*,
  675 F.3d 1192 (9th Cir. 2012) ....................................................................................... 9

*Brown v. Kelly*,
  609 F.3d 467 (2d Cir. 2010) ........................................................................................... 5

*Butto v. Collecto Inc.*,
  845 F. Supp. 2d 491 (E.D.N.Y. 2012) ........................................................................... 26

*Casale v. Kelly*,
  257 F.R.D. 396 (S.D.N.Y. 2009) ................................................................................... 29

*Christiania General Insurance Corp. v. Great American Insurance Co.*,
  979 F.2d 268 (2d Cir. 1992) ......................................................................................... 20

*Comcast Corp. v. Behrend,*
    133 S. Ct. 1426 (2013) ................................................................................. 5, 12

*Continental Orthopedic Appliances, Inc. v. Health Insurance Plan of Greater New York, Inc.,*
    198 F.R.D. 41 (E.D.N.Y. 2000) .......................................................................... 8

*Cooper v. Federal Reserve Bank,*
    467 U.S. 867 (1984) ......................................................................................... 29

*Cordes & Co. Financial Services, Inc. v. A.G. Edwards & Sons, Inc.,*
    502 F.3d 91 (2d Cir. 2007) ................................................................................ 4

*Denney v. Deutsche Bank AG,*
    443 F.3d 253 (2d Cir. 2006) ............................................................................ 28

*Denney v. Jenkins & Gilchrist,*
    412 F. Supp. 2d 293, 29 (S.D.N.Y. 2005) ....................................................... 26

*Dominguez v. UAL Corp.,*
    666 F.3d 1359 (D.C. Cir. 2012) ......................................................................... 7

*Duchardt v. Midland National Life Insurance Co.,*
    265 F.R.D. 436 (S.D. Iowa 2009) ................................................................... 24

*Federal Trade Commission v. Superior Court Trial Lawyers' Association,*
    493 U.S. 411 (1990) ......................................................................................... 25

*Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.,*
    301 F.R.D. 116 (S.D.N.Y. 2014) ..................................................................... 23

*Freeland v. AT&T Corp.,*
    238 F.R.D. 130 (S.D.N.Y. 2006) ................................................................ 24, 25

*General Leaseways, Inc. v. Nationall Truck Leasing Association,*
    744 F.2d 588 (7th Cir. 1984) ............................................................................. 7

*Glictronix Corp. v. AT&T Co.,*
    603 F. Supp. 552 (D.N.J. 1984) ......................................................................... 8

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.,*
    392 U.S. 481 (1968) ........................................................................................ 6, 7

*Heerwagen v. Clear Channel Communications,*
    435 F.3d 219 (2d Cir. 2006) .............................................................................. 9

*Hill v. T-Mobile USA, Inc.,*
    No. 09-1827, 2011 WL 10958888 (N.D. Ala. May 16, 2011) ......................... 27

*Houser v. Pritzker*,
   --- F. Supp. 2d ---, 2014 WL 2967446 (S.D.N.Y. July 1, 2014)................................ 30

*I Sports v. IMG Worldwide, Inc.*,
   813 N.E.2d 4 (Ohio Ct. App. 2004)........................................................................ 26

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977)............................................................................................. 6, 7

*In re Air Cargo Shipping Services Antitrust Litigation*,
   No. 06-md-1775, Dkt. No. 2055 (Oct. 15, 2014) .................................................. 21

*In re Cathode Ray Tube (CRT) Antitrust Litigation*,
   No. 07-5944, 2013 WL 5391159 (N.D. Cal. Sept. 24, 2013)............................... 4, 5

*In re Electronic Books Antitrust Litigation*,
   No. 11-md-2293, 2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) .................... 6, 7, 13

*In re Electronic Books Antitrust Litigation*,
   No. 11-md-2293, 2014 WL 1641699 (S.D.N.Y. Apr. 24, 2014).............................. 7

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litigation*,
   256 F.R.D. 82 (D. Conn. 2009) ........................................................................ 20, 22

*In re Flag Telecom Holdings, Ltd. Securities Litigation*,
   574 F.3d 29 (2d Cir. 2009) ................................................................................... 23

*In re IndyMac Mortgage-Backed Securities Litigation*,
   286 F.R.D. 226 (S.D.N.Y. 2012) .......................................................................... 21

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
   209 F.R.D. 323 (S.D.N.Y. 2002) .......................................................................... 30

*In re Polyurethane Foam Antitrust Litigation*,
   No. 10-md-2196, 2014 WL 6461355 (N.D. Ohio Nov. 17, 2014) ........................... 5

*In re Rail Freight Fuel Surcharge Antitrust Litigation*,
   725 F.3d 244 (D.C. Cir. 2013).................................................................................. 9

*In re Relafen Antitrust Litigation*,
   346 F. Supp. 2d 349 (D. Mass. 2004) ...................................................................... 7

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
   No. 07-md-1827, 2012 WL 555090 (N.D. Cal. Feb. 21, 2012)............................. 20

*In re Titanium Dioxide Antitrust Litigation*,
   962 F. Supp. 2d 840 (D. Md. 2013) ....................................................................... 27

*In re Titanium Dioxide Antitrust Litigation,*
  No. 10-318, 2013 WL 6577029 (D. Md. Dec. 13, 2013) ...................................... 27

*In re U.S. Foodservice Inc. Pricing Litigation,*
  729 F.3d 108 (2d Cir. 2013) .......................................................................... 4, 5

*In re Urethane Antitrust Litigation,*
  251 F.R.D. 629 (D. Kan. 2008) ............................................................................ 8

*In re Urethane Antitrust Litigation,*
  768 F.3d 1245 (10th Cir. 2014) ................................................................. 5, 8, 22

*In re Visa Check/Mastermoney Antitrust Litigation,*
  192 F.R.D. 68 (E.D.N.Y. 2000) ........................................................................... 6

*In re Visa Check/MasterMoney Antitrust Litigation,*
  280 F.3d 124 (2d Cir. 2001) .............................................................................. 24

*In re Whirlpool Corp. Front-Loading Washer Products Liability Litigation,*
  722 F.3d 838 (6th Cir. 2013) ............................................................................... 5

*Jimenez v. Allstate Insurance Co.,*
  765 F.3d 1161 (9th Cir. 2014) ........................................................................... 21

*Kohen v. Pacific Investment Management Co.,*
  571 F.3d 672 (7th Cir. 2009) ............................................................................... 9

*Laumann v. National Hockey League,*
  907 F. Supp. 2d 465 (S.D.N.Y. 2012) ................................................................. 9

*Laumann v. National Hockey League,*
  989 F. Supp. 2d 329 (S.D.N.Y. 2013) ............................................................... 27

*Litton Systems, Inc. v. AT&T Co.,*
  700 F.2d 785 (2d Cir. 1983) ................................................................................. 8

*Livingston v. Metropolitan Pediatrics, LLC,*
  227 P.3d 796 (Ct. App. Or. 2010) ...................................................................... 26

*Lozano v. AT&T Wireless Services Inc.,*
  504 F.3d 718 (9th Cir. 2007) ............................................................................. 27

*Messner v. Northshore University HealthSystem,*
  669 F.3d 802 (7th Cir. 2012) ............................................................................... 9

*Moss v. BMO Harris Bank, N.A.,*
  --- F. Supp. 2d ---, 2014 WL 2565824 (E.D.N.Y. June 9, 2014) ......................... 26

*New York v. Hendrickson Brothers*,
    840 F.2d 1065 (2d Cir. 1988) ................................................................. 23

*Pablo v. ServiceMaster Global Holdings, Inc.*,
    No. 08-3894, 2011 WL 3476473 (N.D. Cal. Aug. 9, 2011) .................... 27

*Patterson v. Balsamico*,
    440 F.3d 104 (2d Cir. 2006) ................................................................... 21

*Pickett v. Iowa Beef Processors*,
    209 F.3d 1276 (11th Cir. 2000) .............................................................. 24

*Retired Chicago Police Association v. City of Chicago*,
    7 F.3d 584 (7th Cir. 1993) ...................................................................... 24

*Ross v. Bank of America, N.A.*,
    524 F.3d 217 (2d Cir. 2008) ................................................................... 10

*Seijas v. Republic of Argentina*,
    606 F.3d 53 (2d Cir. 2010) ..................................................................... 21

*Shahriar v. Smith & Wollensky Restaurant Group, Inc.*,
    659 F.3d 234 (2d Cir. 2011) ................................................................... 28

*Stinson v. City of New York*,
    282 F.R.D. 360 (S.D.N.Y. 2012) ........................................................... 29

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
    282 U.S. 555 (1931).................................................................................. 23

*Suchanek v. Sturm Foods, Inc.*,
    764 F.3d 750 (7th Cir. 2014) .................................................................... 9

*Thomson-CSF, S.A. v. American Arbitration Association*,
    64 F.3d 773 (2d Cir. 1995) ..................................................................... 26

*UFCW Local 1776 v. Eli Lilly & Co.*,
    620 F.3d 121 (2d Cir. 2010) ..................................................................... 4

*United States v. Shumway*,
    199 F.3d 1093 (9th Cir. 1999) ................................................................ 20

*United States v. Topco Associates, Inc.*,
    405 U.S. 596 (1972).................................................................................. 25

*United Steel Workers International Union v. ConocoPhillips Co.*,
    593 F.3d 802 (9th Cir. 2010) .................................................................... 5

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*,
  350 F.3d 1181 (11th Cir. 2003) ............................................................ 24

*Walters v. Reno*,
  145 F.3d 1032 (9th Cir. 2004) ............................................................ 30

**Other Authorities**

Crawford, Gregory S. & Ali Yurukoglu, *The Welfare Effects of Bundling in Multichannel Television Markets*, 102 Am. Econ. Rev. 643 (2012)............................................. 18

Hovenkamp, Herbert, *Federal Antitrust Policy* (4th ed. 2011) ..................................... 6

Rubenstein, William B., *Newberg on Class Actions* (5th ed.)................................. 24, 30

Wright, Charles Alan & Arthur R. Miller, *Federal Practice and Procedure* (3d ed.) ................ 30

## INTRODUCTION

The Court should reject Defendants' opposition to class certification. It is undisputed that nearly every issue in this case—including the ultimate question of whether the challenged practices are lawful—are common to all class members' claims. Defendants' brief is largely a reprise of their failed motions for summary judgment, claiming—once again—that the challenged restraints benefit consumers. But if these arguments are successful at trial, they will resolve the case in Defendants' favor on a *classwide* basis. If a jury accepts Plaintiffs' view instead, Defendants will lose on a *classwide* basis. *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013) (holding that the court does not need to find that common questions "will be answered, on the merits, in favor of the class").

