UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THOMAS LAUMANN, FERNANDA GARBER, ROBERT SILVER, DAVID DILLON, GARRETT TRAUB, and PETER HERMAN, representing themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br> v.<br><br>NATIONAL HOCKEY LEAGUE, et al.,<br><br>      Defendants | 12-cv-1817 (SAS) |
| FERNANDA GARBER, MARC LERNER, DEREK RASMUSSEN, ROBERT SILVER, GARRETT TRAUB, and VINCENT BIRBIGLIA, representing themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br> v.<br><br>OFFICE OF THE COMMISSIONER OF BASEBALL, et al.,<br><br>      Defendants | 12-cv-3704 (SAS)<br><br>ECF Cases<br>~~Filed under Seal~~ |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF DEFENDANTS' EXPERT DR. JANUSZ ORDOVER**

# INTRODUCTION

Defendants proffer Dr. Janusz Ordover as their sole expert witness in opposition to class certification. Plaintiffs move to exclude Dr. Ordover's testimony because his testimony will not "help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a), and will not assist the Court in determining whether Plaintiffs have satisfied the requirements of Rule 23.

Plaintiffs are mindful of the fact that "rejection of expert testimony is the exception rather than the rule," and is not justified simply because an opposing expert offers "competing principles or methods in the same field of expertise." Fed. R. Evid. 702, Notes of Advisory Committee, 2000 Amendments.[1] Nevertheless, exclusion is appropriate because Dr. Ordover's opinions about what would occur in the but-for world do not even qualify as expert testimony. He is not an expert in the field of sports economics and did not educate himself about that field, instead offering opinions about the but-for world based entirely on declarations of self-interested parties. He did not conduct *any* independent economic analysis of core components of his opinions, so his conclusions are not properly submitted as expert opinion evidence. Nor is there evidence that Dr. Ordover is sufficiently familiar with the facts of this case to advance his opinions as required by Rule 702(b) and (c).

# ARGUMENT

I. **DR. ORDOVER IS NOT AN EXPERT IN THE FIELD OF SPORTS ECONOMICS**

Dr. Ordover is employed by the consulting firm Compass Lexecon LLC and teaches at New York University.[2] In his work as an expert witness, he has invariably testified to the same opinion: that impact cannot be proven on a classwide basis in antitrust class action cases. He has

---

[1] Plaintiffs hereby incorporate the summary of the *Daubert* standard provided in their opposition to Defendants' motion to exclude the testimony of Dr. Noll.

[2] In addition to the hourly compensation he stated in his declaration, Dr. Ordover is also paid a portion of the fees charged for his staff at Compass Lexecon. Ordover Tr. 97-100.

reached this opinion in at least 27 cases over the last two decades.[3] He has reached this conclusion in cases involving a wide variety of industries.  For example, he recently concluded that impact could not be proven on a class basis in a case alleging collusion in the corrugated box industry,[4] even though two national antitrust class actions alleging collusion in the corrugated box industry had previously been certified, with one succeeding at trial and the other affirmed on appeal on the very issue of classwide impact.[5] He has *never* found that impact could be proven on a class basis.[6]

Plaintiffs do not doubt Dr. Ordover's experience in industrial organization and antitrust, but Dr. Ordover is not an expert in sports economics. As Dr. McFadden testified, sports economics is a "specialization[] within applied microeconomics," akin to health economics or environmental economics.[7] Dr. Ordover has never written in the field of sports economics[8] and never taught a course devoted to the subject.[9] Nor did he make any effort to familiarize himself with the field for his work in this case. He testified that he did not consult any literature on sports economics in coming to his conclusions in this case.[10] Nor did he read any of the articles on

