UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FERNANDA GARBER, MARC LERNER, DEREK RASMUSSEN, ROBERT SILVER, GARRETT TRAUB, and VINCENT BIRBIGLIA, representing themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> OFFICE OF THE COMMISSIONER OF BASEBALL, et al., <br><br> Defendants | No. 12-cv-3704 (SAS) <br><br> **[Filed Under Seal]** |

**PLAINTIFFS' MOTION *IN LIMINE* # 2
TO BAR IMPROPER LAY WITNESS OPINION TESTIMONY**

Defendants seek to introduce at trial lay witness testimony that contravenes Federal Rule of Evidence 701. In the guise of supposed "lay opinions," defendants seek to present self-interested speculation, not grounded in any study or analysis, about what would happen if the broadcasting restraints at issue were removed. Defendants have not disclosed these lay witnesses as experts, have not filed any expert reports by them, and their testimony does not attempt to meet any *Daubert* criteria. Indeed, the lay opinions flatly *contradict* the expert opinions Defendants will seek to present under Rule 702.

**I.   THE STANDARD FOR LAY OPINION TESTIMONY UNDER RULE 701**

Rule 701 requires that lay witness opinion testimony be "(a) rationally based on the witness's perception;" "(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue;" and "(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

The Second Circuit has enunciated three basic requirements for the admission of lay opinion testimony. First, the opinion must be limited to the witness' own "personal perception,"

and cannot be based upon collective knowledge he or she gathered from others. *See, e.g.*, *United States v. Garcia,* 413 F.3d 201, 212 (2d Cir. 2005) (excluding testimony that was not based on "personal perceptions but drew on the total information developed by all of the officials who participated in the investigation … ."). Accordingly, lay opinions cannot be used as a channel for hearsay, whether in the form of an opinion about what others believe or a summation of what others purportedly have told the witness. Moreover, "[s]ince a lay witness' opinion must be based on personal knowledge, 'unlike an expert, a lay witness may not answer hypothetical questions.'" *United States v. King*, No. 94-cr-455, 1997 WL 666778, at *11 (S.D.N.Y. Oct. 24, 1997), *rev'd on other grounds*, 134 F.3d 1173 (2d Cir. 1998) (quoting 4 Jack B. Weinstein and Margaret A. Berger, *Weinstein's Federal Evidence*, § 701.03, at 701–9 (rev. 2d ed. 1997)); *see also, e.g.*, *United States v. Henderson*, 409 F.3d 1293, 1300 (11th Cir. 2005) ("[T]he ability to answer hypothetical questions is '[t]he essential difference' between expert and lay witnesses.").[1]

Second, any conclusion the lay witness draws must be based upon an "investigation" he or she made of the issue in suit, and not on background specialized knowledge he or she has acquired. In *Bank of China v. NBM LLC*, 359 F.3d 171, 180-82 (2d Cir. 2004) (Scheindlin, J.), the court affirmed the exclusion of lay opinion testimony by a bank employee about "typical international banking transactions" and "the business community's understanding" of transactions like the ones at issue because the testimony was based on his "extensive experience," rather than any actual investigation:

> [T]o the extent Huang's testimony was not a product of his investigation, but rather reflected specialized knowledge he has because of his extensive experience in international banking, its

---

[1] The Second Circuit has established a narrow exception to the bar on hypothetical questions not applicable here. In *United States v. Cuti*, the Court allowed lay testimony based on hypothetical questions, but only because "the inference that [the witnesses] were asked to make in answering the hypothetical questions was limited by the factual foundation laid in earlier admitted testimony and exhibits, the factual nature of the hypotheticals, and the witnesses' reasoning, which was based on undisputed accounting rules." 720 F.3d 453, 458 (2d Cir. 2013). "These limitations left little room for the witnesses to engage in speculation and ensured that their testimony fell near the fact end of the fact-opinion spectrum." *Id*.

> admission pursuant to Rule 701 was error. Thus, Huang's explanations regarding typical international banking transactions or definitions of banking terms, and *any conclusions he made that were not the result of his investigation*, were improperly admitted.

