~~FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER~~

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FERNANDA GARBER, MARC LERNER, DEREK RASMUSSEN, ROBERT SILVER, GARRETT TRAUB, and VINCENT BIRBIGLIA, representing themselves and all others similarly situated, | ~~Filed Under Seal~~ ~~Contains Highly Confidential Material~~ Civil Action No. 12-cv-3704 (SAS) |
| Plaintiffs, | |
| v. | |
| OFFICE OF THE COMMISSIONER OF BASEBALL, et al., | |
| Defendants. | |

## DEFENDANTS' TRIAL MEMORANDUM OF LAW

PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone (212) 373-3000
Facsimile (212) 373-2758

*Counsel for MLB Defendants*

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800

*Counsel for Comcast Defendants*

KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Counsel for DIRECTV Defendants*

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Counsel for New York Yankees Partnership*

WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029

*Counsel for Yankees Entertainment and Sports Network, LLC*

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................. 1

FACTUAL BACKGROUND ................................................................................... 5

SUMMARY OF LEGAL FRAMEWORK.................................................................. 8

KEY ISSUES FOR TRIAL ................................................................................... 10

    A.   Plaintiffs Cannot Demonstrate That the Relevant Market Is MLB Broadcasts........... 10

    B.   Rather than Adversely Affecting Competition, the Challenged Conduct
        Provides Multiple Procompetitive Benefits.................................................. 12

        1.   The Broadcast Structure Promotes Competitive Balance ............................... 12

        2.   The Broadcast Structure Promotes Investment and Innovation ....................... 13

        3.   The Broadcast Structure Reduces Transaction Costs and Promotes
            Efficiencies .............................................................................. 15

    C.   Plaintiffs Cannot Demonstrate That the Procompetitive Effects Fans Enjoy
        Today Could Be Achieved Through Less Restrictive Alternatives............................ 16

    D.   Plaintiffs Cannot Demonstrate *Any* Cognizable Adverse Effects, Much Less
        Effects that Outweigh the Current System's Procompetitive Benefits....................... 17

    E.   Plaintiffs' Claims, Which Fall Within the Baseball Exemption, Are Barred.............. 19

CONCLUSION .................................................................................................. 20

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Motor Inns, Inc.* v. *Holiday Inns, Inc.*,
  521 F.2d 1230 (3d Cir. 1975) ................................................................... 9

*Am. Needle, Inc.* v. *NFL*,
  560 U.S. 183 (2010) ............................................................................ 8, 9

*City of N.Y.* v. *Grp. Health Inc.*,
  649 F.3d 151 (2d Cir. 2011) ............................................................... 8, 10

*City of San Jose* v. *Office of Comm'r of Baseball*,
  776 F.3d 686 (9th Cir. 2015), *cert. denied*, 136 S. Ct. 36 (Oct. 5, 2015) ......... 13, 19

*United States* v. *Cont'l Can Co.*,
  378 U.S. 441 (1964) .............................................................................. 11

*E & L Consulting, Ltd.* v. *Doman Indus. Ltd.*,
  472 F.3d 23 (2d Cir. 2006) ...................................................................... 9

*Eastman Kodak Co.* v. *Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) .............................................................................. 10

*Kingray* v. *NBA, Inc.*,
  188 F. Supp. 2d 1177 (S.D. Cal. 2002) ....................................................... 18

*L.A. Mem'l Coliseum Comm'n* v. *NFL*,
  726 F.2d 1381 (9th Cir. 1984) ............................................................ 13, 15

*Laumann* v. *NHL*,
  __ F. Supp. 3d __, 2015 WL 2330107 (S.D.N.Y. May 14, 2015) .................... 17–18

*MLB Props., Inc.* v. *Salvino*,
  542 F.3d 290 (2d Cir. 2008) ............................................................ *passim*

*NCAA* v. *Bd. of Regents of Univ. of Okla.*,
  468 U.S. 85 (1984) ........................................................................ 8, 13, 20

*O'Bannon* v. *NCAA*,
  802 F.3d 1049 (9th Cir. 2015) ................................................................. 16

*PepsiCo, Inc.* v. *Coca-Cola Co.*,
  315 F.3d 101 (2d Cir. 2002) ............................................................... 8, 10

FILED UNDER SEAL — SUBJECT TO PROTECTIVE ORDER

*Rebel Oil Co.* v. *Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ................................................................17

*Reifert* v. *S. Cent. Wis. MLS Corp.*,
    450 F.3d 312 (7th Cir. 2006) ................................................................11

*Spinelli* v. *NFL*,
    96 F. Supp. 3d 81 (S.D.N.Y. 2015) ......................................................11

*Texaco Inc.* v. *Dagher*,
    547 U.S. 1 (2006) ...................................................................................8

*Theatre Party Assocs., Inc.* v. *Shubert Org., Inc.*,
    695 F. Supp. 150 (S.D.N.Y. 1988) ......................................................11

*Trans Sport, Inc.* v. *Starter Sportswear, Inc.*,
    964 F.2d 186 (2d Cir. 1992)..................................................................15

*Virgin Atl. Airways Ltd.* v. *British Airways PLC*,
    257 F.3d 256 (2d Cir. 2001)..................................................................16

*United States* v. *Visa U.S.A., Inc.*,
    344 F.3d 229 (2d Cir. 2003)...............................................................9, 10

**Other Authorities**

Federal Rule of Civil Procedure 12 .............................................................19

XI Areeda & Hovenkamp, *Antitrust Law* (3d ed. 2011)......................9, 15, 16

~~FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER~~

Pursuant to the Pre-Trial Order and the Court's Individual Rules and Procedures, Defendants respectfully submit this Trial Memorandum of Law.  Defendants incorporate by reference the arguments made in all of their other pre-trial filings.[1]

