~~FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER~~

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| FERNANDA GARBER, MARC LERNER, DEREK RASMUSSEN, ROBERT SILVER, GARRETT TRAUB, and VINCENT BIRBIGLIA, representing themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>OFFICE OF THE COMMISSIONER OF BASEBALL, et al.,<br><br>Defendants. | ~~Filed Under Seal~~<br>~~Contains Highly Confidential Material~~<br><br><br>Civil Action No. 12-cv-3704 (SAS) |

**DEFENDANTS' PROPOSED FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW**

PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone (212) 373-3000
Facsimile (212) 373-2758

*Counsel for MLB Defendants*

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800

*Counsel for Comcast Defendants*

KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Counsel for DIRECTV Defendants*

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Counsel for New York Yankees Partnership*

WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029

*Counsel for Yankees Entertainment and Sports Network, LLC*

~~FILED UNDER SEAL — SUBJECT TO PROTECTIVE ORDER~~

## TABLE OF CONTENTS

PROPOSED FINDINGS OF FACT ....................................................................................1

I.      Background .....................................................................................................1

II.     MLB's Broadcast Licensing System ...........................................................1

III.    The Clubs' Use of Local Broadcast Licensing Rights.................................2

IV.     The League's Use of National Broadcast Licensing Rights .......................3

V.      The Development of MLB's Out-of-Market Packages ("OMPs") ............4

VI.     Relevant Market............................................................................................6

VII.    Increased Output Due to MLB's Broadcast Licensing System .................7

VIII.   Competitive Balance .....................................................................................9

IX.     Reduced Transaction Costs and Increased Efficiencies Due to MLB's
        Broadcast Licensing System ......................................................................11

X.      Procompetitive Benefits Outweigh Anticompetitive Effects....................11

XI.     Facts Specifically Relevant to Television Defendants..............................15

PROPOSED CONCLUSIONS OF LAW .......................................................................16

I.      Plaintiffs Lack Antitrust Standing .............................................................17

II.     All Defendants Are Entitled to Judgment on Counts One to Three of the
        Second Amended Complaint (Sherman Act § 1)......................................18

III.    Television Defendants Are Entitled to Judgment on Counts One to Three
        of the Second Amended Complaint (Sherman Act § 1) for Independent
        Additional Reasons .....................................................................................21

IV.     League Defendants Are Entitled to Judgment on Count Four of the Second
        Amended Complaint (Sherman Act § 2) ...................................................24

V.      The Baseball Exemption Bars Plaintiffs' Claims .....................................25

~~FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER~~

## PROPOSED FINDINGS OF FACT

### I.      Background

1. Major League Baseball ("MLB" or the "League") is an unincorporated association acting as a joint venture of 30 interdependent member clubs that cooperate to produce, exhibit, and distribute professional baseball games.

2. Under Article VIII, Section 1 of MLB's Constitution, the League and the clubs agree "to act at all times in the best interests of Baseball" and the League.  (DX 156, MLB000051.)

3. The objectives of MLB include growing and satisfying the demand for baseball and ensuring that baseball remains competitive in its market.

4. The market in which MLB competes includes other sports and non-sports entertainment, as well as other leisure activities.  (E.g., DX 310, MLB0335620.)

### II.     MLB's Broadcast Licensing System

5. Under MLB's Constitution, the clubs have the exclusive right to license live baseball telecasts within geographically defined territories, known as Home Television Territories ("HTTs").  The right to license national telecasts is centralized in the League, specifically in MLB's Office of the Commissioner ("BOC").  (DX 156, MLB000051, Article X, §§ 3, 4.)

6. The origin of this rights allocation dates back to the 1930s when the American and the National Leagues (which merged in 2000 to form MLB) established exclusive "home territories" within which each club could license radio broadcasts of its games.

7. In the 1950s and 1960s, the Leagues extended this approach to television, agreeing that each club would have the exclusive right to license broadcasts of its games within 50 miles of its home stadium.  (E.g., DX 401, MLB0013049.)  In the 1960s, the clubs began granting to the Leagues authority to license broadcasting rights to national networks, such as ABC, CBS, and NBC. (E.g., DX 105, MLB0275825; DX 400, MLB0013056; DX 372, MLB0276080.)

FILED UNDER SEAL — SUBJECT TO PROTECTIVE ORDER

8.   In the late 1970s, the national networks became concerned that clubs would use cable to broadcast their games more than 50 miles from their stadiums and thus dilute the value of their licenses.  In 1982, the clubs agreed that no individual club would be permitted to televise its games outside its home territory without consent of the other participating club and the League. (DX 074, MLB0511878; DX 171, MLB0276259; DX 322, MLB0511816; DX 330, MLB0370422.)   At the same time, the existing home territories were expanded to create the HTTs, which exist in largely the same form today.  The goal was to define the areas within which each club was best situated to develop its local fan base, without diluting the national broadcast rights.   The factors considered included, inter alia, actual broadcast patterns, measurable viewing patterns, and geographic proximity to a club's home city.  (DX 330, MLB0370422.)   From time to time, the HTTs have been adjusted in keeping with those considerations.

9.   The objective of the HTTs and the corresponding centralization of national rights in MLB is to achieve efficiency by allocating rights to the entity best positioned to market baseball to fans—clubs in their local markets and the League nationwide.

**III.    The Clubs' Use of Local Broadcast Licensing Rights**

10. MLB's broadcast licensing system has increased output of local telecasts.  In 1988, on average, 64% of clubs' games were locally televised.  By 2012, that average rate had climbed to 93%, or an average of 151 of the 162 regular season games per club.  In most cases where games are not locally telecast, it is because they are produced for national telecast.  (DX 234, MLB0006767; DX 385, MLB1000082.)

11. Most games are locally telecast by Regional Sports Networks ("RSNs").  RSNs combine game telecasts with other baseball and non-baseball programming into a single regional network and sell the right to distribute that programming to cable, satellite, and telco television providers

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

(collectively, Multichannel Video Programming Distributors or "MVPDs").  MVPDs bundle RSNs with dozens or hundreds of other non-sports and sports cable and broadcast networks, and distribute them to consumers.

