**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| FERNANDA GARBER, et al., | No. 12-cv-03704 (SAS) |
| Plaintiffs, | |
| v. | ECF CASE |
| OFFICE OF THE COMMISSIONER OF BASEBALL, et al., | |
| Defendants. | |

**<u>PLAINTIFFS' PRETRIAL MEMORANDUM OF LAW</u>**

**TABLE OF CONTENTS**

Introduction................................................................................................................. 1

Background ................................................................................................................. 3

Discussion .................................................................................................................. 5

I.      All Defendants Have Violated Section One of the Sherman Act ....................... 5

        A.      The Territorial Restraints Suppress Competition...................................... 6

        B.      Defendants' Asserted Procompetitive Justifications Fail........................ 14

        C.      The Television Defendants Participate in and Require the Restraints ................. 22

II.     The League Defendants Have Violated Section Two of the Sherman Act...................... 24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Needle, Inc. v. Nat'l Football League,*
    560 U.S. 183 (2010)................................................................................6, 21

*Anderson News, L.L.C. v. Am. Media, Inc.,*
    680 F.3d 162 (2d Cir. 2012).....................................................................5

*Bank of China, N.Y. Branch v. NBM LLC,*
    359 F.3d 171 (2d Cir. 2004).....................................................................2

*Bd. of Regents of Univ. of Okla. v. Nat'l Collegiate Athletic Ass'n,*
    546 F. Supp. 1276 (W.D. Okla. 1982) ....................................................24

*Bd. of Trade of Chi. v. United States,*
    246 U.S. 231 (1918)................................................................................6

*Broad. Music, Inc. v. CBS, Inc.,*
    441 U.S. 1 (1979)...................................................................................22

*FTC v. Ind. Fed'n of Dentists,*
    476 U.S. 447 (1986)................................................................................8

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n,*
    744 F. 2d 588 (7th Cir. 1984) .................................................................5

*Geneva Pharm. Tech. Corp. v. Barr Labs Inc.,*
    386 F.3d 485 (2d Cir. 2004).....................................................................6, 14

*Laumann v. Nat'l Hockey League,*
    56 F. Supp. 3d 280, 299 (S.D.N.Y. 2014)...................................... *passim*

*Laumann v. Nat'l Hockey League,*
    907 F. Supp. 2d 465 (S.D.N.Y. 2012)......................................10, 23, 24

*Laumann v. Nat'l Hockey League,*
    No. 12-cv-1817 (SAS), 2015 WL 2330107 (S.D.N.Y. May 14, 2015) ............................1, 3, 7

*Law v. Nat'l Collegiate Athletic Ass'n,*
    134 F.3d 1010 (10th Cir. 1998) ..............................................................6, 7

*Major League Baseball Props., Inc. v. Salvino, Inc.,*
    542 F.3d 290 (2d Cir. 2008).....................................................................21, 22

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents,*
    468 U.S. 85 (1984)...................................................................... *passim*

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
    435 U.S. 679 (1978)..................................................................................1, 7, 18

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
    802 F.3d 1049 (9th Cir. 2015) .........................................................................2

*Polygram Holding, Inc. v. FTC*,
    416 F.3d 29 (D.C. Cir. 2005).........................................................................22

*United States v. Apple*,
    791 F.3d 290 (2015)......................................................................................18

*United States v. National Football League*,
    116 F. Supp. 319 (E.D. Pa. 1953) ..............................................................8, 10

*United States v. Topco Assocs., Inc.*,
    405 U.S. 596 (1972)....................................................................................1, 5

*White Motor Co. v. United States*,
    372 U.S. 253 (1963).......................................................................................1

**STATUTES**

15 U.S.C. § 1...............................................................................................10, 22

**OTHER AUTHORITIES**

Brief for Resp'ts, *Flood v. Kuhn*,
    407 U.S. 258 (1972), 1972 WL 125826........................................................20

Fed. R. of Evid. 701 ........................................................................................2

## INTRODUCTION

This case concerns an undisputed horizontal market allocation. There is no dispute that the Defendants have collectively entered into agreements to allocate markets to teams and regional sports networks ("RSNs"). Nor is there a dispute that such agreements would be *per se* unlawful under the Sherman Act if they did not involve sports. The Supreme Court "has reiterated time and time again that '[h]orizontal territorial limitations … are naked restraints of trade with no purpose except stifling of competition.'" *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 615 (1972) (quoting *White Motor Co. v. United States*, 372 U.S. 253, 263 (1963)). Because this case involves sports, the Defendants have the opportunity—and burden—to show that the restraints have a procompetitive justification. "There can be no question, however, that territorial exclusivity *is* anticompetitive—it reflects an explicit agreement among competitors, purposely designed to prevent competition. The question is whether, by doing so, territorial exclusivity enhances consumer welfare overall." *Laumann v. Nat'l Hockey League*, No. 12-cv-1817 (SAS), 2015 WL 2330107, at *2 (S.D.N.Y. May 14, 2015) ("Class Op.").

As the Supreme Court has emphasized, explicit restraints on output in sports broadcasting markets "place upon [Defendants] a heavy burden of establishing an affirmative defense which competitively justifies this apparent deviation from the operations of a free market." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*, 468 U.S. 85, 113 (1984) ("*NCAA*"). All of Defendants' defenses fall far short of meeting this "heavy burden," or any other standard.

Many of Defendants' supposed benefits can be rejected immediately because they have already been found not to be cognizable defenses under the antitrust laws by this Court and the Supreme Court. The Defendants assert that the territorial restrictions promote increased investment in baseball broadcasting. But as this Court already explained, Defendants' theory is that "the incentive for added investment is inflated profit stemming from limited competition. '[T]he Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable.'" *Laumann v. Nat'l Hockey League*, 56 F. Supp. 3d 280, 299 (S.D.N.Y. 2014) ("SJ Op.") (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695-96 (1978)).

1

Similarly, Defendants suggest that the territories may be justified by the protection of ticket sales in local markets. But the Supreme Court rejected precisely the same argument in *NCAA* as inconsistent with the antitrust laws. 468 U.S. at 116-17.

On other defenses, such as competitive balance, the Defendants have made no attempt to meet their "heavy burden." The league's economic expert for the merits, Professor Kevin Murphy, submitted a 78-page report that barely touches on competitive balance or any other potentially cognizable benefits of the territorial restraints. Neither Professor Murphy nor any of Defendants' four other economic experts have ever disputed that economic research has consistently found that "the pooled sale of television rights by a league either has no effect on competitive balance or makes matters worse." PX 201 ("Noll Decl.") at 119. Nor have they attempted to connect any hypothetical improvement of competitive balance to consumer demand, even though the Supreme Court has emphasized that competitive balance is only relevant to the extent it "maximize[s] consumer demand for the product." *NCAA*, 468 U.S. at 120; *see also O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1073 (9th Cir. 2015). Indeed, none of Defendants' experts have conducted any formal economic analysis to establish *any* of the procompetitive justifications they propose.

