**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| FERNANDA GARBER, et al., <br><br>            Plaintiffs, <br><br>     v. <br><br> OFFICE OF THE COMMISSIONER OF BASEBALL, et al., <br><br>            Defendants. | No. 12-cv-03704 (SAS) <br><br><br> ECF CASE |

## <u>PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

# TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................................... 1

II.   CLASS AND CLASS REPRESENTATIVES ...................................................... 2

III.  STRUCTURE OF MAJOR LEAGUE BASEBALL ........................................... 2

IV.   CHALLENGED RESTRAINTS ........................................................................... 2

      A.  History of the Territorial Restraints ............................................................. 2

      B.  Creation of the Modern Restraints ................................................................ 4

      C.  Broadcasters Such as Comcast and DirecTV Contract for, Require, and Implement
          the Territorial Restraints ............................................................................... 7

V.    THE RESTRAINTS HAVE ANTI-COMPETITIVE PURPOSES AND EFFECTS ....... 10

      A.  Defendants Intend the Restraints to Reduce Competition .......................... 10

      B.  But for the Restraints, Teams Would Distribute Nationwide ..................... 11

      C.  But for the Restraints, Prices Would Be Lower .......................................... 16

VI.   DEFENDANTS HAVE MARKET POWER IN RELEVANT MARKETS ................... 17

VII.  THE RESTRAINTS DO NOT CREATE LEGITIMATE PROCOMPETITIVE
      BENEFITS, AND DEFENDANTS' PROPOSED BENEFITS COULD BE ACHIEVED
      THROUGH LESS RESTRICTIVE ALTERNATIVES ................................................. 20

VIII. CONCLUSIONS OF LAW ................................................................................. 24

## I.   INTRODUCTION

1.     This case concerns an undisputed restraint on output: horizontal market allocation. The owners of Major League Baseball ("MLB") teams, acting through the league, have agreed to divide the United States into territories ("Home Television Territories" or "HTTs"), and to forbid any team or its telecast partner(s) from telecasting that club's games outside of its assigned HTT or over the Internet. This core restriction is embodied in the MLB Constitution, Article X, § 3(a). PX1; Stip. 7.

2.     Comcast Corp., DirecTV LLC, and their affiliated RSNs have participated in, implemented, and ensured the continuation of this scheme. Each pays more for protection from other teams' broadcasts and insists on contractual provisions preventing the teams from abandoning their anticompetitive scheme. Each RSN agrees to limit its geographical reach contingent on the knowledge that every other RSN has agreed to an equivalent restriction. And Comcast and DirecTV have coordinated on the terms and pricing of the out-of-market bundles they independently sell to class members.

3.     This restraint was intended to restrict consumer choice, reduce output, and drive up prices. These are the results that basic antitrust economics predicts, and this is exactly what has occurred. Class members who are interested in "out-of-market" teams are denied access to telecasts of their choosing and forced to purchase bundles of all teams' "out-of-market" games at monopoly prices to get access to any one team's games. The suppression of competition drives up the prices that teams and their broadcast partners can charge, leading to inflated rights fees that are passed on to class members and other consumers. By restraining competition and creating artificial local monopolies, Defendants have harmed all class members.

4.     Defendants cannot prove any legitimate procompetitive benefits—and even if they could, the purported benefits they have proffered could all be achieved by less restrictive alternatives. Accordingly, the restraints must be enjoined under the Sherman Act.

## II.    CLASS AND CLASS REPRESENTATIVES

5.      On May 14, 2015, the Court certified this matter as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure. Stip. 1. The class representatives are Vincent Birbiglia, Marc Lerner, Derek Rasmussen, and Garrett Traub. Stip. 2-3. These individuals are ongoing participants in the market for major-league baseball telecasts. They have purchased Defendants' out-of-market bundles subject to the challenged restraints, and either continue to purchase MLB telecasts or would do so in the future if the restraints were lifted. They have faced increased prices and decreased choices as a result of the restraints.

## III.    STRUCTURE OF MAJOR LEAGUE BASEBALL

6.      The Office of the Commissioner of Baseball is an unincorporated association doing business as Major League Baseball ("MLB" or the "League"). Its members are 30 companies operating as MLB teams (the "teams" or "clubs"). Each team is an independent business with a separate owner and autonomy over its business operations.  Each team operates as a profit-maximizing entity. They are the only providers of major league baseball in the United States.

7.      The teams cooperate to schedule and produce baseball games and facilitate competition on the field. Off the field, they compete in numerous business capacities, including in various efforts to cultivate and market to baseball fans.

8.      Teams agree to various rules, including the Major League Constitution (the "Constitution"), which is a written agreement entered into by all teams. PX 1; Stip. 6.

9.      Each team holds the right to broadcast games occurring in its home stadium. Stip. 33. Since at least 1965, all MLB teams have mutually agreed to allow the visiting team to produce a separate telecast of each game. PX 1, Art. X, § 3(c); PX2-PX4. Each team has the right to broadcast all of its games, home and away, except for a handful of games chosen by the League for exclusive national telecasts.

## IV.    CHALLENGED RESTRAINTS

### A. History of the Territorial Restraints

10.     In 1946, the league adopted Major League Rule 1(d), which prohibited a major league

2

club from broadcasting a game into the "home territory" of any other club, major or minor, without the consent of that club. PX5 at 13.

11.     The Department of Justice "asked baseball to repeal that rule, and threatened unless they did repeal it they would face a suit." PX5 at 9. MLB modified the rule in 1949 to prohibit broadcasts near another team's ballpark only at the time the local team was playing a game, but abandoned the rule entirely in 1951 in response to continued DOJ concerns, stating:

> With the repeal of rule 1(d), each major-league club will act independently of all other clubs and free from any major-league rule, regulation, or agreement in the use, control and sale of all rights to broadcast and telecast its home games, subject only to rights granted to each visiting club. PX5 at 15, 29.

12.     In 1956, the National League required home teams to permit visiting teams to create a telecast of every game (consistent with prior practice), and permitted distribution of either telecast anywhere in the country with the consent of both teams. PX4 at 13051.

13.     A number of teams telecast outside their current home territories during this period. For example, in 1958, the Phillies telecast more than half of their games in New York City. PX6.

