**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

FERNANDA GARBER, MARC LERNER,
DEREK RASMUSSEN, ROBERT SILVER,
GARRETT TRAUB, and VINCENT
BIRBIGLIA, representing themselves and all
others similarly situated,

                              Plaintiffs,

          v.

OFFICE OF THE COMMISSIONER OF
BASEBALL, et al.,

                              Defendants

No. 12-cv-3704 (SAS)

---

### PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

Plaintiffs Marc Lerner, Derek Rasmussen, Garrett Traub, and Vincent Birbiglia ("Plaintiffs"), on behalf of themselves and the Class certified by this Court on May 14, 2015, respectfully move the Court for preliminary approval of their Settlement Agreement ("Agreement") with all Defendants in *Garber v. Office of the Commissioner of Baseball*.[1] If approved, the Agreement would fully resolve the *Garber* litigation.

The Plaintiffs request that the Court grant preliminary approval of the Settlement and enter the proposed Order Preliminarily Approving Proposed Settlement, Scheduling Hearing for Final Approval Thereof, and Approving the Proposed Form and Program of Notice to the Class ("Proposed Order") attached as Exhibit A to the Agreement.

---

[1] As discussed below, the Court certified two separate classes, an Internet Class and a Television Class. For purposes of this motion, Plaintiffs will refer to them jointly as the "Class," unless otherwise specified.

1

I.      INTRODUCTION

        The Agreement follows over three-and-a-half years of hard-fought litigation, extensive

trial preparations, and intense negotiation. *See* Declaration of Howard I. Langer ("Langer Dec."),

Ex. 1, ¶¶ 1-14. The Agreement provides relief for Class members and the broader public through

increased consumer choice and lower prices. The Agreement provides more relief than the

agreement the Court previously approved in the *Laumann* litigation.[2] As the NHL agreed to do in

*Laumann* with regard to its Internet out-of-market package, MLB will offer an unbundled

MLB.TV Internet package for the next five years, allowing for the purchase of single-team

packages for a price significantly below the price of the league-wide bundled package.[3]

Enhancing the choices presently available for consumers of MLB telecasts, consumers will be

able to choose between a season-long package of an individual team from outside their local

markets, or they can choose to purchase the league-wide out-of-market bundle. In contrast to

*Laumann,* the reduced prices on MLB.TV obtained as part of the settlement are guaranteed for

all packages for five years with very limited rights to increase over that time.

        In addition to the single-team package offering, which was the centerpiece of the

*Laumann* settlement, the *Garber* agreement provides additional options to consumers. The

agreement creates a "Follow Your Team" variant of MLB.TV, which—for the first time in any

major professional sports league—will allow consumers to watch a chosen out-of-market club's

telecast of a game even when that club is playing an "in-market" club. This new product, which

will cost only $10 more than the MLB.TV package, will enable authenticated subscribers—

---

[2] *Laumann v. National Hockey League*, No. 12-1807, is a related case involving National Hockey
League telecasts whose settlement was finally approved by this Court on September 1, 2015.
[3] MLB will also offer the MVPD Defendants the ability to sell Extra Inning television packages
as single-team unbundled products.

individuals who are pay television subscribers of the RSN that carries the in-market club—to watch what, up until now, would have been "blacked out" telecasts.

The agreement also ensures that "unserved" fans who do not have access to any MVPD or virtual MVPD service will be able to watch both in-market and out-of-market games through the Internet on MLB.TV. The agreement creates an incentive for MLB to provide free live local team broadcasts over the Internet ("In-Market Streaming" or "IMS") by prohibiting any increases of any Internet package prices if IMS is not in place for the 24 RSNs carrying MLB games owned by DIRECTV, Comcast and 21st Century Fox by the start of the 2017 season.