Defendants try to disguise the classwide nature of this dispute by arguing that a single issue—antitrust impact—might *theoretically* require some individualized analysis. But for impact to become an individual question, even under Defendants' incorrect view of the law, a jury would have to proceed through a series of classwide questions and make an implausible set of findings. It would have to conclude that the restraints violate the Rule of Reason on a class basis, but that Plaintiffs have no means of proving that that classwide violation caused classwide damages. The jury would also have to conclude that Plaintiffs cannot establish classwide impact on the basis of the reduction in market choices. Only if a jury made this peculiar series of findings could there be a possibility of *any* individualized issues emerging—and even at that point, classwide issues would still predominate overall.

Defendants' speculative theory of individualized impact fails at its first step because Dr. Noll has shown that damages can be determined on a class basis. Defendants' challenges to Dr. Noll's work—which themselves apply classwide—betray a basic misunderstanding of his model. Most significantly, in what Defendants' expert Dr. Ordover testified to be "the focus of everything that I'm thinking about," Ordover Tr. 242, Defendants assume that Dr. Noll's model requires teams and RSNs to eliminate a form of "content exclusivity" by requiring local game

feeds to be carried on the packages in-market. Defendants are wrong about content exclusivity in general (as programming is often available through multiple sources), but that does not matter here because Dr. Noll's model does *not* assume that in-market broadcasts will lose their content exclusivity.

Defendants also question whether Dr. Noll's model is appropriately tailored to the sports broadcasting market. Dr. Noll is an expert in sports broadcasting and antitrust economics (a fact that Defendants do not challenge). He is plainly qualified to testify as to the appropriate assumptions for the relevant markets. In contrast, Defendants employ economists who have little or no experience in sports economics, and who lack a basic working knowledge of the contractual relationships at issue.

Defendants' criticisms of Dr. Noll's modeling choices, moreover, go only to potential adjustments to the modeling; they do not challenge his underlying methodology. Thus, they have no bearing on whether Dr. Noll has articulated a *method* for determining damages on a class basis. No expert has questioned the reliability of the fundamental methods Dr. Noll has used, nor their ability to determine damages on a classwide basis. Dr. Noll has continued to refine his model as he works towards the final damages model that will be submitted after class certification. These refinements address many of Defendants' criticisms and confirm that Defendants' critiques do not bear on whether he has a workable methodology for determining class damages.

Only at the end of their opposition brief do Defendants make any arguments that have relevance to class certification, but those arguments are trivial. As discussed below, those arguments—that a small number of DirecTV class members obtained discounts and that certain plaintiffs have arbitration agreements with some defendants—have no effect on how these cases will be tried and cannot predominate over the overwhelmingly common issues. None of these

arguments alters the reality that these cases are ideally suited for class certification: if Defendants' theory of the case is correct, they will prevail on a class basis, and if Plaintiffs' theory is correct, they will prevail on a class basis.

## **DISCUSSION**

### I.     **Common Issues Overwhelmingly Predominate**

Defendants focus primarily on predominance. Predominance is not a requirement for a 23(b)(2) injunctive class, as discussed in section VII, *infra*, and Plaintiffs seek certification under both (b)(2) and (b)(3). And even under 23(b)(3), Defendants ignore the crux of the predominance inquiry—whether common issues *predominate* over individual ones. *Amgen*, 133 S. Ct. at 1196. They do not compare the extent of the common issues with the extent of any individual issues. Indeed, Defendants do not and cannot contest that *all* of the issues concerning their liability under the antitrust laws—including all of the issues and defenses addressed in their motions for summary judgment—are common issues. Nor do they dispute that these will be the primary issues before the jury. Defendants do not even seriously contest that monetary *damages* will be resolved on a common basis. They mainly argue that Plaintiffs will be unable to show damages for *anyone*, not that the methods Plaintiffs proposed require individualized inquiries.

Defendants focus on a single issue—antitrust impact—arguing that it alone predominates over all other issues in these cases. Even then, they do not argue that impact cannot be shown if Plaintiffs establish that class members were overcharged for their out-of-market packages. Thus, Defendants' argument for individualized impact walks a tightrope. Their theory of individualized impact could only be actualized if the jury concludes (1) that Defendants' prediction of the but-for world is wrong—meaning that the harms to competition from their market allocation schemes outweigh their benefits—but (2) that Defendants' prediction of the but-for world is nevertheless right, and many consumers would not be harmed in the but-for world, and (3) that, despite the overall harm to the market, Defendants can establish that the out-of-market packages would be more expensive or unavailable in the but-for world. Only then could class members

even possibly be divided into "winners and losers" as Defendants suggest. In sum, Defendants are attempting to defeat predominance on the basis of a single, theoretically individualized issue that would arise only if the litigation were to follow a narrow path that neither party advocates.[1]

To even get to this tightrope, Defendants also have to convince the Court that the legal assumptions underlying this scenario are correct. But Defendants are also wrong about the requirements for predominance, about what constitutes antitrust impact, and about the relevance of secondary and tertiary benefits in their speculative but-for world. All class members bought the same products for the same standardized prices, and all were denied the same kind of market choices. Only a radical change in the law would permit Defendants to defeat such a paradigmatic case of common impact.

## A.    Defendants Misstate the Applicable Law

Defendants assert several incorrect propositions of law. They claim, for example, that impact must be established "without need for individualized inquiry" and must have the same "common answer" for all plaintiffs.[2] That is not the law. "Even if the district court concludes that the issue of injury-in-fact presents individual questions, … it does not necessarily follow that they predominate over common ones and that class action treatment is therefore unwarranted." *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 108 (2d Cir. 2007). No particular element of Plaintiffs' claims must be resolvable through exclusively common proof; common questions need only be "'more substantial than the issues subject only to individualized proof.'" *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013) (quoting *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 131 (2d Cir. 2010)).[3]

---

[1] The Court, of course, retains control of its class certification decision and could amend or rescind its order in the unlikely event Defendants' speculation comes to pass. *See* Fed. R. Civ. P. 23(c)(1)(C); *Amgen*, 133 S. Ct. at 1202 n.9.

[2] Defendants' assertion that Plaintiffs agree with this proposition, Opp'n 16, is untrue.

[3] *See also, e.g.*, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-5944, 2013 WL 5391159, at *5 (N.D. Cal. Sept. 24, 2013) ("Defendants' argument … is essentially that [plaintiffs] must be able to prove at the class certification stage that every single (or basically every single) class

Defendants also turn the applicable evidentiary standard on its head. Predominance, like all of the requirements of Rule 23, must be "'established by at least a preponderance of the evidence.'" *U.S. Foodservice*, 729 F.3d at 117 (quoting *Brown v. Kelly*, 609 F.3d 467, 476 (2d Cir. 2010)).[4] Defendants instead argue that the class may not be certified if there is *any* possibility that individual issues might predominate. By any measure, it is more likely than not that these cases will be resolved without the need for resolution of *any* individualized issues. Defendants' own theory of impact is based on common issues that must be resolved in Defendants' favor before any individual issues could arise. This is enough to establish predominance. *See, e.g., In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1254 (10th Cir. 2014) (affirming certification where "impact *involved* a common question that would override other individualized issues," even though "the class members experienced varying degrees of injury, with some avoiding injury altogether") (emphasis added); *see also United Steel Workers Int'l Union v. ConocoPhillips C*o., 593 F.3d 802, 808 (9th Cir. 2010) (holding that the district court abused its discretion "by declining certification based on the *possibility* that plaintiffs would not prevail on the merits of their primary legal theory.") (emphasis in original).

## B. Defendants' Speculation Cannot Defeat Class Certification

Plaintiffs' monetary damages equal the difference between the price they paid for the out-of-market packages and the price they would have paid if individual clubs were allowed to compete outside of their local markets.[5] Common sense, well-settled economic principles, and

---

member was injured by Defendants' conduct. This contention is wrong."); *In re Polyurethane Foam Antitrust Litig.*, No. 10-md-2196, 2014 WL 6461355, at *65 (N.D. Ohio Nov. 17, 2014).