---

[3] Dr. Ordover identified twenty cases (Ordover Tr. 81 and preceding testimony) and Plaintiffs' counsel has found seven additional reported class action decisions mentioning his opinions.
[4] *Kleen Prods., LLC v. Int'l Paper*, No. 10-cv-5711, Dkt. No. 758 (N.D. Ill Sept. 20, 2014).
[5] *See In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 206 (5th Cir. 1981) ("The plaintiffs proceeded … [to] a jury trial. The jury found that Mead had conspired to fix prices in the corrugated container industry with eighteen of the settling defendants."); *In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002) (affirming certification of a national class of purchasers of corrugated boxes).
[6] Ordover Tr. 88 ("As I said, every case in which I testified either by Declaration, deposition or in Court, I testified that the class should not be certified.").
[7] McFadden Tr. 22.
[8] Ordover Tr. 109 ("I don't recall writing an article that explicitly deals with the issues of sports economics.").
[9] Ordover Tr. 104.
[10] Ordover Tr. 110-11 ("Q. You did not consult any texts or articles devoted to sports economics, is that correct, with regard to your retention in this case? A. Not for the purposes of this case I have not, no."); *id.* 140 ("Given the issues that I have been asked to opine on, I did not see at that time any deep and particular need to study a variety of issues that are discussed in the area of sports economics.").

sports economics authored by Professor Noll or cited in Dr. Noll's declaration, which Dr. Ordover criticizes.[11] Though he states in his declaration that he has testified previously in matters involving sports, his sole prior testimony involved NCAA rules regarding collegiate scholarships, not professional sports or sports broadcasting.[12]

Dr. Ordover's deposition revealed further that he is not generally knowledgeable about the basic structure and business of Major League Baseball or the National Hockey League. He testified that Gary Bettman was the commissioner of baseball,[13] was not certain who Bud Selig was,[14] and had little knowledge of the leagues generally.[15] While his lack of expertise in this area does not prevent him from presenting appropriate testimony drawing on his expertise, it means that his testimony must be grounded on economic analysis reflecting that expertise.[16]

In support of his basic conclusions about the but-for world, however, Dr. Ordover relies entirely on the declarations of party witnesses without having done any economic analysis at all. Dr. Ordover offers the opinion that if Plaintiffs prevailed and the RSNs lost "content exclusivity," as he defines it, fewer games would be broadcast and broadcasts of games would decline in quality. Ordover Decl. ¶¶ 30-33 & n.28. Dr. Ordover's remaining conclusions

---

[11] Ordover Tr. 111.
[12] His position was rejected in *White v. National Collegiate Athletic Association*, No. 06-cv-999, 2006 WL 8066803 (C.D. Cal. 2006) (relating to rule limiting financial aid colleges could offer to student athletes), where the court certified the class, and were not relied upon by the court in denying class certification in *In re NCAA I-A Walk-On Football Players Litigation,* No. 04-cv-1254, 2006 WL 1207915, at *11 (W.D. Wash. May 3, 2006) ("[T]his Court will not engage in a battle of the experts or a detailed back-and-forth between the expert declarations submitted on this motion. Nor will it endorse either party's approach."). While not listed on any of his disclosures, Dr. Ordover testified that he thought he was deposed prior to 2006 in a sports related matter on behalf of Madison Square Garden and was also consulted prior to 2006 by Comcast.
[13] Ordover Tr. 54.
[14] Ordover Tr. 55.
[15] Ordover Tr. 226.
[16] Dr. Ordover reaches sweeping conclusions regarding sports broadcasting in a but-for world. *See, e.g.,* the headings and subheadings listed in his table of contents for Section IV and V of his declaration regarding his "winners" and "losers" conclusion.

3

regarding "winners" and "losers" in a but-for world are built upon this premise. The only basis for Dr. Ordover's opinions, however, is the party declarations on which he relies. He testified:

> I did not do any work that is not recorded in this Declaration. So, there is nothing I can add to what you have written. I do believe, however, that the testimony from the representatives of the defendants clearly indicate that their incentives would be affected if there were a frontal breach of the – of the content exclusivity as it is present in baseball and hockey right now. All of them, I think, are in agreement on that proposition, *but I as an economist, did not undertake such an investigation.*

(Ordover Tr. 248-49, emphasis added). Moreover, although citations to these witnesses' declarations occur throughout his Declaration, Dr. Ordover did not know who any of the declarants he cited were, other than Dr. Noll.[17]