*Id.* (emphasis added). While the witness's opinions "may have been admissible pursuant to Rule 702," such admission would have required the proponent to "satisfy the reliability requirements set forth in that Rule, and disclose Huang as an expert pursuant to Rule 26(a)(2)(A) of the Federal Rules of Civil Procedure." *Id.* at 182.

Third, because the opinion cannot be "based on scientific, technical, or other specialized knowledge within the scope of Rule 702," the opinion must be only "the product of reasoning processes familiar to the average person in everyday life" and cannot involve "a process of reasoning which can be mastered only by specialists in the field." *Garcia*, 413 F.3d at 215-16 (internal quotation omitted). This clear and sharp demarcation between "lay opinion" under Rule 701 and "expert opinion" under Rule 702 exists in order to "prevent a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702 and the pre-trial disclosure requirements set forth in … Fed. R. Civ. P. 26." *Id*.

If the opinion "rests in any way upon scientific, technical, or other specialized knowledge, its admissibility must be determined by reference to Rule 702, not Rule 701." *Id.* In *Garcia,* the police officer failed this criterion because his opinion was based upon his "specialized training and experience" as a narcotics officer, 413 F.3d at 216, and in *Bank of China*, the bank officer failed this criterion to the extent his opinion "reflected specialized knowledge he has because of his extensive experience in international banking," 359 F.3d at 182.

Similarly, in *United States v. Haynes*, 729 F.3d 178, 195 (2d Cir. 2013), the Second Circuit excluded testimony from a border patrol agent regarding the defendant's fuel tank because it was "based on specialized training and experience," *i.e*., the border agent's routine vehicle inspections, and "not through the reasoning process of the average person."

It is the burden of the proponent of the testimony to satisfy each of these requirements. *Garcia*, 413 F.3d at 211 ("It is the proponent of lay opinion testimony who must satisfy the rule's three foundation requirements.").

## II. DEFENDANTS SEEK TO CIRCUMVENT RULE 701

Based on their declarations, deposition testimony, and their attorneys' representations, it appears Defendants intend to proffer impermissible speculation and lay opinion testimony through a number of their witnesses. The starkest example of such testimony is that offered by Robert Manfred, who was named Commissioner of Major League Baseball a little less than a year ago. Mr. Manfred succeeded the long-time Commissioner Allan Huber "Bud" Selig, whom Defendants have never listed as a trial witness.

The central issue in this lawsuit is whether defendants' broadcasting restraints—which prohibit each team from telecasting beyond its assigned territories or over the Internet—violate the antitrust laws. Defendants propose to offer Commissioner Manfred to testify that if those restraints were abolished, and free competition were permitted, a cascade of horribles would be inflicted on "small market" teams. Defendants did not disclose Mr. Manfred as an expert under Rule 702; indeed, they have specifically disavowed putting him forward as an expert, and resisted deposition questions on that ground.[2] Rather than proffering actual expert testimony regarding the counterfactual world, Defendants intend to rely on Mr. Manfred's speculative opinion testimony.[3]

To show why this testimony fails all three prongs of Rule 701, it is necessary to examine Mr. Manfred's deposition testimony (and therefore expected trial testimony). He began by stating that the territorial restraints "protect smaller markets from excessive or direct invasion

---

[2] *See, e.g.*, Manfred Dep. 32:5-7 ("Ms. Wilkinson: Mr. Diver, understand, he is not an expert witness. You're trying to examine him like he's coming to opinions.").

[3] Such testimony must also be excluded because it is based on a defense—that competition itself is unreasonable—that the antitrust laws do not recognize. *See* Plaintiffs Motion *In Limine* #1 to Preclude Argument or Evidence Regarding Justifications that the Antitrust Laws Do Not Recognize.