## PRELIMINARY STATEMENT

The broadcast licensing system of Major League Baseball ("MLB" or "the League") has improved consumer welfare by increasing output, fostering innovation, enhancing competitive balance, and improving the quality of the on-the-field product.  Under this system, fans can watch local telecasts of virtually every regular-season game played by their home clubs through cable, satellite, and telco television and/or over-the-air networks.  They can watch national telecasts of a multitude of additional games through widely available national channels such as FOX, ESPN, TBS, and MLB Network.  And fans who want even more baseball can get thousands more regular season games through MLB Extra Innings and MLB.TV, an industry-leading Internet service providing high-quality live-video telecasts.  This prodigious output was not always available to fans, and it did not occur overnight or by happenstance.  It is the product of decades of effort by the League and its member clubs, acting not as business competitors but as members of a joint venture committed to MLB's core mission:  to make as much competitive baseball available to as many current and future fans as possible.

Make no mistake, this mission is not altruistic.  Baseball faces fierce competition, including from other sports offerings and an increasing slate of *non*-sports entertainment and leisure options.  For example, in recent years, programming as diverse as *Dancing with the Stars*, *NCIS*, *60 Minutes*, and *Two and a Half Men* have beaten the World Series for television viewers. MLB and its member clubs know that they can survive in this crowded and competitive

---

[1] The Comcast Defendants, DIRECTV Defendants, and Yankees Entertainment and Sports Network, LLC (the "Television Defendants") are filing a separate supplemental trial brief addressing the independent reasons for denying the claims against them.

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

marketplace only if they maintain and grow demand for baseball in local markets—where the sport has always garnered its strongest fan support—and, at the same time, develop the popularity of MLB's brand on a nationwide basis.  MLB's broadcast licensing system works to achieve both of those goals by (1) allocating to each club exclusive broadcast licensing rights within the territory where that club is best equipped to market baseball, and (2) centralizing national broadcast licensing rights in the League, which has the resources and reach to efficiently promote the game nationally.

The allocation of local broadcasting rights to the clubs dates back to the 1930s, long before the Television Defendants even existed, when local territories were developed for radio. Far from a conspiratorial device, these territorial rules were adopted to allow, and encourage, clubs to promote baseball in their local markets, where cultivating avid and committed fan interest is critical to their success, and that of the League.  And these rules have worked.  The last two decades have seen a dramatic increase in the quantity and quality of local telecasts, which in turn have fostered greater fan loyalty, boosted stadium attendance, and promoted greater club financial stability and competitive balance.

The allocation of national broadcasting rights to the League, which dates to the 1970s, reinforces these procompetitive benefits.  Acting on behalf of *all* clubs, the League has negotiated broadcasting agreements that further expand the output and options available to consumers, while promoting the game in general.  This allocation allows the League to promote all of the clubs and to develop a national brand, rather than entrench the popularity of a few select clubs.  It has also permitted the League to innovate new products, including MLB Extra Innings and MLB.TV, which provide more baseball to more fans through more devices and options.  MLB Extra Innings takes feeds produced by the clubs' local telecast partners—which

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

the clubs presently provide to the League at no cost—and packages them for distribution to out-of-market fans in the rest of the country.  MLB.TV live-streams those same telecasts to out-of-market fans, and provides additional interactive media content, over the web and wireless networks.  Widely recognized as the Internet's preeminent live video streaming service, this cutting-edge product allows fans to watch multiple games occurring at the same time on scores of different devices.  Individual clubs never could have achieved the same levels of innovation, quality, and efficiency on their own.  And MLB.TV's accomplishments would not have been possible without the League's long-standing system of licensing rights, which has allowed the clubs to focus on producing high-quality game content while the League has made the investments necessary to launch and develop the complex technology MLB.TV requires.

Together, these offerings allow fans across the country to watch virtually all of MLB's 2,430 regular season games on television through regional and national networks, and a huge portion of the games on their desktops, tablets, and phones.  And the menu of options and levels of output are only increasing.  Beginning in 2016, a fan living outside the territory of her favorite club will be able to purchase a single-club package (at a price comparable to the single-club package offered by the NHL).  In addition, *in*-market fans of, currently, at least 15 clubs will be able to view live local broadcasts over the Internet, as a complimentary service through cable, satellite, and telco companies (Multichannel Video Programming Distributors or "MVPDs").  Meanwhile, Sony Vue provides fans of eight clubs access to live local broadcasts through the nation's first comprehensive "Cloud TV" service.

Notwithstanding the availability of all of this baseball, Plaintiffs insist that the League's licensing system should be dismantled because it purportedly *reduces* consumer choice.  But the only way "choice" is reduced here is that, in a minuscule number of cases, a fan who lives

FILED UNDER SEAL — SUBJECT TO PROTECTIVE ORDER

outside the territory of her favorite club cannot watch that *particular club's telecast* of a few games.  She can still watch the games themselves (via the local club's television feed)—as well as every other MLB game—but, in a tiny fraction of cases, she may not have her pick of announcers.  For that, Plaintiffs ask the Court to dismantle MLB's entire broadcast licensing structure; to strip local clubs, and the League, of their current exclusive rights; to disrupt the multitude of business arrangements that have developed in reliance on those rights; and to do so with the hope that these changes might produce the narrow additional option Plaintiffs seek without destroying all of the options and value the system now indisputably provides.