12. The exclusive right to telecast particular games in HTTs incentivizes RSNs to, at significant costs, develop high-quality live baseball game productions tailored to local audiences, with popular local announcers.  Such productions entail, by way of example, the costs of operating state-of-the-art production facilities housing multiple high-definition cameras, instant replay devices, animated visual effects, enhanced digital audio, and databases offering useful statistics and information displayed on multiple graphics platforms.  RSNs also produce club-specific programming surrounding game telecasts.  RSNs have made the significant investments necessary to create high-quality local programming in reliance on the exclusivity secured by their licensing agreements with the clubs, which they would not do absent such exclusivity.

13. Local telecasts promote ticket sales by encouraging individuals to attend games. Revenue derived from stadium gate receipts is by far the most significant source of revenue for all clubs.  Revenue from licensing of local broadcast rights, and revenue from in-park corporate sponsorships and publications, are the next largest sources of revenue.

## IV.    The League's Use of National Broadcast Licensing Rights

14. MLB's broadcast licensing system has also increased output of nationwide telecasts.  In 1982, just 45 regular season games were telecast on the national networks.  In 2012, pursuant to MLB's current license agreements, hundreds of games were telecast on national networks. During the 2012 regular season, that total included 86 games on Fox, 79 games on ESPN, 26 games on Turner networks, and 152 games on MLB Network.  (DX 427, MLB0048713–15; DX 791, MLB0509567.)  All 37 playoff games in the 2012 postseason were also televised through a combination of Fox, Turner networks, and MLB Network telecasts.

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

15. Clubs centralize national broadcast licensing rights in the League to increase the number and diversity of games available to consumers, and to promote the game of baseball nationwide for the benefit of all clubs.  For example, MLB's national broadcast agreements restrict the number of times a particular club can appear on the national telecasts each season, which results in greater diversity of viewing options for fans.  (E.g., DX 064.1, MLB0437330.)

16. If the League's national broadcasting rights were not exclusive, and clubs could individually license national broadcast rights, it is unlikely that national networks would agree with the League to broadcast national games, let alone national games featuring small-market clubs.  As it is, national telecasters routinely select a few large-market clubs with the greatest national appeal as many times as their contracts allow, and often do not select small-market clubs at all, or no more than the minimum number of appearances required by contract.  If every club could license its games nationally, the League would be less able to negotiate contracts that offer national networks the most compelling games and the exclusivities that they desire, placing it at a competitive disadvantage compared to other sports leagues and entertainment providers.

17. MLB employs extensive personnel and internal resources to manage national broadcasts and other marketing efforts (such as in-game advertisements and promotions for MLB), an infrastructure the clubs could not efficiently duplicate on their own.

## V.    The Development of MLB's Out-of-Market Packages ("OMPs")

18. In 1996, MLB created MLB Extra Innings ("Extra Innings"), which packages nearly all 2,430 of the MLB games telecast during the regular season for distribution to out-of-market fans through MVPDs.  Thus, Extra Innings permits fans living outside the HTTs of their favorite clubs to watch nearly all of those clubs games not already provided by national or local telecast.

19. In 2000, the clubs entered into an Interactive Media Rights Agreement ("IMRA"), which granted to a newly created entity, MLB Advanced Media, L.P. ("MLBAM") certain rights to

FILED UNDER SEAL—SUBJECT TO PROTECTIVE ORDER

distribute live-video game content over the Internet.  (DX 003, MLB0000083.)   In 2002, MLBAM launched MLB.TV, which distributes live, out-of-market game content over the Internet and wireless networks to a wide variety of devices.  ███████████████████████ ████████████████████████████████████████████████████.  Since then, MLBAM has made substantial additional investments to improve the quality and availability of MLB.TV.  MLBAM now employs 800 people nationwide.

20. Streaming live video over the Internet and wireless networks involves many complex and difficult tasks, including:  compressing, encoding, and transporting the live feed; segmenting the stream (slicing up the feed into files that are indexed and written to a network); and utilizing a provisioning system that makes all of the preceding steps occur.  MLBAM ensures that content can be integrated with multiple content delivery networks ("CDNs") and played by separate applications for each device on different operating systems.  These efforts impose significant recurring costs and require continuous management.  Every day during the season, MLBAM employees monitor the quality of the user experience for more than 3,000 different combinations of devices, operating systems, and updates.  If MLBAM's employees observe a problem with the viewing quality on any of these device types, they take immediate steps to correct it so that each user receives smooth, high-quality streaming video regardless of her device.

21. Today, MLBAM is an industry-leader with respect to the distribution of live-video broadcasts via the Internet and wireless technologies.  MLBAM also now provides technological support to numerous sports and non-sports entities that offer Internet and wireless broadcasts of their content to consumers, including HBO, ESPN, ████████████████████████.

22. The revenues provided by MLB.TV and Extra Innings collectively represent less than 3% of the overall gross revenues of MLB and its clubs.  (DX 442, MLB0217087; DX 455,

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

MLB0509849.)

23. In 2015, MLB.TV telecast live 178 games for free on the Internet.

24. It is unlikely that individual clubs would develop, maintain, and innovate the technology necessary to create high-quality streams of their own games over the Internet equivalent to those created by MLB.TV, given the substantial and recurring investments of time, money, and technological and human resources required. MLB.TV is available only because, under MLB's broadcast licensing structure, the clubs and their RSNs produce high-quality broadcasts of their games and provide that content free of charge to MLBAM through MLB.

## VI. Relevant Market

25. Broadcasts of MLB games compete with, and are in the same relevant market as, other sports telecasts and non-sports entertainment offerings. (E.g., DX 310, MLB0335620; DX 231, MLB0005921.)

26. MLB and its member clubs have long recognized that other sports and non-sports programming competes with telecasts of its clubs' games.

27. MLB, as a business practice, keeps track of other entertainment competition, regularly monitors other sports and non-sports programming, and routinely compares MLB's ratings to such competitive programming. Contemporaneous documents show that MLB employees compare MLB's viewership performance to the performance of other sports and non-sports programming. MLB executives discuss MLB's ratings relative to the ratings of these other forms of entertainment. MLB also conducts proprietary research that measures the impact of other entertainment offerings on the ratings of MLB telecasts.

28. In making its scheduling decisions, MLB considers the availability of other sports and non-sports entertainment programming and the potential of that programming to negatively impact the ratings of MLB telecasts. For example, in 2014, MLB changed the start date of the

FILED UNDER SEAL — SUBJECT TO PROTECTIVE ORDER

████████████████████████████████████████████████████████████████

████████████████████████████████████. Other popular entertainment options, including

telecasts of nationally broadcast shows ████████████████████████████████████

██████. (E.g., DX 112, MLB0029763; DX 247, MLB0029118.)