Instead of providing any pertinent economic analysis, Defendants rely entirely on their own executives' self-serving speculation about what the economic consequences of eliminating the horizontal agreement might be. Their assertions are not based on any investigation or analysis of the issue. Defendants have repeatedly conceded that they have never conducted any market analysis, economic analysis, or any other form of remotely rigorous investigation of the necessity or effects of the restraints. If their conclusions were as obviously true as they present them to be, then surely they could have found an economist to actually analyze the issues and support their self-serving speculation.[1]

---

[1] These assertions are, in any event, inadmissible lay opinions under Federal Rule of Evidence 701. *See Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 182 (2d Cir. 2004).

The only analysis that any of Defendants' experts has conducted that bears on these effects is flatly inconsistent with Defendants' claims. Professor Murphy's theory of the market is that broadcasts of different baseball games are *not* competitive substitutes for each other—a conclusion that is as inconsistent with Defendants' position in this case as it is with common sense. Simply put, if Professor Murphy's market analysis were correct, then there would be no rational purpose for the territorial restraints (lawful or unlawful), and none of Defendants' purported procompetitive effects would be possible.

## BACKGROUND

The parties have stipulated to the essential conduct at issue. The League Defendants agreed in the early 1980s to divide the country into geographic territories, so that only one or a handful of teams could distribute their games in any given area. PFF ¶¶ 17-30. That agreement is reflected today in contracts with the RSNs, which pay for the right to be free from competition from other RSNs, and with the MVPDs, which contractually require the League to continue the restraints. PFF ¶¶ 36, 38-39, 45. "Defendants do not dispute the existence of territorial exclusivity in the actual world; nor do they dispute that territorial exclusivity is the product of deliberate cooperation among actors in the supply chain. Rather, the core dispute in this case— on the merits—is whether the procompetitive benefits of territorial exclusivity outstrip its anticompetitive effects, once all of its economic effects are taken into account." *Class Op.*, 2015 WL 2330107, at *2.

Nor is there any dispute that the purpose of these restraints is to increase the "value" of broadcasting by restricting output in order to increase prices. The territorial agreement was created to avoid "dilution" of telecasts, with MLB's Executive Council worried about the "risk … of having too much baseball on television." PFF ¶ 17; PX7-9. The same concerns hold today. Commissioner Manfred testified that "RSNs pay a higher fee than they would if they didn't have exclusivity." Manfred Dep. 61:4-11. The owner of both the Boston Red Sox and its RSN testified that "[i]t's important for the clubs … [n]ot to compete with other clubs or with the—with baseball itself in your home television territory. Exclusivity is worth a lot to

3

broadcasters and, therefore, to clubs." Henry Dep. 63:16-64:1. Nor is there a dispute that interclub competition would exist if the restraints were removed. Former Commissioner Allan Selig contended that such competition would be "devastating." Selig Decl. ¶ 44, May 27, 2014, ECF No. 284. Defendants' core defense, in other words, is not that the prices consumers pay for in-market telecasts would not decrease—but that they would decrease so much that they would cause a loss of investment and output.[2]

There is no documentary evidence or economic analysis to support the claim that the restraints increase output or investment. The economics of sports broadcasting show that Defendants would offer their telecasts even if prices dropped precipitously, as Plaintiffs have previously discussed at length. *See* Pls.' Mem. of Law in Opp. to Mot. for Summ. J. ("SJ Mem.") at 16-25, June 12, 2014, ECF No. 301. The cost of producing the telecasts is low compared to the revenue they can attract, and distributing games over satellite, digital cable, and the Internet nationwide is nearly costless once the telecasts are available. PFF ¶¶ 62-63 & 68-70. Indeed, nearly every RSN broadcasting MLB games *already* distributes its content nationwide, but geographically blacks out telecasts of the games themselves; they thus distribute a less attractive product at a higher cost, making it implausible that they would cease distribution once they could offer their full channel. PFF ¶ 62. It would continue to be economical to produce telecasts (albeit with lower rights fees paid) under any plausible set of assumptions, as is confirmed by the breadth and quantity of sports that are produced now (including Minor League Baseball, which is not nearly as popular as MLB and has no territorial restraints on most broadcasts). *See, e.g.*, Noll

---

[2] In fact, Defendants have made the remarkable argument that artificially inflated prices are a *justification* under the Rule of Reason: "Nor is it a concern under the antitrust laws that exclusive broadcast territories may allow teams to obtain higher rights fees than they might otherwise. On the contrary, being able to sell exclusive broadcast rights is *procompetitive* as these rights encourage the original investment and ongoing local marketing of the teams." Mem. of Law in Supp. of NHL Defendants' Mot. for Summ. J. at 11, May 27, 2014, ECF No. 232 (No. 12-cv-1817) (incorporated by reference in Mem. of Law in Supp. of MLB Defendants' Mot. for Summ. J. ("MLB SJ Mem.") at 15 n.31, May 27, 2014, ECF No. 282).

Decl. at 97-98; Bowman Dep. 61:4-62:5.[3] Sports without territorial restraints, such as college football and basketball, are widely available.[4] Noll Decl. at 110. Moreover, the promotional value of broadcasting would give teams an incentive to offer their rights even if their value dropped to zero. PFF ¶ 67.

Defendants have produced no analysis to rebut this. Instead, they have offered vague speculation about "procompetitive justifications" together with an economic expert report that not only does not support that speculation, but is fundamentally inconsistent with it.

## DISCUSSION

### I.    All Defendants Have Violated Section One of the Sherman Act

The exclusive territorial system is a classic, horizontal division of the market, and would be a *per se* violation of the antitrust laws if it did not involve sports. *Topco*, 405 U.S. at 608; *see also Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012). As Judge Posner has explained:

> One way the firm can free itself from competition is by agreeing with sellers of the same product that they will not enter each other's markets; such an agreement will create a series of regional or local (sometimes, as in *Timken*, national) monopolies. An agreement on output also equates to a price-fixing agreement. If firms raise price, the market's demand for their product will fall, so the amount supplied will fall too—in other words, output will be restricted. If instead the firms restrict output directly, price will as mentioned rise in order to limit demand to the reduced supply. Thus, with exceptions not relevant here, raising price, reducing output, and dividing markets have the same anticompetitive effects.

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F. 2d 588, 594-95 (7th Cir. 1984).