14.     In 1961, in response to lobbying by MLB and other leagues, Congress enacted the Sports Broadcasting Act of 1961 ("SBA"), 15 U.S.C. § 1291, *et seq.,* which exempted from the antitrust laws certain broadcasting agreements. The SBA only exempted "sponsored telecasts," meaning over-the-air telecasts. The exemption does not include the pay-tv telecasts or Internet streaming at issue here. *Garber v. Office of the Comm'r of Baseball*, 907 F. Supp. 2d 465, 489 n.141 (S.D.N.Y. 2012). The SBA also expressly excludes agreements involving geographic blackouts unless they are limited to protection when a team is playing a home game. 15 U.S.C. § 1292.

15.     After MLB began league-wide television contracts under the SBA, the output of national baseball programming dropped substantially. DX255 at 304; PX206 ("Murphy") ¶ 42.

16.     In 1965, the American League enacted an agreement requiring teams to permit visiting teams to create a telecast of every game, and granted the visiting team exclusive rights within its 50-mile territory. Home teams remained free to broadcast on local channels throughout the remainder of the country. PX2 at 276299; PX3 at 13059.

3

**B. Creation of the Modern Restraints**

17.     By the late 1970s, baseball executives were concerned "that there was a risk … of having too much baseball on television." PX7 at 276176. National networks expressed concerns about "dilution" of the value of national rights arising from increased competition from individual teams' telecasts. PX8 at 276030; *see also* PX9.

18.     In response, before the 1980 season, the League proposed to amend the Leagues' broadcasting agreements to include a "clause prohibiting clubs from expanding beyond their 1979 regional TV and radio markets without approval of Commissioner's Office." PX9. In March 1980, MLB executive Villante told teams that "under the terms and conditions of baseball's TV agreements with ABC and NBC, Major League clubs are prohibited from expanding their regional TV networks beyond their traditional TV markets." PX10.

19.     Several teams expressed concerns. The owner of the New York Yankees complained that "the Clubs were being called upon to yield their individual rights." PX11 at 276227.

20.     In December, 1982, the teams formally agreed not to telecast outside each team's respective HTTs. PX12 at 276263. This was the first such agreement since abandoning similar but less-restrictive rules at the insistence of the DOJ in 1951.

21.     The restriction is now codified in the MLB Constitution, Article X, §3(a):

> The Clubs hereby agree that each Club shall have, with respect to each game in which it participates, the right to authorize the telecast of such game only by means of over-the-air, cable and satellite technology, and only within its home television territory. PX1.

22.     This provision prohibits each team from telecasting its games outside of its assigned HTT. It also prohibits each team from distributing its telecasts via the Internet at all.

23.     Baseball executives contemporaneously understood that their new territorial allocation raised antitrust concerns. In 1983, the St. Louis Cardinals objected to the Chicago teams' telecasting via a station in the Cardinals' newly defined territory. MLB's broadcasting director, Bryan Burns, wrote: "If we pull back from WCEE, our exposure to potential anti-trust problems is increased." To avoid such scrutiny, he proposed "let[ting] the marketplace decide how

successful any of the ventures are." PX13. Similarly, a broadcaster's general counsel told the California Angels in 1981 that applying the agreement to cable television or other paid television would be "questionable" in terms of "antitrust exposure." PX14. And a station seeking to carry Yankees games in Red Sox territory asked in 1984 if the League was involved in "something that would fall under 'restraint of trade.'" PX15.

24.     Baseball team officials also knew that the National Hockey League ("NHL") had determined that comparable hockey agreements were illegal. In 1984, NHL President John Ziegler issued a formal interpretation of the NHL Constitution explaining that it was "absolutely clear that under the NHL Constitution no Member Club at this time can restrain or prevent the broadcasting of any game at any time, except the broadcasting of its home games." Any other interpretation, he said, "would conflict with … the anti-trust laws of the U.S." PX16. Mr. Ziegler subsequently joined the Detroit Tigers, representing the team at MLB meetings. PX17. At least one owner of an MLB team, John McMullen, owned an NHL team at the time of Mr. Ziegler's ruling, and therefore knew of this official conclusion. PX12; PX18; PX19.

25.     In its initial form, the territorial system included a substantial amount of "unassigned" or "outer market" areas into which any team could broadcast. PX12. Numerous teams took advantage of this opportunity, even though far fewer distribution channels were available then than today. For example, the Chicago Cubs and White Sox obtained distribution in Michigan, the New York Yankees in Colorado and Kentucky, and the Boston Red Sox in New York and Utah. PX15; PX24. Several teams, including small-market teams like the Cincinnati Reds, telecast or requested permission to telecast into Florida. PX20-23. As one team executive put it, "Clubs are now spreading out to such remote areas, that it is rapidly becoming an 'open sesame.'" PX25.

26.     Broadcasters also expressed interest in adding output in existing markets, but were refused. The California Angels had to talk their broadcaster partner out of distributing in Dallas, the Texas Rangers' territory. PX26. A network in St. Cloud, Minnesota, sought to carry a National League club, but was refused because it was within the territory of the Minnesota Twins, an American League team. PX27. A station in eastern Massachusetts was prevented from

carrying Yankees games because it was in Red Sox territory. PX15.

27.      These territories have hardly been altered since their creation, and have not been touched in over a decade. PX28; Stip. 34. From 1983 to 1993, Defendants made "no changes other than to accommodate expansion franchises." PX29. In 1994, after baseball teams were added in South Florida and Colorado, MLB eliminated all "outer market territory" in the United States, the last way a team could telecast outside of its HTT. PX30. They similarly amended the territories in 1997, to accommodate new teams in Tampa Bay and Phoenix, and 2005, when the Montreal Expos moved to Washington, D.C., to become the Washington Nationals. PX28. Otherwise, the only territorial change since 1983 has been a 2004 alteration for the Milwaukee Brewers, which had been owned by Commissioner Selig and was then owned by his daughter. PX28; PX31.

28.      The current territories are thus nearly identical to the original territories, despite all the technological and demographic changes over the subsequent 35 years. As a result, the territories and the rules attached to them are "cumbersome and perhaps antiquated." DX011.2 at 424838. One MLB executive considered "a full redrawing of the territorial lines" while attempting to address the problem of "underserved areas" (discussed *infra* ¶ 50), but the idea never progressed in light of opposition from RSNs including Comcast. PX32.

29.      Today, every inch of all fifty states and the District of Columbia is assigned to between one and six teams. Thus, in every location in the United States, between 24 and 29 teams have agreed not to compete for distribution. The current territories are summarized in PX100.

30.      Most teams have a monopoly in their home markets. In certain markets, the HTTs of the two teams overlap, creating duopolies. Entirely shared HTTs include New York City, Washington/Baltimore, Chicago, San Francisco/Oakland, Los Angeles, and Texas. PX28; PX100. All teams' HTTs overlap with at least one other team in some part. As many as six teams' HTTs overlap in Iowa, parts of Nevada, and Hawaii. PX28.