The Agreement also requires significantly lower prices. For the upcoming season, the single-team package will cost $84.99. This will be the least expensive full-season package offering among all major professional sports leagues in the United States and represents a 23% reduction from the cheapest version of MLB.TV previously available and a 35% reduction from the most commonly purchased version. It is twenty dollars below the price of the single-team stream required by *Laumann.*

In addition, MLB.TV will discount full-season prices for the league-wide package by over 15% from last year's prices. MLB.TV will now be available for $109.99, down from $129.99 in 2015. Through the 2020 season, these package prices may not increase by more than the greater of 3% (the average inflation rate over previous decades) or the Social Security Administration's annual Cost of Living Adjustment (COLA)—and may not increase at all if MLB does not ensure in-market streaming for authenticated subscribers to RSNs carrying MLB games owned by DIRECTV, Comcast, and 21st Century Fox. In addition, for the 2016 and 2017 seasons, Comcast and DIRECTV will provide the full season MLB Extra Innings product at a 12.5% discount from the 2015 price.

The Agreement is fair, reasonable, and adequate. If approved, Class members would be entitled to the benefits of the settlement immediately—including enhancements and price cuts beyond those obtained in the *Laumann* settlement—rather than facing the risk of ongoing litigation, including the additional risk associated with baseball's antitrust exemption, an issue not present in *Laumann*. This settlement is in the best interest of Class members, and provides exceptional relief.

## II.    NATURE OF THE CASE

The Court is well versed in the factual background of this case. *See, e.g.*, *Laumann v. Nat'l Hockey League*, 56 F. Supp. 3d 280 (S.D.N.Y. 2014) ("S.J. Order"). The following facts are only those most relevant to preliminary approval of the settlement.

### A.    Plaintiffs' Claims

Plaintiffs represent a class of purchasers of league-wide "out-of-market" packages. They claim the prices of the packages are inflated and consumer choices diminished as a result of MLB's broadcasting territories, which create local monopolies for each club and its television partner in exchange for an agreement not to compete against the broadcasts of other clubs. By league-wide agreement, the clubs include these market-dividing restrictions in their contracts with their broadcast partners. *See generally*, S.J. Order, 56 F. Supp. 3d at 286-89. As a result, the markets for live-baseball programming are subject to horizontal, geographical market divisions. Plaintiffs allege that these agreements violate the Sherman Act.

As Plaintiffs have previously argued, the challenged restraints limit consumer choice, reduce output, and increase prices. *See Garber* 2d Am. Compl., Docket No. 177 at ¶ 99; *Laumann v. Nat'l Hockey League,* 105 F. Supp. 3d 384, 401-02 (S.D.N.Y. May 14, 2015) ("Class Cert. Order"). These harms impact all Class members. As the Court held, "all class

members—including previous subscribers to the OMPs ["Out-of-Market" Packages]—are consumers in the market for baseball … broadcasting. All class members, therefore, suffer an ongoing injury in connection with the complained-of restraints—a dearth of choice in the market for baseball … broadcasting." Class Cert. Order, 105 F. Supp. 3d at 412.

### B.    The Procedural History of the Litigation

Plaintiffs filed their original complaint against the MLB Defendants on May 9, 2012. Docket No. 1. The Court ruled on Defendants' motion to dismiss on December 5, 2012, *Laumann v. Nat'l Hockey League,* 907 F. Supp. 2d 465, 472-75 (S.D.N.Y. 2012), allowing Plaintiffs who had purchased out-of-market bundles from one of the Defendants to proceed with their claims.

Nearly 18 months of discovery followed. The resulting record consisted of hundreds of thousands of documents and dozens of depositions. During this same time period, Plaintiffs rebutted Defendants' attempt to limit the scope of the litigation in various ways. *See, e.g. Laumann v. Nat'l Hockey League,* No. 12 Civ. 1817, 2013 WL 837640 (S.D.N.Y. Mar. 6, 2013) (denying motion to stay litigation); Docket No. 222 (granting in part and denying in part motion to compel arbitration and stay certain claims). In April 2014, each of the Comcast, DIRECTV, and MLB Defendants moved separately for summary judgment. The Court denied all of Defendants' summary judgment motions in full. *See generally* S.J. Order.