[4] Defendants' suggestion that *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), made the predominance analysis of Rule 23 more rigorous has been rejected by numerous courts. *See, e.g., In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 860 (6th Cir. 2013) (*Comcast* was "premised on existing class-action jurisprudence"); *Polyurethane Foam*, 2014 WL 6461355, at *13; *CRT*, 2013 WL 5391159, at *5 ("Defendants continually argue that … the [class-certification] standard has somehow changed drastically under *Dukes, Comcast,* or *Amgen*, but the Court does not find that this is true.").

[5] Class members have also suffered damages in the form of their overcharges on the pay-television bills that result from elevated costs for RSNs, but Plaintiffs are seeking only injunctive relief for these injuries.

Dr. Noll's model show that the packages would be less expensive if clubs had the opportunity to compete nationwide. To undermine the conclusion that competition would lead to lower prices, Defendants propose a but-for world that is little more than an extended exercise in speculation. Their alternative is not only unrealistic, it violates the rule that antitrust plaintiffs need not (and may not) account for uncertain secondary and tertiary effects of the challenged restraints in determining damages. *See, e.g.*, *In re Elec. Books Antitrust Litig.* ("*Ebooks*"), No. 11-md-2293, 2014 WL 1282293, at *17 (S.D.N.Y. Mar. 28, 2014).

Plaintiffs have limited their claims for relief to the direct effects of the challenged practices. They do not seek to remedy every possible injury that could be imagined nor predict every decision that anyone might make in response to the removal of the restraints on competition. They seek the amount they overpaid for the products they purchased. And they seek injunctive relief to provide market choices that the challenged restraints preclude.

This is the proper approach in antitrust cases. *See, e.g.*, *Ill. Brick Co. v. Illinois*, 431 U.S. 720 (1977); *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968); *New York v. Hendrickson Bros.*, 840 F.2d 1065, 1077-78 (2d Cir. 1988). Whenever prices are inflated or choice is constrained by an antitrust conspiracy, purchasers necessarily purchase different quantities than they would in the but-for world, make different choices among the offerings presented to them, or do not make purchases that they would have made if the product had been competitively priced. So too might producers make different choices about quality and product mix. But antitrust cases do not delve into these necessarily speculative changes, whether in individual cases or class actions. Rather, they accept as given the products produced, the identities of the purchasers, and the quantity purchased. *See* Herbert Hovenkamp, *Federal Antitrust Policy*, 727 (4th ed. 2011). For this reason, the court in *In re Visa Check/Mastermoney Antitrust Litigation* expressly concluded that the defendants' "'winners' and 'losers' … argument is immaterial when an antitrust plaintiff proceeds on an 'overcharge theory' of damages." 192 F.R.D. 68, 85 (E.D.N.Y. 2000), *aff'd*, 280 F.3d 124 (2d Cir. 2001).

6

As Judge Cote recognized in *Ebooks*, allowing such speculation would infect antitrust cases with the same uncertainty that the Supreme Court rejected in *Hanover Shoe* and *Illinois Brick*. "Because proving (or disproving) these features of the but-for world 'would normally prove insurmountable,' and because antitrust defendants may 'frequently seek to establish [the] applicability' of offsets based on such arguments if allowed, the Court taught that they should be barred. Otherwise, '[t]reble-damage actions would often require additional long and complicated proceedings involving massive evidence and complicated theories.'" *Ebooks*, 2014 WL 1282293, at *17 (quoting *Hanover Shoe*, 392 U.S. at 493).[6]

Defendants cannot defeat certification by speculating that, in the but-for world, they might not offer the products they currently sell. Defendants identify no case in which a court has denied class certification based on an evaluation of whether the defendants' products would not have existed or would have been of inferior quality in the but-for world.[7] In any event, if these issues mattered at all, then they would matter on a classwide basis. *See In re Elec. Books Antitrust Litig.*, No. 11-md-2293, 2014 WL 1641699, at *10 (S.D.N.Y. Apr. 24, 2014) ("Apple is no more able to speculate about injury to one plaintiff as to another, and thus any defense Apple may wish to make on the basis of such speculation would be applicable classwide. Indeed, the

_____

[6] Defendants briefly argue that the normal rules of evaluating antitrust cases do not apply outside the narrow realm of price-fixing. Opp'n 25-26. They cite no authority for this novel proposition, which is contrary to the long-recognized principle that "raising price, reducing output, and dividing markets have the same anticompetitive effects." *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 594-95 (7th Cir. 1984) (Posner, J.). All antitrust violations, not merely price-fixing, entitle a "purchaser to recover the full amount of the overcharge, even if he is otherwise benefited." *In re Relafen Antitrust Litig.*, 346 F. Supp. 2d 349, 369 (D. Mass. 2004) (internal quotation omitted). *Ebooks* certainly does not make the distinction Defendants propose; quite to the contrary, the conduct in *Ebooks* involved a change to a different distribution model with different price setters (as here), the introduction of a new distribution channel (as here) and, according to Apple, questions as to whether actual-world products and distribution channels would exist at all in the but-for world (as Defendants claim here). *See Ebooks*, 2014 WL 1282293, at *4, *15-*21.

[7] The only case that Defendants cite that addressed the non-existence of a product in the but-for world was resolved not at class certification, but at summary judgment, and resulted in a ruling that would have applied—in that case, adversely—to all members of the putative class. *See Dominguez v. UAL Corp.*, 666 F.3d 1359 (D.C. Cir. 2012).

appropriateness of offsets to any damages calculation is itself a class-wide issue.").[8]

Defendants cite a handful of cases denying certification where class members were treated differently than others, receiving a clear benefit in the actual world from the alleged violation to the detriment of other class members—not where all class members were treated the same way in the actual world and a defendant speculated that disparate effects might occur in the but-for world (which would necessarily arise only if a Court confirmed the antitrust violation and imposed practice changes). For example, in *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156 (C.D. Cal. 2007), the plaintiffs challenged a scheme to monopolize the market by, among other things, "lowering prices" to some class members "in return for their commitment to buy specified percentages" of the product from the defendant. *Id.* at 168.[9] The plaintiffs' very theory was that the monetary incentives given to some purchasers in the actual world drove out competition among sellers, resulting in higher prices for other putative class members—a theory that depends on actual disparate treatment of class members. *Id.* at 168-69.[10] Defendants cite no case that supports their theory that the speculative benefits to some class

_____

[8] Defendants do not dispute that the league-wide packages have always been priced on a nationwide basis or that nationwide pricing would continue in the but-for world. Their contention that the packages might be more expensive is common.

[9] In *Allied Orthopedic*, plaintiffs' expert himself opined that the market "would have been completely different from the market that actually prevailed" but for the challenged practice—but made no attempt to incorporate any such difference. 247 F.R.D. at 165. Here, Dr. Noll has carefully explained which aspects of the market he held constant and which he changed, giving reasons that a jury can accept or reject. *See, e.g.*, *Litton Sys., Inc. v. AT&T Co.*, 700 F.2d 785, 825 (2d Cir. 1983) (expert need not "assume that any particular … pricing practices would be eliminated" or "ma[k]e specific assumptions about how individual … pricing practices would have changed."); *In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 637 (D. Kan. 2008), *aff'd*, 768 F.3d 1245 (10th Cir. 2014) ("Defendants argue, for example, that Dr. Beyer does not … view the market to be as complex as defendants believe it is. But, the factual record … supports the notion that Dr. Beyer's understanding of the industry is at least reasonably accurate.").

[10] Beyond these cases, Defendants rely on general propositions and wholly irrelevant cases. Several of their cases involve proposed classes of horizontal competitors seeking damages for lost profits. *See Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 306 (5th Cir. 2003); *Cont'l Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater N.Y., Inc.*, 198 F.R.D. 41, 43, 47 (E.D.N.Y. 2000); *Glictronix Corp. v. AT&T Co.*, 603 F. Supp. 552, 563, 585-89 (D.N.J. 1984). In that circumstance, each class member has an incentive to prove that it, rather than its fellow class members, would have captured the business and obtained greater profits in the but-for

members in their but-for world could defeat class certification.

Moreover, Defendants do not dispute that impact can only undermine predominance when the proposed class "contains a great many persons who have suffered no injury." Opp'n 43 n.47 (quoting *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 678 (7th Cir. 2009)); *see also id.* at 4. They ignore half of that rule, however. "[T]here is a distinction 'between class members who *were not* harmed and those who *could not* have been harmed.'" *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 758 (7th Cir. 2014) (quoting *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 825 (7th Cir. 2012)) (emphasis in original). Defendants argue that some Plaintiffs, due to their personal tastes (as opposed to what they actually purchased), escaped injury—but that does not put them in the same category as class members who could not have been harmed. *Cf. In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 254 (D.C. Cir. 2013) (vacating class certification where damages model could not distinguish class members who purchased outside of conspiracy period). There is no colorable argument—and Defendants do not attempt one—that any class members here could not have been harmed.

Properly analyzed, common impact cannot be disputed. Plaintiffs allege that class members paid too much for the products they purchased due to the absence of competition and that they were denied market choices that would result from independent team offerings. The former can be resolved on a class basis even under Defendants' theory, and the latter—entirely ignored by Defendants—is a clear, direct injury suffered by all class members. As this Court has previously held, reduced choice that results from anticompetitive conduct is antitrust injury. *Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 480 (S.D.N.Y. 2012). In particular, "'the inability to purchase a la carte programming'" can constitute antitrust injury. *Id.* at 480 n.77 (quoting *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012)). "[O]ne form of antitrust injury is 'coercive activity that prevents its victims from making free choices between

---

world. Defendants also cite *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 228-29 (2d Cir. 2006), which denied class certification—but did so because the relevant geographic markets were local, not national—an issue that has no relevance here.

market alternatives.'" *Ross v. Bank of Am., N.A.*, 524 F.3d 217, 223 (2d Cir. 2008) (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 (1983)).