Although his opinion was that broadcasters would lack economic incentives to produce games, Dr. Ordover did not do any analysis of the amount of revenue necessary to warrant broadcasting a game[18] or of the amount of revenue that would be lost in the event of the loss of content exclusivity.[19] He had no idea of the costs of broadcasting a game except for a lone figure he had read in Dr. Noll's report.[20] He had no idea of the fees paid by RSNs for broadcast rights.[21]

---

[17] Ordover Tr. 56. ("You can go through that and I will give you exactly the same answer, because I think it is a true answer, which is to say that I have not memorized the job titles and the employers of these various people on the list.").
[18] Ordover Tr. 26-27 ("Q: What is the minimum amount an RSN must receive in revenue to warrant broadcasting a game? … A … That number, I don't know."); *id.* at 28 ("Q: And you have no sense at all as to what those costs would be? … A. I have not set out to calculate those costs. That was not part of my assignment."); *id.* at 247 ("You didn't do any analysis of your own of the minimum revenue required to provide a quality broadcast? … A. That is true ….").
[19] Ordover Tr. 247 ("Q. And you did not do any analysis of the actual decline—decline in revenue to the RSN if the relief sought in this case were granted? … A. No ….").
[20] Ordover Tr. 21 ("I personally have not set out to calculate these types of costs."); *id.* at 23-24 ("I have not set out to undertake an intensive or extensive study of the various types of costs in hockey and baseball."); *id.* at 24 ("To repeat, I have not done any such research.").
[21] Ordover Tr. 24 ("I would be guessing."); *id.* at 34 ("A. You mean how much they receive for the sale of their rights? ... Not as I sit here, no…. I have not undertaken to—to familiarize myself with these numbers….").

4

And he had no idea of the costs of other content.[22]

Consequently, Dr. Ordover has done nothing more than repeat the declarations of interested parties, rather than conducted an economic analysis.[23] These opinions, in other words, do not constitute expert testimony at all. Moreover, as discussed in Plaintiffs' opposition to Defendants' motions for summary judgment, the defendants themselves have never conducted or commissioned any economic analysis of the consequences of removing the challenged restrictions. *See* SJ Opp'n 57. Thus, Dr. Ordover is not merely reiterating the unsupported declarations of interested parties, he is reiterating the testimony of witnesses who themselves have no economic basis for their opinions.

In *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012), the Third Circuit affirmed exclusion of an expert opinion in an antitrust case where the expert had relied on profit projections contained in a business plan prepared for the plaintiff's board of directors in the normal course of business, before litigation. The court rejected the testimony because it was made "without knowing the circumstances under which such projections were created or the assumptions on which they were based." *Id.* at 292. Here, Dr. Ordover's opinion is based on a far more flimsy predicate: future prognostications in declarations prepared for litigation by interested parties that had undertaken no analysis of their own.

Dr. Ordover argued that even though he had done no economic analysis of the return an RSN required to broadcast a game, his conclusions were supported by basic economics:

> I relied on the economic analysis which I think claims such as, if somebody is making less money on a product sale on an investment in the product there will be a reaction. What kind of reaction will there be, you may ask? The reaction would be to lessen the amount of investment. That's how firms react.

---

[22] Ordover Tr. 32.
[23] All of the declarations that Dr. Ordover cites for this proposition are dated November 12, 2014, the very same day his own declaration is dated. Dr. Ordover could not have had much time to consider them because he testified that he first received them in their final form. Ordover Tr. 60 ("I had not seen any prior version of those declarations, no, sir, I saw only the final version.").

Ordover Tr. 251.

But obviously someone will pay more for a monopoly—here a regional monopoly—than they would pay for rights in a competitive market. This says nothing about output in the absence of monopoly; it means only that monopoly rents can be charged for the same output. Dr. Ordover's entire economic analysis thus comes down to the proposition that monopoly produces greater output and higher quality because it is more profitable, a position that is directly contrary to the basic premises of the antitrust laws.[24] Moreover, this Court has already rejected reliance on "the incentive for added investment [from] inflated profit stemming from limited competition. '[T]he Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable.'" *Laumann v. Nat'l Hockey League,* --- F. Supp. 2d ---, 2014 WL 3900566, at *9 (S.D.N.Y. Aug. 8, 2014) (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679, 695-96 (1978)).