[by telecasts of baseball games] by other teams within their territory." Manfred Dep. 52. He elaborated:

> Q. When you talk about protecting small market teams from invasion, what do you mean?
>
> A. Well, I think in the absence of home television territories, there would be a number of generally larger market iconic franchises, a small handful of those, who would broadcast into territories where there exists smaller market franchises. Those broadcasts would reduce the local television opportunities available to the smaller market clubs and would dramatically reduce the ability of those smaller market clubs to compete on the field. I actually think that the competition would, over time, result in there being fewer than 30 Major League Teams. *Id*. at 55

He then testified that he believed "rights fees" from telecasters to baseball teams would be reduced, *id.* at 56, which would lead to diminished competition on the field:

> Q. And am I right that the connection that you are drawing between the reduced [rights fee] value and the competition on the field is the reduced fees the teams would get would mean that they would have less money to spend on players?
>
> A. Yes. … It may be players. It may be less to spend on stadium improvements that make it more fun for people to go to those stadiums. Less resources, just generally, would make the small markets less competitive. …The teams would be less competitive on the field, yes. *Id.* at 56

He elaborated on why local telecasters would pay less money:

> Q. And going back to the reduction in fees that the teams would be able to get, the RSNs [Regional Sports Networks] would be willing to pay less money to a team because they would have fewer viewers, or why would the RSN pay less money for the rights if there were more baseball games available?
>
> A. I think that there would be fewer subscribers that would be attracted by the availability of baseball or a particular team's baseball and, as a result, less revenue opportunities from a small market RSN. *Id*. at 57-58.

5

Mr. Manfred intends to make a variety of predictions about what might happen if the broadcasting restraints were removed, but he has admitted that neither he nor anyone under his direction has ever undertaken any investigation to buttress his opinions. When asked, "Have you prepared any reports, formal economic analyses of what the territories do and what the economic effects of those territories are," he answered: "No." Manfred Dep. 12. Indeed, he was explicit that changing the profitable status quo was "not something we would ever contemplate" studying. *Id*. at 76.[4]

This testimony is inadmissible under Rule 701. It is paradigmatic expert testimony under Rule 702: what economic chain of causation would happen in a hypothetical "but for" world where there were no market restraints and teams were free to telecast into other teams' "home" territories. Moreover, an expert could not make such causal attributions without a "scientifically sound analysis of the cause" of these developments and an attempt "to control for the factors that may have led to" them. *United States v. Apple, Inc.*, 952 F. Supp. 2d 638, 694 n.61 (2013); *aff'd* 791 F.3d 290, 335 n.24 (2015). Much less can a lay witness simply provide his personal opinion about such causal chains without investigating the matter at hand. *Bank of China*, 359 F.3d at 181-82.

Commissioner Manfred's opinions fail all three criteria for Rule 701. First, they are not based on his "personal perceptions" of actual events. Indeed, Mr. Manfred admitted that "his involvement in the broadcast area was fairly limited" prior to becoming Commissioner. Manfred Dep. 20. "[T]he vast majority of my time, vast, vast majority of my time, was spent on things that had little or nothing to do with broadcasting, television, TV territories or any of those

---

[4] In fact, in 1999, Major League Baseball did investigate "competitive imbalance"—the ostensible subject of Mr. Manfred's opinion. The League created a Blue Ribbon Panel on Economics, which included former Federal Reserve Chairman Paul Volcker and other luminaries, to study the issue. PX88. The Panel's 93-page report never suggests that territorial telecasting restrictions in any way promote competitive balance or help to alleviate competitive imbalance. *Id*. To the contrary, the Panel's only mention of territories was to remark that "[b]ecause local markets vary greatly in size, the local TV and radio revenues flowing to each club vary in size by large amounts." *Id*. at 18.

6

subjects." *Id*. Yet he apparently intends to testify to the last 30 years of MLB broadcasting, going back well before his time as Commissioner or even at MLB.[5] Lacking any relevant personal perceptions, his testimony will be based only on his general "understanding of what the territories do and what the economic effect of those territories are." *Id.* at 12. At best, this opinion is the product of "collective" information he has gathered from team owners and his staff, which is impermissible under *Garcia.* At worst, it is simply litigation-generated, self-serving speculation.