The Court should refuse that request.  Plaintiffs' assertion that, in their but-for world, all or even many MLB clubs would be able to achieve nationwide distribution of their feeds, with their local announcers, is not supported by any evidence other than the words of Plaintiffs' expert, Professor Noll.  Many clubs cannot even achieve full television distribution within their own Home Television Territories ("HTTs").  The notion that the destruction of those HTTs would increase distribution defies common sense.[2]  Moreover, the evidence will show that dismantling the licensing system currently in place would eliminate many of the viewing options and procompetitive benefits that fans now enjoy.  Against this evidence, Plaintiffs offer only speculation—that the local broadcast agreements that facilitate so much local content today would continue to exist even if the clubs' ability to license exclusive rights disappears; that the output and value provided by MLB's nationwide efforts would remain; and that a product offering the same high quality, and requiring the same high level of investment, as MLB.TV

---

[2]   Plaintiffs also have made reference to so-called "underserved territories"—i.e., geographic areas within certain clubs' HTTs where the Regional Sports Networks ("RSN") carrying the local clubs' games is not available on all local MVPDs.  But this complaint has nothing to do with Plaintiffs' challenge, which seeks to alter how a club could theoretically distribute its games *outside* of its HTT.  The fact the certain RSNs cannot get carriage on certain MVPDs *within* an HTT only confirms why that challenge should fail.

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

would remain available to consumers (or ever would have been created in the first place).  This conjecture does not remotely carry Plaintiffs' burden of proof.

## FACTUAL BACKGROUND

The origins of MLB's broadcast licensing system date back to the 1930s, when home territories were established to regulate the licensing of radio broadcasts.  In the 1950s and 1960s, this concept expanded to television: both the National and American Leagues amended their constitutions to grant to clubs the exclusive right to license telecasts of their games within their local territories.  From the start, the purpose and effect of these home territories were to facilitate the clubs' efforts to develop a local fan base, encourage stadium attendance, and build a television audience for baseball in their local markets.

In the 1980s, the territories were enlarged to match the HTTs in existence today.  Among other goals, this was done to "enhance each club's ability to effectively market its current and future TV and radio properties" and "bring baseball to millions of additional fans."[3]  Also, over the past decades, the clubs have given to MLB the right to license national broadcasts of games, as part of the League's effort to promote the popularity and profitability of baseball in general.

Vested with exclusive local broadcasting rights, each of the clubs has been able to negotiate contracts with RSNs to produce and distribute high-quality telecasts of the vast majority of its games.  Those RSNs, in turn, have been able to sell their programming to MVPDs, which distribute the games within the clubs' HTTs.  The result?  Fans now have access to a hugely increased number of games.  In 1988, only 64% of the average club's games were locally televised.  By 2012, that average rate had grown to over 93%.  Today, each club has virtually all of its 162 regular season games televised.  This huge increase in output has given more fans access to more baseball.  Every day during the season, from April to October, fans can

---

[3]  (*See* DX 330, MLB0370422.)

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

turn on their television or Internet-connected device and choose to watch multiple baseball games.  This has also significantly strengthened the ability of the clubs to compete with other sports and entertainment products for consumers, by generating more fan interest, enhancing competitive balance, promoting higher game attendance, and thus increasing revenues.  The resulting infusion of resources has allowed clubs to update stadiums and make other investments that increase the quality of, and thus the demand for, their product both in terms of live attendance and broadcast viewership.

At the same time, the League has been able to obtain favorable broadcasting agreements with national networks.  These agreements increase the availability of baseball to fans in a way that collectively strengthens the League as a whole—allowing baseball to compete more effectively with other sports leagues and entertainment products—without perpetuating the dominance of certain clubs.  For example, the League has negotiated terms in its national broadcast agreements that limit the number of times particular clubs can appear in the national telecasts, which helps to ensure that a greater diversity of clubs receive national exposure.

MLB's rights arrangement has benefitted fans and increased game output in other ways as well.  In the 1990s, the League recognized that some fans living outside the territories of their favorite clubs wanted more access to the games played by those clubs.  For example, a Pittsburgh Pirates fan living in Manhattan was able to watch the Pirates when they played the Mets or (in some cases) when a Pirates game was broadcast nationally; she could not, however, watch the Pirates' games throughout the season.  Moreover, some fans were such fervent followers of the game in general that the access provided by local RSNs and the national networks was not enough.  To meet both types of demand, MLB created MLB Extra Innings, which packages all of the games played throughout the season for distribution to "out-of-market fans."

FILED UNDER SEAL—SUBJECT TO PROTECTIVE ORDER

That package has been available to fans for the past two decades through cable, satellite, and telco television services.  A similar package has been available for the past dozen seasons over the Internet.   The early 2000s saw the creation of MLB Advanced Media, L.P. ("MLBAM"), a pioneer in the Internet distribution of live-video telecasts.   Pursuant to agreements with the clubs, MLBAM holds the exclusive right to live-stream outside a club's HTT all games produced by the club's local telecast partners.  MLBAM invested ███████ ███ to develop and launch MLB.TV, and since then has invested substantially more to make this industry-leading product even more robust and more accessible to out-of-market fans.

MLB.TV and MLB Extra Innings serve fan interests and have furthered MLB's goal of promoting the popularity of baseball.  Today, MLB.TV offers the most broadly distributed, lowest-priced League-wide package available among professional sports leagues.  At various times, MLB has offered single-game or single-day options, but fans overwhelmingly preferred the current options of monthly or seasonal packages.  Nonetheless, beginning with the 2016 Season, the League will also offer discounted single-club packages through MLB.TV for fans who prefer to buy just one club's out-of-market games.  This option will be available to all class members—including Class Representatives Lerner and Birbiglia, both of whom identified their inability to purchase only their favorite clubs' games as their principal purported injury.