29. MLB fans—including the Class Representatives—tend to be fans of multiple sports. All six months of MLB's regular season overlap with the regular seasons and playoffs of other professional sports leagues in the United States, the NFL, NHL, NBA, and MLS. As a result, baseball competes with other sports for fans' limited entertainment budgets and time. (E.g., DX 310, MLB0335620; DX 231, MLB0005921.)

30. MLB reviews and considers the pricing for other sports programming packages and non-sports programming packages when determining the prices for its own OMPs.

31. The growth of online entertainment options has resulted in smaller average audiences for primetime programming. MLB broadcasts have not been immune from this market trend.

32. The procompetitive effects of MLB's broadcast structure increase interbrand competition by improving the quality of, and interest in, MLB games, thus making MLB broadcasts more competitive against other forms of sports and non-sports entertainment programming.

## VII.   Increased Output Due to MLB's Broadcast Licensing System

33. Because of MLB's broadcast licensing system, output of live-video broadcasts of baseball has increased dramatically.

34. Today, a fan living almost anywhere in the United States has the option to watch a telecast of virtually all of the 2,430 baseball games played during each regular season. These games are available through a combination of offerings, including over-the-air national networks (such as Fox), cable networks (such as the RSNs, ESPN, Fox Sports, Turner networks, and MLB Network), and the OMPs. In addition, beginning with the 2016 MLB Season, consumers will be

FILED UNDER SEAL — SUBJECT TO PROTECTIVE ORDER

able to purchase MLB.TV on a single-club, as well as a League-wide, basis.

35. All that out-of-market fans lack under this system is the ability to watch particular *feeds* of certain games—an out-of-market club's feed when that club is competing against a local club.  But the viewer still has the ability to watch the *game*, albeit with the local production and announcers rather than the out-of-market production and announcers.  And even if a fan is unable to view the feed of the RSN producing the games of an opposing club, the fan is still able to listen to the radio broadcast affiliated with the opposing club over the radio or Internet (perhaps in conjunction with watching only the video of the telecast).

36. The overwhelming majority of fans live within their favorite club's HTT.  All of those fans are able to watch the feed tailored to the local club by the RSN that has contracted to telecast that club's games.  The limited number of fans who do not reside in the HTT of their favorite club and prefer to watch that club's feed are able to do so in all but a small fraction of cases—specifically, when the fan's favorite club is playing a club located in the HTT where the fan resides.

37. For example, Class Representative Marc Lerner, who resides in Mississippi, claims injury because he formerly was unable to purchase only Yankees games.  However, Mr. Lerner now can view all of the Yankees games—and only Yankees games, if he so chooses—by purchasing the Yankees single-club (or "a la carte") channel through MLB.TV, combined with watching the national and local network broadcasts.  Similarly, Class Representative Vincent Birbiglia, a Mets fan living in Las Vegas, claimed injury because he wanted to buy only Mets games.  Mr. Birbiglia can now view all of the Mets games by purchasing the Mets single-club channel through MLB.TV, combined with watching national and local network broadcasts.

38. In Mr. Lerner's case, the only thing he is unable to watch from Mississippi is the

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

Yankees' *feed* for a maximum of about 6 to 8 games (out of 162 games each season) that the Yankees play against the Atlanta Braves, St. Louis Cardinals, and Cincinnati Reds, the clubs that share the HTT in which Mr. Lerner lives. In fact, in 2015, Mr. Lerner had access to the Yankees' feed for all but 2 of the games for which the RSN affiliated with the Yankees produced a telecast. Similarly, in 2015, Mr. Birbiglia could not watch just a fraction of the games for which the RSN affiliated with the Mets produced a telecast. In all instances, Mr. Lerner and Mr. Birbiglia were able to watch the Yankees and Mets *games*, respectively.

39. These minor limits on the availability of out-of-market feeds are necessary to preserve the value of the exclusive rights allocated to the clubs and the League, the incentives to produce locally tailored telecasts, and all of the procompetitive benefits that exclusivity provides.

## VIII.   Competitive Balance

40. MLB's broadcast licensing structure fosters competitive balance among clubs, which creates a higher-quality product for fans, sponsors, and advertisers, and strengthens the demand for baseball. Geographic territories encourage local investment and increase output and quality of local television broadcasts, which enhance fan loyalty and promote local attendance. That local market success promotes club revenues and a more competitive roster of players. Competitive balance improves the quality of the ballgames. And increased quality improves demand and output for local broadcasts of clubs.

41. The League divides all revenues resulting from sale of national telecast licensing rights equally among the clubs. These shared revenues help alleviate local revenue disparities among the clubs. MLB also shares equally among the 30 clubs, pursuant to a complicated formula, approximately half of the revenue obtained by each club through its local broadcast licensing agreement with its RSN. This revenue sharing ensures all clubs benefit from their cooperative efforts in creating MLB games, regardless of inherent variations among the clubs with respect to

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

local market size, current popularity in the national market, or current on-field success.

42. Changes to the League's revenue-sharing system are difficult to effect. Any such changes must be collectively bargained with the Major League Baseball Players' Association in a process that occurs approximately once every five to six years.  The Players' Association historically has aggressively rejected MLB proposals to increase revenue sharing.

43. The revenue received from the sale of exclusive in-market broadcast licensing rights is a vital factor in sustaining clubs' financial health.  More significant, though, the exclusive in-market broadcast licensing rights foster competitive balance by allowing clubs to develop avid fan bases and to promote in-person attendance at games, which in turn generates the majority of revenues for clubs.  Clubs go through cycles of on-field success and failure; during down periods, HTTs allow clubs to maintain their avid fan base while they invest in rebuilding.

44. Elimination of the HTTs could harm small-market clubs by eroding fan bases, reducing in-person attendance at games, and making rebuilding more difficult or impossible for small-market clubs.  It is generally not in the long-term interests of the clubs to have other members of the joint venture that are financially weak or that lack local fan support, because such weaknesses drag down the finances of the joint venture and the popularity of MLB ballgames.  Without long-term competitive balance, clubs would be less able to compete against other sports and entertainment options in their local areas.