Sports leagues' horizontal agreements are often exempt from *per se* condemnation

---

[3] The cost of producing a baseball telecast is so low that in the rare instances where neither team's RSN is televising a game, MLBAM finds it worthwhile to create its own telecast for MLB.tv—even though these telecasts are solely for fans outside of the markets of the two teams involved in the game who subscribe to MLB.tv, a potential audience that is a tiny fraction of the potential audience for a typical game available on the local RSNs. PFF ¶ 70.

[4] When the NCAA's broadcasting restraints were found to violate the antitrust laws, broadcasts multiplied and advertising costs plummeted. Pls.' Mem. of Law in Opp. to Mot. for Summ. J. ("SJ Mem.") at 38-39, June 12, 2014, ECF No. 301; PX201 ("Noll Supp.") at 22-23.

because joint activity is required for "the product [] to be available at all." *NCAA*, 468 U.S. at 101; *SJ Op.*, 56 F. Supp. 3d at 297. Instead, courts apply the rule of reason to determine "whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 203 n.10 (2010) (quoting *Bd. of Trade of Chi. v. United States*, 246 U.S. 231, 238 (1918)).

Under the rule-of-reason framework, the plaintiffs bear the initial burden of showing that the challenged restraints have an effect on competition. "If the plaintiffs satisfy their initial burden, the burden shifts to the defendants to offer evidence of the pro-competitive effects of their agreement." *Geneva Pharm. Tech. Corp. v. Barr Labs Inc.*, 386 F.3d 485, 507 (2d Cir. 2004). Where, as here, defendants have imposed naked horizontal restraints on output that purposely suppress competition, they bear "a *heavy burden* of establishing an affirmative defense which competitively justifies this apparent deviation from the operations of a free market." *NCAA*, 468 U.S. at 113 (emphasis added). If defendants prove legitimate procompetitive benefits, "the burden shifts back to the plaintiffs to prove that any legitimate competitive benefits offered by defendants could have been achieved through less restrictive means." *Geneva Pharm.*, 386 F.3d at 507. If any legitimate benefits cannot be achieved without the restraints, the court then must weigh "the competitive effects of the agreement—both pro and con—to determine if the effects of the challenged restraint tend to promote or destroy competition." *Id.*

## A.     The Territorial Restraints Suppress Competition

The initial burden of establishing harm to competition can be met one of three ways: (1) establishing an explicit restraint on output; (2) establishing anticompetitive effects through direct evidence; or (3) showing that the defendants possess market power in a defined market. *See, e.g.*, *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1019 (10th Cir. 1998). Plaintiffs have made all three showings.

### i.     The Defendants' Agreements Expressly Restrain Trade

Plaintiffs have necessarily met their initial burden because the restraints are naked

restrictions on output. As the Supreme Court emphasized in *NCAA*, "when there is an agreement not to compete in terms of price or output, 'no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement.'" *NCAA*, 468 U.S. at 109 (quoting *Prof'l Eng'rs*, 435 U.S. at 692). It could not be clearer that the restraints here are express agreements "not to compete in terms of price or output," as the Court has already held: "There can be no question … that territorial exclusivity *is* anticompetitive—it reflects an explicit agreement among competitors, purposely designed to prevent competition." *Class Op.*, 2015 WL 2330107, at *2; *see also SJ Op.*, 56 F. Supp. 3d at 298. ("The clubs in each League have entered an express agreement to limit competition between the clubs—and their broadcaster affiliates— based on geographic territories."). Such a restraint "reduc[es] the importance of consumer preference in setting price and output," an effect that "is not consistent with th[e] fundamental goal of antitrust law." *NCAA*, 468 U.S. at 107.

It is no accident that this "quick look" rule was articulated in *NCAA*, which also involved restraints in sports broadcasting. *Cf. Law*, 134 F.3d at 1019-21 (applying quick look and upholding summary judgment that the *NCAA*'s rules on coach compensation were anticompetitive as a matter of law). The territorial scheme here, like the restraints in *NCAA*, is of a type that has long been understood to have no redeeming effects and therefore ordinarily warrants *per se* condemnation. Sports leagues are granted an exception to the *per se* rule not because they are immune from the basic principles of economics, or because there is some special need to establish market definition and market power. Rather, sports leagues are not typically subject to *per se* rules because a certain amount of joint activity, such as agreeing on the rules of the game, is required for the underlying products—the games themselves—to exist. *NCAA*, 468 U.S. at 101.

Sports leagues are thus often afforded an opportunity that other defendants are not—to provide a procompetitive justification for otherwise facially anticompetitive conduct. Still, "these hallmarks of anticompetitive behavior place upon [defendants] a heavy burden of establishing an affirmative defense which competitively justifies this apparent deviation from the operations of a

free market." *NCAA*, 468 U.S. at 113. This is especially true in this case. Far less restrictive territorial restraints on sports telecasts have previously been condemned as unlawful, because they have no purpose other than "to enable the clubs in the home territories to sell monopoly rights to purchasers of television rights," *United States v. National Football League*, 116 F. Supp. 319, 326 (E.D. Pa. 1953) (footnote omitted), a holding that was cited by the Supreme Court in *NCAA* itself, 468 U.S. at 104 n.28.

### ii.   Direct Evidence Shows Defendants' Agreements Harm Competition

The record also provides ample direct evidence of harm to competition. "[T]he finding of actual, sustained adverse effects on competition … is legally sufficient to support a finding that the challenged restraint was unreasonable even in the absence of elaborate market analysis." *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 461 (1986). There is no dispute that the purpose of the restraints is to increase prices by preventing competitors from competing with each other. Nor is there any dispute that the restraints have been effective. Teams have been prevented from distributing games wherever they would like, which has increased prices and limited choice. Or, in Defendants' words, the teams and their broadcast partners have been protected from "invasion" by others in order to increase the "value" of broadcasting in those territories, protecting would-be competitors from the "harm" resulting from increased consumer choice. Manfred Dep. 52:10-15, 56:8-20, 79:2-13.[5]

---

[5] Defendants suggest that—despite all of this admitted, intentional damage to competition— Plaintiffs cannot show harm because they lack a model of pricing of the league-wide packages. But Defendants' position rests on the assumption that out-of-market games *would* otherwise be available in a competitive market, and at lower, competitive prices, regardless of the price or availability of the bundles. The disagreement, in other words, is not about whether out-of-market broadcasts *generally* would be available for lower prices, it is about whether the particular product that is currently sold would be more or less expensive. That question was important when Plaintiffs were seeking to establish damages in the form of an overcharge for that particular product, but it is of only peripheral importance to the rule-of-reason analysis. As this Court previously noted, "Even the complete disappearance of OOM packages would not necessarily cause consumer harm if the same content could be distributed in another form (such as by RSNs nationwide). The OOMs are simply one form of delivering the content to consumers—a form made necessary by the territorial rules themselves." 56 F. Supp. 3d at 301.