31.      There are no such territories for radiocasts. The current rules for radio are similar to the pre-1980 rules for telecasts, permitting individual team broadcasts everywhere except within 50 miles of the visiting club's ballpark. PX 1, Art. X, § 3(b).

**C. Broadcasters Such as Comcast and DirecTV Contract for, Require, and Implement the Territorial Restraints**

32.     Teams contract with regional sports networks ("RSNs") to produce and telecast games in the HTTs. RSNs are pay-tv networks that are available only with a subscription to a multichannel video programming distributor ("MVPD") such as Comcast Cable or DirecTV. Comcast owns part or all of 5 RSNs that telecast 6 teams' games; DirecTV owns 4; and 21st Century Fox, which owns Defendant YES Network, owns 15. Stip. 48-50.

33.     A small, and shrinking, number of games are broadcast on free, over-the-air television. In 1990, teams telecast an average of 63 games on over-the-air stations; in 2010, an average of 17 games; in 2015, fewer than 8. Twenty teams had no over-the-air broadcasts in 2015, telecasting only on pay-tv. PX33; PX34; PX102.

34.     RSN contracts typically provide the rights to all of a team's games except for a small number of games used in exclusive national telecasts or telecast by over-the-air networks.

35.     There is "very limited competition in bidding" among RSNs for teams' telecast rights. PX33 (capitalization altered). "Most markets [are] served by a single RSN." PX33.

36.     Each telecast contract between an RSN and a team includes a provision limiting the RSN's telecast rights to the team's HTT. Stip. 45-46; PX35.

37.      Every RSN knows that every other RSN is agreeing to an equivalent limitation. As former Commissioner Selig said, "The RSN knows what the ground rules are. There's only X amount of games that come in. They can live with that. They know—there are no secrets here." Selig Dep. 112:3-6. DirecTV Sports Network President Patrick Crumb acknowledged that DirecTV's RSNs are "generally aware that the Leagues provide their member clubs with certain exclusivities in their HTT." Crumb Decl. ¶ 9, May 27, 2014, ECF No. 290.

38.     RSNs pay more for contracts that exclude other teams' telecasts than they would have to pay for contracts that do not. Manfred Dep. 61:4-7; Elzinga Dep. 96:14-25.

39.     Every Defendant RSN has a "changed circumstances" clause in its contract allowing the RSN to claim a rights fee reduction if MLB decreases the RSN's exclusivity. PX37-46.

40.     In turn, RSNs license to MVPDs the right to offer the RSN-produced telecasts to the MVPDs' customers. Consumers may only watch "in-market" RSN telecasts through an MVPD. RSNs offer their telecasts to multiple, competing MVPDs in markets where they are allowed to distribute.

41.     Each team has granted to the League exclusive distribution rights to all telecasts outside the team's HTT. Since 2004, this has been found in the MLB Local Telecast Regulations, which apply to all contracts between a team and its telecasting partner. PX36.

42.     The League licenses and sells bundles of "out of market" games. The bundle is sold to consumers only as a bundle of all out-of-market games. Stip. 115-16.

43.     MLB sells an Internet bundle to consumers, called "MLB.tv." The Premium version includes home and away feeds of each game, while the Basic version includes only the home feed. Bowman Dep. 74:24-75:6. In 2015, premium cost $129.99, while basic cost $109.99. Stip. 128-29. The vast majority of subscribers to MLB.tv purchase the Premium version. *Id*. 80:12-17.

44.     The League also licenses the out-of-market bundle as "MLB Extra Innings" to DirecTV, In Demand,[1] and other MVPDs for distribution to their subscribers. Stip. 118.

45.     The MVPDs' Extra Innings contracts explicitly require territorial restraints. Both Comcast's and DirecTV's Extra Innings agreements provide in identical language that:

> [N]o club shall expand its regional over-the-air or non-broadcast television network beyond the markets included in that club's Home Television Territory, as amended by Baseball from time to time. The Home Television Territory of any club shall not be materially expanded by Baseball except in connection with and directly related to any increase or decrease in the number of franchises in either the American or National Leagues of Professional Baseball Clubs or in connection with any club relocation. PX47; PX48.

46.     In every HTT, the games of the teams that are "in-market" are blacked out from the out-of-market bundles, so that consumers must subscribe to an MVPD that carries the local teams' RSNs. A consumer within the HTT can only obtain the game through the local team's RSN, and

---

[1] In Demand is co-owned by major cable television providers, and its majority owner is Comcast. Stip. 119.

can only obtain that team's production of that game. No consumer can obtain the other team's telecast from any source, at any price, even though that telecast is being distributed everywhere else throughout the United States in the bundle. *See infra* ¶¶ 76-79.

47.     The blackouts are implemented by the MVPDs and RSNs pursuant to agreements with and among Defendants. PX50-58.

48.     In 2000, the teams eliminated competition in Internet streaming through its Interactive Media Rights Agreement ("IMRA"). PX59. Each team granted "on an exclusive, royalty-free, paid-in-full and worldwide basis to MLBAM all its Interactive Media Rights." PX59.

49.     IMRA permitted MLBAM to stream in-market only with consent of the relevant club (or ¾ of all clubs). PX59 at 95.

50.     Both the TV Defendants have fought changes to the territorial agreement. In 2008, MLB sought to address "underserved territories," areas inside a team's HTT where that team is not distributed by all MVPDs. MLB's then-president, Robert DuPuy, proposed to allow the out-of-market bundle to serve these areas, a proposal the teams unanimously supported. RSNs and MVPDs opposed this, threatening to invoke the "changed circumstances" clauses of their contracts. DuPuy Dep. 68:14-70:24, 74:11-76:8, 78:3-11, 83:18-84:23. Comcast objected to any "release" of "exclusive broadcast territories that are unserved or underserved by the Comcast RSNs." PX60. Fox also objected. PX61. MLB abandoned its plan to expand output. Tully Dep. 99:13-100:4.

51.     RSNs and MVPDs have also used their leverage—both individually and jointly—to impede the introduction of in-market streaming. MLB subjected in-market streaming decisions to the approval of "all three entities"—the team, the RSN, and the MVPD. PX62. Various television entities—particularly Comcast, Fox, DirecTV, and Dish—have opposed in-market streaming. PX63-65. MLB observed, "Distributors object because it compromises their exclusivity—and presents a possible alternative to pay cable." PX66 at 337821. In 2007, Fox sent a letter to each team it telecasts informing them that it was "opposed to any streaming of [the team's] games within [the team's] home television territory," then forwarded this letter to

9

Comcast; Comcast observed that the two companies were "in complete synch." PX63.