The litigation produced lengthy expert declarations and depositions. In March 2015, the Court held a three-day evidentiary hearing to consider Plaintiffs' motion for class certification and Defendants' *Daubert* challenge to Plaintiffs' expert's damages model. Docket Nos. 339, 354. On May 14, 2015, the Court certified a class of purchasers of the OMPs seeking injunctive relief under Federal Rule of Civil Procedure 23(b)(2), although it declined to certify a class seeking

damages under Federal Rule of Civil Procedure 23(b)(3). *See* Class Cert. Order*, 105 F. Supp. 3d at 412. While many of the issues in the *Garber* action overlapped with those in *Laumann*, Plaintiffs in the *Garber* action faced the additional argument from MLB that the territorial broadcast restraints at issue here fall within Major League Baseball's limited exemption from the antitrust laws. The Court rejected Defendants' arguments on this point on summary judgment, as well as MLB's attempt to appeal it immediately. *See* S.J. Order, 56 F. Supp. 3d at 291-97.

On June 10, 2015, the plaintiffs and defendants in *Laumann* reached a proposed settlement resolving claims against the NHL. *Laumann* (1:12-cv-01817), Docket No. 352-1. Under the *Laumann* settlement, the NHL agreed to provide seasonal packages of a single team's out-of-market games over the internet and to make this single-team option available to Comcast and DIRECTV so that they may offer unbundled seasonal packages of single team games for NHL teams. The NHL also agreed to discount retail prices for the full-season league-wide packages for the 2015-2016 season and to discount the unbundled single team package. The Court granted the *Laumann* settlement preliminary approval on June 15, 2015, *Laumann* Docket No. 353, and final approval on September 1, 2015, *Laumann*, Docket No. 379.

### C.     The Parties' Settlement Negotiations

Settlement negotiations began in December 2013, when a mediation session was held by United States Magistrate Judge Dolinger. Langer Decl., ¶ 2. That effort was unsuccessful. The MLB Defendants did not participate in the negotiations that resulted in the *Laumann* settlement. Formal settlement talks with the MLB Defendants recommenced in July 2015, when a meeting was held in Philadelphia between counsel for MLB and class counsel. *Id*., ¶ 3. A second meeting was held among counsel for all parties on October 2. These meetings were unsuccessful and the parties appeared to be at an impasse. *Id*.

6

On November 10, 2015, the parties in the *Garber* action participated in a mediation before Stephen M. Orlofsky, former United States District Judge of the District of New Jersey, who had mediated the *Laumann* settlement. Langer Decl. ¶ 4. The in-person session before Judge Orlofsky was unsuccessful. On November 16, 2015, MLB served an Offer of Judgment presenting terms similar to those in the *Laumann* settlement, which Plaintiffs declined to accept. Langer Decl. ¶ 5. After Thanksgiving, the parties engaged in extensive negotiations, both in person and over the phone. Langer Decl. ¶¶ 6-12.

Throughout, the parties negotiated at arm's length, represented by experienced and skilled counsel. Langer Dec. at ¶ 13. The Agreement is the product of a hard fought compromise reached only days before trial was set to begin.[4]

## III.    KEY SETTLEMENT TERMS

### A.    The Class

The Agreement combines the "Internet Class" and the "Television Class" certified in the Court's May 14, 2015 Order into a single definition:

> All individuals in the United States who purchased television service from DIRECTV and/or Comcast, which included MLB Extra Innings, and/or who purchased MLB.TV from the MLB Defendants or their subsidiaries, at any time between May 9, 2008, and the date on which Plaintiffs file a motion for Preliminary Approval, as certified by the Court in its May 14, 2015 Order [Docket. No. 430].

Agreement at ¶3

---

[4] It was not until the parties had reached agreement on the material terms of the relief to the Class on January 11, 2016 that the negotiation turned to the issue of attorneys' fees and costs to be paid to the Plaintiffs. *See* Langer Dec. at ¶ 14.