The loss of market choices here is not theoretical or speculative. The purpose of the territorial rules is to block market choices. Every class member is denied access to broadcasts of all "out-of-market" clubs. The loss of market choices is not merely an effect of the restraints—it is precisely the point of the restraints. If they are found to be anticompetitive, then all class members will necessarily have established antitrust impact.

## II.  Defendants' Criticisms of Dr. Noll's Damages Model Are Based on Fundamental Errors

Defendants argue that Dr. Noll cannot establish classwide damages for one of two reasons. First, they contend that the out-of-market packages would not exist in the but-for world, so there is no benchmark price against which to measure damages. Second, they contend that even if there would be out-of-market packages, they would somehow—counterintuitively—be more expensive in a competitive market than in a non-competitive market. Only if they establish the failure of the damages model can Defendants move on to speculate about the effects that would cause certain class members to be "losers" in the but-for world.[11] Defendants misunderstand Dr. Noll's model, and their arguments fail at every step.

### A.  Defendants' Errors Concerning "Content Exclusivity"

Defendants continue to confuse the type of exclusivity Plaintiffs are challenging. They claim that if Plaintiffs are successful, RSNs would lose "content exclusivity" in their home markets and would have little interest in producing live sports programming. They also contend that Dr. Noll's damage estimate assumes the elimination of this "content exclusivity." Defendants misunderstand Plaintiffs' position. Plaintiffs are not challenging each individual club's ability to make its games available only to an exclusive producer in its home market, and

---

[11] This means that, under Defendants' own view, Plaintiffs' claims for damages will necessarily be resolved on a class basis, and should be certified.

nothing in Dr. Noll's model assumes that clubs will cease to maintain an exclusive relationship with a single RSN for each game in its local territory.

"Content exclusivity" refers to a kind of distributional exclusivity—some form of exclusive control over the distribution of particular content (as opposed to a right to constrain distribution of other broadcasts of that sport).[12] Plaintiffs contend that, without the challenged restraints, game content would be available through additional distribution methods, both in market and out.[13] Defendants focus on the in-market availability of the local team's broadcasts through additional sources. They argue, in particular, that it would be unprecedented for such programming to be available both from the RSN that produces it (through an MVPD) and from the league (by Internet or MVPD). Whether or not that is true, however, has no bearing on Dr. Noll's damages model because the viewing data and Dr. Noll's pricing analysis are directed only at *out-of-market* availability of games, because the real-world products at issue are out-of-market bundles.

Dr. Noll repeatedly made clear at his deposition that his model was *not* intended to encompass local broadcasts. *See, e.g.*, Noll Tr. 505-06 ("[T]he prices we're estimating are the out-of-market prices."); 453-54, 526. The class members were overcharged for the out-of-market content they purchased, and the viewership data on which the model is built is of out-of-market viewing. Defendants have ignored this, and continue to assume that Dr. Noll's model removes

---

[12] At times, Defendants confuse this concept with the notion that a single programmer will have exclusive control over distribution of a particular *game*—that is, that it can prevent other feeds from being available alongside its feed. This might be called "game exclusivity." At his deposition, Dr. Ordover clarified that his analysis was focused only on content exclusivity, narrowly construed, and not game exclusivity. Ordover Tr. 237 ("I am examining the implications … not from the visiting team now starting to send the feed into the home territory of the host team or the home team, but the implications … that arise as a result of the League using the feed that it obtains heretofore for free at zero price to compete with the RSN.").

[13] Most forms of distribution are, of course, non-exclusive. Most consumers, for example, can obtain RSNs from multiple MVPDs. RSN game programming is frequently carried on the leagues' own cable channels at the same time that it is available in the same areas on the out-of-market packages. And the current bundles are distributed non-exclusively, as consumers can chose either the Internet or TV package, which both offer the same content.

in-market content exclusivity.[14] Plaintiffs believe that it would, in fact, make sense to offer a blackout-free package, but Dr. Noll's damages analysis does not rely on that being true. To the contrary, his analysis is of prices for a package of out-of-market broadcasts and takes no position on in-market broadcasts. If the packages were to include the local teams' broadcasts, that would be all the better for class members, but it is not the question that Dr. Noll modeled, and it has no bearing on his ability to determine damages classwide.[15]

In any event, the notion that this kind of content exclusivity is sacrosanct is not true. Two NHL teams offered their programming non-exclusively through the Internet and television in-market for several years in Canada. *See* Noll Supp. 18 & n.15. Defendants' own RSNs routinely permit distribution of live-sports content through "competing" sources. For example, Major League Soccer games are available, for most teams, simultaneously through league packages (both Internet and television) and through local RSNs, with the same content available on both, as are minor league baseball and hockey games.[16] This is precisely what Defendants now argue "does not exist in mainstream television." Opp'n 13. Bob Bowman, the CEO of MLBAM,

---

[14] Dr. Noll's initial model did not expressly account for blackouts on the supply side. It was not necessary for the model to do so, however, because it is based entirely on the demand for out-of-market broadcasts as expressed in the viewership data. Dr. Noll has now expressly incorporated blackouts into his simulations in order to put this question to rest. This change does not alter the model in any fundamental way and, as expected, it makes little difference to the results. *See* Noll Reply 15, 40-41.

[15] Defendants cite to *Comcast v. Behrend* to argue that Dr. Noll's model is incapable of distinguishing between unlawful and lawful conduct because the model's results are driven by the elimination of content exclusivity rather than territorial exclusivity. This argument is based on the same basic misinterpretation of Dr. Noll's model. There is nothing about his model that requires that RSNs alter the level of content exclusivity they have now in their local territories, so it cannot be that his results are driven by elimination of content exclusivity. His damages model is driven by the fact that the out-of-market bundle will have to be priced in a competitive market in which individual teams offer their games outside of their home markets. That is precisely the relief Plaintiffs seek, so the model plainly fits the theory of liability. *Comcast v. Behrend* has no application here.

[16] *See* http://www.directv.com/sports/soccer; http://www.mlssoccer.com/blackout. Minor League Baseball and the American Hockey League offer league-wide Internet packages with almost no blackouts, regardless of whether the games are televised. Only two Minor League Baseball teams have any blackouts, and only in two locations. *See* http://www.milb.tv. The American Hockey League has no blackouts. *See* http://www.ahllive.com.

specifically declares in support of Defendants' current motions that separate Internet distribution can profitably coexist with MVPD distribution of the same content—a position he has long held. Bowman Decl. ¶ 14. As he has stated, ███████████████████████████████████ ███████████████████ MLB0367317.[17] RSNs may offer teams more money for the ability to obtain all of the revenue from the programming, but any notion that games could not be produced without strict exclusivity is belied by the facts and has no economic basis.[18]

### B.    The Packages Would Continue to Exist in the But-for World.

Calculating overcharge damages requires a determination of the competitive price for the out-of-market packages that were actually sold. To calculate this price, Dr. Noll analyzed the industry and came to the unremarkable conclusion that the packages would continue to exist in the but-for world. Even absent Dr. Noll's analysis, it would be reasonable to hold their existence constant.[19] Defendants' conjectures are consequently beside the point. Nevertheless, Defendants' argument that the packages would not exist is wrong.

Defendants base their claim on their assertion that the RSNs would not permit their productions to be included in a package that competed with their in-market broadcasts. As discussed above, this position misunderstands Plaintiffs' damages theory and Dr. Noll's model. It also misconstrues the relationships between RSNs and leagues.

First, there is no reason to think that RSNs would not agree to allow their feeds to be used

---

[17] The leagues offer identical programming through multiple sources as well. MLB national broadcasts are frequently available separately on the leagues' packages. The NHL currently has a first-run television series, *Road to the Winter Classic*, which is available simultaneously on the Epix television channel and NHL.com. http://www.nhl.com/ice/news.htm?id=744320.

[18] There are numerous other examples of sports programming that lacks content exclusivity, such as top-flight motorcycle racing, which is available on Fox Sports 1 and separately through a streaming package. *See* www.motogp.com. Other sports channels are available through "over-the-top" Internet subscriptions in competition with MVPD providers, including Comcast's own Universal Sports Network, which carries Olympic sports, and beIN Sports, which carries several major European soccer leagues. *See* https://www.dishworld.com/sports.

[19] *Cf. Ebooks*, 2014 WL 1282293, at *27 ("It is unsurprising that Noll did not develop an opinion about many of the issues that Apple contends are important features of a but-for world. After all, the but-for world does not exist.").

outside of their local areas. They already do so. The RSNs currently provide programming for inclusion in the league-wide packages "for free." An RSN would lose nothing by permitting its team partner to distribute those games out-of-market individually, because the RSN gets nothing from such distribution now. And, depending on their arrangement with the club, the RSN may be able to obtain additional revenue in new areas. Defendants thus focus their claims on supposed violations of *local-market* content exclusivity.[20] As discussed, however, Dr. Noll's quantification of the effects of the territorial restrictions does not depend on the RSNs offering their programming for league distribution in the local markets.