Dr. Ordover's opinions regarding the number and quality of broadcasts should be stricken and he should be precluded from testifying on these topics and on his finding of "winners" and "losers" based on this conclusion.[25]

## II.   DR. ORDOVER'S BUT-FOR WORLD DOES NOT PRESENT AN ACCURATE PORTRAYAL OF BROADCAST RIGHTS.

Dr. Ordover's fundamental lack of understanding of the relevant markets also underlies

---

[24] Territorial allocation is arguably more pernicious than price-fixing because, while price fixing leaves open the possibility of competition for service, territorial allocation eliminates all competition. *See* Areeda, Philip E. & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 2031; *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic,* 65 F.3d 1406, 1415 (7th Cir. 1995); *see also* Langer, *Competition Law of the United States,* 103 (2d Ed. 2014). Dr. Ordover himself conceded that he had heard it said that market allocation is worse than even horizontal price-fixing, but opined that that "doesn't mean anything to me as an economist." Ordover Tr. 155.

[25] Dr. Ordover's reliance on these declarations is also inconsistent with his own experience as a consumer. He testified that he prefers to watch esoteric, micro-market sports on television such as Australian rules football (Tr. 10), snooker (Tr. 259), and darts (*id.*). He acknowledged that, "[e]very conceivable sport is -- can be seen somewhere on TV." *Id.* Yet Dr. Ordover concludes without any analysis that in the but-for world there would be insufficient demand to warrant the expenditure of broadcasting certain Major League Baseball and National Hockey League games.

6

his analysis of the but-for price of the league packages. Dr. Ordover concludes that in the but-for-world, the RSNs would charge the leagues per-subscriber fees for their broadcasts. This is the basis for his opinion that the out-of-market packages would cost more, or perhaps not exist, in the but-for competitive world. His analysis rests on a demonstrably incorrect understanding of the relative rights of the parties.

Dr. Ordover's analysis begins with his concept of "content exclusivity." He defined it as follows:

> [I]n my terminology, content exclusivity essentially means that the owner of the content is the sole decider whether or not it's going to license it to somebody that's going to compete with it, and, therefore, has the exclusive rights to distribute it, unless it decides to license the rights to somebody else.

Ordover Dep. 222.

While ownership is fundamental to his definition, Dr. Ordover testified that he has no knowledge of who owns what rights. He acknowledged that he did not know who owns the copyrights, the rights to Internet streaming, or any other relevant rights.[26]

In fact, the clubs own all broadcast rights, and merely convey a limited license to the RSNs to produce and exhibit game broadcasts in market. Anything they do not explicitly convey to RSNs they retain for themselves or convey to the leagues. Thus, taking Dr. Ordover's opinion on its own terms, RSNs are not the relevant owners and have nothing that they could charge the clubs (or the leagues) for. Because the clubs retain the ultimate rights to the content, moreover, there is no issue with "content exclusivity" as Dr. Ordover defines it, because the owner—the club—is the "sole decider" of whether and how it will permit others to distribute its content. Dr. Ordover's assumption that the RSN is the "sole decider" is based on his failure to understand the

---

[26] Ordover Tr. 215-16 ("Q. Who retains the copyright to the broadcast? ... A. That I don't know." Ordover Tr. 215-216); *id.* at 218 ("I do not recall what their rights are over the Internet streaming.").

basic relationships of the industry on which he opines.[27]

Dr. Ordover assumes that the teams and league would sell the rights they now own to the RSNs in the but-for world only to have the league engage in separate subsequent negotiations to buy back those rights. He cites no situation like that where a sports league allows teams to convey rights to third parties only to have the league engage in separate negotiations to reacquire the rights from the third parties. Even assuming that RSNs would obtain concessions for out-of-market broadcasts of their partners' games (which they do not control or own, and which do not compete with the in-market distribution they actually do control), Dr. Ordover does not analyze why these concessions would take the very specific form of a per-subscriber fee charged to the league, which is crucial to his opinion.[28]

Dr. Ordover's mistaken assumption—that the RSNs would charge the leagues for their content—is the foundation of his entire analysis about the existence and pricing of the league-wide packages in the but-for world. Because these analyses are grounded on basic errors and an evident lack of not only expertise, but of basic understanding of MLB and NHL broadcasting, his testimony regarding the hypothetical bargaining and increased costs he posits in the but-for world are properly precluded.