Second, it is not the product of his personal "investigation" as required by *Bank of China*, 359 F.3d at 182, because he admits he conducted no such investigation. Manfred Dep. at 12.

Third, Mr. Manfred's opinion involves "scientific, technical, or other specialized knowledge within the scope of Rule 702," which Rule 701 on its face expressly excludes. Mr. Manfred's opinion is based upon a complex and technical chain of economic assumptions and projections that, without territorial restraints: (1) certain "iconic" teams would "invade" the "small market" teams with their telecasts; (2) as a result, the small markets would lose a substantial number of viewers who would switch to viewing games of the "iconic" teams; (3) as a result, the RSNs would pay less rights fees to broadcast major league baseball games because regional territorial exclusivity would be worth less; (4) as a result, the small market teams would have less revenue and would pay smaller salaries to players and make fewer stadium improvements; (5) as a result, fans in those small markets would attend live games less frequently; (6) as a result, small market teams would be less competitive on the ball field; (7) as a result certain teams would actually go out of business. These are questions for economists with

---

[5] *See, e.g.*, Manfred Dep. 53 ("I also believe that the combination of the local television territories and the inextricably related national packages have resulted in a massive increase in the number of baseball games that are available to consumers, locally and nationally, providing direct benefit to the consumer. I also believe that the combination of the local television territories and the inextricably related national broadcast agreements have developed much higher quality broadcast … .").

appropriate expertise in the field, not "the product of reasoning processes familiar to the average person in everyday life." *Garcia*, 413 F.3d at 215.

As *Garcia* held, if the testimony "rests in any way upon scientific, technical, or other specialized knowledge, its admissibility must be determined by reference to Rule 702, not Rule 701." *Id.* at 215-16. The reason for the sharp demarcation between "lay" opinions under Rule 701 and "expert" opinions under rule 702 is evident, because each part of Mr. Manfred's chain of causation is based upon assumptions and projections which require the methodological safeguards of *Daubert* to ensure reliability and therefore admissibility.[6] *No* methodology—let alone a rigorous expert methodology—has been used by Mr. Manfred to make his predictions, regarding:

- Which teams would "invade" which other teams' territories and, as importantly, which teams would not;
- How the loss of viewers by one team and gain of viewers to a rival team in those "invaded" territories has been projected and quantified. (Mr. Manfred simply opines it would be "really, really damaging … for the Yankees being able to send a full slate of YES games into [Tampa]." This is speculation, not methodology);
- How the projected loss of RSN revenue because of a loss of territorial exclusivity would affect players' salaries and stadium improvement;
- How the impact of players' salaries and stadium improvements of "small market" teams would affect team quality;
- How these effects would affect live attendance and other revenue sources for any team;
- How the projected result of all of the above on the over-all viability of a team and its continued existence has been determined and quantified.

What makes this even more ironic is that Mr. Manfred's purported lay witness opinion diametrically contradicts the actual expert whom defendants have retained for trial, Prof. Murphy. Under the expert opinion of Prof. Murphy, *none* of the economic chain of causation to which Mr. Manfred testifies could possibly happen because, according to Prof. Murphy, the first

---

[6] Even as to expert witness, the Court has precluded overly speculative testimony. The Court precluded Defendants' expert Dr. Ordover from testifying "as to what he believes to be so or his instinct as to what is so because that is speculative." Mar. 18, 2015 Hearing Tr., 289-90.

assumption in Mr. Manfred's causal chain—from which everything else flows—is impossible. That first assumption is that it would be "really, really damaging … for the Yankees being able to send a full slate of YES games into [Tampa]." But according to Prof. Murphy, Yankees games do *not* compete with Tampa games any more than they compete with everything else on television—*Sesame Street,* reruns of *I Love Lucy,* and *Queen for a Day.* Leaving aside for the moment whether Prof. Murphy's methodology for determining relevant markets is economically competent (Prof. Elhauge will testify it is not), at least Prof. Murphy made an effort to employ a methodology to try to analyze this issue. Mr. Manfred made none.