As with its national broadcast agreements, MLB respects the exclusive, and highly valuable, rights long held by the clubs by excluding in-market games from MLB's out-of-market offerings.  But because a Pirates fan living in Manhattan can watch the Mets' and Yankees' telecasts of their games through her local MVPD package, it is of little consequence that the Pirates fan cannot access the (very few) regular season games that the Pirates play against the Mets or Yankees through MLB.TV or Extra Innings.  The same is true of Lerner, for example,

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

who is a Yankees fan living in Mississippi, in the HTTs of the Braves, Cardinals, and Reds.  As things stand today, he is able to watch *all 162 games* the Yankees play in the regular season. The only thing Lerner cannot watch is a Yankees' *feed* of the few games played by the Yankees against the Braves, Cardinals, and Reds.[4]

### SUMMARY OF LEGAL FRAMEWORK

Plaintiffs must prove that MLB's broadcast licensing system unreasonably "suppress[es] or even destroy[s] competition," rather than "merely regulates and perhaps thereby promotes competition."  *See Am. Needle, Inc.* v. *NFL*, 560 U.S. 183, 203 n.10 (2010) (citing *Chi. Bd. of Trade* v. *United States*, 246 U.S. 231, 238 (1918)).[5]  To carry that burden, Plaintiffs must first prove the "relevant market."  *MLB Props., Inc.* v. *Salvino*, 542 F.3d 290, 317 (2d Cir. 2008). That market must include "all products" that consumers consider "reasonably interchangeable" with the product at issue here:  live MLB telecasts.  *City of N.Y.* v. *Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011) (citation omitted).  If Plaintiffs fail to demonstrate that the market in which baseball competes is what Plaintiffs say it is, they lose.  *See PepsiCo, Inc.* v. *Coca-Cola Co.*, 315 F.3d 101, 108 (2d Cir. 2002) (per curiam).

If Plaintiffs were able to carry that critical threshold burden, they would still be required

---

[4]   In the 2015 season, for example, there were only two games for which Lerner could not watch the Yankees' feed of the Yankees' games.  And in all events Lerner could still access live radio broadcasts of the Yankees' announcers for those games for which he could not access the Yankees' feed, and could listen to those announcers through the radio broadcast while viewing the local RSN's or, in one case FOX's, telecasts of the games.

[5]   This brief focuses on Plaintiffs' inability to demonstrate a violation of the Sherman Act under the full Rule of Reason framework.  But Plaintiffs' case also fails under a "quick look." Plaintiffs challenge "the manner in which members of a joint enterprise . . . share the responsibilities and the benefits of the total venture."  *See NCAA* v. *Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 117 (1984) ("It is reasonable to assume that most of the regulatory controls . . . are justifiable means of fostering competition.").  The evidence will show the challenged rules are inherent to the production and distribution of baseball, the core function of the joint venture.  *See Texaco Inc.* v. *Dagher*, 547 U.S. 1, 6 (2006).  The challenged joint venture conduct *increases* output and *promotes* competition, and thus passes scrutiny under the Rule of Reason "in the twinkling of an eye."  *See Am. Needle*, 560 U.S. at 203–04.

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

to prove that the "challenged behavior had an *actual* adverse effect on competition as a whole in the relevant market." *Salvino*, 542 F.3d at 317 (quoting *Geneva Pharms. Tech. Corp.* v. *Barr Labs. Inc.*, 386 F.3d 485, 506–07 (2d Cir. 2004)).  The burden of production, not proof, would then shift to Defendants to articulate procompetitive justifications for the challenged behavior. *Id.*  Plaintiffs would then be required to prove that these competitive benefits "could have been achieved through less restrictive means." *Id.*  Less restrictive alternatives must be demonstrated by a strong evidentiary showing, not speculation or the imaginations of lawyers. *See* XI Areeda & Hovenkamp, *Antitrust Law* ¶ 1913b (3d ed. 2011); *see also Am. Motor Inns, Inc.* v. *Holiday Inns, Inc.*, 521 F.2d 1230, 1249 (3d Cir. 1975) (businesses are not to be the "guarantors" of "imaginations of lawyers").  Finally, it would fall to the Court to weigh the overall effects of the challenged conduct, both pro and con. *Salvino*, 542 F.3d at 317.  A measure that restrains competition is not necessarily unlawful.  Far from it.  Only conduct that, on balance, *unreasonably* constrains competition should be enjoined. *Id.* at 316.

At each step of the analysis, the Court must consider "the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint is imposed; the nature of the restraint and its effect, actual or probable," as well as "[t]he history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, [and] the purpose or end sought to be attained." *Am. Needle*, 560 U.S. at 203 n.10 (citing *Chi. Bd. of Trade*, 246 U.S. at 238).  At the end of the day, the fundamental question the Court must decide is whether "the defendants' actions have had substantial adverse effects on competition" through "decreases in output or quality." *United States* v. *Visa U.S.A., Inc.*, 344 F.3d 229, 238 (2d Cir. 2003).[6]

---

[6]    Plaintiffs advance Section 2 claims against the League Defendants, which also fail.  Conduct that does not give rise to a claim under Section 1 "cannot be the basis of a monopolization scheme under Section 2." *See E & L Consulting, Ltd.* v. *Doman Indus. Ltd.*, 472 F.3d 23, 31

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

## KEY ISSUES FOR TRIAL

**A.     Plaintiffs Cannot Demonstrate That the Relevant Market Is MLB Broadcasts**

Plaintiffs claim that the relevant market in this case is MLB broadcasts.  That is incorrect.

In antitrust cases, the relevant market is determined by "the extent to which consumers will change their consumption of one product in response to a price change in another, *i.e.*, the 'cross-elasticity of demand.'"  *Eastman Kodak Co.* v. *Image Tech. Servs., Inc.*, 504 U.S. 451, 469 (1992); *see also Visa*, 344 F.3d at 239 ("A distinct product market comprises products that are considered by consumers to be 'reasonabl[y] interchangeab[le]' with what the defendant sells." (alterations in original) (citation omitted)).  If Plaintiffs attempt to define the market without "reference to the rule of reasonable interchangeability and cross-elasticity of demand, or allege[ ] a proposed relevant market that clearly does not encompass all interchangeable substitute products," their relevant market is "legally insufficient."  *Grp. Health*, 649 F.3d at 155 (citation and internal quotation marks omitted).