45. Keeping 30 clubs viable also increases output of baseball to fans by ensuring that each club is capable of supporting at least six minor league affiliate clubs. Affiliate clubs provide even more live baseball exhibitions and broadcasts to fans, and they serve as a farm system of talent development for each of the MLB clubs.

46. MLB uses a number of metrics to measure competitive balance, including the number of

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

clubs' postseason appearances and performance over time; the clubs' contention for playoff berths over time; the clubs' winning percentages over time; and the correlation between clubs' payrolls and their winning percentages over time. According to these and other metrics, the League is as competitively balanced today as it ever has been and better than it was in 1980. The level of competitive balance in MLB also compares favorably to that of other sports leagues.

## IX.   Reduced Transaction Costs and Increased Efficiencies Due to MLB's Broadcast Licensing System

47. MLB's broadcast licensing system creates efficiencies that exempt each member club from needing to: (i) negotiate with 29 other clubs to determine the rights to, and means of broadcasting, particular games;[1] (ii) bear the burden for competing in the national market against other national sports leagues and entertainment providers; (iii) negotiate for distribution on proprietary Internet platforms, such as AppleTV and Roku; (iv) independently invest in and develop costly Internet platforms; and (v) negotiate at high cost with third parties to successfully deliver high-quality telecasts nationwide. Indeed, without the system, large-market clubs may exercise "hold out" leverage, an eventuality that would be disadvantageous and inefficient for the joint venture as a whole.

48. The current structure also limits clubs' incentive to free-ride on the efforts made by MLB and the other clubs to promote baseball.

## X.   Procompetitive Benefits Outweigh Anticompetitive Effects

49. The current system substantially and overwhelmingly benefits MLB's fans, including Plaintiffs. In-market fans of clubs benefit because their local club's games are produced for telecast by a club-focused RSN. Out-of-market fans of clubs benefit because they are able to

---

[1]   If each of the 30 clubs had to negotiate with the other 29 clubs to determine broadcast licensing rights, a highly inefficient situation would develop in which the broadcast area for the visiting and home clubs could vary from game to game depending on the matchup.

FILED UNDER SEAL — SUBJECT TO PROTECTIVE ORDER

access, through the OMPs, games that otherwise would not be telecast in their location. Beginning in the 2016 regular season, out-of-market fans of clubs will also benefit from the additional choice of purchasing single-club packages through MLB.TV (alongside the currently available League-wide bundled package). Fans of baseball in general benefit from MLB's broadcast system because HTTs promote both the production of national broadcasts of games and the nationwide distribution of local broadcasts through the OMPs.

50. Today, output, as measured by the number of games broadcast and available for viewership in any one area, could not be materially increased because all games are produced and made available virtually nationwide.

51. If the current system were replaced by Plaintiffs' "but-for world"—in which HTTs do not exist—MLB, its clubs, and its fans would be severely harmed, because the game exclusivity and out-of-market content exclusivity guaranteed by the system would be erased.[2] Eliminating these exclusivities would weaken the incentives to broadcast; decrease the number of games produced for broadcast; harm clubs' ability to build fan loyalty and maintain financial viability; reduce investments by clubs in developing their local market; and limit the number and diversity of games offered through the League OMPs.

52. The number and quality of broadcasts that are available to viewers at either no cost or as part of standard cable television packages would likely decline in the but-for world. Without in-

---

[2] "Game exclusivity" refers to a club's exclusive right to license broadcasts of its games within its HTT. Game exclusivity drives the creation of local broadcasts within an HTT by ensuring that no entity will distribute telecasts of the same game within the assigned territory. "Content exclusivity" refers to an entity's exclusive right to a particular production or feed of a game, including the right to distribute that production or feed, as it sees fit, within the parameters of the rights allocated to it. Assigning exclusive intellectual property rights is common throughout sports and other live or first-run broadcasting because it allows leagues, clubs, and other entities to create, preserve, and enhance their intellectual property. The business model envisioned in the "but-for world," without these exclusivities, does not exist in mainstream sports or non-sports television.

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

market game exclusivity, some RSNs (particularly of small-market clubs) would not invest in the production and telecast of nearly as many games as they do now.  Removing game or out-of-market content exclusivity would devalue the license for broadcasts, and some clubs would be unable to license all of their games locally for telecast.  Telecasts of those games would, in turn, be unavailable for inclusion in the OMPs.

53. Few, if any, clubs would attain nationwide carriage if HTTs did not exist.  While a handful of large-market clubs may be able to license their rights in a way that results in significant geographic coverage of their games, it is unclear that even these clubs would be able to secure truly national coverage.  The remainder of clubs would likely struggle to obtain the same national coverage that they enjoy today, and most would almost certainly get little or no coverage outside of their local areas.  Even today, due to MVPD capacity constraints and lack of demand throughout an HTT, MVPDs do not carry some RSNs with MLB programming in areas in which the RSNs hold broadcast licensing rights.  For instance, in places such as Hawaii and Iowa, RSNs for in-market clubs have been unsuccessful in obtaining carriage on all local MVPDs.  This is likely to become more common in the absence of HTTs.

54. MVPDs cannot add an unlimited number of programming networks to their lineups, and based on a variety of factors—including cost, capacity limitations, and, in the case of sports, local interest in games played by a particular club—they may not carry all clubs' programming if clubs could license nationwide telecasts.  Also, MVPDs would be unlikely to carry both the OMPs and RSNs with the same out-of-market games, and may well stop carrying the OMPs.

55. In the but-for world, all relevant parties in the distribution supply chain for live-video telecasts of games would reevaluate their business models and renegotiate their agreements, which are premised on the content exclusivity created under the current HTT structure, and

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

which include provisions permitting certain parties to demand equitable adjustments to the agreement if a material change in circumstances occurs.

56. If HTTs did not exist, the clubs would be unlikely to agree to the overall video rights structures and rules that exist today.  Existing agreements between clubs to cross-license home and away game telecast rights would need to be amended if every club had the right to telecast nationally in competition with every other club.