Moreover, there is no dispute that the out-of-market packages, MLB.tv and MLB Extra Innings, are expressly designed and monopoly priced to avoid presenting real competition to the clubs' in-market broadcasts. MLB's senior vice president of broadcasting wrote, "We limit our pkg offering to maintain a high price point and restrict the number of subs[cribers]." PFF ¶ 84. The head of MLBAM declared that the league offers MLB.tv in a way that avoids "cannibalizing MLB's local and national video distribution framework," Bowman Decl. ¶ 7, Nov. 12, 2014, ECF No. 360-9, and prices it for their "most avid baseball fans." Bowman Dep. 92:16-18. In other words, the packages are priced at a monopolistic level to avoid creating the competition that the territories prevent. Commissioner Manfred confirmed, for example, that the Yankees' games on the packages are not as harmful to Tampa Bay as the same games would be on the YES Network in Tampa because only a relatively small number of fans purchase the package and a larger number would watch if the Yankees or YES were selling and pricing the telecasts. Manfred Dep. 86:19-87:13. Plaintiffs do not need a formal economic model addressing the but-for price in order to show that out-of-market telecasts are sold at supracompetitive prices, because—by their own admission—Defendants' system depends on it.

The restraints also limit consumer choice by making hundreds of telecasts unavailable to each class member and all other consumers. PFF ¶¶ 76-78; Noll Rebuttal at 49. In each HTT, an in-market team's games can only be seen through the in-market team's telecast; the opponent's telecast is not available by any means, at any price, unless the two teams' territories overlap in that consumer's area. As Defendants have acknowledged, "[t]here is a huge difference, as a fan," between home and away team telecasts, PFF ¶ 79.  The suppression of these telecasts is a substantial harm to consumer welfare.

### iii.    The Defendants Have Market Power in the Relevant Market

Finally, while not necessary here, Plaintiffs' burden can also be met by showing that Defendants have market power in a defined relevant market. "It is well established that 'there are peculiar and unique characteristics that set major league men's … baseball apart from other sports or leisure activities, … that close substitutes do not exist' and that the Leagues possess

9

monopolies of their respective sports." *Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 491-92 (S.D.N.Y. 2012) ("*MTD Op.*") (footnotes and alterations omitted). The law has consistently recognized what is a matter of common sense: leagues and their broadcast partners possess market power in the market for their sport's telecasts. *See id.* at 491 n.153 (collecting cases). As the Supreme Court has explained, not only courts, but Congress has recognized that league-wide agreements to sell television rights in a cooperative fashion—including, specifically, agreements to impose territorial restraints to protect teams' local markets—reduce competition and could thus "run afoul of the Sherman Act." *NCAA*, 468 U.S. at 104 n.28.[6] Professor Noll, drawing on decades of economic research into this issue, has further shown that live MLB telecasts are a relevant market, with geographic submarkets artificially drawn by the territorial restraint. Noll Decl. at 32-58.

In an attempt to upend this well-settled understanding, Professor Murphy has presented the remarkable position that telecasts of MLB games do *not* compete with other MLB games, but *do* compete with other sports and, apparently, everything else on television. He arrives at this result based on a simple, but irrelevant, analysis: when subscribers to DirecTV MLB Extra Innings are not watching their favorite team, they usually watch something besides baseball. This has nothing to do with market definition, as Professors Elhauge and Noll both point out. Indeed, Professor Murphy's methodology has been explicitly rejected by economists and the Horizontal Merger Guidelines. *See* PX82 §§ 4, 4.1.1, 4.1.2; PX205 ("Elhauge Rep.") ¶¶ 42-56.[7] The relevant question for market definition cannot be answered simply by looking at which other

---

[6] "The legislative history of [the Sports Broadcasting Act of 1961] demonstrates Congress' … awareness of the decision in *United States v. National Football League*, 116 F. Supp. 319 (E.D. Pa. 1953), which held that an agreement among the teams of the National Football League that each team would not permit stations to telecast its games within 75 miles of the home city of another team on a day when that team was not playing at home and was televising its game by use of a station within 75 miles of its home city, violated § 1 of the Sherman Act." *NCAA*, 468 U.S. at 104 n.28.

[7] Professor Murphy's analysis is tantamount to saying that ice cream cannot be a relevant market if some people whose favorite ice cream flavor is chocolate would be more likely to eat something else instead of having vanilla ice cream when chocolate is unavailable. This approach to market definition is universally rejected. Elhauge Rep. ¶ 45.

products purchasers select, especially when the comparison is between a narrow category (baseball programming) and a broader category (everything else on television). Elhauge Rep. ¶ 56. At a certain level, *all* products are substitutes. Someone who declines to purchase an out-of-market package, for example, thereby has more money to spend on everything else. Some people might spend more money on coffee, but that would not mean that coffee is in the same market. Some might spend more time reading, but that would not mean that books are in the same market. The question is whether substitutes are sufficiently close that a monopolist could maintain a small but significant, non-transitory increase in price ("SSNIP") over the competitive price. PX82 § 4.1.2; Noll Decl. at 26-27. If other products do not constrain the prices of the products at issue to a competitive level, then they are not in the same market.

The distinction between "generally competitive" and competitive in a way that constrains price is illustrated by the testimony of Robert Bowman, the head of MLBAM, who acknowledged that the pricing of MLB.tv is not constrained by similar products from other sports leagues. Referring to these products, he stated, "We look at all of it, but while we're competitive in a broad sense for time, we set our price talking to our most avid baseball fans." Bowman Dep. 92:16-18; Noll Decl. at 50-51. He admitted that Defendants have never changed the price of the package in response to other leagues' pricing decisions. PFF ¶¶ 91-92.

Moreover, even if MLB pricing were constrained by other sports and entertainment options, the question is not whether these other products compete at *current* pricing and output levels, but whether they constrain pricing at the *competitive* level. "[T]he existence of significant substitution in the event of *further* price increases or even at the *current* price does not tell us whether the defendant *already* exercises significant market power." Elhauge Rep. ¶ 51 (quoting Areeda & Kaplow, Antitrust Analysis ¶ 342(c) (4th ed. 1998)). The issue, in other words, is not whether Defendants "compete" with other sports and entertainment products at current price and output levels—it is whether prices are higher and output lower than they would be in the absence of the restraints. Once prices and output have been affected by monopoly power, the fact that the products face competition from other products is irrelevant, and there is no question here that the

rules have affected price and output. Nor, as noted, is there any evidence that the "competition" faced by MLB programming constrains market power.