52.     Similarly, in 2009, Comcast discussed internally its belief that Fox would "likely continue to reject MLBAM's streaming terms." PX64. Shortly thereafter, Comcast sent a "rejection letter" to Mr. Bowman regarding in-market streaming. PX67. Comcast warned teams that DirecTV and Dish would also "aggressively resist any in-market streaming initiative, purs[u]ing every contractual option they have to prevent its occurrence." PX67.

## V.      THE RESTRAINTS HAVE ANTI-COMPETITIVE PURPOSES AND EFFECTS

### A. Defendants Intend the Restraints to Reduce Competition

53.     Throughout this litigation, Defendants' executives have testified under oath that the purpose of the territorial agreement is to restrict competition. Similarly, documentary evidence shows that the League uses its monopoly control over out-of-market games to restrict competition among otherwise competing telecasts and charge supracompetitive prices. The result, as intended, has been reduced output and increased prices.

54.     In the words of Bud Selig, then-Commissioner and former Milwaukee Brewers owner, the territorial restraints prevent the teams from being "true economic competitors in the video exhibition of games." Selig Decl. ¶ 42, April 22, 2014, ECF No. 256. John Henry, then a member of the MLB Executive Council and an owner of both the Boston Red Sox and its RSN similarly explained that allowing teams to distribute in currently prohibited territories would give them an "economic interest" in pursuing that distribution. Henry Dep. 103:13-20.

55.     As Mr. Henry explained, the reason to suppress that economic interest is to increase broadcasters' revenues from telecasting. "Not to have to compete with other clubs or with baseball itself in your home territory … is worth a lot to broadcasters and, therefore, to clubs." Henry Dep. 63:14-64:1. Mr. Henry could think of no purpose for the HTTs other than "creat[ing] exclusivity which is very valuable to broadcasters." *Id.* 64:2-17.

56.     San Francisco Giants CEO Laurence Baer agreed that a team "can earn more money if they have the exclusive rights to [their] territory." Baer Dep. 88:2-4. He acknowledged that the restraints eliminate competition among erstwhile competitors: "When clubs compete with the

Giants, the way I look at it, they compete on the field, okay? . . . I don't see us competing with them to sell tickets. I don't see us competing with them to sell sponsorships." *Id.* 167:22-168:3.

57.     As they were when creating the territories, *see supra* ¶ 17, baseball executives have been clear about their desire to suppress output. For example, Mr. Henry's co-owner Tom Werner talked with MLB personnel and other industry participants about the need for "controlling the supply of Major League Baseball games on television so as to affect the demand/interest for such games." DX510 at 497093.

### B.  But for the Restraints, Teams Would Distribute Nationwide

58.     As intended, this reduction in competition has reduced competitive offerings that consumers might desire, thwarting consumer preference and relieving teams of competition that would force them to invest more in their products and lower their prices. This is exactly what basic antitrust economics predicts: "This division of the market harms consumers by reducing the intensity of price competition and the variety of live game telecasts in every local television market." PX201 ("Noll Decl.") at 18. "[I]t is a well-known economic principle that horizontal market divisions are even worse than price-fixing because market divisions not only eliminate price competition but also eliminate nonprice competition on quality." PX205 ("Elhauge Rep.") ¶ 28.

59.     Indeed, the territorial agreement would be economically nonsensical unless it reduced competition. By agreeing to forswear a large segment of the country, each team and RSN is giving up a large potential market. Eliminating these sales would be "economically irrational if it does not increase the total revenues that baseball teams receive from other sales of television rights, so its effect must be to reduce competition in the sale of those rights." PX204 ("Noll Rebuttal") at 40-41.

60.     The evidence shows that all teams would most likely distribute nationwide but for the territorial restraint, because of the broad demand for telecasts and the minimal (or even negative) cost of distributing nationwide once a team is distributing its telecasts at all.

61.     Roughly half of each team's fans are located outside the team's home television territory.

11

Bowman Dep. 157:9-22; Noll Decl. at 45-46. Even at monopoly prices, more than a million people are willing to pay between $110 and $200 per season to obtain access to programming of teams outside of the market in which they reside. PX125; DX455. According to Prof. Murphy, most of these consumers "have strong preferences for their favorite teams." Murphy ¶¶ 90, 93. Each team thus has the potential to attract a significant number of subscribers if they made their telecasts available nationwide.

62.     Currently, nearly every RSN that carries MLB telecasts broadcasts nationwide on at least one MVPD, DirecTV, but with live game telecasts blacked out. Noll Decl. at 89; Noll Rebuttal at 41. If there is currently sufficient economic incentive to distribute the RSNs minus their most popular programming, while also incurring the cost of blacking out the games, there is no reason to doubt that there would be sufficient economic incentive to distribute the RSNs *with* the games and *without* the cost of implementing blackouts. Henry Dep. 98:10-17; Dolgin Dep. 52:18-55:4; Feeney Dep. 152:24-154:18; Hilgefort Dep. 69:5-72:1

63.     Similarly, once a telecast is distributed on the Internet—as all telecasts are today—it costs *more* to limit them geographically. The League incurs additional expense to "geolocate" and black out class members. PX203 ("Noll Reply") Ex. 1A. Nationwide distribution over the Internet would thus be cheaper than geographically limited distribution, while simultaneously giving teams access to a broader audience. Even if teams did not aggressively market these products, it would be against their unilateral incentives, but for the conspiracy, *not* to extend their distribution nationwide.

64.     Distribution at the fringes of existing HTTs also shows the demand for distant telecasts. The territories often extend hundreds (or even thousands) of miles from teams' ballparks, yet teams and RSNs seek to distribute throughout each HTT. In 2013, of the 75 largest designated market areas ("DMAs") in the United States, at least 70 received the maximum number of RSNs permitted by the Territorial agreement, and the five holdouts all had distribution by 2015. Noll Decl. Ex. 5A; Murphy Ex. 12.