### B.    Settlement Benefits

The Agreement increases consumer choice and includes benefits to consumers beyond those provided under the *Laumann* settlement. As with the *Laumann* settlement, MLB will offer single-team broadcast packages for all MLB clubs over the Internet, in addition to the current league-wide MLB.TV bundle, for a five-year period starting with the 2016 season. Agreement ¶ 55. The single-team offerings will be priced more than 20% below the league-wide bundle, which addresses one of the core alleged effects of the restraints limiting consumer choice to either in-market television broadcasts or a single league-wide out-of-market package.[5] The geographical limitations applicable to the league bundle will apply equally to the single-team packages.

Although the single-team and bundled packages will retain the league's territorial structure, two new options will be made available.  First, MLB has agreed to create a new "Follow Your Team" variant of MLB.TV. Agreement ¶ 58.  For the first time, subscribers will be able to purchase an enhancement—for only $10 more than the standard MLB.TV package— that will allow them to follow a favorite out-of-market club's telecasts, including those played against the subscriber's local teams. *Id.* This new product will enable authenticated subscribers— individuals who are pay-television subscribers of the RSN that carries the in-market club—to watch the telecasts produced by their preferred club even while playing the local club, an option that is presently unavailable to any subscriber to any package.  The Follow Your Team product thus allows viewing of the selected out-of-market Club's games blackout-free.

---

[5] In addition, MLB will make such single team packages available to DIRECTV and Comcast, allowing them to offer television packages on this same basis. Agreement ¶ 55.

Likewise, unserved fans (those consumers who are unable to obtain any MVPD or virtual MVPD service at their residence) will be able to purchase MLB.TV with telecasts of in-market games included for viewing—the games that are otherwise blacked out on MLB.TV.

The MLB Defendants have also committed to making good faith efforts to enter agreements for live in-market streaming, which will enable consumers to view in-market games over the Internet. The agreement encompasses 24 of the 28 RSNs that carry games of U.S.-based MLB teams, all of the RSNs primarily owned by Comcast, DIRECTV, and 21st Century Fox.[6] If MLB is unable to enter into an IMS deal with these RSNs by the start of the 2017 season, the MLB.TV packages prices (including single-club packages) will be frozen and will not be allowed to increase for the following four years.

Collectively, these benefits provide Class members with increased choices for viewing baseball games including an unbundled package, in-market streaming, the Follow Your Team product, and relief to unserved fans, all of which, combined, reflect significant relief for consumers.

The Agreement provides for additional relief by reducing prices. Under the Agreement, MLB must lower full-season prices for the 2016 MLB.TV season by $20.00 relative to the 2015 season. This discount, coupled with the approximately 35% discount for the single-team package versus the announced 2016 league-wide package price, will provide substantially less expensive options. A class member will be able to pay just $109.99 for a full season of a league-wide package with home-and-away telecasts, $119.99 for the Follow Your Team product, or $84.99 for the single-team package, where formerly the only choices were the league-wide offerings

---

[6] MLB previously announced an agreement with the 21st Century Fox RSNs to offer in-market streaming. *See* http://m.mlb.com/news/article/157696528/mlb-to-expand-safety-nets-in-market-streaming.

including the $129.99 "Premium" bundle, which the vast majority of MLB.TV subscribers

purchased.[7] Unlike the *Laumann* settlement, this Agreement guarantees price relief for five years,

as MLB can raise prices by only 3% per year (or COLA, if higher in a given year), and cannot

raise prices at all if it does not obtain agreements for in-market streaming with at least 24 teams

in the United States by the start of the 2017 season. For the 2016 and 2017 seasons, both

Comcast and DIRECTV will provide the full season of MLB's Extra Innings product at a 12.5%

discount from the 2015 price.[8]

      Under very conservative assumptions, assuming no increase in subscribers, the settlement

is several times the value of the *Laumann* agreement.