The relevant question is whether the leagues would continue to offer a package of games while individual teams offered their games outside their current markets. The answer is yes. As Dr. Noll has shown, it would be more profitable for the clubs jointly to offer a package of games even if they were distributing their games individually outside their markets. Noll Supp. 39; Noll Reply 42. Defendants do not challenge this analysis.

Defendants' experts posit a but-for world in which the leagues would seek an even more profitable solution by changing their league rules to permit a few—but not all—clubs to pull out of the bundle. Again, they do not dispute that the bundle would be more profitable than no bundle, so this solution would require the leagues to prevent most teams from defecting while allowing a few to withdraw from the bundle. This imagined change to league rules, which would favor the profitability of certain clubs over others, is not remotely plausible. Noll Reply 46-47.

Defendants claim that certain teams would maximize profits by defecting. But this proves

---

[20] *See, e.g.*, Ordover Tr. 242 ("[T]he focus of everything that I'm thinking about" is whether the league can obtain a feed for free "and use that free input to construct the product with which to compete against the home team territory RSN."); Litner Decl. ¶ 2 (defining "content exclusivity" as exclusivity "in the team's H[ome] T[elevision] T[erritory]"); Biard Decl. ¶ 3 ██████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Pakes Decl. ¶ 76 (opining that an RSN likely would not "give its telecasts to the BFW League Package free of charge when that Package is competing with the RSN in its home market").

nothing. It would undoubtedly be profitable for teams like the Yankees or New York Rangers to deviate from all sorts of league rules, including the national television contracts, joint-licensing arrangements, and the revenue-sharing system. Indeed, both of those clubs have sued their respective leagues in the past in attempts to defect in this manner. Any notion that the leagues would permit individual clubs or their RSNs to obtain a special status that allows them larger profits than the other clubs is pure fantasy. Defendants offer no expert in sports economics to support this theory, nor have they pointed to any instance where such an arrangement was made by the NHL or MLB. The absurdity of this position is revealed by the fact that the very same analysis shows that the Yankees and MLB would be better off *today* by separating the Yankees from the league-wide packages. Noll Reply 46. There is no evidence or reason to believe that MLB would even consider this.

In short, it is more than reasonable to hold the basic rules and league structures constant in calculating but-for prices; in fact, it would be unreasonable not to.

### C.      The Packages Would Be Less Expensive in the But-for World

Defendants' alternative argument—that the packages would be more expensive in the but-for world—is also built on their misinterpretation of content exclusivity. The basic premise is that the RSNs would not agree to give their programming to the league "for free" only to allow the league to compete with it. Defendants' class-certification expert, Dr. Ordover, surmises that the RSNs would charge the league a per-subscriber fee for their content, which would raise prices above the current prices for the class as a whole.[21]

In addition to the mistaken assumption of the loss of local in-market RSN exclusivity, this theory also mischaracterizes the relationships between clubs, RSNs, and the leagues. Dr. Ordover treats game feeds as the RSNs' property, and the leagues as mere partners in an equal

---

[21] Dr. Pakes, identified by Defendants solely as an expert for *Daubert* purposes, uses a different model, based on a different prediction about the but-for world, to predict higher prices. Defendants do not refer to his joint-pricing approach in their class brief, or explain why Dr. Pakes's model differs from Dr. Ordover's. *See Daubert* Opp'n at 14-20.

bargaining game. But the RSNs' rights come from the clubs in the first place. Dr. Ordover's theory is that, in his but-for world, each league's clubs would sell their rights to RSNs, which would then license them back to the clubs' own joint ventures. This convoluted structure makes no sense, and Dr. Ordover does not point to any example in which an RSN has a contract with MLB or the NHL, much less one in which the RSN charges a league a royalty for rights it obtained from a team.

Dr. Ordover's model follows from his intuition that the RSNs will not give away what they own for free. *E.g.*, Ordover Tr. 201-02. The RSNs, however, would not be providing anything "for free." They receive consideration for whatever value they transfer to the clubs. RSNs pay the clubs based on the rights they obtain. The value of these rights no doubt depends, in part, on the protections they receive from competition and the advantages the clubs derive from the broadcasts. While the RSNs may pay less money for less exclusivity, it is speculative, at best, to imagine that they would pay a license fee to the club and then charge a separate, per-subscriber royalty back to the club or the league. Noll Reply 17-18.

The more fundamental problem with Dr. Ordover's model is that the RSNs are *not* the content owners in the relevant sense. The clubs retain the basic rights to the content, and they grant the RSNs various rights, including the right to distribute the content in certain areas by certain means. RSNs have no rights at all with respect to out-of-market distribution. The RSNs, in other words, do not have something for which they *could* charge the leagues a royalty. Dr. Ordover acknowledged that he has no idea what, if any, ownership rights the RSNs have, or who holds the copyright in the feed.[22] His entire model, in other words, is based on a demonstrably

---

[22] In fact, Dr. Ordover exhibited a remarkable lack of understanding of the basic facts of NHL and MLB broadcasting markets. *See, e.g.*, Ordover Tr. 19-34, 251-52, 256 (no knowledge or empirical analysis of broadcast costs or revenue, how revenue is divided, or the amount an RSN must receive to warrant broadcasting a game); *id.* at 54 (misidentifying Gary Bettman as the commissioner of MLB); *id.* at 108-11 (acknowledging that he has no published work on sports economics, "did not consult any texts or articles devoted to sports economics … for the purpose of this case," and did not read the articles Noll cited); *id.* at 122-28 (has not worked on television broadcasting since the 1980s). Indeed, Dr. Ordover's main area of expertise appears to be

false assumption that he has not bothered to confirm.[23]

Nor would Dr. Ordover's model be any more plausible if, instead of positing a bargain between the RSNs and the league, he assumed that the clubs would independently bargain with the league.[24] Leagues do not engage in bilateral bargaining with individual clubs for joint products. Neither the Yankees nor the YES Network now charges a rights fee or feed fee for Yankees national broadcasts, out-of-market package distribution, or centralized licensing. These bargains occur through league rules, not bilateral bargaining.[25] In any event, the teams do not need to charge the leagues a "feed fee," because they are paid in the form of a share of the league-wide profits.

In sum, Dr. Ordover's contention that prices would be higher in the but-for world is based on a misunderstanding of Dr. Noll's treatment of in-market exclusivity, a lack of understanding of the relative rights of clubs and RSNs, and unfounded speculation about RSN-League bargaining. It also runs counter to basic economics and the foundational assumptions of antitrust law. Territorial allocations among competitors are viewed as *per se* restraints because they virtually always result in higher prices and reduced output. Dr. Ordover nevertheless concludes that prices would be higher with the restraints removed.

---

opposing class certification: he has testified in more than 20 antitrust cases and in all of them he has found that a class should not be certified, no matter what the industry, who the expert, or how complex the market. *Id.* at 81-92. *Cf. Allen v. Dairy Farmers of Am.*, No. 09-230, 2012 WL 5844871, at *11 n.10 (D. Vt. Nov. 19, 2012) (court "concerned with relying upon the analysis of [defense expert] who has purportedly *never* found common antitrust impact when it undisputedly has been found in scores of cases that have been upheld on appeal").

[23] Indeed, Dr. Ordover's understanding of content exclusivity would not be violated by the team or league streaming the game in competition with the RSN, because a single, principal owner of the rights—the team—would retain the ultimate right to control the distribution of that content.

[24] He does not pursue this approach, which is not surprising given that the claimed basis for his analysis is the assumption that the RSN would not give "its" programming to a competitor for free. That analysis has no application to the clubs, who would simply be choosing to distribute the programming through multiple channels.

[25] MLB's declarant undermines any notion that the RSNs might bargain with the leagues. He described the bargains that he foresees in the but-for world, which include club bargaining through league-wide agreement and do not include RSN-League bargaining. Brosnan Decl. ¶ 25.

As Dr. Noll notes, the reason Dr. Ordover's model produces these results is that it is simply replacing one form of collusion with another. Instead of dividing markets, the parties are modeled as setting joint prices through what Dr. Ordover's describes as "bargaining." But it is not bargaining in anything like the same way that bargaining is modeled by Drs. Crawford and Yurukoglu, as the parties are not modeled as attempting to maximize their own profits through the strength of their bargaining positions.[26] Instead they are modeled as maximizing the joint profits of the league and the RSN. His model, in other words, is simply a Bertrand model with collusion instead of competition. Noll Reply 40 & n.55

Defendants also suggest that the price could be higher if Dr. Noll had formally modeled bargaining between the various parties. Plaintiffs address this issue in their response to Defendants' *Daubert* motions. It is sufficient to note that Defendants have offered *no* evidence that prices would be higher as a result of any bargaining. To the contrary, the primary basis for their argument—that C&Y found prices to generally rise as a result of bargaining over a la carte cable programming—supports the conclusion that, if anything, prices would be expected to go *down*. C&Y found that sports channels in general, and RSNs in particular, were among the few channels whose costs were *lower* as result of the bargaining they modeled. C&Y at 677.[27] Dr. Noll describes why modeling bargaining is inappropriate and, in any event, would have little or no effect on consumer pricing, and Defendants have not offered any analysis that supports a different conclusion.[28] Dr. Ordover actually supports this conclusion, because his assumption, "consistent with the economic literature on bargaining," is that the most likely outcome is a joint-

---

[26] *See* Gregory S. Crawford & Ali Yurukoglu, *The Welfare Effects of Bundling in Multichannel Television Markets*, 102 Am. Econ. Rev. 643 (2012) ("C&Y")

[27] Dr. Pakes contends that this is not a reliable result. But, as discussed in Plaintiffs *Daubert* response, he has no basis for assuming that it is wrong while also assuming that the same methods reliably predict the costs of other channels. *See Daubert* Opp'n at 12 n.11.