---

[27] Dr. Ordover did not know these basic relationships even though he cited rights agreements between teams and RSNs as among the documents he considered. *See, e.g.*, COM00001014 (Rights Agreement between Flyers and Comcast SportsNet): COM000074 (Rights Agreement between Athletics and Comcast Sportsnet). Dr. Ordover was evasive when questioned regarding what documents he received and when he reviewed them. Ordover Tr. 44 ("I don't recall when these documents were flowing in. My office in Washington likely has a log, but I don't."); *see also id.* at 45-46. He could not even recall what documents he reviewed in the three months between receiving Dr. Noll's Supplemental Declaration and his deposition. Ordover Tr. 49-50 ("I certainly reviewed the documents that came in after that, but which those documents are—which are those documents, I just cannot tell you .... I don't know when they were actually reviewed by me, reviewed by my staff under my direction or any of it.").

[28] The sole basis for Dr. Ordover's assumption "that negotiations between an individual RSN and League would result in a per subscriber license fee," is a citation to an introductory passage in a textbook and an article that discusses bargaining in general terms. Ordover Decl. ¶ 34 & n. 48. Neither provides a glimmer of support to his assumption.

8

Moreover, as discussed in Plaintiffs reply in support of class certification, Dr. Ordover's basic assumption that Dr. Noll's model assumes that the content exclusivity of the RSN's broadcasts in the local markets would be lost is simply wrong. Dr. Noll testified repeatedly at his deposition that this is not the case, that he was measuring competitive effects in the out-of-market prices and made no assumptions of any changes in the local markets.[29] To the extent Dr. Ordover's critique is based on this erroneous assumption regarding Dr. Noll's analysis, it is irrelevant.

## CONCLUSION

Plaintiffs respectfully request that the Court grant Plaintiffs' motion to exclude the opinions and testimony of Dr. Janusz Ordover for the reasons discussed.

Dated: December 29, 2014

Respectfully Submitted,

/s/ Edward Diver

Edward Diver
Howard Langer
Peter Leckman
**LANGER, GROGAN & DIVER, P.C.**
1717 Arch Street, Suite 4130
Philadelphia, PA 19103
Telephone: (215) 320-5660
Facsimile: (215) 320-5703

---

[29] *See* Noll Tr. 453 ("The way I modeled it is what the in-markets—the way the in-market product is currently distributed and sold wouldn't change."); *id.* at 490 ("[T]he model takes account only of the competition in the out of market—it's—it—that's why the implicit assumption in the model is what's going on with respect to the way that the in-market RSNs are offered is held constant."); *id.* at 526 ("The price that we're estimating is the incremental price of the out-of-market teams, all right.... So we're—whether they actually carry the in-market stuff or not is irrelevant ....").

9

Michael J. Boni
Joshua D. Snyder
**BONI & ZACK, LLC**
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Telephone: (610) 822-0200
Facsimile: (610) 822-0206

J. Douglas Richards
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745

Jeffrey B. Dubner
Richard A. Koffman
Matthew S. Axelrod
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

Kevin Costello
Gary Klein
**KLEIN KAVANAGH COSTELLO, LLP**
85 Merrimac Street, 4th Floor
Boston, MA 02114
Telephone: (617) 357-5500
Facsimile: (617) 357-5030

Robert J. LaRocca
Craig W. Hillwig
**KOHN, SWIFT & GRAF, P.C.**
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
Facsimile: (215) 238-1968

Michael M. Buchman
John A. Ioannou
**MOTLEY RICE, LLC**
600 Third Avenue, Suite 2101
New York, NY 10016
Telephone: (212) 577-0040
Facsimile: (212) 577-0054

Marc I. Gross
Adam G. Kurtz
**POMERANTZ, LLP**
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212)-661-1100
Facsimile: (212) 661-8665

*Attorneys for Plaintiffs*