In sum, any opinion by Mr. Manfred that territorial restraints promote "competitive balance" and that eliminating territories will lead to "competitive imbalance" runs afoul of Rule 701 and must be excluded from trial.

As for the remainder of Defendants' witnesses, it is obviously not possible for plaintiffs to know or anticipate each and every occasion on which Defendants will seek to introduce testimony that runs afoul of Rule 701's proper boundaries. However, it is clear from declarations filed in this action that the problem is not limited to Mr. Manfred. The Group President of Comcast's NBC Sports Group, Jon Litner, for example, opined speculatively about what might have happened "[i]f, in a world without territorial restrictions, Comcast RSNs would have been given the ability to negotiate with each League over the price for including the Comcast RSNs' feeds in the OMP." Litner Decl., ¶ 9; ECF No. 360-14. Such testimony is regularly excluded, because "testimony as to how a hypothetical negotiation might proceed is not based on the perception of the witness of events within their personal knowledge" and "requires that the witness 'reconstruct the market, a necessarily hypothetical exercise, to project economic results that did not actually occur.'" *Info-Hold, Inc. v. Muzak LLC*, No. 11-cv-283, 2013 WL 4482442, at \*5 (S.D. Ohio Aug. 20, 2013) (quoting *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002)).

Similarly, Patrick Crumb, President of DirecTV Sports Networks, opined that "[i]n substantial part because of the exclusivity term, the quality of broadcasts of professional sports

9

games in baseball and hockey has … substantially improved." Crumb Decl. ¶ 16, ECF No. 264. Not only is Mr. Crumb's causal analysis as unreasoned as Mr. Manfred's, he relied on *another* defense executive for information about what these "quality enhancements" were. *Id.* ¶ 16 n.3.

Finally, Christopher Tully, Executive Vice President of Media for MLB—who has never worked at an RSN or MVPD—opined about what "MVPDs want and expect" and about the "factors" on which "[a]n RSN's willingness to invest in a club's rights depends." Tully Decl. ¶¶ 16-17; ECF No. 257. This can only be based on hearsay: what contracting counterparties have told MLB or team personnel. Indeed, Mr. Tully is another level removed from these negotiations; because he works for the central League office, not a team, he does not himself negotiate with RSNs, so can hardly testify from "personal perception." And like Mr. Manfred, Mr. Tully appears prepared to testify that he "believe[s] single-team out-of-market packages being marketed in the home television territory of other clubs threatens the viability of those clubs" even though neither he nor anyone else at MLB has ever "conducted studies on that." Tully Dep. 175.

### III. CONCLUSION

To prevent Rule 701 violations and minimize disputes at trial, Plaintiffs request that the Court bar at trial testimony by any lay witness opinion testimony (including, but not limited to, the testimony outlined above) that is (A) not based on that witness' personal perception and investigation; and/or (B) which seeks to project the economic or financial consequences in a "but for" world free of the territorial restraints challenged in this action.

Dated: December 22, 2015

Respectfully submitted,

*/s/ Edward Diver*

Edward Diver
Howard Langer
Peter Leckman
**LANGER, GROGAN & DIVER, P.C.**
1717 Arch Street, Suite 4130
Philadelphia, PA 19103
Telephone: (215) 320-5660
Facsimile: (215) 320-5703

10

Jeffrey B. Dubner
**COHEN MILSTEIN SELLERS & TOLL, PLLC**
1100 New York Ave. NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

Robert J. LaRocca
**KOHN, SWIFT & GRAF, P.C.**
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
Facsimile: (215) 238-1968

Joshua D. Snyder
**BONI & ZACK, LLC**
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Telephone: (610) 822-0200
Facsimile: (610) 822-0206

Marc I. Gross
Adam G. Kurtz
**POMERANTZ, LLP**
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212)-661-1100
Facsimile: (212) 661-8665

*Attorneys for Plaintiffs*