That is exactly what Plaintiffs have done here.  Since before the advent of television, baseball has competed with a range of other sports and, as importantly, with *non*-sports entertainment for consumers.  And the market in which baseball competes has only expanded as the availability of entertainment and other leisure options has exploded with the growth of the Internet and related technological developments.  Nonetheless, Plaintiffs cling to their wildly narrow market conception—one in which baseball competes with only itself—because they know they cannot possibly prove that MLB exercises power in any properly defined market.

---

(2d Cir. 2006).  Here, Plaintiffs have no proof that MLB can exclude competition or control price in the relevant market for sports and non-sports entertainment, a prerequisite to their Section 2 claim.  *PepsiCo*, 315 F.3d at 107–08.  Nor can they show that MLB's rules were designed to maintain market power through suppression of competition.  *Id.*  To the contrary, the evidence will show that, from the beginning, the objective of the challenged rules has been to promote the distribution of more baseball telecasts, and to increase output to more fans—not to restrict output or advance any other nefarious purpose.

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

Based on nothing but theorizing from Professor Noll, Plaintiffs contend that the market in which baseball competes includes live broadcasts of MLB games—and nothing else.  *See Reifert* v. *S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 318 (7th Cir. 2006) (market definition requires "[a]ctual data and a reasonable analysis").  But the evidence will prove what experience and common sense already tell us:  that people who watch baseball consider a whole range of other entertainment options as reasonably interchangeable substitutes for ballgames.[7]

Fact witnesses and contemporaneous MLB documents will prove that the business of the League and the clubs is conducted with the knowledge that baseball broadcasts compete with a wide range of alternative entertainment options for viewers (as well as advertisers and distributors), and that the League monitors baseball's competitive performance accordingly.  *See United States* v. *Cont'l Can Co.*, 378 U.S. 441, 453–55 & n.8 (1964) (contemporaneous documents and witness testimony demonstrated competition between metal cans and glass bottles).  For example, MLB (like other sports leagues) tries to schedule nationally televised games to avoid conflicts with other television and live events that may siphon viewers from the baseball telecasts.  Witnesses for the League Defendants will testify that MLB.TV competes against a range of entertainment offerings, including a number of Internet offerings such as Netflix and Hulu.  Witnesses for the Television Defendants will likewise explain that there is no "baseball market" for viewers.  Instead, people who consume baseball programming, including MLB's out-of-market packages, substitute sports and non-sports entertainment for this

---

[7]   Courts generally do not recognize relevant markets defined by a single brand.  *See Spinelli* v. *NFL*, 96 F. Supp. 3d 81, 111 (S.D.N.Y. 2015) (quoting *Global Disc. Travel Servs., LLC* v. *Trans World Airlines, Inc.*, 960 F. Supp. 701, 704–05 (S.D.N.Y. 1997)); *see also, e.g.*, *Theatre Party Assocs., Inc.* v. *Shubert Org., Inc.*, 695 F. Supp. 150, 154–55 (S.D.N.Y. 1988) ("Plaintiff has failed to explain why other forms of entertainment, namely other Broadway shows, the opera, ballet or even sporting events are not adequate substitute products" for tickets to the "hit" production, *Phantom of the Opera*.).

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

programming.  As a result, baseball products are specifically priced so that they can compete with these options.  Further evidence will include the opinions of Professor Murphy, who has found, based on an empirical analysis of television viewing habits, that the relevant market encompasses, at a minimum, other professional sports broadcasts (e.g., basketball, football, hockey) and non-sports programming.[8]  All of this evidence, and more that will be presented at trial, defeats the market definition that Plaintiffs proffer (i.e., MLB broadcasts) and makes clear that MLB and its clubs lack power in the true market.

## B.   Rather than Adversely Affecting Competition, the Challenged Conduct Provides Multiple Procompetitive Benefits

Plaintiffs are also incapable of showing that MLB's broadcast licensing system has any adverse effect on competition.  In fact, the evidence will show that this long-standing system enhances competition by efficiently allocating licensing rights within the joint venture between the League and its member clubs.  This allocation increases output and boosts consumer welfare by promoting competitive balance, investment, and innovation and, at the same time, reducing transaction costs and market inefficiencies.

### 1.   The Broadcast Structure Promotes Competitive Balance

The local exclusivity afforded by HTTs promotes competitive balance.  As the Second Circuit has recognized, competitive balance is "essential" to "the viability of the Clubs and public interest in the sport."  *Salvino*, 542 F.3d at 331–32.  It also increases output by "maximiz[ing] consumer demand for the product."  *Bd. of Regents*, 468 U.S. at 120.  In fact, the "product" that MLB sells is competition—competition on the field of play that must be close,

---

[8]   A Pirates fan flipping through the channels, for example, is unlikely to stop at a San Francisco Giants game instead of the Pirates game being played at the same time; but she may choose some non-baseball option (e.g., *60 Minutes*, *Game of Thrones*), a possibility that may increase if the Pirates game has a lopsided score or the Pirates are far out of the pennant race.