57. If HTTs did not exist, individual clubs would also have less incentive to participate in the packages, and some may not participate.  If the full League-wide OMPs that exist today were available, they would likely be priced higher.  Because MLB is a joint venture owned by and obligated to promote the interests of the clubs, to the extent that MLB.TV is a substitute for the club's in-market broadcasts, the League does not set the price of MLB.TV to compete with its clubs.  This situation would not change in the but-for world.  Moreover, if a substantial number of the clubs began distributing and streaming their games outside of their current HTTs or nationwide, MLBAM would likely price MLB.TV to focus exclusively on the fans who want to watch multiple clubs or the entire League.  The likely result would be a higher price for the package because the more price-sensitive fans would likely self-select to the cheaper standalone offerings and leave the less price-sensitive fans to buy the package.

58. It is also likely that some of the larger market clubs would charge more than the current OMP prices if a significant number of their out-of-market fans have more intense demand and willingness to pay.  In that case, the League would likely charge an even higher price for a package, if it decided to offer a package at all.  We cannot know one way or the other because no reliable model of demand has been produced in this case.

59. It is also likely that fewer club-specific telecasts would be produced in the but-for world.

14

FILED UNDER SEAL — SUBJECT TO PROTECTIVE ORDER

If affiliated RSNs own the broadcast rights for both clubs playing in a single game, those affiliated RSNs are unlikely to produce two separate broadcast feeds for the game, but rather will produce just one feed for distribution.

60. Many clubs (particularly small-market clubs) do not have the capability to stream games over the Internet at the capacity and quality at which those games are streamed by MLB.TV.

61. Because consumers will be able to buy single-club OMPs from MLB starting in the 2016 MLB Season, Plaintiffs' proffered but-for world offers no additional consumer choice.

## XI.   Facts Specifically Relevant to Television Defendants[3]

62. Plaintiffs would receive all the relief they seek from an injunction regarding the League's broadcast licensing structure.  The Television Defendants—like many other RSNs and MVPDs that Plaintiffs have not named as defendants—simply comply with the League's territorial rules and have no legal right to telecast MLB games in a manner that violates them and have no ability to change the challenged rules.

63. The Television Defendants had no role in the creation of the challenged rules.  At the time the HTTs were created, none of the Defendant RSNs existed.

64. The Television Defendants purchase live MLB game rights ██████████████████████ ████████████████████████████████████████████████████████████████ . As a result, downstream vertical agreements licensing telecast rights to RSNs and MVPDs ████████████████████████████████████████████████████████████████ ██████████████████████████ .

---

[3]   The "Television Defendants" include Comcast Corp., Comcast SportsNet California, LLC, Comcast SportsNet Chicago, LLC, Comcast SportsNet Philadelphia, L.P., DIRECTV, LLC, DIRECTV Sports Networks, LLC, DIRECTV Sports Net Pittsburgh, LLC (a/k/a ROOT Sports Pittsburgh), DIRECTV Sports Net Rocky Mountain, LLC (a/k/a ROOT Sports Rocky Mountain), and DIRECTV Sports Net Northwest, LLC (a/k/a ROOT Sports Northwest), and Yankees Entertainment and Sports Network, LLC.

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

65. There is no horizontal conspiracy among the RSNs.  There is no direct evidence of any horizontal conspiracy.  There is no plus factor that would support any inference of a conspiracy in the absence of direct evidence.

66. It is in each RSN's unilateral self-interest to acquire the rights on the only terms on which they are offered by MLB clubs.  Each RSN's agreement to license live games to telecast only within the club's HTT is an independent response to the common structure imposed by the League.  If an RSN refuses to be bound by MLB rules, then the club will license its telecast rights to a different RSN (including the RSNs not named as defendants in this case) or vertically integrate into the RSN business.  If an RSN licenses telecast rights from a club subject to MLB rules but distributes telecasts in violation of MLB rules, then the RSN would face liability for breach of contract or copyright infringement.

67. An RSN has no motive to conspire with other RSNs.  Coordination among RSNs would not result in any different distribution of live MLB games than occurs under the current system.

68. MVPDs distribute MLB programming by virtue of carrying RSNs, national cable networks, and Extra Innings.  They cannot acquire from any of these programmers the right to telecast games contrary to the terms set by the League, because all rights to telecast MLB live games are subject to those terms.

69. The Television Defendants would have no incentive to participate in a horizontal conspiracy that would raise the costs of MLB live game telecast rights.  There is no evidence that MVPDs or RSNs stand to benefit at all from such a conspiracy, let alone that they would benefit sufficiently to make up for their increased costs.

## PROPOSED CONCLUSIONS OF LAW

1.  Plaintiffs have the burden of proving their asserted violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 2 of the Sherman Act, 15 U.S.C. § 2.

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

## I.  Plaintiffs Lack Antitrust Standing

2.  In addition to establishing Article III standing, Plaintiffs must prove they have antitrust standing:  (1) that they suffered an antitrust injury; and (2) that they are "efficient enforcers" of the antitrust laws.  *Balaklaw* v. *Lovell*, 14 F.3d 793, 797–98 & n.9 (2d Cir. 1994).  They cannot.

3.  To establish antitrust injury, Plaintiffs must show that Defendants' conduct injured Plaintiffs in a way that the antitrust laws were designed to prohibit; that is, that (1) the alleged restraint harmed competition as a whole in the relevant market; and (2) the claimed injury flows from that which makes Defendants' conduct unlawful.  *Paycom Billing Servs., Inc.* v. *Mastercard Int'l, Inc.*, 467 F.3d 283, 290 (2d Cir. 2006).

4.  Plaintiffs claim that MLB's rules prevent consumers from watching out-of-market games.  But MLB's OMPs make broadcasts of out-of-market games available to consumers.  Accordingly, as a matter of law, consumers have not been denied access to any product.  Moreover, starting with the 2016 Season, MLB will offer to consumers the option to purchase single-club packages from MLB.TV.  Even assuming that denial of the option to purchase a specific club's game programming on an a la carte basis could constitute an antitrust injury, injunctive relief is unnecessary to redress such injury.

5.  A reduction in choice as to the form or manner of obtaining access to MLB game broadcasts is not a cognizable injury to competition recognized by the antitrust laws.  *See, e.g.*, *Brantley* v. *NBC Universal, Inc.,* 675 F.3d 1192, 1202 (9th Cir. 2012); *Kingray, Inc.* v. *NBA, Inc.*, 188 F. Supp. 2d 1177, 1196 (S.D. Cal. 2002).  Accordingly, Plaintiffs have failed to show any injury to competition as a whole in any relevant market, and thus have failed to establish an antitrust injury sufficient to confer antitrust standing.