More fundamentally, this argument is inconsistent with the reasons for the territories' existence, as well as every one of Defendants' asserted procompetitive justifications. The very purpose of horizontal market division is to increase market power by protecting would-be competitors from competition. It only makes sense when that protection from competition increases its profitability, which is possible only when increased in-market profitability outweighs the loss of sales to out-of-market consumers. That is only possible with increased market power, and increasing market power implies that the would-be competing products are in the same relevant market and that there are not sufficient other competing products to restrain pricing to a competitive level.[8] PX204 ("Noll Rebuttal") at 40-41; Noll Decl. at 48. That is precisely why horizontal market division is ordinarily treated as a *per se* violation under the Sherman Act.

The contention that Defendants lack market power is entirely inconsistent with their affirmative defenses. Take Defendants' argument that teams generally need to be protected from "invasion" by other teams. As one owner put it, "we spent seven years trying to protect our home television territories …. So the last thing we would be doing is trying to invade someone else's home television territory." Henry Dep. 232:4-8. *See also, e.g.*, Manfred Dep. 52:15-21. The "invading" teams could not undermine anyone's market if their games were not closer substitutes for that team's games than the hundreds of other shows already on television. The availability of

---

[8] This can be seen by looking at two teams, say the Cleveland Indians and Cincinnati Reds. Suppose half of the fans in Ohio prefer each team, but some of each team's fans are located in the other team's part of the state. If they divide the Ohio market, then they lose access to their fans in the other half of the state, but each becomes the only supplier of games to all fans in its own territory. If baseball fans never watch games not involving their favorite team, then all that the teams have done is given up access to potential customers in the foreclosed market without gaining anything in the protected market. For it to make any sense, it must be that each team gains a benefit from being the monopoly provider of baseball telecasts in its city. There must be enough benefit to the Reds in thwarting consumer preference for the Indians to make up for the loss of access to Reds fans in the Cleveland area. This necessarily implies that protection from competition in their markets allows them to assert greater market power and raise prices.

other teams' games in a market could have no effect on competitive balance if different baseball games were not competitive substitutes, for the same reason.[9]

Similarly, if different baseball games are not competitive substitutes, then the national networks would have no reason to pay for exclusivity or prevent the RSNs from expanding their reach. Under Professor Murphy's purported market definition, the other games would have no greater competitive effect on the network broadcasts than other television shows. But the Defendants have long argued that preventing other games from competing with national broadcasts is fundamental.[10] There is no dispute that networks pay more for exclusivity with respect to other games. PFF ¶ 38.[11] None of this would make any sense if different baseball games were not close competitive substitutes.

Nor is this position consistent with Defendants' unsupported claims that games would cease to be broadcast in the absence of the restraints. If another baseball game on television is no more of a competitive substitute than other shows that are already on television, then bringing in another game could not diminish the local RSN's incentives to create or invest in the programming. An RSN, in other words, would be indifferent as to whether another channel showed a different baseball game or something else. Indeed, under Professor Murphy's analysis,

---

[9] Indeed, Professor Murphy himself recognizes the inconsistency, which is addressed in a puzzling footnote: "HTTs' role in promoting competitive balance … holds irrespective of my finding that substitution between games involving fans' favorite teams and other teams is not large relative to substitution between fans' favorite teams and other programming." PX206 ("Murphy Rep.") ¶ 84 n.88. The reason for this, he contends, is that other games *are* competitive substitutes "where teams do not have strong fan bases." *Id.* This *ad hoc* distinction is utterly unexplained and unsupported, but it lays bare the inconsistency between his position and the claim that the territories are necessary to promote competitive balance.

[10] *See, e.g.*, MLB SJ Mem. at 7 n.6 ("FOX and ESPN have confirmed under oath that allowing clubs individually to license games for national telecast would fundamentally undermine the value of their licenses from MLB and materially alter their financial and business assessment of their relationship with MLB, potentially leading to termination of the national licenses.").

[11] Professor Murphy himself touts the importance of protecting national broadcasts from competition from other games, despite arguing that different games are not competitive substitutes. "Historical evidence indicates that networks' incentives to produce national broadcasts are affected by the allocation of broadcast rights and the assurance they have as to whether and which *other games* could be broadcast at the same time as they broadcast nationally." Murphy Rep. ¶ 171 (emphasis added).

it should *prefer* other baseball games to be shown instead of other programming, since he argues that *other* programming is *more* of a substitute than other baseball games. Yet Defendants have repeatedly argued that a core reason for restraining other baseball games from being broadcast in an area is to encourage RSN investment—an incentive that could only come from the increased availability of profits made possible by increased market power.

In sum, Professor Murphy's market analysis is implausible on its face, unsupported by any relevant economic analysis, and inconsistent with Defendants' entire theory of the case.

### B.    Defendants' Asserted Procompetitive Justifications Fail

Defendants bear the "heavy burden" of justifying the territorial allocation of markets that so plainly and openly suppress competition by limiting the teams' output—all for the acknowledged purpose of increasing the "value" of RSN and national broadcasting. On any standard, Defendants cannot meet their burden on any of their purported justifications. Moreover, even if any of them constituted proven "legitimate competitive benefits," each could be achieved through less restrictive means. *Geneva Pharm.*, 386 F.3d at 507.

### i.    "Game Exclusivity" Provides No Justification for the Restraints

Throughout the litigation, Defendants have insisted that broadcasts must be distributed on a "game-exclusive" basis. That is, only one telecast of a given game must be produced or, if more than one telecast of that game is produced, they must be distributed so that each one is exclusive to a particular audience. Professor Murphy, for example, contends that "dropping game exclusivity would reduce the incentives of the teams to improve the quality of their product." Murphy Rep. ¶ 76. The league previously argued, "Eliminating territories to allow overlapping telecasts of the same game necessarily means *neither* club has exclusive content rights to license. That is a formula for taking games off the air, not helping fans." MLB SJ Mem. at 2.

As a factual matter, Defendants have offered no analysis to verify, let alone quantify, the supposed benefits of game exclusivity. They simply repeat, over and over again, that this is the normal way that it is done, so it must be procompetitive. Their own practices, however, show this claim to be false.

The general trend in MLB is a *decrease* in the number of game-exclusive broadcasts. During the pendency of this litigation, MLB entered into three new national contracts, and all three increased, rather than decreased, the number of side-by-side (i.e., *non*-game exclusive) games. PFF ¶¶ 102-103. These side-by-sides (or "coexists") are available in the local areas of the participating teams at the same time that the teams' own telecasts are shown. In fact, *most* national broadcasts are now coexists. PFF ¶ 103. National broadcasts also typically coexist outside of these home markets with the teams' telecasts of the same games on the OOM packages. Moreover, on the radio, there is no game exclusivity or even "content exclusivity" as Defendants have defined it; the League sells both teams' radio feeds of every game (often in at least two languages) nationwide without blackouts, both online and to satellite radio distributors, while each team simultaneously and independently licenses the same feeds to radio stations within their assigned territories. PFF ¶ 105.