65.     For example, Des Moines, Iowa, is assigned the HTT of six different teams, all of which

distribute their games through at least one MVPD in the Des Moines DMA. Noll Decl. Ex. 5A. If this market of just 430,000 people, located 194 miles from the nearest ballpark, has enough demand to warrant distribution of six teams, the similarly sized neighboring DMA of Omaha, Nebraska, can surely sustain distribution from more than one team. Noll Decl. at 15 & Ex. 1. It is even more certain that New York City, Los Angeles, or Chicago—each eight times the size of the Des Moines DMA or more—could sustain distribution by more than two teams. *Id.*

66.     Even though the League has not amended territories without expansion or relocation in 30 years—and is prohibited from doing so by Comcast and DirecTV—teams continue to desire broader markets. For example, in 2008, the White Sox sought to telecast in a popular vacation spot for Chicagoans, PX161, and the Boston Red Sox sought to telecast in Fairfield, Connecticut. PX69. The Red Sox have been seeking permission to telecast in Fairfield for nearly 25 years; the League has consistently refused, ostensibly for fear of injuring the Yankees or Mets, the two teams in the largest media market in the country. PX70.

67.     Teams view telecasts of their own games as promotional. Baer Dep. 46:2-10; Nutting Dep. 96:6-8. Because the club incurs no costs (other than the cost of negotiating rights agreements and accommodating broadcasters), they have an incentive to offer rights even if the rights fees they receive drop to near zero. Noll Decl. at 83.

68.     For RSNs, too, telecasting would still make economic sense even if competition significantly reduced potential revenues. MLB telecasts are inexpensive to produce relative to other programing. The incremental cost of creating a telecast of a game is ███████████████████ ████████ per game, or ███████████████████████ per hour. PX71; PX72.

69.     MLB telecasts are no more expensive and sometimes even cheaper to produce than other televised sports. ██████████████████████████████████████████████████ ██████████████████████████████████████. PX71. ████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████ PX72.

70.     The costs of broadcasting a game are so low that, when a game is not carried by either

RSN or a national broadcaster, MLBAM always produces its own broadcast. It is economical to do so even though the MLBAM telecast is not available live in the markets of the teams playing, and is available only to the small fraction of potential viewers who are MLB.tv subscribers. Bowman Dep. 49:3-50:11.

71.     The availability of other sports reflects these cost structures and incentives. All minor-league baseball games at the top, AAA level are distributed, as are many lower-level games. Not only are many of these games telecast locally, they are all available on a streaming package made available through MLBAM called "MiLB.tv." They are not subject to territorial restraints, and thus broadcast despite the lack of "game exclusivity" or "content exclusivity." Noll Decl. 97-98.

72.     College sports are widely televised despite having no territorial restraints. Noll Decl. 110. Similarly, MLBAM streams a variety of sports, such as college field hockey and squash, regardless of the sports' popularity and without territorial limitation. Bowman Dep. 61:4-62:5.

73.     There would also be continued demand for the league package. According to one analysis commissioned by MLB, 31% of "Avid" fans are "Very likely to view MLB games not involving their favorite team." DX362. Moreover, if Defendants are correct that the out-of-market packages are an efficient means of distributing games, "it will continue to be offered without the market division, and if the Bundle is not, then the Bundle is just an inefficient artifact that is purchased only because it is the sole way for fans to buy out-of-market games." Elhauge ¶ 35.

74.     Defendants have not met their burden of showing that teams would withhold games from a bundle or charge a fee to the league for their feeds. There is no evidence of any team in any sports league ever charging a fee to the league for distribution of its telecasts in any context, and such a decision would have to be approved by a majority of teams (at least), which would take into account revenue-sharing effects. Noll Rebuttal 43-44; Elzinga Dep. 153:19-154:7.

75.     Moreover, the teams currently supply their radio feeds to the league for bundled distribution without feed fees, without blackouts designed to ensure "content exclusivity," and without "game exclusivity." Noll Rebuttal 56-57; PX73. Indeed, satellite radio company XM

paid $650 million to distribute MLB radio feeds even though the same feeds are available simultaneously on over-the-air radio stations and the League's subscription bundle. DX146.1.

76.     Unlike radio, the territorial scheme in television denies class members access to hundreds of telecasts each season. In each HTT, an in-market team's games can only be seen through the in-market team's telecast; the opponent's telecast is not available by any means, at any price, unless the two teams' territories overlap in that consumer's area. Thus, for every consumer in America, at least 151 telecasts are not available by any means in a typical season. Noll Rebuttal 49.

77.     For example, in New York City, which has been reserved exclusively for the Mets and Yankees, at least 290 telecasts were entirely removed from the market by the territorial restraints in 2015. The Mets and Yankees play each other up to 6 times a season; in those games, both telecasts are available in New York City. PX101. But in all other games they play, the opposing team's telecast is unavailable to New York consumers.

78.     In Iowa, Hawaii, or Las Vegas—areas given to six HTTs—the numbers are even higher. In 2015, for example, the teams within Iowa played each other 153 times during the regular season, out of the 819 games involving those teams. In the other 666 games, consumers in Iowa were prohibited from choosing the opposing team's telecast, depriving Iowa consumers of access to roughly 14% of the regular season telecasts. PX101.

79.     This is a substantial harm to consumer welfare. A team's own telecast has many features that particularly appeal to fans of that team. San Francisco Giants owner and CEO Laurence Baer described the differences as "[d]ifferent announcers, different production values, different marketing presentations, and promotional announcements and a different strategic imperative as to what to promote and how to present the game to two different fan bases." Baer Dep. 101:14-23. Fans respond to these differences and like "the fact that they can get the games on—with our feed … and with our announcers." Baer Dep. 102:18-103:7. As Pittsburgh Pirates owner Robert Nutting put it, "There is a huge difference, as a fan, watching a Dodgers feed versus a Pirates feed of the game. I mean they are almost watching two separate games." Nutting Dep. 133:3-6.

80.     Finally, the territorial agreement has also harmed competition by retarding the development of in-market streaming over the Internet. In 2015, no United States team offered its games over the Internet within its market. But for the territorial agreement, many if not all teams would have done so before now. As Mr. Bowman testified, every team wants to stream its games over the Internet within its territory. Bowman Dep. 176:7-12. This was confirmed by multiple team owners. Henry Dep. 153:21-154:8; Baer Dep. 161: 18-22. It has been blocked by League and telecasters' actions. See ¶¶ 51-52 above.

**C.  But for the Restraints, Prices Would Be Lower**

81.     The high rights fees paid by the RSNs to preserve exclusive broadcasting territories cause elevated fees to consumers. ██████████████████████████████████████
█████████ ECF No. 295; ██████████████████ ECF No. 292. These costs are passed on to MVPDs in the form of higher carriage fees, and to subscribers in the form of higher subscription fees.