      **C**.    **Class Notice**

      The parties have negotiated an effective notice plan. *See* Agreement, Ex. B.

      With respect to Internet purchasers, the Agreement provides for MLB to provide notice to

the class and to pay for the administration of the settlement. MLB will provide direct email

notice of the settlement to all MLB.TV subscribers at the email address associated with their

MLB.TV account. In addition, MLB will give reasonable publicity to the new single-team

packages.

      With respect to Extra Innings purchasers, the MVPD Defendants will also assume the

cost of notice to the class and administration of the settlement. Agreement ¶ 76. Class members

who purchased Extra Innings from DIRECTV will be provided with notice by either email (if the

---

[7] MLB previously offered a "Basic" version for $109.99, which did not include the telecasts of the visiting team, meaning that consumers had access to only about half of their favorite teams' telecasts. MLB.TV Basic also did not permit viewing on many devices. Only a small percentage of consumers chose this option. Now, consumers will be able to purchase the equivalent of the full Premium version for the same price they would have paid for Basic previously.

[8] In addition to the benefit of having 30 more choices, each person who opts for a single-team package will save approximately $45 in the first year relative to price of MLB.TV Premium, and $25 relative to the price of MLB.TV Basic.

email address of the subscriber is available) or first-class mail. Class members who purchased Extra Innings from Comcast during the 2015 season and who currently subscribe to Comcast will be provided with notice via first-class mail. Agreement, Ex. B. The Agreement allows for postal notice to be inserted into the class member's monthly billing statement. *Id.*[9] Defendants will also provide publication notice of the settlement via various online media outlets through a targeted campaign designed to deliver more than 40 million impressions over a 30-day period. *Id.* In addition, MLB will include a "top-of-page" alert on its primary webpage as well as on the webpage for MLB.TV subscribers.

### D. Attorneys' Fees, Costs, and Service Payments

The Agreement also provides for the payment of Attorneys' Fees and Costs, as well as Service Payments. The Agreement allows the Plaintiffs to seek Court approval for up to $16.5 million in attorneys' fees and costs. Agreement at § VI. This is not a common fund settlement. The fees and costs are separate from the relief afforded to members of the class and were negotiated only after the parties had agreed on the material terms of the relief to the class. *See* Langer Dec. ¶ 14.

In addition, the Agreement provides that Plaintiffs will seek Service Payments of $10,000 each for the named plaintiffs. The Defendants have agreed to pay each of these amounts, to the extent that they are awarded by the Court. These awards cannot in any way reduce the value conferred on the Class under the Settlement.[10]

---

[9] Where the Agreement provides for notice by email by DIRECTV, it also requires DIRECTV, in certain circumstances, to mail written notice to the last known postal address of Class members where the email is returned as undeliverable. Agreement, Exhibit B ¶¶ 14-16.

[10] Plaintiffs will move the Court for approval of these awards separately, well in advance of the proposed Final Approval Hearing, in order to provide ample notice to the Class of the substance of these requests and the rationale underlying them in advance of the Fairness Hearing.

### E.     Release

The Agreement provides for a release of all claims for relief that have been or could have been asserted based on the facts alleged in the Complaint, including claims for damages. Agreement at § IX. Further, the Agreement provides for class members to release claims based upon the conduct adopted pursuant to this settlement, during the period between its implementation and the five-year sunset provision. *Id.* Class members who wish to pursue retrospective claims for damages are permitted to exclude themselves from the settlement for that purpose. Given that this is a settlement of an injunctive class under Rule 23(b)(2), class members may not opt out of the practice changes set forth in the settlement.