[28] Defendants' separate assertion that Dr. Noll's marginal cost assumption drives the analysis is mistaken. The effects on the bundle price of the team-cost assumption are only indirect, and even Defendants do not contend that changing that assumption makes the bundle markedly more expensive than it is now. In any event, Dr. Noll has now modified his cost assumptions based on the record to make it more accurate, rendering this criticism moot. *See Daubert* Opp'n 24-25.

profit maximizing solution. Ordover Decl. ¶ 34. But that is precisely the result that Dr. Noll's Bertrand model—without separate analysis of bargaining—produces. *Daubert* Opp'n 13.

Ultimately, the jury will determine the appropriate benchmark pricing—on a class basis. Dr. Noll's model confirms the truism that prices are lower in competitive markets. Defendants' assertion that the packages would be more expensive is based on a theory that is openly collusive and based on basic misunderstandings of Dr. Noll's model and the markets at issue.

### III.   Defendants' "Winners and Losers" Argument Has No Basis in the Record

Defendants' position that impact cannot be shown additionally requires them to establish that there would be "winners and losers" among the class members. As discussed, this analysis is irrelevant, because it hypothesizes speculative, indirect benefits that certain class members supposedly obtain from the unlawful restraints. It also has no evidentiary basis. Defendants rely exclusively on self-serving affidavits of party witnesses created solely for litigation largely making the same arguments that were rejected at summary judgment. Most significantly, Defendants repeat their argument that many games would not be broadcast in the but-for world.

Defendants challenge just one portion of Plaintiffs' evidence (Dr. Noll's damages model) and do not even acknowledge—let alone rebut—the remainder of Dr. Noll's extensive economic analysis showing the harmful effects of the territorial allocation schemes, as well as the economic reasons that output and quality of broadcasts would be enhanced in the absence of the challenged restraints. *See* Noll Decl. 24-99 & 105-20; Noll Supp. 15-23. Similarly, Defendants do not question the documentary evidence showing that Defendants implemented their schemes to raise prices and restrict competition.[29] This evidence alone would suffice to show the effect of Defendants' market allocation on a common basis, allowing the jury to find for or against Plaintiffs on a common basis.[30]

---

[29] The documentary evidence was discussed at length in Plaintiffs' opposition to Defendants' summary judgment motions. *See, e.g.,* Lauman Dkt. No. 241 ("SJ Opp'n") at 8-14.

[30] Contrary to Defendants' position, the law is clear that econometric analysis is *not* required, and Dr. Noll's model merely confirms injury that Plaintiffs can show on a classwide basis in a number of ways. *See, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-md-1827, 2012

In contrast, despite asking the Court effectively to decide the merits of the core issue in the case—whether Defendants' market allocation schemes increase competition or reduce it—by a preponderance of the evidence, Defendants do not cite a single piece of documentary evidence to support their speculative view of the but-for world. Instead, Defendants proffer only the self-serving declarations of their own corporate executives. Courts properly consider litigation-driven declarations unsupported by record evidence with skepticism. *See, e.g.*, *Christiania Gen. Ins. Corp. v. Great Am. Ins. Co.*, 979 F.2d 268, 277 (2d Cir. 1992); *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 42 (2d Cir. 1986). This is particularly the case where an affidavit "state[s] only conclusions." *United States v. Shumway*, 199 F.3d 1093, 1104 (9th Cir. 1999).

Defendants' declarations state conclusions and speculation, not facts. With few exceptions, they assert only what witnesses think is "likely" or "unlikely" in the but-for world; similarly, they constantly hedge their predictions, asserting only that Defendants "would consider" or "could" do something harmful to fans in the but-for world.[31] This is unsurprising—Defendants' deponents testified repeatedly that they had never studied what would happen in the absence of the territorial restrictions, and were unaware of anybody else studying it. *See* SJ Opp'n 57. These declarations should be given little or no weight.[32]

Defendants' economic expert, Dr. Ordover, merely repeats these conclusory statements, admitting that he, "as an economist, did not undertake … an investigation," meaning that he is

---

WL 555090, at *7 (N.D. Cal. Feb. 21, 2012) (rejecting argument that "formal statistical technique" is required to show classwide impact; documentary evidence and economic analysis sufficient); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 97 (D. Conn. 2009) (plaintiffs not "dependent on their econometric model to meet the requirements of Rule 23" where they present documentary evidence of activity that would raise prices and expert analysis of market structure supporting effectiveness of those efforts).

[31] *E.g.*, Brosnan Decl. ¶¶ 5, 11-14, 16-17, 19, 27, 29-30, 33, 35; Crumb Decl. ¶¶ 5-7, 14; Feeney Decl. ¶¶ 5-8, 11-12; Litner Decl. ¶¶ 9, 13, 18-20; Rigdon Decl. ¶¶ 3, 7, 9, 12-18, 20, 23, 25; and *passim*.

[32] Additionally, Defendants did not disclose three of the declarants (Michael Biard, Benjamin Jack, and Jeffrey Krolik) in their Initial Disclosures or any supplemental disclosures, and accordingly should not be permitted to use them "on a motion, [or] at a hearing." Fed. R. Civ. P. 37(c)(1). *See Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (explaining standard).

not purporting to offer an expert opinion on these issues. Ordover Tr. 249. Indeed, he admitted

that he did not know any of the relevant aspects of the profitability of producing this

programming, such as costs, profit margins, or the size of rights fees. *Id*. at 19-29, 33-34, 251-52,

256.

Defendants hope to sidestep the clear economic facts with these unsupported assertions.

The costs of producing game telecasts are miniscule compared to other forms of programming,

making the claim that they would not be produced without protection against competition

incredible. *See* SJ Opp'n 20-22. The recent explosion in rights fees ends any question about this.

That explosion reflects a demand for broadcast rights that far outstrips supply. Programmers will

continue to produce programming so long as it is profitable, and there is no doubt that it would

remain profitable. Defendants' experts never address this economic reality. In short, there is no

competent evidence that comes close to establishing that any games would cease to be broadcast

in the absence of these restraints.

### IV.    There Are No Individualized Damages Issues, and Individualized Damages Issues Would Not Preclude Certification Even If Any Existed

Defendants briefly argue that individualized damages issues defeat predominance. This

goes against decades of precedent, repeatedly reaffirmed in the last few years, that "[i]ssues

regarding individualized damages calculations generally … are 'not sufficient to defeat class

certification.'" *In re IndyMac Mortgage-Backed Sec. Litig.*, 286 F.R.D. 226, 242 (S.D.N.Y.

2012) (quoting *Seijas v. Republic of Arg.*, 606 F.3d 53, 58 (2d Cir. 2010)).[33] Accordingly, even if

individualized damages issues are present, class certification remains appropriate.

In any event, the issues Defendants raise do not present individualized issues at all. All

class members paid national, standardized prices for the same few products. Defendants' only

response is to point to limited retention credits and discounts by DirecTV. Negotiated discounts

---

[33] Defendants suggest that *Comcast* upset this well-settled law, Opp'n 33 n.36, but courts have consistently rejected that view. *See, e.g.*, *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1167-68 (9th Cir. 2014) (collecting cases); Report & Rec., *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-md-1775, Dkt. No. 2055 (Oct. 15, 2014), at 99-100 & n.34 (same).

off inflated list prices do not defeat class certification. *See, e.g., Urethane*, 768 F.3d at 1254-55

(collecting cases); *EPDM*, 256 F.R.D. at 89 (same). Indeed, the sole case Defendants cite

*explicitly declined* to rely on the discounts some class members received, relying instead on other

grounds that do not exist here. *Blades v. Monsanto Co.*, 400 F.3d 562, 572 (8th Cir. 2005).

Discounts are plainly irrelevant where, as here, there is no reason to think that discounts would

have been different in the but-for world. The argument that a handful of discounts to a tiny

fraction of the class causes individual issues to predominate borders on frivolous.[34]

Defendants' second argument is that Dr. Noll did not run his econometric model on

Comcast data or DirecTV Center Ice data. Of course, this is due to the fact that Defendants did

not produce sufficient data for an econometric analysis.[35] Even so, Defendants do not

hypothesize a reason to expect the overcharge through those distribution channels to be different

in any meaningful way from the channels that Dr. Noll modeled. As Dr. Noll pointed out, "the

overcharge as a fraction of the monopoly price is close to the same for all three products that are

analyzed using the econometric models." Noll Supp. 7-8. Indeed, given that MVPDs "frequently

will work to be on similar lines" with pricing, there is every reason to believe that the overcharge

would be comparable. SJ Opp'n 70 n.70 (quoting Ex. 28); *cf. Urethane*, 768 F.3d at 1257

(extrapolation may be used "to approximate damages").

These cases thus does not resemble *Fort Worth Employees' Retirement Fund v. J.P.

Morgan Chase & Co.*, 301 F.R.D. 116 (S.D.N.Y. 2014). There, the expert merely stated that



[34] Defendants' evidence on this point is flimsy at best. DirecTV has identified ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

similarly misrepresent the ▮▮▮▮▮▮▮▮ the evidence shows that DirecTV reviewed these customers to

determine which were related to the unavailability of Versus and ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ DTV-SP-111499-51.