FILED UNDER SEAL—SUBJECT TO PROTECTIVE ORDER

hard-fought, and of high quality to maintain consumer demand.  Here, the evidence will show that MLB's allocation of broadcast licensing rights is critical to achieving this competitive balance.  By facilitating the availability of large quantities of high-quality, competitive games, this allocation boosts fan avidity, which increases game attendance, which grows revenue, which allows for a more competitive roster.  And the cycle continues.  For this reason (and others), the maintenance of exclusive geographic territories is a "basic organizing principle" of the League, necessary to "safeguard the profitability—and thus viability—of each ball club."  *City of San Jose* v. *Office of Comm'r of Baseball*, 776 F.3d 686, 690 (9th Cir. 2015), *cert. denied,* 136 S. Ct. 36 (Oct. 5, 2015); *see also L.A. Mem'l Coliseum Comm'n* v. *NFL* ("*Raiders*"), 726 F.2d 1381, 1396–97 (9th Cir. 1984) ("Territories foster fan loyalty which in turn promotes traditional rivalries between teams, each contributing to attendance at games and television viewing.").

Indeed, MLB's product on the field has never been more competitive; over the ten most recent seasons (with the current structure), 28 out of the 30 MLB clubs have earned a spot in the playoffs.  Nonetheless, Plaintiffs ask the Court to destroy this local exclusivity and create a system under which all 30 clubs would have essentially the same territory:  North America.  The almost certain result?  More popular clubs grant more licenses and receive more income than less popular clubs, thus "overcompensat[ing]" popular clubs and "foster[ing] a competitive *im*balance."  *Salvino*, 542 F.3d at 332–33 (emphasis added).  Clubs would also be able to free ride on efforts of other clubs and the League through, for example, national broadcasts.  *Id.* at 340.  By limiting this imbalance, MLB ensures a higher quality product more capable of competing with other sports leagues and entertainment providers.

### 2.    The Broadcast Structure Promotes Investment and Innovation

The decades-old decision of the clubs to centralize national broadcasting rights in the League is directly responsible for facilitating key innovations in the business of baseball.  This

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

benefit is best epitomized by the creation of MLBAM and its industry-leading product, MLB.TV.  Over the past decade, MLB has spent hundreds of millions of dollars building the infrastructure needed to make available high-quality, live-video streams of games over the Internet or wireless networks to nearly any mobile device or computer.   Through these innovations, MLB became the first sports league:  (1) to stream its entire season (2003); (2) to wire its venues for TV-quality streaming (2005); (3) to use adaptive bit-rate streaming (2008); (4) to stream live 720p high-definition video (2009); (5) to stream live games through a subscription package to the iPhone (2009); (6) to stream live video to a gaming console (2010); (7) to embed live games on Facebook and Twitter (2011); and (8) to make a live video stream embeddable to any site on the Internet (2013).  Today, MLB.TV streams live video of games to over 400 devices.  And MLBAM provides technological support to numerous non-sports entities that offer Internet and wireless broadcasts of their content to consumers, including HBO, WWE, ███████████████████████.

*None* of these industry-leading innovations—which required extensive expertise, research, development, and maintenance—could have taken place without the centralization of nationwide rights, which itself could not have occurred absent the League's territorial system. And *none* of the clubs could have realized these landmark achievements by themselves.[9]  Absent MLB's centralization of rights, MLBAM and MLB.TV would not have existed, let alone reached their current levels of success.

Meanwhile, the allocation of local broadcasting rights has propelled the clubs to focus

---

[9]   Streaming high-quality live video on the Internet requires many highly technical tasks including writing computer code to compress and transport the telecast, and to ensure that it is integrated with multiple content delivery networks and can be viewed through different operating systems.  Ensuring the quality of the stream also requires constant monitoring and management by hundreds of employees to implement technical operating systems.

FILED UNDER SEAL - SUBJECT TO PROTECTIVE ORDER

their efforts on continually improving the product they provide to their local fans.  Exclusivity

reassures clubs that their large investments in developing local markets for baseball will not be

wasted and that the benefits of those investments will not be appropriated by others.  *See*

*Raiders*, 726 F.2d at 1396 ("Exclusive territories aid new franchises in achieving financial

stability, which protects the large initial investment an owner must make to start up a football

team.").[10]  Clubs leverage these exclusive rights, together with their in-market expertise, to spur

RSNs (and other licensees) to invest in their production capabilities and to telecast as many

games as possible, thereby improving both the quality and quantity of baseball for fans.[11]

The data confirm that this incentive structure works.  Currently, RSNs (and other

licensees) produce and telecast to their local markets nearly all of the games played in the regular

season, resulting in 4,542 total local telecasts in the 2012 regular season, or, on average, nearly

two telecasts of each game.[12]  And, unlike games played in the National Football League, which

centralizes rights into one broadcast per game, the feeds the RSNs feature local announcers and

other enhancements that create a more fan-friendly and exciting production.  This local flavor,

and the undisputed benefit it provides to fans, would not likely exist absent the current system.

### 3.    The Broadcast Structure Reduces Transaction Costs and Promotes Efficiencies

To broadcast 4,542 home and away feeds per season, MLB and its member clubs have no

choice but to cooperate.  The League's broadcast licensing system facilitates this cooperation by

---

[10]   *See also Trans Sport, Inc.* v. *Starter Sportswear, Inc.*, 964 F.2d 186, 190 (2d Cir. 1992) (controlling where a product is sold is lawful "even if profit maximization is the ultimate objective"); *Raiders*, 726 F.2d at 1396 ("[T]he League must be allowed to have some control over the placement of teams to ensure NFL football is popular in a diverse group of markets.").

[11]   RSNs make significant investments to broadcast games, with average production costs of approximately ██████ per game, and hire announcers popular with the local fan bases, including popular former players of the clubs.

[12]   *See* XI Areeda & Hovenkamp, *Antitrust Law* ¶ 1901a ("[A] market can be said to become increasingly competitive when its output increases.").