6.  Plaintiffs also are not "efficient enforcers" of the antitrust laws.  Courts look to four factors to determine if an antitrust plaintiff is an "efficient enforcer":

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

(1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.

*Gatt Commc'ns, Inc.* v. *PMS Assocs., L.L.C.*, 711 F.3d 68, 78 (2d Cir. 2013) (citations omitted).

7.   The injury the Television Class allegedly suffered is, at best, an indirect result of the challenged conduct.   If, contrary to law and fact, the HTT structure were anticompetitive, the direct injury would be felt by the Television Defendants, whose self-interest would motivate them to vindicate the public interest in antitrust enforcement, which they have not done.   *See Gatt Commc'ns*, 711 F.3d at 79.   The Television Plaintiffs' injuries are too remote and speculative to satisfy the efficient enforcer requirement.

8.   Further, both the Television Plaintiffs and Internet Plaintiffs have failed to demonstrate that, absent the challenged conduct, they would have more choice as to the form and manner of viewing MLB games, making their alleged injury highly speculative.   To obtain prospective injunctive relief, Plaintiffs "must demonstrate a 'certainly impending' future injury."   *Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012) (quotation omitted).   The only classwide antitrust injury identified by the Court was the alleged lack of a la carte channels.   Because that lack of choice no longer exists, there is no basis for any injunction.   *See, e.g.*, *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 111 (1986) (injunction under Section 16 can be issued only to prevent "injury of the type the antitrust laws were designed to prevent").

## II.   All Defendants Are Entitled to Judgment on Counts One to Three of the Second Amended Complaint (Sherman Act § 1)

9.   Section 1 prohibits contracts, combinations, and conspiracies that unreasonably suppress or destroy competition, not those that promote or merely regulate competition.   15 U.S.C. § 1; *Texaco Inc.* v. *Dagher*, 547 U.S. 1, 5 (2006); *MLB Props., Inc.* v. *Salvino*, 542 F.3d 290, 323 (2d

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

Cir. 2008) (citing *Chi. Bd. of Trade* v. *United States*, 246 U.S. 231, 238 (1918)).

10. Section 1 does not prohibit a lawful, economically integrated joint venture from imposing restrictions that relate to the core activities of the joint venture itself, such as setting the prices or terms at which the joint venture sells its products. *See Dagher*, 547 U.S at 6–8.

11. To establish a Section 1 violation, Plaintiffs must first establish a combination or some form of concerted action between at least two legally distinct economic entities. *Capital Imaging Assocs., P.C.* v. *Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993).

12. Plaintiffs must then prove that the restraint constitutes an unreasonable restraint of trade under the Rule of Reason. *See Laumann* v. *NHL*, 56 F. Supp. 3d 280, 297 (S.D.N.Y. 2014) (the "per se approach is not appropriate in the context of sports broadcasting restrictions"); *see also NCAA* v. *Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 117 (1984).

13. Under the Rule of Reason, the Court must decide, considering all of the circumstances—including, among others, the facts peculiar to the business; the challenged restraint's history, nature, and effect; and whether Defendants have market power—whether the challenged restraints are harmful to the consumer or are in the consumer's best interest in a properly defined relevant market. *Leegin Creative Leather Prods.* v. *PSKS, Inc.*, 551 U.S. 877, 885–86 (2007).

14. Under the Rule of Reason burden-shifting framework:

  a.  Plaintiffs bear an initial burden to demonstrate that the challenged restraint had an actual, substantial adverse effect on competition as a whole in the relevant market. *Salvino*, 542 F.3d at 317; *United States* v. *Visa U.S.A., Inc.*, 344 F.3d 229, 238 (2d Cir. 2003).

  b.  If Plaintiffs satisfy their initial burden, a burden of production shifts to Defendants to offer evidence of a procompetitive effect of the challenged restraint. *Salvino*, 542 F.3d at 317.

  c.  When Defendants offer such evidence, Plaintiffs have the burden to prove that the same

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

procompetitive benefits could be achieved through a less restrictive alternative. *Id.* at 317; *Virgin Atl. Airways Ltd.* v. *British Airways PLC*, 257 F.3d 256, 265 (2d Cir. 2001).

   d. Then, Plaintiffs bear the burden to prove that the procompetitive benefits of the challenged restraints are outweighed by adverse effects on competition as a whole in the relevant market. *Salvino*, 542 F.3d at 317. The Court must carefully weigh the competitive effects of the challenged restraint to determine if the effects of the challenged restraint tend to promote or destroy competition. *Id.*

15. Plaintiffs' initial burden under the Rule of Reason requires them to show an actual, adverse effect on competition as a whole in the relevant market. A market definition is required to define the boundaries of the relevant market in which competition is allegedly impaired. *Eastman Kodak Co.* v. *Image Tech. Servs., Inc.*, 504 U.S. 451, 469, 482 (1992); *City of N.Y.* v. *Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011).

16. Because baseball competes for viewers with other sports and non-sports entertainment, *see supra* Proposed Findings of Fact ("FOF") ¶¶ 25–32, the relevant market is broader than the exhibition and broadcast of MLB games, as argued by Plaintiffs. Plaintiffs have thus not shown an actual, adverse effect on competition as a whole in any relevant market, or that MLB possesses market power. Accordingly, Plaintiffs' claims fail. *See PepsiCo, Inc.* v. *Coca-Cola Co.*, 315 F.3d 101, 108 (2d Cir. 2002) (§§ 1 and 2 claims dismissed because plaintiff failed to define relevant market).

17. Plaintiffs have failed to demonstrate substantial anticompetitive effects caused by MLB's rules. Plaintiffs have not proven that MLB's broadcast licensing rules reduce output or otherwise diminish product quality. The alleged harm here—reduction in choice through the failure to market standalone RSNs—has not been proven.

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

18. Defendants have put forward legitimate, procompetitive benefits to the challenged restraint. *See* FOF ¶¶ 33–48.   These procompetitive benefits—including the explosion in output, in both the number and quality of games broadcast; the investment and innovation nurtured; the increases in competitive balance; and the reduction in transaction costs and increases in efficiencies—are substantial.

19. Plaintiffs also have failed to demonstrate that the same procompetitive effects generated by the alleged restraints could be obtained through less restrictive alternatives.