Nevertheless, Professor Murphy conclusorily speculates that game exclusivity is so important that, without the territorial allocation, each team might insist on exclusivity for all home games, eliminating visiting team broadcasts. Murphy Rep. ¶ 43 n.49. The evidence, however, does not support that speculation (which Professor Murphy does not support with any analysis). Ten of the thirty teams have territories that overlap in their home cities. When they play each other, nothing prevents the two teams from mutually agreeing to maintain game exclusivity by adopting Professor Murphy's predicted solution of only having a telecast produced by the home team—yet *no* teams currently have such an arrangement. When locally broadcast, these games are always offered by both teams with separate telecasts on separate channels in the same market to the same consumers. PX103. Team owners have specifically denied that the existence of an opposing telecast lessens their interest in promoting viewership. *See, e.g.*, Baer Dep. 103:8-16.

And it is not only those teams whose territories overlap in the home cities of the teams. Every team's territory overlaps with at least one other team in less central areas. But again, no

teams have an arrangement to ensure "game exclusivity" in those areas.[12] There were over 700 locally telecast games between teams with overlapping territories in 2015, and all but two of them were independently telecast by both teams when they held the rights to do so. PX103. There is no evidence at all that multiple broadcasts are "a formula for taking games off the air."

The second problem with Defendants' focus on game exclusivity is that the territorial restraints at issue are not required for game exclusivity at all. As Defendants define it, game exclusivity is preserved so long as each team in a particular game distributes their feed in non-overlapping areas. Obviously, permitting the teams to have such an arrangement does not require the exclusion of *other games* from overlapping with those teams' telecasts. It would be less restrictive for the league to require teams to allow visiting teams to produce telecasts while leaving it to the two teams in a game to determine whether local exclusivity for telecasts of that particular game were necessary, or to return to the less restrictive (though still anticompetitive) pre-1980s rules permitting the home team to distribute the games everywhere in the country except the visiting team's market. PFF ¶¶ 10-16. The territorial scheme introduced in the 1980s did not add anything with respect to preserving game exclusivity. All it did was create *territorial* exclusivity, by excluding *other* games.

### ii. Defendants' Claims of Harm from Competition Are Improper, Untrue, and Inconsistent with Their Own Expert's Analysis

Several of Defendants' proposed procompetitive justifications are based on their claim that some teams and their broadcasters might be harmed by the introduction of competition (a claim that, again, presupposes that Professor Murphy is incorrect and telecasts of different games are close competitive substitutes). They hypothesize that RSNs might cease to invest as much in their broadcasts, that a significant number of games would cease to be broadcast at all, and that some teams would be so harmed by competition that they may no longer be able to continue.

---

[12] In fact, the only relevant arrangement between individual clubs regarding game exclusivity that is in the record *eliminates* game exclusivity that would otherwise occur under the territorial scheme. The two Florida teams have mutually agreed to permit each other's telecasts into their home territories, including when they play each other. PX312 at MLB0014807.

Defendants have presented no analysis that comes close to meeting their burden on these effects; instead, they rely exclusively on the self-serving, litigation-driven statements of party witnesses. But even if they had offered an analysis, these kinds of defenses are not permissible under the antitrust laws. *SJ Op.*, 56 F. Supp. 3d at 299.

Defendants continue to insist that protecting RSNs from competing broadcasts is necessary to encourage increased investment in their own telecasts. The underlying premise is that protecting an RSN from other games being broadcast in the same area increases its ability to profit from its investments, which incentivizes increased investment. If this were true, there would presumably be some evidence in the record that shows that RSNs spend more on the production of their telecasts when they are protected from competition. There is none.

As discussed in Plaintiffs' Memorandum in Opposition to Defendants' Motions for Summary Judgment, costs of production are extremely low and demand for rights is at an all-time high. SJ Mem. at 16-25 (ECF No. 301); PFF ¶¶ 68-70. None of Defendants' experts have analyzed this cost structure, and none attempts to show that any telecasts would cease to be profitable enough to produce and distribute. Sports without territorial restraints and sports of all stripes and levels of popularity are routinely broadcast and distributed widely over the Internet. SJ Mem. at 23-25; Noll Decl. at 97-98. It is not plausible that far less popular sports are routinely distributed broadly and inexpensively, but that MLB games would disappear without protections from competition.

Rather than demonstrate why Major League Baseball is less capable of distribution than countless other sports, Defendants simply point to the fact that there are more telecasts made today than there were 25 years ago. PX207 ("Elzinga Rep.") at 47-49. Over that same time period, output throughout the broadcasting industry has skyrocketed. As Defendants have observed, the number of "channels available per TV household" rose from 9.4 in 1980 to 89.2 in 2001—"an increase of 79.8 channels or 849% in 21 years." DX61.1. Telecast quality has similarly evolved with improvements in technology and increase in demand, not only for baseball or sports programming but for programming of all kinds. Noll Rebuttal at 59; Elzinga

Dep. at 157:10-12. Defendants and their experts have made no attempt to control for the independent factors that have led to the increase in broadcasts. Elzinga Dep. at 157:13-7. With no attempt to "account for the rapid growth and change in that industry," Defendants' assertions are simply inadmissible speculation. *See, e.g.*, *United States v. Apple*, 791 F.3d 290, 335 n.24 (2015).

More fundamentally, the assumption that greater monopoly creates greater investment and increased output is contrary to basic economics and congressional policy. As this Court has held: "[T]he incentive for added investment is inflated profit stemming from limited competition. '[T]he Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable.'" *SJ Op.*, 56 F. Supp. 3d at 299 (quoting *Prof'l Eng'rs*, 435 U.S. at 695-96).[13] This position "is flatly inconsistent with standard antitrust economics and has the causality reversed. Monopolies get higher profits precisely because they reduce output, which makes prices higher given any demand curve." Elhauge Rep. ¶ 75.

Nor is there any evidence, other than the unsupported statements of party witnesses, that any teams need to be protected from competition to be viable. No economist has undertaken any such analysis, and defendants have produced no documentary evidence supporting their view.[14]

In any event, at bottom, Defendants' position is that their products "are unable to compete in a free market. … By seeking to insulate [less popular teams' telecasts] from the full

---

[13] *See also, e.g.*, *Prof'l Eng'rs*, 435 U.S. at 695 ("The Sherman Act reflects a legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services."); Noll Decl. at 109 ("Monopoly leads to less, not more, output and consumer satisfaction."); Noll Rebuttal at 61 ("Competition between teams for the same customers enhances, rather than reduces, the incentive that each team and its RSN has to improve the quality of its telecasts.").