82.     Territorial allocations also increase prices for national telecasts. "[N]ational networks place great value on the exclusive national rights they pay for …. Among other things, this value is reflected in provisions in the FOX and ESPN agreements with MLB that affirmatively prohibit clubs from authorizing telecasts beyond their HTTs and place restrictions on MLB's ability to expand HTTs … ." Tully Decl. ¶ 23, May 27, 2014, ECF No. 285.

83.     Further, by forcing consumers to purchase a bundle of all out-of-market games, defendants have made the bundle "the monopoly offering for out-of-market baseball games." Elhauge ¶ 66. Without price competition, the profit-maximizing price of the bundle is supracompetitive. Elhauge ¶¶ 71-72. Because of the high prices charged for the bundles, less than 1% of baseball fans subscribe to an out-of-market package, Elhauge ¶ 40, even though roughly half of all of the teams' fans are located out of market. Bowman Dep. 157:14-22

84.     The League also intentionally prices the bundle even higher to further limit price competition. MLB's Senior VP of Broadcasting, Christopher Tully, wrote, "We limit our [package] offering to maintain a high price point and restrict the number of subs." PX74. Robert Bowman, MLB's President of Business and Media, explained that they seek to avoid

"cannibalizing MLB's local and national video distribution framework." Bowman Decl. ¶ 7, Nov. 12, 2014, ECF No. 360-9; Henry Dep. 100:6-22, 103:13-20.

85.    The League also actively maintains elevated prices for MLB Extra Innings by coordinating pricing decisions between the ostensibly competing MVPDs. On April 17, 2007, DirecTV met with MLB to agree to the terms of its own Extra Innings contract, and also the contracts for Comcast and other MVPDs. MLB and DirecTV agreed that all contracts would have a formula to "protect ag[ainst] price wars." PX75.

86.    At the beginning of each season, MLB shares each MVPD's tentative pricing plans with its competitor so that they can "work to be on similar lines." PX76. As MLB Senior Director of Broadcasting Susanne Hilgefort explained to a colleague: "I always tried to share each other's pricing and dates in an attempt to be 'fair and equitable' amongst the partners and at least keep them informed, if not on [the] same page. … Once [In Demand] sets their pricing, I share it back w/ DirecTV so there are no surprises and no one yells about anything." PX76.

### VI.    DEFENDANTS HAVE MARKET POWER IN RELEVANT MARKETS

87.    MLB telecasts compete with each other and constitute a relevant product market. The territorial system itself would serve no purpose if different MLB games were not close competitive substitutes. The division of the nation into HTTs "makes economic and business sense only if, in the absence of such a policy, out-of-market telecasts would be offered within the home markets of teams and would be competitive substitutes of telecasts of games involving the home-market team." Noll Decl. at 47-48.

88.    Defendants have repeatedly acknowledged that baseball games are competitive substitutes. For example, former Commissioner Selig testified that "let[ting] anybody go everywhere" would "weaken all your competitors." Selig Dep. 104:7-9. But for the territorial agreement, Mr. Selig has said, teams would be "true economic competitors in the video exhibition of games." Selig Decl. ¶ 42. In 1997, Defendant New York Yankees sued Major League Baseball for antitrust violations, alleging relevant markets in retail licensing and sponsorship that comprised only "major league professional baseball." PX77.

89.     Years of economic research has shown that sports teams are close competitive substitutes *within* a sport, but not *between* sports. Noll Decl. at 39-49. Economic studies conclude "that a team in one sport is not a close competitive substitute for attendance at games of a team in another sport." Noll Decl. at 42. They are "not likely to be close competitive substitutes in the market for television rights because the demand for television rights is derived from the same consumer preferences as the demand for attendance." Noll Decl. at 49.

90.     MLB faces *no* competition from any other major sports league for nearly three months. Noll Decl. at 37; Noll Rebuttal at 20. Because "nearly all of the value of a sporting event is for access to it at or near the time that it occurs," and other major sports do not play during the bulk of the MLB season, telecasts of games in different sports cannot be close competitive substitutes for MLB telecasts. Noll Rebuttal at 19-20.

91.     There is no evidence that pricing of MLB Extra Innings and MLB.tv are constrained by other sports programming packages. Mr. Bowman, the President and CEO of MLBAM, testified that MLB.tv's prices have never been changed in response to a change in the price of the out-of-market services of the other major league sports. Bowman Dep. 92:5-16.

92.     The prices of the bundles offered by the four major sports leagues "moved independently" from 2005 through 2010. Noll Decl. at 51; PX78.

93.     Standard economic measures also show that Defendants possess market power. For example, the Lerner Index, which measures "the proportion of the price that represents a mark-up over marginal cost," "is regarded as a reliable indicator of market power" when it is "high and, especially, rising." Noll Decl. at 75. The index ranges from zero to one, with an index score of 0.05 or above "indicat[ing] the presence of sufficient market power to raise concerns about the competitiveness of the market." *Id.*

94.     MLB.tv's Lerner Index was at least .774 in 2011 and .839 in 2012, many times above the 0.05 threshold, even when assuming that all costs are marginal costs. Noll Decl. at 81 & Reply Ex. 1A. These values are "near the maximum value of 1.0 and far above 0.05, the level that gives rise to antitrust concerns in the case of a merger," and "show[s] that MLB enjoys substantial

market power in the sale of MLB.tv." Noll Decl. at 81.

95.  Similarly, teams' average revenue from local broadcasting rose from ███████ 2006 to ███████ 2013, far above cost, showing that competition for non-baseball programming rights does not exert competitive pressure. PX79; PX80; Noll Decl. at 82-83.

96.  Teams' high market concentration and the high barriers to entry further support the conclusion of market power. Each team has at most one competitor within its metropolitan area and few if any competitors within several hours' drive. To form a new baseball team would require the investment of hundreds of millions of dollars, construction of a stadium, and permission from the 30 existing teams. Similarly, entry for new RSNs is exceedingly difficult, such that, in practice, the only potential competitors are existing RSNs and locally dominant MVPDs. Noll Rebuttal at 34-36; Noll Decl. at 86.

97.  Because league rules dictate what options are available, "each group of DMAs for which the same teams have home television rights [is] a relevant submarket." Noll Decl. at 58.

98.  Defense expert Professor Murphy contends that MLB baseball games are in the same telecast market as everything else on television. However, the Federal Communications Commission has extensively studied competition among different forms of programming, and concluded that "[s]ports programming continues to be a distinct form of programming in comparison to movies and other types of television programming." PX81 at 172.