## IV.    THE COURT SHOULD PRELIMINARILY APPROVE THE SETTLEMENT AGREEMENT

### A.     Legal Standard

"Preliminary approval of a class action settlement proposal 'is at most a determination that there is what might be termed 'probable cause' to submit the [settlement] proposal to class members and hold a full-scale hearing as to its fairness.'" *Authors Guild v. Google, Inc*. No. 05 Civ. 8136, 2009 WL 4434586 at *1 (S.D.N.Y. Dec. 1, 2009) (quoting *In re Traffic Executive Assoc.,* 627 F.2d 631, 634 (2d Cir.1980)). Ultimately, the Court must decide whether the compromise is fair, reasonable and adequate. *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982). As a first step, preliminary approval is "appropriate where … there are no grounds to doubt its fairness and no other obvious deficiencies (such as unduly preferential treatment of class representatives … or excessive compensation for attorneys), and where the settlement appears to fall within the range of possible approval." *In re Herald, Primeo, and Thema Sec. Litig.*, No. 09 Civ. 289 (RMB), 2011 WL 4351492 at *4 (S.D.N.Y. Sept. 15, 2011) (citing Manual for Complex Litig. § 30.41).

### B.      The Compromise is Fair, Reasonable and Adequate

The Court may attach a strong, initial presumption of fairness where "the Settlement was reached by experienced counsel after extensive arm's length negotiations." *Van Oss v. New York*, No. 10-Civ-7525-SAS, 2012 WL 2550959 at *1 (S.D.N.Y. July 2, 2012). Where "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval, preliminary approval is granted." *In re Initial Public Offering Sec. Litig.*, 226 F.R.D. 186, 191 (S.D.N.Y. 2005) (citation omitted) ("*IPO*").

This settlement brings significant relief to Class members, expanding the choices available to them. The settlement is a compromise—as all settlements are—and does not accomplish everything Plaintiffs set out to accomplish. But the benefits to be afforded class members, which include benefits like those in the *Laumann* settlement, but greater in scope, as well as other important new options to consumers, are fair, reasonable and adequate, and the Agreement easily exceeds the standard for preliminary approval.

### 1.      *Non-Collusive Negotiations*

The Agreement is the "product of serious, informed, non-collusive negotiations." *IPO*, 226 F.R.D. at 191. As recounted at length above, this is mature litigation in which the Parties were fully apprised of the strengths and weaknesses of their respective claims and defenses at the time they decided to explore settlement. Discovery yielded a full evidentiary record on which the Court based its summary judgment and class certification rulings.

Moreover, the parties negotiated until only days before a bench trial was set to begin, while simultaneously preparing to face each other in court. These negotiations were exhaustive,

characterized by fierce advocacy on both sides, conducted at arm's length, in good faith, and wholly free from collusion. *See* Langer Dec. at ¶¶ 2-14. Experienced counsel struck the compromise embodied by the Agreement, and therefore it should be afforded a strong, initial presumption of fairness, warranting preliminary approval. *Van Oss*, 2012 WL 2550959 at *1.

2.      *No Preferential Treatment*

The Agreement does not improperly grant preferential treatment to class representatives or segments of the class. The settlement benefits are available across the class without preference or segregation for the class representatives or any other class member.

Among the various aspects of the Agreement's relief, only the service payments proposed for each of the named plaintiffs do not apply equally to all class members. Such payments are routinely awarded in class settlements in order to recognize the risk undertaken and effort expended by class representatives on behalf of the class. *See Velez v. Novartis Pharm. Corp.*, No. 04-Civ.-09194, 2010 WL 4877852 at *24 (S.D.N.Y. Nov. 30, 2010) ("Incentive awards have been awarded to individual class members in a variety of contexts, including employment discrimination suits, antitrust cases and consumer fraud suits.") In this case, they are particularly appropriate, given that the named plaintiffs produced discovery, sat for depositions, and prepared for potential trial testimony. The amount sought is the same as the amount the Court awarded the class representatives in *Laumann*. As a whole, the uniform treatment of all class members under the Agreement warrants a presumption of fairness and preliminary approval.