As Dr. Ordover notes, the data produced by Comcast includes ▮▮▮▮▮▮ subscribers to

each league's package. Ordover Decl. ¶ 44 n.62.

"[t]here are several ways" in which damages could be valued, "and mention[ed] three methods," without providing any "specificity as to the methodology that will be used" or creating any model. *Id.* at 141. Here, Dr. Noll has constructed a model for calculating damages and applied it to the data Defendants produced, resulting in an estimate that approximates the overcharge throughout the class. Requiring any more would flout the rule that plaintiffs are granted leeway in proving antitrust damages where "there is a dearth of market information unaffected by the collusive action of the defendants." *New York v. Hendrickson Bros.*, 840 F.2d 1065, 1077 (2d Cir. 1988). In such circumstances, "the plaintiff's burden of proving damages is, to an extent, lightened, for 'it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts.'" *Id.* (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)); *see also Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264-65 (1946). [36]

## V.    There Are No Class Conflicts

Defendants repackage their predominance argument as an adequacy argument. The theory is identical: they assert that because the league-wide bundles might not exist in the but-for world, or might be more expensive, some class members have an interest in preserving the status quo, antitrust violation or no. This theory fails as a factual matter for all the reasons explained above. But it also fails as a matter of law; even if Defendants were correct, the supposed conflicts they identify are not "fundamental," *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009), and have never been accepted by any court.

Defendants cite a number of cases that supposedly support their "winners and losers" argument. In every one of their cases, however, some class members received a direct and concrete benefit from the challenged conduct that others did not, such as monetary payoffs from

---

[36] Of course, even if Defendants' failure to collect or produce sufficient data prevented Plaintiffs from recovering the overcharge, the proper solution would be to resolve those damages claims against Comcast and DirecTV Center Ice subscribers on a class basis or to exclude them from the damages class—not to deny recovery to those class members for whom sufficient data does exist or to prevent Comcast and DirecTV class members from seeking injunctive relief.

defendants or quantifiably better investment returns. In *Pickett v. Iowa Beef Processors*, 209 F.3d 1276 (11th Cir. 2000), for example, plaintiffs' theory of liability was that defendants entered favorable futures contracts and marketing arrangements with some class members so that they could manipulate the supply of cattle to the detriment of other class members. The class plaintiffs thus sought to "claim harm from the very same acts from which other members of the class have benefitted." *Id.* at 1280. All of Defendants' "winners and losers" cases are of this type.[37] Plaintiffs have found no cases (and Defendants cite none) finding a fundamental conflict to exist where all class members were treated equally in the real world but Defendants argued for uneven benefits in the but-for world based on self-serving predictions that their industry would collapse or they would markedly change their practices. That is the very definition of a speculative conflict. *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001) (rejecting proposed conflict as speculative). "Conflicts that are merely speculative or hypothetical will not affect the adequacy inquiry. A conflict must be manifest at the time of certification rather than dependent on some future event or turn in the litigation that might never occur." William B. Rubenstein, *Newberg on Class Actions* § 3:58 (5th ed.). Indeed, the only case Defendants cite with a similar argument explicitly *rejected* the adequacy argument Defendants' posit here. *See Freeland v. AT&T Corp.*, 238 F.R.D. 130, 141-42 (S.D.N.Y. 2006) (holding adequacy argument "little more than a repackaging of the defendants' claim that their … practices have not caused an antitrust injury on a classwide basis.").[38]

---

[37] *See, e.g.*, *Duchardt v. Midland Nat'l Life Ins. Co.*, 265 F.R.D. 436, 449-50 (S.D. Iowa 2009) (half of the class members had received higher interest because of the use of calculation plaintiffs opposed); *Auto Ventures v. Moran*, No. 92-426, 1997 WL 306895, at *5 (S.D. Fla. Apr. 3, 1997) (theory of liability was that defendants maintained a "'rewards and punishment system,' by which cooperating dealerships were befriended and rewarded, while resisting dealerships were penalized"); *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1190 (11th Cir. 2003) (class members with percentage-based, cost-plus resale contracts obtained higher profits because of defendants' inflated prices); *Retired Chic. Police Ass'n v. City of Chic.*, 7 F.3d 584, 598 (7th Cir. 1993) (class action sought to undo prior settlement that increased the amount of annuities to many class members).

[38] Defendants are thus wrong that Judge Cote denied certification "because some proposed class members may have benefited from the allegedly anticompetitive bundling of products." Opp'n

Moreover, if Defendants' argument were colorable, then it could be applied in *any* antitrust case where the challenged practices increased Defendants' profits—that is, every case. Dr. Ordover makes this clear in his explanation of the supposed "economic benefits" of the challenged conduct: it enables defendants to "earn greater revenues," giving them "incentives to produce live game content." Ordover Decl. ¶¶ 29, 32. This contradicts the decades-old rule that market allocation is *per se* harmful to consumers. *See United States v. Topco Assoc., Inc.*, 405 U.S. 596 (1972); *cf. FTC v. Sup. Ct. Trial Lawyers' Ass'n*, 493 U.S. 411, 423 (1990) (rejecting argument that otherwise unlawful boycott to increase lawyer fees is justifiable by improved quality of representation). As sports leagues, Defendants have some room to collaborate to allow the league to exist—but that does not change the basic rule that higher prices are an evil of market allocation, not a benefit.

## VI. Class Members' Arbitration Agreements with Individual Defendants Do Not Preclude Class Certification

Defendants argue that class members' supposed "arbitration obligations" preclude class certification, either because (1) some class members cannot proceed against *any* Defendants and it will require individualized inquiries to determine which class members; or (2) commonality, typicality, and adequacy cannot be established where named plaintiffs signed arbitration agreements with some Defendants but not others. These arguments are meritless.

### A. All Class Members Can Proceed in Federal Court

Defendants' chief argument is that some states "permit non-signatory defendants to enforce an arbitration agreement against a signatory plaintiff where, as here, the claims allege 'concerted misconduct' by a non-signatory defendant and a signatory defendant." Opp'n 37. Defendants claim that individualized issues will predominate because it will be difficult to determine (1) which states would allow all Defendants to compel arbitration and (2) which class

---

44. The *Freeland* court denied certification (1) because, in a tying case, plaintiffs must show an overcharge for the tied product *plus* the tying product, while plaintiffs only addressed the tied product; and (2) because plaintiffs "offered no methodology" for determining the but-for price of the purchased products and relied wholly upon "a 'presumption of impact.'" *Id.* at 150-51.

members are subject to those states' laws. But neither question poses any actual challenge. Defendants identify *no* states that give conspirators the benefit of an arbitration agreement to which they are not a party unless the claim has to do with the actual terms, formation, or execution of the agreement containing the arbitration clause.[39]

The cases Defendants cite recognize an equitable estoppel exception to the normal rule that only a signatory may enforce an arbitration clause, but they "all involve claims which are integrally related to the contract containing the arbitration clause." *I Sports v. IMG Worldwide, Inc.*, 813 N.E.2d 4, 10 (Ohio Ct. App. 2004) (quoting *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 779 (2d Cir. 1995)); *accord, e.g.*, *Denney v. Jenkins & Gilchrist*, 412 F. Supp. 2d 293, 298 (S.D.N.Y. 2005) (Scheindlin, J.).[40] Every state case Defendants cite deals with breach of contract, fraudulent inducement, or some other claim directly involving the execution or formation of the contract itself.[41] None allows non-signatory defendants to piggyback on a coconspirator's arbitration clause where the claim involves an antitrust conspiracy and does not arise from the contract.

Defendants' claim that there are "fundamental variances among state law," Opp'n 38, is thus wrong for all relevant purposes. Meanwhile, Defendants' federal authority that differing arbitration obligations can defeat class certification in certain situations is inapposite. For example, in *Pablo v. ServiceMaster Global Holdings, Inc.*, No. 08-3894, 2011 WL 3476473 (N.D. Cal. Aug. 9, 2011), all defendants were related and there was no dispute that class

---

[39] Defendants also ignore that DirecTV previously agreed that it would not seek to enforce the arbitration clauses of class members who entered agreements with Comcast, *see* Laumann Dkt. 130 (Stipulation and Order to Stay Certain Claims).

[40] *See also, e.g.*, *Moss v. BMO Harris Bank, N.A.*, --- F. Supp. 2d ---, 2014 WL 2565824, at *4 & nn.7-8 (E.D.N.Y. June 9, 2014) (rejecting claim that one of Defendants' cases here "supports the existence of a separate ground for estoppel" where claims do not "arise under the subject matter of the underlying agreement"); *Butto v. Collecto Inc.*, 845 F. Supp. 2d 491, 498-99 (E.D.N.Y. 2012) (explaining that recent cases "cast doubt on whether concerted misconduct may even be a sufficient basis for estoppel").