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

obviating the need for each of the 30 individual clubs to (i) negotiate with each of the other clubs on their schedule to determine who will have the right to broadcast each particular game; (ii) independently invest in and develop costly Internet platforms on their own; (iii) negotiate for distribution on proprietary Internet platforms, such as AppleTV and Roku; and (iv) negotiate with third-parties—at high cost and with information asymmetries—to successfully deliver high-quality telecasts nationwide.  Without rules governing clubs' rights to distribute live video of their performance on the field, the licensing rights for every one of the 2,430 MLB games each year would be subject to hundreds of separate negotiations and contracting.  These significant transaction costs would lead to fewer telecasts being made available and thus reduced output.

## C.   Plaintiffs Cannot Demonstrate That the Procompetitive Effects Fans Enjoy Today Could Be Achieved Through Less Restrictive Alternatives

To establish an antitrust violation, Plaintiffs must prove that the procompetitive effects of MLB's broadcast licensing system "could be achieved through alternative means that are less restrictive of competition."  *Virgin Atl. Airways Ltd.* v. *British Airways PLC*, 257 F.3d 256, 264 (2d Cir. 2001).  The Ninth Circuit recently explained that any proposed less restrictive alternative must be virtually as effective in preserving the procompetitive benefits of the challenged restraint, and Plaintiffs must make a "strong evidentiary showing" that the alternative is viable. *O'Bannon* v. *NCAA*, 802 F.3d 1049, 1074 (9th Cir. 2015).  "[P]laintiffs cannot be permitted to offer possible less restrictive alternatives whose efficacy is mainly a matter of speculation."  XI Areeda & Hovenkamp, *Antitrust Law* ¶ 1913b (evidence that the proffered alternative "has been tried but failed" tends to defeat such an offering).

Here, Plaintiffs do not identify, much less prove, less restrictive alternatives that might achieve the procompetitive benefits provided by the League's current system.  They merely allude to potential, half-measure alternatives, asserting, for example, that MLB could foster

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

competitive balance through increased revenue sharing among the clubs.  That proffer ignores that the League is unable to unilaterally increase revenue sharing, which is a mandatory subject of collective bargaining with the Major League Baseball Players Association ("MLBPA"), and ███████████████████████████████████.

Nor can Plaintiffs show that wholesale reliance on revenue sharing, or any other imagined alternative that destroys exclusivity, would maintain or increase output, measured in terms of both quantity and quality.  The elimination of exclusivity would throw long-standing business arrangements into chaos.  Among other things, all the existing bargains and agreements that result in the production of the baseball games that fans watch today—agreements between the clubs themselves; between clubs and RSNs; between RSNs and MVPDs; between MLB and national broadcasters; and among MLB, the clubs, and the players—would have to be reassessed in a world where the current exclusivity no longer exists.  Plaintiffs do not, and cannot, offer any evidence that whatever new arrangements might arise would maintain, much less enhance, the procompetitive benefits the current system provides.

**D.    Plaintiffs Cannot Demonstrate *Any* Cognizable Adverse Effects, Much Less Effects that Outweigh the Current System's Procompetitive Benefits**

An act is anticompetitive effect under the Sherman Act "only when it harms both allocative efficiency *and* raises the prices of goods above competitive levels or diminishes their quality."  *Rebel Oil Co.* v. *Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995).  Plaintiffs cannot prove that MLB's broadcast licensing system has any of these ill effects.  To the contrary, the system has *increased* output, making virtually every regular season game available through local and national broadcasts, out-of-market television package options, or the Internet through MLB's industry-leading platform.  Here, the Court concluded that it would be "impossible" for Plaintiffs to prove any overcharge.  *Laumann v. NHL*, __ F. Supp. 3d __, 2015 WL 2330107, at

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

*9 & n.57 (S.D.N.Y. May 14, 2015).  The Court reasoned that the scope of any such injury would "depend[ ] not only on economic analysis"—which is absent after the Court excluded the model Plaintiffs offered to show a classwide overcharge—"but also on speculation about consumer psychology."  *Id.* at *11.  Plaintiffs also have *no* evidence to show that the challenged rules have diminished the quality of the baseball product.  Again, the opposite is true.

Class Representatives have also complained that they are unable to purchase a package that offers only one club's out-of-market games.  But even if that inability could qualify as an "adverse effect" under the law,[13] and even if Plaintiffs could prove that this option would be available in their but-for world, this purported reduction in choice *does not exist* anymore because MLB will offer discounted single-club out-of-market packages for the 2016 Season.

Plaintiffs also contend that in their but-for world fans would be able to watch the feeds produced by their favorite clubs' RSNs, even if that fan lives outside of his favorite club's market.  Thus, Plaintiffs speculate that a Pittsburgh fan who lives in San Francisco *might* be able to watch the Pirates' feed of a game between the Pirates and the San Francisco Giants instead of the locally produced and broadcasted Giants' feed.  It is true that that particular option is not available under the current system.  But if that "reduced choice" were sufficient to sustain an antitrust claim, the entire broadcast and entertainment industries would be in jeopardy.  Every viewer of the Olympics who prefers the Canadian feed to the U.S. feed or every opera-goer who would prefer the English-language *Magic Flute* to the German-language *Die Zauberflöte* would have a potential antitrust case.

Even if this purported lack of "choice" did carry any weight on the scale, Plaintiffs

---

[13]   *See, e.g.*, *Kingray* v. *NBA, Inc.*, 188 F. Supp. 2d 1177, 1196 (S.D. Cal. 2002) (no § 1 violation simply because a product is "not being offered in the manner Plaintiffs would prefer (out-of-market games in a non-bundled format)").