20. The legitimate, procompetitive benefits of the challenged restraint, when weighed against the evidence presented by Plaintiffs, tend to promote competition.  Plaintiffs have not proven that these procompetitive benefits could be achieved in the relevant market as effectively in a world without MLB's broadcast licensing rules.

21. Defendants are entitled to judgment on Counts One to Three.

## III.   Television Defendants Are Entitled to Judgment on Counts One to Three of the Second Amended Complaint (Sherman Act § 1) for Independent Additional Reasons

22. First, Plaintiffs' injunctive claims against the Television Defendants must be dismissed under Rule 12(h)(3) for lack of subject matter jurisdiction.  "To satisfy the Article III case or controversy requirement, a litigant must have suffered some actual injury that can be redressed by a favorable judicial decision."  *Iron Arrow Honor Soc'y* v. *Heckler*, 464 U.S. 67, 70 (1983). Claims for injunctive relief are especially susceptible to dismissal for lack of redressability.  *See, e.g.*, *Brown* v. *Fauver*, 819 F.2d 395, 400 (3d Cir. 1987) ("[A]s numerous Supreme Court decisions illustrate, a given plaintiff may have standing to sue for damages yet lack standing to seek injunctive relief.") (collecting cases).

23. An injunction changing MLB rules would grant Plaintiffs' complete relief.  In the absence of any additional relief that could be provided by Television Defendants, no cognizable case or

FILED UNDER SEAL - SUBJECT TO PROTECTIVE ORDER

controversy exists with respect to Television Defendants. *See, e.g.*, *Reaves* v. *U.S. Dep't of Justice*, 355 F. Supp. 2d 510, 515 (D.D.C. 2005) (three-judge court) (per curiam).  Because an injunction against the Television Defendants would not redress Plaintiffs' alleged injury, the injunctive claims against the Television Defendants must be dismissed.  *See, e.g.*, *McDaniel* v. *Bd. of Educ. of the City of Chi.*, 956 F. Supp. 2d 887, 893 (N.D. Ill. 2013) ("[I]f a defendant does not have the authority to carry out the injunction, a plaintiff's claims for injunctive relief must be dismissed.") (collecting cases).

24. Named Plaintiff Vincent Birbiglia stipulated to staying his claims against the DIRECTV Defendants pending arbitration, and the Court ordered Named Plaintiffs Garrett Traub and Derek Rasmussen to arbitrate their claims against the Comcast Defendants and stayed those claims pending arbitration.  The resulting absence of any active claim against DIRECTV, LLC or Comcast Corp. by one of its customers provides an independent basis for the conclusion that no Plaintiff has standing to seek injunctive relief against DIRECTV, LLC or Comcast Corp.

25. Second, the Television Defendants have done nothing that warrants liability under the Sherman Act.  Plaintiffs have not established any horizontal conspiracy among RSNs.  There is no direct evidence of any horizontal agreement among RSNs to restrain trade.  Therefore, Plaintiffs cannot establish a horizontal conspiracy among RSNs without proving the existence of "plus factors" that rule out the possibility of independent conduct.  *See In re Pub. Paper Antitrust Litig.*, 690 F.3d 51, 62 (2d Cir. 2012).

26. There is no evidence of plus factors in this case.  Plaintiffs have not proven that each RSN's decision to enter into a rights agreement "resulted from horizontal agreement" among RSNs "and not from independent business judgments" to abide by the League's rules.  *See Package Shop, Inc.* v. *Anheuser-Busch*, 675 F. Supp. 894, 905 (D.N.J. 1987).

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

27. Plaintiffs have not proven that RSNs have any "motive to collude." *Laumann*, 56 F. Supp. 3d at 305–07.  There is no evidence that the RSNs would receive any financial benefit from horizontal collusion in addition to any benefit to them of distributing live MLB games pursuant to MLB's rules.  *See, e.g.*, *Package Shop*, 675 F. Supp. 2d at 919; *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 327–28 (3d Cir. 2010); *King Drug Co. of Florence* v. *Cephalon, Inc.*, 2014 WL 2813312, at *13 (E.D. Pa. June 23, 2014).  Further, no rights agreement grants to an RSN the right to exclude any other RSN's telecasts from being distributed into the club's HTT (and other RSNs' telecasts are distributed into each HTT through the League package and, in HTTs shared by two or more clubs, by other RSNs).

28. There is also no evidence that the Television Defendants are liable for participating in any alleged horizontal conspiracy with the League or the clubs.  Plaintiffs have not shown, and cannot show, that RSNs and MVPDs participated in the decision to create the League rules.

29. Plaintiffs have not proven that the Television Defendants have any economic incentive to participate in a conspiracy that would increase their own input costs.  Plaintiffs' speculation that the cost structure of the industry is such that Television Defendants might somehow benefit despite increased input costs has no evidentiary support.  Plaintiffs' model, which attempted to predict MVPDs' output prices, was excluded as unreliable, and Plaintiffs have not otherwise attempted to analyze the effect of the alleged conspiracy on the input prices and output prices for RSNs and MVPDs, much less analyze the net effect.

30. Accordingly, Plaintiffs fail to show concerted action involving the RSN and MVPD Defendants that may be redressed by Section 1 of the Sherman Act.

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

**IV.     League Defendants Are Entitled to Judgment on Count Four of the Second Amended Complaint (Sherman Act § 2)**

31. Section 2 of the Sherman Act prohibits monopolization, attempted monopolization, and conspiracy to monopolize.  15 U.S.C. § 2.

32.  To determine whether a defendant willfully sought to maintain, or attempted to maintain, monopoly power in violation of Section 2, the Second Circuit applies the Rule of Reason test. *New York ex rel. Schneiderman* v. *Actavis PLC*, 787 F.3d 638, 651–52 (2d Cir. 2015) (citing *United States* v. *Microsoft Corp.*, 253 F.3d 34, 58–60 (D.C. Cir. 2001) (en banc)).  Under that framework, Plaintiffs must prove:

   a.  First, that MLB possessed monopoly power in the relevant market.  *Id.* at 651.  A party has monopoly power if it has the power to exclude competitors from the relevant market, and thereby profitably raise prices substantially above the competitive level for a significant period of time.  *Tops Mkts., Inc.* v. *Quality Mkts., Inc.*, 142 F.3d 90, 98 (2d Cir. 1998).

   b.  Second, that MLB willfully acquired or maintained monopoly power in the relevant market through anticompetitive conduct, and not from growth or development as a consequence of a superior product, business acumen, or historic accident.  *Actavis*, 787 F.3d at 651.

   c.  Third, if Plaintiffs prove that MLB has monopoly power and its conduct is anticompetitive or exclusionary, and if MLB then offers procompetitive justifications for its conduct, then the burden shifts to Plaintiffs to prove that the procompetitive benefits are pretextual or that the anticompetitive harm outweighs the procompetitive benefits.  *Id.* at 652.