[14] In fact, all of the relevant evidence is to the contrary. For decades, certain teams, including the Atlanta Braves and the Chicago Cubs, broadcast most of their games on "superstations," which are local, over-the-air stations distributed nationwide. Noll Rebuttal at 41, 45-47. That is *exactly* what the league now argues would "destroy the market" for smaller market teams: teams' broadcasts being available for nationwide distribution, thereby "invading" the territories of other teams. Yet there is no evidence that any team was not able to compete with these "invasions." To the contrary, four teams were added to the league and the Defendants introduced Extra Innings at the height of the superstation era. PFF ¶ 27; Stip. 126.

spectrum of competition because of [their] assumption that the product itself is insufficiently attractive to consumers, [Defendants] forward[] a justification that is inconsistent with the basic policy of the Sherman Act." *NCAA*, 468 U.S. at 116-17 (footnote omitted). "[T]he Leagues purport to bolster regional interest and team loyalty by consciously depriving consumers of out-of-market games they would prefer, which is generally not a permissible aim under the antitrust laws." *SJ Op.*, 56 F. Supp. 3d at 300. This supposed "benefit" is in fact one of the harms wrought by the restraints. "Perhaps the most pernicious aspect is that under the controls, the market is not responsive to viewer preference. … Many games for which there is a large viewer demand are kept from the viewers, and many games for which there is little if any demand are nonetheless televised." *Id.* at 300 n.124 (alterations in original) (quoting *NCAA*, 468 U.S. at 107 n.34).

### iii.    The Territorial Restraints Do Not Further Competitive Balance

Defendants have asserted throughout this litigation that the territories promote competitive balance, yet they have never explained how that works. This is not surprising—a system that permits one team to receive more than *fifteen times* the rights fee obtained by another is hardly an obvious candidate for promotion of competitive balance. PX79. As Professor Noll has explained, the territories cause competitive *imbalance*, by locking teams to territories of vastly different values. Noll Decl. at 117.

The history of the territories is also inconsistent with Defendants' claim. Defendants have cited many documents as evidence of why the territorial system was implemented and why the territories were drawn as they were, and none even mentions competitive balance. As of 1999, nearly twenty years *after* the territorial system was created, a league analysis concluded that "competitive imbalance ha[d] never been greater." PFF ¶ 113. The league has never attempted to address competitive balance through changes to the territories. Testimony and documentary evidence shows that Defendants have consciously based their broadcasting policies on revenue generation, intentionally *separating* them from policies directed at equalizing revenue. PX148-49.

Defendants will attempt to meet their burden with the statements of interested witnesses

providing *post hoc* rationalizations supported by no documentary evidence. They will tout their decades of experience, but will produce no economic analysis of the issue or documents reflecting that experience. This is a standard play from their well-worn playbook. League and team officials insisted for years that free agency (that is, allowing players to negotiate with a different team once their contracts expire) would destroy competitive balance. For example, in a 1972 Supreme Court brief, MLB quoted the president of one club for the proposition that "'in such a system the poorer or weaker franchises would not be able to compete for the better players and therefore baseball would be destroyed.'" Br. for Resp'ts at 8, *Flood v. Kuhn*, 407 U.S. 258 (1972) (No. 71-32), 1972 WL 125826. Yet economists have consistently concluded that free agency did not undermine competitive balance. Noll Decl. at 116.

The economic consensus is that restrictions in competition for television rights do not contribute to competitive balance, no matter how balance is defined, and likely make it worse. Noll Decl. at 117. Not a single one of Defendants' five experts has disputed this consensus or cited a single contrary opinion among economists. Professor Murphy, the league's only merits expert, was the first to offer any opinion concerning competitive balance—and all he provides is a single paragraph in his 78-page report noting that DirecTV Extra Innings subscribers watch more games involving larger-market teams than smaller-market teams.[15] Murphy Rep. ¶ 169. He provides no analysis at all about how this difference would be reflected in any change in revenue disparity, much less a change in competitive balance. Nor does he attempt to connect whatever competitive balance gains he imagines (by whatever measure) to any increase in demand or output. Yet "[t]he hypothesis that legitimates the maintenance of competitive balance as a procompetitive justification under the Rule of Reason is that equal competition will maximize consumer demand for the product." *NCAA*, 468 U.S. at 119-20. Nor does Professor Murphy so much as mention any of the extensive literature on competitive balance. Simply put, he does not begin to meet Defendants' burden of justifying the restraints on this basis. Surely, if the

---

[15] This is no surprise. The teams with more people in their protected territories would be expected to cultivate a larger number of avid fans than teams with smaller HTTs.

Defendants' speculation about the effects on competitive balance were correct, they could have found at least *one* economist to produce some kind of formal analysis that supports their position.

Moreover, Professor Murphy does not even mention any less restrictive alternatives. If Defendants' goal is to equalize the amount of revenue among the teams, then that can be achieved by increasing revenue sharing—without suppressing competition. "If the leagues wish to share revenue more equally, simply increasing the share of total revenue that is shared is a much simpler mechanism for achieving this goal that also is much less anticompetitive than dividing the nation into exclusive local broadcasting territories … ." Noll Decl. at 119-20. Defendants have yet to offer any real evidence to rebut this approach, and they have *no* expert economic support for rejecting it.

### iv.   The Territories Do Not Create a Procompetitive Division of Labor between Teams and the League

Finally, Professor Murphy claims that the territories create an efficient division of labor between the teams—which are best at distributing games locally—and the league—which is better at distributing games nationally. This fails for a number of reasons. First, there is no evidence at all that the territories were created for that purpose. Second, the size and shape of the territories are not plausibly related to any such justification. And third, even if true, it provides no justification at all for the league's *exclusive* "out-of-market" distribution.

Plaintiffs have not challenged either the fact that the league provides for certain national broadcasts or that the league offers the bundles. Nor have they denied that the league could have certain advantages (as well as disadvantages) in selling these products relative to the teams. It is reasonable to think the league may be an appropriate entity to combine the telecasts into a league-wide bundle, for example. But "if the Bundle has all the efficiency advantages that they claim, then it would be in the interests of the League and teams to continue to offer the Bundle without the challenged market division." Elhauge Rep. ¶ 35.

"[C]ompetitors 'cannot simply get around' antitrust liability by acting 'through a third-party intermediary or "joint venture".'" *Am. Needle*, 560 U.S. at 202 (quoting *Major League*

*Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 336 (2d Cir. 2008)). The exclusive

agreement to sell out-of-market games only through the league both restrains output and fixes

prices. Offering the product is lawful to the extent that cooperation is necessary for the bundle to

be available at all. But horizontal bundling is only procompetitive where it comes with "no

limit … placed on the volume that might be sold in the entire market and each individual

remain[s] free to sell his own [product] without restraint." *NCAA*, 468 U.S. at 114. The Supreme

Court has repeatedly emphasized that "[e]nsuring that individual members of a joint venture are

free to increase output has been viewed as central in evaluating the competitive character of joint

ventures." *Id.* at 114 n.54; *see also Broad. Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 23-24 (1979).