99.  Professor Murphy's argument is "economically unsound" and, indeed, relies on a methodology that antitrust economists have rejected. Elhauge ¶¶ 42-56; PX82; PX83.

100.   Professor Murphy's argument is inconsistent with Defendants' admissions that prices would fall if the restraints were removed and with their position that certain clubs would be harmed by other clubs' broadcasting.

101.  The supracompetitive value of telecast exclusivity is further shown by DirecTV's attempt to contract with MLB for $700 million to exclusively televise Extra Innings. After a public and Congressional outcry, exclusivity was rescinded, and multiple MVPDs paid a total of $560 million for distribution rights. DirecTV was willing to pay at least $140 million more than the

entire market was willing to pay in order to obtain exclusivity. Noll Decl. at 83-84; PX84; PX85.

### VII.   THE RESTRAINTS DO NOT CREATE LEGITIMATE PROCOMPETITIVE BENEFITS, AND DEFENDANTS' PROPOSED BENEFITS COULD BE ACHIEVED THROUGH LESS RESTRICTIVE ALTERNATIVES

102.   Defendants generally, and Professor Murphy in particular, contend that "game exclusivity"—the exclusive right of a single entity to broadcast a particular game to a particular audience—is both beneficial to competition and is a result of the territorial system. Murphy Decl. at 4 n.10. Neither contention is supported by the record.

103.   Game exclusivity has become steadily less common over time. While Professor Murphy claims that national network contracts have "almost always provided game exclusivity," the record shows that Defendants have increased the number of non-game-exclusive national telecasts to the point that they are now the majority of all national broadcasts. PX86; PX104. The majority of national broadcasts are shown side-by-side with the local team's telecast of the game.

104.   Many games involve teams with shared territories. Nothing prevents the teams from agreeing to an arrangement that guaranteed game exclusivity, but no teams have such an arrangement, and *all* non-national-exclusive games were broadcast simultaneously by both teams to the same audience in 2015. PX104. In addition, 99.7% of games between teams with partially overlapping territories were telecast by both RSNs. PX103.

105.   There is no game (or content) exclusivity at all with respect to the team's radio broadcasts. Every radiocast of every team is available everywhere in the country, including the opposing team's city, through MLB's Gameday Audio Internet product, and through satellite radio—yet every team licenses the exact same feed to local radio stations. PX73; Noll Rebuttal at 56-57. "The presence of alternative pathways for receiving radio broadcasts of every fan's favorite team has destroyed neither broadcasts over local radio stations nor the national bundle of these broadcasts." Noll Rebuttal at 56-57.

106.   Even if Defendants met their burden of proving the value of game exclusivity, they have not shown why the territorial scheme is necessary. Game exclusivity could be achieved by

agreement of the participating clubs and, in any event, does not require the exclusion of *other* teams' games.

107.    Defendants' contention that exclusivity is needed to promote investment is neither supported by the record nor a potential justification. "[T]he incentive for added investment" presumed by defendants' position "is inflated profit stemming from limited competition." *SJ Op.*, 56 F. Supp. 3d at 299. Defendants' position is not cognizable under the antitrust laws. The Sherman Act is not designed to protect firms from the effects of competition, much less when they already have a natural competitive advantage in their respective home markets.

108.    Defendants imply that the restraints have increased the number of telecasts available over time. However, they have made no attempt to control for the many technological changes that have increased the quantity and quality of telecasts of all types over the same period, and there is no basis for concluding that the territories had any causal role. Noll Rebuttal at 58-59.

109.    Nor is Defendants' claim that certain teams would not be "viable" cognizable. Defendants have provided no economic analysis to show the lack of viability of any clubs, and in any event, the Sherman Act does not contemplate protecting competitors from the effects of competition. If clubs are unable to attract sufficient interest, even where they enjoy a natural advantage in being the only supplier of major league baseball games in a particular area, then they are not entitled to be protected from the operation of the market to ensure their viability in a particular place with a particular ownership group.

110.    History belies Defendants' claim that certain clubs would not be able to survive if certain clubs were able to distribute their games independently, nationwide. For decades, certain teams, including the Atlanta Braves and the Chicago Cubs, broadcast most of their games on "superstations," which are local, over-the-air stations distributed nationwide. Noll Rebut. at 41, 45-47. That is exactly what the league now argues would "destroy the market" for smaller market teams—a team licensing its own broadcasts for nationwide distribution, thereby "invading" the territories of other teams.

111.    Defendants claim the territorial restraints are procompetitive because they promote

"competitive balance." They claim, first, that the restraints promote "balance on the [ball] field." Manfred Dep. 52:5-19. They claim, second, that the restraints preserve all 30 existing teams in the league, and that if a few "iconic" teams (*e.g.*, the New York Yankees or Chicago Cubs) could "invade" the HTT's of smaller, weaker clubs (*e.g.*, the Tampa Bay Rays or Pittsburgh Pirates), those clubs would supposedly go out of business, and there would be a net reduction of baseball teams and therefore games, hurting consumer welfare. Manfred Dep. 55:14-56:3, Selig Dep. 103:15-104:9.

112.    These positions are speculative and unsupported. Defendants cannot point to a single study they undertook or commissioned to support these contentions. The territories were not created to improve competitive balance, and there is no evidence that they do so. The territories were created in the early 1980s and finalized in 1993. At no point was competitive balance mentioned. Rather, territories were created to prevent "diluting" the value of telecasts to networks (thus preventing them from paying as much in rights fees) and because "there was a risk . . . of having too much baseball on television" PX7; PX9.

113.    In 1999—20 years after the territories were created and 6 years after they were finalized—MLB stated, "Competitive imbalance has never been greater." PX87. To address this, they created a Blue Ribbon Panel on Economics. PX88. The Panel's 93-page report does not make any recommendations with respect to the territories, and mentions television markets only in the context of highlighting how imbalanced they are in terms of value. PX88 at 18 ("Because local markets vary greatly in size, the local TV and radio revenues flowing to each club vary in size by large amounts.").

114.    As the Blue Ribbon Panel confirmed, the HTTs themselves *led to*—not alleviated— significant imbalances among teams. The teams with the largest markets have access to four times as many households as the teams with the smallest markets. PX89. This leads some teams to earn fifteen times as much in fees as teams in the smallest markets do. PX79. As MLB admitted, "[t]here are inherent differences in the economics of each club's territory and locally generated revenues." MLB Def's R. 56.1 ¶ 25, ECF No. 283. The League has made no effort to

equalize territories or update them to improve competitive balance. DuPuy Dep. 27:4-16. Indeed, the League rejected a proposal to equalize territories when it created them, and has made no corrective changes since. DX170; *see infra* ¶¶ 27-28.