3.      *The Settlement Is Within the Range of Possible Approval*

The settlement achieves substantially more than what the Plaintiffs were able to obtain in the *Laumann* settlement. It addresses an injury "every class member has suffered" by being "deprived of an option—a la carte channels—that would have been available absent the

14

territorial restraints." Class Cert. Order, 2015 WL 2330107, at *11. By providing an option to purchase a single-team broadcast package, a new "Follow Your Team" product, in-market streaming, and benefits to unserved fans, the Agreement directly addresses Plaintiffs' alleged classwide injury.[11]

The Agreement also lowers prices. Comcast and DIRECTV have agreed to provide Extra Innings at a reduced price to all of their subscribers for the next two years, and MLB has agreed to strict price limits for the next five years. The settlement thus achieves substantial benefits that clear the bar of fair, reasonable and adequate. To be sure, the agreement does not represent everything sought by Plaintiffs, but that is the nature of a compromise. The substantial benefits directly addressing many of the core harms Plaintiffs allege make the settlement more than adequate, and bring about unprecedented options never before available to consumers of baseball telecasts.

Further, the Agreement provides for an effective plan of notice that should be approved. When considering a class action settlement, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." *In re Bank of Am. Corp. Sec., Derivative, and Emp. Ret. Income Sec. Act (ERISA) Litig.*, 772 F.3d 125, 132 (2d Cir. 2014). "The yardstick against which we measure the sufficiency of notices in class action proceedings is one of reasonableness." *Id.*

The Agreement requires Defendants to provide notice of the settlement. Specifically, and as described above, MLB must provide direct email notice to MLB.TV subscribers at the email

---

[11] While Comcast and DIRECTV have not guaranteed that they will provide that option themselves, every Class member—no matter which Defendant they purchased from—will be able to purchase a single-team package over the Internet from MLB. This package can be watched on a TV through a wide variety of methods, including low-cost devices such as the Roku or Apple TV.

address associated with their MLB.TV account and give the new single-team packages reasonable publicity, including prominently offering those packages as alternatives to the league-wide package at each point of sale. The MVPD Defendants will provide notice to their current Extra Innings customers. Class members who purchased Extra Innings from DIRECTV will be provided with notice by either email (if the email address of the subscriber is available) or first-class mail. Class members who purchased Extra Innings from Comcast during the 2015 season and who currently subscribe to Comcast will be provided with notice via first-class mail. *See* Agreement, Exhibit B (Plan of Notice).[12] The Defendants will also provide publication notice via a targeted Internet campaign. The campaign will provide publication notice of the settlement via various online media outlets that will include links and banner ads on sports-related and baseball-related websites, and is estimated to deliver more than 40 million impressions over a 30-day period. *Id.*

Such notice will facilitate the Court's "responsibility to protect members of the class who have had no opportunity to protect themselves" by "fairly appris[ing] the … members of the class of the terms of the proposed settlement." *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exchange*, 660 F.2d 9, 20-21 (2d Cir. 1981) (internal citations and quotations omitted). The proposed notice explains the settlement benefits and includes an Appendix reciting the language of the release verbatim. As the Second Circuit has held, "due process requires [no] further explanation of the effects of the release provision in addition to the clear meaning of the words of the release." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005).

---

[12] DIRECTV will notice all of its customers directly. Comcast will provide direct notice to current Extra Innings subscribers, and will provide publication notice to reach former subscribers.

## V.     CONCLUSION

For the reasons set forth above, the Plaintiffs' motion should be granted and the Court should set deadlines for notice, claims, exclusions, objections, and a date for fairness hearing under Rule 23 by entering the Proposed Order.

January 20, 2016                                    Respectfully Submitted,

                                                    */s/ Howard Langer*
                                                    Edward Diver
                                                    Howard Langer
                                                    Peter Leckman
                                                    LANGER, GROGAN & DIVER, P.C.
                                                    1717 Arch Street, Suite 4130
                                                    Philadelphia, PA 19103
                                                    Telephone: (215) 320-5660

                                                    *Lead Class Counsel*