[41] *See* Opp'n 37 n.42. One case mentioned equitable estoppel but was decided on a different ground. *See Livingston v. Metro. Pediatrics, LLC*, 227 P.3d 796, 805 (Ct. App. Or. 2010).

members who were subject to arbitration agreements with one defendant were required to arbitrate against all. Indeed, the court specifically noted the "unique circumstances" of the case—among other things, the fact that the district court had already granted 37 motions to compel arbitration. *Id.* at *1-*2.[42] Here, the Court correctly denied Defendants' motion to compel arbitration, finding that Plaintiffs' claims against other defendants are not based on their agreements with their providers and that that their claims are not "inextricably intertwined" with those agreements. *Laumann v. Nat'l Hockey League*, 989 F. Supp. 2d 329, 340 (S.D.N.Y. 2013).[43]

**B.    Arbitration Does Not Affect Commonality, Typicality, or Adequacy**

Defendants also argue that the named plaintiffs cannot adequately represent the class, or their claims lack commonality or typicality, because they have arbitration agreements with some Defendants. Defendants do not discuss the standards for those three prongs of Rule 23(a), presumably because the arbitration clauses have no plausible relevance to any of them.

Commonality requires only that the claims "share a common question of law or of fact." *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 252 (2d Cir. 2011) (quotation omitted). Typicality requires only that "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Brown*, 609 F.3d at 475 (quotation omitted). And adequacy requires only that "the

---

[42] Similarly, *Lozano v. AT&T Wireless Servs. Inc.*, 504 F.3d 718 (9th Cir. 2007), and *Hill v. T-Mobile USA, Inc.*, No. 09-1827, 2011 WL 10958888 (N.D. Ala. May 16, 2011), both involved a single defendant and a claim where the terms and execution of the contract were at issue.

[43] Defendants also cite *In re Titanium Dioxide Antitrust Litigation*, 962 F. Supp. 2d 840 (D. Md. 2013), which, unlike the Court here, found that the plaintiffs expressly relied on the contracts at issue in asserting their claims. The court also distinguished this Court's arbitration ruling in *Laumann* under its reading of Fourth Circuit law, which was, in any event, almost certainly wrong. In the Fourth Circuit, estoppel only applies when "the plaintiff has asserted claims in the underlying suit that, either literally or obliquely, assert a breach of a duty created by the contract containing the arbitration clause." *Am. Bankers Ins. Grp., Inc. v. Long*, 453 F.3d 623, 629 (4th Cir. 2006). Notably, before an appeal could be heard, *In re Titanium Dioxide* settled for $163.5 million, suggesting that the parties recognized that the denial of class certification could not be sustained. *See In re Titanium Dioxide Antitrust Litig.*, No. 10-318, 2013 WL 6577029, at *1 (D. Md. Dec. 13, 2013).

proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006).

The partial arbitration obligations at issue here have nothing to do with how this case will be litigated—it is simply a matter of whether certain Plaintiffs will be prevented from recovering from one of the several Defendants. This issue has no bearing on commonality or typicality, nor does it create any conflict at all—let alone a fundamental one. All named plaintiffs "have an interest in vigorously pursuing the claims of the class," *id.* at 268, because all have the potential to recover (jointly and severally) from at least one defendant and at least one named plaintiff has the ability to recover against each defendant. No named plaintiff has "interests antagonistic to the interests of other class members," *id.*, because no named plaintiff has any interest in establishing the non-liability of any defendant or otherwise undermining the claims of class members with differing arbitration clauses. To the contrary, every defendant is a co-conspirator for every class member whether they can recover from that defendant or not.

## VII.    An Injunctive Class May Be Certified Under Rule 23(b)(2)

Finally, Defendants oppose certification of a claim for injunctive relief under Rule 23(b)(2). None of their arguments is sound. Rule 23(b)(2) requires only that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Defendants cannot and do not dispute that they have acted on grounds that apply generally to the class. Nor can Defendants dispute that, if the Plaintiffs prevail on the merits, "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." The relief Plaintiffs seek is that the Court declare the challenged practices unlawful and enjoin any further unlawful restraints. None of this requested relief is specific to any particular class members, so it would plainly be "appropriate respecting the class as a whole."

Defendants argue that Plaintiffs' request for monetary relief under Rule 23(b)(3) renders

28

their alternative request for certification under Rule 23(b)(2) improper.[44] But Plaintiffs do not seek to certify their claims for damages under Rule 23(b)(2). *See, e.g.*, *Stinson v. City of N.Y.*, 282 F.R.D. 360, 381 (S.D.N.Y. 2012) ("So long as the Court here engages in the analysis necessary under Rule 23(b)(2) and Rule 23(b)(3), … the *Dukes* decision does not preclude certification of a class under Rule 23(b)(2) for purposes of injunctive relief and under Rule 23(b)(3) for purposes of money damages."); *see also, e.g.*, *Casale v. Kelly*, 257 F.R.D. 396, 413 n.123 (S.D.N.Y. 2009) (Scheindlin, J.) (certifying "both a Rule 23(b)(2) class and a Rule 23(b)(3) class in order to achieve both equitable and legal relief").

Defendants assert that the request for injunctive relief is not "indivisible" because some class members are not current subscribers or might add or drop the packages.[45] But that does not affect the divisibility of the relief. If Defendants' restraints on trade are determined to be unlawful, they will properly be prevented from continuing them entirely. Defendants do not explain how or why this relief could or should be differentiated among different class members.

That is why predominance in general, and Defendants "winners and losers" argument in particular, are not applicable to 23(b)(2) classes.[46] "All the class members need not be aggrieved by or desire to challenge defendant's conduct in order for some of them to seek relief under Rule 23(b)(2)." 7AA Wright & Miller, *Federal Practice and Procedure* § 1775 (3d ed.). "Although

---

[44] If the Court were to determine that damages claims were too individualized for classwide determination, as Defendants urge, certification of an injunction-only class under Rule 23(b)(2) would not preclude individual plaintiffs from subsequently seeking monetary damages. *See Cooper v. Fed. Reserve Bank*, 467 U.S. 867, 880-81 (1984).

[45] Defendants support their argument by claiming that some named plaintiffs are unlikely to purchase the packages in the future, an argument that they have twice unsuccessfully made before. As explained in Plaintiffs' opposition to summary judgment, these assertions are misleading at best and directly contrary to the testimony at worst. SJ Opp'n 77 & n.79. They are also irrelevant, as all plaintiffs are consumers in the market and all continue to be affected by the restraints in a variety of ways (such as suffering limitations on choice) other than through purchasing the packages at the current, inflated prices.

[46] Moreover, because Plaintiffs' injunctive claims can be certified under 23(b)(2), the only claims that must be resolved under 23(b)(3) are the Plaintiffs' claims for damages. But as we have seen, damages are plainly resolvable on a class basis without regard for Defendants' "winners and losers" argument.

common issues must predominate for class certification under Rule 23(b)(3), no such requirement exists under 23(b)(2). It is sufficient if class members complain of a pattern or practice that is generally applicable to the class as a whole. Even if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate." *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 2004). "In (b)(2) situations, an individual litigant's case is likely to have an impact on similarly situated parties. … Class certification *helps* the absent parties—it guarantees that their interests will be adequately represented." *Newberg on Class Actions* § 4:34.[47]

Again, Defendants will have the opportunity to present their case that their practices are beneficial to competition—that they create more winners than losers—but if those arguments fail, then there will be no occasion to tailor the injunctive relief to only certain of the class members. This is an issue that must be addressed on the merits and on a class basis.

## CONCLUSION

For the foregoing reasons and those stated in Plaintiffs' opening brief, the proposed class should be certified under Rule 23(b)(3) and (b)(2).

Respectfully Submitted,

Dated: December 29, 2014

Edward Diver
Howard Langer
Peter Leckman
**LANGER, GROGAN & DIVER, P.C.**
1717 Arch Street, Suite 4130
Philadelphia, PA 19103
Telephone: (215) 320-5660

---

[47] Defendants argue that Rule 23(b)(2) contains an unstated "cohesiveness" requirement that is supposedly *harder* to satisfy than the explicit predominance requirement of Rule 23(b)(3). Opp'n 43. This concern arises only where the relief would be "individualized [in] nature." *Houser v. Pritzker*, --- F. Supp. 2d ----, 2014 WL 2967446, at *25 (S.D.N.Y. July 1, 2014). For example, Defendants' cited case denied 23(b)(2) certification where the court would have to "craft[] a specific remedy for each class member." *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 344 (S.D.N.Y. 2002).

Facsimile: (215) 320-5703

Jeffrey B. Dubner
Richard A. Koffman
Matthew S. Axelrod
**COHEN MILSTEIN SELLERS &
TOLL PLLC**
1100 New York Ave. NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

J. Douglas Richards
**COHEN MILSTEIN SELLERS &
TOLL PLLC**
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745

Michael J. Boni
Joshua D. Snyder
**BONI & ZACK, LLC**
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Telephone: (610) 822-0200
Facsimile: (610) 822-0206

Kevin Costello
Gary Klein
**KLEIN KAVANAGH
COSTELLO, LLP**
85 Merrimac Street, 4th Floor
Boston, MA 02114
Telephone: (617) 357-5500
Facsimile: (617) 357-5030

Robert J. LaRocca
Craig W. Hillwig
**KOHN, SWIFT & GRAF, P.C.**
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
Facsimile: (215) 238-1968

Michael M. Buchman
John A. Ioannou

31

**MOTLEY RICE, LLC**
600 Third Avenue, Suite 2101
New York, NY 10016
Telephone: (212) 577-0040
Facsimile: (212) 577-0054

Marc I. Gross
Adam G. Kurtz
**POMERANTZ, LLP**
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212)-661-1100
Facsimile: (212) 661-8665

*Attorneys for Plaintiffs*