FILED UNDER SEAL — SUBJECT TO PROTECTIVE ORDER

cannot plausibly claim that it outweighs the procompetitive benefits that MLB's broadcast licensing system provides.  As shown above, this system increases the quantity and quality of baseball output by incenting clubs to develop the market for baseball among local fans, while allowing MLB to promote the sport on a nationwide basis.  Plaintiffs have no evidence that the range and degree of consumer benefits that result could have been created or would continue to exist in their but-for world.  They cannot even prove that the "harm" they seek to address (i.e., their inability to hear certain announcers when watching certain games) would be resolved if the injunction they seek were granted.  Indeed, the evidence will indicate otherwise.

E.     **Plaintiffs' Claims, Which Fall Within the Baseball Exemption, Are Barred**

This Court has found that whether the baseball exemption applies is a "threshold merits issue."  (Order Denying Certification of Interlocutory Appeal (Dkt. No. 342) at 9.)  Defendants once again urge the Court, pursuant to Federal Rules 12(h)(2)(C) and 12(h)(3), to dismiss Plaintiffs' claims pursuant to the exemption to the antitrust laws for the business of baseball.  *See City of San Jose*, 776 F.3d at 690–92.

*     *     *     *     *

Because of the territorial rules and centralization of out-of-market telecast rights, MLB has been able to evolve with technology to provide fans nationwide access to the ballgames of their choice.  These single-club and League-wide out-of-market offerings do what Plaintiffs have *no* evidence could be done otherwise—allow fans of a club, such as the Pittsburgh Pirates, to view their favorite club's games anywhere, from Portland, Oregon to Portland, Maine.  Nor can Plaintiffs prove that, in their but-for world, any cable, satellite, or telco provider would elect to carry many of the clubs' telecasts on a near-nationwide basis.   Indeed, many smaller-market clubs, even though successful on the field, are unlikely to be carried widely by MVPDs in Plaintiffs' but-for world.  Telecasts of all those smaller-market clubs' games are carried across

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

the nation in the current world only *because of* MLB's out-of-market packages.   Accordingly,

MLB's packages "enable[ ] a product to be marketed which might otherwise be unavailable,"

"widen consumer choice," and, as the Supreme Court has explained, "hence can be viewed as

procompetitive."  *Bd. of Regents*, 468 U.S. at 101–02.

## <u>CONCLUSION</u>

The Court should, for the reasons stated above and for the reasons that will be shown at

trial, find against Plaintiffs and deny injunctive relief.

~~FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER~~

Dated:  December 18, 2015                      Respectfully submitted,


/s/ Beth A. Wilkinson                          /s/ Tammy A. Tsoumas
Beth A. Wilkinson                              Tammy A. Tsoumas
Alexandra M. Walsh                             Melissa D. Ingalls
**PAUL, WEISS, RIFKIND,**                      **KIRKLAND & ELLIS LLP**
**WHARTON & GARRISON LLP**                     333 South Hope Street
2001 K Street, N.W.                            Los Angeles, California  90071
Washington, D.C. 20006                         Telephone:  (213) 680-8400
Telephone:  (202) 223-7300                     Facsimile:  (213) 680-8500
Facsimile:  (202) 223-7420                     tammy.tsoumas@kirkland.com
bwilkinson@paulweiss.com                       melissa.ingalls@kirkland.com
awalsh@paulweiss.com

                                               *Attorneys for Defendants DIRECTV, LLC,*
Daniel J. Toal                                 *DIRECTV Sports Networks, LLC, DIRECTV*
**PAUL, WEISS, RIFKIND,**                      *Sports Net Pittsburgh, LLC (a/k/a Root Sports*
**WHARTON & GARRISON LLP**                     *Pittsburgh), DIRECTV Sports Net Rocky*
1285 Avenue of the Americas                    *Mountain, LLC (a/k/a Root Sports Rocky*
New York, New York 10019                       *Mountain) and DIRECTV Sports Net*
Telephone:  (212) 373-3000                     *Northwest, LLC (a/k/a Root Sports Northwest)*
Facsimile:  (212) 757-3990
dtoal@paulweiss.com


*Attorneys for Defendants Office of the*
*Commissioner of Baseball, Major League*
*Baseball Enterprises Inc., MLB Advanced*
*Media L.P., MLB Advanced Media, Inc.,*
*Athletics Investment Group, LLC, the Baseball*
*Club of Seattle, L.P., Chicago Cubs Baseball*
*Club, LLC, Chicago White Sox, Ltd., Colorado*
*Rockies Baseball Club, Ltd., The Phillies, L.P.,*
*Pittsburgh Baseball, Inc., and San Francisco*
*Baseball Associates, L.P.*




*Additional Counsel Signatures*
*on Following Page*




21

FILED UNDER SEAL—SUBJECT TO PROTECTIVE ORDER

/s/ Arthur J. Burke
Arthur J. Burke
David B. Toscano
**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, New York  10017
Telephone:  (212) 450-4000
Facsimile:  (212) 701-5800
arthur.burke@davispolk.com
david.toscano@davispolk.com

*Attorneys for Defendants Comcast*
*Corporation, Comcast SportsNet Philadelphia,*
*L.P., Comcast SportsNet California, LLC, and*
*Comcast SportsNet Chicago, LLC*

/s/ Jonathan D. Schiller
Jonathan D. Schiller
Alan B. Vickery
Christopher E. Duffy
**BOIES, SCHILLER & FLEXNER LLP**
575 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-2300
Facsimile:  (212) 446-2350
CDuffy@bsfllp.com

*Attorneys for Defendant New York Yankees*
*Partnership*

/s/ John Schmidtlein
John Schmidtlein
William Vigen
Joelle Perry
**WILLIAMS & CONNOLLY LLP**
725 Twelfth St., N.W.
Washington, D.C. 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
jschmidtlein@wc.com
wvigen@wc.com
jperry@wc.com

*Attorneys for Defendant Yankees*
*Entertainment and Sports Network, LLC*