33.  MLB does not possess monopoly power over any relevant market.  Plaintiffs also failed to prove that any market power obtained by MLB was willfully acquired or maintained.  In particular, Plaintiffs have not proven that Defendants engaged in unlawful conduct that lacked a business justification or that, on balance, harmed competition in any cognizable relevant market.

~~FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER~~

Defendants have offered numerous legitimate procompetitive justifications for MLB's rules. *See* FOF ¶¶ 33–48. Plaintiffs have failed to rebut those justifications, and have further failed to prove that any anticompetitive harm outweighs Defendants' articulated procompetitive justifications.

34.   To demonstrate a conspiracy to monopolize, Plaintiffs must prove that two or more Defendants (i) engaged in concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly; (ii) committed an overt act in furtherance of the conspiracy; and (iii) had the specific intent to monopolize. *Discover Fin. Servs.* v. *Visa U.S.A. Inc.*, 598 F. Supp. 2d 394, 405 (S.D.N.Y. 2008) (quoting *Elecs. Commc'ns Corp.* v. *Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 246 (2d Cir. 1997)). Plaintiffs have not proven these elements.

35.   Defendants are entitled to judgment on Count Four.

### V.      The Baseball Exemption Bars Plaintiffs' Claims

36.   The business of baseball is not subject to antitrust regulation. *Fed. Baseball Club of Balt.* v. *Nat'l League of Prof'l Baseball Clubs*, 259 U.S. 200, 208–09 (1922).

37.   This exemption, a matter of *stare decisis*, can be narrowed only by Congress. *See Flood* v. *Kuhn*, 407 U.S. 258, 282–83 (1972); *City of San Jose* v. *Office of the Comm'r of Baseball*, 776 F.3d 686, 690 (9th Cir. 2015).

38.   Issues of league structure, including territorial restrictions on the exhibition of games to live and broadcast audiences, are exempt from antitrust scrutiny. *See Toolson* v. *N.Y. Yankees, Inc.*, 346 U.S. 356, 357 (1953); *City of San Jose*, 776 F.3d at 690.

39.   Accordingly, the longstanding baseball antitrust exemption bars Plaintiffs' claims, and the claims should be dismissed under Federal Rule of Civil Procedure 12(h)(3).

FILED UNDER SEAL – SUBJECT TO PROTECTIVE ORDER

Dated:  December 18, 2015                    Respectfully submitted,


/s/ Beth A. Wilkinson                              /s/ Tammy A. Tsoumas
Beth A. Wilkinson                                   Tammy A. Tsoumas
Alexandra M. Walsh                                Melissa D. Ingalls
**PAUL, WEISS, RIFKIND,**                    **KIRKLAND & ELLIS LLP**
**WHARTON & GARRISON LLP**            333 South Hope Street
2001 K Street, N.W.                               Los Angeles, California  90071
Washington, DC 20006                          Telephone: (213) 680-8400
Telephone:  (202) 223-7300                  Facsimile: (213) 680-8500
Facsimile:  (202) 223-7420                   tammy.tsoumas@kirkland.com
bwilkinson@paulweiss.com                   melissa.ingalls@kirkland.com
awalsh@paulweiss.com

                                                        *Attorneys for Defendants DIRECTV, LLC,*
Daniel J. Toal                                       *DIRECTV Sports Networks, LLC, DIRECTV*
**PAUL, WEISS, RIFKIND,**                    *Sports Net Pittsburgh, LLC (a/k/a Root Sports*
**WHARTON & GARRISON LLP**            *Pittsburgh), DIRECTV Sports Net Rocky*
1285 Avenue of the Americas               *Mountain, LLC (a/k/a Root Sports Rocky*
New York, New York 10019                   *Mountain) and DIRECTV Sports Net*
Telephone:  (212) 373-3000                  *Northwest, LLC (a/k/a Root Sports Northwest)*
Facsimile:  (212) 757-3990
dtoal@paulweiss.com

*Attorneys for Defendants Office of the*
*Commissioner of Baseball, Major League*
*Baseball Enterprises Inc., MLB Advanced*
*Media L.P., MLB Advanced Media, Inc.,*
*Athletics Investment Group, LLC, the Baseball*
*Club of Seattle, L.P., Chicago Cubs Baseball*
*Club, LLC, Chicago White Sox, Ltd., Colorado*
*Rockies Baseball Club, Ltd., The Phillies, L.P.,*
*Pittsburgh Baseball, Inc., and San Francisco*
*Baseball Associates, L.P.*




*Additional Counsel Signatures*
*on Following Page*

~~FILED UNDER SEAL~~ – SUBJECT TO PROTECTIVE ORDER

/s/ Arthur J. Burke
Arthur J. Burke
David B. Toscano
**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, New York  10017
Telephone:  (212) 450-4000
Facsimile:  (212) 701-5800
arthur.burke@davispolk.com
david.toscano@davispolk.com

*Attorneys for Defendants Comcast*
*Corporation, Comcast SportsNet Philadelphia,*
*L.P., Comcast SportsNet California, LLC, and*
*Comcast SportsNet Chicago, LLC*

/s/ Jonathan D. Schiller
Jonathan D. Schiller
Alan B. Vickery
Christopher E. Duffy
**BOIES, SCHILLER & FLEXNER LLP**
575 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-2300
Facsimile:  (212) 446-2350
CDuffy@bsfllp.com

*Attorneys for Defendant New York Yankees*
*Partnership*

/s/ John Schmidtlein
John Schmidtlein
William Vigen
Joelle Perry
**WILLIAMS & CONNOLLY LLP**
725 Twelfth St., N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
jschmidtlein@wc.com
wvigen@wc.com
jperry@wc.com

*Attorneys for Defendant Yankees*
*Entertainment and Sports Network, LLC*