Preventing the teams from being "free to increase output" by distributing their games as they see

fit is not in any way necessary to the existence of the joint product, nor does it promote

competition. To the contrary, the bundle is intentionally priced and offered on terms that limit its

output in order to prevent competition. PFF ¶ 84. Just as in *NCAA*, the joint product itself may be

lawful, but restraining the joint venturers' own output is a naked restraint on trade. *NCAA*, 468

U.S. at 109. *See also, e.g.*, *Polygram Holding, Inc. v. FTC*, 416 F.3d 29, 38 (D.C. Cir. 2005)

(joint marketers of "Three Tenors" album could not suppress competition from venturers'

separate Three Tenors albums).

### C.    The Television Defendants Participate in and Require the Restraints

Section 1 of the Sherman Act proscribes any "contract, combination …, or conspiracy,"

in restraint of trade. 15 U.S.C. § 1. In this case, there is no dispute that each of the television

defendants entered into an explicit contract adopting and agreeing to enforce the territorial

restraints at issue and including contractual provisions designed to ensure that the territorial

restraints continue. PFF ¶¶ 36, 39, 45. At an absolute minimum, these contracts violate Section 1

and cannot stand.

But the Television Defendants' participation goes beyond these anticompetitive contracts.

Each RSN agrees to limit its distribution geographically, knowing that each potentially

competing RSN has entered into a similar agreement. PFF ¶ 37. Each pays more for this

territorial protection than they would pay in its absence. PFF ¶ 38. This is a classic multi-leveled horizontal conspiracy. *See MTD Op.*, 907 F. Supp. 2d at 486-87 & nn.120-23 (collecting cases).

It is hard to imagine a clearer case of a "contract, combination …, or conspiracy" in restraint of trade than this web of contracts that *explicitly* restrain trade. Despite all of these uncontested facts, the Television Defendants contend that they cannot be liable because Professor Elzinga claims that the teams would capture all of the monopoly profits from the RSNs in a perfectly competitive market in which the RSNs had zero bargaining power. In other words, the RSNs and MVPDs would charge supracompetitive prices, and earn higher revenue as a result, but they would lose it all to the teams at the bargaining table and end up right where they would have been without it. This, unsurprisingly, is not backed up by any documentary evidence; quite to the contrary, Defendants' executives themselves admit that exclusivity "is worth a lot to broadcasters," who presumably know their own interest in paying more for and contractually requiring such exclusivity. Henry Dep. 63:25-64:1.

In any event, Defendants have never cited any case in which explicit participants in a scheme who charged supracompetitive prices were found not to be liable because they "passed through" all of their would-be profits to other participants with greater bargaining power. There is no such defense in either antitrust or conspiracy law. Moreover, the facts are clear that the perfectly competitive market that the television defendants hypothesize bears no relation to the actual market at issue in this case. "Most markets [are] served by a single RSN," and there is "very limited competition in bidding." PX 33 at MLB0409362 (capitalization altered); Noll Rebuttal at 32-38. The TV Defendants' position is also flatly inconsistent with the position that the RSNs are "incentivized" to increase "investment" because of the territories. That could be true only if the territories made those investments more profitable.

Finally, the MVPDs have consistently worked with each other to "protect ag[ainst] price wars" in the distribution of the bundles. PFF ¶ 85. Not only did DirecTV design the terms of the Extra Innings contracts to minimize horizontal competition among MVPDs, DirecTV and Comcast coordinate every year on pricing through MLB's broadcasting office. Senior MLB

broadcasting personnel "always tried to share each other's pricing … in an attempt to be 'fair and equitable' amongst the [MVPD] partners and at least keep them informed, if not on same page. They frequently will work to be on similar lines, just need the info to do so." PFF ¶ 86. Were there any question about the Television Defendants' liability for the competitive harm that they pay for, require, profit from, and implement, their direct fixing of prices removes any doubt.

## II.   The League Defendants Have Violated Section Two of the Sherman Act

Finally, the conduct described above also constitutes monopolization and conspiracy to monopolize and should be found unlawful under Section Two of the Sherman Act. As discussed above, live major league baseball telecasts are a relevant product market, and the territorial allocation divides the country into geographic submarkets in which no consumer can purchase from any outside entity. Rather than 30 competing price-setters, each submarket has between one and six, and most have one or two.[16] In the many DMAs where only one team may broadcast, the permitted team has a full 100% share; in the DMAs with two, one team necessarily has at least a 50% share, and may have significantly more. For all the reasons discussed above, Defendants have both achieved and exploited monopoly power, raising price and excluding competitors. *See MTD Op.*, 907 F. Supp. 2d at 491-92. Similarly, by agreeing to an artificial "in-market" and "out-of-market" divide, the teams and league have ceded a monopoly to the League to control "out-of-market" telecasts. *See, e.g., Bd. of Regents of Univ. of Okla. v. Nat'l Collegiate Athl. Ass'n*, 546 F. Supp. 1276, 1323 (W.D. Okla. 1982) (holding that it was "clear that NCAA exercises monopoly power," because "NCAA controls all of regular season college football television").

The League Defendants did not come by this monopoly power innocently. While local baseball teams might generally be expected to have some market power, given the many advantages of being present in the market, that market power is dramatically magnified by the

---

[16] Because the bundle is a joint venture of the teams themselves (and is priced and marketed to avoid competition with the teams, as discussed above), "these products are not properly regarded as competitive." Noll Decl. at 85.

horizontal market allocation. Here again, the very purpose of the agreement is to create this monopoly power: to insulate teams from competition and increase their ability to market their product without any fear of being outcompeted by other baseball teams or their RSNs.

The Court should condemn the territorial restraint under Section Two as well as Section One.

Dated: December 18, 2015

Respectfully submitted,

Edward Diver
Howard Langer
Peter Leckman
**LANGER, GROGAN & DIVER, P.C.**
1717 Arch Street, Suite 4130
Philadelphia, PA 19103
Telephone: (215) 320-5660
Facsimile: (215) 320-5703

Jeffrey B. Dubner
**COHEN MILSTEIN SELLERS &**
**TOLL, PLLC**
1100 New York Ave. NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

Robert J. LaRocca
**KOHN, SWIFT & GRAF, P.C.**
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
Facsimile: (215) 238-1968

Joshua D. Snyder
**BONI & ZACK, LLC**
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Telephone: (610) 822-0200
Facsimile: (610) 822-0206

Marc I. Gross
Adam G. Kurtz
**POMERANTZ, LLP**
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212)-661-1100
Facsimile: (212) 661-8665

***Attorneys for Plaintiffs***