115.    For the territorial allocation and the League's exclusive control of out-of-market distribution to improve competitive balance, there would have to be a causal chain (i) between the territories and revenue equity, (ii) between revenue equity and payroll equity, (iii) between payroll equity and team quality, and (iv) between relative team quality and the increased interest in baseball. None of Defendants' economists has analyzed any of these relationships. Moreover, economic research has shown that "pooled sale of television rights by a league either has no effect on competitive balance or makes matters worse." Noll Decl. at 119. None of Defendants' five economic experts have ever disputed this economic consensus. Nor do any of them attempt any analysis of the effects of the territorial allocation on competitive balance.

116.    The only relevant economic analysis put forth by Defendants contradicts the conclusion that the territories promote competitive balance. Professor Murphy opines that baseball telecasts do not compete with each other any differently than every other program on television. Under his analysis, *no* adverse consequences could flow from allowing unfettered telecasts of baseball games. According to this opinion, telecasts of Cubs or Yankees games could no more threaten the Tampa or Pittsburgh teams than do reruns of *I Love Lucy*.

117.    In any event, the League has other mechanisms to address "competitive balance." As noted above, the League's seminal effort to address competitive balance, the Blue Ribbon Commission, did not attempt to improve competitive balance through television policies. PX88. Instead, it recommended revenue sharing, a "competitive balance tax," a new distribution formula for central revenues, various changes to player drafts, and franchise relocation. PX88 at 8-10.  These areas are far less restrictive alternatives than horizontal market allocation.

118.    "If the leagues wish to share revenue more equally, simply increasing the share of total revenue that is shared is a much simpler mechanism for achieving this goal that also is much less anticompetitive than dividing the nation into exclusive local broadcasting territories, especially

when the economic value of these territories is highly variable and actually advantages the teams in the best DMAs." Noll Decl. at 119-20.

119.    Nor are the HTTs plausibly related to any area from which the team expects to draw ticket buyers. As discussed, several teams have HTTs that extend hundreds or thousands of miles from their home ballparks. At the same time, some are prevented from distributing telecasts to consumers who live less than fifty miles from their ballpark. PX100.

120.    Finally, the League's current rules for radio, which mirror the pre-1980 television agreements, provide another model of less restrictive alternatives. They permit the home team to broadcast nationwide except in the visiting team's local market, and permit the visiting team to broadcast within its market. PX1, Art. X, § 3(b). This less restrictive rule has led to *broader* availability than for telecasts; unlike telecasts, every single radiocast, both home and away, is available nationwide. Noll Rebuttal at 56-57.

121.    Eliminating territories would increase consumer choice. Currently, only 1% of fans purchase the bundled out-of-market packages, despite the fact that this programming is so inexpensive to produce and distribute, and despite the fact that so many fans prefer teams that are only available on the package. Elhauge ¶ 40. If teams could broadcast outside of their HTT's, both by cable and Internet, the choices for consumers would increase dramatically.

## VIII.   CONCLUSIONS OF LAW

1.    Defendants have entered into agreements to geographically allocate the market for telecasting live major league baseball games and restrict the methods by which those products can be distributed.

2.    Plaintiffs have standing to challenge these agreements, because they are ongoing participants in the market for major-league baseball telecasts; because they have previously purchased Defendants' out-of-market bundles subject to the challenged restraints, and either continue to purchase major-league baseball telecasts or have shown that they may do so in the future if the restraints are lifted; and because they have been denied any means of accessing hundreds of telecasts, including telecasts of their preferred teams.

3.      These agreements restrain trade among horizontal competitors. As Defendants intended, they have reduced output, restrained consumer choice, and increased price.

4.      Because Plaintiffs have shown an explicit agreement not to compete, and have directly shown anticompetitive effects, the Court does not need to define a relevant market. Nevertheless, distribution of telecasts of live major league baseball games is a relevant product market. The geographical market is the United States, with submarkets created by the territorial allocation itself. Defendants collectively possess substantial market power in these relevant markets.

5.      Defendants have not met their burden to show that the challenged restraints produce any legitimate competitive benefits. Their purpose is to obtain monopoly rights fees from the telecasters, who derive monopoly subscription fees from consumers. Defendants have proffered no credible evidence of any supposed benefits.

6.      Even if Defendants had provided proof of their claimed justifications, each of those goals could be achieved through less restrictive alternatives than horizontal market allocation. Had Defendants shown any marginal competitive benefit that exceeds what other restraints could achieve, it likely would have been outweighed by the clear competitive harm.

7.      Accordingly, the challenged restraints are illegal under 15 U.S.C. § 1.

8.      The League Defendants' conduct also violates Section Two of the Sherman Act, 15 U.S.C. § 2. Defendants have engaged in anticompetitive conduct with a specific intent to confer monopoly power on MLB teams in their artificially created submarkets and to create monopoly power in the League as a distributor of out-of-market broadcasts. Their conduct not only has a dangerous probability of achieving monopoly power, it has in fact achieved that power. Defendants have also used their market power to prevent competition in the relevant market.

9.      This conduct injured Plaintiffs and members of the class they represent. Each was denied access to competitive choices, including a competitively priced out-of-market bundle and access to team's games. Each was completely denied access to hundreds of telecasts each season. And those who subscribed to an MVPD paid higher prices as a result of the reduced competition.

10.      For these reasons, the challenged restraints must be enjoined.

Dated: December 18, 2015

Respectfully submitted,

Edward Diver
Howard Langer
Peter Leckman
**LANGER, GROGAN & DIVER, P.C.**
1717 Arch Street, Suite 4130
Philadelphia, PA 19103
Telephone: (215) 320-5660
Facsimile: (215) 320-5703

Jeffrey B. Dubner
**COHEN MILSTEIN SELLERS &
TOLL, PLLC**
1100 New York Ave. NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

Robert J. LaRocca
**KOHN, SWIFT & GRAF, P.C.**
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
Facsimile: (215) 238-1968

Marc I. Gross
Adam G. Kurtz
**POMERANTZ, LLP**
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212)-661-1100
Facsimile: (212) 661-8665

Joshua D. Snyder
**BONI & ZACK, LLC**
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Telephone: (610) 822-0200
Facsimile: (610) 822-0206

***Attorneys for Plaintiffs***